SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
Jay M. Goffman
Four Times Square
New York, New York 10036
(212) 735-3000

Nick P. Saggese
Rick C. Madden
Glenn S. Walter
300 South Grand Avenue
Suite 3400
Los Angeles, California 90071
(213) 687-5000

and

KLEE, TUCHIN, BOGDANOFF & STERN LLP
Kenneth N. Klee
Michael L. Tuchin
1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, California 90067
(310) 407-4000

Proposed Counsel for Debtors and
 Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------- x
                                  :
In re:                            : Chapter 11
                                  :
METRO-GOLDWYN-MAYER STUDIOS       : Case No. 10-15774 (SMB)
INC., et al.,                     :
                                  :
           Debtors.               : (Motion for Joint Administration Pending)
                                  :
--------------------------------- x

**DECLARATION OF STEPHEN F. COOPER PURSUANT TO
LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF CHAPTER 11
PETITIONS AND VARIOUS FIRST-DAY APPLICATIONS AND MOTIONS**

I, Stephen F. Cooper, declare as follows under penalty of perjury:

1. I am a member of the Office of the Chief Executive Officer (the "Office of the CEO") of MGM Holdings Inc. ("Holdings"), a corporation organized under the laws of the state of Delaware and an affiliate of the other debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors").[1] I have held the title of member of the Office of the CEO since August 12, 2009. I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") and in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) "first-day" motions and applications, which are being filed concurrently herewith (collectively, the "First-Day Pleadings"). I am authorized by each of the Debtors to submit this Declaration in support of the Debtors' chapter 11 petitions and the First-Day Pleadings described herein.[2]

2. In my capacity as a member of the Office of the CEO, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs, and books and records. As reflected in the summary of my qualifications attached hereto as Exhibit I, I have more than 30 years of experience as a financial advisor. My recent engagements include serving as an independent member of the supervisory board of LyondellBasell Industries and chairman of its restructuring committee. I also recently served as the CEO of Hawaiian Telcom and provided management services to American Home Mortgage. Other recent engagements include serving as executive chairman of Blue Bird, a leading bus manufacturer that successfully pursued a prepackaged bankruptcy case, and chairman of the board of auto supplier Collins & Aikman. In

---

[1] The names of the Debtors in these cases, which the Debtors are separately seeking to have jointly administered, are identified on Exhibit A hereto.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the relevant First-Day Pleading or the Plan (defined below).

2005, I was CEO of Krispy Kreme Doughnuts; from 2002-2005 I served as CEO and CRO of Enron.

3. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; my review of the Debtors' books and records, as well as other relevant documents; my discussions with other members of the Debtors' management team; my opinion based upon my experience, expertise, and knowledge of the Debtors' operations and financial condition; and/or information and materials that the Debtors' personnel and advisors have supplied to me. In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

4. Section I of this Declaration provides an overview of the Debtors' businesses and operations. Section II of the Declaration describes the Debtors' corporate and capital structures. Section III describes the developments that led to the Debtors' filings for relief under chapter 11 of the Bankruptcy Code. Section IV sets forth the First-Day Pleadings and proposed First-Day Orders that I have reviewed and with respect to which I am prepared to testify. Finally, Section V sets forth the specific information required under Local Bankruptcy Rule 1007-2.

I. THE DEBTORS' BUSINESS AND OPERATIONS

A. The Chapter 11 Cases

5. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

6. On the Petition Date, the Debtors filed with the Court, among other things, (a) a joint prepackaged plan of reorganization (the "Plan") and (b) a disclosure statement related thereto (the "Disclosure Statement"). The Plan provides for the payment in full of all allowed general unsecured claims against the Debtors.

**B. Overview of the Debtors' Businesses**

7. Metro-Goldwyn-Mayer Studios Inc. ("MGM Studios") along with its Debtor and non-Debtor affiliates (collectively, the "Company" or "MGM") is a filmed entertainment company, with one of the world's largest film and television libraries and a group of important content franchises. MGM is engaged primarily in the development, production, and worldwide distribution of feature films, television programming, interactive media, music, and licensed merchandise.

8. MGM's film and television library (the "MGM Library") contains approximately 4,100 theatrically released feature film titles and approximately 10,800 television episodes. MGM currently owns one of the largest modern (post-1948) collections of feature films in the world, comprised of the post-1985 MGM library, and the historic United Artists, Orion Pictures, and Polygram film libraries. Films in the MGM Library have won over 200 Academy Awards®, including 15 Best Picture Awards. The MGM Library also contains rights to many iconic film and television franchises, including 24 titles in the *James Bond* film franchise, six titles in the *Rocky* film franchise, and, with respect to the *Stargate* franchise, one film, two direct-to-video titles, and several television series, including *Stargate SG-1*, the longest-running science-fiction series in U.S. television history.

## II. THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

### B. Corporate Structure

9. The ultimate parent of the MGM family of companies is Holdings, a Debtor and debtor in possession in these cases. Holdings directly or indirectly holds 100% of the equity interests in all of the other Debtors in these chapter 11 cases. The Debtors do not include (a) the Debtors' foreign subsidiaries, (b) joint ventures, or (c) bankruptcy-remote special-purpose entities.

### C. The Debtors' Assets and Liabilities

10. As of September 30, 2010, the Debtors' unaudited consolidated financial statements, as prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial statements, included $2,673,772,000 in total assets and $3,451,493,000 in total liabilities. Excluding certain adjustments made by the Company in accordance with GAAP, the Debtors' total outstanding liabilities would be $5,766,721,000, which includes the total face value of outstanding principal and accrued, but unpaid, interest under the Credit Agreement (as defined below) and interest rate swap agreements.

### D. Prepetition Capital Structure

(a) **MGM Credit Facility.**

11. On April 8, 2005, MGM Holdings II Inc. ("Holdings II") and Metro-Goldwyn-Mayer Inc. ("MGM Inc.") entered into a credit agreement (the "Credit Agreement" and, the credit facility provided thereunder, the "MGM Credit Facility") with the lenders that are parties thereto, Bank of America, N.A., Citicorp USA, Inc. and The Royal Bank of Scotland PLC, as documentation agents, Credit Suisse First Boston, as syndication agent, and JPMorgan Chase Bank, N.A., as administrative agent. The Credit Agreement provided for a revolving credit facility and term loans. Holdings II and several of its direct and indirect subsidiaries

(collectively, including Holdings II, the "Guarantors") guaranteed the obligations under the Credit Agreement. The MGM Credit Facility is secured by substantially all of the assets of MGM Inc. and the Guarantors, including perfected first-priority security interests in the capital stock and, subject to certain exceptions, substantially all other tangible and intangible assets of MGM Inc. and the Guarantors.[3]

12. Under the Plan, claims under the Credit Agreement will be converted into approximately 95.3% of the equity in Holdings, as reorganized ("Reorganized Holdings"). As of the Petition Date, approximately $3.918 billion was outstanding under the MGM Credit Facility, plus accrued but unpaid interest, fees, and other charges, and approximately $95 million in related swap obligations, plus accrued but unpaid interest, was also outstanding.

**(b)  United Artist Entertainment Credit Facility.**

13. MGM Studios own a 62.5% stake in United Artists Entertainment, LLC ("United Artists Entertainment," and, together with its subsidiaries, "New United Artists"), which is not a Debtor herein. United Artists Entertainment was formed to develop and create new theatrically released films under the New United Artists banner. New United Artists, in part, funded production for films produced under the New United Artists banner under independent financing arrangements. Under a Master Distribution Agreement dated August 16, 2007, MGM Studios is the exclusive distributor of eligible pictures with respect to which New United Artists owns or has acquired distribution, marketing, and promotion rights.

14. Specifically, on August 16, 2007, United Artists Entertainment, through its wholly owned subsidiary, UAPF, entered into (a) a Credit and Security Agreement (the

---

[3] The Company is prohibited by contract from encumbering certain assets, such as certain assets relating to the *James Bond* franchise.

"UAPF Credit Agreement") with certain lenders and others, and (b) a Note Purchase and Security Agreement (the "UAPF Note Purchase Agreement") with certain lenders and others.

15. To secure MGM Studios's performance of certain obligations under the Master Distribution Agreement, including its obligations to make payments to UAPF, MGM Studios and certain of its subsidiaries granted UAPF a security interest in their rights, title, and interest in and to certain collateral relating to licensed pictures.

**(c)** **P&A Facility.**

16. On September 19, 2006, MGM Studios and certain of its distribution subsidiaries entered into a Revenue Participation Agreement (as amended, supplemented or modified from time to time, including, without limitation, pursuant to that certain Confirmation Agreement, dated as of October 13, 2010 (the "Confirmation Agreement"), among DDI (as defined below), MGM Studios, and the P&A Agent (as defined below), and, collectively with all related loan and other documents as identified therein (other than the DDI Credit Agreement (as defined below), the "Revenue Participation Agreement") with Domestic Distribution Inc. ("DDI"). Under the Revenue Participation Agreement, MGM commits to offer to sell to DDI revenue participations in certain qualifying pictures in exchange for a purchase price that is tied in large part to MGM Studio's domestic print and advertising costs for such picture. DDI, in turn, commits to pay the purchase price for such revenue participations; however, such commitment is limited to the amount of DDI's availability under the P&A Facility (as defined below).

17. DDI funds its obligations under the Revenue Participation Agreement by borrowings under a credit agreement (as amended, supplemented or modified from time to time, including, without limitation, pursuant to the Confirmation Agreement, the "P&A Credit Agreement") among DDI, as borrower, JP Morgan Chase Bank, N.A., as administrative agent (the "P&A Agent"), and the lenders party thereto, which credit agreement provides DDI with a

7

revolving credit facility (the "P&A Facility"), under which approximately $43.8 million was outstanding as of October 15, 2010. The proceeds of the P&A Facility are to be used by DDI to purchase revenue participations under the Revenue Participation Agreement. Pursuant to the P&A Credit Agreement and to that certain Assignment Agreement, dated as of September 19, 2006, by and among MGM Studios, DDI and the P&A Agent, the P&A Facility is secured by all of the assets of DDI, including all of DDI's rights in and to the Revenue Participation Agreement as well as a collateral assignment of the security interest in all qualified pictures granted by the Debtors to DDI in the Revenue Participation Agreement.

### III. THE CHAPTER 11 FILINGS

#### A. Events Leading to the Filing of the Chapter 11 Cases

18. The revolving facility under the MGM Credit Agreement matured in April 2010 and material amortization of the term loan was scheduled to begin in June 2011.

19. In April 2009 the Company retained Moelis & Company ("Moelis"), as financial advisor, to assist it in exploring strategic alternatives in light of, among other things, the approaching April 2010 maturity of the revolving facility under the Credit Agreement. Shortly thereafter, a steering committee (the "Steering Committee") of certain lenders under the Credit Agreement was formed in connection with a potential restructuring of the Debtors' obligations under the Credit Agreement, and the Company and the Steering Committee commenced discussions regarding potential alternatives. I am informed that the Steering Committee represents lenders whose collective holdings would allow the Steering Committee to block acceptance of any reorganization plan by the class of lenders under the Credit Agreement.

20. Through a combination of industry-wide pressures and Company-specific issues, it eventually became evident to the Company that the value of the Company would not

support a refinancing of the revolving facility on maturity. Therefore, the Company ultimately determined that a balance sheet restructuring was the only viable alternative for the Company to continue to operate as a going concern.

21. In August 2009, the Debtors engaged me to serve as Vice Chairman (which position is not a position on the Board of Directors of the Debtors) and as a member of the Office of the CEO. The Debtors also engaged additional individuals and firms to provide management services as the Debtors explored their restructuring options.

22. In September 2009, the Company requested, among other things, an extension under the Credit Agreement of the time for payment of interest, letter-of-credit participation fees, and swap-termination payments that otherwise would be due and payable from and including September 30, 2009 to December 15, 2009. On September 30, 2009, the parties to the Credit Agreement entered into a forbearance agreement that granted such extensions. Thereafter, the Company requested and continued to receive additional extensions of the forbearance period from time to time.

23. Starting in September 2009, the Debtors, by and through a Capital Structure Committee of Holdings' Board of Directors ("CSC"), began working with Moelis to draft a confidential information memorandum ("CIM") regarding a potential sale of the Company. In this regard, the Debtors, along with Moelis (in consultation with the Steering Committee's advisors), prepared a potential-buyers list and Moelis reached out to numerous potentially interested parties to gauge interest. Beginning in December 2009, Moelis began delivering CIMs to eighteen potential buyers and their respective advisors following execution of confidentiality agreements. These potential buyers and their advisors were also granted access to a virtual data room.

24. In January 2010, the Debtors received non-binding indications of interest from eight parties. Following such indications of interest, the Debtors, working with Moelis and the Steering Committee's advisors, invited six of these parties to participate in a second round of bidding. The parties' indications of interests were evaluated based primarily on long-term value to the Company's stakeholders, the proposed structure, the perceived ability of each party to consummate a transaction on a timely basis, and the ability to obtain the requisite secured-lender support for the transaction.

25. During the second round, bidders were granted access to both physical and virtual data rooms. The Debtors also invited bidders to management presentations to discuss the Company's business. Bidders were later invited to follow-up diligence sessions with the Company's management to address questions following the management presentation, as well as questions resulting from the review of documents in the data rooms.

26. Following the second round, three parties submitted non-binding bid letters by the end of March 2010, subject to, among other things, continued due diligence and the negotiation of definitive documents. The Steering Committee informed the Debtors that the Steering Committee's members would not support a plan of reorganization embodying a transaction based upon these bids. As a result, the Debtors did not accept any of the bids. The Steering Committee then requested that the Debtors present their business plan that assumed a stand-alone plan of reorganization. In early April 2010, the Debtors presented such a business plan to the Steering Committee. I am informed that, later that month, the Steering Committee elected to meet with certain industry experts, with the Company's consent, to inform the Steering Committee's perspectives on such a stand-alone plan, and that an informal committee consisting of certain members of the Steering Committee (the "Subcommittee") was formed to discuss this

plan with experts and to consider additional alternatives. I am informed and believe that, during April and May of 2010, the Subcommittee met with numerous industry experts and potential partners to discuss their perspectives on MGM and potential alternatives for a reorganization of the Company. I am further informed and believe that, during the months of June and July of 2010, the discussions narrowed to Spyglass Entertainment Holdings, LLC ("Spyglass") and a handful of other parties.

27. Ultimately, the Steering Committee advised the Debtors that it supported moving forward with a proposal by Spyglass and the C/G Stockholders (as defined below). After analyzing the proposed transaction, weighing the relative benefits and costs of such transaction against the transactions proposed by other parties, and considering the viability of any other alternatives, the Debtors, after consultation with their advisors, determined that the Spyglass transaction was the best alternative available to the Debtors under the circumstances. The Subcommittee (in consultation with the Steering Committee) and the Debtors negotiated a non-binding letter of intent with Spyglass and the stockholders of Cypress Entertainment Group, Inc and Garoge, Inc (together, the "C/G Stockholders"), which was executed by the parties thereto. Thereafter, the Company, Spyglass, and the C/G Stockholders negotiated definitive documentation.

**B.     The Proposed Prepackaged Plan of Reorganization**

28. Concurrently herewith, the Debtors have filed the Plan and accompanying Disclosure Statement. The primary purpose of the Plan is to implement the restructuring of the Debtors' liabilities in a manner designed to maximize recovery to all stakeholders and to enhance the financial viability of the Debtors, as reorganized (the "Reorganized Debtors").

29. I believe that, through the Plan, holders of claims will obtain a substantially greater recovery from the estates than would be available under a traditional, non-prepackaged chapter 11 reorganization plan or a liquidation under chapter 7. The Debtors further believe that the Plan, if consummated, will substantially enhance the Company's capital structure and liquidity position, afford the Company the opportunity to continue its businesses as viable going concerns and to execute its broad business restructuring strategy, and preserve ongoing employment for the majority of the Company's employees.

30. Generally, the Plan provides for a balance sheet restructuring whereby existing equity in Holdings will be cancelled and approximately $5 billion of claims under the Credit Agreement will be converted into 100% of the equity in reorganized Holdings, less any New Common Stock issued to Spyglass and C/G in exchange for the contribution of assets.[4] Under the Plan, Gary Barber and Roger Birnbaum, the co-founders of Spyglass, will be appointed as co-chief executive officer of reorganized Holdings. C/G are entities affiliated with Messrs. Barber and Birnbaum.

31. On October 7, 2010, the Debtors commenced their solicitation (the "Solicitation") of acceptances of the Plan by disseminating the Disclosure Statement, the Plan, and ballots to holders of claims against the Debtors that are impaired under the Plan, and, thus, entitled to vote on the Plan. The Debtors established October 22, 2010 as the deadline for receipt of ballots accepting or rejecting the Plan, which deadline was subsequently extended to October 29, 2010 (as extended, the "Voting Deadline").

---

[4] As set forth below, certain significant Holders of Credit Agreement Claims and the Debtors (subject to certain conditions) agreed to certain proposed amendments to the Transaction Documents, which are exhibits to the Plan. If such amendments are implemented, C/G's assets will not be acquired (by way of merger or otherwise) by the reorganized Debtors and no New Common Stock (as defined in the Plan) will be issued to Cypress or Garoge.

32.     I understand that, after the Voting Deadline, Donlin, Recano & Company, Inc. ("Donlin Recano"), the Debtors' voting agent, tabulated the votes reflected in the ballots timely received by the Voting Deadline.  At that time, as set forth in the declaration of Jung (JW) W. Song, Esq. of Donlin Recano, the requisite number of votes accepting the Plan had been received.

33.     After the Solicitation, certain significant Holders of Credit Agreement Claims and the Debtors negotiated proposed amendments (the "Plan Modifications") to the Investment Agreement, the Stockholders Agreement and the other applicable Transaction Documents that provide, among other things, for certain modifications to corporate governance provisions and that C/G would not contribute assets to the reorganized Debtors and will not receive New Common Stock.  Whether the Plan Modifications are approved or not, all allowed creditors' claims (except for Credit Agreement Claims) will be paid in full.

## IV.    FIRST-DAY MOTIONS AND ORDERS

34.     Concurrently with the filing of their chapter 11 petitions, the Debtors are seeking orders approving the First-Day Pleadings (collectively, the "First-Day Orders").  The Debtors request that each of the proposed First-Day Orders be entered, as each is integral to maximizing the value of these estates for the benefit of parties in interest.  A list of the First-Day Pleadings is attached hereto as Exhibit B.

35.     In connection with the preparation of these bankruptcy cases, I have reviewed the following First-Day Pleadings (including the exhibits thereto):

36.     The facts set forth in these First-Day Pleadings are true and correct to the best of my knowledge, information, and belief, and based upon the information supplied or

verified by various employees of the Debtors.[5] As set forth more fully below, I believe that the entry of the proposed First-Day Orders granting the relief requested in these First-Day Pleadings is critical to the Debtors' ability to preserve the value of their estates.

**V. INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2**

37. Local Bankruptcy Rule 1007-2 requires that the Debtors provide certain information, which is set forth below.

38. As required under Local Rule 1007-2(a)(3), <u>Exhibit C</u> lists the names and addresses of the members of, and attorneys for, the committees organized prior to the order for relief in these chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee and the date of formation is set forth in Section III.A.

39. As required under Local Bankruptcy Rule 1007-2(a)(4), <u>Exhibit D</u> lists the following information with respect to each of the holders of the Debtors' fifty (50) largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with the Debtors' accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured. In each case, the claim amounts listed on <u>Exhibit D</u> are estimated and subject to verification. In addition, the Debtors reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

40. As required under Local Bankruptcy Rule 1007-2(a)(5), <u>Exhibit E</u> provides the following information with respect to each of the holders of the five (5) largest

---

[5] Contemporaneously herewith, the Debtors are filing the Declaration of Steve Hendry, Senior Executive Vice President, Finance, in support of certain of the First-Day Pleadings as identified on Exhibit C.

secured claims against the Debtors on a consolidated basis: the creditor's name and address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the amount of the claim, a brief description of the claim, an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed. In each case, the claim amounts and collateral values listed on Exhibit E are estimated and subject to verification. In addition, the Debtors reserve their rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

41. As required under Local Bankruptcy Rule 1007-2(a)(6), the Debtors submit that as of September 30, 2010, the Debtors' unaudited consolidated financial statements, as prepared in accordance with GAAP for interim financial statements, included $2,673,772,000 in total assets and $3,451,493,000 in total liabilities. Excluding certain adjustments made by the Company in accordance with GAAP, the Debtors' total outstanding liabilities would be $5,766,721,000, which includes the total face value of outstanding principal and accrued, but unpaid, interest under the Credit Agreement and interest rate swap agreements.

42. As required under Local Bankruptcy Rule 1007-2(a)(7), to the best of the Debtors' knowledge and belief, the Debtors do not have any shares of stock, debentures, or other securities that are publicly held.

43. As required under Local Bankruptcy Rule 1007-2(a)(8), to the best of the Debtors' knowledge and belief, the Debtors do not have property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

44. As required under Local Bankruptcy Rule 1007-2(a)(9), Exhibit F provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

45. As required under Local Bankruptcy Rule 1007-2(a)(10), Exhibit G provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

46. As required under Local Bankruptcy Rule 1007-2(a)(11), to the best of the Debtors' knowledge and belief, there are no actions or proceedings, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of the Debtors' property may be imminent.

47. As required under Local Bankruptcy Rule 1007-2(a)(12), Exhibit H provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

48. As required under Local Bankruptcy Rule 1007-2(b)(1)-(2), the estimated amount, on a consolidated basis, to be paid to the Debtors' employees (not including officers, directors, and stockholders) for the 30-day period following the filing of the Debtors' chapter 11 petitions is $1,398,998.78 and the estimated amount, on a consolidated basis, to be paid to the Debtors' officers, stockholders, and directors for that same period is $1,750,334.52. Furthermore, the Debtors have budgeted between approximately $1.9 and $3.1 million for advisory fees related to restructuring costs for the thirty day period after the Petition Date. Such amount includes estimates for the fees and expenses of the Debtors' bankruptcy professionals as well as

professional fees and expenses that the Debtors will pay as a form of adequate protection to certain of their secured lenders.  This amount excludes ordinary course professional payments

49. As required under Local Bankruptcy Rule 1007-2(b)(3), <u>Exhibit J</u>, the Debtors' cash collateral budget, provides a list of estimated cash receipts and disbursements, and net cash gain or loss other than professional fees, on a consolidated basis for the 30-day period following the Petition Date.  The Debtors do not believe that they will accrue material obligations or receivables during such 30-day period that will not be satisfied in the ordinary course of business.

## VI. CONCLUSION

Accordingly, for the reasons stated herein and in each of the First-Day Pleadings, the Debtors request that the relief sought in the First-Day Pleadings be approved.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: November 3, 2010

METRO-GOLDWYN-MAYER
STUDIOS INC., et al.
Debtors and Debtors in Possession

*/s/ Stephen F. Cooper*
Stephen F. Cooper
Member of the Office of the Chief
Executive Officer