Metro-Goldwyn-Mayer Studios Inc. and certain of its affiliates (collectively, the "Debtors") are sending you this disclosure statement (the "Disclosure Statement") because you may be a creditor entitled to vote on the Joint Prepackaged Plan of Reorganization of Metro-Goldwyn-Mayer Studios Inc. and certain of its Affiliates (the "Plan"). This solicitation (the "Solicitation") of votes is being conducted to obtain sufficient acceptances of the Plan *prior* to the filing of voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). If sufficient votes to obtain confirmation of the Plan are received and certain other conditions are met, the Debtors intend to file voluntary cases under chapter 11 of the Bankruptcy Code to implement the Plan. Because no chapter 11 cases have yet been commenced, this Disclosure Statement has not been approved by any Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. Following the commencement of their chapter 11 cases, the Debtors expect to seek promptly an order of the Bankruptcy Court (1) approving (a) this Disclosure Statement as having contained "adequate information" and (b) the Solicitation as having been in compliance with Section 1125(b) of the Bankruptcy Code, and (2) confirming the Plan described herein.

# DISCLOSURE STATEMENT

## DATED OCTOBER 7, 2010

### PREPETITION SOLICITATION OF VOTES
### WITH RESPECT TO JOINT PREPACKAGED PLAN OF REORGANIZATION

### OF

# METRO-GOLDWYN-MAYER STUDIOS INC. AND CERTAIN OF ITS AFFILIATES

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court, and the securities to be issued on or after the Effective Date (as defined below) are not the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue Sky Law"). The Debtors are relying on section 4(2) of the Securities Act and similar provisions of state securities law, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of new securities in connection with the Solicitation and the Plan.

Each holder of a Credit Agreement Claim (as defined in the Plan) or authorized signatory for the beneficial owner of a Credit Agreement Claim will be required to certify on its Ballot whether such holder or beneficial owner is an Accredited Investor, as that term is defined by Rule 501 of Regulation D of the Securities Act.

The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell, or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement and the information set forth herein are confidential. This Disclosure Statement contains material non-public information concerning the Debtors, their subsidiaries, and their respective securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"), and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any person, under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

---

THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF METRO-GOLDWYN-MAYER STUDIOS INC. AND CERTAIN OF ITS AFFILIATES IS 5:00 P.M. PREVAILING EASTERN TIME ON OCTOBER 22, 2010, UNLESS EXTENDED BY THE DEBTORS (THE "VOTING DEADLINE"). THE RECORD DATE FOR DETERMINING WHETHER A HOLDER OF AN IMPAIRED CLAIM IS ENTITLED TO VOTE ON THE PLAN IS OCTOBER 4, 2010 (THE "VOTING RECORD DATE").

---

THE DEBTORS ARE FURNISHING THIS DISCLOSURE STATEMENT TO EACH MEMBER OF AN IMPAIRED CLASS UNDER THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF METRO-GOLDWYN-MAYER STUDIOS INC. AND CERTAIN OF ITS AFFILIATES. THIS DISCLOSURE STATEMENT IS TO BE USED BY EACH RECIPIENT SOLELY IN CONNECTION WITH HIS, HER, OR ITS EVALUATION OF THE PLAN, AND USE OF THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. WITHOUT THE PRIOR WRITTEN CONSENT OF THE DEBTORS, THIS DISCLOSURE STATEMENT MAY NOT BE REPRODUCED OR PROVIDED TO OTHERS (OTHER THAN THOSE ADVISORS OF ANY RECIPIENT OF THIS DISCLOSURE STATEMENT WHO MAY REVIEW THE INFORMATION CONTAINED HEREIN TO ASSIST SUCH RECIPIENT IN HIS, HER, OR ITS EVALUATION OF THE PLAN).

---

Prepared by:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Jay M. Goffman

300 South Grand Avenue
Suite 3400
Los Angeles, California 90071
(213) 687-5000
Nick P. Saggese
Rick C. Madden
Glenn S. Walter

Klee, Tuchin, Bognanoff & Stern LLP
1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, California 90067
(310) 407-4000
Kenneth N. Klee
Michael L. Tuchin

Proposed Counsel for Debtors and
  Debtors in Possession

# INTRODUCTION AND DISCLAIMER

Metro-Goldwyn-Mayer Studios Inc. ("MGM Studios") and its affiliated Debtors[1] (collectively, together with their non-Debtor affiliates the "Company" or "MGM") submit this Disclosure Statement to certain holders of claims against the Debtors in connection with the Solicitation of acceptances of the proposed Joint Prepackaged Plan of Reorganization of Metro-Goldwyn-Mayer Studios Inc. and Certain of Its Affiliates, dated as of October 7, 2010 (a copy of which is annexed hereto as Appendix A). The Debtors are soliciting such acceptances from holders of secured obligations under the Credit Agreement.[2]

Under the Plan, the Debtors propose to restructure their financial affairs, including the obligations owed under the Credit Agreement. To effectuate the restructuring of such obligations, assuming the requisite votes are obtained on the Plan, the Debtors will file for bankruptcy relief (and will concurrently or shortly thereafter file the Plan) and will seek the necessary relief from the Bankruptcy Court to continue, in the ordinary course of business, to pay their employees, trade vendors, and certain other creditors in full and on time. In furtherance of their restructuring, the Debtors have entered into (or will be entering into) the Transaction Documents, which include the Investment Agreement, the Stockholders Agreement, and the Registration Rights Agreement. Together, the Plan and the Transactions Documents provide, inter alia, for (i) existing equity in Reorganized Holdings to be cancelled, (ii) claims under the Credit Agreement to be converted into approximately 95.3% of the equity in Reorganized Holdings, (iii) the contribution by Spyglass Entertainment Holdings, LLC ("Spyglass") of certain assets to the Reorganized Company in exchange for 0.52% of the equity in Reorganized Holdings, and (iv) the merger of Cypress Entertainment Group, Inc. ("Cypress") and Garoge, Inc. ("Garoge") with and into a special purpose direct limited liability company subsidiary of Reorganized Holdings, with the Debtor affiliate as the surviving entity and the C/G Stockholders receiving approximately 4.17% of the equity in Reorganized Holdings.

The Debtors are furnishing this Disclosure Statement to all holders of Credit Agreement Claims to enable such claimholders to vote to accept or reject the Plan. The Disclosure Statement is to be used by holders of Credit Agreement Claims solely in connection with their evaluation of the Plan. Use of this Disclosure Statement for any other purpose is not authorized. This Disclosure Statement may not be reproduced or provided to anyone other than advisors to the recipient without the prior written consent of the Debtors.

The Debtors intend to use any and all Ballots (as defined herein) accepting the Plan that were received pursuant to the Solicitation and not subsequently withdrawn prior to the Voting Deadline (as defined herein) to seek confirmation of the Plan. Votes in favor of the Plan may also be used by the Debtors as acceptances to any modifications to the Plan provided such modifications do not materially and adversely affect the treatment of Credit Agreement Claims. *See* **Section IX.D — "Feasibility of the Plan and Best Interests of Creditors – Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative."**

This Disclosure Statement describes certain aspects of the Plan, the Company's operations, the restructuring of the Company's financial affairs, the disposition of the Company's obligations with respect to the Credit Agreement, the Company's post-restructuring management and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE APPENDICES AND EXHIBITS THERETO IN THEIR ENTIRETY. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

**THE DEBTORS HAVE NOT COMMENCED CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AT THIS TIME.** BECAUSE NO BANKRUPTCY CASES HAVE BEEN COMMENCED, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN

---

[1]     A list of the Debtors is attached to the Plan as Exhibit B.

[2]     All capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan, a copy of which is attached hereto as Appendix A.

APPROVED BY ANY BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  NONETHELESS, IF CHAPTER 11 CASES ARE SUBSEQUENTLY COMMENCED, THE DEBTORS INTEND TO SEEK PROMPTLY AN ORDER OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND DETERMINING THAT THE SOLICITATION OF VOTES ON THE PLAN BY MEANS OF THIS DISCLOSURE STATEMENT COMPLIED WITH SECTION 1126(b) OF THE BANKRUPTCY CODE.

THE DEBTORS INTEND TO CONTINUE OPERATING THEIR BUSINESSES IN CHAPTER 11 IN THE ORDINARY COURSE AND TO SEEK THE NECESSARY RELIEF FROM THE BANKRUPTCY COURT TO PAY THEIR EMPLOYEES, TRADE VENDORS, AND CERTAIN OTHER CREDITORS IN FULL AND ON TIME.  THE CLAIMS OF THE DEBTORS' EMPLOYEES, GENERAL UNSECURED CREDITORS (INCLUDING TRADE CREDITORS, LICENSORS, AND LESSORS), AND OTHER SECURED CREDITORS OTHER THAN THOSE HOLDING CREDIT AGREEMENT CLAIMS ARE NOT IMPAIRED UNDER THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO THE SATISFACTION OR WAIVER OF MATERIAL CONDITIONS PRECEDENT, INCLUDING ALL CONDITIONS PRECEDENT TO ENTERING INTO THE INVESTMENT AGREEMENT AND NEW CREDIT FACILITY.  THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS PRECEDENT WILL BE SATISFIED.

THE DEBTORS CURRENTLY INTEND TO SEEK TO EFFECTUATE THE PLAN PROMPTLY AFTER CONFIRMATION OF THE PLAN.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR.  PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT (A) THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS IN CERTAIN CLASSES AND (B) THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS ARE DESCRIBED IN **SECTION V — "SUMMARY OF THE PLAN OF REORGANIZATION."**

IF THE PLAN IS NOT CONFIRMED AND/OR EFFECTUATED, THEN THE DEBTORS WILL HAVE TO CONSIDER ALL OF THEIR OPTIONS AS DEBTORS IN BANKRUPTCY.  *SEE* **SECTION X — "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN."**

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE APPENDICES ATTACHED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN.  IF SUCH INFORMATION OR REPRESENTATION IS GIVEN OR MADE, IT MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  ANY CREDITOR OR INTEREST HOLDER DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE COMPANY'S HISTORY, BUSINESS, AND OPERATIONS, IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS THAT MAY BE PENDING AS OF THE FILING OF THE DEBTORS' CHAPTER 11 CASES OR COMMENCED AFTER THE FILING OF THE DEBTORS' CHAPTER 11 CASES, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN, AND NOTHING

STATED HEREIN CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE COMPANY OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE COMPANY OR HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CREDIT AGREEMENT CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING **SECTION VI — "RISK FACTORS TO BE CONSIDERED,"** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

Except with respect to the "Financial Projections" attached hereto as <u>Appendix C</u> and except as otherwise specifically and expressly stated herein (including with respect to the pleadings the Debtors expect to file in the Chapter 11 Cases), this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  Accordingly, the delivery of this Disclosure Statement will not, under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, ALL INFORMATION CONTAINED HEREIN HAS BEEN PROVIDED BY THE DEBTORS.

UNLESS SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM.

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS:** This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, among others, those summarized herein. *See* **Section VI — "Risk Factors To Be Considered."** When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," may," "intend," and "expect" and similar expressions generally identify forward-looking statements.  Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved.  These statements are only predictions and are not guarantees of future performance or results.  Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement.  All forward-looking statements attributable to the Debtors or persons acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement.  Forward-looking statements speak only as of the date on which they are made.  Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

**TABLE OF CONTENTS**

INTRODUCTION AND DISCLAIMER .................................................................................................i
I.      OVERVIEW OF THE COMPANY ....................................................................................1
        A.      Corporate Structure of the Company ....................................................................1
        B.      Overview Of Business Operations .........................................................................1
                1.      New Film and Television Production: ........................................................1
                2.      Theatrical Distribution: ..............................................................................2
                3.      Physical Home Entertainment Distribution: ..............................................3
                4.      Digital Home Entertainment Distribution: .................................................3
                5.      Worldwide Television Distribution: ...........................................................3
                6.      MGM Channels / Networks: ......................................................................3
                7.      Consumer Products and Licensing: ............................................................4
        C.      Corporate History ...................................................................................................4
        D.      Capital Structure .....................................................................................................5
                1.      MGM Credit Facility ..................................................................................5
                2.      Print and Advertising Facility ....................................................................6
                3.      United Artists Entertainment Credit Facility .............................................6
        E.      Events Leading to Chapter 11 Cases ......................................................................7
                1.      Industry Wide Factors ................................................................................7
                2.      Lack of New Production ..............................................................................7
                3.      Evaluation of Restructuring Alternatives ..................................................8
        F.      The Proposed Plan ..................................................................................................9
        G.      Spyglass, Cypress and Garoge ...............................................................................9
        H.      Transaction Documents .........................................................................................10
II.     SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN .....21
III.    PLAN VOTING INSTRUCTIONS AND PROCEDURES ...............................................26
        A.      Notice To Holders Of Claims ...............................................................................26
        B.      Solicitation Package .............................................................................................26
        C.      Voting Procedures And Ballots And Voting Deadline...........................................27
        D.      Confirmation Hearing And Deadline For Objections To Confirmation..................28
IV.     THE ANTICIPATED CHAPTER 11 CASES ...................................................................28
        A.      Motions To Be Filed On The Petition Date ..........................................................28
                1.      Motion To Approve Combined Disclosure Statement And Confirmation Hearing..........28
                2.      Motion To Use Cash Collateral And Obtain DIP Financing.......................28
                3.      Motion To Continue Using Existing Cash Management Systems.................29
                4.      Motion For Authority To Pay Prepetition Employee Compensation And
                        Associated Benefits ...................................................................................29
                5.      Motion To Pay Prepetition Unsecured Claims ..........................................29
                6.      Motion To Pay Taxes..................................................................................29
                7.      Adequate Assurance Of Utilities ...............................................................29
                8.      Motion To Pay Shippers And Storage Labs...............................................30
                9.      Retention Of Noticing Agent .....................................................................30
                10.     Motion To Pay Prepetition Participations And Residuals...........................30
                11.     Motion For Authorization To Honor Obligations Due To United Artists
                        Production Finance LLC In The Ordinary Course of Business ...................30
                12.     Motion to Approve Break-Up Fee and Expense Reimbursement.................30
                13.     Other "First Day" Motions.........................................................................31
        B.      Anticipated Timetable For The Chapter 11 Cases ..................................................31
V.      SUMMARY OF THE PLAN OF REORGANIZATION....................................................31
        A.      Overview Of Chapter 11 ........................................................................................32
        B.      Overall Structure Of The Plan...............................................................................32
        C.      Classification And Treatment Of Claims And Interests .........................................32
                1.      Treatment Of Unclassified Claims.............................................................32
                2.      Classification And Treatment Of Claims And Interests ............................33
                3.      Acceptance Or Rejection Of The Plan.......................................................37

|  |  | 4. | Means For Implementation Of The Plan ................................................. | 37 |
| D. | | Provisions Governing Distributions ..................................................................... | 40 |
|  | 1. | Allowed Claims ...................................................................................... | 40 |
|  | 2. | Distributions For Claims Allowed As Of The Effective Date ................. | 40 |
|  | 3. | Fractional Shares ................................................................................... | 40 |
|  | 4. | Interest And Penalties On Claims .......................................................... | 40 |
|  | 5. | Means Of Cash Payment ....................................................................... | 40 |
|  | 6. | Withholding And Reporting Requirements ........................................... | 40 |
|  | 7. | Setoffs ................................................................................................... | 41 |
| E. | | Treatment Of Executory Contracts And Unexpired Leases .................................. | 41 |
|  | 1. | Assumption/Rejection of Executory Contracts and Unexpired Leases... | 41 |
|  | 2. | Compensation And Benefit Programs ..................................................... | 42 |
|  | 3. | Century City Leases ............................................................................... | 42 |
|  | 4. | Employment Contracts .......................................................................... | 42 |
| F. | | Confirmation And Consummation Of The Plan ................................................... | 42 |
|  | 1. | Condition To Entry Of The Confirmation Order ................................... | 42 |
|  | 2. | Conditions To Effective Date ................................................................ | 43 |
|  | 3. | Waiver Of Conditions ............................................................................ | 43 |
| G. | | Effect Of Plan Confirmation ............................................................................... | 44 |
|  | 1. | Binding Effect ........................................................................................ | 44 |
|  | 2. | Revesting Of Assets ............................................................................... | 44 |
|  | 3. | Releases And Related Matters ............................................................... | 44 |
|  | 4. | **Discharge Of The Debtors** .................................................................. | 45 |
|  | 5. | **Injunction** .......................................................................................... | 45 |
|  | 6. | **Exculpation And Limitation Of Liability** ........................................ | 46 |
|  | 7. | Term Of Bankruptcy Injunction Or Stays ............................................. | 46 |
|  | 8. | Post-Effective Date Retention Of Professionals .................................... | 47 |
| H. | | Retention Of Jurisdiction .................................................................................... | 47 |
| I. | | Failure of Bankruptcy Court to Exercise Jurisdiction ........................................ | 48 |
| J. | | Miscellaneous Provisions .................................................................................... | 48 |
|  | 1. | Effectuating Documents And Further Transactions................................ | 48 |
|  | 2. | Corporate Action ................................................................................... | 48 |
|  | 3. | Indemnification Of Directors And Officers ........................................... | 48 |
|  | 4. | Payment Of Statutory Fees ................................................................... | 49 |
|  | 5. | Amendment Or Modification Of The Plan ............................................. | 49 |
|  | 6. | Additional Debtors................................................................................. | 50 |
|  | 7. | Severability Of Plan Provisions ............................................................ | 50 |
|  | 8. | Successors And Assigns ......................................................................... | 50 |
|  | 9. | Revocation, Withdrawal, Or Non-Consummation ................................. | 50 |
|  | 10. | Governing Law ....................................................................................... | 50 |
| VI. | RISK FACTORS TO BE CONSIDERED .............................................................. | | 50 |
| A. | | Failure to Confirm the Plan ................................................................................. | 51 |
| B. | | Potential Adverse Effects of Chapter 11 ............................................................. | 51 |
| C. | | Dependence on Key Personnel ............................................................................ | 51 |
| D. | | Business Risks ..................................................................................................... | 51 |
|  | 1. | No Assurance Of Ultimate Recoveries ................................................. | 51 |
|  | 2. | Inherent Uncertainty Of Debtors' Financial Projections ....................... | 51 |
|  | 3. | Lack of Audited and Recent Financial Reports ..................................... | 51 |
|  | 4. | Turmoil In Financial Markets ................................................................ | 52 |
|  | 5. | Unpredictability Of Entertainment Industry ......................................... | 52 |
|  | 6. | Rapid Technological Changes And Alternative Forms Of Delivery Or Storage Of Filmed Entertainment ......................................................... | 53 |
|  | 7. | Piracy Of Motion Pictures, Including Digital And Internet Piracy, May Reduce The Gross Receipts From The Exploitation Of Our Films ............ | 53 |
|  | 8. | Collective Bargaining Agreements ......................................................... | 53 |
|  | 9. | Competition ............................................................................................ | 53 |

|  |  | 10. | World Events | 53 |
|  |  | 11. | Litigation | 54 |
|  |  | 12. | Brand Concentration | 54 |
|  |  | 13. | UAPF Credit Facility | 54 |
|  |  | 14. | Sale Of Equity In Cypress and Garoge | 54 |
|  | E. | Methods of Solicitation | | 54 |
|  | F. | Classification And Treatment Of Claims And Equity Interests | | 55 |
| VII. | | APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS | | 56 |
|  | A. | Plan Securities | | 56 |
|  | B. | Issuance and Resale of Plan Securities Under the Plan | | 56 |
|  |  | 1. | Exemption From Registration | 56 |
|  |  | 2. | Resales Of Plan Securities; Definition Of Underwriter | 56 |
|  | C. | Listing of New Common Stock | | 57 |
|  | D. | Issuance of New Common Stock to Spyglass and the C/G Stockholders | | 57 |
| VIII. | | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | | 58 |
|  | A. | Certain U.S. Federal Income Tax Consequences to the Debtors | | 59 |
|  |  | 1. | Cancellation Of Indebtedness Income | 59 |
|  |  | 2. | Net Operating Losses – Section 382 | 59 |
|  | B. | Certain Income Tax Consequences to U.S. Holders | | 60 |
|  |  | 1. | U.S. Holders Of Class 3 Credit Agreement Claims | 60 |
|  |  | 2. | U.S. Holders Of Interests In Holdings | 62 |
|  |  | 3. | Backup Withholding And Information Reporting | 62 |
|  | C. | Certain Income Tax Consequences to Non-U.S. Holders | | 63 |
|  |  | 1. | Non-U.S. Holders Of Class 3 Credit Agreement Claims | 63 |
|  |  | 2. | Backup Withholding And Information Reporting | 63 |
|  |  | 3. | Additional Withholding Requirements | 64 |
|  | D. | Importance of Obtaining Professional Tax Assistance | | 64 |
| IX. | | FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS | | 64 |
|  | A. | Feasibility of the Plan | | 64 |
|  | B. | Acceptance Of The Plan | | 65 |
|  | C. | Best Interests Test | | 65 |
|  | D. | Confirmation Without Acceptance Of All Impaired Classes: The 'Cramdown' Alternative | | 66 |
| X. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | 67 |
| XI. | | THE SOLICITATION | | 67 |
|  | A. | Parties In Interest Entitled To Vote | | 67 |
|  | B. | Classes Impaired Under The Plan | | 68 |
|  | C. | Revocation; Waivers Of Defects; Irregularities | | 68 |
|  | D. | Further Information; Additional Copies | | 68 |
| XII. | | CONCLUSION AND RECOMMENDATION | | 69 |

# APPENDICES

APPENDIX A      Joint Prepackaged Plan of Reorganization of Metro-Goldwyn-Mayer Studios Inc. and Certain of Its Affiliates

APPENDIX B      Liquidation Analysis

APPENDIX C      Financial Projections

APPENDIX D      Audited Financial Statement (March, 2009)

APPENDIX E      Unaudited Financial Statement (March, 2010)

# I.     OVERVIEW OF THE COMPANY

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan.  Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

## A.     Corporate Structure of the Company

MGM Holdings Inc. ("Holdings") is the ultimate parent of the MGM family of companies. Holdings owns MGM Holdings II Inc. which, in turn, owns Metro-Goldwyn-Mayer Inc.  Metro-Goldwyn-Mayer Inc. owns, directly or indirectly, a number of subsidiaries, including various non-Debtor entities.  Metro-Goldwyn-Mayer Inc.'s principal direct and indirect subsidiaries are MGM Studios, United Artists Corporation, United Artists Films Inc. and Orion Pictures Corporation.

A list of the Debtors is attached as Exhibit B to the Plan.  Generally, the Debtors include all the wholly owned domestic subsidiaries of Holdings other than certain special purpose subsidiaries whose organizational documents contain bankruptcy remote provisions.

The Company's executive offices are located at 10250 Constellation Boulevard, Los Angeles, California 90067-6241.  The Company's telephone number is (310) 449-3000.  The Company's internet address is www.mgm.com.  Attached hereto as Appendices D and E, respectively, is the Company's audited financial statement for the fiscal year ending March, 2009, and unaudited financial statement for the fiscal year ending March, 2010 (collectively, the "Financial Statements").

## B.     Overview Of Business Operations

MGM is a film entertainment company, with one of the world's largest film and television libraries and a group of important content franchises.  The Company is engaged primarily in the development, production and worldwide distribution of feature films, television programming, interactive media, music, and licensed merchandise. The Company's film and television library (the "MGM Library") contains approximately 4,100 theatrically released feature film titles and approximately 10,800 television episodes, and is one of the largest collections of post-1948 feature films in the world.  Films in the MGM Library have won over 200 Academy Awards, including fifteen Best Picture Awards.  The MGM Library also contains rights to many iconic film and television franchises.  More specifically, assets comprising the MGM Library include: (i) MGM (post-1985) / United Artists film library which consists of more than 2,100 MGM, United Artists and Cannon Group titles, including the *James Bond*, *Pink Panther*, and *Rocky* franchises as well as *Legally Blonde*, *Hannibal*, *Rain Man*, and *A Fish Called Wanda*; (ii) the Orion Pictures film library which consists of more than 1,300 titles, including *Silence of the Lambs* and *Dances With Wolves*; (iii) the Polygram film library which consists of more than 700 titles, including *When Harry Met Sally* and *Four Weddings and a Funeral*; and (iv) the television programs library which includes approximately 10,800 episodes of programming, including *Stargate SG-1*, the longest running science fiction series in U.S. television history.  The Company also co-owns the rights to produce two films based on *The Hobbit*, a book which has sold more than 100 million copies worldwide.

The Company's operations are carried out through seven key business segments:

1.     *New Film and Television Production:*

The Company is involved in the development and production of films, television series, and other programs.  In recent history, the Company has been involved in production in one of three ways:  (i) under the New United Artists (as defined below) banner with certain non-Debtor affiliates, (ii) as part of joint ventures with strategic partners, or (iii) under the MGM banner.

First, MGM Studios own a 62.5% stake in United Artists Entertainment, LLC ("United Artists Entertainment," and, together with its subsidiaries, "New United Artists"), which is not a debtor herein.  United

Artists Entertainment was formed to develop and create new theatrically released films under the New United Artists banner. Although the Debtors have begun to produce films other than under the New United Artists banner, almost all of the Debtors' new films in recent years were developed and produced under the New United Artists banner (such films, together with the associated intellectual property rights, the "UA Films"). Films released under the New United Artists banner include the major motion pictures *Fame*, *Hot Tub Time Machine*, *Lions for Lambs*, and *Valkyrie*. New United Artists currently has two major theatrical releases in "post production" (*The Cabin in the Woods* and *Red Dawn*), both of which are contemplated to be available for release in 2011. As discussed more fully below, New United Artists funded production for films produced under the New United Artists banner under independent financing arrangements. Under a Master Distribution Agreement dated August 16, 2007 by and between MGM Studios and United Artists Production Finance LLC ("UAPF"), a wholly owned subsidiary of United Artists Entertainment (as amended, the "Master Distribution Agreement"), MGM Studios is the exclusive distributor of UA Films and other films for which New United Artists has acquired distribution, marketing, and promotion rights. For the reasons set forth more fully below, the Company does not anticipate additional future production under its arrangement with United Artists Entertainment.

The Company also participates with third parties in various joint ventures to produce films and/or television programs (the "Production Joint Ventures"). For example, the Company is currently involved in the following Production Joint Ventures.

The Company currently has an agreement with New Line to co-produce two films based on J.R.R. Tolkien's novel, *The Hobbit*. The Debtors, with the support of the Subommittee (as defined below), anticipate imminently greenlighting the production of these two films. The Debtors believe that the production of these films will result in numerous direct and indirect benefits to the Reorganized Debtors. The Company is currently exploring alternatives to satisfy its funding obligations with respect to *The Hobbit*. Any such funding would require that the third party would be compensated for providing such funding. By voting in favor of the Plan, Holders of Class 3 – Credit Agreement Claims shall also be deemed to have approved and ratified in all respects the production of these films and the expenditure of the funds necessary to fund the Debtors' commitment (which is currently estimated to be approximately $265-$275 Million with respect to the production of these films).

The Company has also participated in various Production Joint Ventures with Sony Pictures Entertainment and certain of its affiliates (collectively, "Sony"). Under a current joint venture with Sony (through its Columbia Pictures subsidiary), the Company is co-funding production of a film entitled *Zookeeper*, which is scheduled to be released in the summer of 2011.

The rights in and to the finished products are determined by the applicable arrangements between the parties in the particular Production Joint Venture.

Finally, although a number of recent film and television productions were conducted under the New United Artists banner or through Production Joint Ventures, the Company also produces projects internally. At present, the Company's only internal production is the *Stargate Universe* television series; however, the Company has several other projects in development. In 1994, the Company released the *Stargate* movie, which spawned a number of related successful television series, including *Stargate SG-1*, *Stargate Atlantis*, and *Stargate Universe*, and certain direct-to-video productions.

2. *Theatrical Distribution:*

The Company distributes theatrically released films to movie theatres in the United States and abroad. The Company works with movie exhibitors such as AMC Entertainment, Regal Cinemas, and Cinemark to distribute new product. The Company negotiates screen count, trailer placements, and box office receipts share, among other details, in an effort to ensure proper support and economics for new productions. Twentieth Century Fox provides international theatrical distribution services for the Company under a distribution services agreement.

3. *Physical Home Entertainment Distribution:*

The Company sells DVDs and Blu-ray discs of MGM Library product and new product in the United States and abroad. Historically, home video sales have represented the second largest driver of MGM Library cash receipts. Twentieth Century Fox Home Entertainment provides distribution services for the Company's home videos under a worldwide physical home entertainment distribution services agreement. The contract is currently in its fifth year and is scheduled to expire in August 2011.

4. *Digital Home Entertainment Distribution:*

To capitalize on growing demand, MGM is also engaged in digital home entertainment distribution. Specifically, the Company utilizes broadband and wireless technology to distribute MGM Library product. Distributing MGM Library product in this manner increases the Company's ability to monetize the MGM Library product. The Company also increasingly uses digital media distribution for promotions of its high profile films. The Company digitally distributes MGM Library product and new product through leading distribution channels such as iTunes, Xbox, and Hulu, among others, using various revenue models, including Video On Demand ("VOD"), Free VOD, and Electronic Sell Through.

5. *Worldwide Television Distribution:*

The Company frequently licenses current theatrical motion pictures for pay television whereby MGM films not yet produced are pre-licensed for a specified fee paid based on the date of availability. In the domestic pay TV market, beginning with films released after December 31, 2008, the Company has licensed its new releases to EPIX, a premium channel joint venture in which the Company has an equity stake.

The Company also licenses MGM Library product to television stations and networks around the world. Specifically, the Company licenses MGM Library content to all four domestic pay TV networks: EPIX, HBO, Showtime, and Starz. In the domestic free TV market, the Company licenses content to cable networks (e.g. Spike and USA) and to station affiliates of the major networks (e.g. Fox and CW). In the international market, the Company licenses its content to pay and free TV customers. Such television distribution is the primary driver of MGM Library cash receipts. Presently, the Company manages over 2,500 licensing contracts serving almost 600 unique clients worldwide.

6. *MGM Channels / Networks*:

The Company distributes MGM Library content for audiences in the United States and international markets on wholly owned and joint venture television channels. The Company currently has ownership interests in television channels and joint ventures reaching subscribers in over 120 countries and territories around the globe.

The Company has an ownership interest in over 25 MGM branded international channels, free TV networks and pay-TV joint ventures reaching 90 million subscribers in over 130 countries. Combined, these channels provide programming services spanning scores of markets across Europe, North and South America, Asia and Africa. These channels and joint ventures broadcast selections from the MGM Library. The Company has interests in three foreign pay-TV joint ventures reaching 30 million subscribers internationally. MGM also has an ownership interest in ThisTV, a digital US broadcast channel launched in November 2008 that reaches over 35 million US cable households.

In addition, the MGM HD channel, launched in 2007, is currently carried in the United States on DirecTV, Dish Network, Time Warner, Comcast, and Verizon, among others, with close to 10 million subscribers as of June 2010. MGM HD licenses available MGM Library content, generally for short licensing windows, and generates affiliate fees and advertising revenues for the Company.

The Company also has a minority stake in EPIX, a domestic premium TV channel joint venture, which is owned by MGM, Paramount, Viacom, and Lionsgate. Launched on October 30, 2009, the EPIX channel

provides first-run films, select library features and new TV programming from these studio partners as well as other content providers.

In August 2010, EPIX announced a licensing agreement with Netflix that allows Netflix members to watch an array of new releases and library titles from EPIX streamed over the Internet.  Under the agreement, EPIX's new release content will go to Netflix 90 days after it debuts on EPIX's premium pay-TV and subscription video-on-demand services.  Library titles will be made immediately available.  This agreement has a term of up to 5 years.  License fee payments from Netflix are significant and, based on EPIX's most recent business plan, would bring EPIX to approximately cash-flow breakeven for its fiscal year ending September 30, 2011.  This agreement will provide additional time for EPIX to continue to pursue new carriage agreements with major cable companies without requiring meaningful funding from its studio partners in the near to mid-term.

       7.    *Consumer Products and Licensing*:

Beyond its endeavors in the film and television medium, the Company also licenses MGM content and brands for use in interactive entertainment and consumer products.  Prominent Company properties licensed in this regard include: *Pink Panther, Stargate,* and *Rocky*.  In addition, the Company licenses MGM content for several location-based entertainment projects.  Through its MGM On Stage unit, the Company also licenses and develops stage productions. Such productions include *Legally Blonde The Musical*, which premiered on Broadway and is currently touring nationally.

## C.    Corporate History

The Metro-Goldwyn-Mayer brand was established in 1924 when Metro Pictures Corporation (founded in 1916), the Goldwyn Picture Corporation (founded in 1917), and Louis B. Mayer Pictures Corporation (founded in  1918) were joined together by Marcus Loew, the owner of a large theatre chain, Loew's Theatres. During the 1930s and 1940s, Metro-Goldwyn-Mayer was the most dominant motion picture studio in Hollywood and since that time has remained one of the most recognizable worldwide film studios.  Following a series of corporate transactions, MGM currently owns one of the largest modern (post-1948) collections of feature films in the world, comprised of the post-1985 MGM library, and the historic United Artists, Orion Pictures, and Polygram film libraries.  The following timeline notes key events since 1996.

In July 10, 1996, Metro-Goldwyn-Mayer Inc., a Delaware corporation, was formed specifically to acquire from an indirect wholly-owned subsidiary of Consortium de Realisation all of the outstanding capital stock of MGM Studios and its subsidiaries.  Metro-Goldwyn-Mayer Inc. was majority owned by an investor group including Kirk Kerkorian, Tracinda Corporation, a corporation that is principally owned by Mr. Kerkorian, and certain current and former executive officers of MGM Studios.  On October 10, 1996, Metro-Goldwyn-Mayer Inc. purchased MGM Studios for an aggregate consideration of $1.3 billion.

In July 1997, Metro-Goldwyn-Mayer Inc. acquired all of the outstanding capital stock of Orion Pictures Corporation and its subsidiaries, including the entity formerly known as The Samuel Goldwyn Company and now known as Orion Film Classics Company, from Metromedia International Group, Inc.  In connection with the Orion Pictures Corporation acquisition, Metro-Goldwyn-Mayer Inc. obtained the film and television libraries of Orion Pictures Corporation companies consisting of approximately 1,900 film titles and 3,000 television episodes. In January 7, 1999, Metro-Goldwyn-Mayer Inc. acquired certain film libraries, including 1,300 feature films, and film-related rights that were previously owned by PolyGram N.V. and its subsidiaries.

In November 1997, Metro-Goldwyn-Mayer Inc. completed an initial public offering, whereby it issued and sold 9,000,000 new shares of common stock at a price per share of $20.00 for net proceeds of $165 million.  Concurrently with the consummation of the initial public offering, Tracinda Corporation purchased 3,978,780 shares of the common stock for an aggregate purchase price of $75 million.  From 1998 to 2003, Metro-Goldwyn-Mayer Inc. made subsequent securities offerings, including public offerings and private placements.

On April 8, 2005, Metro-Goldwyn-Mayer Inc. was acquired by Holdings, a Delaware corporation owned by a consortium comprised of Sony Corporation of America, Providence Equity Partners, Texas Pacific

Group, Comcast Corporation and DLJ Merchant Banking Partners (the "Acquisition").  The consortium acquired Metro-Goldwyn-Mayer Inc. for a total price of $4.9 billion, consisting of $3.0 billion in cash and  $1.9 billion in assumed debt.  Subsequent to the Acquisition, Metro-Goldwyn-Mayer Inc.'s shares were de-listed from the New York Stock Exchange and Metro-Goldwyn-Mayer Inc. became privately held.  In 2007, Quadrangle Capital Partners purchased a small stake in Holdings from Providence Equity Partners.

**D.      Capital Structure**

1.      MGM Credit Facility

In connection with the Acquisition, the Debtors entered into a credit agreement, dated as of April 8, 2005, by and among MGM Holdings II Inc. ("Holdings II"), Metro-Goldwyn-Mayer Inc., as Borrower, Bank of America, N.A., Citicorp USA, Inc. and The Royal Bank of Scotland PLC, as Documentation Agents, Credit Suisse, as Syndication Agent, JPMorgan Chase Bank, N.A., as Administrative Agent, and the lenders from time to time party thereto  (as amended, the "Credit Agreement").  The Credit Agreement provided the Company with a credit facility (the "MGM Credit Facility") consisting of a five-year $250 million revolving credit facility ("Revolving Facility"), a six-year $1.05 billion term loan ("Term Loan A") and a seven-year $2.7 billion term loan ("Term Loan B").  The proceeds of Term Loan A and Term Loan B were used to finance a portion of the Acquisition and to pay related fees and expenses.  The proceeds of the Revolving Facility were used to finance the working capital needs and general corporate purposes of MGM and its subsidiaries.

Holdings II and several of its direct and indirect subsidiaries guarantee the MGM Credit Facility (collectively, the "Guarantors").  The MGM Credit Facility is secured by substantially all of the assets of Metro-Goldwyn-Mayer Inc. and the Guarantors, including perfected first-priority security interests in the capital stock and, subject to certain exceptions, substantially all other tangible and intangible assets of MGM and the Guarantors.[3]

On March 9, 2007, Holdings II and Metro-Goldwyn-Mayer Inc. entered into the second amendment to the Credit Agreement which replaced Term Loan A with a five-year $1.1 billion term loan ("Term Loan B-1") that incorporated the same loan amortization payment requirements of Term Loan B.  Both Term Loan B and Term Loan B-1 mature on April 8, 2012, while the Revolving Facility maturity date remained April 8, 2010.  On September 30, 2009, the parties entered into a Third Amendment to the Credit Agreement, Amendment To Swap Agreements and Forbearance Agreement (the "Initial Forbearance Agreement") extending until December 15, 2009 the time for payment of interest, letter of credit participation fees and swap termination payments that otherwise would be due and payable from and including September 30, 2009 through December 15, 2009.  On November 13, 2009, the parties entered into a Fourth Amendment To Credit Agreement, Amendment To Swap Agreements and Second Forbearance Agreement extending the forbearance period to January 31, 2010.  On January 31, 2010, the parties entered into a Fifth Amendment To Credit Agreement, Amendment To Swap Agreements and Third Forbearance Agreement extending the forbearance period to March 31, 2010.  On March 31, 2010, the parties entered into a Sixth Amendment To Credit Agreement, Amendment To Swap Agreements and Fourth Forbearance Agreement extending the forbearance period to May 14, 2010.  On May 14, 2010, the parties entered into a Seventh Amendment To Credit Agreement, Amendment To Swap Agreements and Fifth Forbearance Agreement extending the forbearance period to July 14, 2010.  On July 14, 2010, the parties entered into a Eighth Amendment To Credit Agreement, Amendment To Swap Agreements and Sixth Forbearance Agreement extending the forbearance period to September 15, 2010.  On September 15, 2010, the parties entered into a Ninth Amendment To Credit Agreement, Amendment To Swap Agreements and Seventh Forbearance Agreement extending the forbearance period to October 28, 2010.

As of the date hereof, the aggregate amount of the outstanding obligations under the Credit Agreement is approximately $4.737 billion plus an additional $152 million outstanding obligations on account of certain interest rate protection arrangements entered into in connection with the Credit Agreement.

---

[3]      The Company is prohibited by contract from encumbering certain assets, such as certain assets relating to the *James Bond* franchise.

2.        Print and Advertising Facility

On September 19, 2006, MGM Studios and certain of its distribution subsidiaries entered into an Amended and Restated Revenue Participation Agreement with Domestic Distribution Inc. ("DDI") (as amended, the "P&A Facility").  Under the P&A Facility, MGM Studios committed to offer to sell to DDI revenue participations in certain qualifying pictures in exchange for a purchase price that is tied to MGM Studio's domestic print and advertising costs for such picture.  DDI, in turn, committed to pay the purchase price for such revenue participations, however such commitment was limited to DDI's availability under the DDI Credit Agreement (as defined below).

DDI's revenue participation is secured by a first priority security interest in (i) an interest in a cash collateral account of up to $20 million funded by MGM Studios from receipts generated from exploitation of certain television and home video rights with respect to qualifying pictures, (ii) certain domestic distribution agreements pursuant to which MGM Studios distributes qualifying pictures, (iii) any collateral granted to MGM Studios with respect to such qualifying pictures, and (iv) subject to certain limitations, any interest in the underlying copyright in, and physical materials relating to, such qualifying picture solely to the extent necessary to exercise certain distribution rights for such qualifying picture.

DDI is a non-Debtor special purpose entity that was formed for the sole purpose of providing financing to the Company under the P&A Facility.  DDI funded its obligations under the P&A Facility by borrowings under a credit agreement among DDI, as borrower, JP Morgan Chase Bank, N.A., as administrative agent, and the lenders from time to time party thereto (as amended, the "DDI Credit Agreement").  The DDI Credit Agreement provided DDI with a $175 million revolving credit facility, the proceeds of which were to be used by DDI to purchase revenue participations under the P&A Facility.  The DDI Credit Agreement is secured by all of the assets of DDI, including all of DDI's rights in and to the P&A Facility as well as a collateral assignment of the security interest in the qualified pictures granted by the Company to DDI in the P&A Facility.  The failure to pay principal under the Credit Agreement at the April 8, 2010 maturity date triggered a cross-default under the P&A Facility.

As of the date hereof, the aggregate principal amount of the Debtors' obligations under the P&A Facility is approximately $52 million.

3.        United Artists Entertainment Credit Facility

As set forth above, MGM Studios is a majority owner of United Artists Entertainment.  New United Artists was formed to develop and create new theatrically released films under the New United Artists banner.

On August 16, 2007, United Artists Entertainment, through its wholly-owned subsidiary, UAPF, entered into (i) a Credit and Security Agreement (the "UAPF Credit Agreement") with certain lenders and others, and (ii) a Note Purchase and Security Agreement (the "UAPF Note Purchase Agreement") with certain lenders and others.

The UAPF Credit Agreement provided United Artists Entertainment with a $250 million senior credit facility (the "UAPF Facility").  In addition, under the UAPF Note Purchase Agreement, United Artists Entertainment sold mezzanine promissory notes totaling $75 million (the "Mezzanine Notes").  The proceeds of this financing were designed to support the production or acquisition by New United Artists of up to 18 films to be produced under the New United Artists banner and distributed by MGM under the Master Distribution Agreement.  Obligations under the UAPF Facility and UAPF Note Purchase Agreement are guaranteed by UAPF's domestic subsidiaries and are secured by substantially all of UAPF's and its domestic subsidiaries' assets, including the certain intellectual property rights related to the films produced and developed by New United Artists.  To secure MGM Studios' performance of certain obligations under the Master Distribution Agreement, including its obligations to make payments to UAPF, MGM Studios and certain of its subsidiaries granted UAPF a security interest in their rights, title, and interest in and to certain collateral relating to licensed pictures.  A "Stop Funding Event" has occurred under the UAPF Facility.  Therefore the lenders under the UAPF Facility are not required to make additional loans to UAPF for new films.

Neither United Artists Entertainment nor UAPF are expected to be debtors in the Debtors' Chapter 11 cases.

**E.      Events Leading to Chapter 11 Cases**

The Revolving Facility under the Credit Agreement matured in April 2010 and material amortization of Term Loan B and Term Loan B-1 is scheduled to begin in June 2011. Through a combination of industry-wide pressures and Company-specific issues, it became evident to the Debtors' board in the Spring of 2009 that the value of the Company might not support a re-financing or re-payment of the Revolving Facility at maturity. Subsequently, the Company's board determined that a balance sheet restructuring was the only viable alternative for the Company to continue to operate as a going concern post-maturation of the Revolving Facility. The industry-wide factors include a precipitous decline in home video sales and the worldwide economic downturn which has reduced consumer spending on discretionary items, such as entertainment, and has chilled the capital markets for new financial accommodations. The Company has also suffered because it has not had sufficient resources to support new production and thereby maximize the value of the MGM Library by maintaining an optimal level of new production.

1.      *Industry-Wide Factors*

The greatest macroeconomic factor affecting the Company is the dramatic decline in consumer spending which directly affected the home entertainment business. Due to the economic downturn, consumer spending on discretionary items such as home video has decreased significantly, and remains dormant. Similarly, many consumers are delaying new Blu-ray disc purchases until Blu-ray players become more affordable, and those that do purchase Blu-ray discs are generally selecting new titles. The economic downturn has also caused many retailers to stop selling new DVDs as loss-leaders to drive store traffic. Competitors' aggressive pricing strategy on new releases has also affected the sale of older MGM Library titles.

In addition to the foregoing, the home video market has experienced an overall decline due to consumer shifts to cable-based and Internet-based on demand service providers which allow consumers to view movies and other programming without the need for DVDs or similar physical media. Likewise, consumer shifts toward subscription-based rental services, such as Netflix, have led to a decrease in home video sales.

The economic downtown has also resulted in lower advertising spending, which has negatively affected television broadcasting revenues. This decline directly impacts advertising sales on MGM-owned channels as well as third-party owned channels that license MGM Library content.

2.      *Lack of New Production*

After the Acquisition in April, 2005, the Company sought to implement a business plan that attempted to exploit the MGM Library with limited new production. Limiting new production failed to maximize the value of the MGM Library and allowed the MGM Library to become stale. Therefore, the Company determined that a more robust new production slate was necessary to refresh and replenish the MGM Library, drive sales of MGM Library product, and otherwise preserve the inherent value of the MGM Library. To that end, as set forth above, in August, 2007, the Company established New United Artists with its joint venture partners. Thereafter, in March, 2008, Ms. Mary Parent, an executive with extensive entertainment industry and financial management experience, was appointed Chairperson of the Company's Worldwide Motion Picture Group.

The current credit crisis has also restricted the Company's ability to procure third-party production financing. Because a substantial portion of cash flow generated from the MGM Library has been dedicated to debt service requirements, the Company has had insufficient liquidity to fund new production at levels that the Company believes is necessary to maximize the value of the MGM Library.

3.      *Evaluation of Restructuring Alternatives*

Due to the approaching April 2010 maturity of the Revolving Facility and the issues identified above, in April 2009 the Company retained Moelis & Company ("Moelis"), as financial advisor, to assist it in exploring strategic alternatives.  Shortly thereafter, a steering committee (the "Steering Committee") of certain lenders under the Credit Agreement was formed in connection with a potential restructuring of the Debtors' obligations under the Credit Agreement, and the Company and the Steering Committee commenced discussions regarding potential alternatives.  On August 18, 2009, the Company hired restructuring expert Mr. Stephen Cooper (co-founder and former chairman of the restructuring firm Zolfo Cooper), who was appointed to the newly created office of the Chief Executive Officer together with Mary Parent (Chairperson for Worldwide Motion Picture Group), and Bedi A. Singh (President, Finance and Administration & Chief Financial Officer).

In September 2009 the Company requested, among other things, an extension under the Credit Agreement of the time for payment of interest, letter of credit participation fees and swap termination payments that otherwise would be due and payable from and including September 30, 2009 to December 15, 2009.  On September 30, 2009, the parties to the Credit Agreement entered into the Initial Forbearance Agreement, granting such extensions. As set forth in Section I.D.1. hereof,  the Company requested and continued to receive additional extensions of the forbearance period from time to time.

Starting in September 2009, the Debtors, by and through a Capital Structure Committee of Holdings' Board of Directors ("CSC"), collaborated with Moelis to draft a confidential information memorandum ("CIM") regarding a potential sale of the Company.  In this regard, the Debtors, along with Moelis (in consultation with the Steering Committee's advisors), prepared a potential buyers list and Moelis reached out to numerous potential parties to gauge interest.  Beginning in December 2009, Moelis began delivering CIMs to eighteen potential buyers and their respective advisors following execution of confidentiality agreements.  These potential buyers and their advisors were also granted access to a virtual data room.

In January 2010, the Debtors received non-binding indications of interest from eight parties. Following such indications of interest, the Debtors, working with Moelis and the Steering Committee's advisors, invited six of these parties to participate in a second round of bidding.  The parties' indications of interests were evaluated primarily on long term value to the Company's stakeholders, proposed structure, the perceived ability of each party to consummate a transaction on a timely basis, and the ability to obtain the requisite Secured Lender support for the transaction.

During the second round, bidders were granted access to both physical and virtual data rooms. The Debtors also invited the bidders to management presentations to discuss the Company's business.  Bidders were later invited to follow-up diligence sessions with the Company's management to address questions following the management presentation as well as questions resulting from the review of documents in the data rooms.

Following the second round, three parties submitted non-binding bid letters by the end of March, 2010, subject to, among other things, continued due diligence and the negotiation of definitive documents.  The Steering Committee determined that such bids were inadequate, and informed the Debtors that its members would not support a plan of reorganization embodying a transaction based upon these bids, and as a result, the Debtors did not accept any of the bids.  The Steering Committee then requested that the Debtors present their business plan that assumed a stand-alone plan of reorganization.  In April 2010, the Steering Committee, with the Company's consent, elected to meet with certain industry experts to inform their perspectives of such standalone plan and formed an informal committee of certain members of the Steering Committee (the "Subcommittee") to do so and to consider additional alternatives.  During April and May, 2010, the Subcommittee met with numerous industry experts and potential partners to discuss their perspectives on MGM and potential alternatives for a reorganization of the Company.  During the months of June and July, 2010, the discussions narrowed to Spyglass and handful of other parties.

Ultimately, the Subcommittee, in consultation with the Steering Committee and, separately, the Debtors, negotiated a non-binding letter of intent with Spyglass and the C/G Stockholders, which was presented to the Debtors for their consideration.  The Steering Committee advised the Debtors that it supported moving forward

with a proposal with Spyglass and the C/G Stockholders. After analyzing the proposed transaction, and considering the viability of any other alternatives, the Debtors, after consultation with their advisors, determined that under the circumstances the Spyglass transaction was the best alternative available to the Debtors at which point the Company, Spyglass and the C/G Stockholders negotiated and signed a non-binding letter of intent.

**F. The Proposed Plan**

After several months of considering their strategic alternatives, the Debtors and the Steering Committee negotiated the terms of the Plan, the Investment Agreement, and related documents with Spyglass and the C/G Stockholders. The Plan is a prepackaged plan of reorganization. The overall purpose of the Plan is to provide for a restructuring of the Debtors' liabilities in a manner designed to maximize value to all stakeholders and to enhance the financial viability of the reorganized Debtors. Generally, the Plan provides for a balance sheet restructuring whereby (i) existing equity in Holdings will be cancelled, (ii) approximately $4.75 billion of claims under the Credit Agreement will be converted into approximately 95.3% of the equity in Reorganized Holdings, (iii) Spyglass will contribute certain assets to the Reorganized Company in exchange for 0.52% of the equity in Reorganized Holdings, and (iv) Cypress and Garoge will merge with and into a special purpose direct limited liability company subsidiary of Reorganized Holdings, with the Debtor affiliate as the surviving entity and the C/G Stockholders receiving approximately 4.17% of the equity in Reorganized Holdings. All other classes of claims are unimpaired under the Plan. Furthermore, all equity interests in Subsidiary Debtors will be reinstated.

In furtherance of the implementation of the Plan, the Debtors have entered into (or will be entering into) the Transaction Documents, which include the Investment Agreement, the Stockholders Agreement, and the Registration Rights Agreement as well as related documents, including the Stock Incentive Plan. Set forth below in Section I.H. are summaries of the terms of such Investment Agreement, Stockholders Agreement, Registration Rights Agreement, and Stock Incentive Plan. The Plan also contemplates that the Reorganized Debtors will enter into a New Credit Facility on the Effective Date. The New Credit Facility is contemplated to be a $500 million credit facility to be entered into between the Reorganized Debtors and the lenders party thereto, which shall have terms substantially as set forth in the commitment letter or term sheet attached to the Plan as Exhibit A, which will be filed with the Bankruptcy Court at least five business days prior to the deadline that the Bankruptcy Court sets for parties in interest to file objections to confirmation of the Plan.

The Debtors believe that their businesses and assets have significant value that would not be maximized in a liquidation. Further in connection with the Debtors' decision to pursue the Plan, the Debtors' financial advisors have prepared and delivered a going concern valuation of the business. The Steering Committee has advised the Debtors that its financial advisors have also prepared a going concern valuation. Moreover, the Debtors believe that any alternative to confirmation of the Plan, such as an out-of-court restructuring or attempts by another party in interest to file a plan of reorganization, would result in significant delays, litigation, and additional costs, and ultimately would lower the recoveries for Holders of Allowed Claims. Additionally, based upon feedback during the course of this restructuring from both the Subcommittee and the Steering Committee, the Company concluded that as a practical matter no other plan of reorganization could be proposed that would garner the support of the Secured Lenders, whose support is essential to the success of any plan. **Accordingly, the Debtors strongly recommend that you vote to accept the Plan, if you are entitled to vote**.

The Debtors have been advised that the Subcommittee and the Administrative Agent also support the Plan and will recommend that Holders of Credit Agreement Claims vote in favor of the Plan.

**G. Spyglass, Cypress and Garoge**

Spyglass is a film and television production company, co-founded by Gary Barber and Roger Birnbaum. Cypress and Garoge (together, "Cypress/Garoge") are affiliates of Messrs. Barber and Birnbaum that own and exploit a library of films. Collectively, these films have grossed over $5 billion in worldwide box office. They enjoyed instant success with the blockbuster *The Sixth Sense* and have produced a slate of successful films including, among others, *Bruce Almighty*, *Seabiscuit*, *Memoirs of a Geisha*, *27 Dresses*, and *Invictus*. Spyglass and Cypress/Garoge films have amassed over 34 Oscar nominations, including three wins. Spyglass also co-financed the 2009 blockbusters *Star Trek* and *GI Joe: The Rise of Cobra*.

Under the Plan, Messrs. Barber and Birnbaum will be appointed as co-chairmen and co-chief executive officers of Reorganized Holdings. Reorganized Holdings will enter into identical employment agreements with each of Messrs. Barber and Birnbaum, which will be effective as of the Effective Date and have a 5 year term, subject to the terms and conditions of such agreements. Messrs. Barber and Birnbaum will also be issued options for stock in Reorganized Holdings at a strike price equal to or greater than the value of the stock of Reorganized Holdings at the Effective Date, which options will be subject to vesting.

Messrs. Barber and Birnbaum will be subject to noncompetition and nonsolicitation restrictions while employed by Reorganized Holdings for certain periods following a termination of their respective employment. Messrs. Barber and Birnbaum will also continue to act as directors of Spyglass, and under the terms of the Investment Agreement and their employment agreements, they will be subject to restrictions on the scope of activities they may perform in that capacity. Spyglass will remain a separate entity, subject to restrictions on its activities pursuant to the Investment Agreement, and will receive 0.52% of the New Common Stock in Reorganized Holdings in consideration of the contribution of certain assets under the Investment Agreement. The C/G Stockholders (which include the trusts of Messrs. Barber and Birnbaum) will receive 4.17% of the New Common Stock issued under the Plan in connection with the mergers.

## H. Transaction Documents

Set forth below are summaries of material terms and conditions of the Investment Agreement, Stockholders Agreement, Registration Rights Agreement, and Stock Incentive Plan, respectively. To the extent of any conflict between the summaries set forth below and the underlying Transaction Document to which such summary relates, the respective Transaction Document controls. Capitalized terms not defined in this Disclosure Statement or in the summaries shall have the meaning ascribed to them in the respective Transaction Document.

### 1. Investment Agreement

| | |
|---|---|
| *Acquiror:* | Holdings |
| *Target:* | 100% of the equity interests of Cypress and Garoge and the Contributed Assets (and related liabilities) of Spyglass. |
| *Transaction; Restructuring:* | Contributions/Merger: On the Closing Date, (i) Spyglass will transfer, assign, convey and deliver the Contributed Assets to Holdings or one of its wholly owned limited liability company subsidiaries that is treated as a disregarded entity for U.S. federal income tax purposes; (ii) Holdings will (or will cause such subsidiary to) assume and pay, perform and discharge all Assumed Liabilities with respect to the Contributed Assets; and (iii) Cypress and Garoge will each merge with and into a wholly owned limited liability company subsidiary of Holdings that is treated as a disregarded entity for U.S. federal income tax purposes ("Merger Sub"), with Merger Sub as the surviving entity. In consideration for the Contribution, Spyglass will receive approximately 0.52% of issued and outstanding New Common Stock as of the Closing Date. In consideration for the Mergers, the shareholders of Cypress and Garoge will receive in aggregate approximately 4.17% of the issued and outstanding New Common Stock as of the Closing Date. |
| | Pre-Effective Date Sale of Cypress/Garoge Equity: Up to thirty percent (30%) of the equity interests of Cypress/Garoge owned by the stockholders of Cypress/Garoge may be transferred to one or more third parties for cash (the "Third Party Transfer") prior to the Closing Date. (The Stockholders Agreement also permits such Third Party Transfers following the Closing Date if the entire 30% has not been transferred prior to the Closing Date). Such Third Party Transfer shall be permitted, subject to the terms of any such Third Party Transfer not committing, obligating or encumbering the assets of Cypress/Garoge or the Company without the prior written consent of Holdings, and Holdings must be reasonably satisfied that such terms shall not otherwise have any adverse consequences to Company or its business. It is understood that one or more of the third party transferees may constitute certain domestic and/or international distribution partners who may have (or may enter into) output distribution arrangements on terms and conditions that are fair to the Company, do not conflict with any existing contractual arrangements and are otherwise on customary terms and conditions in the motion picture industry, which, in any event, shall be subject to the review and |

| | |
|---|---|
| | prior written consent of Holdings, in consultation with the Administrative Agent (which consent shall not be unreasonably withheld and shall be solely to confirm that such arrangements are fair to the Company, do not conflict with any existing contractual arrangements and are otherwise on customary terms and conditions in accordance with the foregoing).<br><br>The mergers of Cypress and Garoge with and into Merger Sub are intended to be treated as tax-deferred reorganizations with Holdings within the meaning of Section 368(a)(1)(A) of the Code. The contribution of assets by Spyglass to Holdings or one of its wholly owned limited liability company subsidiaries (that is treated as a disregarded entity for U.S. federal income tax purposes), and the conversion of claims under the Credit Agreement into equity in Reorganized Holdings, taken together, as part of an integrated plan, are intended to be treated as a tax-deferred contribution pursuant to Section 351(a) of the Code. The parties to the Investment Agreement have agreed to report these transactions consistently with the intended tax treatment. |
| **Ordinary Course Operation:** | Except for the restricted activities set forth in section 9.1(b) of the Investment Agreement with respect to Cypress/Garoge and section 9.3(b) of the Investment Agreement with respect to the Company, from the date that the Investment Agreement is executed (the "Execution Date") until the Closing Date, Cypress/Garoge and the Company shall be operated in the ordinary course of business consistent with past practice, except (i) as disclosed in sections 9.1 and 9.3 (as applicable) of the C/G Disclosure Schedule and the Parent Disclosure Schedule attached to the Investment Agreement, (ii) as otherwise expressly provided or required by the Investment Agreement and the Transaction Documents or as may be necessary or appropriate to implement the transactions contemplated by the Investment Agreement and the Transaction Documents, (iii) as required by applicable law (including the Bankruptcy Code) or as otherwise ordered by the Bankruptcy Court, (iv) as required under the Plan or (v) as the parties may otherwise consent in writing.<br><br>Except for the restricted activities set forth in section 9.2(b) of the Investment Agreement, from the Execution Date until the Closing Date, Spyglass shall be operated in the ordinary course of business consistent with past practice, except (i) as disclosed in section 9.2 of the Spyglass Disclosure Schedule attached to the Investment Agreement, (ii) as otherwise expressly provided or required by the Investment Agreement and the Transaction Documents or as may be necessary or appropriate to implement the transactions contemplated by the Investment Agreement and the Transaction Documents, (iii) as required by applicable law (including the Bankruptcy Code) or as otherwise ordered by the Bankruptcy Court, (iv) as required under the Plan or (v) as the parties may otherwise consent in writing.<br><br>Following the Closing Date and until the Restricted Period End Date, Spyglass agrees that the conduct of the business of Spyglass and its Subsidiaries shall be subject to the limitations set forth in section 9.2(c) of the Investment Agreement, except (i) as required by applicable Law, or (ii) with the prior consent of the Company (acting through its Board of Directors). Among the restrictions set forth therein, without limitation, and subject to certain limited exceptions described therein, Spyglass shall not provide production services, act as a "producer for hire" or distributor or sub-distributor for third party films or acquire, directly or indirectly (including through any Subsidiary) any new Films, including development projects, although Spyglass will be permitted to operate for purposes of (A) owning and Exploiting its completed Films existing as of the date of the Investment Agreement and (B) completing (and owning and Exploiting) the Films set forth in Section 9.2(c)(i) of the Spyglass Disclosure Schedule. In addition, Spyglass shall not directly or indirectly agree to any modification, waiver, amendment or extension of the Spyglass Credit Facility to provide Spyglass with additional borrowing capacity, nor shall Spyglass refinance the Spyglass Credit Facility or enter into any new or replacement financing, in each case in a manner that would provide additional Film production or acquisition financing to Spyglass. |
| **Company Representations and Warranties; Survival** | The Company will make customary representations and warranties with respect to (i) organization; (ii) title and authority; (iii) capitalization; (iv) governmental consents and approvals; (v) permits and compliance with laws; (vi) financial statements and absence of undisclosed liabilities; (vii) employee benefits plans; (viii) material contracts; (ix) no conflicts or violations; (x) taxes; (xi) intellectual property; (xii) related party transactions; (xiii) absence of certain changes; (xiv) valid offering and issuance of shares; (xv) litigation; and (xvi) absence of broker's fees. None of the representations |

| | |
|---|---|
| | and warranties shall survive the Closing Date. |
| ***Target Representations and Warranties; Survival:*** | Spyglass will make customary representations and warranties with respect to (i) organization; (ii) authority; (iii) governmental consents and approvals; (iv) no conflicts or violations; (v) no third party consents with respect to the Contributed Assets; (vi) absence of undisclosed liabilities with respect to the Contributed Assets; (vii) investment intent; (viii) absence of certain changes with respect to the Contributed Assets; (ix) litigation; and (x) performance of material obligations with respect to the Contributed Assets.<br><br>Each of Cypress and Garoge will make customary representations and warranties with respect to (i) organization; (ii) title and authority; (iii) capitalization; (iv) governmental consents and approvals; (v) permits and compliance with laws; (vi) financial statements and absence of undisclosed liabilities; (vii) material contracts; (viii) no conflicts or violations; (ix) taxes; (x) intellectual property; (xi) films and elements; (xii) litigation; (xiii) no third party consents; (xiv) required vote of the Cypress/Garoge stockholders; (xv) absence of certain changes; (xvi) employment benefit plans; and (xvii) absence of broker's fees.<br><br>Each of the stockholders of Cypress/Garoge will make customary representations and warranties with respect to (i) authority; (ii) no conflicts or violations; (iii) governmental consents and approvals; (iv) title to Cypress/Garoge shares; (v) investment intent; and (vi) agreements relating to management stockholders.<br><br>Representations of Cypress/Garoge regarding authority and representations of the stockholders of Cypress/Garoge regarding authority and title to the Cypress/Garoge equity shall survive indefinitely, and tax representations of Cypress and Garoge shall survive the Closing Date for 60 days beyond the applicable statute of limitations (taking into account any applicable extensions). None of the other representations and warranties shall survive the Closing Date. |
| ***Non-Competition and Non-Solicitation***: | The Management Stockholders and Spyglass agree to be bound by certain non-competition and non-solicitation restrictions (as applicable) set forth in section 9.11 of the Investment Agreement and similar to those restrictions set forth in the form of employment agreement attached to the Investment Agreement. |
| ***Indemnification:*** | The Investment Agreement provides for post-closing indemnification of the Company by the shareholders of Cypress/Garoge on a several, and not joint, basis for all pre-Closing tax liabilities, breaches of the surviving title representation, any all liabilities to the extent related to distributions of cash, cash equivalents and specified assets of Cypress/Garoge (the "<u>Excluded Cypress/Garoge Assets</u>") prior to the Closing and any and all liabilities related to the transfer of the Excluded Cypress/Garoge Assets. The Management Stockholders shall provide prior to Closing guarantees in form and substance reasonably acceptable to Holdings, on a several basis, of the punctual payment and performance of the indemnification obligations of their respective family trusts that are stockholders of Cypress and Garoge. Any post-Closing indemnification payments to be made to the Company by the shareholders of Cypress/Garoge or the Management Stockholders pursuant to the guarantees may be paid, at the election of the indemnifying party, either in cash or pursuant to a transfer of such shareholders' New Common Stock to the Company (valued at the fair market value thereof) or a combination of cash and New Common Stock, in each case in an aggregate amount equal to the amount of the post-closing indemnification obligation. The cumulative aggregate indemnification obligation of the Cypress/Garoge stockholders shall not exceed the aggregate consideration received thereby on the Closing Date; <u>provided</u>, however, that any indemnification obligations relating to the pre-Closing tax liabilities of Cypress/Garoge or the Excluded Cypress/Garoge Assets shall not be (i) limited to the aggregate consideration received by the stockholders of Cypress/Garoge or (ii) taken into account in determining the amount of the aggregate indemnification obligation of any stockholder of Cypress/Garoge. |
| ***Closing Conditions:*** | The closing conditions include:<br>(i) accuracy of all representations and warranties in all respects, except where the failure of such representations and warranties does not have or would not reasonably be expected to have, individually or in the aggregate, a C/G/S Material Adverse Effect or a Parent Material Adverse |

| | |
|---|---|
| | Effect; _provided_ that certain specified representations and warranties shall be, as applicable, true and correct both when made and as of the Closing Date or accurate in all material respects; <br><br> (ii) no C/G/S Material Adverse Effect or Parent Material Adverse Effect since the date the Investment Agreement is signed; <br><br> (iii) performance of and compliance with all obligations in the Investment Agreement in all material respects; <br><br> (iv) acceptance and consummation of the Plan in accordance with its terms therein; <br><br> (v) entry of a Confirmation Order acceptable to Holdings, the Administrative Agent, Cypress/Garoge and Spyglass, which order shall be in full force and effect and not subject to any stay; <br><br> (vi) no adverse proceedings; <br><br> (vii) execution and delivery of the Transaction Documents and certain closing and tax certificates; <br><br> (viii) no rejection of material executory contracts or unexpired leases, other than executory contracts or unexpired leases previously disclosed; and <br><br> (ix) adoption of restated Company charter documents and the Board of Directors shall have an authorized size of nine members. |
| _**No Shop; Break-up Fee:**_ | The Investment Agreement includes a customary no-shop provision, provided that the Board of Directors may, in response to an unsolicited Superior Proposal, cause Holdings to terminate the Investment Agreement any time prior to 5:00 p.m. on the date that is 45 calendar days after the Execution Date. If Holdings either (i) terminates the Investment Agreement in accordance with the preceding sentence, (ii) rejects the Investment Agreement (or the Investment Agreement is deemed rejected) pursuant to section 365 of the Bankruptcy Code or (iii) otherwise terminates (or purports to terminate) the Investment Agreement in breach of the Investment Agreement (each, a "Break-Up Fee Event"), and so long as Cypress, Garoge and Spyglass are not then in breach of their obligations or representations or warranties under the Investment Agreement in such a manner that the conditions set forth in any of sections 11.1(a), (b) or (c) of the Investment Agreement cannot be satisfied, Spyglass shall be paid a break-up fee in the total aggregate amount of $4 million, plus up to an additional $500,000 in expense reimbursement for reasonable and documented out of pocket expenses and reasonable and documented legal fees, tax-related accounting fees and valuation fees and expenses (the "Break-Up Fee"). <br><br> It is a closing condition under the Investment Agreement that the Plan has been accepted by the requisite votes of the Holders of Allowed Credit Agreement Claims in accordance with section 1126(c) of the Bankruptcy Code on or before thirty (30) days after commencement of solicitation of the Plan. The Break-Up Fee is not payable if Holdings terminates the Investment Agreement in accordance with its terms because this condition is not satisfied. <br><br> Except for the Break-Up Fee, which shall be the sole and exclusive remedy of Spyglass, Cypress or Garoge for any loss or damage suffered as a result of a Break-Up Fee Event or any other breach of the Investment Agreement or any representation, warranty, covenant or agreement of Holdings contained in the Investment Agreement that results in the failure of the Contemplated Transactions to be consummated, and, upon the payment in full in cash of an amount equal to the Break-Up Fee in accordance with the Investment Agreement, (A) none of Spyglass, Cypress, Garoge or the stockholders of Cypress and Garoge will be entitled to any additional payment, compensation or any damages as a result of such breach, rejection or wrongful termination of the Investment Agreement, and (B) none of Spyglass, Cypress, Garoge or the stockholders of Cypress and Garoge or any of their respective Affiliates shall thereafter seek to recover any losses or damages in connection with the Investment Agreement or arising from any claim or cause of action in connection with the Contemplated Transactions in excess of the Break-Up Fee from the Company and its Subsidiaries and their respective Affiliates (other than for fraud or breach of the Confidentiality Agreements as set forth in section 12.2 of the Investment Agreement). Notwithstanding anything to the contrary contained in the Investment Agreement, (but subject to section 12.2 of the Investment Agreement), the parties expressly agree that Cypress/Garoge and Spyglass (and their Affiliates) shall be entitled to recover damages following termination of the Investment Agreement under section 12.1 thereof if (and only if) the Break Up Fee is not promptly paid in accordance with the Investment Agreement, but in no event shall such parties be entitled to both receive the Break-Up Fee (or retain any further right to claim the Break-Up Fee under the Escrow Agreement) and pursue damages under the Investment Agreement. |

| | |
|---|---|
| | To provide payment of the Break-Up Fee, Holdings shall (or cause a Subsidiary to), on or before the execution of the Investment Agreement, transfer to an escrow agent immediately available funds in an amount equal to the Break-Up Fee for deposit into an escrow account.<br><br>If notwithstanding the escrow, the Break-Up Fee or any portion thereof remains unpaid following the occurrence of a Break-Up Fee Event, Cypress and Garoge and Spyglass shall have a superpriority administrative expense priority in the Debtors' Chapter 11 Cases, junior only to any DIP financing or cash collateral stipulation and any carve out for Chapter 11 professional fees and expenses.  Such claim shall be paid in full upon the occurrence of a Break-Up Fee Event (in an amount not to exceed the Break-Up Fee) and thereupon discharged, or in the event of dispute whether any such claim is owed, reserved for in full on such effective date pending further order of the Bankruptcy Court in full satisfaction of any requirement under Section 1129(a)(9) of the Bankruptcy Code, including by amounts on deposit pursuant to the Escrow Agreement to the extent sufficient to cover the Break-Up Fee (or the amount thereof claimed to be unpaid) or any similar arrangement agreed by the parties or approved by the Bankruptcy Court. |
| *Termination:* | The Investment Agreement may be terminated  and transactions contemplated therein may be abandoned at any time prior to Closing:<br><br>i.  by mutual written consent of Holdings, Spyglass and Cypress/Garoge;<br>ii.  by Cypress/Garoge and Spyglass if the Chapter 11 Cases are not commenced 45 days after the Execution Date;<br>iii.  by Cypress/Garoge and Spyglass if the Bankruptcy Court fails to deem any amount of the Break-Up Fee owing as an allowed claim with superpriority status within 14 days following commencement of the Chapter 11 Cases;<br>iv.  on or after February 1, 2011, by Cypress/Garoge and Spyglass, so long as those parties are not then in breach of their material obligations under the Investment Agreement, (a) upon the occurrence of the inability of any of the conditions precedent set forth in section 11.2 of the Investment Agreement to be satisfied or (b) if Holdings or Merger Sub has committed a material breach of its representations, warranties or covenants under the Investment Agreement such that the conditions set forth in section 11.2 cannot be satisfied (which breach remains unremedied for 10 days);<br>v.  by Holdings, so long as Holdings and Merger Sub are not then in breach of its material obligations under the Investment Agreement, (a) upon the occurrence of the inability of any of the conditions precedent set forth in section 11.1 of the Investment Agreement to be satisfied or (b) if Cypress/Garoge or Spyglass has committed a material breach of its representations, warranties or covenants under the Investment Agreement such that the conditions set forth in section 11.1 cannot be satisfied (which breach remains unremedied for 10 days);<br>vi.  by Holdings in accordance with its right to terminate in response to a Superior Proposal, subject to payment of the Break-Up Fee; or<br>vii.  by either Cypress/Garoge and Spyglass or Holdings if the Closing does not occur on or prior to March 31, 2011 (the "<u>Termination Date</u>"); <u>provided</u> that the right to terminate after the Termination Date shall not be available to any party whose breach of any provision of the Agreement has been a cause of the failure of the Closing to occur on or before the Termination Date. |
| *Governing Law:* | The Investment Agreement and related agreements will be governed by the laws of the State of Delaware, to the extent not governed by the Bankruptcy Code. |

## 2. The Stockholders Agreement

| | |
|---|---|
| *Parties:* | Reorganized Holdings as the issuer of Common Stock and other Equity Interests, the creditors of Reorganized Holdings or its Subsidiaries, or their predecessors, (the "<u>Original Stockholders</u>"), Spyglass and certain former owners of shares in Cypress or Garoge (the "Spyglass Shareholders), the Directors of Reorganized Holdings who hold Equity Interests (the "<u>Director Stockholders</u>"),  the employees or formers employees of Reorganized Holdings or its Subsidiaries who hold Equity |

| | |
|---|---|
| | Interests (the "<u>Management Stockholders</u>") and the other stockholders that may become party to the Stockholders Agreement after the date of the Stockholders Agreement (collectively, the "<u>Stockholders</u>"). |
| ***Board Composition:*** | The Board will be comprised of nine (9) Directors. The initial Directors will include Gary Barber and Roger Birnbaum for so long as each serves as CEO and seven (7) other Directors. The Stockholders Agreement also contains additional corporate governance provisions. |
| ***Board Committees:*** | The Board shall establish one or more committees, including the following: audit committee, compensation committee, and Greenlight Committee. The Board may also establish an executive committee.<br><br>Both Executive Directors shall be appointed to serve on any executive committee and the Greenlight Committee, and one Executive Director shall be appointed to serve on each other Board committee, with the exception of the audit committee and the compensation committee, neither of which shall include the Executive Directors.<br><br>The Greenlight Committee shall be comprised of both CEOs and the heads of each of the motion picture, television and digital media departments, such department heads to serve in an advisory capacity only. The Greenlight Committee shall be the sole decision-making authority of Reorganized Holdings regarding the acquisition, production or financing of a motion picture, television program or other audiovisual program and regarding the applicable P&A Budget associated with motion pictures and the initial marketing expenditures associated with the launch of television programs and other audio visual programs, subject to the Annual Budget, the P&A Budget and the guidelines of the Greenlight Committee. The CEOs have authority to make Greenlight decisions without following the Greenlight procedures if Exigent Circumstances exist, subject to the Annual Budget and certain other restrictions set forth in the Stockholders Agreement.<br><br>The Non-Executive Directors may appoint a "Lead Director" from among the Non-Executive Directors. Such person shall have the authority and duties set forth in Reorganized Holdings' by-laws, as the same may be amended from time to time in accordance with the terms of the Stockholder Agreement and Reorganized Holdings' by-laws. |
| ***Protective Provisions:*** | <u>Decisions Requiring Approval of a Majority of the Board</u>: The following acts, set forth more fully in section 2.3(a) of the Stockholders Agreement, shall not be taken by management without first obtaining the approval of a majority of the Board at a meeting at which a "quorum" (as summarized below) is present:<br>i. Greenlighting or producing a motion picture with a production budget in excess of $150 million, which was not included in the approved Annual Budget (or if included in the Annual Budget, to the extent such production budget is in excess of the amounts budgeted therefor);<br>ii. entering into (a) licensing agreements in any or all media (now known or hereafter developed) in the Domestic Territory or any Major International Territory with respect to the Company's library of motion pictures, televisions programs and other intellectual property, (b) output agreements in any or all media (now known or hereafter developed) in the Domestic Territory or any Major International Territory with respect to the Company's newly released motion pictures, televisions programs and other intellectual property with respect to newly released media or (c) a sale of library assets, in each case subject to certain minimum thresholds specified in section 2.3(a)(2) of the Stockholders Agreement;<br>iii. spending "going in" US P&A in excess of $50 million or adopting a P&A Budget which would require the affirmative waiver of any material term of a credit facility;<br>iv. committing to deficit financing of a television production reasonably projected to be greater than $200,000 per episode (or if included in the Annual Budget, to the extent such deficit financing is in excess of the amounts budgeted therefor);<br>v. causing Reorganized Holdings to (a) enter into or amend any employment agreement for an employee that is not included in the Annual Budget and provides for annual compensation in excess of $400,000 per annum; or (b) pay any discretionary bonus to any employee to the extent not included in the Annual Budget; provided, that (i) other than as expressly set forth in the Stockholders Agreement, the CEOs will have general hiring and firing |

|  |  |
|---|---|
|  | authority over all employees of Reorganized Holdings without need for Board approval and (ii) a majority of the Board will have the right to approve the hiring of the Co-President/President of the motion picture department, Co-President/Chief Operating Officer, Chief Financial Officer, head of the television department and head of the digital media department (including any replacements thereof, but the CEOs shall have the right to fire any such executives without Board approval);<br><br>vi.   incurring indebtedness, except for (a) Reorganized Holdings' obligations pursuant to a new financing facility, (b) in connection with acquisition/production financing for motion pictures greenlit by the Greenlight Committee and (c) in the ordinary course of business provided such ordinary-course indebtedness does not exceed $100 million;<br><br>vii.   authorizing, adopting or amending any profit sharing, stock-based or equity option plan, other than the Equity Incentive Plan;<br><br>viii.   entering into any affiliate or related-party transactions which requires consent of a majority of the "disinterested" directors; and<br><br>ix.   entering into any transaction with respect to the issuance or sale of Equity Interests; provided that any issuances will be limited to the amounts determined in the good faith of the Board to be appropriate to satisfy the working capital needs and other corporate purposes of Reorganized Holdings (including future acquisitions and investments).<br><br>Decisions Requiring the Approval of a Supermajority of the Board. The following acts, set forth more fully in section 2.3(b) of the Stockholders Agreement, shall require the approval of at least two-thirds of the Board at a meeting at which a "quorum" (as summarized below) is present:<br><br>i.   adopting an Annual Budget for a given fiscal year or making any material changes thereto or to the business plan;<br><br>ii.   creating or issuing any new class of Equity Interests with rights, preferences or privileges senior to the Common Stock;<br><br>iii.   a material acquisition or disposition, other than ordinary course acquisitions or dispositions or any acquisitions entered into with respect to the Greenlight Committee's authority;<br><br>iv.   authorizing a merger or consolidation involving, or sale of all or substantially all of, Reorganized Holdings or its Subsidiaries;<br><br>v.   amending or a repealing any provision of the Certificate of Incorporation or By-Laws;<br><br>vi.   converting Reorganized Holdings into another form of legal entity;<br><br>vii.   commencing a bankruptcy (as customarily defined) of Reorganized Holdings or its Subsidiaries; and<br><br>viii.   commencing an initial Public Offering or filing a shelf registration of Reorganized Holdings or any of its Subsidiaries, subject to the Registration Rights Agreement.<br><br>Quorum: A majority of the Directors in office that includes one Executive Director will constitute a quorum, unless in the good faith opinion of the Non-Executive Directors, there is a willful or unreasonable failure on the part of both Executive Directors to attend a meeting of the Board for the purpose of preventing the transaction of business at such meeting and in such event, the majority of the Directors will constitute a quorum. If the quorum will fail solely because of the absence of a Executive Director, the meeting shall be adjourned to the following 2nd business day, as more fully described in the Stockholder Agreement. The foregoing quorum requirement shall terminate and no longer be valid if there are no Executive Directors on the Board, in which case, the majority of the Directors will constitute a quorum. |
| *Transfer Restrictions:* | Except for (i) Transfers (A) to Affiliates (subject to applicable notice requirements), (B) to third parties as permitted under the Investment Agreement (subject to applicable notice requirements) or (C) pursuant to the *Tag-Along Rights* and the *Drag-Along Rights* described below or (ii) Transfers effected pursuant to an effective registration statement filed under the Securities Act, no Transfer of Equity Interest shall be permitted that would require registration under Section 5 of the Securities Act or any applicable state securities laws, subject to certain customary exceptions and applicable notice requirements, including (x) for Transfers by a Stockholder who beneficially owns less than ten percent (10%) of the shares of Common Stock then outstanding or is not an "Affiliate" (as such term is defined in Rule 405 under the Securities Act) of Reorganized Holdings, (y) if the Transfer is being made in compliance with Rule 144 under the Securities Act or (z) Transfers of Equity Interests to Reorganized Holdings pursuant to the repurchase provisions of any management equity plan or agreement or independent director equity plan or agreement. |

| | No Transfer shall be permitted (i) prior to a Public Offer, if such Transfer would result in Reorganized Holdings becoming subject to the reporting requirements of the Exchange Act, (ii) unless and until the proposed Transferee agrees in writing to become a party to the Stockholder Agreement, (iii) if such Transfer would violate the provisions of the Stockholders Agreement, the Registration Rights Agreement or any applicable federal or state securities laws or (iv) to a Company Competitor or an Affiliate thereof without the prior written consent of the Board. |
| | Any of the C/G Stockholders may transfer Common Stock as permitted under the Investment Agreement, and, in such event, only the restrictions in (i), (ii) and (iii) of this paragraph shall apply. |
| *Tag-Along Rights:* | If one or more Stockholders, acting individually or in concert, propose to sell, in a single transaction or a series of related transactions, at least 35% of the then issued and outstanding Common Stock, the other Stockholders, including the Spyglass Stockholders, will be entitled to customary tag-along rights on a pro-rata basis in respect of any such proposed transfer. |
| *Drag-Along Rights:* | Customary "drag-along" rights if one or more Stockholders, acting individually or in concert and holding at least 66 2/3% of the then issued and outstanding Common Stock calculated on a fully diluted basis, agree to consent to, vote for or enter into a transaction that provides for the sale of all or substantially all of the Common Stock (or the assets of Reorganized Holdings) to an unaffiliated third party (and subject to customary "self dealing" protections). |
| | Such drag-along rights will terminate upon a Change of Control. |
| *Participation Rights:* | If Reorganized Holdings issues any additional Equity Interests (subject to certain customary exceptions including the Equity Incentive Plan), the Stockholders beneficially owning an aggregate number of shares representing at least 1% of the then issued and outstanding Common Stock will be provided the opportunity to purchase a pro-rata share of such Equity Interests on the same terms so as to maintain their fully diluted equity ownership. |
| *Call Rights:* | Except to the extent otherwise agreed in writing between Reorganized Holdings and a Management Stockholder, if Reorganized Holdings terminates a Management Stockholder's employment for Cause, Reorganized Holdings shall have the option to purchase, and the Management Stockholder shall be required to sell to Reorganized Holdings, any or all of the Common Stock or Common Stock Equivalents then held by such Management Stockholder, at certain designated purchase prices set forth in section 5.1(a) of the Stockholders Agreement. |
| *Indemnification* | If a conversion of Reorganized Holdings into another form of legal entity is undertaken on or prior to the date that is six (6) months after the Effective Date, Reorganized Holdings will indemnify the Spyglass Stockholders, as applicable, for an amount equal to the taxes payable by the Spyglass Stockholders that is attributable to the taxable gain recognized in connection with any such conversion (plus any income taxes imposed on such amounts); provided that any such indemnification shall not exceed the amount of taxes that would have been due and payable by the Spyglass Stockholders as of the Effective Date as a result of the mergers of Cypress and Garoge with and into a Subsidiary of Reorganized Holdings and the contribution of assets by Spyglass to a Subsidiary of Reorganized Holdings not having been treated as tax deferred transactions. |
| *Information Rights:* | Until Reorganized Holdings becomes subject to the reporting requirements of the Exchange Act, Reorganized Holdings shall provide the Stockholders, other than any Management Stockholder or Director Stockholder who it not a Spyglass Stockholder with: |
| | (i) at the end of each fiscal year and fiscal quarter, customary GAAP compliant financial statements accompanied with (a) (for the annual financial statements only) an auditor's report and (b) a management discussion and analysis of financial conditions for each such fiscal year or quarter similar to the management discussion and analysis that would be contained in a filing with the SEC Form 10-K or Form 10-Q (which management discussions and analysis will be abridged for the quarterly reports), as the case may be; and |
| | (ii) the annual and quarterly financial reports shall include a comparison to actual results to Reorganized Holdings' budgeted results for such period and discussion comparing actual results for |

| | such period to the Reorganized Holdings' budgeted results for such period. |
|---|---|
| | At least once per fiscal quarter, Reorganized Holdings shall host a conference call with the Chief Financial Officer and other members of senior management and the Stockholders to discuss the performance of Reorganized Holdings. No Stockholder who is a Company Competitor or an Affiliate thereof shall be permitted to participate in such calls. |
| *Termination:* | The Stockholders Agreement shall terminate upon the first to occur of (a) the sale of all or substantially all of the assets of Reorganized Holdings, (b) any bankruptcy, insolvency, liquidation or dissolution of Reorganized Holdings or (c) an initial Public Offering. |
| *Amendments:* | The Stockholders Agreement, the Certificate of Incorporation and the By-Laws may be amended only by a written instrument signed by (a) Reorganized Holdings and (b) Stockholders beneficially owning at least two-thirds of the then outstanding shares of Common Stock; provided that for so long as the Spyglass Stockholders and their Affiliates own at least 50% (in the aggregate) of the Common Stock held by the Spyglass Stockholders on the Effective Date, the consent of the holders of a majority of the Common Stock held by the Spyglass Stockholders shall be required for any amendment to the Stockholder Agreement, the Certificate of Incorporation or the By-Laws that disproportionately adversely affects the rights or obligations of the Spyglass Stockholders relative to the Original Stockholders; and provided further that any amendment to certain sections of the Stockholder Agreement (such sections specified in section 7.5 thereof) adversely affecting the rights or obligations of the Spyglass Stockholders or their Affiliates or certain other specified stockholders in section 7.5 will require consent of such stockholders or the holders of a majority of the Common Stock then held by the Spyglass Stockholders and their Affiliates. |
| *Governing Law:* | The Stockholders Agreement and related agreements will be governed by the laws of the State of Delaware. |

### 3. Registration Rights Agreement

| | |
|---|---|
| *Parties:* | Holdings and the holders of the Registrable Common Stock (the "Holders"). |
| *Registrable Common Stock* | Means any share of Common Stock beneficially owned by the Holders or their respective Affiliates from time to time, provided, however, that a share of Common Stock will cease to be Registrable Common Stock after it has been sold under any effective registration statement effected pursuant the Registration Rights Agreement (or, in the case of a Management Holder, the issuance to the Management Holder of Common Stock that was registered under a registration statement on Form S-8 which includes a resale prospectus on Form S-3) or pursuant to Rule 144 promulgated under the Securities Act after a Public Offering. |
| *Registration Rights:* | Subject to certain limitations, Shelf Requesting Holders may request that Holdings or any of its Subsidiaries file one shelf registration statement (a "Shelf Registration Statement") providing for the sale by the Shelf Requesting Holders of any or all of the Registrable Common Stock beneficially owned by such Shelf Requesting Holders (the date of such request, the "Shelf Request Date") and any or all of the Registrable Common Stock beneficially owned by other Holders who furnishes a completed questionnaire, which is attached to the Registration Rights Agreement. Shelf Requesting Holders may make such request at any time after the earlier to occur of (i) the completion of an initial Public Offering of Holdings (or a successor entity) or (ii) the second anniversary of the Effective Date; provided, that following the closing date of an initial Public Offering, Holdings shall not be required to file a Shelf Registration Statement until the later of (i) a period of one hundred eighty (180) days shall have elapsed from such closing date and (ii) the expiration of any lock-up agreement with the underwriters of any such initial Public Offering. |
| | "Shelf Requesting Holders" means (i) after the effectiveness of a Shelf Registration Statement or the initial Public Offering of Holdings (or a successor entity), one (1) or more Holders (other than Management Holders), who shall have no right to initiate a Shelf Registration Statement filing request |

|  |  |
|---|---|
|  | but in any event may participate in such registration), which, together with their Affiliates, beneficially own at least twenty percent (20%) of the shares of Registrable Common Stock outstanding on the Shelf Request Date (excluding shares held by Management Holders) or (ii) if there has not been a Shelf Registration that has been declared effective or an initial Public Offering of Holdings (or a successor entity) within two (2) years of the Effective Date, one (1) or more Holders (other than Management Holders), who shall have no right to initiate a Shelf Registration Statement filing request but in any event may participate in such registration), which, together with their Affiliates, beneficially own at least thirty five percent (35%) of the shares of Registrable Common Stock outstanding on the Shelf Request Date (excluding shares held by Management Holders).<br><br>At any time after (i) the expiration of effectiveness of the initial Shelf Registration Statement or (ii) the earlier of (x) if the initial Shelf Registration Statement has not been filed and declared effective, the completion of the initial Public Offering and (y) if the initial Shelf Registration Statement has not been filed and declared effective and Holdings has not yet completed an initial Public Offering, the second anniversary of the Effective Date, one or more Holders (other than Management Holders who shall have no such request rights) may make a written request to Holdings for the registration of such Holders' Registrable Common Stock; <u>provided</u> however, that in the case of clauses (i) and (ii)(x), such request shall be made by Holders together with their Affiliates beneficially owning at least 20% of the then outstanding shares of Registrable Common Stock (excluding shares held by Management Holders) and in the case of clause (ii)(y), such request shall be made by Holders together with their Affiliates beneficially owning at least 35% of the then outstanding shares of Registrable Common Stock (excluding shares held by Management Holders) (<u>provided</u> that, if an earlier registration has been declared effective and has not been deemed not to have been effected, subsequent requests pursuant to clause (ii)(y) shall only require at least twenty percent (20%) of the then outstanding shares of Registrable Common Stock (excluding shares held by Management Holders)).<br><br>No Management Holder's Registrable Common Stock shall be included in any registration statement unless the Minimum Hold Requirement is satisfied.<br><br>Holdings shall not be required to effect more than a total of 6 registrations and any single registration shall be required to have a minimum expected sale price of at least $250 million. |
| ***Piggyback Rights:*** | At any time when a Shelf Registration Statement covering all outstanding shares of Registrable Common Stock is not effective, the Holders (including Management Holders) shall have customary piggyback registration rights (other than in connection with (i) the registration rights above or (ii) an initial Public Offering in which only primary shares are to be sold).<br><br>No Management Holder's Registrable Common Stock shall be included in any registration statement unless the Minimum Hold Requirement is satisfied. |
| ***Expenses*** | All expenses of registration (other than underwriter discounts and commissions and applicable transfer taxes) shall be borne by Holdings. |
| ***Holdback Agreement:*** | The Holders and Holdings shall not, unless other agreed to by the managing underwriter, effect any sale or distributions of any equity securities of Holdings or securities convertible into or exchangeable for equity securities of Holdings (i) during the ten days prior to the initial Public Offering and for 180 days after the initial Public Offering or such shorter period acceptable to the managing underwriter or (ii) following the initial Public Offering, during the 10 days prior to the date on which an underwritten registration statement has become effective and for 90 days after the effective date of such underwritten registration or such shorter period acceptable to the managing underwriter. |
| ***Termination:*** | The Registration Rights Agreement shall terminate on the earlier of (i) the first date on which no shares of Registrable Securities are outstanding or (ii) the first date on which less than 10% of the aggregate number of shares of Common Stock issued pursuant to the Plan are collectively held by the Original Holders, the Spyglass Holders and their Affiliates. |
| ***Governing Law:*** | New York |

## 4. 2010 MGM Holdings Inc. Stock Incentive Plan

| | |
|---|---|
| *Purpose:* | The purpose of the 2010 MGM Holdings Inc. Stock Incentive Plan (the "<u>SIP</u>") is to aid Holdings and its Affiliates in recruiting and retaining key employees, directors or other service providers (a "Participant") and to motivate such employees, directors, or other service providers to exert their best efforts on behalf of Holdings and its Affiliates by providing incentives through the granting of an Option, Stock Appreciation Right or Other Stock-Based Award granted pursuant to the SIP (an "<u>Award</u>"). |
| *Shares Subject to SIP:* | Subject to certain adjustments as permitted by Section 9 of the SIP, including without limitation as a result of a Change of Control, the total number of shares of common stock of Holdings ("<u>Shares</u>") which may be issued under the SIP is 15% of the fully diluted Shares.  The Shares may consist, in whole or in part, of unissued Shares or treasury Shares.  The issuance of Shares or the payment of cash upon the exercise of an Award or in consideration of the settlement, cancellation or termination of an Award shall reduce the total number of Shares available under the SIP, as applicable.  Shares which are subject to Awards which are cancelled, forfeited, terminated or otherwise expired by their terms without the payment of consideration and Shares which are used to pay the exercise price of any Award, may be granted again subject to Awards under the SIP. |
| *Administration:* | The SIP shall be administered by the Compensation Committee of the Board (or a subcommittee thereof) or such other committee of the Board to which the Board has delegated power to act under or pursuant to the provisions of the SIP (the "<u>Committee</u>"), and if no such Committee has been created, the Board. Additionally, the Committee may delegate the authority to grant Awards under the SIP to any employee or group of employees of Holdings or an Affiliate; <u>provided</u> <u>that</u> such delegation and grants are consistent with applicable law and guidelines established by the Board from time to time.

Each Award granted under the SIP shall be evidenced by an Award agreement (the "<u>Award Agreement</u>") that shall contain such provisions and conditions as the Committee deems appropriate. |
| *Limitation:* | No Award may be granted under the SIP after the tenth anniversary of the Effective Date, but an Award theretofore granted may extend beyond that date. |
| *Options:* | Options granted under the SIP shall be non-qualified stock options for federal income tax purposes, as evidenced by the related Award Agreements, subject to the terms and conditions set forth in Section 6 of the SIP and to such other terms and conditions, not inconsistent therewith, as the Committee shall determine.  The terms and conditions of the Options include, without limitation:

<u>Option Price</u>.  The Option Price shall be determined by the Committee, provided that, for the purposes of an Option granted under the SIP to a Participant who is a U.S. taxpayer, in no event will (i) the Option Price be less than 100% of the Fair Market Value of a Share on the date an Option is granted (other than in the case of Options granted in substitution of previously granted awards, as described in Section 4 of the SIP) and (ii) any Option be granted unless the Share on which it is granted constitutes "service recipient stock" (within the meaning of Section 409A of the Code) with respect to the applicable Participant.

<u>Exercisability</u>.  Options granted under the SIP shall be exercisable at such time and upon such terms and conditions as may be determined by the Committee, but in no event shall an Option be exercisable more than ten years after the date it is granted.

<u>Exercise of Options</u>.  Except as otherwise provided in the SIP or in an Award Agreement, an Option may be exercised for all, or from time to time any part, of the Shares for which it is then exercisable. No Participant shall have any rights to dividends or other rights of a stockholder with respect to Shares subject to an Option until the Participant has given written notice of exercise of the Option, paid in full for such Shares and, if applicable, has satisfied any other conditions imposed by the Committee pursuant to the SIP. |

| | |
|---|---|
| **Stock Appreciation Rights:** | The Committee may also grant a Stock Appreciation Right.<br><br>Terms.  The exercise price per Share of a Stock Appreciation Right shall be an amount determined by the Committee but in no event shall such amount be less than the Fair Market Value of a Share on the date the Stock Appreciation Right is granted, (other than in the case of Stock Appreciation Rights granted in substitution of previously granted awards, as described in Section 4 of SIP).  Each Stock Appreciation Right shall entitle a Participant upon exercise to an amount equal to (i) the excess of (A) the Fair Market Value on the exercise date of one Share over (B) the exercise price per Share, times (ii) the number of Shares covered by the Stock Appreciation Right.<br><br>Limitations.  The Committee may impose, in its discretion, such conditions upon the exercisability or transferability of Stock Appreciation Rights as it may deem appropriate, but in no event shall a Stock Appreciation Right be exercisable more than ten years after the date it is granted. |
| **Other Stock-Based Awards:** | The Committee, in its sole discretion, may grant or sell Awards of Shares, Awards of restricted Shares, purchased Shares and Awards that are valued in whole or in part by reference to, or are otherwise based on the Fair Market Value of, Shares ("Other Stock-Based Awards").  Other Stock-Based Awards may be granted alone or in addition to any other Awards granted under the SIP. |
| **Transferability:** | Unless otherwise (i) provided in an Award Agreement, (ii) determined by the Committee or (iii) after an initial Public Offering subject to the Minimum Hold Requirement, an Award shall not be transferable or assignable by the Participant otherwise than by will or by the laws of descent and distribution.<br><br>As used in the SIP, "Minimum Hold Requirement" means any minimum hold requirement established by the Board in good faith in a manner consistent with the recommendation of Holdings' investment bankers or proxy solicitors, as consistent with good governance practices for public companies; provided, in no event will the minimum hold requirement require a Participant to hold Shares with a Fair Market Value at any given time in excess of four (4) times  the sum of such Participant's (x) annual base salary and (y) annual cash bonus, paid in respect of  the immediately preceding calendar year. |
| **Amendments or Termination:** | The Board may amend, alter or discontinue the SIP, but no amendment, alteration or discontinuation shall be made, (a) without the approval of a majority of the shareholders of Holdings, if such action would (except as is provided in Section 9 of the SIP), increase the total number of Shares reserved for the purposes of the Plan or (b) without the consent of a Participant, if such action would materially adversely affect any of the rights of such Participant under any Award theretofore granted to such Participant under the Plan; provided, however, that the Committee may amend the Plan in such manner as it deems necessary to permit the granting of Awards meeting the requirements of the Internal Revenue Code or other applicable laws (including, without limitation, to avoid adverse tax consequences to Holdings or to Participants). |
| **Governing Law:** | New York |

## II.   SUMMARY OF TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

The table set forth below summarizes the classification and treatment of the prepetition Claims and Interests under the Plan.

The Debtors intend to pursue consummation of the Plan and to cause the Effective Date to occur immediately after all conditions to the Effective Date are satisfied or waived.  There can be no assurance, however, as to when or whether the Effective Date will occur.  *See* **Section VI — "Risk Factors To Be Considered"** for a further discussion of certain factors that could delay or prevent the occurrence of the Effective Date.

The Debtors believe that the distributions contemplated by the Plan reflect an appropriate resolution of the Claims, taking into account the differing nature and priority of such Claims.

| Description And Amount Of Claims Or Interests | Summary Of Treatment |
|---|---|
| **Administrative Claims** | On, or as soon as reasonably practicable after, the later of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.  Notwithstanding the foregoing, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and the Debtors or the Reorganized Debtors. |
| **Priority Tax Claims** | On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the sole discretion of the Debtors, (i) Cash equal to the unpaid portion of such Holder's Allowed Priority Tax Claim, (ii) treatment in any other manner such that such Holder's Allowed Priority Tax Claim shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code over a period of not later than five years from the Petition Date, or (iii) such other treatment as to which the Debtors or the Reorganized Debtors and such Holder shall have agreed upon in writing. |
| **Class 1 – Non-Tax Priority Claims** | Except to the extent that the Holder of an Allowed Non-Tax Priority Claim has agreed to a less favorable treatment of such Claim, on, or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date on which such Non-Tax  Priority Claim becomes an Allowed Non-Tax Priority Claim, (c) the date on which such Allowed Non-Tax Priority Claim is otherwise due and payable and (d) such other date as mutually may be agreed to by and between the Debtors and the Holder of such Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim. |

| Description And Amount Of Claims Or Interests | Summary Of Treatment |
|---|---|
| | Class 1 is an Unimpaired Class, and the Holders of Allowed Class 1 Non-Tax Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Non-Tax Priority Claims are not entitled to vote to accept or reject the Plan. |
| **Class 2 – Other Secured Claims** | On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Class 2 Other Secured Claim shall, in the sole discretion of the applicable Debtor, be entitled to the treatment set forth below in option A, B, C, or D. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported Liens relating to the Other Secured Claims. |
| | Option A: Allowed Other Secured Claims with respect to which the applicable Debtor elects option A shall be Reinstated. The failure of the Debtors to file an objection, prior to the Effective Date, with respect to any Other Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtors to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court in accordance with Article X of the Plan) when and if such Claim is sought to be enforced. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such Reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes Allowed, or (c) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors. |
| | Option B: Allowed Other Secured Claims with respect to which the applicable Debtor elects option B shall be paid in Cash, in full, including any amounts owed under section 506 of the Bankruptcy Code, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, (c) the date on which such Other Secured Claim is otherwise due and payable and (d) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors. |
| | Option C: Allowed Other Secured Claims with respect to which the applicable Debtor elects option C shall be satisfied by the surrender to the Holder of the Claim of the collateral securing the applicable Other Secured Claim. |
| | Option D: Allowed Other Secured Claims with respect to which the applicable Debtor elects option D shall be satisfied in accordance with such other terms and conditions as may be agreed upon by the applicable Debtor or Reorganized Debtors and the Holder of such |

| Description And Amount Of Claims Or Interests | Summary Of Treatment |
|---|---|
| | Allowed Other Secured Claim. |
| | The applicable Debtor shall be deemed to have elected option A with respect to all Allowed Other Secured Claims except those with respect to which the applicable Debtor elects another option in writing prior to the Confirmation Hearing. |
| | Class 2 is an Unimpaired Class, and the Holders of Allowed Class 2 Other Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject the Plan. |
| **Class 3 – Credit Agreement Claims** | Each Holder of an Allowed Credit Agreement Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Credit Agreement Claim, its pro rata share of 95.3% of the New Common Stock to be issued and outstanding on the Effective Date, subject to dilution by the Equity Incentive Plan, plus the consideration described in the paragraph immediately below. Distributions on account of Credit Agreement Claims shall be made on the Effective Date to each Holder of an Allowed Credit Agreement Claim in accordance with Section 6.2 of the Plan. As set forth in Section 5.4 of the Plan, the New Common Stock will be subject to the Stockholders Agreement. For the purpose of the Plan all Class 3 Claims shall be deemed Allowed in an amount not less than $4,888,053,018.00[4] in accordance with the terms of the Credit Agreement and the Loan Documents and shall not be subject to defense, offset, counterclaim or reduction. |
| | With respect to each of the Letters of Credit outstanding on the Effective Date (if any), the Debtors will, at their discretion and in consultation with the Administrative Agent, (i) return such Letter of Credit to the issuing bank undrawn and marked "cancelled," (ii) "roll" such Letters of Credit into the New Credit Facility in a manner and pursuant to documentation reasonably satisfactory to the applicable issuing lenders of such Letters of Credit, or (iii) cash collateralize Claims in respect of their obligations under such Letters of Credit in an amount acceptable to the Administrative Agent that is intended to insure as much as is practicable a recovery on such Claims that is ratable with other Class 3 Claim recoveries. As of the date hereof, there are approximately $78,000 principal amount of letters of credit issued and outstanding under the Credit Agreement. |

---

[4] Although the Allowed Amount of each Credit Agreement Claim includes interest and other fees, in accordance with the terms of the Credit Agreement, balloting will be based on the principal amount of such Claims plus the face amount of any undrawn Letters of Credit.

| Description And Amount Of Claims Or Interests | Summary Of Treatment |
|---|---|
| | All fees, costs and expenses of the Administrative Agent as well as reasonable professional fees and expenses for the Administrative Agent and also for the Steering Committee payable shall be paid in full and in cash on the Effective Date or as soon thereafter as is practicable. |
| | Class 3 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 3 Credit Agreement Claim is entitled to vote to accept or reject the Plan. |
| **Class 4 – P&A Facility Claims** | Holders of Class 4 P&A Facility Claims shall have such Claims Reinstated on the Effective Date. |
| | Class 4 is an Unimpaired Class, and the Holders of Allowed Class 4 P&A Facility Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 P&A Facility Claims are not entitled to vote to accept or reject the Plan. |
| **Class 5 – General Unsecured Claims** | On the latest of (a) the Effective Date, (b) the date on which such General Unsecured Claim becomes Allowed, and (c) such other date as mutually may be agreed to by and between the Debtors or Reorganized Debtors and the Holder of such General Unsecured Claim, or, in each case, as soon thereafter as practicable, each Holder of an Allowed General Unsecured Claim in Class 5 shall be paid in Cash the amount of such Allowed General Unsecured Claim, in full and final satisfaction of such Holder's Allowed General Unsecured Claim; *provided, however,* a General Unsecured Claim that is not due and payable on or before the Effective Date shall be paid thereafter (i) in the ordinary course of business in accordance with the terms of any agreement governing, or other documents relating to, such General Unsecured Claim or (ii) in accordance with the course of practice between the Debtors and such Holder with respect to such General Unsecured Claim. |
| | Class 5 is an Unimpaired Class, and the Holders of Allowed Class 5 General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 General Unsecured Claims are not entitled to vote to accept or reject the Plan. |
| **Class 6 – Interests in Subsidiary Debtors** | Holders of Allowed Class 6 Interests in Subsidiary Debtors shall have such Interests Reinstated on the Effective Date. |
| | Class 6 is an Unimpaired Class, and the Holders of Allowed Class 6 Interests are conclusively deemed to have accepted the Plan pursuant |

| Description And Amount Of Claims Or Interests | Summary Of Treatment |
|---|---|
| | to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6 Interests are not entitled to vote to accept or reject the Plan. |
| **Class 7 – Interests in Holdings** | All Interests in Holdings shall be cancelled, and each Holder of Allowed Interests in Holdings shall not receive or retain any property on account thereof.<br><br>Holders of Allowed Interests in Holdings are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Class 7 Interests in Holdings are not entitled to vote to accept or reject the Plan. |

THE PLAN IS A SINGLE PLAN OF REORGANIZATION FOR THE JOINTLY ADMINISTERED CHAPTER 11 CASES, BUT DOES NOT CONSTITUTE A SUBSTANTIVE CONSOLIDATION OF THE DEBTORS' ESTATES.

### III.     PLAN VOTING INSTRUCTIONS AND PROCEDURES

**A.     Notice To Holders Of Claims**

This Disclosure Statement will be transmitted to Holders of Claims that are entitled under the Bankruptcy Code to vote on the Plan. Holders of Claims in Class 3 are the only Holders of Claims that are entitled to vote on the Plan. The purpose of this Disclosure Statement is to provide adequate information to enable such Holders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan. With the exception of Class 7 Equity Interests in Holdings, all other Classes are Unimpaired under the Plan and the Holders of Claims and Interests in such classes are deemed to have accepted the Plan.

ALL HOLDERS OF CLAIMS IN CLASS 3 ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN. This Disclosure Statement contains important information about the Plan and important considerations pertinent to acceptance or rejection of the Plan.

THIS DISCLOSURE STATEMENT, THE PLAN, AND BALLOTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No person has been authorized to distribute any information concerning the Company relating to the Solicitation other than the information contained herein.

**B.     Solicitation Package**

In soliciting votes for the Plan pursuant to this Disclosure Statement from the Holders of Claims in Class 3, the Debtors also will send copies of the Plan (attached hereto as <u>Appendix A</u>) and one or more Ballots to be used by Holders of Claims in such Class to vote to accept or reject the Plan.

**C. Voting Procedures And Ballots And Voting Deadline**

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please complete and sign your Ballot and return your Ballot to Donlin, Recano & Company, Inc. (the "Voting Agent") either by first class mail, or by hand delivery, or overnight courier to the address set forth below, so that it is received by the Voting Deadline.

THE VOTING DEADLINE IS 5:00 P.M. PREVAILING EASTERN TIME ON OCTOBER 22, 2010, UNLESS EXTENDED BY THE DEBTORS.

**The Voting Record Date for determining whether a Holder of an Impaired Claim is entitled to vote on the Plan is October 4, 2010.**

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN THE VOTING DEADLINE BY THE VOTING AGENT BY FIRST CLASS MAIL, HAND DELIVERY, OR OVERNIGHT COURIER AT THE ADDRESS SET FORTH BELOW.

**IF BY REGULAR MAIL**

**Donlin, Recano & Company, Inc.**
**Ballot Processing Center**
**P.O. Box 2034 Murray Hill Station**
**New York, NY 10156**


**IF BY HAND DELIVERY OR OVERNIGHT COURIER:**

**Donlin, Recano & Company, Inc.**
**Ballot Processing Center**
**419 Park Avenue South**
**New York, NY 10016**

If you have any questions about the procedure for voting your Claim, the packet of materials that you have received or the amount of your Claim, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact the Voting Agent as follows:

**Voting Department**
**Donlin, Recano & Company, Inc.**
**P.O. Box 2034 Murray Hill Station**
**New York, NY 10016**
**DIRECT PHONE: (212) 771-1128**

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline or the Bankruptcy Court orders otherwise, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

In the event of a dispute with respect to any Impaired Claim, any vote to accept or reject the Plan cast with respect to such Claim will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise.

FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, *SEE* **SECTION XI — "THE SOLICITATION."**

**D.      Confirmation Hearing And Deadline For Objections To Confirmation**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

If and when the Debtors file petitions for relief under chapter 11 of the Bankruptcy Code, they will request that the Bankruptcy Court schedule a Confirmation Hearing to consider the adequacy of this Disclosure Statement and to confirm the Plan. Notice of the Confirmation Hearing will be provided to Holders of Claims and Interests or their representatives (the "Confirmation Hearing Notice") pursuant to an order of the Bankruptcy Court. Objections to Confirmation must be filed with the Bankruptcy Court by the date designated in the Confirmation Hearing Notice and are governed by Bankruptcy Rules 3020(b) and 9014 and local rules of the Bankruptcy Court. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, SUCH OBJECTION TO CONFIRMATION MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING.

## IV.      THE ANTICIPATED CHAPTER 11 CASES

If the Debtors receive the requisite acceptances in response to the Solicitation occurring pursuant to this Disclosure Statement, the Debtors intend promptly to commence the Chapter 11 Cases. From and after the Petition Date, the Debtors intend to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Debtors do not expect the Chapter 11 Cases to be protracted. To ease their transition into Chapter 11 and to expedite their emergence from Chapter 11, the Debtors intend to seek from the Bankruptcy Court, among other things, the relief detailed below on the Petition Date. If granted, this relief will facilitate the administration of the Chapter 11 Cases. There can be no assurance, however, that the Bankruptcy Court will grant the requested relief. The Debtors may also seek various other forms of administrative and other relief in the early stages of the Chapter 11 Cases.

**A.      Motions To Be Filed On The Petition Date**

1.      *Motion To Approve Combined Disclosure Statement And Confirmation Hearing*

The Debtors expect to seek an order (i) scheduling a combined Confirmation Hearing and hearing on the adequacy of this Disclosure Statement on the earliest date which is convenient for the Bankruptcy Court (the "Combined Hearing"); (ii) approving the objection deadline and procedures with respect to the Combined Hearing; and (iii) approving the proposed notice of the Combined Hearing. At the Combined Hearing, the Debtors would seek approval of this Disclosure Statement and confirmation of the Plan pursuant to sections 1125, 1128, and 1129 of the Bankruptcy Code. At that time, the Debtors also expect to request the Bankruptcy Court to approve the prepetition solicitation of votes on the Plan.

2.      *Motion To Use Cash Collateral And Obtain DIP Financing*

The Debtors expect to seek authority to use their cash collateral and, if necessary, to obtain debtor in possession financing in order to continue their business operations. The Debtors expect to seek authorization to use only such amounts of cash collateral and incur indebtedness under any DIP Financing as are necessary to continue to operate their businesses in the ordinary course.

3.    *Motion To Continue Using Existing Cash Management Systems*

Because the Debtors expect the Chapter 11 Cases to be pending for approximately 45 days, and because of the administrative hardship that any operating changes would impose, the Debtors expect to seek authority to continue using their existing cash management system, bank accounts, and business forms and to follow their internal investment and deposit guidelines. Absent the Bankruptcy Court's authorization of the continued use of the cash management system, the Debtors' cash flow could be impeded to the detriment of the Debtors' Estates and their creditors.

Further, the Debtors expect to seek authority to continue undertaking ordinary course intercompany transactions by and among themselves and their non-Debtor affiliates consistent with past practices of the Debtors and such non-Debtor affiliates.

4.    *Motion For Authority To Pay Prepetition Employee Compensation And Associated Benefits*

The Debtors have a valuable asset in their work force and believe that any delay in paying prepetition compensation or benefits to their employees would destroy their relationships with such employees and irreparably harm employee morale at a time when the continued dedication, confidence and cooperation of their employees is most critical. Accordingly, the Debtors expect to seek authority to pay compensation and benefits which were accrued but unpaid as of the Petition Date. Furthermore, under MGM's 2005 Security Plan (the "Security Plan") certain employees are eligible for severance benefits in the event of a Change in Control (as defined in the Security Plan) if, within one year thereafter, such employee's employment is terminated without cause, or such employee voluntarily terminates his/her employment under certain conditions constituting good reason. On May 21, 2010, the Debtors adopted an amendment to the Security Plan allowing all eligible employees to opt out of the Security Plan and instead receive a lump sum payment representing a percentage of the amount they would be entitled to receive if all conditions precedent under the Security Plan were met. For certain of those employees that are not participants in the Security Plan, the Debtors adopted a Retention Bonus Plan on May 21, 2010 to incentive eligible individuals to diligently perform during the Debtors' reorganization efforts. To receive an award, eligible participants must diligently perform their services from January 1, 2010 to the date of effectiveness of the Debtors' plan of reorganization in bankruptcy (the "Vesting Date"). Participants are also eligible to receive a reduced distribution if they are terminated without cause prior to the Vesting Date. The maximum target for the early payment option of the Security Plan is approximately $10.8 million and for the Retention Bonus Plan is $9.7 million, for a total of $20.5 million. The Plan provides for the Debtors' assumption of the Security Plan and the Retention Bonus Plan, which will be funded in large part by a contribution of approximately $12.7 million of unencumbered cash from Holdings, constituting substantially all of the assets of Holdings as of the Petition Date.

5.    *Motion To Pay Prepetition Unsecured Claims*

The Debtors plan to continue to operate their businesses in the ordinary course after the filing of the Chapter 11 Cases. In order to avoid any disruption to their businesses and consistent with their past practices, the Debtors expect to seek authority to pay prepetition claims as they become due in the ordinary course of business. Out of an abundance of caution, the Debtors also expect to file separate motions seeking authority to pay the Claims of various categories of unsecured creditors.

6.    *Motion To Pay Taxes*

The Debtors expect to seek authority to pay prepetition sales taxes, use taxes, and foreign taxes, regardless of when incurred, to the appropriate taxing, licensing and other governmental authorities in the ordinary course of the Debtors' businesses and consistent with their past practices.

7.    *Adequate Assurance Of Utilities*

In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, telephone, and similar services from many different utility companies. Historically, the

Debtors have paid these utilities timely. The Debtors expect to move the Bankruptcy Court on the Petition Date to enter an order approving, as adequate assurance of payment for utility providers, a cash deposit of $10,500 in the aggregate into a newly created, segregated interest-bearing account within 20 days of the Petition Date. The amount of the deposit equals the estimate aggregate cost for half of one month of utility service, calculated based on an historical average over the past 12 months. Further, the motion will request an order prohibiting utility providers from altering, refusing, or discontinuing services. The Debtors believe that uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' reorganization.

8. *Motion To Pay Shippers And Storage Labs*

The Debtors expect to seek authority to pay, in the ordinary course of business and consistent with their past practices, various storage laboratory facilities ("Storage Labs") and third-party shippers, freighters, common carriers, and other transporters (collectively, the "Shippers") who store and deliver to domestic and foreign customers and vendors, as applicable, the Debtors' stock of original films and prints in the MGM Library. Disruption of such services would be detrimental to the Debtors' ongoing operations. Moreover, many of the Storage Labs and Shippers likely will assert possessory or other liens on materials currently in their possession if their prepetition claims are not paid.

9. *Retention Of Noticing Agent*

The Debtors expect to seek Bankruptcy Court authority to retain and employ Donlin, Recano & Company as noticing agent in connection with the Chapter 11 Cases. Among other things, the noticing agent would (i) distribute required notices to parties in interest and (ii) provide such other administrative services as the Debtors may require. Such assistance will permit the Debtors to focus on their reorganization efforts.

10. *Motion To Pay Prepetition Participations And Residuals*

In order to preserve the Debtors' standing and goodwill with the actors, writers, directors, producers, and other similar persons responsible for the development and production of the Debtors' entertainment content, the Debtors expect to seek Bankruptcy Court approval to pay all prepetition participations and residuals incurred in the ordinary course of business and consistent with their past practices.

11. *Motion For Authorization To Honor Obligations Due To United Artists Production Finance LLC In The Ordinary Course of Business*

As set forth above, MGM Studios is a party to a Master Distribution Agreement with UAPF. Under the Master Distribution Agreement, MGM Studios is the exclusive distributor of eligible pictures with respect to which New United Artists owns or has acquired distribution, marketing, and promotion rights. UAPF is a party to certain financing agreements, which (i) are secured by substantially all of UAPF's and its domestic subsidiary's assets and (ii) contain default provisions that are triggered by MGM Studios' failure to make a payment to UAPF under the Master Distribution Agreement. Because UAPF is not contemplated to be a debtor in these Chapter 11 Cases, a default under such financing agreements would allow the lenders under such agreements to accelerate UAPF's obligations to UAPF's lenders and exercise remedies. Accordingly, the Debtors will be seeking Bankruptcy Court authority to continue making payments under the Master Distribution Agreement. Absent such payment, the Debtors' ability to continue to exploit the films developed and produced by New United Artists could be harmed.

12. *Motion to Approve Break-Up Fee and Expense Reimbursement*

Upon the occurrence of certain events and conditions as set forth in the Investment Agreement, including if the Company rejects the Investment Agreement or terminates after receipt of a Superior Proposal (as defined in the Investment Agreement) (*see* **section I.H.1 – "Summary of Investment Agreeement"**), Spyglass and Cypress/Garoge will be paid a break-up fee in the amount of $4 million and the reimbursement of expenses of no more than $500,000 (the "Break-Up Fee"). Pursuant to the Investment Agreement, the Debtors have deposited an amount equal to the Break-Up Fee into an escrow account for payment to Spyglass in the event Spyglass and Cypress/Garoge are entitled to the Break-Up Fee. In addition, the Debtors are contractually obligated to seek a

Bankruptcy Court order (1) deeming any claim of Spyglass and Cypress/Garoge for unpaid amounts of the Break-Up Fee in the event the escrow is not available as contemplated by the Investment Agreement, and allowing such claim in full as, a superpriority administrative expense of the Company, junior in priority only to any DIP financing or cash collateral priority obligations and any carve-outs for chapter 11 professional fees and (2) approving the payment of any unpaid fees and expenses owed by Holdings to Spyglass and Cypress/Garoge as administrative expenses of the Company entitled to administrative expense priority.

13.    *Other "First Day" Motions*

Upon the commencement of the Chapter 11 Cases, the Debtors also intend to seek court approval to provide for, among other things:

- the filing of a consolidated list of creditors;

- the extension of the deadlines to (a) file schedules and statements, and (b) to file financial reports pursuant to Bankruptcy Rule 2015.3; and ultimate waiver if the Plan is effectuated;

- certain procedures specific to a prepackaged chapter 11 case;

- admission of certain attorneys to practice pro hac vice;

- joint administration of the Debtors' Chapter 11 Cases;

- retention of professionals; and

- engagement of the arranger for the New Credit Facility

## B.    Anticipated Timetable For The Chapter 11 Cases

Following the Petition Date, the Debtors expect the Chapter 11 Cases to proceed on the following estimated timetable.  There can be no assurance, however, that the Bankruptcy Court will permit the Chapter 11 Cases to proceed as expeditiously as anticipated.

The Debtors anticipate that the hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan will occur within 30 to 45 days after the Petition Date.  Assuming that the Plan is confirmed at that hearing, the Plan provides that the Effective Date will be the first Business Day on which all conditions to the Plan's effectiveness (as set forth in Article VIII of the Plan) have been satisfied or waived.  *See* **Section V.F.1 — "Summary Of The Plan Of Reorganization – Confirmation And Consummation Of The Plan – Condition To Entry of the Confirmation Order."**  Based upon information currently available, the Debtors believe that the Effective Date could occur shortly after the Confirmation Date.  There can be no assurance, however, that this projected timetable can be achieved.

## V.    SUMMARY OF THE PLAN OF REORGANIZATION

The primary objectives of the Plan are to (i) deleverage the Company's balance sheet, (ii) settle, compromise, or otherwise dispose of certain Claims on terms that the Debtors believe to be fair and reasonable and in the best interests of their respective estates and stakeholders, and (iii) consummate the transaction contemplated by the Investment Agreement.

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or the documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statements of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Interests in the Debtors under the Plan and will, upon the Effective Date, be binding upon all Holders of Claims

against and Interests in the Debtors and their Estates, the Reorganized Debtors, and other parties in interest. In the event of any conflict between this Disclosure Statement, on the one hand, and the Plan or any other operative document, on the other hand, the terms of the Plan and such other operative document are controlling.

## A. Overview Of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors, and its interest holders. Another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization or liquidation is the principal objective of a chapter 11 case. The plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the Bankruptcy Court makes that plan binding upon the debtor and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) holds a claim or interest that is impaired under the plan; (ii) has voted to accept or reject the plan; or (iii) receives or retains any property under the plan.

## B. Overall Structure Of The Plan

The Plan is a single plan of reorganization for the jointly administered Chapter 11 Cases, but does not constitute a substantive consolidation of the Debtors' Estates. Holders of Claims entitled to vote on the Plan will receive a single Ballot. Under the Plan, Claims against and Interests in the Debtors are divided into different classes. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and distributions, if any, to be made under the Plan are described below.

## C. Classification And Treatment Of Claims And Interests

The Plan classifies Claims and Interests separately and provides different treatment for different Classes of Claims and Interests in accordance with the Bankruptcy Code. As described more fully below, the Plan provides, separately for each Class, that Holders of Claims and Interests will receive types of consideration based on the different rights of the Holders of Claims or Interests in each Class. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

Procedures for the distributions pursuant to the Plan, including matters that are expected to affect the timing of the receipt of distributions by Holders of Claims, are described in **Section V.D — "Summary Of The Plan Of Reorganization – Provisions Governing Distributions."**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified.

### 1. *Treatment Of Unclassified Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

(a) Administrative Claims. On, or as soon as reasonably practicable after, the later of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or

(c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim. Notwithstanding the foregoing, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and the Debtors or the Reorganized Debtors.

(b)      Priority Tax Claims.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the sole discretion of the Debtors, (i) Cash equal to the unpaid portion of such Holder's Allowed Priority Tax Claim, (ii) treatment in any other manner described in section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code over a period of not later than five years from the Petition Date, or (iii) such other treatment as to which the Debtors or the Reorganized Debtors and such Holder shall have agreed upon in writing.

2.      *Classification And Treatment Of Claims And Interests*

(a)      Introduction

The Plan is a single plan of reorganization for the jointly administered Chapter 11 Cases, but does not constitute a substantive consolidation of the Debtors' Estates.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, and the respective treatment of such Unclassified Claims is set forth in Article II of the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

(b)      Summary of Classes

| *Class* | *Impaired/Unimpaired; Entitlement To Vote* |
| --- | --- |
| Class 1 – Non-Tax Priority Claims | Unimpaired – Deemed to have accepted the Plan and not entitled to vote |
| Class 2 – Other Secured Claims | Unimpaired – Deemed to have accepted the Plan and not entitled to vote |
| Class 3 – Credit Agreement Claims | Impaired – Entitled to vote |
| Class 4 – P&A Facility Claims | Unimpaired – Deemed to have accepted the Plan and not entitled to vote |
| Class 5 – General Unsecured Claims | Unimpaired – Deemed to have accepted the Plan and not entitled to vote |
| Class 6 – Interests in Subsidiary Debtors | Unimpaired – Deemed to have accepted the Plan and not entitled to vote |

| Class 7 – Interests in Holdings | Impaired – Deemed to have rejected the Plan and not entitled to vote |
|---|---|

       (c)       Treatment Of Classes

       (i)       Class 1 – Non-Tax Priority Claims

       (A)    *Claims In Class:*  Class 1 consists of all Non-Tax Priority Claims against each of the Debtors.

       (B)    *Treatment:*  Except to the extent that the Holder of an Allowed Non-Tax Priority Claim has agreed to a less favorable treatment of such Claim, on, or as soon as reasonably practicable after the latest of (a) the Effective Date, (b) the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, (c) the date on which such Allowed Non-Tax Priority Claim is otherwise due and payable and (d) such other date as mutually may be agreed to by and between the Debtors and the Holder of such Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim.

       (ii)       Class 2 – Other Secured Claims

       (A)    *Claims In Class:* Class 2 consists of all Other Secured Claims against each of the Debtors.

       (B)    *Treatment:*  On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Class 2 Other Secured Claim shall, at the option of the applicable Debtor, be entitled to the treatment set forth below in option A, B, C, or D. The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported Liens relating to the Other Secured Claims.

       Option A:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option A shall be Reinstated.  The failure of the Debtors to file an objection, prior to the Effective Date, with respect to any Other Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtors to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.  Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such Reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes Allowed, or (c) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors.

       Option B:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option B shall be paid in Cash, in full, including any amounts owed under section 506 of the Bankruptcy Code, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, (c) the date on which such Other Secured Claim is otherwise due and payable and (d) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors.

       Option C:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option C shall be satisfied by the surrender to the Holder of the Claim of the collateral securing the applicable Other Secured Claim.

Option D:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option D shall be satisfied in accordance with such other terms and conditions as may be agreed upon by the applicable Debtor or Reorganized Debtor and the Holder of such Allowed Secured Claim.

The applicable Debtor shall be deemed to have elected option A with respect to all Allowed Other Secured Claims except those with respect to which the applicable Debtor elects another option in writing prior to the Confirmation Hearing.

(iii)     Class 3 – Credit Agreement Claims

(A)     *Claims In Class:*  Class 3 consists of all Credit Agreement Claims against each of the Debtors.

(B)     *Treatment:*  Each Holder of an Allowed Credit Agreement Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Credit Agreement Claim, its pro rata share of 95.3% of the New Common Stock to be issued and outstanding on the Effective Date, subject to dilution by the Equity Incentive Plan, plus the consideration described in the paragraph immediately below. Distributions on account of Credit Agreement Claims shall be made on the Effective Date to each Holder of an Allowed Credit Agreement Claim in accordance with Section 6.2 of the Plan.  As set forth in Section 5.4 of the Plan, the New Common Stock will be subject to the Stockholders Agreement.  For the purpose of the Plan all Class 3 Claims shall be deemed Allowed in an amount not less than $4,888,053,018.00[5] in accordance with the terms of the Credit Agreement and the Loan Documents and shall not be subject to defense, offset, counterclaim or reduction.

With respect to each of the Letters of Credit outstanding on the Effective Date (if any), the Debtors will, at their discretion and in consultation with the Administrative Agent, (i) return such Letter of Credit to the issuing bank undrawn and marked "cancelled," (ii) "roll" such Letters of Credit into the New Credit Facility in a manner and pursuant to documentation reasonably satisfactory to the applicable issuing lenders of such Letters of Credit, or (iii) cash collateralize Claims in respect of their obligations under such Letters of Credit in an amount acceptable to the Administrative Agent that is intended to insure as much as is practicable a recovery on such Claims that is ratable with other Class 3 Claim recoveries.  As of the date hereof, there are approximately $78,000 principal amount of letters of credit issued and outstanding under the Credit Agreement.

All fees, costs and expenses of the Administrative Agent as well as reasonable professional fees and expenses for the Administrative Agent and also for the Steering Committee payable shall be paid in full and in cash on the Effective Date or as soon thereafter as is practicable.

(iv)     Class 4 –  P&A Facility Claims

(A)     *Claims In Class:*  Class 4 consists of all P&A Facility Claims against each of the Debtors.

(B)     *Treatment:*  Holders of Class 4 P&A Facility Claims shall have such Claims Reinstated on the Effective Date.

---

[5]     Although the Allowed Amount of each Credit Agreement Claim includes interest and other fees, in accordance with the terms of the Credit Agreement, balloting will be based on the principal amount of such Claims plus the face amount of any undrawn Letters of Credit.

(v)     Class 5 – General Unsecured Claims

(A)     *Claims In Class:*  Class 5 consists of all General Unsecured Claims against each of the Debtors.

(B)     *Treatment:*  On the latest of (a) the Effective Date, (b) the date on which such General Unsecured Claim becomes Allowed, and (c) such other date as mutually may be agreed to by and between the Debtors or Reorganized Debtors and the Holder of such General Unsecured Claim, or, in each case, as soon thereafter as practicable, each Holder of an Allowed General Unsecured Claim in Class 5 shall be paid in Cash the amount of such Allowed General Unsecured Claim, in full and final satisfaction of such Holder's Allowed General Unsecured Claim; *provided, however,* a General Unsecured Claim that is not due and payable on or before the Effective Date shall be paid thereafter (i) in the ordinary course of business in accordance with the terms of any agreement governing, or other documents relating to, such General Unsecured Claim or (ii) in accordance with the course of practice between the Debtors and such Holder with respect to such General Unsecured Claim.

(vi)     Class 6 – Interests in Subsidiary Debtors

(A)     *Interests In Class:* Class 6 consists of all Interests in Subsidiary Debtors.

(B)     *Treatment:*  Holders of Allowed Class 6 Interests in Subsidiary Debtors shall have such Interests Reinstated on the Effective Date.

(vii)     Class 7 – Interests in Holdings

(A)     *Claims In Class:*  Class 7 consists of all Interests in Holdings and all Claims arising from or related to Interests in Holdings that are subject to subordination under section 510(b) of the Bankruptcy Code.

(B)     *Treatment:*  All Interests in Holdings shall be cancelled, and each Holder of Allowed Interests in Holdings shall not receive or retain any property on account thereof.

(d)     Intercompany Claims.  On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors or between one or more Debtors and any affiliate of one of the Debtors that is not itself a Debtor shall, at the election of Reorganized Holdings, be either (a) Reinstated, (b) released, waived, and discharged, or (c) contributed to, or dividended to, the capital of the obligor.

(e)     Alternative Treatment.  Notwithstanding any provision in the Plan to the contrary, any Holder of an Allowed Claim or Interest may receive, instead of the distribution or treatment to which it is entitled under the Plan, any other distribution or treatment to which it and the Debtors, with the consent of the Administrative Agent and each of the Spyglass Consent Parties, or, after the Effective Date, the Reorganized Debtors may agree in writing.

(f)     Special Provision Regarding Unimpaired Classes of Claims.  Except as otherwise provided in the Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims in Unimpaired Classes, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs against or recoupments of Claims in Unimpaired Classes.

(g)     Procedures For Resolving Disputed, Contingent, And Unliquidated Claims.  The Debtors and Reorganized Debtors may contest the amount and validity of any disputed, contingent or unliquidated Claim in the ordinary course of business in the manner and, at their option, may do so in the venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced;

*provided, however*, if the Reorganized Debtors contest the amount or validity of any Claim arising under a Transaction Document, they must do so in the venue provided in such Transaction Document.  Without limiting Section 3.7 of the Plan, the Bankruptcy Court shall retain jurisdiction over any dispute in respect any pre Effective Date default or alleged default under any Assumed or Rejected Contract and over the amount of any rejection damage claim in respect of a Rejected Contract.

        3.        *Acceptance Or Rejection Of The Plan*

        (a)        Classes Entitled To Vote.  Class 3 – Credit Agreement Claims are entitled to vote to accept or reject the Plan.  By operation of law, each Unimpaired Class of Claims and Interests is deemed to have accepted the Plan and, therefore, is not entitled to vote.  By operation of law, Class 7 – Interests in Holdings is deemed to have rejected the Plan and is not entitled to vote.

        (b)        Acceptance By Impaired Classes.  An Impaired Class of Claims shall have accepted the Plan if, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code, (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan.

        (c)        Elimination Of Classes.  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

        (d)        Cramdown.  To the extent necessary, except with respect to Class 3, the Debtors shall request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan with the consent of the Administrative Agent and each of the Spyglass Consent Parties to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

        4.        *Means For Implementation Of The Plan*

        (a)        Continued Legal Existence and Revesting of Assets.  Except as otherwise provided in the Plan, each of the Debtors will continue to exist after the Effective Date as a separate legal entity, with all the powers of such an entity (whether a limited liability company, corporation, or other entity, as appropriate) under applicable law in the jurisdiction in which each applicable Debtor is organized, incorporated or otherwise formed and pursuant to such Debtor's articles of organization or formation, operating agreement and other organizational documents in effect as of the Effective Date (provided that such organizational documents shall be amended to prohibit the Reorganized Debtors from issuing non-voting equity securities, to the extent necessary to comply with section 1123(a) of the Bankruptcy Code), without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  In accordance with section 9.2 of the Plan, and except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising each Estate (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in the applicable Reorganized Debtors.

        (b)        Sources Of Cash For Distribution.  All Cash necessary for the Reorganized Debtors to make payments required by the Plan shall be obtained from (i) existing Cash balances, (ii) the operations of the Debtors or Reorganized Debtors, and (iii) proceeds from the New Credit Facility.

        (c)        Investment Agreement; Issuance of New Common Stock.  On the Effective Date, upon the terms and subject to the conditions set forth in the Investment Agreement, (i) Spyglass will contribute the assets set forth in the Investment Agreement to Reorganized Holdings or its designated subsidiary and Reorganized Holdings will assume all liabilities related thereto, (ii) Cypress and Garoge will merge with and into the Debtor Merger Party, with the Debtor Merger Party as the surviving limited liability company, (iii) Spyglass will be issued

approximately 0.52% of the New Common Stock issued and outstanding as of the Effective Date, and (iv) the C/G Stockholders will be issued approximately 4.17% of the New Common Stock issued and outstanding as of the Effective Date. Under Section 3.3(c) of the Plan, Holders of Credit Agreement Claims will be issued the remaining approximately 95.3% of the New Common Stock issued and outstanding on the Effective Date. The New Common Stock issued to the Holders of Credit Agreement Claims and to Spyglass and the C/G Stockholders shall be subject to dilution by the Equity Incentive Plan. All shares of New Common Stock issued under the Plan shall be, upon issuance, fully paid and non-assessable, and the holders thereof shall have no preemptive or other rights to subscribe for additional shares, except as otherwise provided in the Stockholders Agreement pursuant to options or other awards issued pursuant to the Equity Incentive Plan. Except as set forth in Section 5.2 of the Plan or the Transaction Documents, no New Common Stock or securities convertible into, exchangeable for, or exercisable for shares of common stock or other equity of Reorganized Holdings shall be issued or outstanding as of the Effective Date.

(d)     Section 1145 Exemption. Pursuant to section 1145 of the Bankruptcy Code, the issuance and allocation of shares of the New Common Stock to Holders of Credit Agreement Claims pursuant to the Plan shall be exempt from registration under the Securities Act and any state or local law requiring registration for offer or sale of a security.

(e)     Stockholders Agreement for New Common Stock. On the Effective Date, Reorganized Holdings, Spyglass and the C/G Stockholders shall execute and deliver the Stockholders Agreement. Each Holder of an Allowed Class 3 – Credit Agreement Claim shall be deemed bound by the Stockholders Agreement as of the Effective Date without the need for execution or delivery by such Holder.

(f)     Registration Rights Agreement. Without limiting the effect of section 1145 of the Bankruptcy Code, on the Effective Date, Reorganized Holdings will enter into a Registration Rights Agreement with (i) Spyglass and each C/G Stockholder, and (ii) each holder of New Common Stock, (a) who by virtue of holding New Common Stock to be distributed under the Plan and/or its relationship with Reorganized Holdings could reasonably be deemed to be an "affiliate" (as such term is used with the meaning of applicable securities laws) of Reorganized Holdings, and (b) who requests in writing that Reorganized Holdings execute such agreement.

(g)     Equity Incentive Plan. On the Effective Date, the Equity Incentive Plan, in the form attached to the Plan as Exhibit F, shall become effective without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

(h)     Corporate Action. Each of the matters provided for under the Plan or the Transaction Documents involving the corporate structure of any Debtor or Reorganized Debtor or any corporate action to be taken by or required of any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

(i)     Preservation Of Causes Of Action. In accordance with section 1123(b)(3) of the Bankruptcy Code the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions. After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court. The Reorganized Debtors or any successors, in the exercise of their sole discretion, may pursue such Retained Actions so long as it is in the best interests of the Reorganized Debtors or any successors holding such rights of action. The failure of the Debtors to specifically list any claim, right of action, suit, proceeding, or other Retained Action in the Plan or the Disclosure Statement does not, and will not be deemed to, constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits, proceedings, and other Retained Actions in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the confirmation or consummation of the Plan.

(j)     Effectuating Documents; Further Transactions.  Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record the Transaction Documents and such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable law.

(k)     Exemption From Certain Transfer Taxes And Recording Fees.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

(l)     Further Authorization.  The Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of the Plan.

(m)     Dissolution Of Creditors' Committee.  <u>The Debtors do not anticipate a Creditors' Committee will be formed in the Chapter 11 Cases because all general unsecured creditors are Unimpaired under the Plan.</u>  If a Creditors' Committee is appointed, it shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors' Committee, if appointed, shall be dissolved and the Creditors' Committee's members shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order.

(n)     Cancellation of Existing Securities and Agreements.  Except as provided in the Plan or in the Confirmation Order or for the purpose of evidencing a right to distribution hereunder or a contractual right to indemnification or reimbursement of the Administrative Agent against the Secured Lenders under the terms of the Credit Agreement, on the Effective Date, all notes, stock, instruments, certificates, agreements, side letters, fee letters and other documents evidencing or giving rise to Credit Agreement Claims and Interests in Holdings shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person.  The Holders of or parties to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents shall have no rights arising from or relating to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents or the cancellation thereof, except the rights provided pursuant to the Plan and the Confirmation Order.

(o)     Officers and Directors of Reorganized Debtors.  On the Effective Date, each of the members of the existing board of directors or managers, as applicable, of the Debtors shall be deemed to have resigned in such capacity.  Except as set forth in the Transaction Documents and this Disclosure Statement, it is anticipated that the Debtors' businesses will continue to be managed, as of the Effective Date, by existing management.  At any time at least two business days prior to the deadline that the Bankruptcy Court sets for parties in interest to file objections to Confirmation, the Debtors will file a notice with the Court designating the Reorganized Debtors' new officers and members of the board of directors or managers, as applicable, of the Reorganized Debtors.  On the Effective Date, the new officers, directors or managers, as applicable, of the Reorganized Debtors will be appointed automatically without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

**D.       Provisions Governing Distributions**

      1.       *Allowed Claims*

Notwithstanding any provision in the Plan to the contrary, the Debtors or the Reorganized Debtors shall make distributions only to Holders of Allowed Claims.  A Holder of a Disputed Claim shall receive only a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

      2.       *Distributions For Claims Allowed As Of The Effective Date*

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.   Distributions of New Common Stock shall be made by the Debtors or a distribution agent designated by the Debtors and shall be distributed (x) directly to Spyglass and the C/G Stockholders as provided in the Investment Agreement, and (y) directly to the Holders of Credit Agreement Claims listed on the Administrative Agent's register as of the Confirmation Date.  The Administrative Agent shall provide the distribution agent a copy of the Administrative Agent's register as of the Confirmation Date within two business days after the Confirmation Date.

      3.       *Fractional Shares*

No fractional shares of New Common Stock will be issued or distributed under the Plan.  The actual distribution of shares of New Common Stock will be rounded to the next higher or lower whole number as follows:  (a) fractions less than one-half (½) shall be rounded to the next lower whole number and (b) fractions equal to or greater than one-half (½) shall be rounded to the next higher whole number.  The total number of shares of New Common Stock to be distributed under the Plan will be adjusted as necessary to account for such rounding.  No consideration will be provided to holders of Credit Agreement Claims in lieu of fractional shares that are rounded down.  The treatment of fractional shares for Spyglass and the C/G Stockholders will be as provided for under the Investment Agreement.

      4.       *Interest And Penalties On Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable bankruptcy law, or necessary to render a Claim Unimpaired, postpetition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims, Non-Tax Priority Claims, and General Unsecured Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of the Plan.

      5.       *Means Of Cash Payment*

Payments of Cash made pursuant to the Plan shall be made, at the option and in the sole discretion of the applicable Reorganized Debtor, by checks drawn on, or wire transfer from, a domestic bank selected by the Reorganized Debtor.  Cash payments to foreign creditors may be made, at the option of the applicable Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

      6.       *Withholding And Reporting Requirements*

In connection with the Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.  The Reorganized

Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

7.    *Setoffs*

The Reorganized Debtors may, pursuant to applicable law, but shall not be required to, set off against any Claim the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

## E.    Treatment Of Executory Contracts And Unexpired Leases

1.    *Assumption/Rejection of Executory Contracts and Unexpired Leases*

Except for the Century City Leases which shall be assumed or rejected pursuant to Section 7.3 of the Plan, each Executory Contract and Unexpired Lease shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease:

(a)    has been previously rejected by the Debtors by Final Order of the Bankruptcy Court;

(b)    has been rejected by the Debtors by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order);

(c)    is the subject of a motion to reject filed by the Debtors under section 365 of the Bankruptcy Code pending as of the Effective Date; or

(d)    is rejected under Section 7.4 of the Plan.

An Executory Contract or Unexpired Lease that is deemed to be assumed pursuant to the foregoing sentence shall be referred to as an "Assumed Contract."  An Executory Contract that is rejected or subject to a motion to reject as described above shall be referred to as a "Rejected Contract."

Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (i) the Reorganized Debtors have properly provided for the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code, (ii) each assumption (or rejection, as the case may be) is in the best interest of the Debtors and their Estates and that each Assumed Contract is assumed as of the Effective Date, and (iii) the requirements for assumption (or rejection, as the case may be) of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  No provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtors based on the filing of the Chapter 11 Cases or the financial condition of the Debtors shall be enforceable.  Except as otherwise provided in the following sentence, Assumed Contracts will be cured by being Reinstated and all cure payments under any Assumed Contract will be made by the Reorganized Debtors on the Effective Date or as soon as practicable thereafter.  In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid upon entry of a Final Order resolving such dispute; *provided, however*, if an objection to the Debtors' proposed cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors, in their sole discretion, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.  The Debtors do not anticipate that there will be any material cure payments under any Assumed Contract.

Unless otherwise provided by an order of the Bankruptcy Court, any asserted Claims arising from the rejection of an Executory Contract or Unexpired Lease must be filed by Holders of such Claims with the Bankruptcy Court and served on the parties entitled to notice under the Plan no later than sixty (60) days after the

later of (1) the Effective Date or (2) the effective date of such rejection, subject to the Debtors' and Reorganized Debtors' right to object thereto. In the event of such objection, the Debtors shall not be obligated to make any distribution in respect of such Claim until such dispute is resolved by Final Order of the Bankruptcy Court or the agreement of the parties.

2.  *Compensation And Benefit Programs*

All of the Debtors' existing programs, plans, agreements, and arrangements relating to employee compensation and benefits (other than as set forth in any Rejected Contract), including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, and life, accidental death and dismemberment insurance plans, entered into before the Petition Date, as amended from time to time and to the extent and as in effect immediately prior to the Effective Date ("Benefit Plans") will be deemed to be, and will be treated as though they are, executory contracts that are assumed under Section 7.1 of the Plan, and the Debtors' and Reorganized Debtors' obligations and rights under such programs, plans, agreements, and arrangements will survive confirmation of the Plan, subject to the terms and conditions of such Benefit Plans. The Reorganized Debtors' obligations as a result of the assumption of (i) the New Employee Security Plan, dated April 8, 2005 and (ii) the Retention Bonus Plan, dated May 21, 2010, will be supplementally funded by a contribution of $12.7 million of unencumbered cash from Holdings (or such lesser amount that, when combined with amounts previously approved by the Debtors' Board of Directors and the Steering Committee, is necessary to fully fund the early exercise option under the New Employee Security Plan and the Retention Bonus Plan and is acceptable to the Administrative Agent and any cash held at Reorganized Holdings in excess of such amounts shall re-vest in Reorganized Holdings on the Effective Date and be available for general corporate purposes.) On the Effective Date, the MGM Deferred Compensation Plan, dated July 1, 1999 shall be terminated and liquidated under Treasury Regulation Section 1.409A-3(j)(4)(ix)(B) upon the occurrence of the change of control event (as defined in Treasury Regulation Sections 1.409A-3(i)(5)) and pursuant to the transactions contemplated by the Plan without penalty to the Debtors or Reorganized Debtors and distributions solely from amounts held in trusts established prior to the Petition Date for the MGM Deferred Compensation Plan beneficiaries (and not from other assets of the Debtors or Reorganized Debtors) made to the beneficiaries thereof in accordance with all requirements of such regulation. Nothing contained herein shall be deemed to modify the existing terms of the Benefit Plans, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

3.  *Century City Leases*

Prior to twelve months after the Petition Date, the Debtors shall designate in writing (the "Designation") and file with the Bankruptcy Court their intention to assume or reject the Century City Leases. The Century City Leases will be deemed assumed or rejected, as the case may be, as of the Effective Date or such later date set forth in the Designation. If applicable, any Claims arising from the rejection of the Century City Leases shall be governed by the deadlines and limitations set forth in Section 7.1 of the Plan.

4.  *Employment Contracts*

The employment agreements designated for rejection in writing by the Debtors and filed with the Bankruptcy Court prior to the Confirmation Date shall be deemed rejected as of the Effective Date. Any Claims arising from the rejection of any employment agreements shall be governed by the deadlines set forth in Section 7.1 of the Plan. Any such Claims will be classified as Class 5 General Unsecured Claims and will likewise be Unimpaired and will be capped in accordance with section 502(b)(7) of the Bankruptcy Code.

F.  **Confirmation And Consummation Of The Plan**

1.  *Condition To Entry Of The Confirmation Order*

The following are conditions precedent to the Confirmation, each of which must be satisfied or waived by the Debtors, the Administrative Agent and each of the Spyglass Consent Parties in accordance with the terms of the Plan:

The Plan and all schedules, documents, supplements and exhibits relating to the Plan shall have been filed in form and substance acceptable to the Debtors, the Administrative Agent and each of the Spyglass Consent Parties.

The proposed Confirmation Order shall be in form and substance acceptable to the Debtors, the Administrative Agent and each of the Spyglass Consent Parties.

2.    *Conditions To Effective Date*

The Debtors shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors, the Administrative Agent and each of the Spyglass Consent Parties in accordance with the terms hereof:

The Confirmation Order, in form and substance satisfactory to the Debtors, the Administrative Agent, and each of the Spyglass Consent Parties shall be in full force and effect and not subject to any stay and shall, among other things, provide that the Debtors and Reorganized Debtors are authorized without further board or shareholder approval or consent to take all actions necessary to enter into the Transaction Documents and other agreements or documents created in connection with the Plan.  Without limiting the foregoing, the chairman of the board of directors, president, chief executive officer, chief financial officer or any other appropriate officer of the Debtors shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Transaction Documents.  The secretary or assistant secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

All Transaction Documents shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date).

All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

The Debtors shall have sufficient Cash, whether on hand or from funds advanced under the New Credit Facility to make all required payments to be made on the Effective Date.

The Effective Date shall have occurred on or prior to March 31, 2011.

3.    *Waiver Of Conditions*

The Debtors, the Administrative Agent and each of the Spyglass Consent Parties may jointly waive, in whole or in part, the conditions to the occurrence of the Effective Date, without any notice to parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Effective Date shall preclude the occurrence of the Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtors, the Administrative Agent and each of the Spyglass Consent Parties.  The waiver of a condition to the occurrence of the Effective Date shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

G.    **Effect Of Plan Confirmation**

1.    *Binding Effect*

The Plan shall be binding upon and inure to the benefit of the Debtors, their Estates, all current and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors.

2.    *Revesting Of Assets*

Except as otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the Estates (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in the Reorganized Debtors, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

3.    *Releases And Related Matters*

(a)    *Releases by Holders of Claims and Interests*

**To the maximum extent permitted by applicable law, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim or Interest shall be deemed to forever release, waive, and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud or willful misconduct, including the willful misappropriation of confidential information) against the Released Parties, in connection with or related to the Debtors or the Reorganized Debtors, the Chapter 11 Cases, or the Plan (other than the rights under the Plan, the Transaction Documents, and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise.**

(b)    *Releases by the Debtors, their Estates and the Reorganized Debtors*

**As of the Effective Date, for good and valuable consideration, including (without limitation) the service of the Released Parties in facilitating the expeditious implementation of the restructuring and reorganization contemplated by the Plan, the adequacy of which is hereby confirmed, the Debtors, in their individual capacities and as debtors in possession, their Estates, and the Reorganized Debtors shall be deemed forever to release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud or willful misconduct, including the willful misappropriation of confidential information) against the Released Parties in connection with or related to the Debtors or the Reorganized Debtors, the Chapter 11 Cases, the Disclosure Statement or the Plan, and that could have been asserted by or on behalf of the Debtors, the Estates or the Reorganized Debtors against such Persons; provided, however, that there shall be no such release, waiver or discharge on account of claims or obligations in respect of (i) any loan, advance or similar payment made by the Debtors or their affiliates to or for the benefit of any party the subject of the release in Section 9.3(b) of the Plan, (ii) any unperformed contractual obligation owed by any party the subject of the release in Section 9.3(b) of the Plan to or for the benefit of the Debtors or the Reorganized Debtors, or (iii) the rights and obligations under the Plan, the Transaction Documents, and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby.**

(c)    *Releases of Holders of Allowed Interests in Holdings*

Each Holder of Allowed Interests in Holdings will not receive or retain any property under the Plan, but shall receive the benefit of the release, injunction and exculpation provisions of Article IX of the Plan (collectively, the "<u>Shareholder Releases</u>").  The Debtors believe that these Shareholder Releases (i) have been negotiated in good faith and at arms' length, (ii) are consistent with sections 105, 1129 and 1142 of the Bankruptcy Code, and (iii) are each necessary for the Debtors' successful reorganization and are integral to the structure of the Plan.  Specifically, Holders of Allowed Interests in Holdings have a residual ownership interest in approximately $12.7 million of unencumbered funds at Holdings.  As part of the compromises embodied in the Plan, Holders of Allowed Interests in Holdings will not receive any distribution on account of this ownership interest; rather, such funds will be used to fund the Debtors' Security Plan and Retention Bonus Plan.  In exchange for this substantial consideration, the Holders of Allowed Interests in Holdings will receive the benefit of the Shareholder Releases.  This compromise is an integral and essential component of the Plan, and plays an important part in the Debtors' Plan.  Furthermore, the Plan provides for the payment in full of all creditors other than Holders of Credit Agreement Claims, who will have an opportunity to vote to accept or reject the Plan.

Furthermore, the Debtors do not believe that there is evidence suggesting viable Claims or Avoidance Actions or other causes of action against held by any of them against any of the Holders of Interest in Holdings or any other Released Party, and the Debtors confirm that there have been no distributions, transfers or other transactions (directly or indirectly) between Holdings and any other Debtor, or from any other Debtor to or for the benefit of any Holder of an Interest in Holdings or any other Released Party, except in each case as permitted from time to time under, and pursuant to, the Credit Agreement.

4.      *Discharge Of The Debtors*

(a)      Other than Claims arising from or related to the Transaction Documents and except as otherwise provided herein or in the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtors, and each of them, shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the holder of a Claim based upon such debt accepted the Plan.

(b)      As of the Effective Date, other than Claims arising from or related to the Transaction Documents and except as provided in the Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further Claims, debts, rights, causes of action, claims for relief, or liabilities relating to the Debtors or any Interest in the Debtors  based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, other than with respect to Claims arising from or related to the Transaction Documents and except as provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors, and the termination of all such Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or a terminated Interest.

5.      **Injunction**

(a)      **General.  Except as provided in the Plan or the Confirmation Order, from and after the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is**

**released, terminated, exculpated, or discharged under Article IX of the Plan, along with their respective current and former employees, agents, officers, directors, managers, principals, affiliates, shareholders, and members are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors and the Exculpated Parties, and their respective agents, officers, directors, managers, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns or any of their respective property on account of any such released, terminated or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or Interest: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.**

### 6. *Exculpation And Limitation Of Liability*

(a)     None of the Exculpated Parties shall have or incur any liability to any Person or any of their respective agents, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the transactions contemplated by or described in the Transaction Documents, the formulation, negotiation, or implementation of the Plan or the Transaction Documents, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan or the Transaction Documents, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud or willful misconduct, including the willful misappropriation of confidential information; *provided, however*, that the foregoing exculpation and limitation of liability shall not apply to and shall not operate to waive, release, or exculpate any Claims or causes of action arising from or related to the rights and obligations under the Plan, the Transaction Documents, and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby. Without limiting the generality of the foregoing, the Debtors, the Reorganized Debtors, the Administrative Agent, the Secured Lenders, the New Lenders, Spyglass, Cypress and Garoge, the C/G Stockholders, the Creditors' Committee (if any), and any of such parties' directors, managers, officers, or members, shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(b)     Notwithstanding any other provision of the Plan, no Person, no Person's agents, directors, managers, officers, employees, representatives, advisors, attorneys, affiliates, shareholders, or members and no Person's successors or assigns shall have any right of action against any of the Exculpated Parties for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the transactions contemplated by or described in the Transaction Documents, the formulation, negotiation, or implementation of the Plan or the Transaction Documents, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan or the Transaction Documents, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud or willful misconduct, including the willful misappropriation of confidential information; *provided, however*, that the foregoing prohibition shall not apply to and shall not operate to waive, release, or exculpate any Claims or causes of action arising from or related to any unperformed contractual obligation owed by any party under the Transaction Documents.

### 7. *Term Of Bankruptcy Injunction Or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

8. *Post-Effective Date Retention Of Professionals*

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtors may employ and pay professionals in the ordinary course of business.

## H. Retention Of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, except as otherwise set forth in Section 3.7 of the Plan or in the Transaction Documents, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

1. Resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease with respect to which any Debtor or Reorganized Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

2. Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving the Debtors that may be pending on the Effective Date;

3. Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

4. Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any entity's rights arising from, or obligations incurred in connection with, the Plan or such documents (other than a dispute arising after the Effective Date under, or directly with respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

5. Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission, or reconcile any inconsistency, in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

6. Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b) and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtors, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

7. Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of the Plan or the Confirmation Order;

8. Adjudicate controversies arising out of the administration of the Estates or the implementation of the Plan;

9. Recover all assets of the Debtors and property of the Estates, wherever located;

10. Hear and determine causes of action by or on behalf of the Debtors or the Reorganized Debtor;

11. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason, or in any respect, modified, stayed, reversed, revoked, or vacated, or distributions pursuant to the Plan are enjoined or stayed;

12. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order (other than a dispute arising after the Effective Date under, or directly with respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

13. Hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

14. Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

15. Hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code; and

16. Enter an order closing the Chapter 11 Cases.

## I. Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in Section 10.1 of the Plan, the provisions of Article X of the Plan will have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## J. Miscellaneous Provisions

1. *Effectuating Documents And Further Transactions*

Each of the Debtors and the Reorganized Debtors shall be authorized to execute, deliver, file, or record the Transaction Documents and such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan.

2. *Corporate Action*

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan or the Transaction Documents that would otherwise require approval of the stockholders, members or directors of one or more of the Debtors or the Reorganized Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable general corporation or other applicable law of the states in which the Debtors or the Reorganized Debtors are organized without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

3. *Indemnification Of Directors And Officers*

For a period of six (6) years from and after the Effective Date, unless otherwise required by law, the certificate of incorporation and bylaws of Reorganized Holdings and each of its Subsidiaries shall contain provisions no less favorable with respect to the elimination of liability of directors and indemnification of directors, officers, employees and agents than are set forth in the certificate of incorporation and bylaws of Holdings (or the

relevant Subsidiary) as in effect on the Petition Date; provided, however, that in the event any claim or claims are asserted against any individual entitled to the protections of such provisions within such six (6) year period, such provisions shall not be modified in any manner adverse to any such individual until the final disposition of any such claims.  From and after the Effective Date, Reorganized Holdings shall indemnify and hold harmless, (i) to the fullest extent permitted under applicable law and (ii) without limiting the obligations under clause (i), as required pursuant to any indemnity agreements of any of the MGM Companies each present and former director and officer of the MGM Companies (in and to the extent of their capacities as such, and not as stockholders and/or optionholders of the MGM Companies) (collectively, the "Indemnified D&O Parties") against any costs or expenses (including attorneys' fees and expenses), judgments, fines, losses, claims, settlements, damages or liabilities incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or pertaining to matters pending, existing or occurring at or prior to the Effective Date (including the transactions provided for herein).  Reorganized Holdings shall also advance reasonable and documented costs and expenses (including attorneys' fees) of Indemnified D&O Parties as incurred promptly after receipt by Reorganized Holdings of a written request for such advance; provided that the Person to whom costs and expenses are advanced provides an undertaking to repay such advances if it is ultimately determined that such Person is not entitled to indemnification (it being understood that Reorganized Holdings shall not require any security for such undertaking).

Holdings shall acquire a tail policy covering the six year period after the Effective Date for persons currently covered by the MGM Companies' current directors' and officers' liability insurance and fiduciary liability insurance (the "D&O Insurance") in respect of acts or omissions occurring at or prior to the Effective Date, covering each person currently covered by the D&O Insurance, on terms with respect to the coverage, deductible and amounts no less favorable than those of the D&O Insurance in effect on the date of this Agreement.  The insurance purchased pursuant to Section 11.3 of the Plan shall be prepaid in full at the Effective Date and shall be non-cancelable.

If Reorganized Holdings or any of its successors or assigns shall (i) consolidate with or merge into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the successors and assigns of Reorganized Holdings (or acquiror of such assets) shall assume all of the obligations of Reorganized Holdings set forth in Section 11.3 of the Plan.

The rights of each Indemnified D&O Party under Section 11.3 of the Plan shall be in addition to any right such Person might have under the certificate of incorporation or by-laws of Holdings, Reorganized Holdings or any of their respective Subsidiaries, or under any agreement of any Indemnified D&O Party with Holdings, Reorganized Holdings or any of their respective Subsidiaries.  The provisions of Section 11.3 of the Plan survive the consummation of the Mergers (as defined in Section 2.1 of the Investment Agreement) and are intended to be for the benefit of, and shall be enforceable by, each of the Indemnified D&O Parties, their respective heirs and representatives.

4.      *Payment Of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

5.      *Amendment Or Modification Of The Plan*

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code and subject further to the consent of the Administrative Agent and each of the Spyglass Consent Parties, the Debtors reserve the right to alter, amend, or modify the Plan at any time prior to or after the Confirmation Date, including, without limitation the right to withdraw the Plan as to any particular Debtor and seek to confirm and consummate the Plan with respect to the other Debtors.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

6.      *Additional Debtors*

The Debtors reserve the right to commence Chapter 11 Case(s) on behalf of Additional Debtor(s) through the Confirmation Date. Upon entry of an order jointly administering such Additional Debtor's chapter 11 case with the Chapter 11 Cases, such Additional Debtor shall automatically become a party to the Plan. Each holder of a Claim that accepts distributions pursuant to the Plan is conclusively deemed to have agreed to the inclusion of any Additional Debtors to all of the provisions set forth in the Plan, subject to the rights of the Administrative Agent and each of the Spyglass Consent Parties to consent to any such inclusion.

7.      *Severability Of Plan Provisions*

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, upon request of the Debtors (having obtained consent of the Administrative Agent and each of the Spyglass Consent Parties) to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

8.      *Successors And Assigns*

The Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns, including, without limitation, the Reorganized Debtors. The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

9.      *Revocation, Withdrawal, Or Non-Consummation*

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims or any release contemplated thereby), assumption of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (A) constitute or be deemed to constitute a waiver or release of any claims by or against, or any Interests in, the Debtors or any other Person, (B) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (C) constitute an admission of any sort by the Debtors or any other Person.

10.     *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of New York without giving effect to the principles of conflicts of law of such jurisdiction.

## VI.      RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan. This information, however, does not describe the only risks involved in connection with the Plan and its implementation.

**A.      Failure to Confirm the Plan**

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Cases will continue rather than be converted to chapter 7 liquidations. The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion with respect to the affairs of the Debtors during the Chapter 11 Cases. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a plan and requires, among other things, that the value of distributions to dissenting creditors and shareholders not be less than the value of distributions such creditors and shareholders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Furthermore, although the Debtors believe that the Effective Date will occur shortly after the Confirmation Date, there can be no assurance as to such timing. In addition, the Debtors could experience material adverse changes in their liquidity as a result of such delay.

**B.      Potential Adverse Effects of Chapter 11**

Although the Debtors will seek to make their stay in chapter 11 as brief as possible and to obtain relief from the Bankruptcy Court so as to minimize any potential disruption to their business operations, it is possible that the commencement of the Chapter 11 Cases could materially adversely affect the relationship among the Debtors and their customers, employees, talent, vendors, and joint venture partners.

**C.      Dependence on Key Personnel**

The success of the Reorganized Debtors' business is materially dependent upon the services of their key officers and employees, including Messrs. Barber and Birnbaum. The loss of these key personnel due to death, disability or termination of employment could have a material adverse effect on the results of operations or financial conditions, or both, of the Reorganized Debtors.

**D.      Business Risks**

1.      *No Assurance Of Ultimate Recoveries*

Because the value of the New Common Stock cannot be determined with precision due to the absence of a public market for the New Common Stock and the inherent risks related to the Reorganized Debtors' ability to successfully implement their business plan, there can be no assurances of the actual recoveries to Holders of Allowed Credit Agreement Claims or that such recoveries will exceed the recoveries that could have been obtained if the Debtors had pursued any of the offers received by the Debtors in their sale process.

2.      *Inherent Uncertainty Of Debtors' Financial Projections*

The Financial Projections attached hereto as <u>Appendix C</u> includes projections covering the Reorganized Company's operations through 2016. These projections are based on assumptions that are an integral part of the projections, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Company, industry performance, general business and economic conditions and other matters, may of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Reorganized Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Reorganized Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the projections should not be relied upon as a guaranty or other assurance of the actual results that will occur.

Furthermore, the business plan was developed by the Company with the assistance of its advisors, and in consultation with Messrs. Barber and Birnbaum. Upon consummation of the Plan, Messrs. Barber and

Birnbaum will be appointed as co-chairmen and co-chief executives of Reorganized Holdings and a new Board of Directors will be appointed. There can be no assurances that the Company's business plan will not change, perhaps materially, as a result of decisions Messrs. Barber and Birnbaum and the new Board of Directors make after fully evaluating the strategic direction of the Company and its business plan. Any deviations from the Company's existing business plan would necessarily cause a deviation from the attached projections, and could result in materially different outcomes from those projected.

3.      *Lack of Audited and Recent Financial Reports*

Attached as <u>Appendix D</u> is the Company's audited financial statement for the fiscal year ended March, 2009. This is the last period for which an audited financial statement is available. Attached as <u>Appendix E</u> is the Unaudited Financial Statement for the fiscal year ended March, 2010. The Company is undergoing a complete financial audit of its financial statement for this period. Until that audit is completed, there cannot be any assurances as to whether, how, or to what degree those results may be restated in the future. Furthermore, as of the date hereof, the Company has not prepared financial statements for fiscal periods after March, 2010. The information to be contained in these reports is not available at this time and there can be no assurance that such information would not have been material to your decision whether to vote to accept or reject the Plan.

4.      *Turmoil In Financial Markets*

The recent unprecedented deterioration in the global economy, global credit markets and financial services industry has severely and negatively affected the entertainment industry. This unprecedented deterioration in global and U.S. economic conditions has negatively affected the Company's revenues, profitability, operating results and cash flow, and the continuation or worsening of these economic conditions would exacerbate these effects and may make it necessary for the Company to take further restructuring actions and charges.

5.      *Unpredictability Of Entertainment Industry*

Motion picture and television production and distribution is highly speculative and inherently risky. There can be no assurance of the economic success of such motion pictures and television programming since the revenues derived from the production and distribution (which do not necessarily bear a direct correlation to the production or distribution costs incurred) depend primarily upon their acceptance by the public, which cannot be predicted.

The production, completion and distribution of motion pictures are subject to a number of uncertainties, including delays and increased expenditures due to creative differences among key cast, other creative personnel, strikes, disruptions caused by weather, cast or crew illness, or accidents or other events beyond the producer's control. As such, the costs of an MGM-produced film or television program may increase significantly from the original budget, and the date of completion may be substantially delayed due to the exigencies of production. Increased costs may make it less likely that such film will recoup its production costs, and delays in production may result in such film not being ready for release at the intended time and postponement to a potentially less favorable time, all of which could cause a decline in gross receipts for such a film.

The commercial success of a motion picture also depends upon the quality and acceptance of other competing films released into the marketplace at or near the same time, the availability of alternative forms of entertainment and leisure time activities, general economic conditions and other tangible and intangible factors, all of which can change and cannot be predicted with certainty. Further, the theatrical success of a motion picture is generally a key factor in generating revenues from other distribution channels.

There is a substantial risk that some or all of the Company's future motion pictures will not be commercially successful, resulting in costs not being recouped or anticipated profit not being realized. The success of the Company's television programming is subject to similar risks and also may be impacted by, among other factors, prevailing advertising rates, which are subject to fluctuation. Therefore, there is a substantial risk that some or all of the Company's future motion picture and television projects will not be commercially successful, resulting in costs not being recouped or anticipated profits not being realized.

6. *Rapid Technological Changes And Alternative Forms Of Delivery Or Storage Of Filmed Entertainment*

The entertainment industry in general and the motion picture and television industries in particular continue to undergo significant technological developments. Advances in technologies or alternative methods of product delivery or storage or certain changes in consumer behavior driven by these or other technologies and methods of delivery and storage could have a negative effect on the Company's business. Examples of such advances in technologies include VOD, new video formats and downloading and streaming from the internet. An increase in VOD could decrease home video rentals. Similarly, further increases in the use of portable digital devices that allow users to view content of their own choosing while avoiding traditional commercial advertisements could adversely affect the Company's revenues. Other larger entertainment distribution companies will have larger budgets to exploit these growing trends. The Company cannot predict how it will financially participate in the exploitation of our motion pictures and television programs through these emerging technologies or whether it has the right to do so for certain of its library titles. If the Company cannot successfully exploit these and other emerging technologies, it could have a material adverse effect on its business, results of operations and financial condition.

7. *Piracy Of Motion Pictures, Including Digital And Internet Piracy, May Reduce The Gross Receipts From The Exploitation Of Our Films*

Motion picture piracy is extensive in many parts of the world, including South America, Asia, and former Eastern bloc countries, and is made easier by technological advances and the conversion of motion pictures into digital formats. This trend facilitates the creation, transmission and sharing of high quality unauthorized copies of motion pictures in theatrical release on DVDs, Blu-ray discs, from pay-per-view through set top boxes and other devices and through unlicensed broadcasts on free television and the internet. The proliferation of unauthorized copies of these products has had and will likely continue to have an adverse effect on the Company's business, because these products reduce the revenue the Company receives from its products.

8. *Collective Bargaining Agreements*

The motion picture and television programs produced by the Company, and the other major studios in the United States, generally employ actors, writers and directors who are members of the Screen Actors Guild, Writers Guild of America and Directors Guild of America, respectively, pursuant to industry-wide collective bargaining agreements. Many productions also employ members of a number of other labor organizations including, without limitation, the International Alliance of Theatrical and Stage Employees and the International Brotherhood of Teamsters. A strike by one or more of the unions that provide personnel essential to the production of motion pictures or television programs could delay or halt our ongoing production activities. Such a halt or delay, depending on the length of time involved, could cause delay or interruption in the Company's release of new motion pictures and television programs and thereby could adversely affect the Company's cash flow and revenues.

9. *Competition*

The Company faces competition from companies within the entertainment business, as well as alternative forms of leisure entertainment. The Company competes with the other major studios, numerous independent motion picture and television production companies, television networks and pay television systems for the acquisition of literary properties, the services of performing artists, directors, producers and other creative and technical personnel and production financing. Numerous organizations with which the Company competes in the motion picture industry have significantly greater financial and other resources than the Company, while the independent production companies may have less overhead than the Company.

10. *World Events*

Because the Company has historically derived approximately 55%-65% of its MGM Library television receipts and 40%-50% of its MGM Library net home video cash flows from non-U.S. and Canadian sources, its business is subject to risks inherent in international trade, many of which are beyond its control. These

risks include: changes in laws and policies affecting trade, investment and taxes, including laws and policies relating to the repatriation of funds and to withholding taxes; differing degrees of protection for intellectual property; financial instability and increased market concentration of buyers in foreign television markets; the instability of foreign economies and governments; fluctuating foreign exchange rates; and war and acts of terrorism.

11.     *Litigation*

The Company is, from time to time, subject to various asserted or unasserted legal proceedings and claims.  Any such claims, regardless of merit, could be time-consuming and expensive to defend and could divert management's attention and resources.  While management believes the Company has adequate insurance coverage and accrues loss contingencies for all known matters that are probable and can be reasonably estimated, the Company cannot ensure that the outcome of all current or future litigation will not have a material adverse effect on the Company and its results of operations.

12.     *Brand Concentration*

The Company is subject to the potential risks associated with the brand image associated with MGM and the MGM Lion logo.  A negative public image or other adverse event which becomes associated with the Company's brand could adversely affect revenue and profitability.

13.     *UAPF Credit Facility*

As set forth above, a "Stop Funding Event" has occurred under the UAPF Credit Agreement.  Therefore, the lenders under the UAPF Credit Agreement are not required to make additional loans to UAPF.  The Company does not expect to borrow any additional funds under the UAPF Facility in the future.  Additionally, if the Stop Funding Event is not cured by November 20, 2011, the Stop Funding Event will become an event of default under the UAPF Credit Agreement.  Upon an event of default, the lenders under the UAPF Credit Agreement will be able to accelerate the debt under such facility, and exercise remedies, including potentially foreclosing on their collateral.

14.     *Sale Of Equity In Cypress and Garoge*

Prior to (or following) the Effective Date, it is expected that thirty percent (30%) of the equity interests in Cypress and/or Garoge owned by the C/G Stockholders will be transferred to one or more third parties for cash (the "Third Party Transfer").  Prior to any Third Party Transfer, the C/G Stockholders are required to notify the Company of the identity of such third party and the full and final terms of any such transaction.  One or more of the third party transferees may constitute certain domestic and/or international distribution partners who may have (or may enter into) output distribution arrangements with the Company on terms and conditions that are required under the Investment Agreement to be fair to the Company, not conflict with any existing contractual arrangements and are otherwise on customary terms and conditions in the motion picture industry, which, in any event, would be subject to the review and prior written consent of the Company (which consent cannot be unreasonably withheld and shall be solely to confirm that such arrangements are fair to the Company, do not conflict with any existing contractual arrangements and are otherwise on customary terms and conditions in accordance with the foregoing).  There can be no assurances that the terms of such output distribution arrangements will be as favorable to the Company as could have been achieved in a third party arrangement that was not related to the Third Party Transfer.

**E.     Methods of Solicitation**

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of "adequate information" (as defined by section 1125(a) of the Bankruptcy Code).

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.

The Debtors believe that its Solicitation of votes to accept or reject the Plan from the Holders of Impaired Claims is proper under applicable nonbankruptcy law, rules, and regulations, and that the Disclosure Statement contains "adequate information" as defined by section 1125(a) of the Bankruptcy Code. The Debtors also believe that they are not required to solicit any other class under the Bankruptcy Code or applicable nonbankruptcy law, rules, or regulations. The Debtors cannot be certain, however, that its Solicitation of acceptances or rejections will be approved by the Bankruptcy Court. There is also a risk that confirmation of the Plan could be denied by the Bankruptcy Court.

The Debtors believe that the Solicitation, including the use of the Disclosure Statement and the Ballots for the purpose of obtaining acceptances of the Plan complies with the Bankruptcy Code. The Bankruptcy Court may decide, however, that the Solicitation failed to meet the requirements of section 1126(b) of the Bankruptcy Code. If the Bankruptcy Court determines that the Solicitation did not comply with the requirements of section 1126(b) of the Bankruptcy Code, the Debtors may seek to resolicit acceptances, and, in that event, confirmation of the Plan could be delayed and possibly jeopardized.

## F.   Classification And Treatment Of Claims And Equity Interests

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against and Interests in the Debtors. The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors currently anticipate that they would seek to (i) modify the Plan to provide for whatever classification might be required for confirmation and (ii) use the acceptances received from any creditor pursuant to the Solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member. Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification without requiring that the Debtors resolicit votes. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to the Solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that, under the Bankruptcy Rules, the Debtors would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim of any creditor or equity holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that they have complied with this requirement. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan or the Debtors could be required to modify the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

## VII.     APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS

### A.     Plan Securities

The Plan provides for the Debtors to issue to Holders of Credit Agreement Claims in Class 3 New Common Stock (the "Plan Securities").

The Debtors believe that the Plan Securities constitutes "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable Blue Sky Law.  The Debtors further believe that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the Holders thereof that are not "underwriters," as defined in Section 2(a)(1) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

### B.     Issuance and Resale of Plan Securities Under the Plan

1.     *Exemption From Registration*

Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering.  By virtue of section 18 of the Securities Act, section 4(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

In reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any state Blue Sky Law.

The issuance of the Plan Securities is covered by section 1145 of the Bankruptcy Code. Accordingly, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

2.     *Resales Of Plan Securities; Definition Of Underwriter*

If the holder of the Plan Securities is an underwriter, the Plan Securities will be "restricted securities" and may not be resold under the Securities Act and applicable state Blue Sky Law absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the holders of such securities; or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the

consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Plan Securities by Persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Company does not presently intend to make publicly available the requisite current information regarding the Company, and as a result, Rule 144 will not be available for resales of Plan Securities by persons deemed to be underwriters. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view whether any Person would be deemed an "underwriter" with respect to the Plan Securities. In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Debtors make no representations concerning the right of any Person to freely resell Plan Securities. Accordingly, the Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws. The Plan and the Investment Agreement contemplate the parties entering into the Registration Rights Agreement, the form of which is attached as <u>Exhibit D</u> to the Plan.

## C.        Listing of New Common Stock

The Company shall not be obligated to list the New Common Stock on a national securities exchange.

## D.        Issuance of New Common Stock to Spyglass and the C/G Stockholders

The New Common Stock to be issued to Spyglass and the C/G Stockholders shall be issued under Section 4(2) of the Securities Act. This issuance will not be exempt under section 1145 of the Bankruptcy Code because these securities are not being issued in exchange for an existing claim against the Debtors. Therefore, this New Common Stock will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act and may not be resold under the Securities Act and applicable state Blue Sky Law absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration. The Plan and the Investment Agreement contemplate Reorganized Holdings and Spyglass and the C/G Stockholders entering into the Registration Rights Agreement, the form of which is attached as <u>Exhibit D</u> to the Plan.

# VIII.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain Holders that are entitled to vote to accept or reject the Plan. This summary is for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described herein.  No opinion of counsel has been obtained as to any of the tax consequences of the Plan and no ruling will be sought from the Internal Revenue Service ("IRS") with respect to any statement or conclusion in this summary.  No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any creditor or equity interest-holder and there can be no assurance that the IRS would not assert, or that a court would not sustain, positions different from those discussed herein.

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, partnerships or other pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, employees, and persons who received their claims pursuant to the exercise of an employee stock option or otherwise as compensation).  In addition, this summary does not discuss any U.S. federal income tax consequences to a Non-U.S. Holder (as defined below) that (A) is engaged in the conduct of a United States trade or business, (B) is a nonresident alien individual and such holder is present in the United States for 183 or more days during the taxable year, or (C) is a corporation which operates through a United States branch.  This summary assumes that Holders of Claims or Interests hold their Claims or Interests as capital assets for U.S. federal income tax purposes and will hold any New Common Stock as a capital asset for U.S. federal income tax purposes.  Furthermore, the following discussion does not address U.S. federal taxes other than income taxes.  Holders of Claims and Interests are urged to consult with their tax advisor regarding the tax consequences to them of the transactions contemplated by the Plan, including U.S. federal, state, local and foreign tax consequences.

For purposes of the following discussion, a "U.S. Holder" is a beneficial owner of a Claim or Interest that is (1) an individual that is a citizen or resident of the United States, (2) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (3) an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or (4) a trust if (x) a court within the United States is able to exercise primary supervision over its administration and (y) one or more United States persons have the authority to control all of the substantial decisions of such trust.

For purposes of the following summary, a "Non-U.S. Holder" is a beneficial owner of Claim or Interest that is neither a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) nor a U.S. Holder.

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) holds Claims or Interests, the U.S. federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership considering participating in the Plan is urged to consult its tax advisor regarding the consequences to its partners of the Plan.

**TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, CREDITORS AND EQUITY INTEREST-HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE, (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (C) CREDITORS AND EQUITY INTEREST-HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**A.      Certain U.S. Federal Income Tax Consequences to the Debtors**

        1.      *Cancellation Of Indebtedness Income*

In general, the discharge of a debt obligation in exchange for cash and other property having a fair market value (or, in the case of a new debt instrument, an "issue price") less than the "adjusted issue price" of the debt gives rise to cancellation of indebtedness ("COD") income to the debtor.  However, COD income is not taxable to the debtor if the debt discharge occurs in a Title 11 bankruptcy case.  Rather, under the Tax Code, such COD income instead will reduce certain of the Debtors' tax attributes, generally in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) the tax basis of the Debtors' depreciable and nondepreciable assets (but not below the amount of its liabilities immediately after the discharge); and (f) foreign tax credit carryforwards.  A debtor may elect to alter the preceding order of attribute reduction and, instead, first reduce the tax basis of its depreciable assets (and, possibly, the depreciable assets of its subsidiaries).  Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain tax attributes of the consolidated subsidiaries of the debtor and other members of the group be reduced.  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income that accrues between the date of discharge and the end of the Debtors' tax year).  Any excess COD income over the amount of available tax attributes is not subject to United States federal income tax and has no other United States federal income tax impact.

The Debtors expect to realize a substantial amount of COD income as a result of the discharge of obligations pursuant to the Plan, which, under the attribute reduction rules described above, is expected to result in the substantial reduction of the Debtors' NOLs, and of certain other U.S. federal income tax attributes of the Debtors, including basis in the assets (the "Attribute Reduction").

        2.      *Net Operating Losses – Section 382*

In 2005, the Debtors experienced an "ownership change" (within the meaning of Section 382 of the Tax Code) (the "Ownership Change") as a result of which the Debtors' ability to use any pre-Ownership Change NOLs and certain other tax attributes is subject to an annual limitation.  The Debtors anticipate that they will experience a second "ownership change" on the Effective Date as a result of the issuance of the New Common Stock to the Holders of Claims, Spyglass, and the C/G Stockholders pursuant to the Plan.  As a result, the Debtors' ability to use any pre-Effective Date NOLs or other tax attributes to offset their income in any post-Effective Date taxable year (and in the portion of the taxable year of the ownership change following the Effective Date) to which such a carryforward is made generally (subject to various exceptions and adjustments, some of which are described below) will be subject to a second annual limitation.  Subject to the discussion below, the annual limitation under Section 382 of the Tax Code is generally equal to the product of (i) the "long-term tax exempt" (for example, 3.98% for ownership changes occurring during the month of October 2010) and (ii) the fair market value of the stock of the corporation immediately before the ownership change occurs.  Under section 382 of the Tax Code, NOLs attributable to a period preceding an earlier ownership change are treated as pre-change losses with respect to later ownership changes with the result that such NOLs always will be subject to the smaller of the earlier annual limitation and any later annual limitations.  Thus, the second ownership change may cause pre-Ownership Change NOLs which survive the Attribute Reduction, if any, to be more significantly limited than they currently are and will subject the use of NOLs generated following the earlier ownership change which survive Attribute Reduction, if any, to an annual limit.  Section 382 of the Tax Code may also limit the Debtors' ability to use "net unrealized built-in losses" to offset future taxable income.  Moreover, the Debtors' loss carryforwards will be subject to further limitations if the Debtors experience additional future ownership changes and could potentially be reduced to zero if they do not continue their business enterprise for at least two years following the Effective Date.

If the Debtors are qualified to use the special rules for corporations in bankruptcy provided in section 382(l)(5) of the Tax Code, and do not elect out of that provision, then, to the extent that the Debtors have post-Ownership Change NOLs that survive the Attribute Reduction, the application of section 382 of the Tax Code will be materially different from that just described. In that case, the Debtors' ability to utilize post-Ownership Change NOLs generated prior to the Effective Date would not be limited as described in the preceding paragraph. However, several other limitations would apply to the Debtors under section 382(l)(5) of the Tax Code, including (a)

the Debtors' NOLs would be calculated without taking into account deductions for interest paid or accrued in the portion of the current tax year ending on the Effective Date and all other tax years ending during the three-year period prior to the current tax year with respect to the Claims that are exchanged for New Common Stock pursuant to the Plan, and (b) if the Debtors undergo another ownership change within two years after the Effective Date, the Debtors' section 382 limitation with respect to that ownership change will be zero. Even if section 382(l)(5) of the Tax Code is available, the Debtors could elect not to apply the special rules of section 382(l)(5).

If the Debtors do not qualify for, or elect not to apply, the special rule under section 382(l)(5) of the Tax Code for corporations in bankruptcy described above, then, to the extent that the Debtors have post-Ownership Change NOLs that survive the Attribute Reduction, a different rule under section 382(l)(6) of the Tax Code applicable to corporations under the jurisdiction of a bankruptcy court may apply in calculating the annual section 382 limitation applicable to post-Ownership Change NOLs generated prior to the Effective Date. Under this rule, the limitation will be calculated by reference to the lesser of the value of the company's new stock (with certain adjustments) immediately after the ownership change or the value of such company's assets (determined without regard to liabilities) immediately before the ownership change. Although such calculation may substantially increase the annual section 382 limitation, the Debtors' use of NOLs or other tax attributes remaining after implementation of the Plan, if any, may still be substantially limited after an ownership change.

Because Holders of Class 3 Claims will hold a significant equity position in Reorganized Holdings following the consummation of the Plan, disposition by such persons or entities of all or a significant amount of this position after the Effective Date, could cause the Reorganized Debtors to undergo a subsequent ownership change. This would generally further limit (or possibly eliminate) the Reorganized Debtors' ability to use NOLs and other tax attributes.

## B.        Certain Income Tax Consequences to U.S. Holders

The U.S. federal income tax consequences of the transactions contemplated by the Plan to U.S. Holders generally will be as described below. These consequences (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (1) the manner in which a holder acquired a Claim; (2) the length of time the Claim has been held; (3) the holder's method of tax accounting; (4) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion of the Claim) in the current or prior taxable years; (5) whether the Claim was acquired at a discount; (6) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; and (7) whether the Claim is a hedge against or is hedged against currency risk or are part of a straddle, constructive sale, or conversion transaction. Therefore, each U.S. Holder is strongly urged to consult its tax advisor regarding information that may be relevant to its particular situation and circumstances and the tax consequences to it of the transactions contemplated by the Plan. This discussion assumes that a U.S. Holder has not taken a bad debt deduction with respect to a Claim (or any portion thereof) in the current or any prior year and such Claim did not become completely or partially worthless in a prior taxable year.

### 1.        *U.S. Holders Of Class 3 Credit Agreement Claims*

Whether a U.S. Holder of a Credit Agreement Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock depends on whether (i) the exchange qualifies as an exchange described in Section 351 of the Tax Code (a "Section 351 Exchange"), (ii) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the Credit Agreement Claim, (iii) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such Credit Agreement Claim, and (iv) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

(a)        *Treatment of a U.S. Holder of a Credit Agreement Claim if the Exchange of its Claim for New Common Stock is Treated as a Section 351 Exchange*

In a Section 351 Exchange no gain or loss is generally recognized by transferors of property to a corporation solely in exchange for stock of the corporation, if, immediately after the exchange, the transferors as a group are in control of the corporation. The exchange of a U.S. Holder's Credit Agreement Claim for New Common Stock as part of the same plan as the Spyglass contribution of its assets is intended to be treated as

a Section 351 Exchange and will be reported as such by the Debtors. If property other than stock is received by a U.S. Holder in such exchange, the U.S. Holder will recognize capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the amount of property other than stock treated as received in the exchange. A U.S. Holder will generally recognize the ordinary interest income to the extent that the New Common Stock is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Credit Agreement Claim (see "Accrued Interest" discussion below). In such case, a U.S. Holder's tax basis in its New Common Stock should be equal to the tax basis of the obligation constituting the Credit Agreement Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of property other than stock treated as received in the exchange), and a U.S. Holder's holding period for its New Common Stock should include the holding period for the obligation constituting the surrendered Credit Agreement Claim; provided, however, to the extent that any New Common Stock is treated as received in satisfaction of accrued but untaxed interest the tax basis of such New Common Stock should equal the amount of such accrued but untaxed interest, and the holding period for such New Common Stock should not include the holding period of the debt instrument constituting the surrendered Credit Agreement Claim (see "Accrued Interest" discussion below) but should begin on the day following the Effective Date.

(b) *Treatment of a U.S. Holder of a Credit Agreement Claim if the Exchange of its Claim for New Common Stock is Not Treated as a Section 351 Exchange*

If the exchange of a Credit Agreement Claim for New Common Stock is not treated as a Section 351 Exchange, then a U.S. Holder of such a Claim should be treated as exchanging its Credit Agreement Claim for New Common Stock or property other than stock, as applicable, in a fully taxable exchange. A U.S. Holder of a Credit Agreement Claim who is subject to this treatment should recognize gain or loss equal to the difference (positive or negative) between (a) the fair market value of the shares of New Common Stock and property other than stock it receives in the exchange that is not allocable to accrued interest and (b) the U.S. Holder's adjusted tax basis in the obligation constituting the surrendered Credit Agreement Claim treated as exchanged for New Common Stock. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the debts constituting the surrendered Credit Agreement Claim exchanged for New Common Stock were held for more than one year. To the extent that a portion of the New Common Stock is allocable to accrued but untaxed interest, the U.S. Holder will generally recognize ordinary interest income (see "Accrued Interest" discussion below). A U.S. Holder's tax basis in the shares of New Common Stock received on the Effective Date should equal the fair market value of the shares of New Common Stock as of the Effective Date. A U.S. Holder's holding period for the New Common Stock received on the Effective Date should begin on the day following the Effective Date.

(c) *Accrued Interest*

Under the Plan, cash or other property may be distributed or deemed distributed to certain U.S. Holders with respect to their Claims for accrued interest. U.S. Holders of Claims for accrued interest which previously have not included such accrued interest in taxable income will be required to recognize ordinary income equal to the amount of cash or the fair market value of other property received with respect to such Claims for accrued interest. U.S. Holders of Claims for accrued interest which have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plan (after allocating the distribution between principal and accrued interest), even if the underlying Claim is held as a capital asset. The adjusted tax basis of any property received in exchange for a Claim for accrued interest will equal the fair market value of such property on the Effective Date, and the holding period for the property will begin on the day after the Effective Date. The extent to which consideration distributable under the Plan is allocable to interest is not clear. U.S. Holders of Claims are urged to consult their tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

(d) *Market Discount*

The market discount provisions of the Tax Code may apply to U.S. Holders of certain Claims. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market

discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having "original issue discount", the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition.  However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount.  Gain recognized by a creditor with respect to a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the creditor's period of ownership, unless the creditor elected to include accrued market discount in taxable income currently.  If the exchange of a Credit Agreement Claim for New Common Stock is treated as a Section 351 Exchange with respect to a U.S. Holder, any accrued market discount on the Credit Agreement Claim would generally carry over to the New Common Stock received by such holder.

(e)      *Ownership And Disposition Of New Common Stock*

Distributions.  A distribution paid by the Reorganized Debtors in respect of New Common Stock will generally constitute a dividend for U.S. federal income tax purposes to the extent the distribution is paid out of the Reorganized Debtors' current or accumulated earnings and profits, as determined under U.S. federal income tax principles.  The gross amount of any such dividend to a U.S. Holder will be included in income of the U.S. Holder as ordinary dividend income.  In general, distributions in excess of the Reorganized Debtors' current and accumulated earnings and profits will not be taxable to a U.S. Holder to the extent that such distributions to the U.S. Holder do not exceed the U.S. Holder's adjusted tax basis in the shares of New Common Stock with respect to which the distribution is paid, but rather will reduce the U.S. Holder's adjusted tax basis in such New Common Stock (but not below zero).  To the extent that distributions exceed the Reorganized Debtors' current and accumulated earnings and profits as well as the U.S. Holder's adjusted tax basis in the New Common Stock, such distributions generally will be taxable as capital gain realized in respect of the New Common Stock.

Under current U.S. federal income tax law (presently effective for taxable years beginning before January 1, 2011 and subject to expiration thereafter absent extension), dividends paid to certain non-corporate U.S. Holders, including individuals, generally will constitute qualified dividend income eligible for preferential rates of U.S. federal income tax, with a maximum rate of 15%, provided certain conditions and requirements are satisfied, such as minimum holding period requirements. U.S. Holders that are corporations may be eligible for a partial dividends-received deduction with respect to dividend distributions that are paid in respect of New Common Stock, subject to certain conditions and requirements, such as minimum holding period requirements. There can be no assurance that the Reorganized Debtors will have sufficient current or accumulated earnings and profits for distributions in respect of New Common Stock to qualify as dividends for U.S. federal income tax purposes.

Sale or Other Disposition of New Common Stock.  In general, a U.S. Holder will recognize gain or loss upon the sale or other taxable disposition of New Common Stock in an amount equal to the difference between the sum of the fair market value of any property and the amount of cash received in such disposition and such U.S. Holder's adjusted tax basis in the New Common Stock at the time of the disposition. Subject to the treatment of a portion of any gain as ordinary income to the extent of any market discount carried over to the New Common Stock from the Credit Agreement Claim, such gain or loss will generally be capital gain or loss.

2.      *U.S. Holders Of Interests In Holdings*

An existing U.S. Holder who holds existing common stock of Holdings will generally recognize a capital loss for U.S. federal income tax purposes in an amount equal to the stockholder's adjusted basis in its existing common stock of Holdings cancelled under the Plan.

3.      *Backup Withholding And Information Reporting*

Certain payments are generally subject to information reporting to the IRS.  Moreover, such reportable payments may be subject to backup withholding unless the taxpayer:  (i) comes within certain exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a U.S. Holder's U.S. federal income tax liability, and such U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## C.    Certain Income Tax Consequences to Non-U.S. Holders

### 1.    *Non-U.S. Holders Of Class 3 Credit Agreement Claims*

Except with respect to consideration received in respect of accrued but unpaid interest, a Non-U.S. Holder generally will not be subject to U.S. federal income tax on any gain or loss realized on the exchange of a Credit Agreement Claim for New Common Stock. To the extent that the New Common Stock or any other property is treated as received in satisfaction of accrued but unpaid interest on the debt instrument underlying the Credit Agreement Claim, a Non-U.S. Holder generally will be exempt from U.S. federal income tax and withholding tax provided that (i) such holder (A) does not actually or constructively own 10% or more of the total combined voting power of all classes of stock of the Debtors entitled to vote and (B) is not a controlled foreign corporation that is related to the Debtors through stock ownership for U.S. federal income tax purposes, and (ii) the beneficial owner of the Credit Agreement Claim certifies, under penalties of perjury, to the Debtors or the Debtors' paying agent, if applicable, on IRS Form W-8BEN (or appropriate substitute form) that it is not a United States person (as defined under the Tax Code) and provides its name, address and certain other required information or certain other certification requirements are satisfied. If a Non-U.S. Holder cannot satisfy requirements (i) and (ii) above, payments of interest made to a Non-U.S. Holder will be subject to a 30% U.S. withholding tax, unless the Non-U.S. holder qualifies for a reduced rate of withholding, or is able to claim a valid exemption, under a tax treaty (generally, by providing an IRS Form W-8BEN claiming treaty benefits).

#### (a)    *Ownership And Disposition Of New Common Stock*

Distributions. Dividends paid in cash to a Non-U.S. Holder will generally be subject to withholding of U.S. federal income tax at the rate of 30% unless an applicable income tax treaty reduces or eliminates such tax. Non-United States Holders should consult any applicable income tax treaties that may provide for a reduction in, or exemption from, withholding taxes. A Non-U.S. Holder will generally be required to satisfy certain certification requirements in order to claim such treaty benefits.

Sale or Other Disposition of New Common Stock. A Non-U.S. Holder generally will not be subject to U.S. federal income tax on gain recognized on a sale or other taxable disposition of New Common Stock unless the Reorganized Debtors are or have been a U.S. real property holding corporation for U.S. federal income tax purposes at any time during the five year period (or shorter holding period for New Common Stock) ending on the date of the disposition. Debtors have not been, are not and do not anticipate becoming a U.S. real property holding corporation for U.S. federal income tax purposes.

### 2.    *Backup Withholding And Information Reporting*

In general, the Debtors or their paying agent must report to the IRS and to a Non-U.S. Holder the amount of certain payments made in connection with the Plan, as well as the amount of dividends on the New Common Stock, paid to a Non-U.S. Holder and the amount of U.S. federal withholding tax, if any, deducted from those payments. Copies of the information returns reporting such payments and any associated U.S. federal withholding tax also may be made available to the tax authorities in the country in which the Non-U.S. Holder resides under the provisions of an applicable tax treaty. A Non-U.S. Holder generally will not be subject to backup withholding with respect to payments that the Debtors make in connection with the Plan or New Common Stock provided that the Debtors or their paying agent do not have actual knowledge or reason to know that the Non-U.S. Holder is a United States person (as defined under the Tax Code), and the Debtors or their paying agent has received from the Non-U.S. Holder an appropriate certification of non-U.S. status (i.e., IRS Form W-8BEN or other applicable IRS Form W-8). Information reporting and, depending on the circumstances, backup withholding will apply to a payment under the Plan or with respect to New Common Stock that is effected within the United States or effected outside the United States through certain U.S.-related financial intermediaries, unless the Non-U.S. Holder

certifies under penalty of perjury as to its non-U.S. status, and the payor does not have actual knowledge or reason to know that the beneficial owner is a U.S. person, or the Non-U.S. Holder otherwise establishes an exemption.

Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a Non-U.S. Holder's U.S. federal income tax liability provided the required information is furnished to the IRS on a timely basis. Non-U.S. Holders are urged to consult their tax advisers regarding the application of information reporting and backup withholding in their particular situations, the availability of an exemption therefrom, and the procedure for obtaining an exemption, if applicable.

3.    *Additional Withholding Requirements*

Recently enacted legislation will require, after December 31, 2012, withholding at a rate of 30% on dividends in respect of, and gross proceeds from the sale of, New Common Stock held by or through certain foreign financial institutions (including investment funds), unless such institution enters into an agreement with the Secretary of the Treasury to report, on an annual basis, information with respect to shares in the institution held by certain United States persons and by certain non-U.S. entities that are wholly or partially owned by United States persons. Accordingly, the entity through which New Common Stock is held will affect the determination of whether such withholding is required. Similarly, dividends in respect of, and gross proceeds from the sale of, New Common Stock held by an investor that is a non-financial non-U.S. entity will be subject to withholding at a rate of 30 percent, unless such entity either (i) certifies to the Reorganized Debtors that such entity does not have any 'substantial United States owners' or (ii) provides certain information regarding the entity's 'substantial United States owners,' which the Reorganized Debtors will in turn provide to the Secretary of the Treasury. Non-U.S. Holders are encouraged to consult with their tax advisors regarding the possible implications of the legislation on their investment in New Common Stock.

**D.      Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM OR HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## IX.      FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

**A.      Feasibility of the Plan**

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. For purposes of showing that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

To support their belief in the feasibility of the Plan, the Debtors have relied upon the financial projections (the "Financial Projections") set forth as Appendix C of the Disclosure Statement. The Financial Projections show that the Reorganized Debtors should have sufficient cash to make payments required under the Plan. Accordingly, the Debtors believe the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS ARE BY THEIR NATURE FORWARD LOOKING, AND ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THE INFORMATION SET FORTH THEREIN. Readers of this Disclosure Statement are cautioned not to place undue reliance on the Financial Projections, and

should carefully review **Section VI — "Risk Factors To Be Considered**" herein.  The Financial Projections should not be relied upon as necessarily indicative of future, actual recoveries.

Holders of Claims against and Interests in the Debtors are advised that the Financial Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles.  Furthermore, the Debtors' independent certified public accountants have not compiled or examined the Financial Projections and accordingly do not express any opinion or any other form of assurance with respect thereto and assume no responsibility for the Financial Projections.

In addition to the assumptions footnoted in the Financial Projections themselves, the Financial Projections also assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of Reorganized Debtors, and (iii) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors.  Although considered reasonable by the Debtors as of the date hereof, unanticipated events and circumstances occurring after the preparation of the Financial Projections may affect actual recoveries under the Plan.

The Debtors do not intend to update or otherwise revise the Financial Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition.  Furthermore, the Debtors do not intend to update or revise the Financial Projections to reflect changes in general economic or industry conditions.

## B.     Acceptance Of The Plan

As a condition to confirmation, the Bankruptcy Code requires that each Impaired Class of Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two thirds (2/3) in dollar amount and more than one half (1/2) in number of claims in that class, but for that purpose only those who actually vote to accept or to reject the Plan are counted.  Thus, Class 3 will have voted to accept the Plan only if creditors holding at least two thirds (2/3) in amount and a majority in number actually voting in such Class cast their Ballots in favor of acceptance.  Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

## C.     Best Interests Test

Section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find that each entity who rejects (or is deemed to reject) the Plan will receive property with a value, as of the Effective Date, that is not less than the amount that it would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on that date.  This requirement is known as the "best interests of creditors" test.

In a chapter 7 case, one or more bankruptcy trustees would sell the Debtors' assets to generate cash.  In general, the net proceeds of assets encumbered by valid and perfected security interests would be paid to the creditors holding those security interests.  The remaining proceeds would be applied to the administrative expenses of the liquidation, including the trustees' fees, the fees of their professionals, and wind-down expenses.  If funds were remaining, priority claims, including certain employee and tax claims, would be paid prior to any distributions to non-priority unsecured creditors.  A chapter 7 liquidation analysis of the Debtors' assets is attached hereto as Appendix B.

Under the Plan, unsecured creditors will be paid in full.  Because unsecured creditors would not be entitled to be paid more than in full under a chapter 7 liquidation, the Plan is clearly in the best interest of unsecured creditors who are deemed to accept the Plan.  Similarly, the Plan leaves claims under the P&A Facility unimpaired, so the best interest test is satisfied with respect to this class.

Furthermore, after analyzing the effect that a chapter 7 liquidation would have on the ultimate proceeds available for distribution, the Debtors, in consultation with their advisors, believe that the distributions under the Plan to impaired secured creditors on account of their allowed secured claims (namely, Holders of Allowed Credit Agreement Claims) will be far greater than under a chapter 7 liquidation. The Debtors believe that any liquidation analysis in these cases is highly speculative given the nature of the Debtors' assets. However, based on the Debtors' extensive marketing efforts and all indications of interest that were received, the Debtors believe that in chapter 7 liquidations the net proceeds of any sale would be far less than the value provided under the Plan.

The fact that the going concern value would be higher than a liquidation value can be attributed to the following: (i) the increased costs and expenses of liquidation under chapter 7, including the fees payable to the chapter 7 trustee and the attorneys and advisors to such trustee, (ii) additional expenses and claims, some of which would have to be paid in order to liquidate the Debtors' assets, which would be generated during the liquidation, (iii) the erosion of the value of the Debtors' assets during the liquidation process, (iv) the incompatibility of the "forced sale" atmosphere of a chapter 7 liquidation with the extended and extensive due diligence that would be required by any bidder willing to pay fair market value for the assets, (v) the inability of a trustee to fully and properly market and sell the assets, which are primarily intellectual property assets that often have complex chain of title and related issues that require institutional knowledge and expertise to understand and market, and (vi) the likelihood of increased opportunistic litigation and claims by counterparties to the Debtors' various agreements. Additionally, the Subcommittee strongly supports the Plan over any alternatives, including a chapter 7 liquidation, and believes that the Plan is in the best interest of holders of Allowed Credit Agreement Claims.

Finally, under the Plan, Holders of Allowed Interests in Holdings will not receive or retain any property under the Plan, but Holders of Interests, who are Released Parties, will be entitled to the benefit of the release and exculpation provisions of Article IX of the Plan. In a chapter 7 liquidation, the Holders of Allowed Interests in Holdings would not receive the benefit of these release and exculpation provisions but would have a residual ownership interest in approximately $12.7 million at Holdings. However, this residual interest will likely be reduced inasmuch as Holdings would be obligated in a chapter 7 liquidation to fund its own administrative expenses, including the cost of professionals for a trustee and trustee fees in chapter 7. Moreover, Holdings also would be obligated for the cost of providing indemnification to its officers and directors, as well as to pay other third party claims, including claims creditors of the other Debtors may assert against Holdings as the ultimate parent of the Debtors, and intercompany claims. Furthermore, as set forth in Section G.3 hereof, the substantial contribution of the $12.7 million under the Plan is a negotiated and integral element of the Plan, that results in a benefit to the Holders of Allowed Interests in Holdings that the Debtors believe is fair to all parties and satisfies the best interests test as to this Class.

## D. Confirmation Without Acceptance Of All Impaired Classes: The 'Cramdown' Alternative

The Plan currently only has one impaired voting class. However, to the extent the Bankruptcy Court finds that a different classification is required, the Debtors anticipate that they would seek to modify the Plan to provide for the classification required for confirmation. The Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and the Debtors reserve the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification.

Under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan over the objection of an impaired rejecting class, if, among other things, at least one Impaired Class of Claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and if the plan "does not discriminate unfairly" against and is "fair and equitable" to each impaired, rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if the value of the cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class. A plan is fair and equitable as to a class of secured claims that rejects the plan if, among other things, the plan provides (i) (a) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (b) that each holder of a claim of such class receives on account of that claim deferred cash

payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property, (ii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (i) or (iii) of this paragraph, or (iii) for the realization by such holders of the indubitable equivalent of such claims.

If one of the Impaired Classes does not vote as a Class to accept the Plan, the Debtors reserve the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Plan by such Class and reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code notwithstanding the rejection of the Plan by other Classes of Claims.

## X.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan or plans of reorganization.  Such a plan or plan(s) might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

Further, although the Debtors could theoretically solicit votes with respect to an alternative plan if the requisite acceptances are not received, or the Plan is not confirmed and effectuated, a possible result would be the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  As set forth above, in a chapter 7 liquidation, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  Further, because there are over a hundred separate Debtors, there could be multiple chapter 7 trustees – one for each Debtor – whose interests and obligations conflict.  This, in turn, would result in additional legal and other expenses.  It is impossible to predict precisely how the proceeds of a chapter 7 liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors.  The Debtors believe that in a liquidation under chapter 7, before prepetition unsecured creditors received any distribution, additional administrative expenses incurred by a trustee or trustees and attorneys, accountants, and other professionals to assist such trustee(s) would cause a substantial diminution in the value of the Estates.  Additionally, the Debtors believe that conversion from chapter 11 to chapter 7 of the Bankruptcy Code would result in (i) significant delay in distributions to all creditors who would have received a distribution under the Plan and (ii) diminished recoveries for Holders of Impaired Claims.  Accordingly, the Debtors believe the Plan is superior to a chapter 7 liquidation because of the greater return that is anticipated to be provided by the Plan.

## XI.  THE SOLICITATION

### A.  Parties In Interest Entitled To Vote

Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than the defaults set forth in section 365(b)(2) of the Bankruptcy Code) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is impaired by the plan and (ii) the holder of the claim or interest will receive or retain some value on account of such claim or interest.  If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

**B.      Classes Impaired Under The Plan**

Class 3 is entitled to vote to accept or reject the Plan.  By operation of law, each Unimpaired Class of Claims, Classes 1, 2, 4, 5 and 6, respectively, is deemed to have accepted the Plan and, therefore, creditors holding Claims in these Classes are not entitled to vote to accept or reject the Plan.  By operation of law, Class 7 is deemed to have rejected the Plan and, therefore, creditors holding Interests in Class 7 are not entitled to vote to accept or reject the Plan.

**C.      Revocation; Waivers Of Defects; Irregularities**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Voting Agent and the Debtors in their sole discretion, which determination will be final and binding.  Once a party delivers a valid Ballot for the acceptance or rejection of the Plan, such party may not withdraw or revoke such acceptance or rejection without the Debtors' written consent or an order of the Bankruptcy Court.  The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

**D.      Further Information; Additional Copies**

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits or appendices to such documents, please contact the Voting Agent:

**Voting Department**
**Donlin, Recano & Company, Inc.**
**P.O. Box 2034 Murray Hill Station**
**New York, NY 10016**
**DIRECT PHONE: (212) 771-1128**

## XII.    CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any other the alternative under the circumstances.  Other alternatives would involve significant delay, uncertainty, substantial additional administrative costs, and/or a lower recovery to the Holders of Impaired Claims.

Consequently, the Debtors urge all Holders of Impaired Claims to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before 5:00 P.M., Prevailing Eastern Time, on October 22, 2010 by the Voting Agent.

Dated:   October 7, 1010

MGM HOLDINGS INC.
  (for itself and on behalf of the other Debtors)


By:    */s/ Stephen F. Cooper*
        Name:  Stephen F. Cooper
        Title:   Member of the Office of
               the CEO

Jay M. Goffman
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000
Email: Jay.Goffman@skadden.com


Nick P. Saggese
Rick C. Madden
Glenn S. Walter
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
300 South Grand Avenue
Suite 3400
Los Angeles, California 90071
(213) 687-5000
Email: Nick.Saggese@skadden.com
Email: Rick.Madden@skadden.com
Email: Glenn.Walter@skadden.com


Kenneth N. Klee
Michael L. Tuchin
KLEE, TUCHIN, BOGNANOFF & STERN LLP
1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, California  90067
(310) 407-4000
Email: KKlee@ktbslaw.com
Email: MTuchin@ktbslaw.com

APPENDIX A

TO

DISCLOSURE STATEMENT
OF METRO-GOLDWYN-MAYER STUDIOS INC. AND CERTAIN OF ITS AFFILIATES

JOINT PREPACKAGED PLAN OF REORGANIZATION
OF METRO-GOLDWYN-MAYER STUDIOS INC. AND CERTAIN OF ITS AFFILIATES

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Jay M. Goffman
Four Times Square
New York, New York 10036
(212) 735-3000

Nick P. Saggese
Rick C. Madden
Glenn S. Walter
300 South Grand Avenue
Suite 3400
Los Angeles, California 90071
(213) 687-5000

and

KLEE, TUCHIN, BOGDANOFF & STERN LLP
Kenneth N. Klee
Michael L. Tuchin
1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, California 90067
(310) 407-4000

Proposed Counsel for Debtors and
  Debtors in Possession


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                                    : Chapter 11
                                                          :
METRO-GOLDWYN-MAYER STUDIOS INC.,        : Case No. 10-
et al.,                                                   :
                                                          : (Motion for Joint Administration
                    Debtors.                       : Pending)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF METRO-GOLDWYN-
MAYER STUDIOS INC. AND CERTAIN OF ITS AFFILIATES**

Dated: October 7, 2010

# TABLE OF CONTENTS

Page

**INTRODUCTION**

**ARTICLE I**

**DEFINED TERMS AND RULES OF INTERPRETATION**

| | | |
|---|---|---|
| 1.1 | Additional Debtor | 1 |
| 1.2 | Administrative Agent | 1 |
| 1.3 | Administrative Claim | 1 |
| 1.4 | Allowed | 1 |
| 1.5 | Avoidance Action | 2 |
| 1.6 | Bankruptcy Code | 2 |
| 1.7 | Bankruptcy Court | 2 |
| 1.8 | Bankruptcy Rules | 2 |
| 1.9 | Business Day | 2 |
| 1.10 | Cash | 2 |
| 1.11 | Cash Collateral Order | 2 |
| 1.12 | C/G Merger Parties | 2 |
| 1.13 | C/G Stockholders | 2 |
| 1.14 | Century City Leases | 2 |
| 1.15 | Chapter 11 Case(s) | 3 |
| 1.16 | Claim | 3 |
| 1.17 | Class | 3 |
| 1.18 | Confirmation | 3 |
| 1.19 | Confirmation Date | 3 |
| 1.20 | Confirmation Hearing | 3 |
| 1.21 | Confirmation Order | 3 |
| 1.22 | Credit Agreement | 3 |
| 1.23 | Credit Agreement Claim | 3 |
| 1.24 | Creditors' Committee | 3 |
| 1.25 | Cypress Stockholders | 3 |
| 1.26 | Debtor Merger Party | 3 |
| 1.27 | Debtors | 3 |
| 1.28 | DIP Facility | 4 |
| 1.29 | DIP Lenders | 4 |
| 1.30 | Disclosure Statement | 4 |
| 1.31 | Disputed Claim | 4 |
| 1.32 | Effective Date | 4 |
| 1.33 | Equity Incentive Plan | 4 |
| 1.34 | Estate(s) | 4 |
| 1.35 | Exculpated Parties | 4 |

| 1.36 | Executory Contracts and Unexpired Leases | 4 |
|------|------------------------------------------|---|
| 1.37 | Exhibit | 4 |
| 1.38 | Final Order | 4 |
| 1.39 | Garoge Stockholders | 5 |
| 1.40 | General Unsecured Claim | 5 |
| 1.41 | Holder | 5 |
| 1.42 | Holdings | 5 |
| 1.43 | Impaired | 5 |
| 1.44 | Intercompany Claim | 5 |
| 1.45 | Interest | 5 |
| 1.46 | Investment Agreement | 5 |
| 1.47 | Letters of Credit | 5 |
| 1.48 | Lien | 5 |
| 1.49 | Loan Documents | 5 |
| 1.50 | MGM Companies | 6 |
| 1.51 | New Common Stock | 6 |
| 1.52 | New Credit Facility | 6 |
| 1.53 | New Lenders | 6 |
| 1.54 | Non-Tax Priority Claim | 6 |
| 1.55 | Other Secured Claim | 6 |
| 1.56 | P&A Facility | 6 |
| 1.57 | P&A Facility Claim | 6 |
| 1.58 | Person | 6 |
| 1.59 | Petition Date | 6 |
| 1.60 | Plan | 6 |
| 1.61 | Priority Tax Claim | 6 |
| 1.62 | Professional | 7 |
| 1.63 | Professional Fee Claim | 7 |
| 1.64 | Registration Rights | 7 |
| 1.65 | Registration Rights Agreement | 7 |
| 1.66 | Reinstated | 7 |
| 1.67 | Released Parties | 7 |
| 1.68 | Reorganized | 7 |
| 1.69 | Retained Actions | 7 |
| 1.70 | Secured Claim | 8 |
| 1.71 | Secured Lenders | 8 |
| 1.72 | Spyglass | 8 |
| 1.73 | Spyglass Consent Parties | 8 |
| 1.74 | Steering Committee | 8 |
| 1.75 | Stockholders Agreement | 8 |
| 1.76 | Subsidiary | 8 |
| 1.77 | Subsidiary Debtors | 9 |
| 1.78 | Transaction Documents | 9 |
| 1.79 | Unclassified Claims | 9 |
| 1.80 | Unimpaired | 9 |

# ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

2.1    Administrative Claims ................................................................................ 10
2.2    Priority Tax Claims.................................................................................... 10
2.3    Professional Fees ...................................................................................... 10

# ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

3.1    Introduction............................................................................................... 11
3.2    Summary of Classes.................................................................................. 11
3.3    Treatment of Classes................................................................................ 11
3.4    Intercompany Claims ............................................................................... 15
3.5    Alternative Treatment .............................................................................. 15
3.6    Special Provision Regarding Unimpaired Classes of Claims ................... 15
3.7    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims.................... 16

# ARTICLE IV

## ACCEPTANCE OF THIS PLAN

4.1    Classes Entitled to Vote ........................................................................... 16
4.2    Acceptance by Impaired Classes .............................................................. 16
4.3    Elimination of Classes ............................................................................. 16
4.4    Cramdown.................................................................................................. 16

# ARTICLE V

## MEANS FOR IMPLEMENTATION OF THIS PLAN

5.1    Continued Legal Existence and Revesting of Assets................................. 17
5.2    Sources of Cash for Distribution.............................................................. 17
5.3    Investment Agreement; Issuance of New Common Stock ........................ 17
5.4    Section 1145 Exemption .......................................................................... 17
5.5    Stockholders Agreement for New Common Stock.................................... 18
5.6    Registration Rights Agreement ................................................................ 18
5.7    Equity Incentive Plan............................................................................... 18
5.8    Corporate Action...................................................................................... 18
5.9    Preservation of Causes of Action............................................................. 18
5.10   Effectuating Documents; Further Transactions ....................................... 19
5.11   Exemption From Certain Transfer Taxes and Recording Fees.................. 19
5.12   Further Authorization............................................................................... 19
5.13   Dissolution of Creditors' Committee ....................................................... 19
5.14   Cancellation of Existing Securities and Agreements................................ 19

5.15   Officers and Directors of Reorganized Debtors................................................................ 20

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

6.1   Allowed Claims and Interests ........................................................................... 20
6.2   Distributions for Claims Allowed as of the Effective Date ............................. 20
6.3   Fractional Shares.............................................................................................. 20
6.4   Interest and Penalties on Claims ..................................................................... 21
6.5   Means of Cash Payment................................................................................... 21
6.6   Withholding and Reporting Requirements ...................................................... 21
6.7   Setoffs .............................................................................................................. 21

## ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

7.1   Assumption/Rejection of Executory Contracts and Unexpired Leases ............................ 21
7.2   Compensation and Benefit Programs................................................................ 22
7.3   Century City Leases.......................................................................................... 23
7.4   Employment Contracts...................................................................................... 23

## ARTICLE VIII

## CONFIRMATION AND CONSUMMATION OF THIS PLAN

8.1   Condition To Entry of the Confirmation Order ............................................... 24
8.2   Conditions To Effective Date ........................................................................... 24
8.3   Waiver Of Conditions ....................................................................................... 25

## ARTICLE IX

## EFFECT OF PLAN CONFIRMATION

9.1   Binding Effect.................................................................................................... 25
9.2   Revesting of Assets............................................................................................ 25
9.3   Releases and Related Matters ........................................................................... 25
9.4   Discharge of the Debtors .................................................................................. 26
9.5   Injunction .......................................................................................................... 27
9.6   Exculpation and Limitation of Liability .......................................................... 27
9.7   Term of Bankruptcy Injunction or Stays ......................................................... 28
9.8   Post-Effective Date Retention of Professionals............................................... 28

# ARTICLE X

## RETENTION OF JURISDICTION

10.1 Retention of Jurisdiction ............................................................................................ 28
10.2 Failure of Bankruptcy Court to Exercise Jurisdiction ...................................................... 30

# ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1 Effectuating Documents and Further Transactions ........................................................... 30
11.2 Corporate Action ....................................................................................................... 30
11.3 Indemnification of Directors and Officers ..................................................................... 31
11.4 Payment Of Statutory Fees ......................................................................................... 32
11.5 Amendment Or Modification Of This Plan ..................................................................... 32
11.6 Additional Debtors ..................................................................................................... 32
11.7 Severability of Plan Provisions .................................................................................... 32
11.8 Successors and Assigns .............................................................................................. 32
11.9 Revocation, Withdrawal, or Non-Consummation ............................................................ 33
11.10 Notice ..................................................................................................................... 33
11.11 Governing Law ......................................................................................................... 35
11.12 Tax Reporting and Compliance ................................................................................... 35
11.13 Conflicts .................................................................................................................. 35

**EXHIBITS**

EXHIBIT A  -    New Credit Facility Term Sheet

EXHIBIT B  -    List of Debtors

EXHIBIT C  -    Investment Agreement

EXHIBIT D  -    Registration Rights Agreement

EXHIBIT E  -    Stockholders Agreement

EXHIBIT F  -    Equity Incentive Plan

EXHIBIT G -    Amended Bylaws of Reorganized Holdings

EXHIBIT H -    Certificate of Incorporation of Reorganized Holdings

## INTRODUCTION

Metro-Goldwyn-Mayer Studios Inc. and its affiliated debtors and debtors in possession in the above-captioned cases propose the following joint prepackaged plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtors. Reference is made to the Disclosure Statement, filed contemporaneously herewith, for a discussion of (i) certain information relating to the Debtors, (ii) a summary and analysis of this Plan, and (iii) certain matters related to the confirmation and the consummation of this Plan. Subject to certain restrictions and requirements set forth in section 1127 of title 11 of the United States Code and Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, subject to Section 11.5 herein, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan.

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

*Defined Terms.* As used herein, capitalized terms shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**1.1** *Additional Debtor* means any affiliate or other related party of a Debtor that files a chapter 11 petition at any time prior to the Confirmation Date and that files a motion to have such debtor's chapter 11 case jointly administered with the Chapter 11 Cases.

**1.2** *Administrative Agent* means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Credit Agreement.

**1.3** *Administrative Claim* means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 503(b) or 507(b) of the Bankruptcy Code, including, but not limited to: (a) any actual and necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims; (c) all fees and charges assessed against the Estates under Section 1930 of title 28 of the United States Code, (d) claims under section 503(b)(9) of the Bankruptcy Code, (e) claims, if any, under any DIP Facility, Cash Collateral Order, or any engagement or fee letter for post-Effective Date financing, as applicable, and (f) any amounts owed by the Debtors to Spyglass, the C/G Merger Parties, or the C/G Stockholders under the Investment Agreement for a Break-Up Fee (as such term is defined in the Investment Agreement) or that certain Letter of Intent dated September 3, 2010 by and among Spyglass, the C/G Merger Parties, MGM Holdings, Inc., and MGM Holdings II, Inc.

**1.4** *Allowed* means, with respect to any Claim, such Claim or any portion thereof that the Debtors have assented to the validity of or that has been allowed (a) by a Final Order of the Bankruptcy Court, (b) pursuant to the terms of this Plan, or (c) by agreement between the Holder of such Claim and the Debtors or Reorganized Debtors; *provided, however*, that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim"

the Debtors do not waive their rights to contest the amount and validity of such Claim to the extent it is disputed, contingent or unliquidated, in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; and provided, further that the amount of any Allowed Claim shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code.

**1.5** **_Avoidance Action_** means any claim or cause of action of an Estate arising out of or maintainable pursuant to sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b) or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

**1.6** **_Bankruptcy Code_** means title 11 of the United States Code, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Cases.

**1.7** **_Bankruptcy Court_** means the United States Bankruptcy Court for the Southern District of New York, or any other court with jurisdiction over the Chapter 11 Cases.

**1.8** **_Bankruptcy Rules_** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Cases.

**1.9** **_Business Day_** means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**1.10** **_Cash_** means legal tender of the United States of America, and equivalents thereof.

**1.11** **_Cash Collateral Order_** means an order entered by the Bankruptcy Court with the consent of the Administrative Agent and each of the Spyglass Consent Parties, whether on an interim or final basis, governing the use of, and adequate protection with respect to, the Secured Lender's collateral, including cash collateral, as amended from time to time.

**1.12** **_C/G Merger Parties_** means Cypress Entertainment Group, Inc. and Garoge, Inc.

**1.13** **_C/G Stockholders_** means the Cypress Stockholders and the Garoge Stockholders.

**1.14** **_Century City Leases_** means (a) that certain lease between A P Properties, Ltd. and MGM Studios Inc. dated on or about November 15, 2000 (as amended and together with any documents executed in connection therewith), for non-residential real property located at 10250 Constellation Boulevard, Los Angeles, California 90067, and (b) that certain unexpired sublease between MGM Studios Inc. and International Creative Management, Inc. dated May 26, 2006 (as amended and together with any documents executed in connection therewith) for non-residential real property located at 10250 Constellation Boulevard, Los Angeles, California 90067.

**1.15** *Chapter 11 Case(s)* means (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court.

**1.16** *Claim* means a "claim" as defined in section 101(5) of the Bankruptcy Code.

**1.17** *Class* means a category of Claims or Interests, as described in Article III hereof.

**1.18** *Confirmation* means the confirmation of this Plan by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code.

**1.19** *Confirmation Date* means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

**1.20** *Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.21** *Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

**1.22** *Credit Agreement* means that certain Credit Agreement, dated as of April 8, 2005, by and among MGM Holdings II Inc., Metro-Goldwyn-Mayer Inc., as Borrower, the lenders party thereto, Bank of America, N.A., Citicorp USA, Inc. and The Royal Bank of Scotland PLC, as Documentation Agents, Credit Suisse, as Syndication Agent, and the Administrative Agent, as amended, modified or supplemented from time to time.

**1.23** *Credit Agreement Claim* means a Claim under or arising from the Credit Agreement or the Loan Documents, including all amounts owed as "Obligations" (as defined in the Credit Agreement) and shall include Claims owed in respect of any "Specified Swap Agreement" (as defined in the Credit Agreement).

**1.24** *Creditors' Committee* means the statutory committee of unsecured creditors, if any, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**1.25** *Cypress Stockholders* means the owners of the stock in Cypress Entertainment Group, Inc. immediately prior to consummating the transactions contemplated by the Investment Agreement.

**1.26** *Debtor Merger Party* means a newly formed special purpose direct or indirect wholly owned subsidiary of Reorganized Holdings.

**1.27** *Debtors* means the debtors and debtors in possession in the Chapter 11 Cases identified on Exhibit B hereto.

**1.28**    *DIP Facility* means any debtor in possession financing facility provided to the Debtors.

**1.29**    *DIP Lenders* means those lenders under the DIP Facility, if any, from time to time.

**1.30**    *Disclosure Statement* means the disclosure statement filed contemporaneously herewith (including all exhibits and schedules thereto) relating to this Plan, as amended, modified or supplemented from time to time.

**1.31**    *Disputed Claim* means (a) any Claim as to which the Debtors have interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any claim otherwise disputed by the Debtors, the Reorganized Debtors, or other party-in-interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) if there are schedules, any Claim scheduled by the Debtors as contingent, unliquidated, or disputed, (c) any Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated, or disputed, or (d) any Claim prior to it having become an Allowed Claim.

**1.32**    *Effective Date* means a Business Day on or after the Confirmation Date specified by the Debtors on which (a) no stay of the Confirmation Order is in effect and (b) the conditions to effectiveness set forth in Article VIII hereof have been satisfied or waived.

**1.33**    *Equity Incentive Plan* means an equity incentive plan to be implemented by Reorganized Holdings with the terms as set forth on Exhibit F.

**1.34**    *Estate(s)* means, individually, the estate of any of the Debtors and, collectively, the estates of all of the Debtors created under section 541 of the Bankruptcy Code.

**1.35**    *Exculpated Parties* means collectively: (a) the Reorganized Debtors, (b) the Released Parties, (c) Spyglass, (d) the Spyglass Merger Parties, (e) the C/G Stockholders, and (f) the respective agents, officers, directors, managers, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns of (a) through (e) (each in their capacity as such).

**1.36**    *Executory Contracts and Unexpired Leases* means all executory contracts and unexpired leases to which any of the Debtors is a party.

**1.37**    *Exhibit* means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement, as amended, modified or supplemented from time to time.

**1.38**    *Final Order* means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal, that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed, has been resolved by the

highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

   **1.39** *Garoge Stockholders* means the owners of the stock in Garoge, Inc. immediately prior to consummating the transactions contemplated by the Investment Agreement.

   **1.40** *General Unsecured Claim* means a Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Non-Tax Priority Claim, Credit Agreement Claim, P&A Facility Claim or Other Secured Claim.

   **1.41** *Holder* means a holder of a Claim or Interest, as applicable.

   **1.42** *Holdings* means MGM Holdings Inc.

   **1.43** *Impaired* means, when used in reference to a Claim, a Claim that is in a class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

   **1.44** *Intercompany Claim* means (a) any account reflecting intercompany book entries by one Debtor with respect to any other Debtor or any non-Debtor affiliate that is a direct or indirect wholly owned subsidiary of a Debtor or (b) any Claim that is not reflected in such book entries and is held by a Debtor against any other Debtor or any non-Debtor affiliate that is a direct or indirect wholly owned subsidiary of a Debtor.

   **1.45** *Interest* means the legal, equitable, contractual (including, without limitation, any contractual right to acquire equity in a Debtor contingent upon future events, such as an initial public offering), and other rights of any Person with respect to any capital stock or other ownership interest in any Debtor, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor.

   **1.46** *Investment Agreement* means the Investment Agreement by and among MGM Holdings Inc., C/G Acquisition LLC, Cypress Entertainment Group, Inc., Garoge, Inc., Spyglass Entertainment Holdings, LLC, the C/G Stockholders (as defined therein), and the Management Stockholders (as defined therein), in the form, excluding exhibits, attached hereto as Exhibit C, and as may be amended by the parties thereto pursuant to the terms thereof.

   **1.47** *Letters of Credit* means any undrawn letters of credit issued under the Credit Agreement outstanding as of the Effective Date.

   **1.48** *Lien* means any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

   **1.49** *Loan Documents* means the "Loan Documents" as defined in the Credit Agreement.

**1.50** *MGM Companies* means, collectively, Holdings and any of its Subsidiaries (including Merger Sub, as such term is defined in the Investment Agreement).

**1.51** *New Common Stock* means shares of common stock of Reorganized Holdings.

**1.52** *New Credit Facility* means that certain financing facility to be entered into between the Reorganized Debtors and the lenders party thereto on the Effective Date, which shall have terms substantially as set forth in the commitment letter or term sheet attached hereto as Exhibit A, and all documents, agreements and instruments related thereto. The Debtors may file Exhibit A with the Bankruptcy Court at any time at least five business days prior to the deadline that the Bankruptcy Court sets for parties in interest to file objections to Confirmation.

**1.53** *New Lenders* means those lenders party to the New Credit Facility from time to time and the DIP Lenders, if any.

**1.54** *Non-Tax Priority Claim* means a Claim, other than an Administrative Claim or Priority Tax Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

**1.55** *Other Secured Claim* means a Secured Claim that is not a P&A Facility Claim or a Credit Agreement Claim.

**1.56** *P&A Facility* means that certain Amended and Restated Revenue Participation Agreement by and among, on the one hand, Metro-Goldwyn-Mayer Studios Inc. and the Distribution Subsidiaries (as defined therein), and, on the other hand, Domestic Distribution Inc., as amended, modified or supplemented from time to time.

**1.57** *P&A Facility Claim* means a Claim under the P&A Facility.

**1.58** *Person* means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, joint venture, joint stock company, firm, trust, estate, unincorporated organization, association, government, governmental agency, or other entity, in each case whether acting in an individual, fiduciary or other capacity.

**1.59** *Petition Date* means, with respect to a Debtor, the date on which such Debtor filed its petition for relief commencing its Chapter 11 Case.

**1.60** *Plan* means this chapter 11 plan of reorganization, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be amended, modified or supplemented from time to time with the consent of the Administrative Agent.

**1.61** *Priority Tax Claim* means a Claim of a governmental unit of the kind specified in sections 502(i), 507(a)(8), or 1129(a)(9)(D) of the Bankruptcy Code.

**1.62** *Professional* means (a) any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.63** *Professional Fee Claim* means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

**1.64** *Registration Rights* means registration rights to be provided to certain holders of New Common Stock pursuant to the Registration Rights Agreement.

**1.65** *Registration Rights Agreement* means a registration rights agreement to be entered into on the Effective Date among Reorganized Holdings and certain holders of New Common Stock, in the form attached hereto as Exhibit D.

**1.66** *Reinstated* means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave the class including such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (iii) compensating the holder of a Claim for any damages incurred as a result of any reasonable reliance by such holder of a Claim on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim; *provided*, *however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions, change of control or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured to achieve reinstatement.

**1.67** *Released Parties* means (a) the Debtors and the Debtors' former and present directors, officers, or employees (in their capacity as such), (b) the Administrative Agent (in its capacity as such), (c) the Creditors' Committee and its members, if any (in their capacity as such), (d) the Secured Lenders (in their capacity as such), (e) the New Lenders (in their capacity as such), and (f) the respective agents, officers, directors, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns of (a) through (e) (in their capacity as such).

**1.68** *Reorganized* means, with respect to a Debtor, the successor to such Debtor on and after the Effective Date.

**1.69** *Retained Actions* means all claims, causes of action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any Debtor,

any Debtor's Estate, or any Reorganized Debtor may hold against any Person, including, without limitation, (a) claims and causes of action brought prior to the Effective Date, (b) claims and causes of action against any Persons for failure to pay for products or services provided or rendered by any of the Debtors or Reorganized Debtors, (c) claims and causes of action relating to strict enforcement of any of the Debtors' or Reorganized Debtors' intellectual property rights, including patents, copyrights and trademarks, (d) claims and causes of action seeking the recovery of any of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of any of the Debtors' or the Reorganized Debtors' businesses, including, without limitation, claim overpayments and tax refunds, and (e) all Avoidance Actions; *provided*, *however*, that Retained Actions shall not include those claims, causes of action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, released under Article IX herein.

      **1.70** *Secured Claim* means a Claim that is secured by a Lien on property in which a Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

      **1.71** *Secured Lenders* means those lenders party to the Credit Agreement from time to time and their affiliates holding Credit Agreement Claims.

      **1.72** *Spyglass* means Spyglass Entertainment Holdings, LLC.

      **1.73** *Spyglass Consent Parties* means (a) Spyglass, (b) a majority of the Cypress Stockholders, and (c) a majority of the Garoge Stockholders.

      **1.74** *Steering Committee* means that certain steering committee of certain lenders under the Credit Agreement.

      **1.75** *Stockholders Agreement* means one or more stockholders agreement(s), as necessary, with respect to the New Common Stock, in the form attached hereto as Exhibit E.

      **1.76** *Subsidiary* of any Person means (a) a corporation more than 50% of the combined voting power of the outstanding voting stock of which is owned, directly or indirectly, by such Person or by one of more other Subsidiaries of such Person or by such Person and one or more other Subsidiaries thereof; (b) a partnership of which such Person, or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, is the general partner and has the power to direct the policies, management and affairs of such partnership; (c) a limited liability company of which such Person or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, is the managing member and has the power to direct the policies, management and affairs of such company; or (d) any other Person (other than a corporation, partnership or limited liability company) in which such Person, or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, has at least a majority ownership and has the power to direct the policies management and affairs

thereof.  For the purposes of this definition, "voting power" shall mean the right to elect a majority of the board of directors of such corporation, and United Artists Entertainment LLC shall be deemed to be a Subsidiary of Holdings.

      **1.77**   ***Subsidiary Debtors*** means each of the Debtors other than Holdings.

      **1.78**   ***Transaction Documents*** means, collectively, the New Credit Facility, the Investment Agreement, all Registration Rights Agreements, the Stockholders Agreement, any other document included with the definition of "Transaction Document" in the Investment Agreement, and any option agreement, contract, instrument, and other agreement or document executed or delivered in connection with the foregoing.

      **1.79**   ***Unclassified Claims*** means Administrative Claims and Priority Tax Claims.

      **1.80**   ***Unimpaired*** means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

      *Rules Of Interpretation And Computation Of Time*.  For purposes of this Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions with any modifications subject to the consent of the Debtors, the Administrative Agent, and the Spyglass Consent Parties; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to Sections and Articles are references to Sections and Articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without limitation;" and (l) with reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

      *Exhibits*.  All Exhibits are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or after the Petition Date, but in any event, no later than the Confirmation Date and shall be in form and substance satisfactory to the Administrative Agent, Spyglass, and

the C/G Stockholders.  Holders of Claims and Interests may obtain a copy of the Exhibits upon written request to the Debtors.  Upon their filing, the Exhibits may be inspected (i) in the office of the clerk of the Bankruptcy Court or its designee during normal business hours; (ii) on the Bankruptcy Court's website at http://www.nysb.uscourts.gov (registration required) or (iii) at the Debtors' noticing agent's website at www.donlinrecano.com at no charge.  The documents contained in the Exhibits shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on this Plan.

2.1     *Administrative Claims*.  On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.  Notwithstanding the foregoing, (y) any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and the Debtors or the Reorganized Debtors.

2.2     *Priority Tax Claims*.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the sole discretion of the Debtors, (i) Cash equal to the unpaid portion of such Holder's Allowed Priority Tax Claim, (ii) treatment in any other manner such that such Holder's Allowed Priority Tax Claim shall be paid in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code over a period not ending later than five years from the Petition Date, or (iii) such other treatment as to which the Debtors or the Reorganized Debtors and such Holder shall have agreed upon in writing.

2.3     *Professional Fees*.  Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Cases prior to the Effective Date shall file with the Bankruptcy Court an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases on or before the 60th day following the Effective Date.  Without limiting the foregoing, the Reorganized Debtors may pay the charges incurred by the Reorganized Debtors on and after the Effective Date for any Professional's fees, disbursements, expenses or related support services, without application to or approval by the Bankruptcy Court.

# ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 3.1 *Introduction*.

This Plan is a single plan of reorganization for the jointly administered Chapter 11 Cases, but does not constitute a substantive consolidation of the Debtors' Estates. Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified, and the respective treatment of such Unclassified Claims is set forth in Article II of this Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

### 3.2 *Summary of Classes*.

| Class | Impaired/Unimpaired; Entitlement To Vote |
|---|---|
| Class 1 - Non-Tax Priority Claims | Unimpaired - Deemed to have accepted this Plan and not entitled to vote |
| Class 2 – Other Secured Claims | Unimpaired - Deemed to have accepted this Plan and not entitled to vote |
| Class 3 – Credit Agreement Claims | Impaired – Entitled to vote |
| Class 4 – P&A Facility Claims | Unimpaired - Deemed to have accepted this Plan and not entitled to vote |
| Class 5 - General Unsecured Claims | Unimpaired - Deemed to have accepted this Plan and not entitled to vote |
| Class 6 - Interests in Subsidiary Debtors | Unimpaired - Deemed to have accepted this Plan and not entitled to vote |
| Class 7 – Interests in Holdings | Impaired – Deemed to have rejected this Plan and not entitled to vote |

### 3.3 *Treatment of Classes*.

*Class 1 – Non-Tax Priority Claims*

*Claims In Class:* Class 1 consists of all Non-Tax Priority Claims against each of the Debtors.

*Treatment:* Except to the extent that the Holder of an Allowed Non-Tax Priority Claim has agreed to a less favorable treatment of such Claim,

on, or as soon as reasonably practicable after the latest of (a) the Effective Date (b) the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, (c) the date on which such Allowed Non-Tax Priority Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between the Debtors and the Holder of such Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim.

*Voting:*  Class 1 is an Unimpaired Class, and the Holders of Allowed Class 1 Non-Tax Priority Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Non-Tax Priority Claims are not entitled to vote to accept or reject this Plan.

*Class 2 – Other Secured Claims*

*Claims In Class:*  Class 2 consists of all Other Secured Claims against each of the Debtors.

*Treatment:*  On the Effective Date, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Class 2 Other Secured Claim shall, at the option of the applicable Debtor, be entitled to the treatment set forth below in option A, B, C, or D.  The Debtors and the Reorganized Debtors specifically reserve the right to challenge the validity, nature and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported Liens relating to the Other Secured Claims.

Option A:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option A shall be Reinstated.  The failure of the Debtors to file an objection, prior to the Effective Date, with respect to any Other Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtors to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court in accordance with Article X of this Plan) when and if such Claim is sought to be enforced.  Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such Reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Other Secured Claim becomes Allowed, or (c) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors.

Option B:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option B shall be paid in Cash, in full, including any amounts owed under section 506 of the Bankruptcy Code, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date on

which such Other Secured Claim becomes an Allowed Other Secured Claim, (c) the date on which such Other Secured Claim is otherwise due and payable and (d) such other date as mutually may be agreed to by and between such Holder and the Debtors or Reorganized Debtors.

Option C:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option C shall be satisfied by the surrender to the Holder of the Claim of the collateral securing the applicable Other Secured Claim.

Option D:  Allowed Other Secured Claims with respect to which the applicable Debtor elects option D shall be satisfied in accordance with such other terms and conditions as may be agreed upon by the applicable Debtor or Reorganized Debtor and the Holder of such Allowed Secured Claim.

The applicable Debtor shall be deemed to have elected option A with respect to all Allowed Other Secured Claims except those with respect to which the applicable Debtor elects another option in writing prior to the Confirmation Hearing.

*Voting:*  Class 2 is an Unimpaired Class, and the Holders of Allowed Class 2 Other Secured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject this Plan.

### Class 3 – Credit Agreement Claims

*Claims In Class:* Class 3 consists of all Credit Agreement Claims against each of the Debtors.

*Treatment:*  Each Holder of an Allowed Credit Agreement Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Credit Agreement Claim, its pro rata share of 95.3% of the New Common Stock to be issued and outstanding on the Effective Date, subject to dilution by the Equity Incentive Plan, plus the consideration described in the paragraph immediately below.  Distributions on account of Credit Agreement Claims shall be made on the Effective Date to each Holder of an Allowed Credit Agreement Claim in accordance with Section 6.2 hereof.  As set forth in Section 5.4 hereof, the New Common Stock will be subject to the Stockholders Agreement.  For the purpose of this Plan, all Class 3 Claims shall be deemed Allowed in an amount not less than $4,888,130,941.97 in accordance with the terms of the Credit Agreement and the Loan Documents and shall not be subject to defense, offset, counterclaim or reduction.

With respect to each of the Letters of Credit outstanding on the Effective Date (if any), the Debtors will, at their discretion and in consultation with the Administrative Agent, (i) return such Letter of Credit to the issuing bank undrawn and marked "cancelled," (ii) "roll" such Letters of Credit into the New

Credit Facility in a manner and pursuant to documentation reasonably satisfactory to the applicable issuing lenders of such Letters of Credit or (iii) cash collateralize Claims in respect of their obligations under such Letters of Credit in an amount acceptable to the Administrative Agent that is intended to insure as much as is practicable a recovery on such Claims that is ratable with other Class 3 Claim recoveries.

All fees, costs and expenses of the Administrative Agent as well as reasonable professional fees and expenses for the Administrative Agent and also for the Steering Committee payable shall be paid in full and in cash on the Effective Date or as soon thereafter as is practicable.

*Voting:* Class 3 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, each Holder of an Allowed Class 3 Credit Agreement Claim is entitled to vote to accept or reject this Plan.

### Class 4 – P&A Facility Claims

*Claims In Class:* Class 4 consists of all P&A Facility Claims against each of the Debtors.

*Treatment*: Holders of Class 4 P&A Facility Claims shall have such Claims Reinstated on the Effective Date.

*Voting:* Class 4 is an Unimpaired Class, and the Holders of Allowed Class 4 P&A Facility Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 P&A Facility Claims are not entitled to vote to accept or reject this Plan.

### Class 5 – General Unsecured Claims

*Claims In Class:* Class 5 consists of all General Unsecured Claims against each of the Debtors.

*Treatment:* On the latest of (a) the Effective Date, (b) the date on which such General Unsecured Claim becomes Allowed, and (c) such other date as mutually may be agreed to by and between the Debtors or Reorganized Debtors and the Holder of such General Unsecured Claim, or, in each case, as soon thereafter as practicable, each Holder of an Allowed General Unsecured Claim in Class 5 shall be paid in Cash the amount of such Allowed General Unsecured Claim, in full and final satisfaction of such Holder's Allowed General Unsecured Claim; *provided, however,* a General Unsecured Claim that is not due and payable on or before the Effective Date shall be paid thereafter (i) in the ordinary course of business in accordance with the terms of any agreement governing, or other documents relating to, such General Unsecured Claim or (ii) in accordance with the course of practice between the Debtors and such Holder with respect to such General Unsecured Claim.

*Voting:* Class 5 is an Unimpaired Class, and the Holders of Allowed Class 5 General Unsecured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 General Unsecured Claims are not entitled to vote to accept or reject this Plan.

*Class 6 – Interests in Subsidiary Debtors*

*Interests In Class:* Class 6 consists of all Interests in Subsidiary Debtors.

*Treatment:* Holders of Class 6 Interests in Subsidiary Debtors shall have such Interests Reinstated on the Effective Date.

*Voting:* Class 6 is an Unimpaired Class, and the Holders of Allowed Class 6 Interests are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6 Interests are not entitled to vote to accept or reject this Plan.

*Class 7 – Interests in Holdings*

*Claims In Class:* Class 7 consists of all Interests in Holdings and all Claims arising from or related to Interests in Holdings that are subject to subordination under section 510(b) of the Bankruptcy Code.

*Treatment:* All Interests in Holdings shall be cancelled.

*Voting:* Class 7 is Impaired, and the Holders of Allowed Class 7 Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the Holders of Class 7 Interests in Holdings are not entitled to vote to accept or reject this Plan.

**3.4** ***Intercompany Claims***. On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors or between one or more Debtors and any affiliate of one of the Debtors that is not itself a Debtor shall, at the election of Reorganized Holdings, be either (a) Reinstated, (b) released, waived, and discharged, or (c) contributed to, or dividended to, the capital of the obligor.

**3.5** ***Alternative Treatment***. Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim or Interest may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it and the Debtors, with the consent of the Administrative Agent and each of the Spyglass Consent Parties, or, after the Effective Date, the Reorganized Debtors may agree in writing.

**3.6** ***Special Provision Regarding Unimpaired Classes of Claims***. Except as otherwise provided in this Plan, nothing shall affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims in Unimpaired Classes,

including, but not limited to, all rights with respect to legal and equitable defenses to setoffs against or recoupments of Claims in Unimpaired Classes.

**3.7**     ***Procedures for Resolving Disputed, Contingent, and Unliquidated Claims***.  The Debtors and Reorganized Debtors may contest the amount and validity of any disputed, contingent, or unliquidated Claim in the ordinary course of business in the manner and, at their option, may do so in the venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; *provided*, *however*, if the Reorganized Debtors contest the amount or validity of any Claim arising under a Transaction Document, they must do so in the venue provided in such Transaction Document.  Without limiting this Section 3.7, the Bankruptcy Court shall retain jurisdiction over any dispute in respect any pre-Effective Date default or alleged default under any Assumed or Rejected Contract and over the amount of any rejection damage claim in respect of a Rejected Contract.

# ARTICLE IV

## ACCEPTANCE OF THIS PLAN

**4.1**     ***Classes Entitled to Vote***.  Class 3 - Credit Agreement Claims are entitled to vote to accept or reject this Plan.  By operation of law, each Unimpaired Class of Claims and Interests is deemed to have accepted this Plan and, therefore, is not entitled to vote.  By operation of law, Class 7 – Interests in Holdings is deemed to have rejected this Plan and is not entitled to vote.

**4.2**     ***Acceptance by Impaired Classes***.  An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code, (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept this Plan.

**4.3**     ***Elimination of Classes***.  To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

**4.4**     ***Cramdown***.  To the extent necessary, except with respect to Class 3, the Debtors shall request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify this Plan with the consent of the Administrative Agent and each of the Spyglass Consent Parties to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

# ARTICLE V

## MEANS FOR IMPLEMENTATION OF THIS PLAN

**5.1** ***Continued Legal Existence and Revesting of Assets***.  Except as otherwise provided in this Plan, each of the Debtors will continue to exist after the Effective Date as a separate legal entity, with all the powers of such an entity (whether a limited liability company, corporation, or other entity, as appropriate) under applicable law in the jurisdiction in which each applicable Debtor is organized, incorporated or otherwise formed and pursuant to such Debtor's articles of organization or formation, operating agreement and other organizational documents in effect as of the Effective Date (provided that such organizational documents shall be amended to prohibit the Reorganized Debtor from issuing non-voting equity securities, to the extent necessary to comply with section 1123(a) of the Bankruptcy Code), without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.  In accordance with section 9.2 hereof, and except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising each Estate (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in the applicable Reorganized Debtor.

**5.2** ***Sources of Cash for Distribution***.  All Cash necessary for the Reorganized Debtors to make payments required by this Plan shall be obtained from (i) existing Cash balances, (ii) the operations of the Debtors or Reorganized Debtors, and (iii) proceeds from the New Credit Facility.

**5.3** ***Investment Agreement; Issuance of New Common Stock***.  On the Effective Date, upon the terms and subject to the conditions set forth in the Investment Agreement, (i) Spyglass will contribute the assets set forth in the Investment Agreement to Reorganized Holdings or its designated subsidiary and Reorganized Holdings will assume all liabilities related thereto, (ii) Cypress and Garoge will merge with and into the Debtor Merger Party, with the Debtor Merger Party as the surviving limited liability company, (iii) Spyglass will be issued approximately 0.52% of the New Common Stock issued and outstanding as of the Effective Date, and (iv) the C/G Stockholders will be issued approximately 4.17% of the New Common Stock issued and outstanding as of the Effective Date.  Under Section 3.3(c) hereof, Holders of Credit Agreement Claims will be issued the remaining approximately 95.31% of the New Common Stock issued and outstanding on the Effective Date.  The New Common Stock issued to the Holders of Credit Agreement Claims and to Spyglass and the C/G Stockholders shall be subject to dilution by the Equity Incentive Plan.  All shares of New Common Stock issued under this Plan shall be, upon issuance, fully paid and non-assessable, and the holders thereof shall have no preemptive or other rights to subscribe for additional shares, except as otherwise provided in the Stockholders Agreement pursuant to options or other awards issued pursuant to the Equity Incentive Plan.  Except as set forth in this Section 5.2 or the Transaction Documents, no New Common Stock or securities convertible into, exchangeable for, or exercisable for shares of common stock or other equity of Reorganized Holdings shall be issued or outstanding as of the Effective Date.

**5.4** ***Section 1145 Exemption***.  Pursuant to section 1145 of the Bankruptcy Code, the issuance and allocation of shares of the New Common Stock to Holders of Credit

Agreement Claims pursuant to the Plan shall be exempt from registration under the Securities Act and any state or local law requiring registration for offer or sale of a security.

   **5.5** ***Stockholders Agreement for New Common Stock***.  On the Effective Date, Reorganized Holdings, Spyglass and the C/G Stockholders shall execute and deliver the Stockholders Agreement.  Each Holder of an Allowed Class 3 - Credit Agreement Claim shall be deemed bound by the Stockholders Agreement as of the Effective Date without the need for execution or delivery by such Holder.

   **5.6** ***Registration Rights Agreement***.  Without limiting the effect of section 1145 of the Bankruptcy Code, on the Effective Date, Reorganized Holdings will enter into a Registration Rights Agreement with (i) Spyglass and each C/G Stockholder, and (ii) each holder of New Common Stock, (a) who by virtue of holding New Common Stock to be distributed under this Plan and/or its relationship with Reorganized Holdings could reasonably be deemed to be an "affiliate" (as such term is used with the meaning of applicable securities laws) of Reorganized Holdings, and (b) who requests in writing that Reorganized Holdings execute such agreement.

   **5.7** ***Equity Incentive Plan*** On the Effective Date, the Equity Incentive Plan, in the form attached hereto as Exhibit F, shall become effective without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

   **5.8** ***Corporate Action***.  Each of the matters provided for under this Plan or the Transaction Documents involving the corporate structure of any Debtor or Reorganized Debtor or any corporate action to be taken by, or required of, any Debtor or Reorganized Debtor shall be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

   **5.9** ***Preservation of Causes of Action***.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions.  After the Effective Date, the Reorganized Debtors, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The Reorganized Debtors or any successors, in the exercise of their sole discretion, may pursue such Retained Actions so long as it is in the best interests of the Reorganized Debtors or any successors holding such rights of action.  The failure of the Debtors to specifically list any claim, right of action, suit, proceeding, or other Retained Action in this Plan or the Disclosure Statement does not, and will not be deemed to, constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtors will retain the right to pursue such claims, rights of action, suits, proceedings, and other Retained Actions in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches will apply to such claim, right of action,

suit, proceeding, or other Retained Action upon or after the confirmation or consummation of this Plan.

       **5.10**    *Effectuating Documents; Further Transactions*.  Each of the Debtors and Reorganized Debtors, and their respective officers and designees, is authorized to execute, deliver, file, or record the Transaction Documents and such other contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law.

       **5.11**    *Exemption From Certain Transfer Taxes and Recording Fees*.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or to any other Person or entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

       **5.12**    *Further Authorization*.  The Reorganized Debtors shall be entitled to seek such orders, judgments, injunctions, and rulings as they deem necessary to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

       **5.13**    *Dissolution of Creditors' Committee*.  <u>The Debtors do not anticipate a Creditors' Committee will be formed in the Chapter 11 Cases because all general unsecured creditors are Unimpaired under this Plan</u>.  If a Creditors' Committee is appointed, it shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors' Committee, if appointed, shall be dissolved and the Creditors' Committee's members shall be deemed released of all their duties, responsibilities, and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, accountants, professionals, and other agents shall terminate, except with respect to (i) all Professional Fee Claims and (ii) any appeals of the Confirmation Order.

       **5.14**    *Cancellation of Existing Securities and Agreements*.  Except as provided in this Plan or in the Confirmation Order or for the purpose of evidencing a right to distribution hereunder or a contractual right to indemnification or reimbursement of the Administrative Agent against the Secured Lenders under the terms of the Credit Agreement, on the Effective Date, all notes, stock, instruments, certificates, agreements, side letters, fee letters and other documents evidencing or giving rise to Credit Agreement Claims and Interests in Holdings shall be canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or

any requirement of further action, vote, or other approval or authorization by any Person. The Holders of or parties to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents shall have no rights arising from or relating to such notes, stock, instruments, certificates, agreements, side letters, fee letters, and other documents or the cancellation thereof, except the rights provided pursuant to this Plan and the Confirmation Order.

5.15 *Officers and Directors of Reorganized Debtors*. On the Effective Date, each of the members of the existing board of directors or managers, as applicable, of the Debtors shall be deemed to have resigned in such capacity. Except as set forth in the Transaction Documents or in the Disclosure Statement, it is anticipated that the Debtors' businesses will continue to be managed, as of the Effective Date, by existing management. At any time at least two business days prior to the deadline that the Bankruptcy Court sets for parties in interest to file objections to Confirmation, the Debtors will file a notice with the Court designating the Reorganized Debtors' new officers and members of the board of directors or managers, as applicable, of the Reorganized Debtors. On the Effective Date, the new officers, directors or managers, as applicable, of the Reorganized Debtors will be appointed automatically without any requirement of further action by stockholders, members, creditors, directors, or managers of the Debtors or the Reorganized Debtors.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

6.1 *Allowed Claims and Interests*. Notwithstanding any provision herein to the contrary, the Debtors or the Reorganized Debtors shall make distributions only to Holders of Allowed Claims. A Holder of a Disputed Claim shall receive only a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

6.2 *Distributions for Claims Allowed as of the Effective Date*. Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable. Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable. Any payment or distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions of New Common Stock shall be made by the Debtors or a distribution agent designated by the Debtors and shall be distributed (x) directly to Spyglass and the C/G Stockholders as provided in the Investment Agreement, and (y) directly to the Holders of Credit Agreement Claims listed on the Administrative Agent's register as of the Confirmation Date. The Administrative Agent shall provide the distribution agent a copy of the Administrative Agent's register as of the Confirmation Date within two business days after the Confirmation Date.

6.3 *Fractional Shares*. No fractional shares of New Common Stock will be issued or distributed under this Plan. The actual distribution of shares of New Common Stock will be rounded to the next higher or lower whole number as follows: (a) fractions less than one-half (½) shall be rounded to the next lower whole number and (b) fractions equal to or greater

than one-half (½) shall be rounded to the next higher whole number. The total number of shares of New Common Stock to be distributed herein will be adjusted as necessary to account for such rounding. No consideration will be provided to holders of Credit Agreement Claims in lieu of fractional shares that are rounded down. The treatment of fractional shares for Spyglass and the C/G Stockholders will be as provided for under the Investment Agreement.

**6.4** *Interest and Penalties on Claims*. Unless otherwise specifically provided for in this Plan or the Confirmation Order, required by applicable bankruptcy law, or necessary to render a Claim Unimpaired, postpetition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims, Non-Tax Priority Claims, and General Unsecured Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

**6.5** *Means of Cash Payment*. Payments of Cash made pursuant to this Plan shall be made, at the option and in the sole discretion of the applicable Reorganized Debtor, by checks drawn on, or wire transfer from, a domestic bank selected by the Reorganized Debtor. Cash payments to foreign creditors may be made, at the option of the applicable Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**6.6** *Withholding and Reporting Requirements*. In connection with this Plan and all distributions hereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

**6.7** *Setoffs*. The Reorganized Debtors may, pursuant to applicable law, but shall not be required to, set off against any Claim the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such Holder.

**ARTICLE VII**

**TREATMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES**

**7.1** *Assumption/Rejection of Executory Contracts and Unexpired Leases*. Except for the Century City Leases which shall be assumed or rejected pursuant to Section 7.3, each Executory Contract and Unexpired Lease shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease:

(a)     has been previously rejected by the Debtors by Final Order of the Bankruptcy Court;

(b)     has been rejected by the Debtors by order of the Bankruptcy Court in effect as of the Effective Date (which order may be the Confirmation Order);

(c)     is the subject of a motion to reject filed by the Debtors under section 365 of the Bankruptcy Code pending as of the Effective Date; or

(d)     is rejected under Section 7.4 hereof.

An Executory Contract or Unexpired Lease that is deemed to be assumed pursuant to the foregoing sentence shall be referred to as an "Assumed Contract."  An Executory Contract that is rejected or subject to a motion to reject as described above shall be referred to as a "Rejected Contract."

Entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (i) the Reorganized Debtors have properly provided for the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code, (ii) each assumption (or rejection, as the case may be) is in the best interest of the Debtors and their Estates and that each Assumed Contract is assumed as of the Effective Date, and (iii) the requirements for assumption (or rejection, as the case may be) of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  No provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtors based on the filing of the Chapter 11 Cases or the financial condition of the Debtors shall be enforceable.  Except as otherwise provided in the following sentence, Assumed Contracts will be cured by being Reinstated and all cure payments under any Assumed Contract will be made by the Reorganized Debtors on the Effective Date or as soon as practicable thereafter.  In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid upon entry of a Final Order resolving such dispute; *provided*, *however*, if an objection to the Debtors' proposed cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors, in their sole discretion, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

Unless otherwise provided by an order of the Bankruptcy Court, any asserted Claims arising from the rejection of an Executory Contract or Unexpired Lease must be filed by Holders of such Claims with the Bankruptcy Court and served on the parties entitled to notice under this Plan no later than sixty (60) days after the later of (1) the Effective Date or (2) the effective date of such rejection, subject to the Debtors' and Reorganized Debtors' right to object thereto.  In the event of such objection, the Debtors shall not be obligated to make any distribution in respect of such Claim until such dispute is resolved by Final Order of the Bankruptcy Court or the agreement of the parties.

**7.2     *Compensation and Benefit Programs.***  All of the Debtors' existing programs, plans, agreements, and arrangements relating to employee compensation and benefits

(other than as set forth in any Rejected Contract), including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, and life, accidental death and dismemberment insurance plans, entered into before the Petition Date, as amended from time to time and to the extent and as in effect immediately prior to the Effective Date ("Benefit Plans") will be deemed to be, and will be treated as though they are, executory contracts that are assumed under Section 7.1 of this Plan, and the Debtors' and Reorganized Debtors' obligations and rights under such programs, plans, agreements, and arrangements will survive confirmation of this Plan, subject to the terms and conditions of such Benefit Plans. The Reorganized Debtors' obligations as a result of the assumption of (i) the New Employee Security Plan, dated April 8, 2005 and (ii) the Retention Bonus Plan, dated May 21, 2010, will be supplementally funded by a contribution of $12.7 million of unencumbered cash from Holdings (or such lesser amount that, when combined with amounts previously approved by the Debtor's Board of Directors and the Steering Committee, is necessary to fully fund the early exercise option under the New Employee Security Plan and the Retention Bonus Plan and is acceptable to the Administrative Agent and any cash held at Reorganized Holdings in excess of such amounts shall re-vest in Reorganized Holdings on the Effective Date and be available for general corporate purposes). On the Effective Date, the MGM Deferred Compensation Plan, dated July 1, 1999 shall be terminated and liquidated under Treasury Regulation Section 1.409A-3(j)(4)(ix)(B) upon the occurrence of the change of control event (as defined in Treasury Regulation Sections 1.409A-3(i)(5)) pursuant to the transactions contemplated by this Plan without penalty to the Debtors or Reorganized Debtors and distributions solely from amounts held in trusts established prior to the Petition Date for the MGM Deferred Compensation Plan beneficiaries (and not from other assets of the Debtors or Reorganized Debtors) made to the beneficiaries thereof in accordance with all requirements of such regulation. Nothing contained herein shall be deemed to modify the existing terms of the Benefit Plans, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder.

> **7.3    Century City Leases.**  Prior to twelve months after the Petition Date, the Debtors shall designate in writing (the "Designation") and file with the Bankruptcy Court their intention to assume or reject the Century City Leases. The Century City Leases will be deemed assumed or rejected, as the case may be, as of the Effective Date or such later date set forth in the Designation. If applicable, any Claims arising from the rejection of the Century City Leases shall be governed by the deadlines and limitations set forth in Section 7.1.

> **7.4    Employment Contracts.**  The employment agreements designated for rejection in writing by the Debtors and filed with the Bankruptcy Court prior to the Confirmation Date shall be deemed rejected as of the Effective Date. Any Claims arising from the rejection of any employment agreements shall be governed by the deadlines set forth in Section 7.1. Any such Claims will be classified as Class 5 General Unsecured Claims and will likewise be Unimpaired and will be capped in accordance with section 502(b)(7) of the Bankruptcy Code.

# ARTICLE VIII

## CONFIRMATION AND CONSUMMATION OF THIS PLAN

**8.1** ***Condition To Entry of the Confirmation Order***.  The following are conditions precedent to the Confirmation, each of which must be satisfied or waived by the Debtors, the Administrative Agent and each of the Spyglass Consent Parties in accordance with the terms hereof:

The Plan and all schedules, documents, supplements and exhibits relating to this Plan shall have been filed in form and substance acceptable to the Debtors, the Administrative Agent and each of the Spyglass Consent Parties.

The proposed Confirmation Order shall be in form and substance acceptable to the Debtors, the Administrative Agent and each of the Spyglass Consent Parties.

**8.2** ***Conditions To Effective Date***.  The Debtors shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry.  The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors, the Administrative Agent and each of the Spyglass Consent Parties in accordance with the terms hereof:

The Confirmation Order, in form and substance satisfactory to the Debtors, the Administrative Agent, and each of the Spyglass Consent Parties shall be in full force and effect and not subject to any stay and shall, among other things, provide that the Debtors and Reorganized Debtors are authorized without further board or shareholder approval or consent to take all actions necessary to enter into the Transaction Documents and other agreements or documents created in connection with this Plan.  Without limiting the foregoing, the chairman of the board of directors, president, chief executive officer, chief financial officer or any other appropriate officer of the Debtors shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan and the Transaction Documents.  The secretary or assistant secretary of the Debtors shall be authorized to certify or attest to any of the foregoing actions.

All Transaction Documents shall have been executed and delivered, and all conditions precedent thereto shall have been satisfied (other than the occurrence of the Effective Date).

All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained.

All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed.

The Debtors shall have sufficient Cash, whether on hand or from funds advanced under the New Credit Facility to make all required payments to be made on the Effective Date.

The Effective Date shall have occurred on or prior to March 31, 2011.

**8.3**     *Waiver Of Conditions*.  The Debtors, the Administrative Agent and each of the Spyglass Consent Parties may jointly waive, in whole or in part, the conditions to the occurrence of the Effective Date, without any notice to parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Effective Date shall preclude the occurrence of the Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtors, the Administrative Agent and each of the Spyglass Consent Parties.  The waiver of a condition to the occurrence of the Effective Date shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

## ARTICLE IX

## EFFECT OF PLAN CONFIRMATION

**9.1**     *Binding Effect*.  This Plan shall be binding upon and inure to the benefit of the Debtors, their Estates, all current and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors.

**9.2**     *Revesting of Assets*.  Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in the Reorganized Debtors, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and equity security holders.  As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

**9.3**     *Releases and Related Matters*

(a)     Releases by Holders of Claims and Interests

To the maximum extent permitted by applicable law, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim or Interest shall be deemed to forever release, waive, and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud or willful misconduct, including the willful misappropriation of confidential information) against the Released Parties, in connection with or related to the Debtors or the Reorganized Debtors, the Chapter 11 Cases, or this Plan (other than the rights under this Plan, the Transaction Documents, and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby) whether

liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise.

(b)     Releases by the Debtors, their Estates and the Reorganized Debtors

As of the Effective Date, for good and valuable consideration, including (without limitation) the service of the Released Parties in facilitating the expeditious implementation of the restructuring and reorganization contemplated by this Plan, the adequacy of which is hereby confirmed, the Debtors, in their individual capacities and as debtors in possession, their Estates, and the Reorganized Debtors shall be deemed forever to release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever (other than for fraud or willful misconduct, including the willful misappropriation of confidential information) against the Released Parties in connection with or related to the Debtors or the Reorganized Debtors, the Chapter 11 Cases, the Disclosure Statement or this Plan, and that could have been asserted by or on behalf of the Debtors, the Estates or the Reorganized Debtors against such Persons; *provided*, *however*, that there shall be no such release, waiver or discharge on account of claims or obligations in respect of (i) any loan, advance or similar payment made by the Debtors or their affiliates to or for the benefit of any party the subject of the release in this section 9.3(b), (ii) any unperformed contractual obligation owed by any party the subject of the release in this section 9.3(b) to or for the benefit of the Debtors or the Reorganized Debtors, or (iii) the rights and obligations under this Plan, the Transaction Documents, and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby.

**9.4     *Discharge of the Debtors***

(a)     Other than Claims arising from or related to the Transaction Documents and except as otherwise provided herein or in the Confirmation Order, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property shall have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to this Plan on account of such Claims, upon the Effective Date, the Debtors, and each of them, shall be deemed discharged and released under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (iv) the holder of a Claim based upon such debt accepted this Plan.

(b)     As of the Effective Date, other than Claims arising from or related to the Transaction Documents and except as provided in this Plan or the Confirmation Order, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further Claims, debts, rights, causes of action, claims for relief, or liabilities relating to the Debtors or any Interest in the Debtors  based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date.  In accordance with the

foregoing, other than with respect to Claims arising from or related to the Transaction Documents and except as provided in this Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors, and the termination of all such Interests, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or a terminated Interest.

### 9.5 *Injunction*

(a) ***General.*** Except as provided in this Plan or the Confirmation Order, from and after the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released, terminated, exculpated, or discharged under this Article IX, along with their respective current and former employees, agents, officers, directors, managers, principals, affiliates, shareholders, and members are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors and the Exculpated Parties, and their respective agents, officers, directors, managers, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns or any of their respective property on account of any such released, terminated or discharged Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or Interest: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of this Plan or the Confirmation Order.

### 9.6 *Exculpation and Limitation of Liability*

(a) None of the Exculpated Parties shall have or incur any liability to any Person or any of their respective agents, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the transactions contemplated by or described in the Transaction Documents, the formulation, negotiation, or implementation of this Plan or the Transaction Documents, the pursuit of Confirmation of this Plan, the Confirmation of this Plan, the consummation of this Plan or the Transaction Documents, or the administration of this Plan or the property to be distributed under this Plan, except for acts or omissions that are the result of fraud or willful misconduct, including the willful misappropriation of confidential information; *provided*, *however*, that the foregoing exculpation and limitation of liability shall not apply to and shall not operate to waive, release, or exculpate any Claims or causes of action arising from or related to the rights and obligations under this Plan, the Transaction Documents, and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby. Without limiting the generality of the foregoing, the Debtors, the Reorganized Debtors, the Administrative Agent, the Secured Lenders, the New Lenders, Spyglass, Cypress and Garoge,

the C/G Stockholders, the Creditors' Committee (if any), and any of such parties' directors, managers, officers, or members, shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

(b)     Notwithstanding any other provision of this Plan, no Person, no Person's agents, directors, managers, officers, employees, representatives, advisors, attorneys, affiliates, shareholders, or members and no Person's successors or assigns shall have any right of action against any of the Exculpated Parties for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the transactions contemplated by or described in the Transaction Documents, the formulation, negotiation, or implementation of this Plan or the Transaction Documents, the pursuit of Confirmation of this Plan, the Confirmation of this Plan, the consummation of this Plan or the Transaction Documents, or the administration of this Plan or the property to be distributed under this Plan, except for acts or omissions that are the result of fraud or willful misconduct, including the willful misappropriation of confidential information; *provided*, *however*, that the foregoing prohibition shall not apply to and shall not operate to waive, release, or exculpate any Claims or causes of action arising from or related to any unperformed contractual obligation owed by any party under the Transaction Documents.

**9.7     *Term of Bankruptcy Injunction or Stays*.**  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

**9.8     *Post-Effective Date Retention of Professionals*.**  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtors may employ and pay professionals in the ordinary course of business.

## ARTICLE X

## RETENTION OF JURISDICTION

**10.1     *Retention of Jurisdiction*.**  Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, except as otherwise set forth in Section 3.7 herein or in the Transaction Documents, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease with respect to which any Debtor or Reorganized Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b)     decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving the Debtors that may be pending on the Effective Date;

(c)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

(d)     resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan, or any entity's rights arising from, or obligations incurred in connection with, this Plan or such documents (other than a dispute arising after the Effective Date under, or directly with respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

(e)     modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission, or reconcile any inconsistency, in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(f)     hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b) and 1129(a)(4) of the Bankruptcy Code; *provided*, *however*, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtors, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(g)     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(h)     adjudicate controversies arising out of the administration of the Estates or the implementation of this Plan;

(i)     recover all assets of the Debtors and property of the Estates, wherever located;

(j)     hear and determine causes of action by or on behalf of the Debtors or the Reorganized Debtor;

(k)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason, or in any respect, modified, stayed, reversed, revoked, or vacated, or distributions pursuant to this Plan are enjoined or stayed;

(l)     hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(m)     determine any other matters that may arise in connection with, or relate to, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order (other than a dispute arising after the Effective Date under, or directly with respect to, the Transaction Documents, which such disputes shall be adjudicated in accordance with the terms of the Transaction Documents);

(n)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(o)     hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code; and

(p)     enter an order closing the Chapter 11 Cases.

**10.2     *Failure of Bankruptcy Court to Exercise Jurisdiction*.**  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set for in Section 10.1 of the Plan, the provisions of this Article X shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

**11.1     *Effectuating Documents and Further Transactions*.**  Each of the Debtors and the Reorganized Debtors shall be authorized to execute, deliver, file, or record the Transaction Documents and such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan.

**11.2     *Corporate Action*.**  Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan or the Transaction Documents that would otherwise require approval of the stockholders, members or directors of one or more of the Debtors or the Reorganized Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable general corporation or other applicable law of the states in which the Debtors or the Reorganized Debtors are organized without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

**11.3** *Indemnification of Directors and Officers*.

(a)     For a period of six (6) years from and after the Effective Date, unless otherwise required by law, the certificate of incorporation and bylaws of Reorganized Holdings and each of its Subsidiaries shall contain provisions no less favorable with respect to the elimination of liability of directors and indemnification of directors, officers, employees and agents than are set forth in the certificate of incorporation and bylaws of Holdings (or the relevant Subsidiary) as in effect on the Petition Date; *provided*, *however*, that in the event any claim or claims are asserted against any individual entitled to the protections of such provisions within such six (6) year period, such provisions shall not be modified in any manner adverse to any such individual until the final disposition of any such claims.  From and after the Effective Date, Reorganized Holdings shall indemnify and hold harmless, (i) to the fullest extent permitted under applicable law and (ii) without limiting the obligations under clause (i), as required pursuant to any indemnity agreements of any of the MGM Companies, each present and former director and officer of the MGM Companies (in and to the extent of their capacities as such, and not as stockholders and/or optionholders of the MGM Companies) (collectively, the "Indemnified D&O Parties") against any costs or expenses (including attorneys' fees and expenses), judgments, fines, losses, claims, settlements, damages or liabilities incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or pertaining to matters pending, existing or occurring at or prior to the Effective Date (including the transactions provided for herein).  Reorganized Holdings shall also advance reasonable and documented costs and expenses (including attorneys' fees) of Indemnified D&O Parties as incurred promptly after receipt by Reorganized Holdings of a written request for such advance; provided that the Person to whom costs and expenses are advanced provides an undertaking to repay such advances if it is ultimately determined that such Person is not entitled to indemnification (it being understood that Reorganized Holdings shall not require any security for such undertaking).

(b)     Holdings shall acquire a tail policy covering the six year period after the Effective Date for persons currently covered by the MGM Companies' current directors' and officers' liability insurance and fiduciary liability insurance (the "D&O Insurance") in respect of acts or omissions occurring at or prior to the Effective Date, covering each person currently covered by the D&O Insurance, on terms with respect to the coverage, deductible and amounts no less favorable than those of the D&O Insurance in effect on the date of this Agreement.  The insurance purchased pursuant to this Section 11.3 shall be prepaid in full at the Effective Date and shall be non-cancelable.

(c)     If Reorganized Holdings or any of its successors or assigns shall (i) consolidate with or merge into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the successors and assigns of Reorganized Holdings (or acquiror of such assets) shall assume all of the obligations of Reorganized Holdings set forth in this Section 11.3.

(d)     The rights of each Indemnified D&O Party under this Section 11.3 shall be in addition to any right such Person might have under the certificate of incorporation or by-laws of Holdings, Reorganized Holdings or any of their respective Subsidiaries, or under any

agreement of any Indemnified D&O Party with Holdings, Reorganized Holdings or any of their respective Subsidiaries. The provisions of this Section 11.3 survive the consummation of the Mergers (as defined in Section 2.1 of the Investment Agreement) and are intended to be for the benefit of, and shall be enforceable by, each of the Indemnified D&O Parties, their respective heirs and representatives.

**11.4** *Payment Of Statutory Fees*. All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

**11.5** *Amendment Or Modification Of This Plan*. Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code and subject further to the consent of the Administrative Agent and each of the Spyglass Consent Parties, the Debtors reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date, including, without limitation the right to withdraw the Plan as to any particular Debtor and seek to confirm and consummate the Plan with respect to the other Debtors. A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**11.6** *Additional Debtors*. The Debtors reserve the right to commence Chapter 11 Case(s) on behalf of Additional Debtor(s) through the Confirmation Date. Upon entry of an order jointly administering such Additional Debtor's chapter 11 case with the Chapter 11 Cases, such Additional Debtor shall automatically become a party to this Plan. Each holder of a Claim that accepts distributions pursuant to this Plan is conclusively deemed to have agreed to the inclusion of any Additional Debtors to all of the provisions set forth in this Plan, subject to the rights of the Administrative Agent and each of the Spyglass Consent Parties to consent to any such inclusion.

**11.7** *Severability of Plan Provisions*. If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, upon the request of the Debtors (having obtained consent of the Administrative Agent and each of the Spyglass Consent Parties) to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**11.8** *Successors and Assigns*. This Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns, including, without limitation, the Reorganized Debtors. The rights, benefits, and obligations of any entity named or referred to

in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**11.9** *Revocation, Withdrawal, or Non-Consummation*.

The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Debtors revoke or withdraw this Plan, or if Confirmation or consummation of this Plan does not occur, then (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Class of Claims or any release contemplated hereby), assumption of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (iii) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (A) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (B) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (C) constitute an admission of any sort by the Debtors or any other Person.

**11.10** *Notice*. All notices, requests, and demands to or upon the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors, to:

MGM Holdings Inc.
10250 Constellation Blvd.
Los Angeles, CA 90067
Attention: Scott Packman, Esq.

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Attention: Jay M. Goffman, Esq.

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, California 90071
Attention: Nick Saggese, Esq.
Attention: Rick C. Madden, Esq.
Attention: Glenn S. Walter, Esq.

-and-

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, California 90067
Attention:  Kenneth N. Klee, Esq.
Attention:  Michael L. Tuchin, Esq.

If to the C/G Merger Parties or the C/G Stockholders, to:

Cypress Entertainment Group, Inc.
10900 Wilshire Boulevard, Floor 10
Los Angeles, California  90024
Fax:  (310) 443-5912
Attention:  Gary Barber

and

Garoge, Inc.
10900 Wilshire Boulevard, Floor 10
Los Angeles, California  90024
Fax:  (310) 443-5912
Attention:  Gary Barber

with a copy to:

Allen Matkins Leck Gamble Mallory & Natsis LLP
515 South Figueroa Street, 9th Floor
Los Angeles, California  90071
Fax:  (213) 620-8816
Attention:  Jeffrey N. Strug, Esq.

If to Spyglass, to:

Spyglass Entertainment Holdings, LLC
10900 Wilshire Boulevard, Floor 10
Los Angeles, California  90024
Fax:  (310) 443-5912
Attention:  Gary Barber

with a copy to:

O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067
Fax:  (310) 246-6779
Attention:   Christopher Brearton, Esq.
                  Suzzanne Uhland, Esq.

Allen Matkins Leck Gamble Mallory & Natsis LLP
515 South Figueroa Street, 9th Floor
Los Angeles, California  90071
Fax:  (213) 620-8816

-and-

O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067
Fax:  (310) 246-6779
Attention: Sean Monroe, Esq.

If to the Administrative Agent to:

Simpson, Thacher & Bartlett, LLP
425 Lexington Avenue
New York, N.Y. 10017
Attention: Peter V. Pantaleo, Esq.
Attention: Nicholas Baker, Esq.

      **11.11** ***Governing Law***.  Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflicts of law of such jurisdiction.

      **11.12** ***Tax Reporting and Compliance***.  The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

      **11.13** ***Conflicts***.  In the event that provisions of the Disclosure Statement and provisions of this Plan conflict, the terms of this Plan shall govern.

*Remainder of Page Left Intentionally Blank*

Dated:  October 7, 2010

            MGM HOLDINGS INC.
             (for itself and on behalf of the other Debtors)


By:   ***/s/ Stephen F. Cooper***
          Name:  Stephen F. Cooper
          Title:    Member of the Office of
                   the CEO

EXHIBIT A

NEW CREDIT FACILITY TERM SHEET

(To be Filed at Least 5 Business Days Prior to the
Deadline to Object to Confirmation of the Plan)

EXHIBIT B

LIST OF DEBTORS

| DEBTOR<br>(Other names used by the Debtor) | TAX ID NO |
|---|---|
| Aidart Distributors Corp. | 13-6135491 |
| Aidart Pictures, Inc. | 13-6135384 |
| Albino Alligator Productions, Inc. | 95-4533875 |
| Alpha Library Company, Inc. | 95-4590796 |
| Altar Productions, Inc. | 95-3928257 |
| American International Pictures, Inc. | 95-3898645 |
| Ameriglad Holdings LLC | 39-2070618 |
| Backlot Productions Inc. | 95-4860998 |
| Band Films, Inc. | 95-3879273 |
| Beginning To Roar Inc. | 95-4662104 |
| Beta Library Company, Inc. | 95-4630381 |
| Beverly Hills Ninja Productions, Inc. | 95-4548625 |
| Brighton Productions, Inc. | 95-3312978 |
| Candantino Music, Inc. | 52-1602101 |
| Canzione Music, Inc. | 13-2624793 |
| Carcassonne Productions Inc. | 56-2334777 |
| Charles Band Films, Inc. | 95-3948813 |
| Cosmic Title Corp. | 95-4624439 |
| Days Picture Corporation | 13-6135419 |
| Dayton Film Productions, Inc. | 95-3408062 |
| Delta Library Company, Inc. | 95-4550364 |
| Delta Library Holdings, Inc. | 95-4550362 |
| Domestic Library Acquisition LLC | 95-4823504 |
| Donna Music Publications | 95-6080697 |
| El Paso Films LLC | No EIN Applicable |
| Empire Entertainment, Inc. | 95-3979268 |
| Epic Pictures Enterprises, Inc. | 95-4158563 |
| Epsilon Library Company, Inc. | 95-4595687 |
| F.P. Productions | 95-2041603 |
| Famous Artists Agency, Inc. | 95-0729360 |
| Famous Artists Productions, Inc. | 95-1906073 |
| First Walnut Inc. | 95-4671828 |
| Flipper Productions, Inc. | 95-1782000 |
| Foreign Library Acquisition LLC | 95-4823506 |
| G-2 Entertainment Company | 95-4438510 |
| G26 Company | 95-4704218 |
| Gamma Library Company, Inc. | 95-4613426 |
| Ghoulies Productions, Inc. | 95-3887449 |
| Grand Talk Inc. | 95-4640421 |
| Heritage Entertainment, Inc. | 95-4053860 |
| Ivan Tors Music, Inc. | 95-2511516 |

| | |
|---|---|
| JH Productions Inc. | 95-2496446 |
| Lambda Library Company, Inc. | 95-4617880 |
| Lexyn Productions, Inc. | 95-3929055 |
| Lion Independent Television Inc. | 95-4032675 |
| Lopert Pictures Corporation | 13-1923659 |
| Maple Street Entertainment Inc. | 95-4431927 |
| Massachusetts Productions LLC | 94-3469889 |
| MCEG Sterling Computer Services | 95-4140553 |
| MCEG Sterling Development | 95-4126070 |
| MCEG Sterling Entertainment | 95-2214871 |
| MCEG Sterling Productions | 95-4180219 |
| Media Resources Credit Corporation | 13-3528381 |
| Metro Pictures Corporation of America | 95-3993708 |
| Metro-Goldwyn-Mayer Animation Inc. | 13-1828183 |
| Metro-Goldwyn-Mayer Distribution Co. | 95-4486465 |
| Metro-Goldwyn-Mayer Home Entertainment LLC | 57-1148596 |
| Metro-Goldwyn-Mayer Inc. | 95-4605850 |
| Metro-Goldwyn-Mayer India, Ltd. | 13-6067411 |
| Metro-Goldwyn-Mayer Interactive Productions Inc. | 95-4624446 |
| Metro-Goldwyn-Mayer Lion Corp. | 95-4069019 |
| Metro-Goldwyn-Mayer Motion Picture Co. | 13-6067407 |
| Metro-Goldwyn-Mayer Music Inc. | 95-4599144 |
| Metro-Goldwyn-Mayer of China, Inc. | 13-6067416 |
| Metro-Goldwyn-Mayer Online Inc. | 95-4599142 |
| Metro-Goldwyn-Mayer Overseas Inc. | 95-4553054 |
| Metro-Goldwyn-Mayer Pictures Inc. | 95-4158381 |
| Metro-Goldwyn-Mayer Studios Inc. | 95-4452285 |
| MGM and UA Services Company | 95-4504664 |
| MGM Development Inc. | 13-1896288 |
| MGM Digital Development Inc. | 82-0538570 |
| MGM Direct Inc. | 95-4755519 |
| MGM Domestic Digital Media Inc. | 38-3745458 |
| MGM Domestic Networks LLC | 37-1553966 |
| MGM Domestic Television Distribution LLC | 95-4667114 |
| MGM Domestic TV Networks LLC | 80-0195553 |
| MGM Franchise Film Co. LLC | 36-4641196 |
| MGM Global Holdings Inc. | 95-4640420 |
| MGM HD Productions LLC | 37-1553969 |
| MGM Holdings Inc. | 56-2500545 |
| MGM Holdings II Inc. | 56-2500553 |
| MGM Home Entertainment Distribution Corp. | 95-4704219 |
| MGM Interactive Inc. | 95-4599140 |
| MGM International Digital Media Inc. | 32-0185923 |
| MGM International Television Distribution Inc. | 95-4599146 |
| MGM LAPTV LLC | 57-1148600 |

| | |
|---|---|
| MGM Lion Prints LLC | 90-0111624 |
| MGM ME Inc. | 95-4845950 |
| MGM Middle East Co. | 95-4827252 |
| MGM Networks Inc. | 95-4599139 |
| MGM Networks U.S. Inc. | 02-0615668 |
| MGM NMOC LLC | No EIN Applicable |
| MGM North America Holdings Inc. | 95-4798180 |
| MGM On Demand Inc. | 95-4877733 |
| MGM Super Productions Inc. | 95-4645760 |
| MGM Television Australia Inc. | 95-4566697 |
| MGM Television Entertainment Inc. | 95-4495886 |
| MGM/UA, Inc. | 95-4114327 |
| Midnight Blue Productions, Inc. | 95-4550624 |
| Musicways, Inc. | 95-2980079 |
| NSNA Co. | 95-4708219 |
| Omega Library Company, Inc. | 13-4051773 |
| OPC Music Publishing, Inc. | 95-2581750 |
| Orion Film Classics Company | 95-3441269 |
| Orion Home Entertainment Corporation | 22-2683277 |
| Orion Music Publishing, Inc. | 95-2980080 |
| Orion Pictures Corporation | 95-4556565 |
| Orion Pictures Distribution Corporation | 95-3304776 |
| Orion Pictures Library Acquisition Co., Inc. | 95-4717564 |
| Orion Productions Company | 95-4474270 |
| Orion TV Productions, Inc. | 13-1845120 |
| P & F Acquisition Corp. | 95-4671825 |
| Panther & Pals LLC | 39-2070615 |
| Partnership Picture Corp. | 13-6135506 |
| Pathe Entertainment Moviesongs, Inc. | 95-4311605 |
| Pathe Entertainment Music, Inc. | 95-4286954 |
| Pathe Films, Inc. | 13-2986269 |
| Pathe Releasing Corp. | 95-4016244 |
| Pathe TS, Inc. | 95-4059724 |
| PFE Library Acquisition Company, Inc. | 95-4667397 |
| Purple Photoplays, Inc. | 13-6135516 |
| Red Corner Production Inc. | 95-4566696 |
| Sarafilms Productions Inc. | 73-1688750 |
| She Spies Inc. | 82-0538571 |
| Sigma Library Company, Inc. | 95-4544038 |
| Singles Productions, Inc. | 95-4132051 |
| Tangled Web Productions Inc. | 95-4612384 |
| Taryn Productions, Inc. | 95-4029289 |
| The Azimuth Company, Inc. | 95-1954392 |
| The Mirisch Corporation of Delaware | 95-2217975 |
| The War At Home Productions, Inc. | 95-4545415 |

| | |
|---|---|
| THIS Network LLC | 32-0257547 |
| Three P Holdings LLC | 39-2070611 |
| Three Pictures Corporation | 94-1712157 |
| Time Production Inc. | 32-0015217 |
| Turbo Productions Inc. | 95-4890066 |
| Twenty-One Leasing Corporation | 02-0643627 |
| U.A. of Brazil, Inc. | 13-1861300 |
| U/A Music, Inc. | 95-3896686 |
| United Artists China, Inc. | 13-1690539 |
| United Artists Corporation | 95-4080805 |
| United Artists Corporation of Egypt | 13-6117113 |
| United Artists Corporation of Puerto Rico | 13-6117082 |
| United Artists Europa, Inc. | 13-2668608 |
| United Artists Films (Mr. Accident) Inc. | 95-4705814 |
| United Artists Films Company | 95-4140289 |
| United Artists Films Inc. | 95-4669459 |
| United Artists Music (Belgium), Inc. | 13-2920328 |
| United Artists Music Inc. | 95-4861000 |
| United Artists Overseas, Inc. | 13-6119153 |
| United Artists Pictures Inc. | 13-1424060 |
| United Artists Productions Inc. | 95-4566698 |
| United Artists Records Inc. | 95-4861002 |
| United Artists Television Corp. | 13-1686624 |
| United Lion Music, Inc. | 95-3896688 |
| Ventura/Gloria Films Inc. | 95-4781258 |
| Virgin Vision, Inc. | 95-4035628 |
| Wargames II Productions Inc. | 95-4827250 |
| Webspinner Inc. | 95-4624449 |
| Wizard Video, Inc. | 95-3585047 |
| Zeta Library Company, Inc. | 13-4009714 |

EXHIBIT C

INVESTMENT AGREEMENT

INVESTMENT AGREEMENT


by and among

MGM HOLDINGS INC.

C/G ACQUISITION LLC

CYPRESS ENTERTAINMENT GROUP, INC.

GAROGE, INC.

SPYGLASS ENTERTAINMENT HOLDINGS, LLC

the UNDERSIGNED C/G STOCKHOLDERS identified herein and party hereto

and

the MANAGEMENT STOCKHOLDERS identified herein and party hereto


Dated as of October 6, 2010

**Table of Contents**

Page

ARTICLE I DEFINITIONS ........................................................................... 2

Section 1.1  Definitions ............................................................................ 2

Section 1.2  Construction ........................................................................ 18

ARTICLE II THE MERGERS ...................................................................... 19

Section 2.1  The Mergers ......................................................................... 19

Section 2.2  Closing ................................................................................. 19

Section 2.3  Effective Time ...................................................................... 20

Section 2.4  Effects of the Mergers .......................................................... 20

Section 2.5  Tax Treatment of the Mergers ............................................... 20

Section 2.6  Certificate of Formation; Managing Member and Officers ............... 20

Section 2.7  Transfer Taxes ...................................................................... 20

ARTICLE III CONTRIBUTION OF ASSETS ............................................... 21

Section 3.1  Contributed Assets ............................................................... 21

Section 3.2  Assignment of the Contributed Assets .................................. 22

Section 3.3  Assumed Liabilities .............................................................. 22

Section 3.4  Tax Treatment of the Contribution ........................................ 23

Section 3.5  Transfer Taxes ...................................................................... 23

ARTICLE IV CONSIDERATION; CONVERSION OF SHARES;
EXCHANGE OF CERTIFICATES ............................................................... 23

Section 4.1  Consideration ....................................................................... 23

Section 4.2  Cancellation of Shares ......................................................... 24

Section 4.3  Merger Sub Membership Units .............................................. 24

Section 4.4  Fractional Shares .................................................................. 24

Section 4.5  Adjustments to the Exchange Ratio ....................................... 25

Section 4.6  Exchange Procedures ........................................................... 25

Section 4.7  Withholding Rights ............................................................... 25

Section 4.8  No Further Ownership Rights in Cypress/Garoge Common Stock; Closing of
Transfer Books ...................................................................... 26

Section 4.9  No Liability ........................................................................... 26

Section 4.10 Lost Certificates .................................................................. 26

ARTICLE V REPRESENTATIONS AND WARRANTIES OF C/G ................. 26

Section 5.1  Qualification; Organization; Subsidiaries ............................... 27

i

Section 5.2     Authority Relative to this Agreement .............................................. 27

Section 5.3     Capital Stock .................................................................................... 28

Section 5.4     Governmental Consents and Approvals ........................................... 29

Section 5.5     Permits; Compliance with Laws ...................................................... 29

Section 5.6     Financial Statements ........................................................................ 30

Section 5.7     No Undisclosed Liabilities ............................................................... 30

Section 5.8     Contracts .......................................................................................... 30

Section 5.9     No Conflicts or Violations ............................................................... 31

Section 5.10    Taxes ................................................................................................ 31

Section 5.11    Intellectual Property ........................................................................ 33

Section 5.12    Films and Elements .......................................................................... 34

Section 5.13    Litigation .......................................................................................... 36

Section 5.14    Absence of Certain Changes or Events ............................................ 36

Section 5.15    Required Vote of the Stockholders of C/G ...................................... 36

Section 5.16    Employment Benefit Plans ............................................................... 37

Section 5.17    Brokers and Finders; Transaction Expenses .................................... 37

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF
SPYGLASS ............................................................................................................... 37

Section 6.1     Qualification; Organization; Subsidiaries ....................................... 37

Section 6.2     Authority Relative to this Agreement .............................................. 37

Section 6.3     Governmental Consents and Approvals ........................................... 38

Section 6.4     No Conflicts or Violations ............................................................... 38

Section 6.5     Spyglass Development Projects and Other Contributed Assets ....... 38

Section 6.6     Litigation .......................................................................................... 40

Section 6.7     Absence of Certain Changes or Events ............................................ 40

Section 6.8     Contracts .......................................................................................... 40

Section 6.9     Investment ........................................................................................ 41

ARTICLE VII REPRESENTATIONS AND WARRANTIES OF THE
UNDERSIGNED C/G STOCKHOLDERS ............................................................... 41

Section 7.1     Authority Relative to this Agreement .............................................. 41

Section 7.2     No Conflicts or Violations ............................................................... 42

Section 7.3     Governmental Consents and Approvals ........................................... 42

Section 7.4     Title to Shares .................................................................................. 42

Section 7.5     Investment ........................................................................................ 43

Section 7.6     Management Stockholders ............................................................... 43

509265-1076-01000-Active.12124289.15

ARTICLE VIII REPRESENTATIONS AND WARRANTIES OF
PARENT AND MERGER SUB ........................................................................................... 43

Section 8.1    Qualification; Organization; Subsidiaries .......................................... 44

Section 8.2    Authority Relative to this Agreement ................................................ 44

Section 8.3    Capital Stock ..................................................................................... 45

Section 8.4    Governmental Consents and Approvals .............................................. 46

Section 8.5    Permits; Compliance with Laws ......................................................... 47

Section 8.6    Financial Statements .......................................................................... 47

Section 8.7    No Undisclosed Liabilities ................................................................ 47

Section 8.8    Employee Benefit Plans .................................................................... 47

Section 8.9    Contracts ........................................................................................... 50

Section 8.10   No Conflicts or Violations ................................................................. 50

Section 8.11   Taxes ................................................................................................ 51

Section 8.12   Intellectual Property .......................................................................... 51

Section 8.13   Litigation .......................................................................................... 52

Section 8.14   Absence of Certain Changes or Events .............................................. 53

Section 8.15   Related Party Transactions ................................................................ 53

Section 8.16   Offering; Valid Issuance ................................................................... 53

Section 8.17   Brokers and Finders; Transaction Expenses ....................................... 53

ARTICLE IX COVENANTS AND OTHER AGREEMENTS ........................................... 53

Section 9.1    Conduct of Business by C/G Pending the Closing .............................. 53

Section 9.2    Conduct of Business by Spyglass Pending and After the Closing ........ 56

Section 9.3    Conduct of Business by Parent Pending the Closing ........................... 59

Section 9.4    Certain Notifications .......................................................................... 61

Section 9.5    Access to Personnel and Information ................................................. 62

Section 9.6    Third Party Transfers ......................................................................... 63

Section 9.7    Affiliate Transactions ......................................................................... 63

Section 9.8    Regulatory Approvals; Reasonable Efforts; Cooperation ................... 64

Section 9.9    Bankruptcy Covenants ....................................................................... 65

Section 9.10   No Shop; Break-Up Fee ..................................................................... 66

Section 9.11   Noncompetition; Nonsolicitation ....................................................... 69

Section 9.12   Confidentiality ................................................................................... 72

Section 9.13   Public Announcements ....................................................................... 73

Section 9.14   Tax .................................................................................................... 73

Section 9.15   No Other Representations and Warranties .......................................... 73

509265-1076-01000-Active.12124289.15

ARTICLE X INDEMNIFICATION ................................................................. 73

Section 10.1  Survival ........................................................................... 73

Section 10.2  Indemnification................................................................. 74

Section 10.3  Indemnification Procedures................................................. 74

Section 10.4  Indemnification Relating to Taxes......................................... 76

Section 10.5  Limitations and Other Provisions ........................................ 81

Section 10.6  Exclusive Remedy ............................................................. 82

Section 10.7  Treatment of Indemnification Payments ............................... 82

ARTICLE XI CONDITIONS PRECEDENT ................................................... 82

Section 11.1  Condition Precedent to Obligations of Parent......................... 82

Section 11.2  Condition Precedent to Obligations of Spyglass and C/G ......... 83

ARTICLE XII TERMINATION................................................................... 85

Section 12.1  Termination ..................................................................... 85

Section 12.2  Effect of Termination......................................................... 86

ARTICLE XIII GENERAL PROVISIONS...................................................... 87

Section 13.1  Notices............................................................................ 87

Section 13.2  Construction ..................................................................... 89

Section 13.3  Entire Agreement; Assignment; Binding Effect....................... 89

Section 13.4  No Obligations to Third Parties............................................ 89

Section 13.5  Governing Law; Jurisdiction ............................................... 89

Section 13.6  WAIVER OF JURY TRIAL ................................................. 90

Section 13.7  Expenses; Attorneys' Fees ................................................. 90

Section 13.8  Amendment ..................................................................... 90

Section 13.9  Waiver ........................................................................... 90

Section 13.10 Counterparts; Effectiveness................................................ 90

Section 13.11 Severability; Validity ........................................................ 90

Section 13.12 Disclosure Schedules ........................................................ 90

Section 13.13 Availability of Equitable Relief Following Entry of Confirmation Order ......... 91

509265-1076-01000-Active.12124289.15

**List of Exhibits**

Exhibit A         Form of Plan of Reorganization

Exhibit B-1       Form of Certificate of Incorporation

Exhibit B-2       Form of Bylaws

Exhibit C         Form of Certificate of Formation

Exhibit D         Stockholders Agreement

Exhibit E         Form of Employment Agreement

Exhibit F         Registration Rights Agreement

Exhibit G         Form of General Assignment and Assumption Agreement

Exhibit H         C/G Disclosure Schedule

Exhibit I         Spyglass Disclosure Schedule

Exhibit J         Parent Disclosure Schedule

Exhibit K         Form of Indemnification Agreement

Exhibit L         Form of Escrow Agreement

Exhibit M         Form of Termination and Release of Funds Notice

Exhibit N         Disclosure Statement

Exhibit O         Rejected Contracts

Exhibit P         Form of Tax Certificate

509265-1076-01000-Active.12124289.15

## INVESTMENT AGREEMENT

THIS INVESTMENT AGREEMENT (together with all exhibits and schedules hereto, the "Agreement"), dated as of October 6, 2010, by and among MGM Holdings Inc., a Delaware corporation ("Parent"), C/G Acquisition LLC, a Delaware limited liability company and a wholly-owned subsidiary of Parent ("Merger Sub"), Cypress Entertainment Group, Inc., a Delaware corporation ("Cypress"), Garoge, Inc., a Delaware corporation ("Garoge" and, together with Cypress, "C/G"), Spyglass Entertainment Holdings, LLC, a Delaware limited liability company ("Spyglass"), the undersigned stockholders of C/G set forth on the signature pages hereto (the "Undersigned C/G Stockholders") and, solely for purposes of Sections 7.6, 9.11 and 10.2, the management stockholders set forth on the signature pages hereto (the "Management Stockholders").

WHEREAS, Parent and certain of its affiliates and subsidiaries set forth in the Plan (as defined below) will restructure their capital structure through a pre-packaged joint plan of reorganization filed in connection with voluntary chapter 11 cases (the "Chapter 11 Cases") under 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, pursuant to the Plan, Parent will cancel all of its existing and outstanding securities;

WHEREAS, Parent, Merger Sub and C/G have agreed to engage in a business combination simultaneously with the Closing (defined below), whereby C/G will be merged with and into Merger Sub, with Merger Sub continuing as the surviving limited liability company of such merger and a directly or indirectly wholly-owned subsidiary of Parent (and as a disregarded entity separate from Parent as contemplated by Treasury Regulations Section 301.7701-3) in accordance with the terms and conditions of this Agreement;

WHEREAS, in accordance with the terms and conditions herein, Spyglass has agreed to contribute, transfer, convey, assign, grant and deliver, or cause to be contributed, transferred, conveyed, assigned, granted and delivered, all of the Contributed Assets (as defined herein) to Parent or any directly or indirectly wholly-owned limited liability company subsidiary thereof (that is disregarded as an entity separate from Parent as contemplated by Treasury Regulations Section 301.7701-3) as directed by Parent reasonably prior to the Closing (the "Designated Subsidiary"), and Parent has agreed to assume, pay, perform and discharge, or cause the Designated Subsidiary to assume, pay, perform and discharge, the Assumed Liabilities (as defined herein);

WHEREAS, subject to the terms and conditions of this Agreement and the Plan, Parent intends to cause its subsidiaries to (i) convert the outstanding principal amount and any accrued but unpaid interest under the Credit Agreement (as defined below) into new common stock of Parent ("Parent Common Stock") upon the Closing (the "Debt Conversion"), (ii) issue to Spyglass a certain amount of Parent Common Stock in exchange for the Contribution (as defined below) and (iii) issue to the Undersigned C/G Stockholders a certain amount of Parent Common Stock in connection with the Mergers (as defined below);

WHEREAS, the respective boards of directors of Parent and C/G and the sole managing member of Merger Sub have approved and declared advisable the Mergers upon the terms and conditions of this Agreement and in accordance with, as applicable, the Delaware General Corporation Law (the "DGCL") and the Delaware Limited Liability Company Act (the "DLLCA");

WHEREAS, it is intended that, for United States federal income tax purposes (i) each Merger shall qualify as a wholly tax-deferred (other than in respect of the receipt of cash in lieu of fractional shares pursuant to Section 4.4) "reorganization" within the meaning of Section 368(a)(1)(A) of the Code, (ii) this Agreement shall constitute a plan of reorganization within the meaning of Treasury Regulations Section 1.368-2(g), and (iii) the Contribution (as defined below) and the Debt Conversion, taken together, as part of an integrated plan, shall qualify as a wholly tax-deferred (other than in respect of the receipt of cash in lieu of fractional shares pursuant to Section 4.4) contribution described in Section 351 of the Code; and

WHEREAS, the parties acknowledge that consummation of the Mergers, the Contribution and the other transactions contemplated by this Agreement, including, without limitation, the entering into of the Employment Agreements, the Stockholder Agreement and the Registration Rights Agreement (collectively, the "Contemplated Transactions") are subject to the approval of the Bankruptcy Court and the entry of an order confirming the Plan (the "Confirmation Order").

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  As used herein, the following terms shall have the following meanings for all purposes of this Agreement:

"Accountant" shall have the meaning set forth in Section 10.4(e)(i).

"Acquisition Proposal" shall mean a proposal or offer for (i) any merger, consolidation, share exchange, recapitalization, reorganization, business combination or similar transaction involving Parent or any of the MGM Companies; (ii) any sale, lease, exchange, license, mortgage, transfer or other disposition, in a single transaction or series of related transactions, of assets representing all or substantially all of the assets of the MGM Companies, taken as a whole; (iii) the sale of equity interests representing, individually or in the aggregate, thirty percent (30%) or more of the voting power of Parent; or (iv) any transaction or series of transactions which requires as a term or condition of such transaction (or as a practical consequence thereof), the termination of this Agreement and the Contemplated Transactions.

"Administrative Agent" shall mean JPMorgan Chase Bank, N.A. in its capacity as administrative agent under the Credit Agreement.

"Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or under common control with, such specified Person; provided, that any portfolio companies under common control with such specified Person shall not be deemed an Affiliate of such specified Person. For the purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through ownership of voting securities or by contract or otherwise.

"Agreement" shall have the meaning set forth in the preamble.

"Assumed Contracts" shall have the meaning set forth in Section 3.1(a).

"Assumed Elements" shall have the meaning set forth in Section 3.1(b).

"Assumed IP" shall have the meaning set forth in Section 3.1(c).

"Assumed Liabilities" shall have the meaning set forth in Section 3.3.

"Bankruptcy and Equity Exception" shall have the meaning set forth in Section 5.2.

"Bankruptcy Code" shall have the meaning set forth in the recitals.

"Bankruptcy Court" shall have the meaning set forth in the recitals.

"Board of Directors" shall mean the board of directors of Parent (or the reorganized Parent, as the case may be).

"Break-Up Fee" shall have the meaning set forth in Section 9.10(d).

"Break-Up Fee Event" shall have the meaning set forth in Section 9.10(d).

"Break-Up Fee Order" shall have the meaning set forth in Section 9.9(a)(iv).

"Business Day" shall mean any day, other than a Saturday, Sunday and any day which is a legal holiday under the Laws of the State of New York or the State of California, or is a day on which banking institutions located in either such state are authorized or required by Law or other governmental action to close.

"Cancelled Shares" shall have the meaning set forth in Section 4.6.

"Cash Collateral Priority Obligation" means a claim of the Administrative Agent (on behalf of the lenders under the Credit Agreement) arising from the use of such lenders' cash collateral in the Chapter 11 Cases to the extent allowed as a superpriority administrative claim by order of the Bankruptcy Court pursuant to section 507(b) of the Bankruptcy Code.

"Certificate of Merger" shall have the meaning set forth in Section 2.3.

"C/G" shall have the meaning set forth in the preamble.

"C/G Benefit Plan" shall mean each C/G Pension Plan, C/G Welfare Plan and any other plan, fund, program, arrangement or agreement (including any employment or consulting agreement) to provide employees, directors, independent contractors, consultants, officers or agents with medical, health, disability, life, bonus, incentive, stock or stock-based right (option, ownership or purchase), retirement, deferred compensation, severance, change in control, salary continuation, vacation, sick leave, fringe, incentive insurance or other benefits, maintained, or contributed to, or required to be contributed to, by any of the C/G Companies for the benefit of any current or former independent contractors, consultants, agents, employees, officers or directors of the C/G Companies.

"C/G Companies" shall mean C/G and their respective Subsidiaries.

"C/G Disclosure Schedule" shall have the meaning set forth in Article V.

"C/G Elements" shall mean all Elements relating to the C/G Library Films owned by the C/G Companies or with respect to which the C/G Companies have laboratory access letters.

"C/G Films in Progress" shall have the meaning set forth in Section 5.12(f)(i).

"C/G Foreign Plan" shall mean each C/G Benefit Plan that is governed by the Laws or applicable customs or rules of relevant jurisdictions other than the United States.

"C/G Intercompany Loans" shall mean any loan arrangements between two Persons that are each direct or indirect wholly-owned subsidiaries of C/G.

"C/G Library Films" shall have the meaning set forth in Section 5.12(a).

"C/G Organizational Documents" shall have the meaning set forth in Section 5.1(a).

"C/G Pension Plan" shall mean "employee pension benefit plan" (as defined in Section 3(2) of ERISA) maintained, or contributed to, or required to be contributed to, by any of the C/G Companies for the benefit of any current or former independent contractors, consultants, agents, employees, officers or directors of any of the C/G Companies.

"C/G Significant Unproduced Properties" shall have the meaning set forth in Section 5.12(f)(ii).

"C/G/S Material Adverse Effect" means any change, event, occurrence, condition, circumstance, development or effect that, individually or in the aggregate has had, or would reasonably be expected to have, a material adverse effect on the business,

properties, assets, liabilities, condition (financial or otherwise) or results of operations of Target, taken as a whole, or that would reasonably be expected to materially delay or materially adversely affect the ability of C/G, the Undersigned C/G Stockholders or Spyglass to consummate the Contemplated Transactions; provided, however, that any change, event, occurrence, condition, circumstance, development or effect that is (i) primarily caused by conditions affecting the United States economy generally or the economy of any nation or region in which any of the C/G Companies or Spyglass conducts business that is material to the business of such entities, taken as a whole, shall not be taken into account in determining whether there has been or would be a "C/G/S Material Adverse Effect", (ii) primarily caused by conditions generally affecting the entertainment industry shall not be taken into account in determining whether there has been or would be a "C/G/S Material Adverse Effect", and (iii) primarily caused by the announcement or pendency of the Transaction Documents or the Contemplated Transactions shall not be taken into account in determining whether there has been or would be a "C/G/S Material Adverse Effect"; it being understood and agreed that the foregoing exclusions described in clauses (i) and (ii) shall not apply to the extent that the applicable changes, events, occurrences, conditions, circumstances, developments or effects described therein have or would reasonably be expected to have a materially disproportionate adverse effect on Target, taken as a whole, as compared to any other Persons engaged in the same business.

"C/G Subsidiary Organizational Documents" shall have the meaning set forth in Section 5.1(a).

"C/G Trusts" means the Undersigned C/G Stockholders (except Jonathan Glickman).

"C/G Welfare Plan" shall mean "employee welfare benefit plan" (as defined in Section 3(1) of ERISA) maintained, or contributed to, or required to be contributed to, by the C/G Companies for the benefit of any current or former independent contractors, consultants, agents, employees, officers or directors of the C/G Companies.

"Chapter 11 Cases" shall have the meaning set forth in the recitals.

"Class A Common Stock" shall have the meaning set forth in Section 8.3(a).

"Class B Common Stock" shall have the meaning set forth in Section 8.3(a).

"Closing" shall have the meaning set forth in Section 2.2.

"Closing Date" shall have the meaning set forth in Section 2.2.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Group" shall have the meaning set forth in Section 9.11(a)(i)(1).

"Competing Proposal" shall have the meaning set forth in Section 9.10(a).

"Competitive Business" shall have the meaning set forth in Section 9.11(a)(i)(1).

"Competition Disclosure" shall have the meaning set forth in Section 9.10(c).

"Confidentiality Agreements" shall have the meaning set forth in Section 9.12.

"Confirmation Order" shall have the meaning set forth in the recitals.

"Contemplated Transactions" shall have the meaning set forth in the recitals.

"Contract" shall mean any note, bond, mortgage, indenture, lease, sublease, license, purchase order, permit, concession, franchise, contract, agreement, insurance policy, undertaking, commitment, instrument or other binding arrangement or obligation, express or implied, inclusive of any amendment, that is binding on any Person or any part of its property under applicable Law.

"Contributed Assets" shall have the meaning set forth in Section 3.1.

"Contribution" shall have the meaning set forth in Section 3.1.

"Contribution Consideration" shall have the meaning set forth in Section 4.1(b).

"Credit Agreement" shall mean the Credit Agreement, dated as of April 8, 2005 (as amended, supplemented or otherwise modified from time to time), by and among MGM Holdings II Inc., Metro-Goldwyn-Mayer Inc., as Borrower, the lenders party thereto, Bank of America, N.A., Citicorp USA, Inc. and The Royal Bank of Scotland PLC, as Documentation Agents, Credit Suisse, as Syndication Agent, and JPMorgan Chase Bank, N.A., as Administrative Agent, and the swap agreements related thereto.

"Cypress" shall have the meaning set forth in the preamble.

"Cypress Common Stock" shall have the meaning set forth in Section 4.1(a)(i).

"Cypress Exchange Ratio" shall have the meaning set forth in Section 4.1(a)(i).

"Cypress Merger Consideration" shall have the meaning set forth in Section 4.1(a)(i).

"Cypress/Garoge Balance Sheet Date" shall have the meaning set forth in Section 5.6.

"Cypress/Garoge Common Stock" shall have the meaning set forth in Section 4.1(a)(ii).

"Cypress/Garoge Contract" shall have the meaning set forth in Section 5.8(a)(i).

"Cypress/Garoge Financial Statements" shall have the meaning set forth in Section 5.6.

"Cypress/Garoge Intellectual Property" shall have the meaning set forth in Section 5.11(a).

"Cypress/Garoge Organizational Documents" shall have the meaning set forth in Section 5.1(a).

"Cypress/Garoge Stockholder Representative" shall mean Spyglass Entertainment Group, LLC or its designee.

"Cypress/Garoge Stockholders" shall mean those Persons who on the date of this Agreement are holders of the Cypress/Garoge Common Stock.

"Debt Conversion" shall have the meaning set forth in the recitals.

"Designated Subsidiary" shall have the meaning set forth in the recitals.

"Development Projects" shall mean any and all Films that have been proposed to be developed, produced or acquired by or on behalf of an entity, with respect to which pre-production has not commenced, regardless of the stage of development of such project.

"DGCL" shall have the meaning set forth in the recitals.

"Disclosure Statement" means the disclosure statement with respect to the Plan attached as Exhibit N hereto.

"Distribution Terms" shall have the meaning set forth in Section 9.6(a).

"DLLCA" shall have the meaning set forth in the recitals.

"Effective Time" shall have the meaning set forth in Section 2.3.

"Elements" shall mean all physical embodiments of any Film or its elements, or any marketing, advertising or promotional materials, behind-the-scenes footage, featurettes, "bonus" or "added value" materials or other ancillary or subsidiary materials of every kind and nature relating to a Film or its elements in whatever state of completion, wherever located (including in any film laboratory or storage facility owned or controlled by an entity, any of its Subsidiaries or any other Person), in any video, audio or other format (including PAL, NTSC and high definition), including: (i) all positive, negative, fine grain and answer prints; (ii) all exposed or developed film, pre-print materials (including positives, interpositives, negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised), subtitles, special effects, cutouts, stock footage, outtakes, tabs and trims; (iii) tapes, discs, hard drives, computer memory, or other electronic media of any nature; (iv) all sound and music tracks, audio and video recordings of all types and gauges (whether analog, digital

or otherwise) in all languages; and (v) all cells, drawings, storyboards, models, sculptures, puppets, bibles, outlines, scripts, screenplays and other physical properties.

"<u>Employment Agreements</u>" shall mean the employment agreements, in the form attached hereto as <u>Exhibit E</u>, to be entered into on the Closing Date between Parent and each of Gary Barber and Roger Birnbaum.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"<u>ERISA Affiliate</u>" means, with respect to any entity, trade or business, any other entity, trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"<u>Escrow Agreement</u>" shall have the meaning set forth in Section 9.10(e).

"<u>Exchange Ratio</u>" shall have the meaning set forth in Section 4.1(a)(ii).

"<u>Excluded Cypress/Garoge Assets</u>" means all cash, cash equivalents and the other assets set forth in Section 1.1(a) of the C/G Disclosure Schedule.

"<u>Exploit</u>" shall mean, with respect to the Films, to release, distribute, perform, display, exhibit, broadcast or telecast, license, sell, reproduce or create derivative works from, market, create merchandising or otherwise commercially or non-commercially exploit by any and all known or hereafter developed (i) technology, (ii) uses, (iii) media, (iv) formats, (v) modes of transmission and (vi) methods of distribution, dissemination or performance. The meaning of the term "<u>Exploitation</u>" shall be correlative to the foregoing.

"<u>Films</u>" shall mean all motion pictures (including features, shorts and trailers), television, cable or satellite programming (including on-demand and pay-per-view programming), Internet programming, direct-to-video/DVD programming or other live action, animated, filmed, taped or recorded entertainment of any kind or nature, and all components thereof, including titles, themes, content, dialogue, characters, plots, concepts, scenarios, characterizations, elements and music (whether or not now known or recognized) as to which a Person owns or controls any right, title or interest, including in any of the following: (i) completed and released works or projects; (ii) works or projects in any stage of progress, including works or projects in development and/or pre-production, in principal photography and/or post-production, and completed but not released as of the Closing Date; (iii) abandoned or "turnaround" works or projects; (iv) to the extent related to the works or projects referred to in the foregoing clauses (i) through (iii), any sequel, prequel and/or remake rights and/or other derivative production rights, including any novelization, merchandising, character, serialization, game and/or interactive rights; (v) any other allied, ancillary, subsidiary and derivative rights (including theme park rights) throughout the universe related to the works and projects

referenced in the foregoing clauses (i) through (iv); and (vi) any contractual and other rights associated with or related to such works, projects or rights referenced in the foregoing clauses (i) through (v), whether in any media now known or hereafter developed.  For the avoidance of doubt, the term "Films" shall include all of such entity's Library Films, Films in Progress, Development Projects and Significant Unproduced Properties.

"Films in Progress" shall mean all Theatrical Motion Pictures, direct-to-video/DVD and made-for-television programming that have not been released and for which principal photography or post-production has commenced, which are being (or are to be) produced by the applicable entity or any of its Subsidiaries, or which the applicable entity or any of its Subsidiaries have "greenlit" or committed to finance, in whole or in part, or acquire any ownership interest, distribution rights or other rights from a third Person.

"GAAP" shall mean United States generally accepted accounting principles.

"Garoge" shall have the meaning set forth in the preamble.

"Garoge Common Stock" shall have the meaning set forth in Section 4.1(a)(ii).

"Garoge Exchange Ratio" shall have the meaning set forth in Section 4.1(a)(ii).

"Garoge Merger Consideration" shall have the meaning set forth in Section 4.1(a)(ii).

"General Assignment and Assumption Agreement" means the General Assignment and Assumption substantially in the form attached hereto as Exhibit G.

"G.I. Joe Co-Financing Agreement" shall mean that certain letter agreement, dated as of January 30, 2008, by and between Paramount Pictures Corporation and Spyglass Entertainment Productions, LLC with respect to the co-financing of that certain motion picture entitled "G.I. Joe:  The Rise of Cobra" (f/k/a "Dark Sky").

"G.I. Joe / Wanted Co-Financing Rights" shall mean, collectively, (A) the right to co-finance (i) certain Subsequent Productions (as defined in the G.I. Joe Co-Financing Agreement) based on the Theatrical Motion Picture entitled "G.I. Joe: The Rise of Cobra" (f/k/a "Dark Sky") pursuant to and in accordance with Paragraph 13 and the other terms and conditions of the G.I. Joe Co-Financing Agreement relating to the Subsequent Productions of "G.I. Joe: The Rise of Cobra" and (ii) certain Subsequent Productions (as defined in the Wanted Co-Financing Agreement) based on the Theatrical Motion Picture entitled "Wanted" pursuant to and in accordance with Paragraph 10(b) and the other terms and conditions of the Wanted Co-Financing Agreement relating to the Subsequent Productions of "Wanted"; and (B) all other rights, privileges and entitlements to which the co-financier of the applicable Subsequent Productions is entitled in connection with the rights set forth clause (A) pursuant to and in accordance with the terms and conditions of the G.I. Joe Co-Financing Agreement and the Wanted Co-Financing Agreement.  The "G.I. Joe / Wanted Co-Financing Rights" shall expressly exclude any and all rights,

509265-1076-01000-Active.12124289.15

privileges and entitlements (and corresponding Liabilities) under the G.I. Joe Co-Financing Agreement and the Wanted Co-Financing Agreement with respect to the motion pictures entitled "G.I. Joe: The Rise of Cobra" (f/k/a "Dark Sky"), "Wanted" and "Welcome Home Roscoe Jenkins" and any other rights, privileges and entitlements not directly relating to the applicable Subsequent Production, all of which shall be retained by the Spyglass Companies. For the avoidance of doubt, no rights, entitlements or Liabilities relating to the motion picture entitled "Welcome Home Roscoe Jenkins" shall constitute Contributed Assets or Assumed Liabilities.

"Governmental Entity" shall mean any governmental body, court, agency, official or regulatory or other authority, whether federal, state, local or foreign.

"Greenlit Films" shall have the meaning set forth in Section 9.2(c)(i)(B).

"Indemnification Agreement" means a director indemnification agreement, in the form attached hereto as Exhibit K, to be entered into between Parent and each of Roger Birnbaum and Gary Barber.

"Indemnifying Party" shall have the meaning set forth in Section 10.3(a)(i).

"Infringe" means, with respect to any Intellectual Property, to infringe or misappropriate such Intellectual Property in a manner that violates applicable Law or the legal rights of the owner thereof, or to dilute (as defined under applicable Law) the legal rights of the owner thereof in violation of applicable Law. The terms "Infringes" and "Infringing" shall have correlative meanings.

"Intellectual Property" means all intellectual property rights of any nature under the laws of the United States or any other jurisdiction, including, without limitation: (i) patents; (ii) trade secrets, inventions, discoveries, improvements, databases, technology and technical data, whether or not patentable or copyrightable; (iii) trademarks, service marks, trade dress, trade names and Internet domain names; (iv) copyrights and works of authorship; and (v) rights of privacy and publicity and rights arising under defamation laws, and, with respect to all of the foregoing, any and all registrations, certificates, issuances, recordings, applications, divisionals, continuations, continuations-in-part, reissues, renewals, extensions and/or re-examinations related thereto.

"IRS" shall mean the Internal Revenue Service.

"Junior Preferred Stock" shall have the meaning set forth in Section 8.3(a).

"Knowledge," or any similar formulation of knowledge, shall mean:

(a)     in the case of Parent, the actual knowledge of the persons listed on Section 1 of the Parent Disclosure Schedule;

(b)     in the case of Spyglass, the actual knowledge of the persons listed on Section 1.1(a) of the Spyglass Disclosure Schedule; and

(c)    in the case of C/G, the actual knowledge of the persons listed on Section 1.1(b) of the C/G Disclosure Schedule.

"Law" shall mean any statute, law, ordinance, rule, regulation, code, order, rule of law (including common law) or other requirement enacted, adopted, issued or promulgated by any Governmental Entity.

"Letter of Intent" shall mean that certain Letter of Intent dated September 3, 2010 by and among Spyglass, C/G, Parent, MGM Holdings Inc. and MGM Holdings II Inc.

"Liability" shall mean any direct or indirect liability, indebtedness, claim, loss, damage, deficiency, commitment, obligation or responsibility, contingent or otherwise, whether arising in the past, present or future.

"Library Films" shall mean any and all Films that have been completed and/or acquired and delivered to the applicable distributor, and for which Exploitation has commenced on or prior to the date of this Agreement, and any and all additional Films that have been completed and/or acquired and delivered to the applicable distributor, and for which Exploitation has commenced after the date of this Agreement, but on or prior to the Closing Date.  For the avoidance of doubt, the term "Library Films" shall include all Films other than Films in Progress, Development Projects and Significant Unproduced Properties.

"Liens" shall mean, with respect to any asset, pledges, mortgages, title defects or objections, claims, liens, charges, covenants, restrictions, encumbrances and security interests of any kind or nature.

"Loss" shall mean Liabilities, losses, costs or expenses (including reasonable attorneys' fees and expenses incurred in connection with the investigation or defense of any claim, action or occurrence), judgments, fines, Taxes, claims, damages, deficiencies or other charges and assessments.

"Management Stockholders" shall have the meaning set forth in the preamble.

"Merger Consideration" shall have the meaning set forth in Section 4.1(a)(ii).

"Mergers" shall have the meaning set forth in Section 2.1.

"Merger Sub" shall have the meaning set forth in the preamble.

"MGM Benefit Plan" shall mean each MGM Pension Plan, MGM Welfare Plan and any other plan, fund, program, arrangement or agreement (including any employment or consulting agreement) to provide employees, directors, independent contractors, consultants, officers or agents with medical, health, disability, life, bonus, incentive, stock or stock-based right (option, ownership or purchase), retirement, deferred compensation, severance, change in control, salary continuation, vacation, sick leave, fringe, incentive insurance or other benefits, maintained, or contributed to, or required to be contributed to, by any of the MGM Companies for the benefit of any current or former

independent contractors, consultants, agents, employees, officers or directors of the MGM Companies.

"MGM Companies" shall mean, collectively, Parent and any of its Subsidiaries (including Merger Sub).

"MGM Foreign Plan" shall mean each MGM Benefit Plan that is governed by the Laws or applicable customs or rules of relevant jurisdictions other than the United States.

"MGM Organizational Documents" shall have the meaning set forth in Section 8.1(a).

"MGM Pension Plan" shall mean "employee pension benefit plan" (as defined in Section 3(2) of ERISA) maintained, or contributed to, or required to be contributed to, by any of the MGM Companies for the benefit of any current or former independent contractors, consultants, agents, employees, officers or directors of any of the MGM Companies.

"MGM Subsidiary Organizational Documents" shall have the meaning set forth in Section 8.1(a).

"MGM Welfare Plan" shall mean "employee welfare benefit plan" (as defined in Section 3(1) of ERISA) maintained, or contributed to, or required to be contributed to, by the MGM Companies for the benefit of any current or former independent contractors, consultants, agents, employees, officers or directors of the MGM Companies.

"Multiemployer Plan" shall mean any "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA.

"Non-Competition Agreement" shall mean a Contract that prohibits or materially restricts the ability of an entity to operate in any geographical area or compete or operate in any line of business in which such entity presently is engaged (or would be reasonably expected to extend an existing business into), other than (i) provisions relating to geographic exclusivity and/or exclusivity by medium or manner of Exploitation contained in agreements for the Exploitation of Films or Intellectual Property licenses or (ii) channel distribution restrictions.

"Order" shall mean any judgment, order, writ, preliminary or permanent injunction or decree of any Governmental Entity.

"Parent" shall have the meaning set forth in the preamble.

"Parent Common Stock" shall have the meaning set forth in the recitals.

"Parent Contract" shall have the meaning set forth in Section 8.9(a)(i).

"Parent Disclosure Schedule" shall have the meaning set forth in Article VIII.

509265-1076-01000-Active.12124289.15

"Parent Financial Statements" shall have the meaning set forth in Section 8.6.

"Parent Indemnified Parties" shall have the meaning set forth in Section 10.2.

"Parent Intellectual Property" shall have the meaning set forth in Section 8.12(a).

"Parent Material Adverse Effect" means any change, event, occurrence, condition, circumstance, development or effect that, individually or in the aggregate has had, or would reasonably be expected to have, a material adverse effect on the business, properties, assets, liabilities, condition (financial or otherwise) or results of operations of the MGM Companies, taken as a whole, or that would reasonably be expected to materially delay or materially adversely affect the ability of the MGM Companies, taken as a whole, to consummate the Contemplated Transactions; provided, however, that any change, event, occurrence, condition, circumstance, development or effect that is (i) primarily caused by conditions affecting the United States economy generally or the economy of any nation or region in which an MGM Company conducts business that is material to the business of the MGM Companies, taken as a whole, shall not be taken into account in determining whether there has been or would be a "Parent Material Adverse Effect", (ii) primarily caused by conditions generally affecting the entertainment industry shall not be taken into account in determining whether there has been or would be a "Parent Material Adverse Effect", and (iii) primarily caused by the announcement or pendency of the Transaction Documents or the Contemplated Transactions (including the commencement of the Chapter 11 Cases under the Bankruptcy Code, but only to the extent such change, event, occurrence, condition, circumstance, development or effect is one that is primarily caused by, or that customarily occurs as a result of, either (x) the commencement or pendency of chapter 11 cases or (y) the anticipation of the filing of chapter 11 cases shall not be taken into account in determining whether there has been or would be a "Parent Material Adverse Effect"; it being understood and agreed that the foregoing exclusions described in clauses (i) and (ii) shall not apply to the extent that the applicable changes, events, occurrences, conditions, circumstances, developments or effects described therein have or would reasonably be expected to have a materially disproportionate adverse effect on the MGM Companies, taken as a whole, as compared to any other Persons engaged in the same business as the MGM Companies.

"Parent Organizational Documents" shall have the meaning set forth in Section 8.1(a).

"Participations" shall mean all amounts (whether described as a deferment, a gross or net participation or otherwise) that a Person may be contractually obligated to pay for rights, services, materials or financing provided by a third Person in connection with any Film and that are based on or dependent on all or any percentage of the receipts or proceeds from the Exploitation of such Film (irrespective of the manner in which such receipts or proceeds are defined or computed) or the passage of time (unless included in the cost of production), including royalties and payments made to guilds and/or their affiliated pension or health plans, whether or not such payments have become due or been made.

"PBGC" shall mean the Pension Benefit Guarantee Corporation.

"Percentage Interest" shall have the meaning set forth in Section 10.4(a).

"Permitted Liens" shall mean (i) statutory Liens for Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP; (ii) inchoate mechanics', materialmen's, carriers', workmen's, warehousemen's, repairmen's, landlords' and similar Liens (including all statutory Liens and all privileges or equivalent rights recognized by applicable Law) granted in the ordinary course of business; (iii) customary Liens granted in the ordinary course of business to any guild or other Person in connection with the development, production or Exploitation of Films; (iv) Liens securing debt reflected as secured debt on the financial statements as of March 31, 2010 (in the case of Parent) or December 31, 2009 (in the case of C/G); (v) title of the lessor under any capital lease; (vi) such other imperfections in title, rights of usufruct or use or other restrictions and encumbrances that do not materially detract from the value of or materially interfere with the use or Exploitation of the Films or Elements (as currently Exploited), as the case may be; (vii) Contracts entered into in the ordinary course of business pursuant to which any Person has acquired, established, developed or granted any rights to Exploit any Film; (viii) Liens that constitute the rights of any lessee or licensee under any lease or license with respect to any Film or Elements; (ix) Liens securing indebtedness incurred in the ordinary course of business attributable to "negative pick-ups" (as such term is commonly understood in the United States entertainment industry) or sale and leaseback transactions; and (x) Liens consisting of any right in, or right to receive, money or other consideration in respect of, or relating in any way to, any Film or Elements which consideration is based on the Exploitation of any such asset, however measured and which was granted in return for talent or other personal services rendered or third party rights utilized in connection with such Film or Elements or the development, financing, production or Exploitation thereof.

"Person" shall mean an individual, corporation, limited liability company, partnership, association, trust or any other entity or organization, including any Governmental Entities.

"Plan" shall mean the chapter 11 plan of reorganization in the form attached hereto as Exhibit A and acceptable to the Administrative Agent and Parent, with any amendments, modifications, supplements and exhibits thereto approved by the parties to this Agreement and acceptable to the Administrative Agent.

"Post-Closing Tax Period" shall mean all taxable periods that begin after the Closing Date and the portion beginning after the Closing Date of any taxable periods that includes (but does not end on) the Closing Date.

"Pre-Closing Tax Period" shall have the meaning set forth in Section 10.4(a).

"Registration Rights Agreement" means the Registration Rights Agreement substantially in the form attached hereto as Exhibit F.

"Related Party" shall have the meaning set forth in Section 8.15.

"Reorganization Document" means the Plan, the Disclosure Statement, any "first-day" motion filed by Parent or its Subsidiaries and any motion, application or pleading filed by Parent or its Subsidiaries in the Chapter 11 Cases which seeks relief that is not inconsistent with the terms hereof.

"Representatives" shall refer to the accountants, consultants, legal counsel, financial and other advisors, agents and other representatives of a Person.

"Restricted Period End Date" shall have the meaning set forth in Section 9.2(c)(vii).

"Retained Interest" shall have the meaning set forth in Section 3.2(b).

"Scheduled Plans" shall have the meaning set forth in Section 8.8(a).

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933 and the rules and regulations of the SEC promulgated thereunder.

"Senior Management Equity Investment Plan" shall mean the 2010 MGM Holdings Inc. Stock Incentive Plan adopted by the Parent, as amended from time to time.

"Senior Preferred Stock" shall have the meaning set forth in Section 8.3(a).

"Share" shall mean each share of Cypress/Garoge Common Stock.

"Significant Unproduced Properties" means those Development Projects with respect to which, as of the date of this Agreement (or, with respect to the Closing, the Closing Date): (i) are in active development (or, if not in active development, development has commenced within two (2) years prior to the date of this Agreement) and have not been abandoned as of the date of this Agreement; (ii) the applicable entity owns or controls rights in such materials and is developing them for possible production as a Theatrical Motion Picture or as direct-to-video/DVD or made-for-television programming, or such materials are being developed by a third Person for possible production as a Theatrical Motion Picture or as direct-to-video/DVD or made-for-television programming and the entity or one or more of its Subsidiaries has the obligation to finance (in whole or in part) and/or acquire any Exploitation rights in such Development Projects, Theatrical Motion Picture, direct-to-video/DVD or made-for-television programming; (iii) pre-production has not been commenced; and (iv) an amount in excess of $300,000 has been expended and/or committed by the applicable Person in respect of development and/or production costs.

509265-1076-01000-Active.12124289.15

"Spyglass" shall have the meaning set forth in the preamble.

"Spyglass Companies" shall mean, collectively, Spyglass and its Subsidiaries that hold Contributed Assets or have any rights, title or interests thereto.

"Spyglass Contracts" means (i) the Contracts set forth in Section 1.1(b) of the Spyglass Disclosure Schedule and (ii) to the extent not included in the foregoing clause (i), all Spyglass License Agreements and other Contracts to which any Spyglass Company is a party or by which any of them or any of the Contributed Assets are bound, in each case, to the extent solely relating to any of the Spyglass Development Projects and the G.I. Joe/Wanted Co-Financing Rights, or the Exploitation thereof, excluding any Contracts relating to any employees of any Spyglass Company.

"Spyglass Credit Facility" shall mean that certain Credit and Security Agreement, dated as of March 22, 2007, by and among Spyglass Entertainment Funding, LLC, the lenders named therein and Dresdner Bank AG (and its successors and assigns), as administrative agent, depository bank, letter of credit issuer and collateral agent, and the other documents and instruments referenced therein, and the transactions contemplated thereby, as the same has been amended, restated or supplemented prior to the date hereof.

"Spyglass Development Projects" shall have the meaning set forth in Section 6.5(a).

"Spyglass Disclosure Schedule" shall have the meaning set forth in Article VI.

"Spyglass Elements" shall mean all Elements relating to the Spyglass Development Projects, including, if applicable, Elements relating to the Spyglass Development Projects with respect to which the Spyglass Companies have laboratory access letters.

"Spyglass Films In Progress" shall have the meaning set forth in Section 6.5(f)(i).

"Spyglass License Agreements" shall mean contracts or agreements to which any Spyglass Company is a party or by which any of them or the Contributed Assets are bound, inclusive of amendments, pursuant to which a Spyglass Company grants or licenses to or acquires or licenses from a third Person any right, title or interest in or to one or more Spyglass Development Projects or any right, title or interest with respect thereto, including any right, title or interest related to the Exploitation of one or more Spyglass Development Projects.

"Spyglass Significant Unproduced Properties" shall have the meaning set forth in Section 6.5(f)(ii).

"Stockholders Agreement" shall mean the stockholders agreement substantially in the form attached hereto as Exhibit D.

"Straddle Period" shall have the meaning set forth in Section 10.4(c).

"Subsidiary" of any Person means (i) a corporation more than 50% of the combined voting power of the outstanding voting stock of which is owned, directly or indirectly, by such Person or by one of more other Subsidiaries of such Person or by such Person and one or more other Subsidiaries thereof; (ii) a partnership of which such Person, or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, is the general partner and has the power to direct the policies, management and affairs of such partnership; (iii) a limited liability company of which such Person or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, is the managing member and has the power to direct the policies, management and affairs of such company; or (iv) any other Person (other than a corporation, partnership or limited liability company) in which such Person, or one or more other Subsidiaries of such Person or such Person and one or more other Subsidiaries thereof, directly or indirectly, has at least a majority ownership and has the power to direct the policies management and affairs thereof.  For the purposes of this definition, "voting power" shall mean the right to elect a majority of the board of directors of such corporation, and United Artists Entertainment LLC shall be deemed to be a Subsidiary of Parent.

"Superior Proposal" means a bona fide written unsolicited Competing Proposal (which did not result from or arise in connection with a breach of Section 9.10), made after the date of this Agreement by a third Person that the Board of Directors and the Administrative Agent determine in good faith to be superior to the transactions provided for herein and contemplated hereby.

"Surviving Entity" shall have the meaning set forth in Section 2.1.

"Surviving Representations" shall have the meaning set forth in Section 10.1.

"Target" means the C/G Companies and the Contributed Assets, taken as a whole.

"Tax" or "Taxes" shall mean any and all federal, state, local and foreign taxes, assessments, duties, impositions and levies, including taxes that are based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, alternative or add-on minimum, severance, capital stock, premium, registration, transfer, gains, franchise, withholding, payroll, recapture, employment, excise, estimated, unemployment, insurance, social security, business license, occupation, business organization, stamp, environmental and property taxes, together with all interest, penalties and additions imposed with respect to such amounts.  For purposes of this Agreement, "Taxes" (i) also includes any obligations under any agreements or arrangements with any Person with respect to the liability for, or sharing of, Taxes (including pursuant to Treasury Regulations Section 1.1502-6 or comparable provisions of state, local or foreign tax Law) and including any liability for Taxes as a transferee or successor, by Contract or otherwise, but (ii) does not include Transfer Taxes.

"Tax Returns" shall mean any report, return, election, notice, declaration, information statement or other form or document (including all schedules, exhibits and other attachments thereto) relating to and filed or required to be filed with a Taxing

17

authority in connection with any Tax (including estimated Taxes), and shall include any amendment to any of the foregoing.

"Termination and Release of Funds Notice" shall have the meaning set forth in Section 12.1(f).

"Termination Date" shall have the meaning set forth in Section 12.1(g).

"Terms" shall have the meaning set forth in Section 9.6(a).

"Theatrical Motion Picture" shall mean any feature length motion picture intended for initial exhibition in motion picture theatres.

"Third Party Claim" shall have the meaning set forth in Section 10.3(a)(i).

"Third Party Transfer" shall have the meaning set forth in Section 9.6(a).

"Transaction Documents" shall mean this Agreement, the Stockholders Agreement, the Senior Management Equity Investment Plan, the Employment Agreements, the Indemnification Agreements, the Registration Rights Agreement, the Plan, the General Assignment and Assumption Agreement and the Escrow Agreement.

"Transferring Party" shall have the meaning set forth in Section 9.6(a).

"Transfer Taxes" means sales, use, value added, transfer, stamp, stock transfer, real property transfer or gains and similar Taxes incurred in connection with the transfer of the Contributed Assets or the Mergers, as the case may be, pursuant to this Agreement.

"Treasury Regulations" means all temporary and final regulations promulgated under the Code.

"Undersigned C/G Stockholders" shall have the meaning set forth in the preamble.

"Unexecuted Development Projects" shall have the meaning set forth in Section 9.2(b)(iii).

"Wanted Co-Financing Agreement" shall mean that certain letter agreement, dated as of September 17, 2007, by and between Universal City Studios LLLP and Spyglass Entertainment Productions, LLC with respect to the co-financing of the motion pictures entitled "Wanted" and "Welcome Home Roscoe Jenkins".

Section 1.2     Construction.

(a)     Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) the singular number includes the plural number and vice versa; (iii) the terms "hereof", "herein", "hereby", "hereto" and derivative or words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article,

509265-1076-01000-Active.12124289.15

Section or other provision hereof; (iv) references herein to a specific Article, Section or Exhibit refer, respectively, to Articles, Sections or Exhibits of this Agreement; and (v) the word "including" (and with correlative meaning "include") shall mean including without limiting the generality of any description preceding such term.

(b)     References to agreements or other documents shall be deemed to include all amendments and other modifications thereto.

(c)     References to statutes shall include all final and temporary regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and final or temporary regulatory provisions consolidating, amending or replacing the statute or regulation.

(d)     The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent and no rule of strict construction shall be applied against any party.

(e)     The terms "Dollars" and "$" shall mean United States Dollars.

(f)     References to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

(g)     References to the "transactions contemplated hereby" and similar phrases shall be deemed to include, without limitation, the consummation of the Mergers, the Contribution, the Plan, the Chapter 11 Cases, entry of the Confirmation Order and the entering into of the Employment Agreements, the Stockholders Agreement and the Registration Rights Agreement.

## ARTICLE II

## THE MERGERS

Section 2.1    <u>The Mergers</u>.  Upon the terms and subject to the conditions set forth in this Agreement and in accordance with the applicable provisions of the DGCL and the DLLCA, C/G shall be merged with and into Merger Sub at the Effective Time (the "<u>Mergers</u>"). Following the Effective Time, the separate corporate existence of C/G shall cease, and Merger Sub shall continue its existence under the DLLCA as the surviving entity in the Mergers (the "<u>Surviving Entity</u>") and a wholly-owned subsidiary of Parent that is disregarded as a separate entity from Parent as contemplated by Treasury Regulation Section 301.7701-3.

Section 2.2    <u>Closing</u>.  Subject to the terms and conditions of this Agreement, the closing of the Mergers and the Contribution (the "<u>Closing</u>") shall take place at the offices of Simpson Thacher & Bartlett, 1999 Avenue of the Stars, Los Angeles, CA 90067, commencing at 9:00 a.m. local time, on either (i) five (5) calendar days following the entry of a Confirmation Order and the satisfaction or waiver of the conditions specified in Section 11.1 and Section 11.2

or (ii) at such other time, date, and place as the parties may mutually agree.  The date on which the Closing actually occurs is hereinafter referred to as the "<u>Closing Date</u>".

Section 2.3     <u>Effective Time</u>.  Subject to the provisions of this Agreement, the parties will cause the Mergers to be consummated by filing an appropriate certificate of merger (the "<u>Certificate of Merger</u>") with the Secretary of State of the State of Delaware in such form as required by, and executed in accordance with, the relevant provisions of the DGCL and the DLLCA on the Closing Date.  The Mergers will become effective upon such filing or at such time thereafter as is provided in the Certificate of Merger (the "<u>Effective Time</u>").

Section 2.4     <u>Effects of the Mergers</u>.  At the Effective Time, the Mergers shall have the effects set forth in this Agreement and the applicable provisions of the DGCL and DLLCA.

Section 2.5     <u>Tax Treatment of the Mergers</u>.  For United States federal income tax purposes, it is intended that the Mergers be treated as wholly tax-deferred (other than in respect of the receipt of cash in lieu of fractional shares pursuant to Section 4.4) reorganizations with Parent within the meaning of Section 368(a)(1)(A) of the Code, and that this Agreement shall constitute a plan of reorganization within the meaning of Treasury Regulations Section 1.368-2(g).  The parties hereto agree to report the Mergers consistently with the foregoing on all applicable Tax Returns.

Section 2.6     <u>Certificate of Formation; Managing Member and Officers</u>.  The certificate of formation of the Merger Sub in effect immediately preceding the Effective Time, which shall be in the form set forth in <u>Exhibit C</u>, shall be the certificate of formation of the Surviving Entity until thereafter changed or amended as provided therein or under the DLLCA. The managing member and officers of Merger Sub immediately prior to the Effective Time will be the managing member and officers of the Surviving Entity at the Effective Time until successors are duly elected or appointed and qualified in accordance with applicable Law or until their death, resignation or removal in accordance with the certificate of formation or limited liability company agreement of the Surviving Entity.

Section 2.7     <u>Transfer Taxes</u>.  All Transfer Taxes with respect to the Mergers shall be shared equally by the Undersigned C/G Stockholders, on the one hand, and Parent, on the other hand.  The Undersigned C/G Stockholders shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Law, Parent shall join in the execution of any such required Tax Returns and other documentation. The costs and expenses associated with such filings shall be borne equally by Parent and the Undersigned C/G Stockholders.  The Undersigned C/G Stockholders and the Parent agree to cooperate in the execution and delivery of all instruments and certificates necessary to enable the Undersigned C/G Stockholders to comply with any filing requirements.

509265-1076-01000-Active.12124289.15

# ARTICLE III

## CONTRIBUTION OF ASSETS

Section 3.1    Contributed Assets.  Subject to the terms and conditions of this Agreement, at the Closing, Spyglass agrees and agrees to cause the applicable Spyglass Companies to transfer, convey, assign, grant and deliver, or cause to be transferred, conveyed, assigned, granted and delivered (together with the assignment and the assumption of the Assumed Liabilities contemplated by Section 3.3) (the "Contribution") to Parent (or, if applicable, to the Designated Subsidiary), free and clear of any Liens (other than Permitted Liens), all of the Spyglass Companies' right, title and interest in and to all the Spyglass Development Projects and the G.I. Joe/Wanted Co-Financing Rights, including the following (collectively, the "Contributed Assets" and individually, a "Contributed Asset"):

(a)    All rights, title and interests of the Spyglass Companies in and to the Spyglass Contracts and the G.I. Joe/Wanted Co-Financing Rights (collectively, the "Assumed Contracts");

(b)    All rights, title and interest of the Spyglass Companies in and to the Spyglass Elements (collectively, the "Assumed Elements");

(c)    All rights, title and interest of the Spyglass Companies in and to the Intellectual Property relating to the Spyglass Development Projects and, if applicable, the G.I. Joe/Wanted Co-Financing Rights (collectively, the "Assumed IP");

(d)    All receivables of the Spyglass Companies relating to the Spyglass Development Projects, the G.I. Joe/Wanted Co-Financing Rights, the Assumed Contracts, the Assumed Elements or the Assumed IP; and

(e)    All files and documents of the Spyglass Companies, including books, ledgers, files, studies, reports, plans, accounting data, inventory records, sales and sales promotional data, advertising materials, cost and pricing information, business plans, creative materials and any other such data, records or materials, however stored, in each case to the extent relating to the Spyglass Development Projects, the G.I. Joe/Wanted Co-Financing Rights, the Assumed Contracts, the Assumed Elements or the Assumed IP; provided, however, that the Spyglass Companies shall be entitled to retain copies of any such materials which are necessary for, and may use such copies solely in connection with, their Tax, accounting or legal purposes; provided that such copies and all information contained therein shall be confidential information bound by the Confidentiality Agreement in accordance with Section 9.12.

For the avoidance of doubt, no other rights, properties or assets are being transferred, conveyed, assigned, granted and delivered to Parent (or the Designated Subsidiary) as part of the Contribution hereunder other than the Contributed Assets and the Assumed Liabilities.  Other than as expressly described in this Section 3.1 with respect to the Spyglass Development Projects and the G.I. Joe/Wanted Co-Financing Rights, the Contributed Assets shall not include any other Intellectual Property of the Spyglass Companies (including, without limitation, the Spyglass name, trademarks, logos, goodwill, going concern value or any other tangible or intangible

509265-1076-01000-Active.12124289.15

Intellectual Property whatsoever) or any other rights, properties or assets of Spyglass or any of the Spyglass Companies.

Section 3.2     Assignment of the Contributed Assets.

(a)     At the Closing, to the extent necessary, Spyglass shall deliver to Parent (or, if applicable, the Designated Subsidiary) a General Assignment and Assumption Agreement in substantially the form of Exhibit G hereto and, to the extent required, such certificates of title, endorsements, consents, assignments and other good and sufficient instruments of conveyance and assignment of the Contributed Assets as Spyglass and Parent shall deem reasonably necessary in order to vest in Parent (or, if applicable, the Designated Subsidiary) all right, title and interest of the Spyglass Companies in and to the Contributed Assets.

(b)     Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any of the Contributed Assets set forth in Section 3.2(b) of the Spyglass Disclosure Schedule for which any third party consent has not been obtained by the Closing (a "Retained Interest") unless and until such third party consent is obtained, at which time such Retained Interest shall be deemed to be sold, conveyed, transferred and assigned in accordance with Section 3.1 and shall cease to be a Retained Interest.

(c)     While a Contributed Asset remains a Retained Interest, Spyglass shall use its, and shall cause any of the applicable Spyglass Companies to use their, reasonable best efforts to obtain any such required consent in writing in form and substance reasonably satisfactory to Parent, which such required consent shall not, in any case, impose any new economic term or monetary obligation or any material non-monetary obligation, in each case that is, or would become after the Closing, applicable to either Parent (or any of the MGM Companies) or any of the Spyglass Development Projects and the G.I. Joe/Wanted Co-Financing Rights.

(d)     While a Contributed Asset remains a Retained Interest, Spyglass and Parent (or a Subsidiary of Parent) shall (i) cooperate in a lawful arrangement reasonably satisfactory to Spyglass and Parent (or a Subsidiary of Parent) designed to provide the benefits (economic or otherwise) of such Retained Interest to Parent to the maximum extent practicable and at no additional cost to Parent (or a Subsidiary of Parent), and Parent (or a Subsidiary of Parent) shall assume the corresponding liabilities and obligations thereunder in accordance with Section 3.3 as if such Retained Interest had been transferred to Parent (or a Subsidiary of Parent), but only to the extent Parent (or a Subsidiary of Parent) obtains the benefits of such Retained Interest; and (ii) enforce, at the request and expense of Parent, any rights of Spyglass arising from such Retained Interest against the issuer thereof or the other party or parties thereto (including the right to elect to terminate any such Retained Interest in accordance with the terms thereof upon the written direction of Parent).

Section 3.3     Assumed Liabilities.  Subject to the terms and conditions of this Agreement, at the Closing and as part of the Contribution, Parent shall or, if applicable, shall cause the Designated Subsidiary to assume and be liable for and agree to pay, discharge and perform when due and hold harmless Spyglass from all of the Spyglass Companies' Liabilities to the extent such Liabilities arise under or are solely related to any of the Contributed Assets, whether arising before, on or after the Closing Date (collectively, the "Assumed Liabilities").

Notwithstanding any other provision of this Agreement, other than the Assumed Liabilities, Parent shall not assume any Liabilities of the Spyglass Companies, including, without limitation: (i) all obligations, liabilities and commitments to the extent relating to or arising out of any assets other than the Contributed Assets; (ii) all Taxes arising out of, relating to or in respect of the Spyglass Companies (other than with respect to the Contributed Assets) imposed for any period; (iii) all Taxes (other than Transfer Taxes) arising out of, relating to or in respect of the Contributed Assets imposed for any Pre-Closing Tax Period and the portion of any Straddle Period ending on the Closing Date; (iv) all obligations, liabilities and commitments to the extent arising from the employment or termination of employment of any employee or former employee of the Spyglass Companies; and (v) all obligations, liabilities and commitments to the extent relating to or arising out of any suit, action or proceeding relating to the Contributed Assets and arising from actions or failure to act of any of the Spyglass Companies prior to the Closing Date. For the avoidance of doubt, Parent and/or the Designated Subsidiary shall be responsible for paying, and shall pay, all Taxes attributable to their ownership of, or entitlements to, the Contributed Assets for any Post-Closing Tax Period.

Section 3.4 <u>Tax Treatment of the Contribution</u>. For United States federal income tax purposes, it is intended that the Contribution and the Debt Conversion, taken together, be treated as part of an integrated plan and as a wholly tax-deferred (other than in respect of the receipt of cash in lieu of fractional shares) contribution pursuant to Section 351(a) of the Code. The parties hereto agree to report the Contribution and Debt Conversion consistently with the foregoing on all applicable Tax Returns.

Section 3.5 <u>Transfer Taxes</u>. All Transfer Taxes with respect to the Contribution shall be shared equally by Spyglass and Parent. Spyglass shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Law, Parent shall join in the execution of any such required Tax Returns and other documentation. The costs and expenses associated with such filings shall be borne equally by Spyglass and Parent. Spyglass and Parent agree to cooperate in the execution and delivery of all instruments and certificates necessary to enable Spyglass to comply with any filing requirements.

## ARTICLE IV

## CONSIDERATION; CONVERSION OF SHARES; EXCHANGE OF CERTIFICATES

Section 4.1 <u>Consideration</u>.

(a) At the Effective Time, by virtue of the Mergers and without any action on the part of C/G, Merger Sub or the holders of any securities in either Cypress, Garoge or Merger Sub, subject to Section 4.4, each issued and outstanding share of (i) common stock, par value $0.01 per share, of Cypress outstanding immediately prior to the Effective Time (such shares, collectively, the "<u>Cypress Common Stock</u>") shall thereupon be converted automatically into and shall thereafter represent the right to receive 667.133 (the "<u>Cypress Exchange Ratio</u>") fully paid and nonassessable shares of common stock, par value of $0.01 per share ("<u>Parent Common Stock</u>"), of Parent (the "<u>Cypress Merger Consideration</u>") and (ii) common stock, par value $0.001 per share, of Garoge outstanding immediately prior to the Effective Time (such shares,

collectively, the "Garoge Common Stock" and, together with the Cypress Common Stock, the "Cypress/Garoge Common Stock") shall thereupon be converted automatically into and shall thereafter represent the right to receive 88.692 (the "Garoge Exchange Ratio" and, together with the Cypress Exchange Ratio, the "Exchange Ratio") fully paid and nonassessable shares of Parent Common Stock (the "Garoge Merger Consideration" and, together with the Cypress Merger Consideration, the "Merger Consideration") representing in the aggregate, immediately following the Effective Time and Debt Conversion, approximately 4.17% of the issued and outstanding Parent Common Stock. Notwithstanding the foregoing, at the Effective Time of the Mergers, each share of Cypress/Garoge Common Stock held by either Cypress or Garoge or by any MGM Company immediately prior to the Effective Time of the Merger, if any, shall be cancelled and extinguished without any conversion thereof.

(b)     At the Effective Time, Parent agrees to issue to Spyglass 400,000 fully paid and nonassessable shares of Parent Common Stock (the "Contribution Consideration") in consideration for the Contribution, representing in the aggregate, immediately following the Effective Time and Debt Conversion, approximately 0.52% of the issued and outstanding Parent Common Stock and to deliver to Spyglass appropriate evidence of such shares of Parent Common Stock. Parent further acknowledges that, after receipt of such appropriate evidence of such shares of Parent Common Stock, Spyglass may distribute some or all of such shares of Parent Common Stock to its members (subject to restrictions under applicable securities laws and under the Stockholders Agreement) and that Parent agrees to take all necessary and reasonable steps to acknowledge such transfer in accordance with the terms of the Stockholders Agreement.

Section 4.2     Cancellation of Shares. As a result of the Mergers, at the Effective Time, all shares of Cypress/Garoge Common Stock converted into the right to receive Parent Common Stock pursuant to Section 4.1(a) shall no longer be outstanding and shall cease to exist and each holder of Shares shall cease to have any rights with respect thereto, except the right to receive the Merger Consideration payable in respect of such Shares which are issued and outstanding immediately prior to the Effective Time and any cash in lieu of fractional shares of Parent Common Stock payable pursuant to Section 4.4, all to be issued or paid, without interest, in consideration therefor upon the surrender of such Shares in accordance with Section 4.6.

Section 4.3     Merger Sub Membership Units. Each membership unit of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one validly issued, fully paid and non-assessable membership unit of the Surviving Entity and shall constitute the only outstanding membership units of the Surviving Entity. From and after the Effective Time, all certificates representing the membership units of Merger Sub shall be deemed for all purposes to represent the number of membership units of the Surviving Entity into which they were converted in accordance with the immediately preceding sentence.

Section 4.4     Fractional Shares. No fractional shares of Parent Common Stock shall be issued in the Mergers or the Contribution and no dividends or other distributions of Parent shall relate to such fractional shares or interests in such, but in lieu thereof each holder of Shares otherwise entitled to a fractional share of Parent Common Stock (after aggregating all fractional shares to be received by such holder at that time) will be entitled to receive, from Parent in accordance with the provisions of this Section 4.4, a cash payment, in lieu of such

fractional share of Parent Common Stock, equal to the amount of the fractional share of Parent Common Stock that such holder is entitled to, multiplied by $25.00. The parties acknowledge that payment of the cash consideration in lieu of issuing fractional shares of Parent Common Stock was not separately bargained-for consideration but merely represents a mechanical rounding off for purposes of avoiding the expense and inconvenience to Parent that would otherwise be caused by the issuance of fractional shares of Parent Common Stock.

Section 4.5    Adjustments to the Exchange Ratio. If at any time during the period between the date of this Agreement and the Effective Time, the outstanding shares of capital stock of C/G or Parent shall have been changed into a different number of shares or a different class by reason of any reclassification, recapitalization, stock split (including a reverse stock split) or combination, exchange or readjustment of shares, or any stock dividend or distribution with a record date during such period, or any other similar event, but excluding any change that results from any issuance of Parent Common Stock that does not result in a greater number of shares being outstanding as of the Closing Date, then the Exchange Ratio, the Merger Consideration, the Contribution Consideration and any other similarly dependent items shall be equitably adjusted to reflect such change and to give effect to the intention of the parties that, immediately following the Closing Date, the Undersigned C/G Stockholders (together with any transferees thereof) and Spyglass will hold approximately 4.17% and 0.52%, respectively, of the issued and outstanding Parent Common Stock.

Section 4.6    Exchange Procedures. On the Closing Date, the holders of securities in C/G shall surrender to Parent their Shares, which shall be immediately cancelled (the "Cancelled Shares"), and the holders of such Cancelled Shares shall be provided with (i) duly executed certificates representing the shares of Parent Common Stock issuable pursuant to Section 4.1(a) (or appropriate alternative arrangements shall be made by Parent if uncertificated shares of Parent Common Stock will be issued) in exchange for such Cancelled Shares (or an affidavit of lost certificate and agreement of indemnity pursuant to Section 4.10) and (ii) if applicable, payment by cash or check in lieu of fractional shares of Parent Common Stock which such holder is entitled to receive pursuant to Section 4.4. If any portion of the Merger Consideration is to be registered in the name of a Person other than the Person in whose name the applicable surrendered Share is registered, it shall be a condition to the registration thereof that the surrendered Share be in proper form for transfer and that the Person requesting such delivery of the Merger Consideration pay any and all transfer and other similar Taxes required to be paid as a result of such registration in the name of a Person other than the registered holder of such Share or establish to the satisfaction of Parent that such Taxes have been paid or are not payable. Until surrendered as contemplated by this Section 4.6, each Share shall be deemed at any time after the Effective Time to represent only the right to receive the Merger Consideration (and any amounts to be paid pursuant to Section 4.4) upon such surrender. No interest shall be paid or shall accrue on any amount payable pursuant to Section 4.4.

Section 4.7    Withholding Rights. Each of Parent, Merger Sub, C/G and the Surviving Entity shall be entitled to deduct and withhold, from any consideration payable or otherwise deliverable under this Agreement, such amounts as are required to be withheld or deducted under the Code or any provision of state, local or foreign tax Law with respect to the making of such payment. To the extent that amounts are so withheld or deducted, such withheld

or deducted amounts shall be treated for all purposes of this Agreement as having been paid to the Person(s) to whom such amounts would otherwise have been paid.

Section 4.8    No Further Ownership Rights in Cypress/Garoge Common Stock; Closing of Transfer Books.  All shares of Parent Common Stock issued upon the surrender for exchange of Shares in accordance with the terms of this Article IV and any cash paid pursuant to Section 4.4 shall be deemed to have been issued (or paid) in full satisfaction of all rights pertaining to the Shares previously represented by such Shares.  At the close of business on the day on which the Effective Time occurs, the stock transfer books of each of C/G shall be closed with respect to the Shares that were outstanding immediately prior to the Effective Time, and there shall be no further registration of transfers on the stock transfer books of the Surviving Entity of the Shares that were outstanding immediately prior to the Effective Time.  If, after the Effective Time and subject to Section 4.10, Shares are presented to the Surviving Entity or Parent, they shall be cancelled and exchanged as provided in this Article IV.

Section 4.9    No Liability.  Notwithstanding anything in this Agreement to the contrary, none of C/G, Parent, Merger Sub, the Surviving Entity or any other Person shall be liable to any former holder of Shares for shares of Parent Common Stock, cash, dividends, other distributions or any other amount properly delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.  If any Shares shall not have been surrendered prior to four years after the Effective Time (or immediately prior to such earlier date on which any Merger Consideration (and cash in lieu of fractional shares payable pursuant to Section 4.4) would otherwise escheat to or become the property of any Governmental Entity), any such shares, dividends, distributions and cash shall, to the extent permitted by applicable Law, become the property of Parent, free and clear of all claims or interest of any Person previously entitled thereto.

Section 4.10    Lost Certificates.  If any certificate representing Shares shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such certificate representing Shares to be lost, stolen or destroyed, Parent shall deliver in exchange for such lost, stolen or destroyed certificate representing Shares, the Merger Consideration and cash in lieu of any fractional shares payable pursuant to Section 4.4 upon the delivery of an indemnity agreement reasonably satisfactory to Parent against any claim that may be made against it with respect to such certificate representing Shares.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF C/G

Except as disclosed in the disclosure schedule delivered by C/G to Parent immediately prior to the execution of this Agreement and attached hereto as Exhibit H (the "C/G Disclosure Schedule"), which identifies the sections (or, if applicable, subsections) to which such exceptions relate (provided that any disclosure in the C/G Disclosure Schedule relating to one section or subsection shall also apply to other sections and subsections to the extent that it is reasonably apparent that such disclosure would also apply to or qualify such other sections and subsections), each of Cypress and Garoge represent and warrant, as to itself and its respective C/G Companies only, to Parent and Merger Sub as follows:

Section 5.1    Qualification; Organization; Subsidiaries.

(a)    Each of the C/G Companies is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate, partnership or limited liability company power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is in good standing as a foreign corporation, partnership or limited liability company in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except for those jurisdictions where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not reasonably be expected to have, individually or in the aggregate, a C/G/S Material Adverse Effect.  C/G have made available to Parent and Merger Sub prior to the date of this Agreement a true and complete copy of each of their respective articles of incorporation and bylaws, each as amended through the date hereof (the "Cypress/Garoge Organizational Documents") and has made available to Parent and Merger Sub prior to the date of this Agreement a true and complete copy of the articles of incorporation and bylaws or other equivalent organizational documents of each of its principal operating Subsidiaries, each as amended through the date hereof (the "C/G Subsidiary Organizational Documents", and together with the Cypress/Garoge Organizational Documents, the "C/G Organizational Documents").  The C/G Organizational Documents so delivered are in full force and effect, and none of the C/G Companies is in violation of its C/G Organizational Documents in any material respect.

(b)    Section 5.1(b) of the C/G Disclosure Schedule lists each of the respective Subsidiaries of C/G and its jurisdiction of organization.  All of the outstanding shares of capital stock or other ownership interests of each of the respective Subsidiaries of C/G have been validly issued and are fully paid and, as applicable, nonassessable.  Except as set forth in Section 5.1(b) of the C/G Disclosure Schedule, all of the outstanding shares of capital stock or other ownership interests of each Subsidiary of either of C/G are owned by either Cypress or Garoge, directly or indirectly, in each case free and clear of all Liens and free of any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such ownership interest), other than (i) restrictions under applicable securities laws and (ii) Liens that will be released prior to the Closing, and have not been issued in violation of pre-emptive or similar rights.  Except as set forth in Section 5.1(b) of the C/G Disclosure Schedule and except for the capital stock and other ownership interest of their respective Subsidiaries, none of the C/G Companies owns, directly or indirectly, any equity, ownership, profit, voting or similar interest in or any other interest convertible, exchangeable or exercisable for, any equity, profit, voting or similar interest in, any Person.

Section 5.2    Authority Relative to this Agreement.

(a)    Each of C/G has all requisite corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to be executed by C/G in connection with the consummation of the Mergers and the other transactions contemplated in this Agreement.  The execution, delivery and performance by it of this Agreement and the Transaction Documents to which it is a party and the consummation by it of Mergers and the other transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of each of

27

Cypress and Garoge, and no other corporate proceedings on the part of each of Cypress and Garoge are necessary to authorize this Agreement or to consummate such transactions. This Agreement has been, and each of the Transaction Documents to which C/G are party will be at or prior to the Closing, duly and validly executed and delivered by each of Cypress and Garoge and, assuming the due authorization, execution and delivery by the other parties hereto and thereto, this Agreement constitutes, and each such Transaction Document when so executed and delivered will constitute, the legal, valid and binding obligation of each of Cypress and Garoge, enforceable against Cypress and Garoge, as applicable, in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general applicability relating to or affecting creditors' rights and to general equity principles (the "Bankruptcy and Equity Exception").

(b)     As of the date hereof, the boards of directors of each of C/G has unanimously by resolution duly adopted at a meeting duly called and held, approved and declared advisable this Agreement and the Contemplated Transactions and determined that it is in the best interests of each of C/G and their respective stockholders to enter into this Agreement.

Section 5.3     Capital Stock.

(a)     The authorized capital stock of Cypress consists of 10,000 shares of Cypress Common Stock and no shares of preferred stock. As of the date hereof, 3,597.484 shares of Cypress Common Stock are issued and outstanding.

(b)     The authorized capital stock of Garoge consists of 10,000 shares of Garoge Common Stock and no shares of preferred stock. As of the date hereof, 9,020 shares of Garoge Common Stock are issued and outstanding.

(c)     Section 5.3(c) of the C/G Disclosure Schedule sets forth the names of and amounts held by each holder of record of Cypress Common Stock and Garoge Common Stock as of the date of this Agreement.

(d)     All outstanding shares of Cypress Common Stock and Garoge Common Stock have been duly authorized and validly issued and are fully paid and nonassessable and free of Liens and have not been issued in violation of pre-emptive or similar rights. No shares of Cypress Common Stock or Garoge Common Stock are held by any Subsidiary of either of C/G.

(e)     Except as set forth in subsections (a) and (b) above, as of the date hereof, there are no outstanding (i) shares of capital stock, voting securities or other equity interests of C/G; (ii) securities convertible into or exchangeable for shares of capital stock or voting securities of any of the C/G Companies; (iii) obligations, options, warrants or other rights, commitments or arrangements to acquire from any of the C/G Companies, or other obligations or commitments of any of the C/G Companies to issue, sell or otherwise transfer, any capital stock or other voting securities or ownership interests in, or any securities convertible into or exchangeable for capital stock or other voting securities or ownership interests in, any of the C/G Companies, or to provide a material amount of funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, any of C/G's respective Subsidiaries; or (iv) restricted shares, restricted share units, stock appreciation rights, performance shares, contingent

value rights, "phantom" stock or similar securities or rights that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any capital stock of, or other voting securities or ownership interests in, any of the C/G Companies. For the avoidance of doubt, the foregoing is not intended to and does not include any C/G Intercompany Loans.

(f)     The C/G Companies have no outstanding bonds, debentures, notes or other obligations the holders of which have the right to vote (or which are convertible or exchangeable into or exercisable for securities having the right to vote) with the stockholders of C/G or any of their respective Subsidiaries on any matter.

(g)     There are no (i) voting trusts, proxies, equityholders agreements or other similar agreements or understandings to which any of the C/G Companies is a party or by which any of the C/G Companies is bound with respect to the voting or registration of, or restricting any Person from purchasing, selling, pledging or otherwise disposing of, the capital stock or other equity interest of any of the C/G Companies; (ii) obligations or commitments restricting the transfer of, or requiring the registration for sale of, any shares of capital stock of any of the C/G Companies; or (iii) obligations or commitments of any of C/G to repurchase, redeem or otherwise acquire any of the Cypress/Garoge Common Stock or to make any investment (in the form of a loan, capital contribution or otherwise) in any Person (other than the partnerships described in Section 1.1(a) of the C/G Disclosure Schedule with respect to which the partnership interests currently owned by C/G will be distributed out of C/G prior to Closing as Excluded Cypress/Garoge Assets). For the avoidance of doubt, the foregoing is not intended to and does not include any C/G Intercompany Loans.

(h)     All outstanding shares of Cypress/Garoge Common Stock have been issued and granted in compliance with (i) all applicable Laws and (ii) all requirements set forth in material contracts applicable to the issuance of Cypress/Garoge Common Stock and/or the issuance of equity interests of any Subsidiary of either of C/G.

Section 5.4     <u>Governmental Consents and Approvals</u>.  Other than in connection with or in compliance with the DGCL and the DLLCA, the execution, delivery and performance by each of C/G of this Agreement do not, and the consummation by C/G of the Mergers or the other transactions contemplated hereby will not, require any filing or registration with, notification to, or authorization, permit, consent or approval of, or other action by or in respect of, any Governmental Entity other than (i) the approval of the Bankruptcy Court and the entry of the Confirmation Order and (ii) such other filings, registrations, notifications, authorizations, permits, consents, approvals or actions, the failure of which to take or obtain would not reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole.

Section 5.5     <u>Permits; Compliance with Laws</u>.  Each of the C/G Companies are in possession of all licenses, franchises, permits and authorizations necessary for the lawful conduct of their respective businesses as they are now being conducted, except for such licenses, franchises, permits and authorizations, the failure of which to hold would not reasonably be expected to have a C/G/S Material Adverse Effect, and each of the C/G Companies have complied with, and are in compliance with, all laws, statutes, codes, rules and regulations applicable to their respective businesses as they are now being conducted, except for such failure

to comply which would not reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole.

Section 5.6    Financial Statements.  C/G have previously delivered to Parent: (a) the audited consolidated balance sheets of Cypress for the fiscal year ended December 31, 2009, and the related audited consolidated statements of operations and cash flows, (b) the audited consolidated balance sheets of Garoge for the fiscal year ended December 31, 2009, and the related audited consolidated statements of operations and cash flows and (c) the unaudited consolidated balance sheets of each of C/G as of June 30, 2010 (the "Cypress/Garoge Balance Sheet Date"), and the related unaudited consolidated statements of operations and cash flows. All of the foregoing financial statements (including the notes thereto) are referred to as the "Cypress/Garoge Financial Statements."  The Cypress/Garoge Financial Statements have been prepared in accordance with GAAP consistently applied with C/G's past practices (except, with respect to the unaudited financial statements, for normal year-end adjustments and the absence of certain footnotes and other disclosures required for audited financial statements) and present fairly the financial condition and operating results of each of C/G as of the dates, and for the periods, thereof.

Section 5.7    No Undisclosed Liabilities.  Except (a) as reflected or reserved against in the Cypress/Garoge Financial Statements, (b) as permitted by this Agreement, (c) for liabilities and obligations incurred since the Cypress/Garoge Balance Sheet Date in the ordinary course of business consistent with past practice, (d) for liabilities or obligations which have been discharged or paid in full in the ordinary course of business consistent with past practice, and (e) as set forth in Section 5.7 of the C/G Disclosure Schedule, none of the C/G Companies has any liabilities or obligations of any nature, whether or not accrued, contingent or otherwise, except as would not reasonably be expected to have, individually or in the aggregate, a C/G/S Material Adverse Effect.  For the avoidance of doubt, the foregoing is not intended to and does not include any C/G Intercompany Loans.

Section 5.8    Contracts.

(a)    To the Knowledge of C/G, none of the C/G Companies nor any other party (i) is in violation or breach of or in default under (nor does there exist any condition which together with the passage of time or the giving of notice would result in a violation or breach of, or constitute a default under, or give rise to any right of termination, amendment, cancellation, acceleration or loss of benefits under, or result in the creation of any Lien upon any of the properties or assets of any of the C/G Companies under) any Contract to which any of the C/G Companies is a party, which Contract is, or is reasonably expected to be, individually or in the aggregate, material to Target taken as a whole (a "Cypress/Garoge Contract") or (ii) has otherwise failed to exercise an option under any Cypress/Garoge Contract which may adversely impact any of the C/G Companies' rights under a Cypress/Garoge Contract, in the case of clauses (i) and (ii), except as would not be reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole.  Each Cypress/Garoge Contract is valid and binding in all respects upon, and enforceable against, the applicable C/G Company and, to the Knowledge of C/G, each other party thereto, and is in full force and effect, subject to the Bankruptcy and Equity Exception.  Except as set forth in Section 5.8(a) of the C/G Disclosure Schedule, no C/G Company has given notice to any other Person that such Person has breached,

violated or defaulted under any Cypress/Garoge Contract. To the Knowledge of C/G, no other party to any such Cypress/Garoge Contract has alleged that any of the C/G Companies is in violation or breach of or in default under any such Cypress/Garoge Contract or has notified any of the C/G Companies of an intention to modify any material terms of or not to renew any such Cypress/Garoge Contract, except where such breach, default, modification or failure to renew is not reasonably expected to be, individually or in the aggregate, material to Target as a whole.

(b) Except as disclosed in Section 5.8(b) of the C/G Disclosure Schedule, none of the C/G Companies are a party to, or bound by, any undischarged written or oral (i) Non-Competition Agreement or (ii) agreement not entered into in the ordinary course of business between either Cypress or Garoge and any of their respective Affiliates that are not themselves a C/G Company.

Section 5.9    No Conflicts or Violations. Assuming the receipt of all consents and approvals described in Section 5.4, the execution, delivery and performance of this Agreement and the Transaction Documents to which it is party by either of C/G does not, and the consummation by it of the Mergers and the other transactions contemplated hereby and thereby will not (a) conflict with, or result in any breach of, any provision of the certificate of incorporation or bylaws of any of C/G or any similar organizational documents of any of their respective Subsidiaries; (b) violate, conflict with, require consent pursuant to, result in a breach of, constitute a default (with or without due notice or lapse of time or both) under, or give rise to a right (by any party other than the applicable C/G Company) of, or result in, the termination, cancellation, modification, acceleration or the loss of a benefit under, or result in the creation of any Lien upon any of the properties or assets of any of the C/G Companies under, any of the terms, conditions or provisions of any Contract to which Cypress, Garoge or any of their respective Subsidiaries is a party or by which any of its properties or assets may be bound; or (c) violate any Order or Law applicable to Cypress, Garoge, any of their respective Subsidiaries or any of their respective properties or assets, except, in the case of clauses (b) and (c) above, for any violation, conflict, consent, breach, default, termination, cancellation, modification, acceleration, loss or creation that would not be reasonably expected to be, individually or in the aggregate, material to Target taken as a whole.

Section 5.10    Taxes.

(a) All Tax Returns required to be filed by or with respect to the C/G Companies have been timely filed, and all such Tax Returns are complete and correct in all material respects. The C/G Companies have timely paid all material Taxes owed by the C/G Companies whether or not shown on such Tax Returns, other than in those instances in which such Taxes are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.

(b) There are no Tax Liens upon any of the assets or properties of the C/G Companies, other than with respect to Taxes not yet due and payable.

(c) No examination or audit of any Tax Return relating to any Taxes of the C/G Companies or with respect to any Taxes due from or with respect to the C/G Companies by any Governmental Authority is currently in progress or, to the Knowledge of C/G, threatened or

509265-1076-01000-Active.12124289.15

contemplated.  No assessment of Tax has been proposed in writing against any of the C/G Companies or any of their assets or properties.  There are no outstanding agreements, waivers or applications extending the statutory period of limitation applicable to any claim for, or the period for the collection or assessment of, any material Taxes due from or with respect to the C/G Companies for any taxable period.

(d)     Except as set forth in Section 5.10(d) of the C/G Disclosure Schedule, no power of attorney granted by or with respect to any of the C/G Companies relating to taxes is currently in force.  No closing agreement pursuant to Section 7121 of the Code (or any similar provision of any state, local or foreign law) has been entered into by or with respect to the C/G Companies.

(e)     None of the C/G Companies has any liability for the Taxes of any Person (other than any of the C/G Companies) under Treasury Regulations Section 1.1502-6 (or any similar provision of any state, local or foreign law), as a transferee or successor, by contract, or otherwise.

(f)     The C/G Companies have collected all material sales and use Taxes required to be collected, and have remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Authorities, or have been furnished properly completed exemption certificates and have maintained all such records and supporting documents in the manner required by all applicable sales and use Tax statutes and regulations.

(g)     None of the C/G Companies is a party to, or bound by, or has any obligation under, any tax allocation or sharing agreement or similar contract or arrangement that obligates it to make any payment computed by reference to the Taxes, taxable income or taxable losses of any other Person.

(h)     None of the C/G Companies will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (A) change in method of accounting for a taxable period ending on or prior to the Closing Date, (B) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state or local income Tax law) executed on or prior to the Closing Date, (C) intercompany transactions or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state or local income Tax law), (D) installment sale or open transaction disposition made on or prior to the Closing Date, (E) prepaid amount received on or prior to the Closing Date or (F) election under Section 108(i) of the Code or any similar provision of state or local Law.

(i)     None of the C/G Companies has been either a "distributing corporation" or a "controlled corporation" in a distribution in which the parties to such distribution treated the distribution as one to which Section 355 of the Code is applicable.

(j)     None of the C/G Companies has entered into a "listed transaction" that has given rise to a disclosure obligation under Section 6011 of the Code and the Treasury Regulations promulgated thereunder.

(k)     As of the date of this Agreement, Cypress is, and has been since January 1, 2009, an S corporation as defined in Section 1361(a)(1) of the Code for United States federal and state income tax purposes and is eligible for such treatment.  The IRS has not sent any correspondence questioning Cypress' status as an S corporation and, to the Knowledge of C/G, there is no basis to revoke the S election.  Each of the Subsidiaries of Cypress (other than Astra Entertainment Group, LLC) is and has been, since its formation, a partnership or a disregarded entity for United States federal income tax purposes.  Astra Entertainment Group, LLC is classified as a corporation for United States federal income tax purposes.

(l)     The C/G Companies have a "historic business" or significant "historic business assets" within the meaning of Treasury Regulation Section 1.368-1(d).  Each of the C/G Companies has not taken, and will not take, any action (including selling, disposing of or otherwise transferring assets) that would prevent Parent from continuing the historic business of the C/G Companies or from using a significant portion of its historic business assets in a business following the Mergers.

Section 5.11   Intellectual Property.

(a)     Except where the failure would not reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole, each of the C/G Companies own or possess adequate licenses or other valid rights to use all Intellectual Property (including, without limitation, Intellectual Property rights that exist in the Films of the C/G Companies) necessary for the conduct of their businesses as conducted on the date hereof (collectively, the "Cypress/Garoge Intellectual Property").  Section 5.11(a) of the C/G Disclosure Schedule sets forth a complete and accurate list of all trademarks, service marks and domain names in which any of the C/G Companies purports to have an ownership interest.  Such schedule will include the title of the mark or domain name and, in the case of trademarks and service marks, the registration, certificate or issuance number (or application number with respect to pending applications) and the date registered or issued (or filed with respect to pending applications) and the identification of the particular entity which holds the interest.  None of the C/G Companies own or exclusively license any patents.

(b)     Except where the failure would not reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole, each of the C/G Companies take and have taken reasonable measures, consistent with industry practice as of the date of this Agreement, to register, maintain and renew all trademarks, trade names, copyrights and service marks owned by each of the C/G Companies that are included in the Cypress/Garoge Intellectual Property.

(c)     The Cypress/Garoge Intellectual Property and the conduct of the businesses of each of the C/G Companies as currently conducted do not Infringe any Intellectual Property right of any Person in any way that would be reasonably expected to be, individually or in the aggregate, material to Target taken as a whole.  To the Knowledge of C/G, no third Person is Infringing any Cypress/Garoge Intellectual Property which would reasonably be expected to have, individually or in the aggregate, a C/G/S Material Adverse Effect, except for Infringement arising from unauthorized copying (e.g., piracy and "bootlegging", peer-to-peer file sharing over the Internet and the like).  No legal proceedings are pending or, to the Knowledge of C/G,

threatened, that (i) assert that any Cypress/Garoge Intellectual Property or any action taken by any of the C/G Companies Infringes any Intellectual Property of any Person or that any Cypress/Garoge Intellectual Property or any action taken by any of the C/G Companies constitutes a libel, slander or other defamation of any Person or (ii) challenge the validity or enforceability of, or the rights of any of the C/G Companies in, any Cypress/Garoge Intellectual Property, which in each case of the foregoing clauses (i) and (ii) would reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole.

(d)     The consummation of the Mergers and the other transactions contemplated hereby will not adversely affect any right or interest of any of C/G Companies in any Cypress/Garoge Intellectual Property in any way which would be reasonably expected to be, individually or in the aggregate, material to Target taken as a whole.

Section 5.12     Films and Elements.

(a)     Section 5.12(a) of the C/G Disclosure Schedule sets forth all of the Library Films with respect to which the C/G Companies own or control any rights or are entitled to a Participation or other economic interest (the "C/G Library Films").

(b)     Section 5.12(b) of the C/G Disclosure Schedule identifies all distribution rights owned or controlled by any of the C/G Companies with respect to the C/G Library Films and identifies the availability dates as of the date hereof of the C/G Library Films in each media in the territories indicated.

(c)     Each of the C/G Library Films is a feature-length motion picture that was produced in color on either 35MM or 70MM film, was submitted to the Motion Picture Association of America for rating and, except for the C/G Library Film entitled "1 Love" was released theatrically in the United States with a rating that is not more restrictive than the current rating equivalent to an "R" under the present system or its equivalent rating under any successor system and was produced primarily in the English language.

(d)     Except as set forth in Section 5.12(d) of the C/G Disclosure Schedule, none of the C/G Companies have, as of the date of this Agreement, any material executory contractual obligations to any third Person relating to the distribution of any minimum number of prints, minimum advertising spend and/or minimum screen release obligations (i.e., minimum number of screens or markets) for any C/G Library Films (or any other Films owned or controlled by the C/G Companies that have not been released but for which principal photography has commenced or that has been completed).

(e)     C/G have delivered to Parent a list that is complete and accurate in all material respects, setting forth all locations where any C/G Elements, set forth in subsections (i), (ii), (iii) and (iv) of the definition of Elements, that any of the C/G Companies own or have access to is maintained.  To the extent such locations are owned or controlled by a third Person, the C/G Companies have laboratory access letters with respect to the C/G Elements at such locations.  With respect to each of the C/G Library Films, the aforementioned C/G Elements owned or controlled by any of the C/G Companies are free and clear of all Liens other than Permitted Liens, customary laboratory pledge agreements and rights of access by third Persons

34

having contractual rights of access thereto), except where such Liens or third Persons rights of access would not be reasonably expected to have a C/G/S Material Adverse Effect.

(f)     Section 5.12(f) of the C/G Disclosure Schedule sets forth as of the date of this Agreement (or, with respect to the Closing, updated as of the Closing) (i) a list of the Films of the C/G Companies that have not been released and for which principal photography or post-production has commenced, which are being (or are to be) produced by any of the C/G Companies, or which any of the C/G Companies have "greenlit" or committed to finance, in whole or in part, or acquire any ownership interest, distribution rights or other rights from a third Person (collectively, the "C/G Films in Progress"), together with a summary of the following with respect to each such C/G Film In Progress: (A) a budget and production schedule, if available, (B) all material costs and expenses paid by any of the C/G Companies, (C) all remaining material amounts that such C/G Company is obligated to pay (including a list of print and advertising and release commitments, if any), and (D) the names of "above-the-line" talent attached to each such C/G Film In Progress and the fixed and contingent compensation payable to each such Person, if known; and (ii) a list of all Significant Unproduced Properties of the C/G Companies (the "C/G Significant Unproduced Properties"), together with a summary of the following with respect to each such C/G Significant Unproduced Property: (A) all material costs and expenses paid by the C/G Companies, (B) all remaining material amounts that any of the C/G Companies is obligated to pay (including a list of print and advertising and release commitments, if any), (C) to C/G's Knowledge, any applicable option period expiration dates, reversion dates or other applicable dates when any material rights may become unavailable for use by the C/G Companies in connection with the possible production of such C/G Significant Unproduced Property, and (D) the names of "above-the-line" talent attached to each such C/G Significant Unproduced Property and the fixed and contingent compensation payable to each such Person, if known.

(g)     No third Person has any put right or other right, which, if exercised would require any of the C/G Companies to produce, finance in whole or in part, acquire any rights in or to, or "greenlight" any Theatrical Motion Picture or direct-to-video/DVD or made-for-television programming that has not yet commenced principal photography.

(h)     The relevant C/G Company has obtained proper and effective licenses or grants of authority (or is the beneficiary of such licenses or grants of authority obtained by one or more third Persons) to use the results and proceeds of the services of performers and other Persons in connection with the C/G Library Films, to the extent reasonably necessary to exercise all rights of such C/G Company therein in a manner consistent with the past practice of the C/G Companies.

(i)     Except as set forth in Section 5.12(i) of the C/G Disclosure Schedule, all music rights contained in the C/G Library Films are (i) available by license from American Society for Composers, Authors and Publishers, Broadcast Music Inc. or SESAC, Inc., (ii) in the public domain or (iii) controlled by a C/G Company directly or through licenses.

(j)     The credits maintained in the main and end titles of each C/G Library Film comply in all material respects with all obligations with respect thereto, including without

limitation, contractual obligations to third Persons who rendered services in connection with the C/G Library Films and all applicable guild agreements.

(k)     To the Knowledge of C/G, to the extent that the C/G Library Films are Exploited from and after the Closing Date in a manner consistent with past practice of the C/G Companies, such Exploitation will not be subject to any limitations outside of the ordinary course (or otherwise customary within the United States film industry taking into account the applicable talent and applicable guild collective bargaining agreements) with respect to the use of performers' names, likenesses and biography (including, without limitation, the dissemination, reproduction, printing and publishing thereof for the purpose of advertising, printing and exploiting the applicable C/G Library Film), editing rights (e.g., the ability to make such cuts, alterations, additions and variations of and in any part of the C/G Library Films (including the dubbing-in of languages) and credit rights and obligations that are not set forth in Section 5.12(k) of the C/G Disclosure Schedule.

(l)     Section 5.12(l) of the C/G Disclosure Schedule sets forth a summary of all Participation obligations with respect to each of the C/G Library Films that a C/G Company is responsible for calculating and directly paying to one or more third Person, and that the C/G Companies reasonably project will become payable.

Section 5.13    Litigation.  Except as set forth in Section 5.13 of the C/G Disclosure Schedule and except as would not reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole, (i) there is no suit, claim, action, proceeding, arbitration or investigation pending before any Governmental Entity against any C/G Company or, to the Knowledge of C/G, threatened against any of the C/G Companies or their respective assets or properties; provided that this clause (i) is not intended to address any suit, claim, action, proceeding, arbitration or investigation of the type described in clauses (a) and (b) of the second sentence of this Section 5.13, and (ii) none of the C/G Companies is subject to any outstanding Order or Orders.  As of the date hereof, there is no suit, claim, action, proceeding, arbitration or investigation pending or, to the Knowledge of C/G, threatened against any of the C/G Companies, (a) which seeks to, or would be reasonably expected to, restrain, enjoin or delay the consummation of the Mergers or the other transactions contemplated herein or (b) which seeks damages in connection therewith, and no injunction has been entered or issued with respect to the transactions provided for herein.

Section 5.14    Absence of Certain Changes or Events.  Except for the negotiation (including activities related to due diligence), execution and delivery of this Agreement and the other Transaction Documents, (a) since January 1, 2010, each of the C/G Companies has conducted its respective business only in the ordinary course consistent with past practice, and (b) to the Knowledge of C/G, since January 1, 2010, there has not been any event or events that has had or would reasonably be expected to have, individually or in the aggregate, a C/G/S Material Adverse Effect.

Section 5.15    Required Vote of the Stockholders of C/G.  The affirmative vote of holders of a majority of the outstanding shares of Cypress Common Stock, voting together as a single class, and Garoge Common Stock, voting together as a single class, is the only vote or

consent of holders of securities of each of Cypress and Garoge that is required to approve this Agreement and the Mergers.

Section 5.16   Employment Benefit Plans.  None of the C/G Companies maintain any C/G Benefit Plans or C/G Foreign Plans (other than any immaterial plans that are not subject to ERISA), nor do the C/G Companies have any liabilities or obligations in respect of any current or former employees of the C/G Companies that would reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole.

Section 5.17   Brokers and Finders; Transaction Expenses.  No person engaged by or acting on behalf of any of the C/G Companies, the Undersigned C/G Stockholders, Spyglass or any Affiliate thereof is entitled to any brokerage, financial advisory, finder's or similar fee or commission in connection with transactions contemplated by this Agreement for which Parent or Merger Sub could have any liability, other than with respect to the valuation fees and expenses of the Salter Group.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF SPYGLASS

Except as disclosed in the disclosure schedule delivered by Spyglass to Parent immediately prior to the execution of this Agreement and attached hereto as Exhibit I (the "Spyglass Disclosure Schedule"), which identifies the sections (or, if applicable, subsections) to which such exceptions relate (provided that any disclosure in the Spyglass Disclosure Schedule relating to one section or subsection shall also apply to other sections and subsections to the extent that it is reasonably apparent that such disclosure would also apply to or qualify such other sections and subsections), Spyglass represents and warrants to Parent and Merger Sub as follows:

Section 6.1   Qualification; Organization; Subsidiaries.  Each of the Spyglass Companies is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or limited liability company power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is in good standing as a foreign limited liability company or corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except for those jurisdictions where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not reasonably be expected to have, individually or in the aggregate, a C/G/S Material Adverse Effect.

Section 6.2   Authority Relative to this Agreement.  Spyglass has all requisite limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to be executed by Spyglass in connection with the consummation of the Contribution and the other transactions contemplated in this Agreement.  The execution, delivery and performance by it of this Agreement and the Transaction Documents to which it is a party and the consummation by it of the Contribution and the other transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action on the part of Spyglass, and no other

limited liability company proceedings on the part of Spyglass is necessary to authorize this Agreement or to consummate such transactions. This Agreement has been, and each of such Transaction Documents to which the Spyglass Companies are party will be at or prior to the Closing, duly and validly executed and delivered by Spyglass and, assuming the due authorization, execution and delivery by the other parties hereto and thereto, this Agreement constitutes, and each such Transaction Document when so executed and delivered, will constitute, the legal, valid and binding obligation of Spyglass, enforceable against Spyglass, as applicable, in accordance with its terms, subject to the Bankruptcy and Equity Exception.

Section 6.3    <u>Governmental Consents and Approvals</u>.  Other than in connection with or in compliance with the DGCL and the DLLCA, the execution, delivery and performance by Spyglass of this Agreement and the other Transaction Documents to which it is a party does not, and the consummation by Spyglass of the Contribution or the other transactions contemplated hereby and thereby, in each case, to which it is a party, will not, require any filing or registration with, notification to, or authorization, permit, consent or approval of, or other action by or in respect of, any Governmental Entity other than (i) the approval of the Bankruptcy Court and the entry of the Confirmation Order and (ii) such other filings, registrations, notifications, authorizations, permits, consents, approvals or actions, the failure of which to take or obtain would not reasonably be expected to have, individually or in the aggregate, a C/G/S Material Adverse Effect.

Section 6.4    <u>No Conflicts or Violations</u>.  Except as set forth in Section 6.4 of the Spyglass Disclosure Schedule and assuming the receipt of all consents and approvals described in Section 6.3, the execution, delivery and performance of this Agreement and the Transaction Documents to which it is a party by Spyglass does not, and the consummation by it of the Contribution and the other transactions contemplated hereby and thereby, in each case, to which it is a party will not (a) conflict with, or result in any breach of, any provision of the certificate of incorporation or bylaws of any of Spyglass or any similar organizational documents of any of its Subsidiaries, (b) violate, conflict with, require consent pursuant to, result in a breach of, constitute a default (with or without due notice or lapse of time or both) under, or give rise to a right (by any party other than the Spyglass or any of its Subsidiaries) of, or result in, the termination, cancellation, modification, acceleration or the loss of a benefit under, or result in the creation of any Lien upon any of the Contributed Assets under, any of the terms, conditions or provisions of any Contract to which any of the Spyglass Companies is a party or any of the Contributed Assets is subject or (c) violate any Order or Law applicable to any of the Spyglass Companies in connection with the Contributed Assets, except, in the case of clauses (b) and (c) above, for any violation, conflict, consent, breach, default, termination, cancellation, modification, acceleration, loss or creation that would not be reasonably expected to be, individually or in the aggregate, material to Target taken as a whole.

Section 6.5    <u>Spyglass Development Projects and Other Contributed Assets</u>.

(a)    Section 6.5(a) of the Spyglass Disclosure Schedule sets forth all of the Development Projects to be contributed by Spyglass to Parent (or, if applicable, the Designated Subsidiary) in connection with the Contribution (the "<u>Spyglass Development Projects</u>"); <u>provided</u>, that Spyglass may continue to develop the Unexecuted Development Projects as described in Section 9.2(b)(iii) and, in the event that Spyglass consummates an arrangement with

respect to any such Unexecuted Development Projects prior to the Closing Date, such Unexecuted Development Project shall be deemed to be a Spyglass Development Project for all purposes hereof.

(b)     Section 6.5(b) of the Spyglass Disclosure Schedule sets forth a summary of the rights arrangements with respect to each Spyglass Development Project, including an identification of such Spyglass Development Project as a Spyglass Company development, "producer-for-hire" arrangement or co-development project.  With respect to each Spyglass Development Project designated as a "Spyglass development project" in Section 6.5(b) of the Spyglass Disclosure Schedule, a Spyglass Company owns, controls or has optioned or licensed the underlying rights thereto necessary to develop such Spyglass Development Project as a Theatrical Motion Picture.

(c)     The G.I. Joe Co-Financing Agreement and the Wanted Co-Financing Agreement are in full force and effect, and the applicable Spyglass Company is entitled to the G.I. Joe/Wanted Co-Financing Rights indicated thereunder.

(d)     Except as set forth in Section 6.5(d) of the Spyglass Disclosure Schedule, none of the Spyglass Companies have, as of the date of this Agreement, any material executory contractual obligations to any third Persons relating to the distribution of any minimum number of prints, minimum advertising spend and/or minimum screen release obligations (i.e., minimum number of screens or markets) for any of the Spyglass Development Projects.

(e)     None of the Spyglass Companies own or have any rights, title or interests in any Spyglass Elements described in clauses (i) through (iv) of the definition of "Elements".

(f)     Section 6.5(f) of the Spyglass Disclosure Schedule sets forth as of the date of this Agreement (or, with respect to the Closing, updated as of the Closing) (i) a list of the Spyglass Development Projects that have not been released and for which principal photography or post-production has commenced, which are being (or are to be) produced by any of the Spyglass Companies, or which any of the Spyglass Companies have "greenlit" or committed to a third Person to finance, in whole or in part, or acquire any ownership interest, distribution rights or other rights from a third Person (collectively, the "Spyglass Films in Progress"), together with a summary of the following with respect to each such Spyglass Film In Progress: (A) a budget and production schedule, if available, (B) all material costs and expenses paid by any of the Spyglass Companies, (C) all remaining material amounts that such Spyglass Company is obligated to pay (including a list of print and advertising and release commitments, if any), and (D) the names of "above-the-line" talent attached to each such Spyglass Film In Progress and the fixed and contingent compensation payable to each such Person, if known; and (ii) a list of all Significant Unproduced Properties of the Spyglass Companies (the "Spyglass Significant Unproduced Properties"), together with a summary of the following with respect to each such Spyglass Significant Unproduced Property: (A) all material costs and expenses paid by the Spyglass Companies, (B) all remaining material amounts that any of the Spyglass Companies is obligated to pay (including a list of print and advertising and release commitments, if any), (C) to Spyglass' Knowledge, any applicable option period expiration dates, reversion dates or other applicable dates when any material rights may become unavailable for use by the Spyglass Companies in connection with the possible production of such Spyglass Significant Unproduced

Property, and (D) the names of "above-the-line" talent attached to each such Spyglass Significant Unproduced Property and the fixed and contingent compensation payable to each such Person, if known.

(g)     The relevant Spyglass Company has obtained proper and effective licenses or grants of authority to use the results and proceeds of the services of performers and other Persons party to an existing Spyglass Contract in connection with the Spyglass Development Projects to the extent reasonably necessary to exercise all rights of such Spyglass Company therein in a manner consistent with the past practice of the Spyglass Companies.

(h)     Section 6.5(h) of the Spyglass Disclosure Schedule sets forth a summary of all Participation obligations with respect to the Contributed Assets.

(i)     Other than as set forth in Section 6.5(i) of the Spyglass Disclosure Schedule, and other than customary "turnaround" or reversionary rights, no buy/sell agreements or similar arrangements exist with respect to any of the Contributed Assets and no third Person has any entitlement to co-finance the production of any of the Spyglass Development Projects.

Section 6.6     Litigation.  Except as set forth in Section 6.6 of the Spyglass Disclosure Schedule and except as would not reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole, (i) there is no suit, claim, action, proceeding, arbitration or investigation pending before any Governmental Entity or, to the Knowledge of Spyglass, threatened against any of the Spyglass Companies in relation to the Contributed Assets; provided that this clause (i) is not intended to address any suit, claim, action, proceeding, arbitration or investigation of the type described in the clauses (a) and (b) of the second sentence of this Section 6.6, and (ii) none of the Spyglass Companies are subject to any outstanding Order or Orders in relation to the Contributed Assets.  As of the date hereof, there is no suit, claim, action, proceeding, arbitration or investigation pending or, to the Knowledge of Spyglass, threatened against any of the Spyglass Companies, (a) which seeks to, or would be reasonably expected to, restrain, enjoin or delay the consummation of the Contribution or the other transactions contemplated herein or (b) which seeks damages in connection therewith, and no injunction has been entered or issued with respect to the transactions provided for herein.

Section 6.7     Absence of Certain Changes or Events.  Except for the negotiation (including activities related to due diligence), execution and delivery of this Agreement and the other Transaction Documents, since January 1, 2010, each of the Spyglass Companies has conducted its respective business in the ordinary course with respect to the Contributed Assets.

Section 6.8     Contracts.  To the Knowledge of Spyglass, none of the Spyglass Companies or any other Party (i) is in violation or breach of or in default under (nor does there exist any condition which together with the passage of time or the giving of notice would result in a violation or breach of, or constitute a default under, or give rise to any right of termination, cancellation, acceleration or loss of benefits under, or result in the creation of any Lien (other than Permitted Liens) upon any of the Contributed Assets under) any material Assumed Contract, or (ii) has otherwise failed to exercise an option under any such Assumed Contract described in clause (i) above which may adversely impact any of the Spyglass Companies' rights in and to a Contributed Asset under an Assumed Contract, in the case of clause (ii), except as

would not be reasonably expected to be, individually or in the aggregate, material to Target taken as a whole. Other than those contracts designated as unexecuted or unsigned in Section 1.1(b) of the Spyglass Disclosure Schedule, each Assumed Contract is valid and binding in all respects upon, and enforceable against, the applicable Spyglass Company and, to the Knowledge of Spyglass, each other party thereto, and is in full force and effect, subject to the Bankruptcy and Equity Exception. No Spyglass Company has given notice to any other Person that such Person has breached, violated or defaulted under any Assumed Contract. To the Knowledge of Spyglass, no other party to any such Assumed Contract has alleged that any of the Spyglass Companies is in violation or breach of or in default under any such Assumed Contract or has notified any of the Spyglass Companies of an intention to, modify any material terms of or not to renew any such Assumed Contract, except where such breach, default, modification or failure to renew would not reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole.

Section 6.9    Investment. Spyglass is accepting the Parent Common Stock to be issued to it hereunder for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities laws. Spyglass is an "accredited investor" as defined in Regulation D promulgated by the SEC under the Securities Act. Spyglass acknowledges that it is informed as to the risks of the transactions contemplated hereby and of ownership of the Parent Common Stock. Spyglass acknowledges that the Parent Common Stock has not been registered under the Securities Act, or any state or foreign securities laws and that the Parent Common Stock may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the Securities Act and the Parent Common Stock is registered under any applicable state or foreign securities laws or sold pursuant to an exemption from registration under the Securities Act and any applicable state or foreign securities laws.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES OF THE UNDERSIGNED C/G STOCKHOLDERS

Each Undersigned C/G Stockholder represents and warrants, severally, but not jointly, to Parent and Merger Sub as follows:

Section 7.1    Authority Relative to this Agreement. If such Undersigned C/G Stockholder is a legal entity, (a) such Undersigned C/G Stockholder has all requisite corporate, partnership, limited liability company, and/or trust power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate to be executed by such Undersigned C/G Stockholder in connection with the consummation of the transactions contemplated in this Agreement and (b) the execution, delivery and performance of this Agreement and the Transaction Documents to which it is a party and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate, partnership, limited liability company and/or trust action on the part of such Undersigned C/G Stockholder, and no other corporate proceedings on the part of such

Undersigned C/G Stockholder is necessary to authorize this Agreement or to consummate such transactions. This Agreement has been, and each of such Transaction Documents to which it is a party will be at or prior to the Closing, duly and validly executed and delivered by such Undersigned C/G Stockholder and, assuming the due authorization, execution and delivery by the other parties hereto and thereto, this Agreement constitutes, and each such Transaction Document when so executed and delivered, will constitute, the legal, valid and binding obligation of such Undersigned C/G Stockholder, enforceable against such Undersigned C/G Stockholder, as applicable, in accordance with its terms, subject to the Bankruptcy and Equity Exception.

    Section 7.2  <u>No Conflicts or Violations</u>. Assuming the receipt of all consents and approvals described in Section 7.3, the execution, delivery and performance of this Agreement and the Transaction Documents to which it is a party by such Undersigned C/G Stockholder does not, and the consummation by it of the transactions contemplated hereby and thereby will not (a) if such Undersigned C/G Stockholder is a legal entity, conflict with, or result in any breach of, any provision of the certificate of incorporation or bylaws or similar organizational documents of such Undersigned C/G Stockholder, (b) violate, conflict with, require consent pursuant to, result in a breach of, constitute a default (with or without due notice or lapse of time or both) under, or give rise to a right of, or result in, the termination, cancellation, modification, acceleration or the loss of a benefit under, or result in the creation of any Lien upon any of the Cypress/Garoge Common Stock of such Undersigned C/G Stockholder under, any of the terms, conditions or provisions of any material Contract to which such Undersigned C/G Stockholder is a party or any of the Cypress/Garoge Common Stock of such Undersigned C/G Stockholder is subject or (c) violate any Order or Law applicable to such Undersigned C/G Stockholder in connection with the Cypress/Garoge Common Stock, except, in the case of clauses (b) and (c) above, for any violation, conflict, consent, breach, default, termination, cancellation, modification, acceleration, loss or creation that would not reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole.

    Section 7.3  <u>Governmental Consents and Approvals</u>. Other than in connection with or in compliance with the DGCL or the DLLCA, the execution, delivery and performance by such Undersigned C/G Stockholder of this Agreement does not, and the consummation by such Undersigned C/G Stockholders of the transactions contemplated hereby with respect to the C/G Companies will not, require any filing or registration with, notification to, or authorization, permit, consent or approval of, or other action by or in respect of, any Governmental Entity other than (i) the approval of the Bankruptcy Court and the entry of the Confirmation Order and (ii) such other filings, registrations, notifications, authorizations, permits, consents, approvals or actions, the failure of which to take or obtain would not reasonably be expected to be, individually or in the aggregate, material to Target taken as a whole.

    Section 7.4  <u>Title to Shares</u>. Subject to any Third Party Transfers pursuant to Section 9.6, such Undersigned C/G Stockholder is the record and beneficial owner of the number of Cypress Common Stock or Garoge Common Stock set forth opposite such Undersigned C/G Stockholder's name in Section 5.3(c) of the C/G Disclosure Schedule. Subject to any Third Party Transfers pursuant to Section 9.6, such Undersigned C/G Stockholder has and at the Closing will have good and valid marketable title to such Cypress Common Stock or Garoge Common Stock set forth opposite such Undersigned C/G Stockholder's name in Section 5.3(c) of

the C/G Disclosure Schedule and the right to deliver such Cypress Common Stock or Garoge Common Stock to Parent in accordance with this Agreement, free and clear of all Liens other than restrictions under applicable securities laws. Subject to any Third Party Transfers pursuant to Section 9.6, no Person other than such Undersigned C/G Stockholder has any existing right, agreement, claim, option or privilege to purchase, sell, transfer, own, acquire or dispose of any of the Cypress Common Stock or Garoge Common Stock owned by such Undersigned C/G Stockholder.

Section 7.5    Investment.  Except as otherwise described herein with respect to Third Party Transfers, such Undersigned C/G Stockholder is accepting the Parent Common Stock to be issued to it hereunder for its own account with the present intention of holding such securities for investment purposes and not with a view to, or for sale in connection with, any distribution of such securities in violation of any federal or state securities laws.  Such Undersigned C/G Stockholder is an "accredited investor" as defined in Regulation D promulgated by the SEC under the Securities Act.  Such Undersigned C/G Stockholder acknowledges that it is informed as to the risks of the transactions contemplated hereby and of ownership of the Parent Common Stock.  Such Undersigned C/G Stockholder acknowledges that the Parent Common Stock has not been registered under the Securities Act, or any state or foreign securities laws and that the Parent Common Stock may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the Securities Act and the Parent Common Stock is registered under any applicable state or foreign securities laws or sold pursuant to an exemption from registration under the Securities Act and any applicable state or foreign securities laws.

Section 7.6    Management Stockholders.  Except as set forth in Section 7.6 of the C/G Disclosure Schedule, the Management Stockholders are not subject to any employment agreement, non-competition agreement or other similar arrangement that would prevent them from being employed by the MGM Companies on the terms set forth in the Employment Agreements.

## ARTICLE VIII

## REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Except as disclosed in the disclosure schedule delivered by Parent to C/G and Spyglass immediately prior to the execution of this Agreement as set forth in Exhibit J (the "Parent Disclosure Schedule"), which identifies the sections (or, if applicable, subsections) to which such exceptions relate (provided that any disclosure in the Parent Disclosure Schedule relating to one section or subsection shall also apply to other sections and subsections to the extent that it is reasonably apparent that such disclosure would also apply to or qualify such other sections and subsections), Parent and Merger Sub represent and warrant to C/G, Spyglass and the Undersigned C/G Stockholders, as follows:

Section 8.1    Qualification; Organization; Subsidiaries.

(a)    Except as set forth in Section 8.1(a) of the Parent Disclosure Schedule, each of the MGM Companies is a legal entity duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is in good standing as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except for those jurisdictions where the failure to be so organized, validly existing, qualified or in good standing, or to have such power or authority, would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.  Parent has made available to C/G and Spyglass prior to the date of this Agreement a true and complete copy of its articles of incorporation and bylaws, each as amended through the date hereof (the "Parent Organizational Documents") and has made available to C/G and Spyglass prior to the date of this Agreement a true and complete copy of the articles of incorporation and bylaws or other equivalent organizational documents of each of its principal operating Subsidiaries, including Merger Sub, each as amended through the date hereof (the "MGM Subsidiary Organizational Documents", and, together with the Parent Organizational Documents, the "MGM Organizational Documents").  The MGM Organizational Documents so delivered are in full force and effect, and none of the MGM Companies are in violation of the MGM Organizational Documents in any material respect.

(b)    Section 8.1(b) of the Parent Disclosure Schedule lists each Subsidiary of Parent and its jurisdiction of organization.  All of the outstanding shares of capital stock or other ownership interests of each Subsidiary of Parent have been validly issued and are fully paid and nonassessable.  Except as set forth in Section 8.1(b) of the Parent Disclosure Schedule, all of the outstanding shares of capital stock or other ownership interests of each Subsidiary of Parent are owned by Parent, directly or indirectly, in each case free and clear of all Liens and free of any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such ownership interest, other than restrictions under applicable securities laws) and have not been issued in violation of pre-emptive or similar rights.

Section 8.2    Authority Relative to this Agreement.

(a)    Parent and Merger Sub have all requisite corporate power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement to be executed by Parent and/or Merger Sub in connection with the Contemplated Transactions.  The execution, delivery and performance of this Agreement and the Transaction Documents to which it is party and the consummation by it of the Mergers and the Contribution and the other transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of each of Parent and Merger Sub, and no other corporate proceedings on the part of Parent or Merger Sub are necessary to authorize this Agreement or to consummate such transactions.  This Agreement has been, and each of such Transaction Documents to which it is party will be at or prior to the Closing, duly and validly executed and delivered by Parent and Merger Sub and, assuming the due authorization, execution and delivery by the other parties hereto and thereto, this Agreement constitutes, and each such Transaction Document when so executed and delivered, will

constitute, the legal, valid and binding obligation of Parent and Merger Sub, enforceable against Parent or Merger Sub, as applicable, in accordance with its terms, subject to the Bankruptcy and Equity Exception.

(b)     As of the date hereof, (i) the board of directors of Parent has by resolution, duly adopted at a meeting duly called and held (x) approved and declared advisable this Agreement and the transactions contemplated hereby, (y) determined that it is in the best interests of Parent and Merger Sub to enter into this Agreement and (z) resolved to recommend to the creditors of Parent that it is in their best interests to vote to accept the Plan and (ii) Parent, as the sole member of Merger Sub, has adopted this Agreement and approved the Mergers.

Section 8.3     Capital Stock.

(a)     As of the date hereof, the authorized capital stock of Parent consists solely of 3,701,550,500 shares, which is comprised of (i) 3,700,000,000 shares of Class A common stock (the "Class A Common Stock"), par value $0.01 per share, (ii) 500 shares of Class B common stock (the "Class B Common Stock"), par value $0.01 per share, (iii) 1,000,000 shares of 14% senior preferred stock (the "Senior Preferred Stock"), par value $0.01 per share and (iv) 550,000 shares of 10% junior preferred stock (the "Junior Preferred Stock"), par value $0.01 per share, of which 531,133,391 shares of Class A Common Stock, 500 shares of Class B Common Stock, 768,067,250 shares of Senior Preferred Stock and 64,819 shares of Junior Preferred Stock are issued and outstanding, all of which are duly authorized, validly issued, fully paid, nonassessable and free of any Liens (except Permitted Liens) and have not been issued in violation of pre-emptive or similar rights.  The Plan will provide for the cancellation, upon the Closing and after giving effect to the Confirmation Order and the Plan, of all then existing or outstanding (i) shares of capital stock, voting securities or other equity interests of Parent; (ii) securities convertible into or exchangeable for shares of capital stock or voting securities of Parent; (iii) obligations, options, warrants or other rights, commitments or arrangements to acquire from Parent, or other obligations or commitments of Parent to issue, sell or otherwise transfer, any capital stock or other voting securities or ownership interests in, or any securities convertible into or exchangeable for capital stock or other voting securities or ownership interests in Parent; or (iv) restricted shares, restricted share units, stock appreciation rights, performance shares, contingent value rights, "phantom" stock or similar securities or rights that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any capital stock of, or other voting securities or ownership interests in Parent.

(b)     Pursuant to the Plan, upon and after giving effect to the Closing and after giving effect to the Confirmation Order and the Plan, the authorized capital stock of reorganized Parent shall consist of 110,000,000 shares of common stock, par value $0.01 per share, of which 76,800,000 shares shall be issued and outstanding, all of which as of the Closing shall be duly authorized, validly issued, fully paid, nonassessable and free of any Liens and shall have not been issued in violation of pre-emptive or similar rights.  Except as set forth in Section 8.3(b) of the Parent Disclosure Schedule, after giving effect to the Confirmation Order and the Plan, the MGM Companies will have no outstanding bonds, debentures, notes or other obligations the holders of which have the right to vote (or which are convertible or exchangeable into or exercisable for securities having the right to vote) with the stockholders of the MGM Companies or any of their respective Subsidiaries on any matter.

(c)     Except as set forth in Section 8.3(c) of the Parent Disclosure Schedule, after giving effect to the Confirmation Order and Plan and the Closing, except as set forth in the Stockholders Agreement and the Senior Management Equity Investment Plan, there shall be no (i) voting trusts, proxies, equityholders agreements or other similar agreements or understandings to which any of the MGM Companies is bound with respect to the voting or registration of, or restricting any Person from purchasing, selling, pledging or otherwise disposing of, the capital stock or other equity interest of any of the MGM Companies; (ii) obligations or commitments restricting the transfer of, or requiring the registration for sale of, any shares of capital stock of any of the MGM Companies; or (iii) obligations or commitments of Parent to issue, repurchase, redeem or otherwise acquire any of the Parent Common Stock, and there shall not be any outstanding obligations, options, warrants or other rights, commitments or arrangements to acquire from Parent, or other obligations or commitments of Parent to issue, sell or otherwise transfer, any capital stock or other voting securities or ownership interests in, or any securities convertible into or exchangeable for capital stock or other voting securities or ownership interests in Parent or to provide a material amount of funds to, or make any material investment (in the form of a loan, capital contribution or otherwise) in, any Subsidiary of Parent, other than obligations or commitments to make material investments (in the form of a loan, capital contribution or otherwise) in non-debtor Subsidiaries of Parent in the ordinary course consistent with past practice.  The rights, preferences and privileges of the capital stock of Parent shall be as set forth in the certificate of incorporation (including any certificates of designation, as applicable) of Parent, as amended pursuant to the Plan and in effect upon the Closing.

(d)     As of the date of this Agreement, the authorized limited liability company interests of Merger Sub consist of 1000 membership units, all of which are validly issued and outstanding.  All of the issued and outstanding membership units of limited liability company ownership interests of Merger Sub are, and at the Closing Date will be, owned by Parent or a direct or indirect wholly-owned Subsidiary of Parent.  Merger Sub has outstanding no option, warrant, right or any other agreement pursuant to which any person other than Parent may acquire any equity security of Merger Sub.  Merger Sub has not conducted any business prior to the date hereof and has no, and prior to the Closing Date will have no, assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the Mergers and the other transactions contemplated by this Agreement.  Merger Sub is, and on the Closing Date will be, disregarded as a separate entity from Parent as contemplated by Treasury Regulations Section 301.7701-3.

Section 8.4     <u>Governmental Consents and Approvals</u>.  Except as set forth in Section 8.4 of the Parent Disclosure Schedule and other than in connection with or in compliance with the DGCL and the DLLCA, the execution, delivery and performance by  each of Parent and Merger Sub of this Agreement and the other Transaction Documents to which they are party do not, and the consummation by Parent or Merger Sub of the Contemplated Transactions will not, require any filing or registration with, notification to, or authorization, permit, consent or approval of, or other action by or in respect of, any Governmental Entity other than (i) the approval of the Bankruptcy Court and the entry of the Confirmation Order and (ii) such other filings, registrations, notifications, authorizations, permits, consents, approvals or actions, the failure of which to take or obtain would not reasonably be expected to have a Parent Material Adverse Effect.

Section 8.5    Permits; Compliance with Laws.  Except as set forth in Section 8.5 of the Parent Disclosure Schedule, each of the MGM Companies are in possession of all licenses, franchises, permits and authorizations necessary for the lawful conduct of their respective businesses as they are now being conducted, except for such licenses, franchises, permits and authorizations, the failure of which to hold would not reasonably be expected to have a Parent Material Adverse Effect, and each of the MGM Companies have complied with, and are in compliance with, all laws, statutes, codes, rules and regulations applicable to their respective businesses as they are now being conducted, except for such failure to comply which would not reasonably be expected to have a Parent Material Adverse Effect.

Section 8.6    Financial Statements.  Parent has previously delivered to Spyglass and C/G (a) the audited consolidated balance sheet of Parent for the fiscal year ended March 31, 2009, and the related audited consolidated statements of operations and cash flows and (b) unaudited condensed consolidated balance sheet of Parent as of March 31, 2010, and the related unaudited condensed consolidated statements of operations and cash flows.  All of the foregoing financial statements (including the notes thereto) are referred to as the "Parent Financial Statements."  Other than as set forth in Section 8.6 of the Parent Disclosure Schedule, the Parent Financial Statements have been prepared in accordance with GAAP consistently applied with Parent's past practices (except, with respect to the unaudited financial statements, for certain assumptions and adjustments that are subject to auditor review and the absence of certain footnotes and other disclosures required for audited financial statements) and present fairly the financial condition and operating results of Parent as of the dates, and for the periods, thereof.

Section 8.7    No Undisclosed Liabilities.  Except (a) as set forth in Section 8.7 of the Parent Disclosure Schedule, (b) as reflected or reserved against in the Parent Financial Statements, (c) as permitted by this Agreement, (d) for liabilities and obligations incurred since March 31, 2009 in the ordinary course of business consistent with past practice and (e) for liabilities or obligations which have been discharged or paid in full in the ordinary course of business consistent with past practice, as of the date hereof, none of the MGM Companies have any liabilities or obligations of any nature, whether or not accrued, contingent or otherwise, other than those which would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

Section 8.8    Employee Benefit Plans.

(a)    Section 8.8(a) of the Parent Disclosure Schedule contains a list of all MGM Benefit Plans (excluding any employment or consulting agreements) (other than (i) any such plan that is maintained for the purpose of complying with any non-United States Law or (ii) any immaterial plan that is not subject to ERISA) (the "Scheduled Plans").  With respect to the Scheduled Plans (other than Multiemployer Plans), Parent has delivered or made available to Spyglass and C/G true, complete and correct copies of (i) each such Scheduled Plan (or, in the case of any unwritten MGM Benefit Plans, descriptions thereof); (ii) the three (3) most recent annual reports on Form 5500 filed with the IRS with respect to each such Scheduled Plan (if any such report was required); (iii) the most recent summary plan description and all subsequent summaries of material modifications for each such Scheduled Plan for which such summary plan description is required; (iv) each trust agreement and group annuity contract relating to any Scheduled Plan; (v) the most recent determination letter from the IRS, if any; (vi) the most recent

actuarial valuation, if any; and (vii) material non-routine correspondence to or from any Governmental Entity within the past three (3) years. Each MGM Benefit Plan (other than a Multiemployer Plan) has, in all material respects, been established, funded, maintained and administered in compliance with its terms and with the applicable provisions of ERISA, the Code and all other applicable Laws, except where the failure to do so could not reasonably be expected to result in a Parent Material Adverse Effect. There are no material amendments to any MGM Benefit Plan or the establishment of any new MGM Benefit Plan (in both cases, other than a Multiemployer Plan or any employment or consulting agreements) that have been adopted or approved by any of the MGM Companies (and that are not reflected in the documents made available by Parent to C/G and Spyglass prior to the date hereof with respect to such MGM Benefit Plan) and, except as set forth in Section 8.8(a) of the Parent Disclosure Schedule, none of the MGM Companies have undertaken or committed to make any such amendments or to adopt or approve any new plans.

(b)      All MGM Pension Plans (other than Multiemployer Plans) have been the subject of favorable and up-to-date (through any applicable remedial amendment period) determination letters from the IRS, or a timely application therefor has been filed, to the effect that such MGM Pension Plans are qualified and exempt from federal income taxes under Section 401(a) and 501(a), respectively, of the Code, and, to the Knowledge of Parent, no circumstances exist and, to the Knowledge of Parent, no events have occurred that would be reasonably expected to adversely affect the qualification of any MGM Pension Plan or the related trust.

(c)      Except as set forth in Section 8.8(c) of the Parent Disclosure Schedule, with respect to any plan (other than a Multiemployer Plan) subject to Title IV of ERISA (or Section 302 of ERISA or Section 412 or 4971 of the Code) to which any of the MGM Companies or any ERISA Affiliate maintains or made, or was required to make, contributions during the past six (6) years:  (i) there does not exist any accumulated funding deficiency within the meaning of Section 412 of the Code or Section 302 of ERISA, whether or not waived; (ii) the fair market value of the assets of such MGM Pension Plan equals or exceeds the actuarial present value of all accrued benefits under such MGM Pension Plan (whether or not vested, each as determined under the assumptions and valuation method of the latest actuarial valuation of such plan); (iii) no reportable event within the meaning of Section 4043(c) of ERISA for which the 30-day notice requirement has not been waived has occurred, and the consummation of the Mergers, the Contribution or the other transactions contemplated hereby will not result in the occurrence of any such reportable event; (iv) all premiums to the PBGC have been timely paid in full; (v) no liability or contingent liability (including liability pursuant to Section 4069 of ERISA but excluding premiums to the PBGC) under Title IV of ERISA has been or is reasonably expected to be incurred by any of the MGM Companies or ERISA Affiliates; and (vi) the PBGC has not instituted proceedings to terminate any such MGM Pension Plan and, to Parent's Knowledge, no condition exists that presents a risk that such proceedings will be instituted or which would constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any such MGM Pension Plan; where, individually or in the aggregate, the liability that would reasonably be expected to result would have a Parent Material Adverse Effect. With respect to any Multiemployer Plan to which any of the MGM Companies or any ERISA Affiliate made, or was required to make, contributions during the past six (6) years: (i) none of the MGM Companies or any ERISA Affiliate have made or suffered a "complete withdrawal" or a "partial withdrawal," as such terms are respectively defined in

Sections 4203 and 4205 of ERISA; (ii) no event has occurred that presents a material risk of a complete or partial withdrawal; (iii) none of the MGM Companies or any ERISA Affiliate have received any notification that they have any contingent liability under Section 4204 or 4212(c) of ERISA and (iv) none of the MGM Companies or any of their respective ERISA Affiliates have received any notification, or have any reason to believe, that any such plan is in "endangered" or "critical" status under Code Section 432, in reorganization, has been terminated, is insolvent, or may be reasonably expected to be in "endangered" or "critical" status under Code Section 432, in reorganization, to be insolvent or to be terminated, where, individually or in the aggregate, the liability that would reasonably be expected to result in a Parent Material Adverse Effect.

(d)     Except as set forth in Section 8.8(d) of the Parent Disclosure Schedule, none of the MGM Companies or any ERISA Affiliate have any material liability for life, health, medical or other welfare benefits for former employees or beneficiaries or dependents thereof with coverage or benefits under MGM Benefit Plans other than MGM Pension Plans, other than as required by Section 4980B of the Code or Part 6 of Title I of ERISA or any other applicable Law.  To the Knowledge of Parent, no MGM Pension Plan or MGM Welfare Plan or any "fiduciary" or "party-in-interest" (as such terms are respectively defined by Sections 3(21) and 3(14) of ERISA) thereto has engaged in a transaction prohibited by Section 406 or 407 of ERISA or 4975 of the Code for which a valid exemption is not available.  There are no pending or, to the Knowledge of Parent, threatened, claims, lawsuits, arbitrations or audits asserted or instituted against any MGM Benefit Plan (other than Multiemployer Plans), any fiduciary (as defined by Section 3(21) of ERISA) thereto, Parent, any of its Subsidiaries or any employee or administrator thereof in connection with the existence, operation or administration of a MGM Benefit Plan (other than Multiemployer Plans), other than routine claims for benefits.  All liabilities with respect to each MGM Foreign Plan have been funded in accordance with the terms of such MGM Foreign Plan and have been properly reflected in the financial statements of the MGM Companies.

(e)     Except as set forth in Section 8.8(e) of the Parent Disclosure Schedule and except where the liability would not reasonably be expected to have a Parent Material Adverse Effect, neither the execution and delivery of this Agreement nor the consummation of the Contemplated Transactions (either alone or in conjunction with any other event (which event would not alone have an effect described in the following clauses (i) through (iii)) (i) cause or result in the accelerated vesting, funding or delivery of, or increase the amount or value of, any material payment or benefit to any employee, officer or director of the MGM Companies, (ii) cause or result in the funding of any MGM Benefit Plan or (iii) cause or result in a limitation on the right of any of the MGM Companies to amend, merge, terminate or receive a reversion of assets from any MGM Benefit Plan or related trust.  Without limiting the generality of the foregoing, except as set forth in Section 8.8(e) of the Parent Disclosure Schedule, no amount paid or payable by any of the MGM Companies in connection with the transactions provided for herein (either solely as a result thereof or as a result of such transactions in conjunction with any other event) will be an "excess parachute payment" within the meaning of Section 280G of the Code.

509265-1076-01000-Active.12124289.15

Section 8.9    Contracts.

(a)    Except as set forth in Section 8.9(a) of the Parent Disclosure Schedule, to the Knowledge of Parent, none of the MGM Companies or any other party (i) are in violation or breach of or in default under (nor does there exist any condition which together with the passage of time or the giving of notice would result in a violation or breach of, or constitute a default under, or give rise to any right of termination, amendment, cancellation, acceleration or loss of benefits under, or result in the creation of any Lien (except Permitted Liens) upon any of the properties or assets of Parent or any of its Subsidiaries under) any Contract to which Parent or any of its Subsidiaries is a party, which is, or is reasonably expected to be, individually or in the aggregate, material to the MGM Companies taken as a whole (each, a "Parent Contract"), or (ii) have otherwise failed to exercise an option under any Parent Contract which may adversely impact Parent's or any of its Subsidiaries' rights or obligations under a Parent Contract, in the case of clauses (i) and (ii), except as would not be reasonably expected to have, either individually or in the aggregate, a Parent Material Adverse Effect.  Except as set forth in Section 8.9(a) of the Parent Disclosure Schedule, each Parent Contract is valid and binding in all respects upon, and enforceable against, the applicable MGM Company and, to the Knowledge of Parent, each other party thereto, and is in full force and effect, subject to the Bankruptcy and Equity Exception and except as would not be reasonably expected to have, either individually or in the aggregate, a Parent Material Adverse Effect.  To the Knowledge of Parent, no MGM Company has given written notice within the past three (3) years to any other Person that such Person has breached, violated or defaulted (which alleged breach, violation or default is continuing) under any Parent Contract specified in Section 8.9(a) of the Parent Disclosure Schedule under the heading "Parent Contracts Subject to Reporting of Breach Notice".  Except as set forth in Section 8.9(a) of the Parent Disclosure Schedule, to the Knowledge of Parent, no other party to any such Parent Contract has alleged that any of the MGM Companies is in violation or breach of or in default under any such Parent Contract or has notified any of the MGM Companies of an intention to, modify any material terms of or not to renew any such Parent Contract, except where such breach, default, modification or failure to renew would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

(b)    Except as disclosed in Section 8.9(b) of the Parent Disclosure Schedule, no MGM Company is a party to, or bound by, any undischarged written or oral (i) Non-Competition Agreement or (ii) agreement not entered into in the ordinary course of business between Parent and any of its Affiliates other than any Subsidiary of Parent.

Section 8.10    No Conflicts or Violations.  Except as set forth in Section 8.10 of the Parent Disclosure Schedule, subject to and after giving effect to any required approvals of the Bankruptcy Court (including, without limitation, the Confirmation Order) and the Plan and assuming the receipt of all consents and approvals described in Section 8.4, the execution, delivery, and performance of this Agreement and the Transaction Documents to which it is a party by each of the MGM Companies does not, and the entry of the Confirmation Order and consummation by each of the MGM Companies of the Mergers, the Contribution, the Plan and the other transactions contemplated hereby and thereby will not (a) conflict with, or result in any breach of, any provision of the certificate of incorporation or bylaws of Parent or Merger Sub or any similar organizational documents of any of its Subsidiaries, (b) violate, conflict with, require consent pursuant to, result in a breach of, constitute a default (with or without due notice or lapse

of time or both) under, or give rise to a right (by any party other than a MGM Company) of, or result in, the termination, cancellation, modification, acceleration or the loss of a benefit or obligation under, or result in the creation of any Lien upon any of the properties or assets of any of the MGM Companies under, any of the terms, conditions or provisions of any Contract to which any MGM Company is a party or by which any of its properties or assets may be bound or (c) violate any Order or Law applicable to any MGM Company or any of their respective properties or assets, except, in the case of clauses (b) and (c) above, for any violation, conflict, consent, breach, default, termination, cancellation, modification, acceleration, loss or creation that would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

Section 8.11    Taxes.

(a)    Except as set forth in Section 8.11(a) of the Parent Disclosure Schedule, the MGM Companies have timely filed all material Tax Returns that are required to have been filed by it with the appropriate taxing authorities, and all such Tax Returns are complete and accurate in all material respects.  Except as set forth in Section 8.11(a) of the Parent Disclosure Schedule, the MGM Companies have timely paid all material Taxes owed by the MGM Companies (whether or not shown on such Tax Returns), other than in those instances in which such Taxes are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP in respect of all such Taxes.

(b)    Except as set forth in Section 8.11(b) of the Parent Disclosure Schedule, no examination or audit of any Tax Return relating to any material Taxes of the MGM Companies or with respect to any Taxes due from or with respect to the MGM Companies by any Governmental Authority is currently in progress or, to the Knowledge of MGM, threatened or contemplated.  Except as set forth in Section 8.11(b) of the Parent Disclosure Schedule, no assessment of Tax has been proposed in writing against any of the MGM Companies or any of their assets or properties.

Section 8.12    Intellectual Property.

(a)    Except as set forth in Section 8.12(a) of the Parent Disclosure Schedule and except where the failure would not reasonably be expected to, individually or in the aggregate, have a Parent Material Adverse Effect, each of the MGM Companies own or possess adequate licenses or other valid rights to use all Intellectual Property (including, without limitation, Intellectual Property rights that exist in the Films of the MGM Companies) used in their businesses as presently conducted (collectively, the "Parent Intellectual Property").  Section 8.12(a) of the Parent Disclosure Schedule sets forth a complete and accurate list of all trademarks, service marks and domain names in which any MGM Company purports to have an ownership interest.  Such schedule will include the title of the mark or domain name and, in the case of trademarks and service marks, the registration, certificate or issuance number (or application number with respect to pending applications) and the date registered or issued (or filed with respect to pending applications) and the identification of the particular entity which holds the interest.  None of the MGM Companies own or exclusively license any patents.

(b)     Except where the failure would not have a Parent Material Adverse Effect, the MGM Companies take and have taken reasonable measures, consistent with industry practice as of the date of this Agreement, to register, maintain and renew all trademarks, trade names, copyrights and service marks owned by the MGM Companies that are included in the Parent Intellectual Property.

(c)     Except as set forth in Section 8.12(c) of the Parent Disclosure Schedule, the Parent Intellectual Property and the conduct of the businesses of each of the MGM Companies as currently conducted do not Infringe any Intellectual Property right of any Person in any way that would be reasonably expected to have, individually or in the aggregate, a Parent Material Adverse Effect.  Except as set forth in Section 8.12(c) of the Parent Disclosure Schedule, to Parent's Knowledge, no third Person is Infringing any Parent Intellectual Property which would be reasonably expected to have, individually or in the aggregate, a Parent Material Adverse Effect, except for Infringement arising from unauthorized copying (e.g., piracy and "bootlegging", peer-to-peer file sharing over the Internet and the like).  Except as set forth in Section 8.12(c) of the Parent Disclosure Schedule, no legal proceedings are pending or, to the Knowledge of Parent, threatened in writing, that (i) assert that any Parent Intellectual Property or any action taken by any MGM Company Infringes any Intellectual Property of any Person or that any Parent Intellectual Property or any action taken by any MGM Company constitutes a libel, slander or other defamation of any Person or (ii) challenge the validity or enforceability of, or the rights of any of the MGM Companies in, any Parent Intellectual Property, which in each case of the foregoing clauses (i) and (ii) would be reasonably expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

(d)     Except as set forth in Section 8.12(d) of the Parent Disclosure Schedule, the execution, delivery, and performance of this Agreement and the Transaction Documents to which it is a party by Parent and Merger Sub does not, and entry of the Confirmation Order and the consummation by Parent and Merger Sub of the Mergers, the Contribution, the Plan and the other transactions contemplated hereby and thereby will not adversely affect any right or interest of any of the MGM Companies in any Parent Intellectual Property in any way which would reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

Section 8.13    Litigation.  Except as set forth on Section 8.13 of the Parent Disclosure Schedule and except as would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect, (i) there is no suit, claim, action, proceeding, arbitration or investigation pending before any Governmental Entity or, to Parent's Knowledge, threatened against any of the MGM Companies or their respective assets or properties; provided that this clause (i) is not intended to address any suit, claim, action, proceeding, arbitration or investigation of the type described in the clauses (a) and (b) of the second sentence of this Section 8.13, and (ii) none of the MGM Companies are subject to any outstanding Order or Orders.  As of the date hereof, there is no suit, claim, action, proceeding, arbitration or investigation pending or, to Parent's Knowledge, threatened against any of the MGM Companies, (a) which seeks to, or would be reasonably expected to, restrain, enjoin or delay the consummation of the Mergers, the Contribution, or the other transactions contemplated herein or (b) which seeks damages in connection therewith, and no injunction has been entered or issued with respect to the transactions provided for herein.

Section 8.14    Absence of Certain Changes or Events.  Except as set forth in Section 8.14 of the Parent Disclosure Schedule and except for the negotiation (including activities related to due diligence), execution and delivery of this Agreement and the other Transaction Documents and the commencement of the Chapter 11 Cases, (a) since January 1, 2010, each of the MGM Companies has conducted its respective business only in the ordinary course, taking into account the financial circumstances to which the MGM Companies are subject, and (b) to Parent's Knowledge, since January 1, 2010, there has not been any event or events that has had or would be reasonably expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

Section 8.15    Related Party Transactions.  Other than as set forth in Section 8.15 of the Parent Disclosure Schedule and other than ordinary course financing transactions, there is no Contract, understanding, or proposed transaction (other than employment agreements and MGM Benefit Plans) between any MGM Company, on the one hand, and any officer, director, Affiliate, stockholder, Person known to Parent to be a lender or any Affiliate of any of them (other than Subsidiaries of Parent) (each, a "Related Party"), on the other hand, that would require payments in excess of $250,000.

Section 8.16    Offering; Valid Issuance.  Subject to the accuracy of the representations set forth in Section 6.9 and Section 7.5 of this Agreement, the offer, sale and issuance of the Parent Common Stock to the Undersigned C/G Stockholders and Spyglass as contemplated by this Agreement are exempt from the registration requirements of the Securities Act and from registration or qualification under all applicable "blue sky" laws.  The Parent Common Stock that is being issued to the Undersigned C/G Stockholders and Spyglass hereunder, when issued, sold and delivered in accordance with the terms of this Agreement, will be duly and validly issued, fully paid, and nonassessable, and will be free of all Liens and free of any other limitation or restriction (including any restriction on the right to vote, sell or otherwise dispose of such ownership interest, other than restrictions under applicable securities laws and under the Stockholders Agreement).

Section 8.17    Brokers and Finders; Transaction Expenses.  Except as set forth in Section 8.17 of the Parent Disclosure Schedule, other than Moelis & Company, Zolfo Cooper and Houlihan Lokey, no person engaged by or acting on behalf of any of the MGM Companies or any Affiliate thereof is entitled to any brokerage, financial advisory, finder's or similar fee or commission in connection with transactions contemplated by this Agreement for which any MGM Company could have any liability.

## ARTICLE IX

## COVENANTS AND OTHER AGREEMENTS

Section 9.1    Conduct of Business by C/G Pending the Closing.

(a)    Prior to Closing, except (1) as set forth in Section 9.1(a) of the C/G Disclosure Schedule, (2) as otherwise expressly provided or required by this Agreement and the Transaction Documents or as may be necessary or appropriate to implement the transactions contemplated hereby and thereby (including, without limitation, distributions to the

Cypress/Garoge Stockholders of the Excluded Cypress/Garoge Assets (which distributions are hereby expressly permitted)), (3) as required by applicable Law, (4) as required under the Plan or (5) with the prior written consent of Parent, C/G shall, and shall cause their respective Subsidiaries to:

(i)     Conduct the respective businesses of the C/G Companies in the ordinary course of business consistent with past practice; and

(ii)    Without limiting the foregoing, use reasonable efforts to: (A) maintain the present business operations, organization and goodwill of the C/G Companies, (B) maintain the present relationships with customers and suppliers of the C/G Companies and other Persons with which any of the C/G Companies have significant business relations, (C) maintain good relations with the employees of the C/G Companies, (D) maintain reserves, accruals and payables in the ordinary course of business and consistent with past practices, (E) maintain and comply in all material respects with the terms of any Cypress/Garoge Contracts and (F) comply with all applicable Laws, except (in each case) for matters of non-compliance as would not reasonably be expected to have a C/G/S Material Adverse Effect.

(b)     Prior to the Closing, except (1) as set forth in Section 9.1(b) of the C/G Disclosure Schedule, (2) as otherwise expressly provided or required by this Agreement and the Transaction Documents or as may be necessary or appropriate to implement the transactions contemplated hereby and thereby, (3) as required by applicable Law, (4) as required under the Plan or (5) with the prior written consent of Parent, C/G shall not, and shall not permit their respective Subsidiaries to:

(i)     Repurchase, redeem or otherwise acquire, or grant any rights or enter into any Contracts or commitments to repurchase, redeem or acquire, any outstanding shares of capital stock or other securities of, or other ownership interests in, the C/G Companies, or declare, set aside, make or pay any dividend or other distribution with respect to its capital stock or other securities or ownership interests, other than any distributions to the Cypress/Garoge Stockholders of the Excluded Cypress/Garoge Assets (which distributions are hereby expressly permitted);

(ii)    Issue or sell any shares of capital stock or other securities of any of the C/G Companies or grant options, warrants, calls or other rights to purchase shares of capital stock or other securities of any of the C/G Companies, other than any Third Party Transfers in accordance with Section 9.6;

(iii)   Effect any recapitalization, reclassification or like change in the capitalization of any of the C/G Companies;

(iv)    Amend the certificate of incorporation or bylaws or comparable organizational documents of any of the C/G Companies;

54

(v)    Enter into, create, incur or assume any obligations, or enter into any agreement in any case which are other than in the ordinary course of business and other than any Third Party Transfers in accordance with Section 9.6;

(vi)    "Greenlight," commit to or commence the production or financing of, or acquisition of any ownership interest or Exploitation rights in or to, any theatrical motion picture(s) not already "greenlit" (or otherwise committed to or commenced) by any of the C/G Companies prior to the date of this Agreement;

(vii)    Except in the ordinary course of business consistent with past practice or in any transaction by C/G with their respective Subsidiaries, (A) sell, transfer, lease, license, encumber or otherwise dispose of any of the assets (other than any distributions to the Cypress/Garoge Stockholders of the Excluded Cypress/Garoge Assets) or acquire any additional material assets, or (B) terminate or in any material respect amend any Cypress/Garoge Contract;

(viii)    Fail to use commercially reasonable efforts to keep in full force and effect present insurance policies or other comparable insurance benefiting the assets of any of the C/G Companies and the conduct of their respective businesses;

(ix)    (A) Make or change any material Tax election (other than a "check-the-box" election for Wilshire and Westwood, LLC), or change any of the C/G Companies' method of accounting for Tax purposes, (B) file any amended Tax Return involving a material amount of additional Taxes, (C) settle or compromise any material Tax liability or enter into any closing agreement with respect to any material amount of Tax, (D) agree to an extension or waiver of the statute of limitations applicable to the assessment or collection of any material Taxes or (E) revoke or otherwise knowingly cause a termination of Cypress' election under Section 1362 of the Code  (other than in connection with a Third-Party Transfer);

(x)    Other than among C/G and their direct or indirect wholly-owned Subsidiaries, enter into, create, incur or assume any obligations, or enter into any agreement, in any case with (A) any Affiliates of any of the C/G Companies, (B) any of the Spyglass Companies or their respective Affiliates or (C) any Cypress/Garoge Stockholders or their respective Affiliates; or

(xi)    Enter into any contract, arrangement or understanding, or agree, in writing or otherwise, to take any of the actions described in this Section 9.1(b) or any action that would make any of the representations or warranties of C/G contained in this Agreement untrue or incorrect in any material respect or prevent C/G from performing or cause C/G not to perform their covenants hereunder or under the Transaction Documents to which it is a party.

Section 9.2    Conduct of Business by Spyglass Pending and After the Closing.

(a)    Prior to Closing, except (1) as set forth in Section 9.2(a) of the Spyglass Disclosure Schedule, (2) as otherwise expressly provided or required by this Agreement and the Transaction Documents or as may be necessary or appropriate to implement the transactions contemplated hereby and thereby, (3) as required by applicable Law, (4) as required under the Plan or (5) with the prior written consent of Parent, Spyglass shall, and shall cause the Spyglass Companies to, continue to manage the Contributed Assets in the ordinary course of business consistent with past practice.

(b)    Prior to Closing, except (1) as set forth in Section 9.2(b) of the Spyglass Disclosure Schedule, (2) as otherwise expressly provided or required by this Agreement and the Transaction Documents or as may be necessary or appropriate to implement the transactions contemplated hereby and thereby, (3) as required by applicable Law, (4) as required under the Plan or (5) with the prior written consent of Parent, Spyglass shall not, and shall not permit the Spyglass Companies to:

(i)    Enter into, create, incur or assume any obligations, or enter into any agreement, in any case with respect to the Contributed Assets, which are other than in the ordinary course of business consistent with past practice;

(ii)    Except in the ordinary course of business consistent with past practice (which shall include, for the avoidance of doubt, continuing to develop the Spyglass Development Projects in the ordinary course of business consistent with past practice), (A) sell, transfer, lease, license, encumber or otherwise dispose of any of any of the Contributed Assets or (B) terminate or in any material respect amend any of the Spyglass Contracts; provided, that any transfer or divestiture of any of the Spyglass Development Projects shall require the prior written consent of Parent;

(iii)    Enter into, create, incur or assume any obligations, take any other action, or enter into any agreement in any case to develop any productions (including co-financings) that were not otherwise committed to or commenced negotiations by Spyglass or any of the Spyglass Companies prior to the date of this Agreement, except, in each case, as may be required for the Spyglass Companies to fully comply with its and its Affiliates obligations under the Spyglass Credit Facility (which may include developing or producing new theatrical motions pictures or entering into co-financing or co-production arrangements with third Persons for Films that are to become collateral under the Spyglass Credit Facility); it being understood and agreed that Spyglass may continue to (A) develop the Spyglass Development Projects during this period subject to clause (i) above and (B) develop and negotiate with applicable third Persons with respect to the Development Projects set forth in Section 9.2(b)(iii) of the Spyglass Disclosure Schedule (the "Unexecuted Development Projects");

(iv)    Enter into, create, incur or assume any obligations, or enter into any agreement in any case with (A) any of the C/G Companies or any of their

respective Affiliates or (B) any of the Undersigned Stockholders or their respective Affiliates, that could reasonably be expected to impair their ability to complete the Mergers or the Contribution as contemplated herein and in the Transaction Documents or performing their obligations thereunder; or

(v)     Enter into any contract, arrangement or understanding, or agree, in writing or otherwise, to take any of the actions described in this Section 9.2(b) or any action that would make any of the representations or warranties of Spyglass contained in this Agreement untrue or incorrect in any material respect or prevent Spyglass from performing or cause Spyglass not to perform its covenants hereunder or under the Transaction Documents to which it is a party.

(c)     Following the Closing Date and until the Restricted Period End Date (defined in clause (vii) below), except (1) as required by applicable Law, or (2) with the prior written consent of Parent (acting through its Board of Directors), Spyglass agrees that the conduct of the business of Spyglass and its Subsidiaries shall be subject to the following limitations:

(i)     Spyglass will be permitted to operate as a separate entity for the purpose of (A) owning and Exploiting its completed Films existing as of the date hereof, and (B) completing (and owning and Exploiting) the Films set forth in Section 9.2(c)(i) of the Spyglass Disclosure Schedule (the "Greenlit Films"). Other than with respect to the Greenlit Films, as may be contractually required with respect to any Retained Interest and as otherwise permitted under this Section 9.2(c), Spyglass will not (x) provide production services or act as a "producer for hire" or film distributor or sub-distributor in any media or territory for third-party Films (as those terms are generally understood in the industry); or (y) acquire directly or indirectly (including through any current or new Subsidiary) any new Films, including development projects, Films in turnaround, "negative pickups" or completed Films.

(ii)     With respect to any Retained Interest, Spyglass will have the right to continue to actively develop such Retained Interest in accordance with Section 3.2(c) and (d) of this Agreement.  Except with respect to any Retained Interest and as otherwise expressly permitted by this Section 9.2(c), Spyglass will not enter into, create, incur or assume any obligations, take any other action, or enter into any agreement, in any case to develop any new Film productions (including co-financings).

(iii)     Spyglass shall not directly or indirectly agree to any modification, waiver, amendment or extension of the Spyglass Credit Facility to provide Spyglass with additional borrowing capacity.  Spyglass shall not refinance the Spyglass Credit facility or enter into any new or replacement financing, in each case in a manner that would provide additional Film production or acquisition financing to Spyglass.  Spyglass may seek opportunities for additional studio co-financings with MGM (or another studio if Spyglass and MGM (with the approval of Parent acting through its Board) cannot agree on a suitable project

and the terms of such co-financing after a 30-day good faith negotiation period) if (x) MGM (or such other studio) acts as "lead studio" and (y) additional borrowing availability is created following the date hereof from the existing collateral (including the Greenlit Films) under the existing Spyglass Credit Facility during the term (i.e., prior to March 31, 2012).

(iv)     Notwithstanding anything to the contrary contained in this Agreement, Spyglass shall be permitted to (A) take those actions that are necessary to comply fully in all respects with the terms of the Spyglass Credit Facility (which may include entering into co-financing or co-production arrangements with third Persons for Films that are to become collateral under the Spyglass Credit Facility as described in clause (iii) above); (B) sell or finance its co-financing rights to the *Star Trek* franchise; and (C) effectuate a transfer, wind-down, dissolution or liquidation of the Spyglass business or otherwise liquidate, dispose and realize the value of any of its equity interests or assets (it being agreed that, if the Spyglass trademarks and logo are transferred to another Person in which the Management Stockholders or their Affiliates beneficially own any direct or indirect ownership interest or for which the Management Stockholders serve as directors, officers, employees or consultants, such transferee shall be subject to the terms of this Section 9.2(c)).

(v)     Spyglass shall not enter into any contract, arrangement or understanding or agree in writing or otherwise to take any of the actions prohibited by or not expressly permitted by this Section 9.2(c), in each case for the purpose or with the effect of circumventing the other provisions hereof.

(vi)     Spyglass will continue to provide certain services and management services to the C/G Companies or any of their respective Affiliates to the extent its fees for such services continue to serve as collateral under the Spyglass Credit Facility and shall reasonably promptly thereafter cease to provide such services or be entitled to such fees.

(vii)     The terms and conditions of this Section 9.2(c) shall terminate and have no further force or effect upon the earliest to occur of the following (the "Restricted Period End Date"): (x) the expiration of the Non-Compete Term (as defined in the Employment Agreements); and (y) the Management Stockholders and their Affiliates cease to (1) beneficially own any direct or indirect ownership interest in Spyglass and (2) serve as directors, officers, employees or consultants of Spyglass.

(d)     Spyglass shall on or prior to the Closing terminate any employment agreements, non-competition agreements or other similar arrangements with any of the Management Stockholders.

Section 9.3     Conduct of Business by Parent Pending the Closing.

(a)     Prior to Closing, except (1) as set forth in Section 9.3(a) of Parent Disclosure Schedule, (2) as otherwise expressly provided or required by this Agreement and the Transaction Documents or as may be necessary or appropriate to implement the transactions contemplated hereby and thereby, (3) as required by applicable Law (including any obligations as debtor in possession under the Bankruptcy Code) or as otherwise ordered by the Bankruptcy Court, (4) as required under the Plan or (5) with the prior written consent of C/G and Spyglass, Parent shall, and shall cause its Subsidiaries to:

(i)     Conduct the respective businesses of the MGM Subsidiaries in the ordinary course of business consistent with past practice, taking into account the financial conditions to which the MGM Companies are subject; and

(ii)    Without limiting the foregoing, use reasonable efforts to: (A) except as set forth in Section 9.3(a)(ii)(A) of the Parent Disclosure Schedule, maintain the present business operations, organization and goodwill of the MGM Companies, (B) maintain the present relationships with customers and suppliers of the MGM Companies and other Persons with which any of the MGM Companies have significant business relations, (C) maintain good relations with the employees of the MGM Companies, (D) maintain reserves, accruals and payables in the ordinary course of business and consistent with past practices, (E) maintain and comply in all material respects with the terms of its Parent Contracts and (F) comply with all applicable Laws, except (in each case) for matters of non-compliance as would not reasonably be expected to have a Parent Material Adverse Effect.

(b)     Prior to the Closing, except (1) as set forth in Section 9.3(b) of Parent Disclosure Schedule, (2) as otherwise expressly provided or required by this Agreement and the Transaction Documents or as may be necessary or appropriate to implement the transactions contemplated hereby and thereby, (3) as required by applicable Law (including any obligations as debtor in possession under the Bankruptcy Code) or as otherwise ordered by the Bankruptcy Court, (4) as required under the Plan or (5) with the prior written consent of C/G and Spyglass, Parent shall not, and shall not permit its Subsidiaries to:

(i)     Repurchase, redeem or otherwise acquire, or grant any rights or enter into any Contracts or commitments to repurchase, redeem or acquire, any outstanding shares of capital stock or other securities of, or other ownership interests in, Parent or, other than in the ordinary course of business, the MGM Companies; or declare, set aside, make or pay any dividend or other distribution with respect to the capital stock or other securities or ownership interests of Parent, or, other than in the ordinary course of business, the MGM Companies;

(ii)    Issue or sell any shares of capital stock or other securities of any of the MGM Companies or grant options, warrants, calls or other rights to purchase shares of capital stock or other securities of any of the MGM Companies;

59

(iii)     Effect any recapitalization, reclassification or like change in the capitalization of any of the MGM Companies;

(iv)     Amend the certificate of incorporation or bylaws or comparable organizational documents of any of the MGM Companies;

(v)     Enter into, create, incur or assume any obligations, or enter into any agreement in any case which are other than in the ordinary course of business;

(vi)     Except as set forth in Section 9.3(b)(vi) of the Parent Disclosure Schedule and except with respect to one or more movies based upon "The Hobbit" franchise, "greenlight," commit to or commence the production or financing of, or acquisition of any ownership interest or Exploitation rights in or to, any theatrical motion picture(s) not already "greenlit" (or otherwise committed to or commenced) by any of the MGM Companies prior to the date of this Agreement;

(vii)     Except in the ordinary course of business consistent with past practice or in any transaction by Parent with its Subsidiaries, (A) sell, transfer, lease, license, encumber or otherwise dispose of any of the assets of the MGM Companies or acquire any additional material assets; or (B) terminate or in any material respect amend any Parent Contract;

(viii)     Except in the ordinary course of business consistent with past practice, terminate the services of any employee of the MGM Companies or make any material change to the compensation or benefits provided to any of the MGM Companies' employees;

(ix)     Fail to use commercially reasonable efforts to keep in full force and effect present insurance policies or other comparable insurance benefiting the assets of any of the MGM Companies and the conduct of their respective businesses;

(x)     Except as set forth in Section 9.3(b)(x) of the Parent Disclosure Schedule, enter into, create, incur or assume any obligations, or enter into any agreement, in any case with any Affiliates or Related Parties of any of the MGM Companies, other than any arrangements entered into in the ordinary course with Subsidiaries; or

(xi)     Enter into any contract, arrangement or understanding, or agree, in writing or otherwise, to take any of the actions described in Section 9.3(b) or any action that would make any of the representations or warranties of Parent or Merger Sub contained in this Agreement untrue or incorrect in any material respect or prevent Parent or Merger Sub from performing or cause Parent or Merger Sub not to perform their covenants hereunder or under any other Transaction Document to which it is a party (it being acknowledged that this clause (xi) is not intended to prohibit Parent from terminating this Agreement in

accordance with Article XII or rejecting this Agreement on the terms set forth in Section 9.10).

Section 9.4    Certain Notifications.  Prior to Closing:

(a)    Parent shall:

(i)    Promptly notify C/G and Spyglass in writing of the occurrence of (A) any circumstance or event that will result in, or would reasonably be expected to result in, the failure of any of the closing conditions specified in Section 11.2 of this Agreement to be satisfied or (B) any Parent Material Adverse Effect;

(ii)    Promptly forward to C/G and Spyglass at least three (3) Business Days in advance of filing or execution (as applicable), drafts, for C/G's and Spyglass' reasonable comment, of (1) memoranda of law and declarations/affidavits regarding the Plan or the Disclosure Statement; (2) the schedules and statements of financial affairs of Parent and its Subsidiaries; (3) all "first day" motions, applications and declarations/affidavits; and (4) all other pleadings, motions, proposed orders, notices, statements, schedules, applications, reports, declarations, affidavits, exhibits and other papers that Parent or its Subsidiaries intend to file in the Chapter 11 Cases that relate to this Agreement, the Mergers, the Contribution, the Plan (including the solicitation or confirmation thereof), C/G or Spyglass, or in any manner relate to or affect the Contemplated Transactions; provided, however, that in the case of the emergency filing of any document listed in subclause (4) of this Section 9.4(a)(ii), Parent shall use commercially reasonable efforts to forward (to the extent possible) drafts to C/G and Spyglass so as to provide C/G and Spyglass sufficient advance notice for review and reasonable comment;

(iii)    Promptly forward to C/G and Spyglass as soon as practicable drafts of (1) any amendment, modification, supplement, or exhibit to the Disclosure Statement, (2) the motion seeking the relief described in Section 9.9(a)(iv) and the order thereon, (3) amendments to the Plan, (4) supplemental Plan documents (including, without limitation, any schedule related to the assumption or rejection of executory contracts), (5) the Confirmation Order, (6) the stipulation providing for use of cash collateral by Parent and its Subsidiaries and related pleadings, (7) any postpetition financing agreement and related documents and pleadings, (8) any motion to assume or reject an executory contract and related proposed order, and (9) any exit financing facility agreement and related documents, final forms of which documents listed in this paragraph 9.4(a)(iii) shall be subject to approval of C/G and Spyglass prior to their filing and/or execution (as applicable) by Parent or its Subsidiaries; and

(iv)    Promptly forward to C/G and Spyglass a copy (unless already served on the counsel of C/G and Spyglass) of any other notices, applications, motions, objections, responses, proposed orders or other documents or pleadings

filed with a court or regulatory agency and received by Parent relating in any way to this Agreement or the Contemplated Transactions.

(b)     C/G or Spyglass, as applicable, shall:

(i)     Promptly notify Parent in writing of the occurrence of (A) any circumstance or event that will result in, or would reasonably be expected to result in, the failure of any of the closing conditions specified in Section 11.1 of this Agreement to be satisfied or (B) any C/G/S Material Adverse Effect;

(ii)     Promptly forward to Parent at least three (3) Business Days in advance of filing or execution (as applicable) drafts, for Parent's reasonable comment, of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that C/G, Spyglass and/or their respective Subsidiaries intend to file in the Chapter 11 Cases that relate to this Agreement, the Mergers, the Contribution, the Plan (including the solicitation or confirmation thereof), Parent or any of the MGM Companies, or in any manner relate to or affect the Contemplated Transactions; provided, however, that in the case of the emergency filing of any document listed in this Section 9.4(b)(ii), C/G and Spyglass shall use commercially reasonable efforts to forward (to the extent possible) drafts to Parent so as to provide Parent sufficient advance notice for review and reasonable comment; and

(iii)     Promptly forward to Parent a copy (unless already served on Parent's counsel) of any notice, application, motion, objection, response, proposed order or other documents or pleadings filed with a court or regulatory agency and received by any of C/G or Spyglass relating in any way to this Agreement or the Contemplated Transactions.

Section 9.5     Access to Personnel and Information.  Each of C/G and Spyglass shall afford Parent and its Representatives reasonable access during normal business hours, throughout the period prior to the earlier of the Effective Time and the Termination Date, to its and its Subsidiaries' personnel and properties, contracts, commitments, books and records and any report, schedule or other document filed or received by it pursuant to the requirements of applicable Laws and with such additional accounting, financing, operating and other data and information regarding the C/G Companies and the Contributed Assets, as Parent may reasonably request.  Parent shall give C/G, Spyglass and their respective Representatives reasonable access during normal business hours, upon reasonable advance notice, throughout the period prior to the earlier of the Effective Time and the Termination Date, to its and its Subsidiaries' personnel and properties, contracts, commitments, books and records and any report, schedule or other document filed or received by it pursuant to the requirements of applicable Laws and with such additional accounting, financing, operating and other data and information regarding the MGM Companies as any of them may reasonably request.  No information or knowledge obtained in any investigation pursuant to this Section 9.5 shall affect or be deemed to modify any representation or warranty contained herein or the conditions to the obligations of the parties to consummate the transactions contemplated herein.

Section 9.6    Third Party Transfers.

(a)    Prior to the Closing Date, one or more of the Undersigned C/G Stockholders (collectively, the "Transferring Parties" and individually, a "Transferring Party") may, in the aggregate, transfer up to thirty percent (30%) of their ownership interests in the Cypress/Garoge Common Stock as of the date of this Agreement and as set forth in Section 5.3(c) of the C/G Disclosure Schedule to one or more third parties in one or more cash transactions (each, a "Third Party Transfer").  Prior to the consummation of any Third Party Transfer, a Transferring Party or a C/G Company shall notify Parent of the identity of the proposed transferee in connection with a proposed Third Party Transfer and provide to Parent the full and final terms and conditions ("Terms") with respect to any such proposed Third Party Transfer.  The Terms of any Third Party Transfer shall not in any manner commit, obligate or encumber (i) the Contributed Assets or (ii) any asset or property (including any right, title and interest in or to such asset or property) of any of the C/G Companies, Parent or any of Parent's Subsidiaries without the prior written consent of Parent, and prior to the consummation of any such Third Party Transfer (that so commits, obligates or encumbers the assets described above), Parent shall be reasonably satisfied that the Terms of any such Third Party Transfer shall not otherwise have any adverse consequences to Parent, its Subsidiaries or the respective businesses of Parent and its Subsidiaries.  Parent hereby acknowledges that one of more of the proposed third party transferees in connection with a Third Party Transfer may constitute certain domestic and/or international distribution partners who may have (or may enter into) output distribution arrangements on Terms that are (A) fair to Parent and its Subsidiaries, (B) do not conflict with any existing contractual arrangements of any of the C/G Companies or Parent and its Subsidiaries, and (C) otherwise on customary terms and conditions in the motion picture industry (such Terms to be referred to herein as, "Distribution Terms").  All Distribution Terms shall be subject to the review and prior written consent of Parent (in consultation with the Administrative Agent), which shall not be unreasonably withheld and shall be solely to confirm that the Distribution Terms are in compliance with subclauses (A), (B) and (C).

(b)    Except as set forth in Section 9.6(a), the Undersigned C/G Stockholders hereby agree not to transfer, sell, convey, assign or grant their ownership interests in the Cypress/Garoge Common Stock to any third Persons prior to the earlier of the Closing Date or the Termination Date.

Section 9.7    Affiliate Transactions.  Except as set forth in Section 9.7 of the C/G Disclosure Schedule, all guarantees, obligations and liabilities arising out of or in connection with any agreements or arrangements (whether oral or in writing) between (a) any of the C/G Companies, on one hand, and (b) any Affiliate of the C/G Companies (other than any direct or indirect wholly-owned Subsidiaries) or the Spyglass Companies or an Undersigned C/G Stockholder (or any of their respective Affiliates), on the other hand, or (x) with respect to the Contributed Assets only, any Spyglass Companies, on one hand, and (y) any Affiliates of any Spyglass Companies or any Undersigned C/G Stockholder (or any of their respective Affiliates), on the other hand, shall be terminated prior to the Closing at no cost, and no such guarantees, obligation and liabilities shall exist or remain after the Closing Date; provided, that any such agreements or arrangements between C/G and their direct or indirect wholly-owned Subsidiaries need not be so terminated.  Except as otherwise agreed in writing by Spyglass, all guarantees, obligations and liabilities of Parent, Merger Sub and/or their  respective Subsidiaries to any of

the secured lenders and/or their respective Affiliates under the Credit Agreement shall be satisfied as described in the Plan and otherwise discharged without further obligation or liability after the Closing Date.

Section 9.8 <u>Regulatory Approvals; Reasonable Efforts; Cooperation</u>.

(a) Subject to the terms and conditions set forth in this Agreement, each of the parties hereto shall use its reasonable best efforts (subject to, and in accordance with, applicable Law) to take promptly, or cause to be taken, all actions, and to do promptly, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Contemplated Transactions, including (i) the obtaining by such party of all necessary actions or nonactions, waivers, consents and approvals required to be obtained by such party from Governmental Entities and the making of all necessary registrations and filings and the taking of all steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Entity; (ii) the obtaining by such party of all necessary material consents, approvals or waivers required to be obtained by such party from third Persons; (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, against such party challenging this Agreement or the consummation of the transactions contemplated by this Agreement; (iv) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement; and (v) satisfying or causing to be satisfied all the conditions precedent to the other party (with Parent and Merger Sub treated as one party, and with the other parties treated as one party, for purposes of this clause (v)); <u>provided</u>, <u>however</u>, that in no event shall C/G or Spyglass be required to pay any fee, penalty or other consideration to any third Person under any contract or agreement for any consent or approval required for the consummation of the Contemplated Transactions or to grant or give any waiver or consent. Subject, in the case of Parent to Section 9.10, each party agrees not to take any action or permit any of its Affiliates to take any action that is reasonably likely to have the effect of materially delaying, impairing or impeding the receipt of any such waivers, consents and approvals to be obtained by such party.

(b) Subject to the terms and conditions herein provided and without limiting the foregoing, C/G and Parent shall (i) use reasonable best efforts to cooperate with each other in (A) determining whether any filings are required to be made with, or consents, permits, authorizations, waivers or approvals are required to be obtained from, any third parties or other Governmental Entities in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and (B) timely making all such filings and timely seeking all such consents, permits, authorizations or approvals; (ii) use reasonable best efforts to take, or cause to be taken, all other actions and do, or cause to be done, all other things necessary, proper or advisable to consummate and make effective the transactions contemplated hereby, including taking all such further action as may be necessary to resolve such objections, if any, as the Antitrust Division of the United States Department of Justice, or competition authorities of any other nation may assert under applicable regulatory Law with respect to the transactions contemplated hereby so as to enable the Closing to occur as soon as reasonably possible (and in any event no later than the Termination Date); and (iii) subject to applicable legal limitations and the instructions of any Governmental Entity, keep each other apprised of the status of matters relating to the completion of the transactions contemplated

thereby, including promptly furnishing the other with copies of notices or other communications received by C/G or Parent, as the case may be, or any of their respective Subsidiaries, from any third Person and/or any Governmental Entity with respect to such transactions, except where any such action in the foregoing clauses (i) through (iii) would reasonably be expected to result in a Parent Material Adverse Effect or C/G/S Material Adverse Effect.  C/G shall permit counsel for Parent reasonable opportunity to review in advance, and consider in good faith the views of Parent in connection with, any proposed written communication to any Governmental Entity relating to such approvals.

Section 9.9    Bankruptcy Covenants.

(a)    Subject to Section 9.10, Parent agrees to support and use its reasonable best efforts, and agrees to cause its Subsidiaries to use their respective reasonable best efforts, to consummate the transactions contemplated herein and in the Plan, to timely and properly solicit acceptances for and confirmation of the Plan, to prosecute the Chapter 11 Cases and, without limitation to the foregoing, to take the following actions:

(i)    commencing the solicitation of votes to accept or reject the Plan in accordance with Bankruptcy Code and applicable nonbankruptcy Law no later than five (5) Business Days after the date hereof;

(ii)    commencing the Chapter 11 Cases as promptly as practicable after determining, in Parent's sole and reasonable discretion, that sufficient acceptances of the Plan may have been obtained;

(iii)    filing and seeking Bankruptcy Court orders approving all customary and otherwise necessary "first day" motions, including a motion requesting approval of a cash collateral stipulation; and

(iv)    seeking, as soon as practicable after the commencement of the Chapter 11 Cases (and in no event later than 14 days after commencement of the Chapter 11 Cases) entry of an order of the Bankruptcy Court ("Break-Up Fee Order") (1) deeming any claim of C/G or Spyglass for any portion of the Break-Up Fee that is unpaid in the event the escrow is not available as contemplated in Section 9.10(f), and allowing such claim in full as, a superpriority administrative expense of Parent and its Subsidiaries in the Chapter 11 Cases, junior in priority only to any DIP financing or any Cash Collateral Priority Obligation and any carve-outs for chapter 11 professional fees and expenses and (2) approving the payment of any unpaid fees and expenses owed by Parent to C/G and Spyglass pursuant to the Letter of Intent as administrative expenses of Parent and its Subsidiaries entitled to administrative expense priority.

(b)    Subject to Section 9.10, C/G and Spyglass agree to support and use their respective reasonable best efforts to support, and use their respective reasonable best efforts to consummate, the transactions contemplated herein and under the Plan.

(c)    Subject to Section 9.10, (i) each of Parent, C/G and Spyglass will not (and Parent shall cause its Subsidiaries to not) propose, agree to, consent to, provide any support to, or

509265-1076-01000-Active.12124289.15

participate, directly or indirectly, in the formulation of any modification of the Plan, unless such modification has been agreed to by all parties to this Agreement and the Administrative Agent, (ii) each of Parent C/G and Spyglass will not (and Parent shall cause its Subsidiaries to not) propose, agree to, vote for, consent to, provide any support to, or participate, directly or indirectly, in the formulation of any other plan in the Chapter 11 Cases and will not vote in favor of any plan other than the Plan and (iii) each of Parent, C/G and Spyglass further agrees that it will not (and Parent shall cause its Subsidiaries to not) object to or otherwise commence or support any proceeding or any other Person's efforts to oppose or alter any of the terms of this Agreement, the Plan, or any Reorganization Document and will not take any action, directly or indirectly, that is inconsistent with, or that would prevent, delay or impede approval or confirmation of the Plan or any Reorganization Document; provided, however, that the terms of all such Reorganization Documents are customary and otherwise consistent with the material terms of this Agreement and the Plan. Without limiting the generality of the foregoing and except pursuant to Section 9.10, each of Parent, C/G and Spyglass agrees that it will not (and Parent shall cause its Subsidiaries to not) directly or indirectly seek, solicit, support or encourage any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of Parent or any of its Subsidiaries that could reasonably be expected to prevent, delay or impede the confirmation or approval of the Plan or any Reorganization Document.

(d)     C/G and Spyglass shall cooperate with Parent in response to any reasonable request for the supply of financial and other information reasonably necessary to demonstrate the feasibility of the Plan (other than information subject to confidentiality restrictions). C/G and Spyglass shall reasonably cooperate with Parent with respect to any description of C/G or Spyglass in the Plan or the Disclosure Statement and provide such other information reasonably requested by Parent to provide "adequate information" (as defined in Section 1125 of the Bankruptcy Code) in the Disclosure Statement to holders of claims entitled to vote on the Plan (other than information subject to confidentiality restrictions), and each shall promptly notify Parent if at any time before the effective date of the Plan it becomes aware that the Disclosure Statement contains any untrue statement of material fact or omits to state a material fact regarding C/G or Spyglass, as applicable, required to be stated therein or necessary to make the statements contained therein with respect to such information regarding C/G or Spyglass, as applicable, in light of the circumstances under which they were made, not misleading. The parties will work together in good faith to obtain appropriate protective orders with respect to any information deemed to be commercially sensitive.

(e)     Notwithstanding any provision to the contrary, neither C/G nor Spyglass shall have any right to direct Parent to include any provision in, or to take any action under, the Plan or the Confirmation Order other than as set forth in this Agreement or as shall be required to effectuate, in a manner reasonably satisfactory to Parent and C/G and Spyglass, the transactions to be consummated under the Agreement, Plan or the Confirmation Order.

Section 9.10   No Shop; Break-Up Fee.

(a)     Parent shall, and shall cause its Subsidiaries and its and each of their respective Representatives to, immediately cease and cause to be terminated any discussions or negotiations or processes (including access to any data rooms) with any parties (other than C/G

and Spyglass) that may be ongoing with respect to, or that are intended by Parent or its Representatives to or would be reasonably expected by Parent or its Representatives to lead to, an Acquisition Proposal (a "Competing Proposal").  Parent shall not, and shall cause its Subsidiaries and its and their respective Representatives not to, directly or indirectly, (i) solicit, initiate, propose or take any other action that would be reasonably expected to facilitate any Competing Proposal, (ii) enter into any agreement, arrangement or understanding with respect to any Competing Proposal (including any letter of intent or agreement in principle), (iii) initiate or participate in any way in any negotiations or discussions regarding a Competing Proposal or (iv) furnish or disclose to any third Person any information with respect to, or which would be reasonably expected to lead to, any Competing Proposal; provided, however, that at any time prior to 5:00 p.m. New York time on the date that is 45 calendar days after the date of this Agreement, in response to a bona fide written unsolicited Competing Proposal that is received after the date hereof and constitutes (or could, in the good faith judgment of the Administrative Agent and the Board of Directors, reasonably be expected to lead to) a Superior Proposal, and which Competing Proposal was not, directly or indirectly, the result of a breach of this Section 9.10, Parent may, pursuant to a customary confidentiality agreement (which shall permit Parent to comply with the terms of this Section 9.10 and shall contain confidentiality and standstill provisions not less restrictive to such Person than such provisions of the Confidentiality Agreement are to Spyglass), (A) furnish information with respect to Parent and its Subsidiaries to the Person making such Competing Proposal (and its representatives) so long as all such information has previously been provided to Spyglass or is provided to Spyglass prior to or substantially concurrently with the time it is provided to such Person and (B) participate in discussions or negotiations with the Person making such Competing Proposal (and its representatives) regarding such Competing Proposal; provided, that the Parent shall not take any of the actions referred to in the foregoing clauses (A) or (B) unless the Parent shall have notified Spyglass in writing prior to taking such action.

(b)     Notwithstanding anything to the contrary contained in this Agreement, until 5:00 p.m. New York time on the 45th calendar day after the date of this Agreement, the Board of Directors may, in response to a Superior Proposal made after the date of this Agreement, cause Parent to terminate this Agreement pursuant to and in accordance with Section 12.1(f).  For the avoidance of doubt, after 5:00 p.m. New York time on the date that is 45 calendar days after the date of this Agreement, Parent shall have no right to terminate this Agreement pursuant to Section 12.1(f) or otherwise on account of a Superior Proposal.

(c)     Parent shall promptly, and in no event later than 24 hours after its receipt of any unsolicited Competing Proposal, advise C/G and Spyglass orally and in writing of such Competing Proposal, including the material terms and conditions of such Competing Proposal and the identity of the Person making such Competing Proposal (the "Competition Disclosure"); provided, however, that if the terms of the confidentiality agreement with such Person prohibit the Competition Disclosure, then Parent shall endeavor in good faith to cause such Person to waive its confidentiality agreement for the purpose of making the Competition Disclosure to C/G and Spyglass (and each of their Representatives) but Parent shall not be required to make such Competition Disclosure if such Person does not waive its confidentiality agreement; provided, further, that if Parent discloses the Competition Disclosure to any third Person (other than the Parent's Representatives and lenders and such lenders' Representatives), Parent shall substantially concurrently disclose the Competition Disclosure to C/G and Spyglass.  Subject to

the foregoing provisos, Parent shall keep C/G and Spyglass informed in all material respects on a prompt basis with respect to any change to the status of any such Competing Proposal (and in no event later than 24 hours following any such change). Parent shall provide C/G and Spyglass with prior notice (i) of any meeting of the Board of Directors at which the Board of Directors is expected to consider any Competing Proposal or to consider providing information to any Person in connection with a Competing Proposal; and (ii) if and when the Board of Directors and the Administrative Agent determines a Competing Proposal to be a Superior Proposal.

(d)     If Parent: (i) terminates this Agreement pursuant to and in accordance with Section 9.10(b); (ii) rejects this Agreement (or this Agreement is deemed rejected) pursuant to section 365 of the Bankruptcy Code; or (iii) otherwise terminates (or purports to terminate) this Agreement in breach hereof (i.e., other than as expressly permitted under Section 12.1 below), with the result that the Contemplated Transactions are not consummated (each, a "<u>Break-Up Fee Event</u>"), and so long as C/G and Spyglass are not then in breach of their obligations or representations and warranties under this Agreement such that the conditions set forth in any of Sections 11.1(a), (b) or (c) cannot be satisfied, Parent shall pay (or cause to be paid) to C/G and Spyglass a break-up fee in the total aggregate amount of $4,000,000.00, plus up to an additional (i.e., in addition to any amounts previously paid or paid on the execution of this Agreement) $500,000.00 in expense reimbursements for reasonable and documented out of pocket expenses and reasonable and documented legal fees, tax-related accounting fees and valuation fees and expenses of the Salter Group (the "<u>Break-Up Fee</u>"). The Break-Up Fee payment shall be the sole and exclusive remedy of C/G and Spyglass against Parent, the MGM Companies and any of their respective Affiliates for any loss or damage suffered as a result of a Break-Up Fee Event or any other breach of this Agreement or any representation, warranty, covenant or agreement contained herein by Parent that results in the failure of the Contemplated Transactions to be consummated, and, upon Parent's payment in full in cash of an amount equal to the Break-Up Fee in accordance herewith (including from the escrow proceeds in accordance with Section 9.10(e)), (A) none of C/G, Spyglass or the Undersigned C/G Stockholders shall be entitled to any additional payment, compensation or any damages as a result of any breach, rejection or wrongful termination of this Agreement by Parent, and (B) no party hereto or any of their respective Affiliates shall thereafter seek to recover any losses or damages in connection with this Agreement or arising from any claim or cause of action in connection with the Contemplated Transactions in excess of such amount from Parent, the MGM Companies or any of their respective Affiliates (other than for fraud or breach of the Confidentiality Agreements as set forth in Section 12.2). Notwithstanding anything to the contrary contained in this Agreement (but subject to Section 12.2), the parties expressly agree that C/G and Spyglass (and their Affiliates) shall be entitled to seek to recover damages following termination of this Agreement under Section 12.1 if (and only if) the Break Up Fee is not promptly paid in accordance herewith, but in no event shall such parties be entitled to both receive the Break-Up Fee (or retain any further right to claim the Break-Up Fee under the Escrow Agreement) and pursue damages hereunder. For purposes of the expense reimbursement set forth herein and subject to the $500,000.00 aggregate reimbursement obligation, the parties agree that such expenses shall include the reasonable and documented legal fees and expenses of O'Melveny & Myers, Munger, Tolles & Olson and Allen Matkins and the valuation expenses of the Salter Group.

(e)     To provide for payment of the Break-Up Fee, Parent shall (or shall cause its Subsidiary to), within one (1) Business Day after the date hereof, irrevocably transfer to J.P.

Morgan Escrow Services (and, in doing so, expressly relinquish any right of possession to or control of, other than a reversionary interest) immediately available funds in an amount equal to the Break-Up Fee for deposit into an escrow account which account shall be subject to an escrow agreement in the form attached hereto as <u>Exhibit L</u> (the "<u>Escrow Agreement</u>").

(f)　　If, notwithstanding the Escrow Agreement, the Break-Up Fee or any portion thereof remains unpaid, for any reason, following the occurrence of a Break-Up Fee Event, C/G and Spyglass shall have a claim against Parent and its Subsidiaries in their Chapter 11 Cases for such unpaid amount, which claim shall be deemed to be a superpriority administrative expense of the Chapter 11 Cases, junior in priority only to any DIP financing or any Cash Collateral Priority Obligation and any carve-outs for chapter 11 professional fees and expenses. Such claim shall be paid in full upon the occurrence of a Break-Up Fee Event (in an amount not to exceed the Break-Up Fee) and thereupon discharged, or in the event of a dispute over whether a Break-Up Fee Event has occurred, reserved for in full on such effective date pending further order of the Bankruptcy Court in full satisfaction of any requirement under Section 1129(a)(9) of the Bankruptcy Code, including by amounts on deposit pursuant to the Escrow Agreement to the extent sufficient to cover the Break-Up Fee (or the amount thereof claimed to be unpaid) or any similar arrangement agreed by the parties or approved by the Bankruptcy Court.

(g)　　Any breach of the provisions of this Section 9.10 by any of the Parent's Subsidiaries or the Representatives of Parent or its Subsidiaries shall be deemed to be a breach by Parent.

Section 9.11　　<u>Noncompetition; Nonsolicitation</u>.

(a)　　In consideration of Parent and Merger Sub entering into this Agreement with C/G, Spyglass, the Undersigned C/G Stockholders and the Management Stockholders, each of Spyglass and the Management Stockholders hereby acknowledges and recognizes the highly competitive nature of the businesses of Parent and its Subsidiaries. The Management Stockholders further acknowledge and recognize that, as a stockholder of Cypress and/or Garoge, such party has transferred (or will transfer) its equity interest and indirect interests in the business of C/G to Parent and its Subsidiaries in accordance with this Agreement and has a material economic interest in the Contemplated Transactions. Accordingly, each of Spyglass and the Management Stockholders agrees as follows:

(i)　　The (i) Management Stockholders during the Non-Compete Term (as such term is defined in the Employment Agreements) and (ii) Spyglass during the period commencing on the Closing Date and ending on the Restricted Period End Date, will not, whether on the applicable party's own behalf or on behalf of or in conjunction with any other Person, directly or indirectly (including, for the sake of clarification, through any of the Undersigned C/G Stockholders or any other family trust or similar Persons):

1.　　engage in any business that directly competes with the business of Parent, its Subsidiaries and any Person in which Parent or any of its Subsidiaries beneficially owns fifteen percent (15%) or more of

the outstanding equity securities (collectively, the "Company Group") of producing and distributing film, television and entertainment media properties (including, without limitation, businesses which any member of the Company Group had specific plans to conduct in the future and as to which the applicable Management Stockholder is aware of such planning as of the time of the applicable Management Stockholder's termination of employment) in the 58 counties of California and any other geographical area where the Company Group manufactures, produces, sells, leases, rents, licenses or otherwise conducts its business (a "Competitive Business");

2.  acquire a financial interest in, become employed by, render any services to or otherwise become actively involved with, any Competitive Business, directly or indirectly, as an individual, partner, shareholder, officer, director, employee, principal, agent, trustee or consultant; provided, however, that the foregoing language shall not preclude Spyglass or any of the Management Stockholders from being employed by, rendering services to, or being actively involved with, a subsidiary or division of a Competitive Business, so long as such subsidiary or division of a Competitive Business does not directly or indirectly compete with the Company Group; or

3.  interfere with, or attempt to interfere with, business relationships (whether formed before, on or after the date of this Agreement) between the Company Group or any of its affiliates, customers, clients suppliers, partners, members or investors.

(ii)  Notwithstanding anything to the contrary in this Agreement,

1.  Each of the Management Stockholders and Spyglass may, directly or indirectly own, solely as an investment, securities of any Person engaged in a Competitive Business if such applicable party (i) is not a controlling Person of, or a member of a group which controls, such Person and (ii) does not, directly or indirectly, own 5% or more of any class of securities of such Person;

2.  Each of the Management Stockholders and Spyglass shall be entitled to retain a passive economic interest relating to the motion picture projects listed on Exhibit D of the Employment Agreements and any bona fide sequels, prequels, remakes or spinoffs or any other exploitation relating to such programs or pictures;

3.  Each of the Management Stockholders and Spyglass may (i) receive all fees for Prior Projects (as defined in the Employment

Agreements) and any bona fide sequels, prequels, remakes or spinoffs or any other exploitation relating to such programs or pictures and (ii) receive executive producer or other applicable credits for Prior Projects and any bona fide sequels, prequels, remakes or spinoffs or any other exploitation relating to such programs or pictures;

4.      Each of the Management Stockholders may perform all services permitted to be rendered by the Management Stockholders pursuant to Section 2(d) of the Employment Agreements;

5.      Each of the Management Stockholders shall be permitted to perform any activities and render any services following the Employment Term (as defined in the Employment Agreements) that were permitted hereunder or under the Employment Agreements to be performed or rendered by the Management Stockholder during the Employment Term (including pursuant to any approval of the Parent or the Parent's board of directors);

6.      Subject only to any applicable distributor or other third party restrictions and/or approvals, for motion pictures that are released by the Company Group during the Term (as defined in the Employment Agreements), each of the Management Stockholders shall be entitled to elect to receive and share credit with the designation of either "Producer" or "Executive Producer" with the other co-chairman and chief executive officer of Parent, to be determined solely among them.  Each of the Management Stockholders, along with the other co-chairman and chief executive officer may, at their election, alternate the order in which their names appear as Producer or Executive Producer (i.e., the First Position Credit (as defined in the Employment Agreements)) on every other motion picture that is released by the Company Group during the Term, including any possessory production credit, and may, at their election, alternate receiving First Position Credit on every other motion picture that is released by the Company Group during the Term, other than as set forth above;

7.      Any actions taken by Spyglass in compliance with Section 9.2(c) shall in no event constitute a breach or default by Spyglass (or the Management Stockholders) under this Section 9.11; and

8.      Each of the Management Stockholders shall be permitted to take any actions reasonably necessary to effectuate Third Party Transfers (whether before or after the Closing Date) in accordance with Section 9.6 hereof and Section 4.2(b) of the Stockholders Agreement.

509265-1076-01000-Active.12124289.15

(iii)     The (A) Management Stockholders during the Non-Solicit Term (as such term is defined in the Employment Agreements) and (B) Spyglass during the period commencing on the Closing Date and ending on the Restricted Period End Date, will not, whether on the applicable party's own behalf or on behalf of or in conjunction with any other Person, directly or indirectly (including, for the sake of clarification, through any of the Undersigned C/G Stockholders or any other family trust or similar Persons):

1.     solicit or encourage any employee of the Company Group to leave the employment of the Company Group;

2.     hire any employee who was employed by the Company Group as of the date of the applicable Management Stockholders' termination of employment with the Company Group or who left the employment of the Company Group coincident with, or within one year prior to or after the termination of the applicable Management Stockholders' employment with the Company Group; or

3.     solicit or encourage to cease to work with the Company Group any consultant then under contract with the Company Group;

provided, that nothing herein shall restrict any of the Management Stockholders from engaging, employing or soliciting his personal assistant(s) at the time of such termination.

(b)     It is expressly understood and agreed that although Spyglass and the Management Stockholders and the Company consider the restrictions contained in this Section 9.11 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Section 9.11 is an unenforceable restriction against any of Spyglass and the Management Stockholders, the provisions of this Section 9.11 shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Section 9.11 is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

Section 9.12     Confidentiality.  The C/G Companies, Undersigned C/G Stockholders and Spyglass Companies shall continue to be bound by the terms of that certain Confidentiality Agreement between the parties dated as of January 6, 2010, as amended by that certain amendment dated as of August 18, 2010.  The MGM Companies shall continue to be bound by the terms of that certain Confidentiality Agreement between the parties effective as of August 18, 2010 (the aforementioned agreements are sometimes collectively or individually referred to herein as the "Confidentiality Agreements").

Section 9.13    Public Announcements.  Without the prior written consent of each of the parties, no party hereto shall make, and  no party shall permit its respective officers, shareholders, directors, employees, Affiliates, advisors, agents or representatives to make, any public announcements concerning this Agreement, the Transaction Documents or any discussion between the parties relating to the transactions contemplated hereby, except as may be required by applicable Law or disclosures necessary in connection with financing transactions by C/G and Spyglass, in which case, the other party shall be provided with reasonable prior notice thereof and a reasonable opportunity to comment prior to the issuance of such public announcement.

Section 9.14    Tax.

(a)    Neither Parent nor any of its Subsidiaries shall take any action (including not taking any action) that could cause the Mergers to fail to qualify as "reorganizations" under Section 368(a)(1)(A) of the Code if such failure results from (i) the failure to satisfy the continuity of business enterprise requirement under Treasury Regulations Section 1.368-1(d), (ii) an election made pursuant to Treasury Regulations Section 301.7701-3 to treat Merger Sub as anything other than an entity disregarded as separate from Parent for United States federal income tax purposes or (iii) any action by which Merger Sub becomes anything other than an entity disregarded as separate from Parent for United States federal income tax purposes (as contemplated by Treasury Regulations Section 301.7701-3), unless an Undersigned C/G Stockholder approves, in any capacity, of the conduct or action (including not taking any action) leading to such failure.

(b)    All Tax sharing agreements, Tax indemnity agreements, Tax allocation agreements or similar agreements that may exist between the C/G Companies, on the one hand, and any other Person, on the other hand, and any obligations thereunder shall terminate as of the Closing Date and the C/G Companies shall not be bound thereby or have any liability thereunder.

Section 9.15    No Other Representations and Warranties.  Except for the representations and warranties contained in this Agreement (as modified by the schedules attached hereto), each party agrees that no other party makes any other express or implied representation or warranty with respect to the transactions contemplated by this Agreement. Each party disclaims any other representations or warranties, whether made by such party, or, to the extent applicable, any of its officers, directors, employees, agents or representatives.

# ARTICLE X

# INDEMNIFICATION

Section 10.1    Survival.  The representations and warranties (a) set forth in Section 5.2 (Authority Relative to this Agreement); Section 7.1 (Authority Relative to this Agreement) and Section 7.4 (Title to Shares) shall survive indefinitely and (b) set forth in Section 5.10 (Taxes) shall survive the Closing until 60 days following the expiration of the applicable statute of limitations (taking into account any applicable extensions) (collectively, the "Surviving Representations"); provided, however, that any claim for breach of Section 5.10 made within such applicable time period with reasonable specificity by Parent shall survive until such claim is finally resolved.  Other than the Surviving Representations, the covenants

contained in Section 9.14(a) and those covenants, agreements and other provisions contained herein or in any instrument delivered pursuant to this Agreement (or applicable portions thereof) that by their terms apply or are to be performed in whole or in part after the Effective Time, including the covenants contained in Section 9.2(c) (Conduct of Business by Spyglass Pending and After the Closing), Section 9.11 (Noncompetition; Nonsolicitation) and Section 9.12 (Confidentiality), all of the representations and warranties in Articles V, VI, VII and VIII shall terminate at the Effective Time and the covenants in Article IX in this Agreement shall terminate sixty (60) days following the Effective Time.

Section 10.2 <u>Indemnification</u>. From and after the Closing, subject to the limitations contained herein, the Undersigned C/G Stockholders, severally and not jointly, shall indemnify and save harmless Parent, its Subsidiaries and each of their respective officers, directors, members, partners, managers, employees, agents, successors and assigns (collectively, the "<u>Parent Indemnified Parties</u>") from and against (a) any and all Losses that are imposed on, suffered by or incurred by the Parent Indemnified Parties arising out of or in connection with or relating to any breach of any of the Surviving Representations, (b) any and all liability for Taxes in accordance with Section 10.4 hereof, and (c) any and all Liability to the extent related to the Excluded Cypress/Garage Assets described in Section 1.1(a) of the C/G Disclosure Schedule (including any and all Liability related to the transfer thereof). Following the execution of this Agreement and prior to Closing, the Management Stockholders shall enter into a guaranty agreement in form and substance reasonably acceptable to Parent to guaranty, on a several basis, the due and punctual payment and performance of the indemnification obligations of their respective C/G Trusts hereunder following a claim made on such C/G Trusts for such indemnification obligations (and which guaranty agreement shall permit the Management Stockholders to satisfy any such indemnification obligations with Parent Common Stock as described in Section 10.5(b)).

Section 10.3 <u>Indemnification Procedures</u>. Except as set forth in Section 10.4 below (which shall apply to a breach of Section 5.10 and all other tax-related indemnities), the following shall apply:

(a) <u>Breaches of the Title Representations</u>.

(i) In respect of a claim made against the Parent Indemnified Parties with respect to a breach of Section 7.4 by any Person who is not a party to this Agreement (a "<u>Third Party Claim</u>"), the Parent Indemnified Party must notify the Undersigned C/G Stockholders hereunder (the "<u>Indemnifying Party</u>") in writing of the Third Party Claim promptly following receipt by the Parent Indemnified Parties of notice of the Third Party Claim; <u>provided</u>, <u>however</u>, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been actually and materially prejudiced as a result of such failure. Thereafter, the Parent Indemnified Party shall deliver to the Indemnifying Party, promptly following the Parent Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Parent Indemnified Party relating to the Third Party Claim, other than those notices and documents separately addressed to the Indemnifying Party.

(ii)     The Indemnifying Party will have the right to defend (and control the defense) against, negotiate, settle or otherwise deal with any Third Party Claim which relates to any Losses indemnifiable hereunder and to select counsel of its choice.  If the Indemnifying Party does not within ten (10) Business Days of its receipt of notice of a Third Party Claim pursuant to Section 10.3(a) elect to defend against or negotiate any Third Party Claim which relates to any Losses indemnifiable hereunder, then the Parent Indemnified Party may at the Indemnifying Party's sole cost and expense defend against, negotiate, settle or otherwise deal with such Third Party Claim with counsel of its choice.  If the Indemnifying Party assumes the defense of any Third Party Claim, the Parent Indemnified Party may participate, at its own expense, in the defense of such Third Party Claim; provided, however, that if counsel to the Parent Indemnified Party advises such Parent Indemnified Party that the Third Party Claim involves a conflict of interest that would make it inappropriate for the same counsel to represent both the Indemnifying Party and the Parent Indemnified Party, then the Parent Indemnified Party shall be entitled to retain its own counsel at the cost and expense of the Indemnifying Party.

(iii)     If the Indemnifying Party chooses to defend or prosecute a Third Party Claim, the Parent Indemnified Party shall (and shall cause the applicable Parent Indemnified Parties to) cooperate in the defense or prosecution thereof and make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Parent Indemnified Party's possession or under the Parent Indemnified Party's control relating thereto as is reasonably required by the Indemnifying Party.  Similarly, if the Parent Indemnified Party is defending or prosecuting such Third Party Claim, the Indemnifying Party shall  cooperate in the defense or prosecution thereof and make available to the Parent Indemnified Party, at the Indemnifying Party's expense, all such witnesses, records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as is reasonably required by the Parent Indemnified Party.  If the Indemnifying Party chooses to defend or prosecute a Third Party Claim, no such Third Party Claim may be settled, compromised or discharged by the Indemnifying Party without the prior written consent of the Parent Indemnified Party (which shall not be unreasonably withheld or delayed), unless any such settlement, compromise or discharge (A) obligates the Indemnifying Party (or its Affiliates) to pay the full amount of the Liability in connection with such Third Party Claim, (B) imposes no injunctive or other non-monetary relief against any Parent Indemnified Party and (C) unconditionally releases all Parent Indemnified Parties from all further liability in respect of such Third Party Claim.  The Parent Indemnified Party shall not settle, compromise or consent to the entry of any judgment with respect to such Third Party Claim or admit to any liability with respect to such Third Party Claim without the prior written consent of the Indemnifying Party (which shall not be unreasonably withheld or delayed).

(b)     In the event any Parent Indemnified Party should have a claim against the Indemnifying Party under this Section 10.3 that does not involve a Third Party Claim, the Parent

Indemnified Party shall deliver notice of such claim to the Indemnifying Party promptly following the Parent Indemnified Party becoming aware of the same. The failure by any Parent Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any liability that it may have to such Parent Indemnified Party under this Section 10.3, except to the extent that the Indemnifying Party has been actually and materially prejudiced by such failure. In the event any Parent Indemnified Party should have a claim against the Indemnifying Party under this Section 10.3 that does not involve a Third Party Claim, if the Indemnifying Party does not notify the Parent Indemnified Party within 15 Business Days from its receipt of such notice that the Indemnifying Party disputes such claim, the Indemnifying Party shall be deemed to have accepted and agreed with such claim.

(c)     Any dispute as between the Parent Indemnified Party and the Indemnifying Party with respect to any claim subject to indemnity hereunder that does not involve, or that is not with respect to, any Third Party Claim shall be resolved pursuant to Section 13.5.

Section 10.4   Indemnification Relating to Taxes. The following provisions shall apply with respect to a breach of Section 5.10 and certain other tax-related indemnities:

(a)     Indemnity by Undersigned C/G Stockholders. Subject to the limitations set forth in Section 10.4(d), Section 10.4(f) and Section 10.5, each Undersigned C/G Stockholders agrees, severally based on such shareholder's Percentage Interest and not jointly, to indemnify, defend and hold harmless the Parent Indemnified Parties against any and all Losses that are imposed on, suffered by or incurred by any Parent Indemnified Party arising out of or in connection with or relating to (i) any breach of Section 5.10, (ii) any Tax payable (and not paid prior to Closing) by or on behalf of the applicable C/G Companies for any Pre-Closing Tax Period, and (iii) any deficiencies in any Tax payable (and not paid prior to Closing) by or on behalf of the applicable C/G Company arising from any audit by any taxing agency or authority with respect to any Pre-Closing Tax Period; provided, however, that the Undersigned C/G Stockholders shall be liable only to the extent that the aggregate Losses or Taxes exceed the sum of (x) the estimated Tax payments for the current taxable year made by the applicable C/G Companies prior to the Closing Date and (y) the amount of cash and cash equivalents, if any, set forth on the applicable C/G Company Closing Date Balance Sheet. The term "Pre-Closing Tax Period" means all taxable periods ending on or before the Closing Date and the portion of a taxable period ending on the Closing Date of any taxable period that includes (but does not end on) the Closing Date. The term "Percentage Interest" means a percentage calculated separately with respect to each of Cypress and Garoge for each Undersigned C/G Stockholder, the percentage found by dividing the number of shares owned on the date hereof by such Undersigned C/G Stockholder in Cypress or Garoge, as the case may be, by the total number of outstanding shares on the date hereof of such C/G Company. For the avoidance of doubt, the Percentage Interest of any Undersigned C/G Stockholder that does not own any stock in a particular C/G Company shall be zero.

(b)     Post-Closing Tax Period Taxes. Parent and Merger Sub shall be jointly and severally liable for and shall timely pay all Taxes of or attributable to the C/G Companies that relate to any Post-Closing Tax Period, and no Undersigned C/G Stockholder shall have any liability or indemnification obligation whatsoever for such Taxes.

76

(c)    Straddle Period.  For purposes of Section 10.4(a), in the case of any Taxes that are imposed on a periodic basis and are payable for a Tax period that includes (but does not end on or before) the Closing Date ("Straddle Period"), the portion of such Tax related to the Pre-Closing Tax Period shall (i) in the case of any Taxes other than Taxes based upon or related to income, sales, gross receipts, wages, capital expenditures or expenses, be deemed to be the amount of such Tax for the Straddle Period multiplied by a fraction the numerator of which is the number of days in the Pre-Closing Tax Period (ending on and including the Closing Date) and the denominator of which is the number of days in the Straddle Period, and (ii) in the case of any Tax based upon or related to income, sales, gross receipts, wages, capital expenditures or expenses, be deemed equal to the amount which would be payable if the Pre-Closing Tax Period ended (and based on an interim closing of the books) as of the close of business on the Closing Date.

(d)    Refunds and Tax Benefits.  The parties agree that (i) any and all Tax refunds (including interest) attributable to a Pre-Closing Tax Period of any C/G Company that are received by Parent, and/or Merger Sub, and/or any of their Affiliates and/or Subsidiaries, and (ii) any amounts credited against Taxes which Parent and/or Merger Sub and/or any of their Affiliates and/or Subsidiaries actually realize with respect to any Tax Return for any Pre-Closing Tax Periods of the C/G Companies, shall be for the account of the Undersigned C/G Stockholders of such entity, and the Parent shall pay over to the applicable Undersigned C/G Stockholders any such refund or the amount of such actually realized credit within 15 days of receipt or entitlement thereto.  For the avoidance of doubt, to the extent any and all refunds or credits of the C/G Companies are attributable (determined on a with and without basis) to the carryback of Post-Closing Tax Period items of loss, deduction or credit, or other Tax items of Parent and/or Merger Sub (or any of their Affiliates or Subsidiaries), such refunds or credits shall be for the account of Parent (or any of its Affiliates or Subsidiaries, as the case may be).

(e)    Responsibility for Filing Tax Returns; Reporting; Cooperation.

(i)    The Cypress/Garoge Stockholder Representative shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for the C/G Companies that are required or permitted to be filed after the Closing Date and that relate to Pre-Closing Tax Periods (other than any Straddle Period).  If the Cypress/Garoge Stockholder Representative is precluded by applicable Law from filing such Tax Returns, then Parent shall file or cause such Tax Returns to be filed in accordance with the following procedure.  The Cypress/Garoge Stockholder Representative shall deliver any such Tax Return (or draft of such Tax Return that is not expected to materially change before such Tax Return is finalized) to Parent for its review and comment at least 45 days prior to the due date (including extensions) of such Tax Return.  Parent shall notify the Cypress/Garoge Stockholder Representative, in writing, no later than 15 days after receipt of each such Tax Return if Parent objects to any matter set forth in such Tax Return.  If Parent does not object with specificity to any matter set forth in such Tax Return during said 15 day period, then Parent shall be deemed to have approved such Tax Return.  If Parent objects with specificity during said 15 day period, then the parties shall engage in good faith discussions to resolve such disagreement.  If they are unable to resolve such disagreement within 15

days thereafter, then the disputed items shall be resolved (within a reasonable time, taking into account the deadline for filing such Tax Return) with respect to (A) items for which the Undersigned C/G Stockholders are or Parent is solely liable, by reference to such party's treatment, and (B) all other items, by the Accountant. Upon resolution of all disputed items, the relevant Tax Return shall be adjusted to reflect such resolution and shall be binding upon the parties without further adjustment. The costs, fees and expense of the Accountant shall be borne equally by Parent and the Undersigned C/G Stockholders. For purposes hereof, the "Accountant" shall mean the Los Angeles office of Ernst & Young LLP. If Ernst & Young LLP is unwilling or unable to serve as the Accountant, then the Cypress/Garoge Stockholder Representative and Parent shall select by mutual agreement another independent certified public accounting firm to serve as the Accountant.

(ii) Parent shall prepare or cause to be prepared and file or cause to be filed on a timely basis all Tax Returns with respect to the C/G Companies (including, post-Closing, Merger Sub) due after the Closing Date (taking into account extensions) that are attributable to (A) Post-Closing Tax Periods, or (B) the Straddle Period. Parent shall be responsible for timely remitting all Taxes reflected on such Tax Returns and the Undersigned C/G Stockholders shall reimburse Parent for any amounts owed in respect of Taxes reflected on such Straddle Period Tax Returns for which the Undersigned C/G Stockholders are required to indemnify Parent and Merger Sub pursuant to the provisions of this Section 10.4.

(iii) Any Tax Return prepared or caused to be prepared by Parent for which the Undersigned C/G Stockholders could be liable for any portion of the Taxes reflected on such Tax Return hereunder shall be prepared in a manner consistent with past practice and without a change of any election or any accounting method and shall be submitted to the Cypress/Garoge Stockholder Representative at least 45 days prior to the due date (including extensions) of such Tax Return. The Cypress/Garoge Stockholder Representative shall have the right to review all work papers and procedures used to prepare any such Tax Return. If the Cypress/Garoge Stockholder Representative, within 15 days after delivery of any such Tax Return, notifies the Parent in writing that he objects, with specificity, to any items in such Tax Return for which the Undersigned C/G Stockholders could be liable hereunder, then the parties shall proceed in good faith to resolve the disputed items. If the parties are unable to do so within 15 days thereafter, then the disputed items shall be resolved (within a reasonable time, taking into account the deadline for filing such Tax Return) with respect to (A) items for which Undersigned C/G Stockholders are or Parent is solely liable, by reference to such party's treatment and (B) all other items, by the Accountant. Upon resolution of all disputed items, the relevant Tax Return shall be adjusted to reflect such resolution and shall be binding upon the parties without further adjustment. The costs, fees and expense of the Accountant shall be borne equally by Parent and the Undersigned C/G Stockholders.

78

(iv)    The Undersigned C/G Stockholders and Parent shall reasonably cooperate, and shall cause their respective Affiliates, agents, auditors, representatives, officers and employees reasonably to cooperate, in preparing and filing all Tax Returns relating to the C/G Companies (including amended returns and claims for refund), including maintaining and making available to each other all records reasonably necessary in connection with Taxes and in resolving all disputes and audits with respect to all taxable periods relating to Taxes.  Parent and the C/G Companies agree to retain or cause to be retained all books and records pertinent to the C/G Companies until the applicable period for assessment under applicable Law (giving effect to any and all extensions or waivers) has expired, and to abide by or cause the abidance with all record retention agreements entered into with any taxing authority.  Parent and the Undersigned C/G Stockholders shall reasonably cooperate with each other in the conduct of any audit or other proceedings involving the C/G Companies for any Tax purposes and each shall execute and deliver such powers of attorney and other documents as are reasonably necessary to carry out the intent of this subsection.

(v)    The Cypress/Garoge Stockholder Representative shall have the responsibility for, and the right to control, at the Undersigned C/G Stockholders' sole expense, the audit (and disposition thereof) of any Tax Return relating to a Pre-Closing Tax Period (other than any Straddle Period) of the C/G Companies.  Parent shall have the responsibility for, and the right to control, at Parent's sole expense, the audit (and disposition thereof) of any Tax Return relating to a Post-Closing Tax Period or Straddle Period.  The Cypress/Garoge Stockholder Representative shall have the right to participate, at its own expense, in the disposition of the audit of any such Tax Return relating to any Post-Closing Tax Period or Straddle Period if such audit or disposition thereof could give rise to a claim for indemnification against any Undersigned C/G Stockholder hereunder.  Parent shall have the right directly or through its designated representatives, to review in advance and comment upon all submissions made in the course of audits or appeals thereof to any Governmental Entity relating to any Pre-Closing Tax Period and to approve the disposition of any audit adjustment with respect to such periods if such disposition would reasonably be expected to result in a material increase in Taxes of Parent or the C/G Companies for any Post-Closing Tax Period or Straddle Period.

(vi)    If any claim, demand, suit, action, litigation or proceeding for Taxes in respect of which indemnity may be sought pursuant to Section 10.4(a) is asserted in writing against Parent, or any of its Affiliates or Subsidiaries, Parent shall promptly notify the Cypress/Garoge Stockholder Representative in writing of such claim or demand within sufficient time that would allow the Cypress/Garoge Stockholder Representative to timely respond to such claim or demand, and shall give the Cypress/Garoge Stockholder Representative such information (that is within its possession or control) with respect thereto as the Cypress/Garoge Stockholder Representative may reasonably request; provided, however, that the failure to give such notice shall not affect the indemnification

provided hereunder except to the extent the Undersigned C/G Stockholders have been materially prejudiced as a result of such failure. The Cypress/Garoge Stockholder Representative shall have the responsibility for, and the right to control, at the expense of the Undersigned C/G Stockholders, the disposition of any claim, demand, suit, action, litigation or proceeding for Taxes relating to Pre-Closing Tax Periods (other than any Straddle Period) of the C/G Companies; provided, however, that the Cypress/Garoge Stockholder Representative must first consult, in good faith, with Parent before taking any action with respect to the conduct of such proceeding and may not settle any such proceeding without the prior consent of Parent, which shall not be unreasonably withheld, conditioned or delayed, if such action would reasonably be expected to result in an increase in Taxes of Parent, Merger Sub or the C/G Companies for any Post-Closing Tax Period or Straddle Period. Parent shall have the responsibility for, and the right to control, at Parent's sole expense, the disposition of any claim, demand, suit, action, litigation or proceeding for Taxes relating to a Post-Closing Period or Straddle Period. The Cypress/Garoge Stockholder Representative shall have the right to participate, at its own expense, in the disposition of any claim, demand, suit, action, litigation or proceeding for Taxes relating to such Post-Closing Tax Period or Straddle Period if such claim, demand, suit, action, litigation or proceeding could give rise to a claim for indemnification against the Undersigned C/G Stockholders hereunder. Whether or not the Cypress/Garoge Stockholder Representative chooses to defend or prosecute any claim, all of the parties hereto shall reasonably cooperate in the defense or prosecution thereof. The Undersigned C/G Stockholders shall not be liable under Section 10.4(a), for any settlements or payments (i) effected without the consent of the Cypress/Garoge Stockholder Representative if required under the terms of this Section 10.4(e), or (ii) resulting from any claim, suit, action, litigation or proceeding in which the Cypress/Garoge Stockholder Representative was otherwise entitled to participate but was not permitted an opportunity to participate.

(f)     Limitation.  Notwithstanding anything else contained herein, no C/G Stockholder shall have any indemnification or payment obligation under this Article X with respect to any Taxes for Pre-Closing Tax Periods that are attributable to any action taken outside of the ordinary course of business by Parent and/or Merger Sub and/or any of their Affiliates and/or Subsidiaries after the Closing Date (other than the actions contemplated hereunder or any actions required under applicable law) or the breach by Parent and/or any of its Affiliates and/or Subsidiaries of any covenants, agreements, or obligations hereunder. The obligation of the Undersigned C/G Stockholders to indemnify, defend and hold harmless the Parent Indemnified Parties in Section 10.4(a) shall terminate upon the 60th day following the expiration of all applicable statutes of limitation (taking into account any applicable extensions) applicable to any Taxes payable by Parent, Merger Sub, or any Affiliate or Subsidiary thereof, or any C/G Company attributable to the Pre-Closing Tax Period; provided, however, that any claim made for indemnification under this Section 10.4 within such applicable time period with reasonable specificity shall survive until such claim is finally resolved.

509265-1076-01000-Active.12124289.15

Section 10.5    Limitations and Other Provisions.  Notwithstanding anything else contained herein:

(a)    In no event will the cumulative aggregate indemnification obligation under this Article X of any Undersigned C/G Stockholders exceed the aggregate consideration received thereby at the Closing of the Contemplated Transactions; provided, however, any indemnification obligation under this Article X relating to Taxes or the Excluded Cypress/Garoge Assets shall not be (i) limited to the aggregate consideration received by the Undersigned C/G Stockholders as provided in this Section 10.5(a) or (ii) taken into account in determining the amount of the aggregate indemnification obligation of any Undersigned C/G Stockholder as provided in this Section 10.5(a).

(b)    Any indemnification obligation under this Article X of an Undersigned C/G Stockholder may be satisfied, at the sole and absolute election of such Undersigned C/G Stockholder, with cash, shares of Parent Common Stock then held by such Undersigned C/G Stockholder (valued at the then fair market value thereof) or any combination thereof; provided that for any indemnification claims made within twelve (12) months following the Closing Date, the fair market value shall be deemed to be $25.00 per share; and otherwise fair market value shall be determined by an independent investment banking firm selected by the parties using the mid-point of valuation methodologies reasonably determined by such firm.

(c)    No claim may be made against the Indemnifying Party with respect to any possible or potential Loss that the Parent Indemnified Party believes may be asserted or incurred where there has not been a claim actually filed of record against the Parent Indemnified Party or an indemnifiable Loss actually paid or incurred by the Parent Indemnified Party.

(d)    To the extent that a Parent Indemnified Party is otherwise indemnified, insured, or compensated for or otherwise recovers any Loss for which indemnification may be asserted under this Article X, then no indemnity shall be permitted for that Loss pursuant to this Article X.  Furthermore, the amount of Loss payable under this Article X by the Indemnifying Party shall be reduced by all amounts with respect thereto recovered by the Parent Indemnified Party under applicable insurance policies or from any other Person.  If the Parent Indemnified Party receives any such amounts under applicable insurance policies or otherwise from any other Person subsequent to an indemnification payment by the Indemnifying Party, then the Parent Indemnified Party shall promptly reimburse the Indemnifying Party for any payment made or expense incurred by the Indemnifying Party in connection with providing such indemnification up to the amount received by the Parent Indemnified Party.

(e)    The Indemnifying Party will not be liable for any Loss, and will not have any indemnity obligation, with respect to (i) any indirect, special, incidental, consequential, or punitive damages, or any claim for diminution in value, interruption of business, lost opportunity, loss of business reputation, or lost profits, in any case except to the extent included in a Third Party Claim subject to indemnification under this Article X, (ii) any Loss that arises out of changes after the Closing in any applicable Law or interpretations or applications thereof or (iii) any Loss that results from the gross negligence, willful misconduct, or fraud of the Parent Indemnified Party.

Section 10.6    Exclusive Remedy.  The parties agree that, other than claims for specific performance or injunctive relief and other than in the event of fraud or willful misconduct, from and after the Closing the remedies provided in this Article X shall be the sole and exclusive remedies of all of the parties and their respective successors and assigns with respect to any breach of any representation or warranty contained in this Agreement.

Section 10.7    Treatment of Indemnification Payments.  Except as otherwise required by applicable Law, the parties shall treat any indemnification payment made hereunder as an adjustment to the aggregate consideration paid or received by the parties hereunder.

## ARTICLE XI

## CONDITIONS PRECEDENT

Section 11.1    Condition Precedent to Obligations of Parent.  The obligation of Parent to effect the Mergers and the Contribution at the Closing shall be subject to the satisfaction or waiver at or prior to the Closing of the following conditions precedent:

(a)    Accuracy of Representations.  The representations and warranties of C/G and Spyglass set forth herein shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date, except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "materiality" or "C/G/S Material Adverse Effect" set forth therein) does not have, and would not reasonably be expected to have, individually or in the aggregate, a C/G/S Material Adverse Effect; provided, that the representations and warranties of (A) (i) C/G set forth in Section 5.1 (Qualification; Organization; Subsidiaries), Section 5.2 (Authority Relative to this Agreement), Section 5.3 (Capital Stock) and Section 5.17 (Brokers and Finders; Transaction Expenses), (ii) Spyglass set forth in Section 6.2 (Authority Relative to this Agreement) and Section 6.9 (Investment) and (iii) the Undersigned Stockholders as set forth in Section 7.4 (Title to Shares) (subject to any changes for any Third Party Transfers consummated in accordance with Section 9.6) and Section 7.5 (Investment), shall be true and correct both when made and at and as of the Closing Date, as if made at and as of such time, and (B) C/G set forth in Section 5.11(a) (Intellectual Property) shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date, except where the failure of such representations and warranties would not be reasonably expected to be material to Target taken as a whole.

(b)    No Material Adverse Effect.  From the date hereof, there shall not have been a C/G/S Material Adverse Effect.

(c)    Performance of Obligations.  C/G and Spyglass have in all material respects performed all obligations and complied with all covenants herein required to be performed or complied with by them at or prior to the Effective Time, and the obligations of C/G in Section 9.7 shall have been duly performed and complied with.

(d)    Effectiveness of the Plan.  The Plan, which during the term of this Agreement shall not have been modified from the form attached hereto as Exhibit A except as expressly agreed by Parent, the Administrative Agent, C/G and Spyglass, has been accepted on

or before thirty (30) days after the commencement of solicitation as contemplated by Section 9.9(a)(i) by the requisite votes under the Bankruptcy Code of the lenders under the Credit Agreement and has been effectuated in accordance with all of its provisions, including, without limitation, the conversion of the debt into Parent Common Stock and the existing outstanding equity interests, such that, on the Closing Date, the Undersigned C/G Stockholders and Spyglass (together with any transferees thereof) shall own in the aggregate the percentages of equity set forth in Section 4.1(a) and (b).

(e) <u>Court Approval</u>. The Bankruptcy Court has entered the Confirmation Order that is acceptable to Parent, the Administrative Agent, C/G and Spyglass, and that order is in full force and effect and has not been reversed, stayed, modified or amended in any manner, material to Parent.

(f) <u>No Adverse Proceedings</u>. No Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently restricting, enjoining or otherwise prohibiting in any material respect the transactions contemplated by this Agreement which order, decree, ruling or other action shall have become final and nonappealable.

(g) <u>Tax Certificate</u>. The C/G Companies, Spyglass and the Undersigned C/G Stockholders, as applicable, shall have delivered to Parent a certificate in the form attached hereto as <u>Exhibit P</u>, duly executed and acknowledged, certifying that the Contemplated Transactions are exempt from withholding under Section 1445 of the Code.

(h) <u>Transaction Documents</u>. Each of the Undersigned C/G Stockholders, Spyglass and the Management Stockholders shall have executed and delivered the Stockholders Agreement, the Registration Rights Agreements and the Employment Agreements, as applicable, to Parent.

(i) <u>Closing Certificate</u>. A duly authorized officer of C/G and Spyglass shall have executed and delivered to Parent at the Closing a certificate (a) having attached thereto copies of all resolutions approved by the Board of Directors of C/G and Spyglass and the stockholders of C/G related to the Contemplated Transactions, each of which shall be in full force and effect and shall not have been modified, and (b) certifying that the conditions specified in Section 11.1(a), Section 11.1(b) and Section 11.1(c) are fulfilled as of the Closing.

Section 11.2 <u>Condition Precedent to Obligations of Spyglass and C/G</u>. The obligation of C/G and Spyglass to effect the Mergers and the Contribution at the Closing shall be subject to the satisfaction or waiver (by each of them) at or prior to the Closing of the following conditions precedent:

(a) <u>Accuracy of Representations</u>. The representations and warranties of Parent and Merger Sub set forth herein shall be true and correct in all respects as of the date of this Agreement and as of the Closing Date, except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "materiality" or "Parent Material Adverse Effect" set forth therein) does not have, and would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect; <u>provided</u>, that the representations and warranties of Parent and Merger Sub set forth in Section 8.2

(Authority Relative to this Agreement), Section 8.3 (Capital Stock) and Section 8.17 (Brokers and Finders; Transaction Expenses) shall be true and correct both when made and at and as of the Closing Date, as if made at and as of such time.

(b)    No Material Adverse Effect.  From the date hereof, there shall not have been a Parent Material Adverse Effect, and there shall not have been any change, event, occurrence, condition, circumstance, development or effect after the date hereof (other than the expiration of Intellectual Property rights pursuant to their contractual terms by the mere passage of time or due to events otherwise wholly unrelated to the Contemplated Transactions) which adversely affects the MGM Companies' right to use the Parent Intellectual Property in their businesses as presently conducted in a manner that would be reasonably expected to be, individually or in the aggregate, material to the MGM Companies taken as a whole.

(c)    Performance of Obligations.  Parent and Merger Sub has in all material respects performed all obligations and complied with all covenants herein required to be performed or complied with by at or prior to the Effective Time.

(d)    Effectiveness of the Plan.  The Plan, which during the term of this Agreement shall not have been modified from the form attached hereto as Exhibit A except as expressly agreed by Parent, the Administrative Agent, C/G and Spyglass, has been accepted by the requisite votes under the Bankruptcy Code of the lenders under the Credit Agreement and has been effectuated in accordance with all of its provisions, including, without limitation, the conversion of the debt into Parent Common Stock and the existing outstanding equity interests, such that, on the Closing Date, the Undersigned C/G Stockholders and Spyglass (together with any transferees thereof) shall own in the aggregate the percentages of equity set forth in Section 4.1(a) and (b).

(e)    Court Approval.  The Bankruptcy Court has entered the Confirmation Order that is acceptable to Parent, the Administrative Agent, C/G and Spyglass, the Order is in full force and effect, and it has not been reversed, stayed, modified or amended in any manner, material to Parent.

(f)    No Adverse Proceedings.  No Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently restricting, enjoining or otherwise prohibiting in any material respect the Contemplated Transactions which order, decree, ruling or other action shall have become final and nonappealable.

(g)    Transaction Documents.  Each of the parties to the Stockholders Agreement, the Registration Rights Agreement, the Employment Agreements and the Indemnification Agreements (other than the Undersigned C/G Stockholders and Spyglass) shall have executed and delivered such Transaction Documents to the Undersigned C/G Stockholders and Spyglass.

(h)    Board of Directors.  The Board of Directors shall have an authorized size of nine (9) members and the members thereof shall include the Management Stockholders.

(i)    Charter Documents; Senior Management Investment Plan.  The Certificate of Incorporation and Bylaws of Parent, in the forms attached hereto as Exhibit B-1 and Exhibit

84

<u>B-2</u>, respectively, and the Senior Management Equity Investment Plan shall have been duly adopted by all necessary action of the Board of Directors and the stockholders of Parent and shall be in full force and effect.

        (j)    <u>Closing Certificate</u>.  A duly authorized officer of Parent shall have executed and delivered to Spyglass and the Undersigned C/G Stockholders at the Closing a certificate (i) having attached thereto (A) the Certificate of Incorporation of Parent, the Bylaws of Parent, and the Senior Management Equity Investment Plan, each as in effect at the time of Closing, (B) the Confirmation Order, (C) copies of all resolutions approved by the Parent's Board of Directors and stockholders related to the Contemplated Transactions, each of which shall be in full force and effect and shall not have been modified, and (ii) certifying that the conditions specified in Section 11.2(a), Section 11.2(b) and Section 11.2(c) are fulfilled as of the Closing.

        (k)    <u>Executory Contracts</u>.  Without the written consent of C/G, none of the MGM Companies that is a debtor in the Chapter 11 Cases shall have rejected any material executory contract or unexpired lease to which it is a party other than those material executory contracts and unexpired leases (i) listed on <u>Exhibit O</u> or (ii) that the MGM Companies would be permitted to terminate or amend in the ordinary course of business consistent with past practice under Section 9.3(b)(vii)(B).  Unless the written consent of C/G has been provided, the MGM Companies shall be obligated to reject the contracts and leases listed on <u>Exhibit O</u>.

# ARTICLE XII

# TERMINATION

        Section 12.1    <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated herein may be abandoned prior to Closing:

        (a)    by the mutual written consent of Parent, Spyglass and C/G;

        (b)    immediately upon written notice of C/G and Spyglass to Parent, in the event that Parent has not, on or before forty-five (45) days after the date hereof, commenced the Chapter 11 Cases, unless a later date has been agreed to in writing by each of Parent, C/G and Spyglass in their sole discretion;

        (c)    immediately upon written notice of C/G and Spyglass to Parent in the event the Bankruptcy Court shall not have entered the Break-Up Fee Order within fourteen (14) days following commencement of the Chapter 11 Cases;

        (d)    on or after February 1, 2011, immediately upon written notice of C/G and Spyglass to Parent, so long as C/G and Spyglass are not then in breach of their material obligations under this Agreement, (i) upon the occurrence of the inability of any of the conditions precedent set forth in Section 11.2 to be satisfied or (ii) if Parent or Merger Sub has committed a material breach of its representations, warranties or covenants under this Agreement such that the conditions set forth in Section 11.2 cannot be satisfied; and if such breach or failure is by its nature capable of being cured Parent has not remedied such breach or satisfied such

condition within ten (10) calendar days after the receipt of written notice by Parent from C/G and Spyglass specifying such breach or unsatisfied condition;

(e)     immediately upon written notice of Parent to C/G and Spyglass, so long as Parent and Merger Sub are not then in breach of its material obligations under this Agreement, (i) upon the occurrence of the inability of any of the conditions precedent set forth in Section 11.1 to be satisfied or (ii) if C/G or Spyglass has committed a material breach of its representations, warranties or covenants under this Agreement such that the conditions set forth in Section 11.1 cannot be satisfied; and if such breach or failure is by its nature capable of being cured C/G or Spyglass has not remedied such breach or satisfied such condition within ten (10) calendar days after the receipt of written notice by C/G and Spyglass from Parent specifying such breach or unsatisfied condition;

(f)     until 5:00 p.m. New York time on the 45th calendar day after the date of this Agreement, upon written notice of Parent to C/G and Spyglass in the form of Exhibit M attached hereto of Parent's receipt of a Superior Proposal not in violation of Section 9.10 and attaching irrevocable instructions to the escrow agent executed by Parent to promptly release and pay the $4,000,000 portion of the Break-Up Fee (a "Termination and Release of Funds Notice"); or

(g)     by either C/G and Spyglass or Parent if the Closing does not occur on or prior to March 31, 2011 (the "Termination Date"); provided that the right to terminate this Agreement under this Section 12.1(g) shall not be available to any party whose breach of any provision of this Agreement has been a cause of the failure of the Closing to occur on or before the Termination Date.

Section 12.2    Effect of Termination.  In the event of the termination of this Agreement by any party hereto pursuant to and in accordance with the terms of this Article XII, written notice thereof shall forthwith be given to the other party or parties specifying the provision hereof pursuant to which such termination of the Contemplated Transactions is made. Upon termination of this Agreement pursuant to and in accordance with this Article XII, there shall be no liability or obligation thereafter on the part of Parent to C/G or Spyglass or any of their respective Affiliates except (A) for fraud, (B) if the Break-Up Fee is not paid, for willful breach of this Agreement prior to such termination of the Contemplated Transactions pursuant to this Article XII, (C) pursuant to the Confidentiality Agreements, or (D) with respect to any obligations of Parent to pay the Break-Up Fee in accordance with Section 9.10(d), (e) and (f) (and subject to the terms thereof, including with respect to limitation of liability).  Upon termination of this Agreement pursuant to and in accordance with this Article XII, there shall be no liability or obligation thereafter on the part of C/G, Spyglass, the Undersigned C/G Stockholders or Management Stockholders to Parent or any of its Affiliates, except (X) for fraud, (Y) for willful breach of this Agreement prior to such termination of the Contemplated Transactions pursuant to this Article XII and (Z) pursuant to the Confidentiality Agreements (any such liability on the part of C/G or Spyglass to be solely for the benefit of those of Parent's Subsidiaries that are "Loan Parties" under the Credit Agreement and not for the benefit of Parent or its shareholders or any other Affiliate of Parent).  No party shall be liable under this Agreement for any special, punitive, consequential or other similar indirect damages.

# ARTICLE XIII

## GENERAL PROVISIONS

Section 13.1    <u>Notices</u>.  All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed received upon the earliest of (a) confirmation of receipt of a facsimile transmission, (b) confirmed delivery by a standard overnight carrier or when delivered by hand or (c) the expiration of five (5) Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective parties at the following addresses (or such other address for a party as shall be specified by like notice):

If to C/G, to

Cypress Entertainment Group, Inc.
10900 Wilshire Boulevard, Floor 10
Los Angeles, California  90024
Fax:  (310) 443-5912
Attn:  Gary Barber

and

Garoge, Inc.
10900 Wilshire Boulevard, Floor 10
Los Angeles, California  90024
Fax:  (310) 443-5912
Attn:  Gary Barber

with a copy to

Allen Matkins Leck Gamble Mallory & Natsis LLP
515 South Figueroa Street, 9th Floor
Los Angeles, California  90071
Fax:  (213) 620-8816
Attn:  Jeffrey N. Strug, Esq.

If to Spyglass, to

Spyglass Entertainment Holdings, LLC
10900 Wilshire Boulevard, Floor 10
Los Angeles, California  90024
Fax:  (310) 443-5912
Attn:  Gary Barber

and

Cerberus California, Inc.
11812 San Vicente Boulevard, Suite 300

Los Angeles, CA 90049
Fax: (310) 826-9203
Attn: Steven F. Mayer

with a copy to

O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Fax: (310) 246-6779
Attn: Christopher Brearton, Esq.

with a copy to

Allen Matkins Leck Gamble Mallory & Natsis LLP
515 South Figueroa Street, 9th Floor
Los Angeles, California 90071
Fax: (213) 620-8816
Attn: Jeffrey N. Strug, Esq.

with a copy to

O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Fax: (310) 246-6779
Attn: Sean Monroe, Esq.

If to Parent and Merger Sub, to

MGM Holdings Inc.
10250 Constellation Boulevard
Los Angeles, CA 90067
Fax: (310) 449-3092
Attn: Scott Packman, Esq.

with a copy to

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Los Angeles, CA 90071
Fax: (213) 687-5600
Attn: Rick C. Madden, Esq.

with a copy to

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars

509265-1076-01000-Active.12124289.15

39th Floor
Los Angeles, CA 90067
Fax: (310) 407-9090
Attn: Michael L. Tuchin, Esq.

with a copy to

Simpson Thacher & Bartlett LLP
1999 Avenue of the Stars
29th Floor
Los Angeles, CA 90067
Fax: (310) 407-7502
Attn: Daniel Clivner, Esq.

Section 13.2    Construction.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

Section 13.3    Entire Agreement; Assignment; Binding Effect.  This Agreement (including the exhibits, schedules, and the other documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, among the parties or any of them, with respect to the subject matter hereof, including any transaction between or among the parties hereto, including the Letter of Intent, except that the terms of the Confidentiality Agreements and Paragraph 4(y) (and the two sentences immediately following Paragraph 4(y)) of the Letter of Intent shall survive execution of this Agreement.  Neither this Agreement nor any of the rights, interest obligations hereunder shall be assigned by any of the parties hereto without the prior written of the other parties, except as expressly permitted herein.  Subject to the preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

Section 13.4    No Obligations to Third Parties.  The execution and delivery of this Agreement shall not confer any rights upon any Person or entity other than the parties hereto, or make any Person or entity a third party beneficiary of this Agreement, or obligate the parties to any Person or entity other than the parties to this Agreement.

Section 13.5    Governing Law; Jurisdiction.  To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by, and interpreted in accordance with the laws of the State of Delaware applicable to contracts made and to be performed in that state, without reference to its conflict of law rules.  The parties hereto agree that (i) after the commencement of the Chapter 11 Cases, the Parties will be subject to the exclusive jurisdiction

of the Bankruptcy Court solely with respect to disputes arising under this Agreement prior to the Effective Time and (ii) in all other cases, the appropriate and exclusive forum for disputes arising out of this Agreement shall be the state or federal courts of the State of New York, and the parties hereto irrevocably consent to the exclusive jurisdiction of such courts.

Section 13.6    WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.7    Expenses; Attorneys' Fees.  Except as set forth in the Letter of Intent, whether or not the transactions contemplated herein are consummated, all costs and expenses incurred in connection herewith shall be paid by the party incurring such expenses.

Section 13.8    Amendment.  This Agreement may not be amended except by an instrument in writing signed on behalf of all the parties hereto.

Section 13.9    Waiver.  At any time prior to the Closing Date, the parties hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies of the other parties hereto in the representations and warranties contained herein or in any document delivered pursuant hereto and (c) waive compliance of the other parties hereto with any of the agreements or conditions contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.  No failure or delay on the part of any party hereto to exercise any right or remedy under this Agreement shall operate as a waiver of such right or remedy, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise thereof.  No party shall be deemed to have waived any claim arising out of this Agreement, or any right or remedy under this Agreement, unless the waiver of such claim, right or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such party.

Section 13.10    Counterparts; Effectiveness.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.  This Agreement shall become effective when each party hereto shall have received counterparts thereof signed by the other parties hereto.

Section 13.11    Severability; Validity.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other Persons or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable.

Section 13.12    Disclosure Schedules.  The parties acknowledge and agree that (i) the disclosure of any matters in the Spyglass Disclosure Schedule, the C/G Disclosure Schedule or the Parent Disclosure Schedule to this Agreement shall not be deemed to constitute an acknowledgment by the parties that the matter is required to be disclosed by the terms of this Agreement or that the matter is material and (ii) except as and to the extent provided in this

Agreement, the Spyglass Disclosure Schedule, the C/G Disclosure Schedule and the Parent Disclosure Schedule are qualified in their entirety by reference to specific provisions of this Agreement, and are not intended to constitute, and shall not be construed as constituting, representation or warranties of the parties hereto.

        Section 13.13 <u>Availability of Equitable Relief Following Entry of Confirmation Order</u>. Each of the parties to this Agreement acknowledges and agrees that the other parties to this Agreement would be irreparably damaged in the event that any of the terms or provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached following entry of the Confirmation Order. Therefore, notwithstanding anything to the contrary set forth in this Agreement, each of the parties to this Agreement hereby agrees that, only after entry of the Confirmation Order, the other parties to this Agreement shall be entitled to seek an injunction or injunctions to prevent breaches of any of the terms or provisions of this Agreement, and to enforce specifically the performance by such first party under this Agreement, and each party to this Agreement hereby agrees to waive the defense in any such suit that the other parties to this Agreement have an adequate remedy at law and to interpose no opposition, legal or otherwise, as to the propriety of injunction or specific performance as a remedy, and hereby agrees to waive any requirement to post any bond in connection with obtaining such relief.

**[Remainder of Page Intentionally Blank]**

509265-1076-01000-Active.12124289.15

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

MGM HOLDINGS INC.

By: _____

Name:
Title:  **SCOTT PACKMAN**
**EXECUTIVE VICE PRESIDENT**
**& GENERAL COUNSEL**

C/G ACQUISITION LLC

By:  MGM Holdings Inc., its Managing Member

By: _____

Name:
Title:  **SCOTT PACKMAN**
**EXECUTIVE VICE PRESIDENT**
**& GENERAL COUNSEL**

CYPRESS ENTERTAINMENT GROUP, INC

By: _____
Name: Grant Barber
Title: CEO

GAROGE, INC.

By: _____
Name: Grant Barber
Title: CEO

SPYGLASS ENTERTAINMENT HOLDINGS, LLC

By: _____
Name: Grant Barber
Title: CEO

UNDERSIGNED C/G STOCKHOLDERS:

THE GARY BARBER LIVING TRUST

By: _____
Name: Gary Barber
Title: Trustee

THE ROGER BIRNBAUM FAMILY TRUST

By: _____
Name: Roger Birnbaum
Title: Trustee

BARBER TRUST PARTNERSHIP,
a California general partnership

By: _____
Michael Warsavsky, not individually,
but solely in his capacity as Trustee of the
Dana B. Barber Irrevocable Trust, the
Romy K. Barber Irrevocable Trust, and the
Teri J. Barber Irrevocable Trust
Its: General Partners

2000 BIRNBAUM IRREVOCABLE TRUST

By: _____
Name: Roger Birnbaum
Title: Trustee

JONATHAN GLICKMAN
_____

[Signature Page to the Investment Agreement]

MANAGEMENT STOCKHOLDERS:
(solely for purposes of Sections 7.6, 9.11 and 10.2)

GARY BARBER

_____

ROGER BIRNBAUM

_____

**Exhibit A**

<u>Form of Plan of Reorganization</u>

**Exhibit B-1**

Form of Certificate of Incorporation

**Exhibit B-2**

<u>Form of Bylaws</u>

**Exhibit C**

Form of Certificate of Formation

**Exhibit D**

<u>Stockholders Agreement</u>

**Exhibit E**

Form of Employment Agreement

**Exhibit F**

<u>Registration Rights Agreement</u>

**Exhibit G**

<u>Form of General Assignment and Assumption Agreement</u>

**Exhibit H**

<u>C/G Disclosure Schedule</u>

**Exhibit I**

<u>Spyglass Disclosure Schedule</u>

**Exhibit J**

<u>Parent Disclosure Schedule</u>

**Exhibit K**

Form of Indemnification Agreement

**Exhibit L**

<u>Form of Escrow Agreement</u>

**Exhibit M**

<u>Form of Termination and Release of Funds Notice</u>

**Exhibit N**

<u>Disclosure Statement</u>

**Exhibit O**

<u>Rejected Contracts</u>

**Exhibit P**

Form of Tax Certificate

EXHIBIT D

REGISTRATION RIGHTS AGREEMENT

**REGISTRATION RIGHTS AGREEMENT**

**by and among**

**MGM HOLDINGS INC.**

**and**

**THE HOLDERS NAMED HEREIN**

Dated as of [●], 2010

# TABLE OF CONTENTS

Page

1.  Definitions.................................................................................................1

2.  Securities Act Shelf Registration on Request. .......................................5

    (a)  Shelf Registration................................................................5

    (b)  Effective Registration Statement .......................................6

3.  Securities Act Registration on Request...................................................7

    (a)  Request.................................................................................7

    (b)  Registration Statement Form ..............................................9

    (c)  Effective Registration Statement .......................................9

    (d)  Selection of Underwriters .................................................10

    (e)  Priority in Requested Registration ...................................10

    (f)  Shelf Registrations ............................................................11

4.  Piggyback Registration .........................................................................12

5.  Expenses ................................................................................................13

6.  Registration Procedures ........................................................................13

7.  Underwritten Offerings ........................................................................18

    (a)  Requested Underwritten Offerings ...................................18

    (b)  Piggyback Underwritten Offerings: Priority....................18

    (c)  Holders of Registrable Common Stock to be Parties to Underwriting Agreement..................................................19

    (d)  Holdback Agreements.........................................................19

8.  Preparation: Reasonable Investigation ................................................20

    (a)  Registration Statements ....................................................20

    (b)  Confidentiality ...................................................................21

Postponements ..............................................................................................21

10. Indemnification ..................................................................................................22

    (a) Indemnification by the Company.................................................................22

    (b) Indemnification by the Offerors and Sellers..............................................23

    (c) Notices of Losses, etc. ...............................................................................23

    (d) Contribution ...............................................................................................24

    (e) Indemnification Payments .........................................................................25

11. Registration Rights to Others..............................................................................25

12. Adjustments Affecting Registrable Common Stock............................................25

Exchange Act Reports..............................................................................................25

14. Rule 144 and Rule 144A.....................................................................................25

15. Amendments ........................................................................................................26

16. Nominees for Beneficial Owners ........................................................................26

17. Assignment ..........................................................................................................26

18. Calculation of Percentage or Number of Shares of Registrable Common Stock .................27

19. Termination of Registration Rights .....................................................................27

20. Miscellaneous .....................................................................................................27

    (a) Further Assurances......................................................................................27

    (b) Headings .....................................................................................................27

    (c) Conflicting Instructions ..............................................................................27

    (d) Remedies ....................................................................................................27

    (e) Entire Agreement ........................................................................................27

    (f) Notices ........................................................................................................28

    (g) Governing Law ...........................................................................................28

    (h) Severability ................................................................................................28

    (i) Counterparts ...............................................................................................28

21.  Director Holders.................................................................................................................28

22.  Management Holders ...........................................................................................................28

Transfer Agent ..........................................................................................................................28

SCHEDULES:

SCHEDULE A – ORIGINAL HOLDERS
SCHEDULE B – SPYGLASS HOLDERS
SCHEDULE C – NOTICES

EXHIBIT:

EXHIBIT A – FORM OF SELLING STOCKHOLDER QUESTIONNAIRE

# REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT, dated as of [●], 2010 (this "Agreement"), is entered into by and among MGM Holdings Inc., a Delaware corporation (the "Company"), and the holders of Registrable Common Stock (as hereinafter defined) who are signatories to this Agreement or who agree to be or otherwise are bound by the terms hereof (the "Holders").

This Agreement is being entered into in connection with the acquisition of Common Stock (as hereinafter defined) on the date hereof by the creditors of the Company identified on Schedule A hereto (the "Original Holders") pursuant to the Plan (as hereinafter defined) and in connection with the acquisition of Common Stock on the date hereof by the Persons (as hereinafter defined) identified on Schedule B hereto (the "Spyglass Holders"), pursuant to an Investment Agreement dated October [●], 2010 by and among the Company and certain of the Spyglass Holders (the "Investment Agreement").

To induce the Original Holders to vote in favor of the Plan and to accept the issuance of the Common Stock by the Company under the Plan and to induce the Spyglass Holders to execute and deliver the Investment Agreement and consummate the transactions contemplated thereby, the Company has undertaken to register Registrable Common Stock under the Securities Act (as hereinafter defined) and to take certain other actions with respect to the Registrable Common Stock. This Agreement sets forth the terms and conditions of such undertaking.

In consideration of the premises and the mutual agreements set forth herein, the parties hereto hereby agree as follows:

1. Definitions. Unless otherwise defined herein, capitalized terms used herein and in the recitals above shall have the following meanings:

"Affiliate" (a) shall mean, with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with, such Person or any Immediate Family of such Person; (b) shall also include, with respect to any Person who is an individual, a corporation or partnership, the stockholders or partners of which include only such individual and/or such individual's Immediate Family; (c) shall also include, with respect to any Person, an entity or trust established or utilized for purposes of estate planning for such Person; and (d) in the case of a Spyglass Holder, shall also include any member, shareholder, or partner thereof that controls such Person. For purposes of this definition, the term "control" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble hereto.

"beneficial ownership" (and related terms such as "beneficially owned" or "beneficial owner") has the meaning set forth in Rule 13d-3 under the Exchange Act.

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day except a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to be closed.

"Commission" means the U.S. Securities and Exchange Commission.

"Common Stock" shall mean the common stock, par value $0.01 per share, of the Company.

"Company" has the meaning set forth in the preamble hereto.

"Company Indemnitee" has the meaning set forth in Section 10(a) hereof.

"Director Holders" means Holders who are directors of the Company and are not employees of the Company or its Subsidiaries.

"Effective Date" means the effective date of the Plan pursuant to the terms thereof.

"Equity Incentive Plan" shall mean 2010 MGM Holdings Inc. Stock Incentive Plan adopted by the Company, as amended from time to time.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, or any similar or successor statute.

"Expenses" means all expenses incident to the Company's performance of or compliance with its obligations under this Agreement, including, without limitation, all registration, filing, listing, stock exchange and FINRA fees (including, without limitation, all fees and expenses of any "qualified independent underwriter" required by the rules of FINRA), all fees and expenses of complying with state securities or blue sky laws (including, without limitation, the reasonable fees, disbursements and other charges of counsel for the underwriters in connection with blue sky filings), all word processing, duplicating and printing expenses, messenger, telephone and delivery expenses, all rating agency fees, the fees, disbursements and other charges of counsel for the Company and of its independent public accountants, including, without limitation, the expenses incurred in connection with "cold comfort" letters required by or incident to such performance and compliance, the fees and expenses incurred in connection with the listing of the securities to be registered on each securities exchange or national market system on which similar securities issued by the Company are then listed, any fees and disbursements of underwriters customarily paid by issuers or sellers of securities, the reasonable fees, disbursements and other charges of one firm of counsel in each applicable jurisdiction (per registration statement prepared) to the Holders making a request pursuant to Section 2(a), Section 3(a) or Section 4 hereof (selected by the Holders beneficially owning a majority of the shares of Registrable Common Stock covered by such registration), the fees and expenses of any special experts retained by the Company in connection with such registration, and the fees and expenses of other Persons retained by the Company, but excluding underwriting discounts and commissions and applicable transfer taxes, if any, in each case relating to the shares of Registrable Common Stock sold by the Selling Holders, which discounts, commissions and

transfer taxes shall be borne by the seller or Selling Holders; provided, that, if the Company shall, in accordance with Section 4 or Section 9 hereof, not register any securities with respect to which it had given written notice of its intention to register to Holders, notwithstanding anything to the contrary in the foregoing, all reasonable out-of-pocket expenses incurred by such requesting Holders in connection with such registration (other than the reasonable fees, disbursements and other charges of counsel other than the one firm of counsel referred to above) shall be deemed to be Expenses.

"FINRA" shall mean the Financial Industry Regulatory Authority.

"Holder Indemnitee" has the meaning set forth in Section 10(b) hereof.

"Holders" has the meaning set forth in the preamble hereto.

"Immediate Family" shall have the meaning specified in Rule 16a-1 of the Exchange Act.

"Initial Shelf" has the meaning set forth in Section 3(a) hereof.

"Initiating Holders" has the meaning set forth in Section 3(a) hereof.

"Initiating Request" has the meaning set forth in Section 3(a) hereof.

"Loss" and "Losses" have the meanings set forth in Section 10(a) hereof.

"Management Holders" means Holders who are employees (and their Affiliates) or former employees (and their Affiliates) of any of the Company or its Subsidiaries; provided that the Spyglass Holders shall not be deemed to be Management Holders.

"Minimum Hold Requirement" has the meaning set forth in the Equity Incentive Plan.

"Offering Documents" has the meaning set forth in Section 10(a) hereof.

"Original Holders" has the meaning set forth in the recitals hereto.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization, governmental or regulatory body or subdivision thereof or other entity.

"Piggyback Requesting Holder" has the meaning set forth in Section 4 hereof.

"Plan" means the Joint Plan of Reorganization confirmed by order dated [●], 2010 of the United States Bankruptcy Court for the Southern District of New York in the chapter 11 case commenced by the Company and certain of its Affiliates.

"Public Offering" means a public offering and sale of Common Stock pursuant to an effective registration statement under the Securities Act.

"Questionnaire" has the meaning set forth in Section 2(a) hereof.

"Registrable Common Stock" means any share of Common Stock beneficially owned by the Holders or their respective Affiliates from time to time, provided, however, that a share of Common Stock will cease to be Registrable Common Stock after it has been sold under any effective registration statement (or, in the case of a Management Holder, the issuance to the Management Holder of Common Stock that was registered under a registration statement on Form S-8 which includes a resale prospectus on Form S-3) or pursuant to Rule 144 promulgated under the Securities Act after a Public Offering.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder, or any similar or successor statute.

"Selling Holder Information" has the meaning set forth in Section 2(a) hereof.

"Selling Holders" means the Holders requesting to be registered pursuant hereto.

"Shelf Filing Date" has the meaning set forth in Section 2(a) hereof.

"Shelf Registration" has the meaning set forth in Section 2(a) hereof.

"Shelf Registration Statement" has the meaning set forth in Section 2(a) hereof.

"Shelf Requesting Holders" means (i) after the effectiveness of a Shelf Registration Statement or the initial Public Offering of the Company (or a successor entity), one (1) or more Holders (other than Management Holders, who shall have no right to initiate a Shelf Registration Statement filing request under the first sentence of Section 2(a) but in any event may participate in such registration), which, together with their Affiliates, beneficially own at least twenty percent (20%) of the shares of Registrable Common Stock outstanding on the Shelf Request Date (excluding shares held by Management Holders) or (ii) if there has not been a Shelf Registration that has been declared effective or an initial Public Offering of the Company (or a successor entity) within two (2) years of the Effective Date, one (1) or more Holders (other than Management Holders, who shall have no right to initiate a Shelf Registration Statement filing request under the first sentence of Section 2(a) but in any event may participate in such registration), which, together with their Affiliates, beneficially own at least thirty five percent (35%) of the shares of Registrable Common Stock outstanding on the Shelf Request Date (excluding shares held by Management Holders).

"Shelf Request Date" has the meaning set forth in Section 2(a) hereof.

"Spyglass Holders" has the meaning set forth in the recitals hereto.

"Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which fifty percent (50%) or more of the total voting power of shares of capital stock entitled (without regard to the occurrence of any contingency) to vote generally in the election of directors, managers or trustees thereof, or fifty percent (50%) or more of the equity interest therein, is at the time owned

or controlled, directly or indirectly, by any Person or one or more of the other Subsidiaries of such Person or a combination thereof.

"Transfer" means any direct or indirect transfer, sale, offer, assignment, exchange, distribution, mortgage, pledge, hypothecation or other disposition. "Transferor" and "Transferee" have correlative meanings.

2. Securities Act Shelf Registration on Request.

(a) Shelf Registration. . Subject to the provisions set forth in the next paragraph and the proviso in Section 3(a)(ii), Shelf Requesting Holders may request that the Company or any of its Subsidiaries file one shelf registration statement (as may be amended or supplemented from time to time, a "Shelf Registration Statement") under this Section 2(a) pursuant to Rule 415 promulgated under the Securities Act (a "Shelf Registration") providing for the sale by the Shelf Requesting Holders of any or all of the Registrable Common Stock beneficially owned by such Shelf Requesting Holders (the date of such request, the "Shelf Request Date") and any or all of the Registrable Common Stock beneficially owned by other Holders who comply with the requirements of this Section 2(a). Shelf Requesting Holders may make such request at any time after the earlier to occur of (i) the completion of an initial Public Offering of the Company (or a successor entity) or (ii) the second anniversary of the Effective Date. The Company shall (i) use its reasonable best efforts to file, at the earliest practicable date, such Shelf Registration Statement under the Securities Act (the "Shelf Filing Date") and (ii) use its reasonable best efforts to have such Shelf Registration Statement thereafter declared effective by the Commission at the earliest practicable date, but in any event not later than sixty (60) days after the Shelf Filing Date or, if a Shelf Registration Statement is reviewed by the staff of the Commission, not later than ninety (90) days after the Shelf Filing Date; provided, that following the closing date of an initial Public Offering, the Company shall not be required to file a Shelf Registration Statement pursuant to this Section 2(a) until the later of (i) a period of one hundred eighty (180) days shall have elapsed from such closing date and (ii) the expiration of any lock-up agreement with the underwriters of any such initial Public Offering. Subject to Section 9(b), the Company agrees to use its reasonable best efforts to keep the Shelf Registration Statement continuously effective under Rule 415 of the Securities Act until the earliest to occur of (i) the second anniversary of the date such Shelf Registration Statement initially is declared effective by the Commission (plus a number of Business Days equal to the number of Business Days, if any, that the Shelf Registration Statement is not kept effective (including any days for which the use of the prospectus is suspended pursuant to Section 9(b)) after the initial date of its effectiveness and prior to the second anniversary thereof), (ii) the day after the date on which all of the Registrable Common Stock covered by the Shelf Registration Statement has been sold pursuant to the Shelf Registration Statement or (iii) the first date on which there shall cease to be any Registrable Common Stock covered by such Shelf Registration Statement. The Company further agrees, if necessary, to supplement or amend the Shelf Registration Statement, if required by the rules, regulations or instructions applicable to the registration form used by the Company for such Shelf Registration or by the Securities Act or by any other rules and regulations thereunder for shelf registration, and the Company agrees to furnish to the Holders whose Registrable Common Stock is included in such Shelf Registration Statement copies of any such supplement or amendment promptly after its being issued or filed with the Commission.

Notwithstanding any other provision hereof, no Holder's Registrable Common Stock shall be included in the Shelf Registration Statement unless and until (i) such Holder furnishes to the Company a fully completed notice and questionnaire substantially in the form attached hereto as Exhibit A (the "Questionnaire") and such other information in writing as the Company may reasonably request in writing for use in connection with the Shelf Registration Statement and any related application to be filed with or under state securities laws and (ii) in the case of Management Holders, the Minimum Hold Requirement is satisfied. At least thirty (30) days prior to the filing of the Shelf Registration Statement, the Company will provide to the Holders (including Management Holders) notice of its intention to file the Shelf Registration Statement, the form of Questionnaire and such other information the Company may reasonably request to be provided by the Holders. In order to be named as a selling stockholder in the Shelf Registration Statement at the time of effectiveness of the Shelf Registration Statement and to include in the Shelf Registration Statement all Registrable Common Stock requested to be included for sale by the Holder, each Holder must no later than twenty (20) days following receipt of notice sent by the Company as set forth in the previous sentence, furnish to the Company in writing the completed Questionnaire and such other information reasonably requested by the Company (all such information, "Selling Holder Information") and the Company will include information in the completed Questionnaire and such other information, if any, in the Shelf Registration Statement, as necessary and in a manner so that upon effectiveness of the Shelf Registration Statement, the Holder will be permitted to deliver the Shelf Registration Statement to purchasers of the Holder's Registrable Common Stock. From and after the date that the Shelf Registration Statement becomes effective, upon receipt of a completed Questionnaire and such other information that the Company may reasonably request in writing, if any, the Company shall (i) as promptly as practicable after the date on which the Questionnaire is delivered, and in any event within the later of (x) fifteen (15) Business Days after receipt of such Questionnaire or (y) fifteen (15) Business Days after the expiration of any suspension pursuant to Section 9(b) in effect when the Questionnaire is delivered, file any amendments or supplements to the Shelf Registration Statement necessary for such Holder to be named as a selling stockholder and to include in the Shelf Registration Statement all Registrable Common Stock requested to be included for sale by such Holder or, if not permitted to name such Holder as a selling stockholder by supplement, file any necessary post-effective amendment to the Shelf Registration Statement or prepare and, if required by applicable law, file any amendment or supplement to any document so that such Holder is named as a selling stockholder, and use its reasonable best efforts to cause such post-effective amendment to be declared effective as promptly as practicable; provided that the Company shall not be obligated to file more than one (1) post-effective amendment in any ninety (90) day period.

(b) Effective Registration Statement. A Shelf Registration pursuant to Section 2(a) hereof shall not be deemed to have been effected

(i) unless a registration statement with respect thereto has been declared effective by the Commission and remains effective (which shall not need to remain effective on a continuous basis if the Company extends the days it maintains the effectiveness of the registration statement by the number of Business Days such registration statement is not effective, as allowed hereunder) in compliance with the provisions of the Securities Act and the laws of any state or other jurisdiction applicable to the disposition of Registrable Common Stock covered by such registration statement

until such time as all of such Registrable Common Stock have been disposed of in accordance with such registration statement or there shall cease to be any Registrable Common Stock covered by such registration statement (provided that such period need not exceed the applicable period provided for in Section 2(a)), or

(ii)     if, after it has become effective, such registration statement is subject to any stop order, injunction or other order or requirement of the Commission or other governmental or regulatory agency or court preventing the sale of securities under such registration statement for any reason (other than a violation of applicable law solely by any Holder) and has not thereafter become effective.

3.     Securities Act Registration on Request.

(a)     Request.     At any time and from time to time (i) after the expiration (in accordance with Section 2(a) above) or cessation of effectiveness of the initial Shelf Registration Statement, if any, filed by the Company pursuant to Section 2(a) hereof (the "Initial Shelf") or (ii) after the earlier to occur of (x) if the Initial Shelf has not been filed and declared effective, the completion of an initial Public Offering of the Company (or a successor entity) (provided that following the closing date of an initial Public Offering, the Company shall not be required to file a registration statement pursuant to this Section 3(a) until the later of (i) a period of one hundred eighty (180) days shall have elapsed from such closing date and (ii) the expiration of any lock-up agreement with the underwriters of any such initial Public Offering) and (y) if the Initial Shelf has not been filed and declared effective and the Company has not yet completed an initial Public Offering, the second anniversary of the Effective Date and, in each case, prior to the termination of the Company's obligations hereunder pursuant to and in accordance with the terms of Section 19 hereof, one (1) or more Holders (other than Management Holders, who shall have no request rights under this Section 3(a)) (the "Initiating Holders") may make a written request (the "Initiating Request") to the Company for the registration with the Commission under the Securities Act (on Form S-3, or, if Form S-3 is not then available to the Company, Form S-1 or any other applicable form) of the sale of all or part of such Initiating Holders' Registrable Common Stock; provided, however, that (a) in the case of clauses (i) and (ii)(x)above, such request shall be made by one (1) or more Holders (other than Management Holders), together with their Affiliates, beneficially owning at least twenty percent (20%) of the then outstanding shares of Registrable Common Stock (excluding shares held by Management Holders) and (b) in the case of clause (ii)(y) above, such request shall be made by one (1) or more Holders (other than Management Holders), together with the Affiliates, beneficially owning at least thirty five percent (35%) of the then outstanding shares of Registrable Common Stock (excluding shares held by Management Holders) (provided that, if an earlier registration has been declared effective and has not been deemed not to have been effected in accordance with Section 3(c), subsequent Initiating Requests pursuant to clause (ii)(y) shall only require at least twenty percent (20%) of the then outstanding shares of Registrable Common Stock (excluding shares held by Management Holders)), which request, in each case in this Section 3(a), shall specify the number of shares of Registrable Common Stock to be disposed of by such Holders and the proposed plan of distribution therefor.  Upon the receipt of any Initiating Request for registration pursuant to this Section 3(a), the Company promptly shall notify in writing all other Holders (including Management Holders) of the receipt of such request and will use its reasonable best efforts to

effect, at the earliest practicable date, such registration under the Securities Act, including a Shelf Registration, if applicable, of

> (i)      the Registrable Common Stock which the Company has been so requested to register by such Initiating Holder or Holders, and

> (ii)     all other Registrable Common Stock which the Company has been requested to register by any other Holders by written request given to the Company within twenty (20) days after the giving of written notice by the Company to such other Holders of the Initiating Request (or ten (10) days if the Company states in such written notice or gives telephonic notice to the relevant Holders, with written confirmation to follow promptly thereafter, stating that (1) such registration will be on Form S-3 (or, if Form S-3 is not then available to the Company, Form S-1 or any other applicable form) and (2) such shorter period of time is required because of a planned filing date),

all to the extent necessary to permit the disposition (in accordance with Section 3(c) hereof) of the Registrable Common Stock to be so registered; provided, that,

> (A)     the Company shall not be required to effect more than a total of an aggregate of six (6) registrations pursuant to Section 2(a) or this Section 3(a) for all Holders (including the Initial Shelf and the initial registration statement filed in accordance with Section 3(a)(ii)),

> (B)     if the intended method of distribution is an underwritten Public Offering, the Company shall not be required to effect such registration pursuant to Section 2(a) or this Section 3(a) unless such underwriting shall be conducted on a "firm commitment" basis,

> (C)     if the Company shall have previously effected a registration pursuant to Section 2(a) or this Section 3(a), the Company shall not be required to effect any registration pursuant to this Section 3(a) until a period of one hundred eighty (180) days shall have elapsed from the date on which the previous such registration ceased to be effective,

> (D)     any Holder whose Registrable Common Stock was to be included in any such registration pursuant to Section 2(a) or this Section 3(a), by written notice to the Company, may withdraw such request, and the Company shall not effect such registration in the event that the Holders (excluding Management Holders) that have not elected to withdraw beneficially own, in the aggregate, less than the percentage of the shares of Registrable Common Stock required to initiate a request under Section 2(a) or this Section 3(a) (provided, that if such registration is not effected for such reason, it shall still count as one of the six registrations under clause (A) above unless the withdrawing Holders reimburse the Company for all Expenses incurred),

> (E)     the Company shall not be required to effect any registration to be effected pursuant to Section 2(a) or this Section 3(a) unless the expected sale

price of the shares of Registrable Common Stock to be included thereunder is at least $250,000,000,

(F)     a Shelf Registration effected under this Section 3(a) shall comply with the procedures set forth in the second paragraph of Section 2(a), and

(G)     in the case of Management Holders, the Minimum Hold Requirement is satisfied.

(b) <u>Registration Statement Form</u>.  Except as provided in Section 3(a), registrations under Section 3(a) hereof shall be on such appropriate registration statement form prescribed by the Commission under the Securities Act as shall be selected by the Company and as shall permit the disposition of the Registrable Common Stock pursuant to an underwritten offering unless the Selling Holders (excluding Management Holders) beneficially owning at least a majority of the shares of Registrable Common Stock requested to be included in such registration statement (excluding shares of Registrable Common Stock held by Management Holders) determine the disposition shall be other than an underwritten offering, in which case the disposition shall be pursuant to the method of distribution determined by such Selling Holders. The Company agrees to include in any such registration statement filed pursuant to Section 3(a) hereof all Selling Holder Information in the registration statement as necessary and in a manner so that upon effectiveness of the registration statement the Holders will be permitted to deliver the prospectus included in the registration statement to purchasers of the Holders' Registrable Common Stock.

(c) <u>Effective Registration Statement</u>.  A registration requested pursuant to Section 3(a) hereof shall not be deemed to have been effected

(i)     unless a registration statement with respect thereto has been declared effective by the Commission and remains effective (which shall not need to remain effective on a continuous basis if the Company extends the days it maintains the effectiveness of the registration statement by the number of Business Days such registration statement is not effective, as allowed hereunder) in compliance with the provisions of the Securities Act and the laws of any state or other jurisdiction applicable to the disposition of Registrable Common Stock covered by such registration statement until such time as all of such Registrable Common Stock have been disposed of in accordance with such registration statement or there shall cease to be any Registrable Common Stock covered by such registration statement, <u>provided</u>, <u>that</u>, except with respect to any Shelf Registration, such period need not exceed ninety (90) days (plus a number of Business Days equal to the number of Business Days, if any, that the registration statement is not kept effective (including any days for which the use of the prospectus is suspended pursuant to Section 9(b)) after the initial date of its effectiveness and prior to the expiration of such ninety (90) day period), and, <u>provided</u>, <u>further</u>, that with respect to any Shelf Registration, such period need not extend beyond the period provided for in Section 3(f) hereof,

(ii)     if, after it has become effective, such registration is subject to any stop order, injunction or other order or requirement of the Commission or other

governmental or regulatory agency or court for any reason other than a violation of applicable law solely by any Selling Holder (excluding Management Holders) and has not thereafter become effective, or

(iii)     if, in the case of an underwritten offering, the conditions to closing specified in an underwriting agreement to which the Company is a party are not satisfied or waived other than by reason of any breach or failure by any underwriter or any Selling Holder (excluding Management Holders).

The Holders to be included in a registration statement pursuant to Section 3(a) (excluding Management Holders) may at any time withdraw such request for registration in accordance with Section 3(a)(ii)(D); provided that any Initiating Holder who withdraws such request shall not be permitted to be an Initiating Holder during the twelve-month period following such withdrawal.

(d)     Selection of Underwriters.  The underwriter or underwriters of each underwritten offering, if any, of the Registrable Common Stock to be registered pursuant to Section 2(a) or Section 3(a) hereof shall be mutually selected by the Selling Holders (excluding Management Holders) beneficially owning at least a majority of the shares of Registrable Common Stock to be registered (excluding shares held by Management Holders) and the Company.  In the case of any offering or registration initiated by the Company for its own account or any other offering not effected pursuant to Section 2(a) or Section 3(a) hereof, including any offering pursuant to which the Holders shall have piggyback rights pursuant to Section 4 hereof, the Company shall select a nationally recognized underwriter (or underwriters) for such offering in its sole discretion; provided that, the Company shall not identify any Holder as an underwriter in any public disclosure with the Commission or any trading market without the prior written consent of such Holder. If the Company is required by law to identify any Holder as an underwriter in any public disclosure or filing with the Commission or any trading market, it must notify such Holder in advance and such Holder shall have the option, in its sole discretion, to consent to such identification as an underwriter within five (5) Business Days or such Holder shall be deemed to have consented to have its Registrable Common Stock removed from the applicable registration statement.

(e)     Priority in Requested Registration.  If a registration requested pursuant to Section 2(a) or Section 3(a) hereof involves an underwritten Public Offering, and the managing underwriter of such underwritten offering shall advise the Company in writing (with a copy to each Selling Holder requesting that Registrable Common Stock be included in such registration statement) that, in its opinion, the number of shares of Registrable Common Stock requested to be included in such registration exceeds the number of such securities that can be sold in such offering within a price range stated to such managing underwriter by Selling Holders (excluding Management Holders) beneficially owning at least a majority of the shares of Registrable Common Stock requested to be included in such registration (excluding shares held by Management Holders) to be acceptable to such Selling Holders (such writing to state the basis of such opinion and the approximate number of securities which the managing underwriter believes may be included in such offering without such effect), then the Company shall include in such registration, to the extent of the number of shares which the Company is so advised the managing underwriter believes can be sold in such offering, (i) first, all Registrable Common

Stock requested to be registered pursuant to Section 2(a) or Section 3(a), pro rata among the Selling Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Selling Holders, (ii) second, if additional shares may be sold based on the opinion of the managing underwriter, then securities that the Company proposed to issue and sell for its own account and (iii) third, other securities, if any.

(f) <u>Shelf Registrations</u>.  If one or more demands made pursuant to Section 3(a) hereof are for a Shelf Registration, the period for which the Shelf Registration Statement in connection with the first Shelf Registration requested pursuant to Section 3(a) must remain effective need not extend beyond one (1) year from the date on which such Shelf Registration Statement initially was declared effective by the Commission and the period for which any subsequent Shelf Registration Statement in connection with the subsequent Shelf Registration requested pursuant to Section 3(a) must remain effective need not extend beyond nine (9) months from the date on which such Shelf Registration Statement initially was declared effective by the Commission (plus, in each case, a number of Business Days equal to the number of Business Days, if any, that the Shelf Registration Statement is not kept effective (including any days for which the use of the prospectus is suspended pursuant to Section 9(b)) after the initial date of its effectiveness and prior to such first-year or nine-month, as the case may be, anniversary thereof).

4.  Piggyback Registration.  If the Company, at any time when a Shelf Registration Statement covering all outstanding shares of Registrable Common Stock is not effective, proposes to register (other than pursuant to (a) Section 2(a) or 3(a) of this Agreement or (b) an initial Public Offering of the Company in which only primary shares are to be sold) Common Stock under the Securities Act by registration on any forms (other than Form S-4 or S-8 or any successor or similar form(s)), whether or not pursuant to registration rights granted to other holders of its securities and whether or not for sale for its own account, it shall give prompt written notice to all of the Holders (including Management Holders) of its intention to do so and of such Holders' rights under this Section 4, which notice, in any event, shall be given at least thirty (30) days prior to such proposed registration (or ten (10) days if the Company states in such written notice or gives telephonic notice to the relevant Holders, with written confirmation to follow promptly thereafter, stating that (i) such registration will be on Form S-3 (or, if Form S-3 is not then available to the Company, Form S-1 or any other applicable form) and (ii) such shorter period of time is required because of a planned filing date).  Upon the written request of any Holder (including any Management Holder but only to the extent that such Holder has satisfied the Minimum Hold Requirement) receiving notice of such proposed registration (a "Piggyback Requesting Holder") made within twenty (20) days after the receipt of any such notice (or ten (10) days if the Company states in such written notice or gives telephonic notice to the relevant Holders, with written confirmation to follow promptly thereafter, stating that (i) such registration will be on Form S-3 (or, if Form S-3 is not then available to the Company, Form S-1 or any other applicable form) and (ii) such shorter period of time is required because of a planned filing date), which request shall specify the Registrable Common Stock intended to be disposed of by such Piggyback Requesting Holder and the minimum offering price per share at which the Holder is willing to sell its Registrable Common Stock, the Company shall, subject to Section 7(b) hereof, effect the registration under the Securities Act of all Registrable Common Stock which the Company has been so requested to register by the Piggyback Requesting Holders thereof; provided that,

(A)     prior to the effective date of the registration statement filed in connection with such registration or, in the case of a Shelf Registration Statement, prior to the delivery of a preliminary prospectus related to such offering, and, in any event, promptly following receipt of notification by the Company from the managing underwriter (if an underwritten offering) of a range of prices at which such securities are likely to be sold, the Company shall so advise each Piggyback Requesting Holder of such price, and if such price is below the minimum price which shall be acceptable to such Piggyback Requesting Holder, such Piggyback Requesting Holder shall then have the right irrevocably to withdraw its request to have its Registrable Common Stock included in such registration statement, by delivery of written notice of such withdrawal to the Company within five (5) Business Days of its being advised of such price, without prejudice to the rights of any such Holder or Holders to include Registrable Common Stock in any future registration (or registrations) pursuant to this Section 4 or to cause such registration to be effected as a registration under Section 3(a) hereof, as the case may be;

(B)     if at any time after giving written notice of its intention to register the offer for sale of any securities and prior to the effective date of the

registration statement filed in connection with such registration or, in the case of a Shelf Registration Statement, prior to the consummation of such offering, the Company shall determine for any reason not to register or to delay registration of such securities, the Company may, at its election, give written notice of such determination to each Piggyback Requesting Holder and (i) in the case of a determination not to register, the Company shall be relieved of its obligation to register any Registrable Common Stock in connection with such registration (but not from any obligation of the Company to pay the Expenses in connection therewith), without prejudice, however, to the rights of any Holder to include Registrable Common Stock in any future registration (or registrations) pursuant to this Section 4 or, if applicable, to cause such registration to be effected as a registration under Section 3(a) hereof, as the case may be, and (ii) in the case of a determination to delay registering, shall be permitted to delay registering any Registrable Common Stock, for the same period as the delay in registering such other securities; and

(C)     if such registration was initiated by the Company for its own account and involves an underwritten offering (provided that such offering is not an initial Public Offering of the Company in which only primary shares are to be sold), each Piggyback Requesting Holder shall sell its Registrable Common Stock on the same terms and conditions as those that apply to the Company, and the underwriters of each such underwritten offering shall be a nationally recognized underwriter (or underwriters) selected by the Company in its sole discretion.

No registration effected under this Section 4 shall relieve the Company of its obligation to effect any registration of the sale of Registrable Common Stock upon request under Section 3(a) hereof and no registration effected pursuant to this Section 4 shall be deemed to have been effected pursuant to Section 3(a) hereof.

5.     Expenses.  Except as provided in the last paragraph of Section 6, the Company shall pay all Expenses in connection with any registration initiated pursuant to Sections 2(a), 3(a) or 4 hereof, whether or not such registration shall become effective and whether or not all or any portion of the Registrable Common Stock originally requested to be included in such registration are ultimately included in such registration.

6.     Registration Procedures.  If and whenever the Company is required to effect any registration under the Securities Act as provided in Sections 2(a), 3(a) and 4 hereof, the Company shall, use its reasonable best efforts to:

(a)     prepare and file with the Commission (at the earliest practicable date and, in the case of any registration pursuant to Section 3(a), in any event on or before the date that is (i) ninety (90) days after the date of any Initiating Request or (ii) if, as of such ninetieth (90th) day, the Company does not have the audited financial statements required to be included in the registration statement, thirty (30) days after the receipt by the Company from its independent public accountants of such audited financial statements, which the Company shall use its reasonable best efforts to obtain as promptly as

practicable) the requisite registration statement to effect such registration and thereafter use its reasonable best efforts to cause such registration statement to become and remain effective; provided, however, that the Company may discontinue any registration of its securities that are not shares of Registrable Common Stock (and, pursuant to, and under the circumstances specified in, Sections 4 and 9(b) hereof, its securities that are shares of Registrable Common Stock) at any time prior to the effective date of the registration statement relating thereto;

(b)     prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective and to comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Common Stock covered by such registration statement until such time as all of such Registrable Common Stock has been disposed of in accordance with the method of disposition set forth in such registration statement; provided, that, except with respect to any Shelf Registration, such period need not extend beyond ninety (90) days after the effective date of the registration statement (plus a number of Business Days equal to the number of Business Days, if any, that the registration statement is not kept effective (including any days for which the use of the prospectus is suspended pursuant to Section 9(b)) after the initial date of its effectiveness and prior to the expiration of such 90-day period); and provided, further, that with respect to the Initial Shelf, such period need not extend beyond the applicable period provided for in Section 2(a) hereof and, with respect to any Shelf Registration other than the Initial Shelf, such period need not exceed the applicable period provided for in Section 3(g) hereof;

(c)     furnish to each seller of Registrable Common Stock covered by such registration statement and their representatives designated pursuant to Section 8(a), if any, and each underwriter, if any, such number of copies of such drafts (other than internal drafts distributed to or by the Company from or to its counsel or its other representatives) and final conformed versions of such registration statement and of each such amendment and supplement thereto (in each case including all exhibits and any documents incorporated by reference), such number of copies of such drafts (other than internal drafts distributed to or by the Company from or to its counsel or its other representatives) and final versions of the prospectus contained in such registration statement (including each preliminary prospectus and any summary prospectus) and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents, including without limitation notification of whether such registration statement or amendment or supplement thereto will be reviewed by the Commission or any other regulatory authority, as the sellers of a majority of the Registrable Common Stock covered by such registration statement or any underwriter may reasonably request in writing; provided, that all drafts (other than internal drafts distributed to or by the Company from or to its counsel or its other representatives) of such registration statement or amendment or supplement thereto shall be furnished to each seller of Registrable Common Stock covered by such registration statement and their representatives designated pursuant to Section 8(a) whether or not so requested;

(d)     (i) register or qualify all Registrable Common Stock and other securities, if any, covered by such registration statement under such other securities or blue sky laws of such states or other jurisdictions of the United States of America as the Selling Holders covered by such registration statement shall reasonably request in writing, (ii) keep such registration or qualification in effect for so long as such registration statement remains in effect and (iii) take any other action that may be necessary or reasonably advisable to enable such sellers to consummate the disposition in such jurisdictions of the securities to be sold by such sellers, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this subsection (d) be obligated to be so qualified, to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction;

(e)     cause all Registrable Common Stock covered by such registration statement to be registered with or approved by such other federal or state governmental agencies or authorities as necessary upon the opinion of counsel to the Company or counsel to the seller of Registrable Common Stock to enable the seller or sellers thereof to consummate the disposition of such Registrable Common Stock;

(f)     obtain and, if obtained, furnish to each seller of Registrable Common Stock that is named as an underwriter in the offering, and each seller's underwriters, if any, a signed

(ii)     opinion of counsel for the Company, dated the date of the closing under the underwriting agreement and addressed to the underwriters, reasonably satisfactory (based on the customary form and substance of opinions of issuers' counsel customarily given in such an offering) in form and substance to such seller and such underwriters, if any, and

(iii)     "cold comfort" letter, dated the effective date of such registration statement (and, if such registration involves an underwritten offering, dated the date of the closing under the underwriting agreement and addressed to the underwriters) and signed by the independent public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement, reasonably satisfactory (based on the customary form and substance of "cold comfort" letters of issuers' independent public accountant customarily given in such an offering) in form and substance to such seller and such underwriters, if any,

in each case, covering substantially the same matters with respect to such registration statement (and the prospectus included therein) and, in the case of the accountants' comfort letter, with respect to events subsequent to the date of such financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' comfort letters delivered to underwriters in such types of offerings of securities;

(g)     notify each seller of Registrable Common Stock and other securities covered by such registration statement, if any, at any time when a prospectus relating

thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made and for which the Company chooses to suspend the use of the registration statement and prospectus pursuant to Section 9(b), and, in accordance with Section 9(b), at the written request of any such seller of Registrable Common Stock, promptly prepare and furnish to it a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made;

(h)     obtain the withdrawal of any order suspending the effectiveness of a registration statement relating to the Registrable Common Stock at the earliest possible moment;

(i)     otherwise comply with all applicable rules and regulations of the Commission and any other governmental agency or authority having jurisdiction over the offering, and make available to its stockholders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first full calendar month after the effective date of such registration statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder, and furnish to each seller of Registrable Common Stock and to the managing underwriter, if any, at least ten (10) days prior to the filing thereof (or such shorter time period reasonably necessary in light of applicable legal requirements) a copy of any amendment or supplement to such registration statement or prospectus;

(j)     cause all Registrable Common Stock covered by a registration statement (i) to be listed on a national securities exchange on which similar securities issued by the Company are then listed, if the listing of such Registrable Common Stock is then permitted under the rules of such exchange, or (ii) if the Company is not required pursuant to clause (i) above to list Registrable Common Stock on a specific national securities exchange, use its reasonable best efforts to list the Registrable Common Stock on a national securities exchange;

(k)     provide a transfer agent and registrar for the Registrable Common Stock covered by a registration statement no later than the effective date thereof;

(l)     enter into such agreements (including an underwriting agreement in customary form) and take such other actions as the Holders beneficially owning a majority of the shares of Registrable Common Stock covered by such registration statement shall reasonably request in order to expedite or facilitate the disposition of such Registrable Common Stock, including customary indemnification;

(m)     if requested by the managing underwriter(s) or the Holders beneficially owning a majority of the shares of Registrable Common Stock being sold in connection with an underwritten offering, promptly incorporate in a prospectus supplement or post-effective amendment such information relating to the plan of distribution for such shares of Registrable Common Stock provided to the Company in writing by the managing underwriter(s) and the Holders of a majority of the Registrable Common Stock being sold and that is required to be included therein relating to the plan of distribution with respect to such Registrable Common Stock, including without limitation, information with respect to the number of shares of Registrable Common Stock being sold to such underwriters, the purchase price being paid therefor by such underwriters and with respect to any other terms of the underwritten offering of the Registrable Common Stock to be sold in such offering, and make any required filings with respect to such information relating to the plan of distribution as soon as practicable after notified of the information; and

(n)     cooperate with the Selling Holders and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates representing Registrable Common Stock to be sold and not bearing any restrictive legends, and enable such Registrable Common Stock to be in such share amounts and registered in such names as the managing underwriter(s) or, if none, the Selling Holders beneficially owning a majority of the shares of Registrable Common Stock being offered for sale, may reasonably request at least three (3) Business Days prior to any sale of Registrable Common Stock to the underwriters.

As a condition to the obligations of the Company to complete any registration pursuant to this Agreement with respect to the Registrable Common Stock of a Holder, such Holder must furnish to the Company in writing such information regarding itself, the Registrable Common Stock held by it and the intended methods of disposition of the Registrable Common Stock held by it as is necessary to effect the registration of such Holders' Registrable Common Stock and is requested in writing by the Company.  Except as otherwise required by Section 2(a), at least thirty (30) days prior to the first anticipated filing date of a registration statement for any registration under this Agreement, the Company will notify in writing each Holder of the information referred to in the preceding sentence which the Company is requesting from that Holder whether or not such Holder has elected to have any of its Registrable Common Stock included in the registration statement.  If, within ten (10) days prior to the anticipated filing date, the Company has not received the requested information from a Holder, then the Company may file the registration statement without including Registrable Common Stock of that Holder, if, in the opinion of the Company's counsel, such information is required to be included in such registration statement.

Each Holder agrees that as of the date that a final prospectus is made available to it for distribution to prospective purchasers of Registrable Common Stock it shall cease to distribute copies of any preliminary prospectus prepared in connection with the offer and sale of such Registrable Common Stock.  Each Holder further agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in subsection (g) of this Section 6 and a suspension of the use of the registration statement and prospectus pursuant to Section 9(b), such Holder shall forthwith discontinue such Holder's disposition of Registrable

Common Stock pursuant to the registration statement and prospectus relating to such Registrable Common Stock until such Holder's receipt of the copies of the supplemented or amended prospectus contemplated by subsection (g) of this Section 6 and, if so directed by the Company, shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies, then in such Holder's possession of the prospectus relating to such Registrable Common Stock at the time of receipt of such notice. If any event of the kind described in subsection (g) of this Section 6 occurs and such event is the fault solely of a Holder (or Holders), such Holder (or Holders) shall pay all Expenses attributable to the preparation, filing and delivery of any supplemented or amended prospectus contemplated by subsection (g) of this Section 6.

7.    Underwritten Offerings.

(a) Requested Underwritten Offerings. If requested by the underwriters in connection with a request for a registration (that is not a Shelf Registration) under Section 3 hereof or any underwritten "takedown" of securities under a Shelf Registration Statement filed pursuant to Section 2(a) or Section 3, the Company shall enter into a firm commitment underwriting agreement with such underwriters for such offering, such agreement to be reasonably satisfactory in substance and form to the Company, a majority of the Selling Holders whose Registrable Common Stock is to be included in such registration and the underwriters and to contain such representations and warranties by the Company and the Selling Holders and such other terms as are customary in agreements of that type, including, without limitation, indemnification and contribution to the effect and to the extent provided in Section 10 hereof.

(b) Piggyback Underwritten Offerings: Priority.

(i)    If the Company proposes to register any of its securities under the Securities Act for its own account as contemplated by Section 4 hereof and such securities are to be distributed in an underwritten offering, and if the managing underwriter of such underwritten offering shall advise the Company in writing (with a copy to the Piggyback Requesting Holders) that if all the Registrable Common Stock requested to be included in such registration were so included, in its opinion, the number and type of securities proposed to be included in such registration would exceed the number and type of securities which the managing underwriter believes could be sold in such offering within a price range acceptable to the Company (such writing to state the basis of such opinion and the approximate number and type of securities which the managing underwriter believes may be included in such offering without such effect), then the Company shall include in such registration pursuant to Section 4, to the extent of the number of securities which the Company is so advised the managing underwriter believes can be sold in such offering, (i) first, securities that the Company proposes to issue and sell for its own account, (ii) second, Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 4 hereof, pro rata among the Piggyback Requesting Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Piggyback Requesting Holders and (iii) third, other securities, if any.

(ii)    In the case of any other registration contemplated by Section 4 involving an underwritten Public Offering, if the managing underwriter of such

underwritten offering shall advise the Company in writing (with a copy to the Piggyback Requesting Holders) that if all Registrable Common Stock requested to be included in such registration were so included, in its opinion, the number and type of securities proposed to be included in such registration would exceed the number and type of securities which the managing underwriter believes could be sold in such offering within a price range stated to such managing underwriter by Selling Holders beneficially owning at least a majority of the shares of Registrable Common Stock requested to be included in such registration to be acceptable to such Selling Holders (such writing to state the basis of such opinion and the approximate number and type of securities which the managing underwriter believes may be included in such offering without such effect), then the Company shall include in such registration pursuant to Section 4, to the extent of the number of securities which the Company is so advised the managing underwriter believes can be sold in such offering, (i) first, Registrable Common Stock requested to be registered by Piggyback Requesting Holders pursuant to Section 4 hereof, pro rata among the Piggyback Requesting Holders on the basis of the number of shares of Registrable Common Stock requested to be registered by all such Piggyback Requesting Holders, (ii) second, securities that the Company proposed to issue and sell for its own account and (iii) third, other securities, if any.

Any Selling Holder may withdraw its request to have all or any portion of its Registrable Common Stock included in any such offering by notice to the Company within ten (10) Business Days after receipt of a copy of a notice from the managing underwriter pursuant to this Section 7(b).

(c) Holders of Registrable Common Stock to be Parties to Underwriting Agreement. The Holders of Registrable Common Stock to be distributed by underwriters in an underwritten offering contemplated by subsections (a) or (b) of this Section 7 shall be parties to the underwriting agreement between the Company and such underwriters and any such Holder that is named as an underwriter in the offering, at its option, may reasonably require that any or all of the representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such underwriters shall also be made to and for the benefit of such Holders (except to the extent any such provision contradicts the terms of this Agreement) and that any or all of the conditions precedent to the obligations of such underwriters under such underwriting agreement be conditions precedent to the obligations of such Holders. No such Holder shall be required to make any representations or warranties to or agreements with the Company or the underwriters other than representations, warranties or agreements regarding such Holder, such Holder's Registrable Common Stock and such Holder's intended method of distribution.

(d) Holdback Agreements. Each Holder agrees, unless otherwise agreed to by the managing underwriter for any underwritten offering pursuant to this Agreement, not to effect any sale or distribution of any equity securities of the Company or securities convertible into or exchangeable or exercisable for equity securities of the Company, including any sale under Rule 144 under the Securities Act, (i) during the ten (10) days prior to the initial Public Offering and for one hundred eighty (180) days after the initial Public Offering or such shorter period of time acceptable to the managing underwriter of the initial Public Offering, if any, except as part of the initial Public Offering or to the extent that such Holder is prohibited by applicable law from

agreeing to withhold securities from sale or is acting in its capacity as a fiduciary or an investment advisor or (ii) following the initial Public Offering, during the ten (10) days prior to the date on which an underwritten registration of Registrable Common Stocks pursuant to Section 2(a), 3 or 4 hereof has become effective and for ninety (90) days after the effective date of such underwritten registration or such shorter period of time acceptable to the managing underwriter of such underwritten offering, if any, except as part of such underwritten registration or to the extent that such Holder is prohibited by applicable law from agreeing to withhold securities from sale or is acting in its capacity as a fiduciary or an investment adviser. Without limiting the scope of the term "fiduciary," a Holder shall be deemed to be acting as a fiduciary or an investment adviser if its actions or the securities proposed to be sold are subject to the Employee Retirement Income Security Act of 1974, as amended, the Investment Company Act of 1940, as amended, or the Investment Advisers Act of 1940, as amended, or if such securities are held in a separate account under applicable insurance law or regulation.

The Company agrees, unless otherwise agreed to by the managing underwriter for any underwritten offering pursuant to this Agreement, not to effect any sale or distribution of any equity securities of the Company, or securities convertible into or exchangeable or exercisable for equity securities of the Company (except pursuant to registrations on Form S-4 or Form S-8 or any successor thereto), (i) during the ten (10) days prior to the initial Public Offering and for one hundred eighty (180) days after the initial Public Offering or such shorter period of time acceptable to the managing underwriter of the initial Public Offering, if any, except as part of the initial Public Offering or (ii) following the initial Public Offering, during the ten (10) days prior to the date on which an underwritten registration of Registrable Common Stock pursuant to Section 2(a), 3 or 4 hereof has become effective and for ninety (90) days after the effective date of such underwritten registration or such shorter period of time approved in writing by the managing underwriter of such underwritten offering, if any, except as part of such underwritten registration.

8.  Preparation: Reasonable Investigation.

(a) Registration Statements.  In connection with the preparation and filing of each registration statement under the Securities Act pursuant to this Agreement, the Company shall (i) give representatives (designated to the Company in writing) of each Holder or group of Holders, together with their Affiliates, beneficially owning at least twenty percent (20%) of the shares of Registrable Common Stock registered under such registration statement, the underwriters, if any, and one firm of counsel, one firm of accountants and one firm of other agents retained on behalf of all underwriters and one firm of counsel, one firm of accountants and one firm of other agents retained by Holders (excluding Management Holders) beneficially owning a majority of the shares of Registrable Common Stock covered by such registration statement (excluding shares held by Management Holders) on behalf of all Holders of Registrable Common Stock registered under such registration statement, the reasonable opportunity to participate in the preparation of such registration statement, each prospectus included therein or filed with the Commission, and each amendment thereof or supplement thereto, (ii) upon reasonable advance notice to the Company, give each of them such reasonable access to all financial and other records, corporate documents and properties of the Company and its Subsidiaries, as shall be necessary, in the reasonable opinion of such Holders' and such underwriters' counsel, to conduct a reasonable due diligence investigation for purposes of the Securities Act, and (iii) upon reasonable advance

notice to the Company and during normal business hours, provide such reasonable opportunities to discuss the business of the Company with its officers, directors, employees and the independent public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of such Holders' and such underwriters' counsel, to conduct a reasonable due diligence investigation for purposes of the Securities Act.

(b) Confidentiality. Each Holder shall maintain the confidentiality of any confidential information received from or otherwise made available by the Company to such Holder in its capacity as such. Information that (i) is or becomes available to a Holder from a public source other than as a result of a disclosure by such Holder or any of its Affiliates, (ii) is disclosed to a Holder by a third-party source who the Holder reasonably believes is not bound by an obligation of confidentiality to the Company or (iii) is or becomes required to be disclosed by a Holder by law, including by court order, shall not be deemed to be confidential information for purposes of this Agreement. The Holders shall not grant access, and the Company shall not be required to grant access, to information under this Section 8 to any Person who will not agree to maintain the confidentiality (to the same extent a Holder is required to maintain confidentiality) of any confidential information received from or otherwise made available to it by the Company or the Holders under this Agreement.

9. Postponements.

(a) Without limiting any other rights of the Holders under this Agreement, if the Company shall fail to file any registration statement to be filed pursuant to a request for registration under Section 2(a) or under Section 3(a) hereof within the time limits required hereunder, (i) any Holder whose Registrable Common Stock was to be included in such registration shall have the right to withdraw such request and (ii) the Holders requesting registration shall have the right to withdraw such request to file a registration statement if and only if the Holders (excluding Management Holders) that have not elected to withdraw beneficially own, in the aggregate, less than the percentage of shares of Registrable Common Stock required to initiate a request under Section 2(a) or under Section 3(a), as the case may be. Any withdrawal shall be made by giving written notice to the Company within twenty (20) days after the Shelf Filing Date (or, if, as of such date, the Company does not have the audited financial statements required to be included in the registration statement, thirty (30) days after the receipt by the Company from its independent public accountants of such audited financial statements), or, in the case of a request pursuant to Section 3(a) hereof, the date on which a registration statement would otherwise have been required to have been filed with the Commission under clause (i) of Section 6 (a) hereof (i.e., twenty (20) days after the date that is ninety (90) days after the date of the relevant Initiating Request, or, if, as of such ninetieth day, the Company does not have the audited financial statements required to be included in the registration statement, thirty (30) days after the receipt by the Company from its independent public accountants of such audited financial statements). In the event of a withdrawal described in clause (ii) of this Section 9(a), the request for registration shall not be counted for purposes of determining the number of registrations to which Holders are entitled pursuant to Section 2(a) or 3(a) hereof, as the case may be. The Company shall pay all Expenses incurred in connection with any withdrawal described in clauses (i) and (ii) of this Section 9(a).

(b)  The Company shall not be obligated to file any registration statement, or file any amendment or supplement to any registration statement, and may suspend the registration process and/or any Selling Holder's ability to use a prospectus, at any time (but not to exceed one time in any twelve- (12) month period) when the Company, in the good faith judgment of its Board of Directors, reasonably believes that (i) the continuation of the registration process thereof at the time requested would adversely affect a pending or proposed material financing or a material acquisition, merger, recapitalization, consolidation, reorganization or similar transaction, or negotiations, discussions or pending proposals with respect thereto or (ii) the registration statement and any prospectus would, in the Company's judgment, contain a material misstatement of fact or omission as a result of an event that has occurred or is continuing.  The filing of a registration statement, or any amendment or supplement thereto, by the Company cannot be deferred, and the Selling Holders' rights to make sales pursuant to an effective registration statement cannot be suspended, pursuant to the provisions of the preceding sentence, (x) in the case of clause (i) above, for more than ten days after the abandonment or consummation of any of the proposals or transactions set forth in such clause (i), (y) in the case of clause (ii) above, following such time as the Company no longer believes, in its judgment, that the registration statement and any prospectus would contain a material misstatement of fact or omission as a result of an event that has occurred or is continuing; provided that the Company will use its reasonable best efforts to update the disclosure in such registration statement and prospectus (whether by amendment or by incorporation by reference) as soon as practicable such that the registration statement and prospectus will not contain a material misstatement of fact or omission, or (z) in any event, in the case of either clause (i) or clause (ii) above, for more than one hundred twenty (120) days after the date of the Board of Directors' determination; provided that the Company may not suspend any Selling Holder's ability to use a prospectus pursuant to this Section 9(b) (including but not limited to as set forth in Section 6(g)) for more than an aggregate of one hundred twenty (120) days in any three hundred sixty five- (365) day period. The Company shall give notice to the Selling Holders that the registration process has been suspended and upon notice duly given pursuant to Section 20(f) hereof, each Selling Holder agrees not to sell any Registrable Common Stock pursuant to any registration statement until such Selling Holder's receipt of copies of the supplemented or amended prospectus, or until it is advised in writing by the Company that the prospectus may be used, and has received copies of any additional or supplemental filings that are incorporated or deemed incorporated by reference in such prospectus. The Company shall not specify the nature of the event giving rise to a suspension in any notice to the Selling Holders of the existence of such a suspension. If the Company suspends the Selling Holders' rights to make sales pursuant hereto, the applicable registration period shall be extended by the number of days of such suspension.

10.  Indemnification.

(a)  Indemnification by the Company.  In connection with any registration statement filed by the Company pursuant to Section 2(a), 3(a) or 4 hereof, to the fullest extent permitted by law the Company shall, and hereby agrees to, indemnify and hold harmless, each seller of any Registrable Common Stock covered by such registration statement, each other Person, if any, who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) such seller and their respective directors, officers, employees and other agents (each, a "Company Indemnitee" for purposes of this Section 10(a)), against any losses, claims, damages, liabilities (or actions or proceedings, whether commenced or threatened, in

respect thereof and whether or not such indemnified party is a party thereto), joint or several, and expenses, including, without limitation, the reasonable fees, disbursements and other charges of legal counsel (subject to Section 10(c) below) and reasonable costs of investigation, to which such Company Indemnitee becomes subject under the Securities Act or otherwise (collectively, a "<u>Loss</u>" or "<u>Losses</u>"), insofar as such Losses arise out of, are based upon or relate to any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which such securities were registered or otherwise offered or sold under the Securities Act or otherwise, any preliminary prospectus, final prospectus or summary prospectus related thereto, or any amendment or supplement thereto (or in any document incorporated by reference in any of the foregoing) (collectively, "<u>Offering Documents</u>"), or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the light of the circumstances in which they were made not misleading; <u>provided</u> that, the Company shall not be liable to any Company Indemnitee in any such case to the extent that any such Loss arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in such Offering Documents in reliance upon and in conformity with information furnished to the Company in a writing duly provided by such Company Indemnitee for use therein, including any Selling Holder Information. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Company Indemnitee and shall survive the transfer of such securities by such Company Indemnitee.

(b) <u>Indemnification by the Offerors and Sellers</u>. In connection with any registration statement filed by the Company pursuant to Section 2(a), 3(a) or 4 hereof in which a Holder has registered for sale Registrable Common Stock, each such seller of Registrable Common Stock shall, and hereby agrees to, on a several and not joint basis, indemnify and hold harmless to the fullest extent permitted by law the Company, each other seller, each other Person, if any, who controls (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) the Company or such seller and their respective directors, officers, employees and other agents (each, a "<u>Holder Indemnitee</u>" for purposes of this Section 10(b)), against all Losses insofar as such Losses arise out of, are based upon or relate to any untrue statement or alleged untrue statement of a material fact contained in any Offering Documents or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein in the light of circumstances in which they were made not misleading, but only to the extent that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with information furnished to the Company in a writing duly provided by such seller of Registrable Common Stock expressly for use therein, including any Selling Shareholder Information; <u>provided</u>, <u>however</u>, that the liability of such indemnifying party under this Section 10(b) shall be limited to the amount of the net proceeds received by such indemnifying party in the sale of Registrable Common Stock giving rise to such liability. Such indemnity shall remain in full force and effect, regardless of any investigation made by or on behalf of the Holder Indemnitee and shall survive the transfer of such securities by such indemnifying party.

(c) <u>Notices of Losses, etc.</u> Promptly after receipt by an indemnified party of written notice of the commencement of any action or proceeding involving a Loss referred to in the preceding subsections of this Section 10, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party, give written notice to the latter of the

commencement of such action; provided, however, that the failure of any indemnified party to give notice as provided herein shall not relieve the indemnifying party of its obligations under the preceding subsections of this Section 10, except to the extent that the indemnifying party is materially and actually prejudiced by such failure to give notice.  In case any such action is brought against an indemnified party, the indemnifying party shall be entitled to participate in and, unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist in respect of such Loss, to assume and control the defense thereof, in each case at its own expense, jointly with any other indemnifying party similarly notified, to the extent that it may wish, with counsel reasonably satisfactory to such indemnified party, and after its assumption of the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof other than reasonable costs of investigation, unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties arises in respect of such claim after the assumption of the defense thereof in which case the indemnifying party shall not be liable for the fees and expenses of more than one separate firm of attorneys at any time for such indemnified party and any other indemnified parties (which firm shall be designated in writing by such indemnified party or parties) in connection with any such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances.  No indemnifying party shall be liable for any settlement of any such action or proceeding effected without its written consent, which shall not be unreasonably withheld.  No indemnifying party shall, without the consent of the indemnified party, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect of such Loss or which requires action on the part of such indemnified party or otherwise subjects the indemnified party to any obligation or restriction to which it would not otherwise be subject.

(d) Contribution.  If the indemnification provided for in this Section 10 shall for any reason be unavailable to an indemnified party under subsection (a) or (b) of this Section 10 in respect of any Loss, then, in lieu of the amount paid or payable under subsection (a) or (b) of this Section 10, the indemnified party and the indemnifying party under subsection (a) or (b) of this Section 10 shall contribute to the aggregate Losses (including legal or other expenses reasonably incurred in connection with investigating the same) (i) in such proportion as is appropriate to reflect the relative fault of the Company and the prospective Selling Holders covered by the registration statement which resulted in such Loss or action in respect thereof, with respect to the statements, omissions or action which resulted in such Loss or action in respect thereof, as well as any other relevant equitable considerations, or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the Company, on the one hand, and such prospective sellers, on the other hand, from their sale of Registrable Common Stock; provided that, for purposes of this clause (ii), the relative benefits received by the prospective sellers shall be deemed not to exceed the proceeds received by such sellers.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  The obligations, if any, of the Selling Holders to contribute as provided in this subsection (d) are several in proportion to the relative value of their respective Registrable Common Stock covered

by such registration statement and not joint. In addition, no Person shall be obligated to contribute hereunder any amounts in payment for any settlement of any action or Loss effected without such Person's consent, which shall not be unreasonably withheld.

(e) <u>Indemnification Payments</u>. The indemnification and contribution required by this Section 10 shall be made by periodic payments of the amount thereof during the course of any investigation or defense, as and when any Loss is incurred and is due and payable.

11. <u>Registration Rights to Others</u>.

If the Company shall at any time hereafter provide to any holder of any securities of the Company rights with respect to the registration of such securities under the Securities Act or the Exchange Act, such rights shall not be in conflict with or adversely affect any of the rights provided to the Holders in, or conflict (in a manner that adversely affects Holders) with any other provisions included in, this Agreement.

12. <u>Adjustments Affecting Registrable Common Stock</u>.

Without the written consent of Holders (excluding Management Holders) of a majority of the outstanding shares of Registrable Common Stock (excluding shares held by Management Holders), the Company shall not effect or permit to occur any combination, subdivision or reclassification of Registrable Common Stock that would materially adversely affect the ability of the Holders to include such Registrable Common Stock in any registration of its securities under the Securities Act contemplated by this Agreement or the marketability of such Registrable Common Stock under any such registration or other offering.

13. <u>Exchange Act Reports</u>.

So long as any Holder beneficially owns Registrable Common Stock, the Company shall timely file (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date of the first registration statement filed pursuant to this Agreement pursuant to Section 13(a) or Section 15(d) of the Exchange Act. After the initial Public Offering, so long as any Holder beneficially owns Registrable Common Stock, if the Company is not required to file reports pursuant to Section 13(a) or Section 15(d) of the Exchange Act, it will prepare and make publicly available in accordance with Rule 144(c) promulgated under the Securities Act annual and quarterly financial statements, as well as any other information required thereby, in the time period that such filings would have been required to have been made under the Exchange Act.

14. <u>Rule 144 and Rule 144A</u>.

If the Company has a class of equity securities registered under the Exchange Act, the Company shall take all actions reasonably necessary to enable Holders to sell Registrable Common Stock without registration under the Securities Act to the maximum extent permitted by the exemptions provided by (a) Rule 144 under the Securities Act, as such Rule may be amended from time to time, (b) Rule 144A under the Securities Act, as such Rule may be amended from time to time, or (c) any similar rules or regulations hereafter adopted by the Commission, including, without limiting the generality of the foregoing, filing on a timely basis

all reports required to be filed under the Exchange Act. Upon the written request of any Holder, the Company shall deliver to such Holder a written statement as to whether it has complied with such requirements.

15. Amendments.

This Agreement may be amended only by a written instrument signed by (a) Company and (b) the Holders beneficially owning at least two-thirds of the shares of Registrable Common Stock; provided that the consent of the holders of a majority of the Registrable Common Stock held by the Spyglass Holders and their Affiliates shall be required for any amendment to this Agreement that adversely affects the rights or obligations of any of the Spyglass Holders or any of their Affiliates. Without requiring the consent any Holders of Registrable Common Stock, the Company may from time to time add additional holders of Registrable Common Stock as parties to this Agreement. In order to become a party to this Agreement, such additional holder must execute a joinder agreement, in form and substance satisfactory to the Company, evidencing such additional holder's agreement to be bound hereby as a Holder, and upon the Company's receipt of any such additional holder's executed joinder agreement, such additional holder shall be deemed to be a party hereto and bound hereby.

16. Nominees for Beneficial Owners.

In the event that any Registrable Common Stock is held by a nominee for the beneficial owner thereof, the beneficial owner thereof may, at its election in writing delivered to the Company, be treated as the Holder of such Registrable Common Stock for purposes of any request or other action by any Holder or Holders pursuant to this Agreement or any determination of the number or percentage of shares of Registrable Common Stock held by any Holder or Holders contemplated by this Agreement. If the beneficial owner of any Registrable Common Stock so elects, the Company may require assurances reasonably satisfactory to it of such owner's beneficial ownership of such Registrable Common Stock.

17. Assignment.

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns. Any Holder may assign its rights and obligations under this Agreement to any Transferee of its Registrable Common Stock (so long as the Transfer complies with under applicable law, the Stockholders Agreement, dated as of even date herewith (the "Stockholders Agreement"), by and among the Company and the stockholders named therein or bound thereby), provided that such Transferee shall agree in writing prior to the assignment to be bound by this Agreement as if it were an original party hereto, whereupon such Transferee shall for all purposes be deemed to be a Holder under this Agreement. Except as provided above or otherwise permitted by this Agreement, neither this Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by any Holder without the prior written consent of the other parties hereto. The Company may not assign this Agreement or any right, remedy, obligation or liability arising hereunder or by reason hereof without the consent of the Holders (excluding Management Holders) beneficially owning a majority of the outstanding shares of Registrable Common Stock.

18.  Calculation of Percentage or Number of Shares of Registrable Common Stock.

For purposes of this Agreement, all references to a percentage or number of shares of Registrable Common Stock or Common Stock shall be calculated based upon the number of shares of Registrable Common Stock or Common Stock, as the case may be, outstanding at the time such calculation is made and shall exclude any Registrable Common Stock or Common Stock, as the case may be, beneficially owned by the Company or any Subsidiary of the Company.

19.  Termination of Registration Rights.  This Agreement, including, without limitation, the Company's obligations under Sections 2(a), 3(a) and 4 hereof to register Common Stock for sale under the Securities Act shall terminate on the earlier of (i) the first date on which no shares of Registrable Common Stock are outstanding or (ii) the first date on which less than ten percent (10%) of the aggregate number of shares of Common Stock issued pursuant to the Plan are collectively held by the Original Holders, the Spyglass Holders and their Affiliates. Notwithstanding any termination of this Agreement pursuant to this Section 19, the parties' rights and obligations under Section 5 and Section 10 hereof shall continue in full force and effect.

20.  Miscellaneous.

(a) Further Assurances.  The Company shall execute such documents and other papers and perform such further acts as may be reasonably required or advisable to carry out the provisions of this Agreement and the transactions contemplated hereby.

(b) Headings.  The headings in this Agreement are for convenience of reference only and shall not control or affect the meaning or construction of any provisions hereof.

(c) Conflicting Instructions.  A Person is deemed to be a Holder whenever such Person owns of record Registrable Common Stock.  If the Company receives conflicting instructions, notices or elections from two or more Persons with respect to the same Registrable Common Stock, the Company will act upon the basis of instructions, notice or election received from the registered owner of such Registrable Common Stock.

(d) Remedies.  Each Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Agreement.  The Company agrees that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Agreement and the Company hereby agrees to waive the defense in any action for specific performance that a remedy at law would be adequate.

(e) Entire Agreement.  This Agreement and the Stockholders Agreement constitute the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and there are no restrictions, promises, representations, warranties, covenants, or undertakings with respect to the subject matter hereof, other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings between the parties hereto with respect to the subject matter hereof.

(f)  <u>Notices</u>.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or two (2) Business Days after being delivered to a recognized courier (whose stated terms of delivery are two (2) Business Days or less to the destination of such notice), or five (5) calendar days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as set forth on <u>Schedule C</u> hereto to the parties hereto, or to such other address as may be hereafter notified by the respective parties hereto.

(g)  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

(h)  <u>Severability</u>.  Notwithstanding any provision of this Agreement, neither the Company nor any other party hereto shall be required to take any action which would be in violation of any applicable federal or state securities law.  The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or the validity, legality or enforceability of this Agreement, including any such provision, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

(i)  <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same Agreement.

21.  <u>Director Holders</u>.  Each Director Holder has executed this Agreement and is bound hereby.  After the date hereof, the Company shall not issue any Registrable Common Stock to any person who is, or who would thereupon become, a Director Holder, or to any Affiliate thereof, unless he or she first delivers to the Company a joinder agreement, in form and substance satisfactory to the Company, acknowledging that he or she is bound by the terms hereof as a Director Holder.

22.  <u>Management Holders</u>.  Each Management Holder has executed this Agreement and is bound hereby.  After the date hereof, the Company shall not issue any Registrable Common Stock to any person who is, or who would thereupon become, a Management Holder, or to any Affiliate thereof, unless he or she first delivers to the Company a joinder agreement, in form and substance satisfactory to the Company, acknowledging that he or she is bound by the terms hereof as a Management Holder.

23.  <u>Transfer Agent</u>. The Company shall serve as transfer agent with respect to transfers of shares of Common Stock until such time as it retains a third party transfer agent to manage such responsibilities.

[Remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

MGM HOLDINGS INC.

By: _____

    Name:

    Title:

ORIGINAL HOLDERS IDENTIFIED ON
<u>SCHEDULE A</u> ARE DEEMED TO BE PARTIES
TO THIS AGREEMENT PURSUANT TO THE
PLAN

SPYGLASS ENTERTAINMENT HOLDINGS, LLC

By:_____
    Name:
    Title:


THE GARY BARBER LIVING TRUST

By:_____
    Name:
    Title:


THE ROGER BIRNBAUM FAMILY TRUST

By:_____
    Name:
    Title:


BARBER TRUST PARTNERSHIP

By:_____
    Name:
    Title:


2000 BIRNBAUM IRREVOCABLE TRUST

By:_____
    Name:
    Title:


JONATHAN GLICKMAN

By:_____
    Name:
    Title:

MANAGEMENT HOLDERS:
(Each of the undersigned signing individually, and not on behalf of any other Management Holder)

By: _____
    Name:

DIRECTOR  HOLDERS:
(Each of the undersigned signing individually, and not on behalf of any other Director Holder)


By: _____
     Name:

**SCHEDULE A**

| Original Holders |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

| **<u>Spyglass Holders</u>** |
| --- |
|  |
| Spyglass Entertainment Holdings, LLC |
| The Gary Barber Living Trust |
| The Roger Birnbaum Family Trust |
| Barber Trust Partnership |
| 2000 Birnbaum Irrevocable Trust |
| Jonathan Glickman |

NOTICES

If to the Company, to:

MGM Holdings Inc.
10250 Constellation Boulevard
Los Angeles, California 90067
Fax: (310) 449-3092
Attn: Scott Packman, Esq.

If to the Original Holders, to:

Such Original Holder, at such Original Holder's address or to such Original Holder's telecopy number reflected in the Company's books and records.

with a copy, which shall not constitute notice, to:

Simpson Thacher & Bartlett LLP
Attention:  Daniel Clivner
1999 Avenue of the Stars
Los Angeles, California  90067
Tel: (310) 407-7555
Fax: (310) 407-7502

If to the Spyglass Holders, to:

Spyglass Entertainment Holdings, LLC
Attention: Gary Barber
10900 Wilshire Boulevard, Floor 10
Los Angeles, California 90024
Tel: (310) 443-5858
Fax: 310-443-5912

and

SEH Investors, LLC
c/o Cerberus California, Inc.
Attention: Kurt Larsen
136 Heber Ave., Suite 206
P.O. Box 683130
Park City, UT 84068
Telephone: (435) 647-7794
Facsimile: (435) 615-1237

and

Brooknol Advisors, LLC
Attention: Brian Mulligan
4236 Commonwealth Ave.
La Canada, CA 91011
Telephone: (818) 952-9526
Facsimile: (310) 209-9125

and

Spyglass Entertainment Group, LLC
Attention: Gary Barber
10900 Wilshire Boulevard, 10th Floor
Los Angeles, CA 90021
Telephone: (310) 443-5858
Facsimile: (310) 443-5912

and

Cypress Entertainment Group, Inc.
Attention: Gary Barber
10900 Wilshire Boulevard, Floor 10
Los Angeles, California 90024
Tel: (310) 443-5858
Fax: 310-443-5912

and

Garoge, Inc.
Attention: Gary Barber
10900 Wilshire Boulevard, Floor 10
Los Angeles, California 90024
Tel: (310) 443-5858
Fax: 310-443-5912

with a copy, which shall not constitute notice, to:

O'Melveny & Myers LLP
Attention: Christopher Brearton, Esq.
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Tel: 310-246-8437
Fax: 310-246-6779

with a copy, which shall not constitute notice, to:

O'Melveny & Myers LLP
Attention: Sean Monroe, Esq.
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Tel: 310-246-8557
Fax: 310-246-6779

with a copy, which shall not constitute notice, to:

Allen Matkins Leck Gamble Mallory & Natsis LLP
Attention: Jeffrey N. Strug, Esq.
515 South Figueroa Street, 9th Floor
Los Angeles, California 90071
Tel: 213-622-5555
Fax: 213-620-8816

If to any other Holders, to:

Such Holder, at such Holder's address or to such Holder's telecopy number reflected in the Company's books and records.

## FORM OF SELLING STOCKHOLDER QUESTIONNAIRE

The undersigned beneficial owner (the "Selling Stockholder") of shares of common stock, par value $0.01 per share (the "Registrable Common Stock"), of MGM Holdings Inc. (the "Company"), hereby gives notice to the Company of its intention to sell or otherwise dispose of Registrable Common Stock beneficially owned by it and listed below in Item 3 (unless otherwise specified under Item 3) pursuant to a registration statement. The undersigned, by signing and returning this Selling Stockholder Questionnaire, understands that it will be bound by the terms and conditions of this Selling Stockholder Questionnaire and the Registration Rights Agreement, dated as of [●], 2010, among the Company and the Holders named therein (the "Registration Rights Agreement"). Capitalized terms used and not defined herein shall have the meaning ascribed to them in the Registration Rights Agreement.

In accordance with the Registration Rights Agreement, Selling Stockholders that do not complete this Selling Stockholder Questionnaire and deliver it to the Company as provided below will not be named selling stockholders in the prospectus and therefore will not be permitted to sell any Registrable Common Stock pursuant to a registration statement.

Pursuant to the Registration Rights Agreement, the undersigned has agreed to indemnify and hold harmless the Company, each other seller, each other Person, if any, who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) the Company or such seller and their respective directors, officers, employees and other agents from and against certain losses arising in connection with statements concerning the undersigned made in any registration statement or related prospectus in reliance upon the information provided in this Selling Stockholder Questionnaire and any other written information duly provided to the Company expressly for use in the registration statement or related prospectus. The undersigned hereby acknowledges its obligations under the Registration Rights Agreement to indemnify and hold harmless certain persons set forth therein.

Certain legal consequences arise from being named a selling stockholder in the registration statement and any related prospectus. Accordingly, holders and beneficial owners are advised to consult their own securities law counsel regarding the consequences of being named or not named as a selling stockholder in the registration statement and any related prospectus.

The undersigned hereby provides the following information to the Company and represents and warrants that such information is accurate and complete:

(1)    (a)    Full Legal Name of Selling Stockholder:

        (b)    Full Legal Name of Registered Holder (if not the same as (a) above) through which Registrable Common Stock listed in (3) below is held:

        (c)    Full Legal Name of DTC Participant (if applicable and if not the same as (b) above) through which Registrable Common Stock listed in (3) below is held:

(2)    Address for Notices to Selling Stockholder:

_____

Telephone (including area code):_____

Fax (including area code):_____

Contact Person:_____

(3)    Beneficial Ownership of Registrable Common Stock:

    (a)    Type and Principal Amount/Number of Registrable Common Stock beneficially owned:

    (b)    CUSIP No(s). of such Registrable Common Stock beneficially owned:

(4)    Beneficial Ownership of Other Securities of the Company Owned by the Selling Stockholder:

*Except as set forth below in this Item (4), the undersigned is not the beneficial or registered owner of any securities of the Company other than the Registrable Common Stock listed above in Item (3).*

    (a)    Type and Amount of Other Securities beneficially owned by the Selling Stockholder:

    (b)    CUSIP No(s). of such Other Securities beneficially owned:

(5)    Relationship with the Company:

*Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (5% or more) has held any position or office or has had any other material relationship with the Company (or its predecessors or affiliates) during the past three years.*

State any exceptions here:_____

(6)    Is the Selling Stockholder a registered broker-dealer?

Yes    ☐

No    ☐

If "Yes", please answer subsection (a) and subsection (b):

    (a)    Did the Selling Stockholder acquire the Registrable Common Stock as compensation for underwriting/broker-dealer activities to the Company?

        Yes  ☐

        No  ☐

    (b)    If you answered "No" to question 6(a), please explain your reason for acquiring the Registrable Common Stock:

(7)    Is the Selling Stockholder an affiliate of a registered broker-dealer?

Yes    ☐

No    ☐

If "Yes", please identify the registered broker-dealer(s), describe the nature of the affiliation(s) and answer subsection (a) and subsection (b):

    (a)    Did the Selling Stockholder purchase the Registrable Common Stock in the ordinary course of business (if no, please explain)?

Yes ☐
No ☐ Explain: _____

(b) Did the Selling Stockholder have an agreement or understanding, directly or indirectly, with any person to distribute the Registrable Common Stock at the same time the Registrable Common Stock were originally purchased (if yes, please explain)?

Yes ☐ Explain: _____
No ☐

(8) Is the Selling Stockholder a non-public entity?

Yes ☐
No ☐

If "Yes", please answer subsection (a):

(a) Identify the natural person or persons that have voting or investment control over the Registrable Common Stock that the non-public entity owns:

_____
_____

(9) Plan of Distribution:

*Except as set forth below, the undersigned Selling Stockholder (including its donees and pledgees) intends to distribute the Registrable Common Stock listed above in Item (3) pursuant to the registration statement only as follows (if at all): Such Registrable Common Stock may be sold from time to time directly by the undersigned Selling Stockholder or, alternatively, in accordance with the Registration Rights Agreement, through underwriters, broker-dealers or agents. If the Registrable Common Stock is sold through underwriters or broker-dealers, the Selling Stockholders will be responsible for underwriting discounts or commissions or agent commissions. Such Registrable Common Stock may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of sale, at varying prices determined at the time of sale, or at negotiated prices. Such sales may be effected in transactions (which may involve cross or block transactions) (i) on any national securities exchange or quotation service on which the Registrable Common Stock may be listed or quoted at the time of sale, (ii) in the over-the-counter market, (iii) in transactions otherwise than on such exchanges or services or in the over-the-counter market, or (iv) through the writing of options. In connection with sales of the Registrable Common Stock or otherwise, the undersigned Selling Stockholder may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the Registrable Common Stock in the course of hedging positions they assume. The undersigned Selling Stockholder may also sell Registrable Common Stock short and deliver Registrable Common Stock to close out short positions, or loan or pledge Registrable Common Stock to broker-dealers that in turn may sell such securities.*

State any exceptions here: _____

The undersigned Selling Stockholder acknowledges that it understands its obligations to comply with the provisions of the Exchange Act, and the rules thereunder relating to stock manipulation, particularly Regulation M thereunder (or any successor rules or regulations), in connection with any offering of Registrable Common Stock pursuant to the Shelf Registration Agreement. The undersigned agrees that neither it nor any person acting on its behalf will engage in any transaction in violation of such provisions.

In the event the undersigned transfers all or any portion of the Registrable Common Stock listed in Item (3) above after the date on which such information is provided to the Company

other than pursuant to the registration statement, the undersigned agrees to notify the transferee(s) at the time of the transfer of its rights and obligations under this Selling Stockholder Questionnaire and the Registration Rights Agreement.

In accordance with the undersigned's obligation under the Registration Rights Agreement to provide such information as may be required by law or by the staff of the Commission for inclusion in the registration statement, the undersigned agrees to promptly notify the Company of any inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof at any time while the registration statement remains effective. All notices hereunder and pursuant to the Registration Rights Agreement shall be made in writing, by hand-delivery, first-class mail, or air courier guaranteeing overnight delivery to the address set forth below.

By signing below, the undersigned consents to the disclosure of the information contained herein in its answers to Items (1) through (9) above and the inclusion of such information in the registration statement and any related prospectus. The undersigned understands that such information will be relied upon by the Company in connection with the preparation or amendment of the registration statement and any related prospectus.

By signing below, the undersigned agrees that if the Company notifies the undersigned in accordance with and pursuant to the Registration Rights Agreement that the registration statement is not available, the undersigned will in accordance with and pursuant to the Registration Rights Agreement suspend use of any prospectus until notice from the Company that the prospectus is again available.

Once this Selling Stockholder Questionnaire is executed by the undersigned and received by the Company, the terms of this Selling Stockholder Questionnaire, and the representations, warranties and agreements contained herein, shall be binding on, shall inure to the benefit of and shall be enforceable by the respective successors, heirs, personal representatives and assigns of the Company and the undersigned with respect to the Registrable Common Stock beneficially owned by the undersigned and listed in Item (3) above. This Selling Stockholder Questionnaire shall be governed in all respects by the laws of the State of New York.

IN WITNESS WHEREOF, the undersigned, by authority duly given, has caused this Selling Stockholder Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Dated:_____

_____
Beneficial Owner

By:_____
Name:_____
Title:_____

PLEASE RETURN THE COMPLETED AND EXECUTED
SELLING STOCKHOLDER QUESTIONNAIRE TO THE COMPANY AT:

MGM Holdings Inc.
10250 Constellation Boulevard
Los Angeles, California 90067
Fax: (310) 449-3092
Attn: Scott Packman, Esq.

EXHIBIT E

STOCKHOLDERS AGREEMENT

STOCKHOLDERS AGREEMENT


dated as of [●], 2010


by and among


MGM HOLDINGS INC.


and


THE STOCKHOLDERS BOUND HEREBY

# TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS ...................................................................................1

Defined Terms ...................................................................................1
Other Definitional Provisions; Interpretation .......................................7

SECTION 2.  CORPORATE GOVERNANCE ........................................................8

Board of Directors ............................................................................8
Board Committees; Lead Director ......................................................9
Protective Provisions ......................................................................11
Certificate of Incorporation and By-Laws ..........................................15

SECTION 3.  INFORMATION REQUIREMENTS ...............................................15

Financial Reports ...........................................................................15
Quarterly Calls ...............................................................................16
Confidentiality ................................................................................16

SECTION 4.  TRANSFERS AND ISSUANCES .....................................................17

Limitations on Transfer ...................................................................17
Transfers to Affiliates; Third Party Transfer .......................................18
Effect of Void Transfers ...................................................................18
Legend on Securities .......................................................................18
Tag-Along Rights ............................................................................19
Drag-Along Rights ..........................................................................22
Participation Rights .........................................................................23

SECTION 5.  CALL RIGHTS .............................................................................25

Management Stockholders ...............................................................25

SECTION 6.  INDEMNIFICATION ....................................................................26

Indemnification ..............................................................................26

SECTION 7.  MISCELLANEOUS ......................................................................27

Additional Securities Subject to Agreement .......................................27
Termination ...................................................................................27
Injunctive Relief .............................................................................27
Other Stockholders Agreements .......................................................27
Amendments; Waiver ......................................................................27

509265-1076-11218-Active.12121102.14

Successors, Assigns and Transferees ...................................................................28
Notices ..................................................................................................................28
Integration ............................................................................................................28
Severability ...........................................................................................................28
Counterparts .........................................................................................................29
Governing Law, Etc ..............................................................................................29
Management Stockholders ....................................................................................29
Director Stockholders ...........................................................................................29
Lender Relationship .............................................................................................29
Further Assurances ...............................................................................................29

List of Schedules

Schedule A-1   Original Stockholders
Schedule A-2   Spyglass Stockholders
Schedule B      Notices

List of Exhibits

Exhibit A        Greenlight Committee Guidelines
Exhibit B        Initial Annual Budget

This STOCKHOLDERS AGREEMENT, dated as of [●], 2010, is entered into by and among MGM Holdings Inc., a Delaware corporation (the "Company"), certain creditors of the Company, including those identified on Schedule A-1 hereto (together with their Permitted Transferees, successors and assigns, the "Original Stockholders"), the Persons (as defined below) identified on Schedule A-2 hereto (the "Spyglass Stockholders"), the Management Stockholders (as defined below), the Director Stockholders (as defined below) and any other stockholder that may become a party to this Agreement after the date hereof and pursuant to the terms hereof (collectively with the Original Stockholders, the Spyglass Stockholders, the Management Stockholders and the Director Stockholders, the "Stockholders").

W I T N E S S E T H:

WHEREAS, this Agreement is made with reference to the Investment Agreement dated October 6, 2010 by and among the Company and certain of the Stockholders (the "Investment Agreement").

WHEREAS, the execution and delivery of this Agreement is a condition to the closing contemplated by the Investment Agreement.

WHEREAS, the Company and the Stockholders are entering into this Agreement pursuant to the terms of the Plan (as defined below) and pursuant to the Investment Agreement to set forth certain agreements with respect to the Company and its Subsidiaries (as defined below) and their respective ownership of Common Stock (as defined below) issued pursuant to the Plan and pursuant to the Investment Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

SECTION 1.   DEFINITIONS

1.1   Defined Terms. As used in this Agreement, terms defined in the preamble shall have their respective assigned meanings, and the following capitalized terms shall have the meanings ascribed to them below:

"Accredited Investor" shall mean an "Accredited Investor," as such term is defined in Regulation D promulgated under the Securities Act, or any successor rule then in effect.

"Adjourned Meeting" shall have the meaning set forth in Section 2.3(c).

"Affiliate" (a) shall mean, with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with, such Person or any Immediate Family of such Person; (b) shall also include, with respect to any Person who is an individual, a trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only such individual and/or such individual's Immediate Family; (c) shall also include, with respect to any Person, an entity or trust established or utilized for purposes of estate planning for such Person; and (d) in the case

of a Spyglass Stockholder, without limitation to the foregoing in this definition of "Affiliate," any member, shareholder, or partner listed on Schedule B.  For purposes of this definition, the term "control" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall mean this Stockholders Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"Annual Budget" shall mean the annual operating budget and business plan for the Company and its Subsidiaries, as approved by the Board in accordance with Section 2.3(b)(1), the first of which is attached hereto as Exhibit B.

"beneficially own" shall have the meaning set forth in Rule 13d-3 under the Exchange Act.

"Board" shall have the meaning set forth in Section 2.1(a).

"Board Notice" shall have the meaning set forth in Section 2.3(c).

"Business Day" shall mean a day other than a Saturday, Sunday, United States federal or New York State holiday or other day on which commercial banks in New York City are authorized or required by law to close.

"By-Laws" shall mean the by-laws of the Company, as amended from time to time.

"Call Notice" shall have the meaning set forth in Section 5.1(b).

"Cause", with respect to a Management Stockholder, shall have the same meaning ascribed to such term in any employment, severance or option agreement entered into between the Management Stockholder and the Company or one of its Subsidiaries or Affiliates.  In the event of any inconsistencies among the aforementioned agreements, the employment agreement shall control.

"CEO" shall mean the Chief Executive Officer of the Company.

"Certificate of Incorporation" shall mean the certificate of incorporation of the Company, as amended from time to time.

"Change of Control" shall mean the occurrence of (a) any consolidation or merger of the Company with or into any other entity, or any other corporate reorganization or transaction (including the acquisition or issuance of capital stock of the Company), whether or not the Company is a party thereto, after giving effect to which (i) in excess of 50% of the Company's voting power is beneficially owned by any Person or "group" (as such term is used in Rule 13d-5 under the Exchange Act) (excluding any such "group" created by this Agreement) or (ii) the stockholders of the Company and their respective

Affiliates prior to such consolidation, merger, reorganization or other transaction shall cease to have a majority of the voting power of, or the power to elect a majority of the entire board of the directors of, the Company or other surviving entity; or (b) a sale of all or substantially all of the assets of the Company to any Person or "group" (as such term is used in Rule 13d-5 under the Exchange Act) (other than to a Subsidiary or an Affiliate of the Company); provided that any consolidation, merger, reorganization or other transaction effected exclusively to change the domicile of the Company or to form a holding company in which the stockholders of the Company immediately prior to such consolidation, merger, reorganization or other transaction own capital stock representing economic interests and voting power with respect to such redomiciled entity or holding company in the same proportions and with substantially the same rights and obligations as their ownership of capital stock of the Company shall be excluded from clause (a) above.

"Common Stock" shall mean the common stock, par value $0.01 per share, of the Company.

"Common Stock Equivalents" shall mean any warrants, rights, options or other securities exchangeable or exercisable for, or convertible into, Common Stock.

"Company" shall have the meaning set forth in the preamble hereto.

"Company Competitor" shall mean any Person that is engaged directly or indirectly in the motion picture, television, interactive gaming or digital entertainment industry or any other business that directly competes with a material line of the business then conducted by the Company or its Subsidiaries. Whether a Person is a Company Competitor shall be determined by the Board, acting in good faith.

"Department Head Committee Member" shall have the meaning set forth in Section 2.2(c).

"Director" and "Directors" shall have the meanings set forth in Section 2.1(a).

"Director Stockholder" shall mean Directors who hold Equity Interests and are not employees of the Company or its Subsidiaries.

"Domestic Territory" shall mean the entire territorial United States and Canada and their respective territories, possessions and commonwealths.

"Drag-Along Notice" shall have the meaning set forth in Section 4.6(a).

"Drag-Along Transaction" shall have the meaning set forth in Section 4.6(a).

"Effective Date" shall mean the effective date of the Plan pursuant to the terms thereof.

"Eligible Stockholder" shall mean each Stockholder; provided that such Stockholder and its Affiliates beneficially own an aggregate number of shares of

Common Stock representing at least one percent (1%) of the then issued and outstanding shares of Common Stock.

"Equity Incentive Plan" shall mean the 2010 MGM Holdings Inc. Stock Incentive Plan adopted by the Company, as amended from time to time.

"Equity Interests" shall mean Common Stock, Common Stock Equivalents or any other equity securities of the Company, or securities exchangeable or exercisable for, or convertible into, such other equity securities of the Company.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

"Executive Directors" shall have the meaning set forth in Section 2.1(b)(ii).

"Exigent Circumstances" shall have the meaning set forth in Section 2.2(h).

"Exigent Circumstances Exception" shall have the meaning set forth in Section 2.2(h).

"Fair Market Value" shall mean the fair market value of any shares of Common Stock on any given date, as determined reasonably and in good faith by the compensation committee of the Board, which shall not take into account any discount for minority interests or transfer restrictions imposed on the shares of Common Stock being valued provided, that, if any affected party objects to the determination of "Fair Market Value" by the compensation committee of the Board, such matter shall be resolved by an independent appraiser mutually agreed upon by the compensation committee of the Board and the affected party.

"Governmental Authority" shall mean any government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Greenlight" shall have the meaning set forth in Section 2.2(d).

"Greenlight Committee" shall have the meaning set forth in Section 2.2(c).

"Greenlight Models" shall have the meaning set forth in Section 2.2(f).

"Greenlight Package" shall have the meaning as described in Exhibit A hereto.

"Immediate Family" shall have the meaning specified in Rule 16a-1 of the Exchange Act.

"Information" shall have the meaning set forth in Section 3.3.

"Initial Term" shall mean the period commencing on the date hereof and terminating on the second anniversary of the Effective Date.

"Investment Agreement" shall have the meaning set forth in the recitals hereto.

"Issuance" shall have the meaning set forth in Section 4.7(a).

"Major International Territory" shall mean any of Australia, Japan, the United Kingdom, Germany, France, Italy, Spain, Russia, and Latin America, subject to replacement of any of the foregoing in the good faith judgment of the Management Stockholders (and upon written notice to the Board) based on then-current industry data.

"Management Stockholders" shall mean employees (and their Affiliates) or former employees (and their Affiliates) of the Company or its Subsidiaries who hold Equity Interests.

"Non-Executive Directors" means Directors (including the Significant Stockholder Director Designees), other than the Executive Directors.

"Original Stockholders" shall have the meaning set forth in the preamble.

"Other Agreements" shall have the meaning set forth in Section 7.8.

"Other Capital Stock" shall have the meaning set forth in Section 4.7(a)(ii).

"Other Capital Stock Equivalents" shall have the meaning set forth in Section 4.7(a)(ii).

"P&A" shall have the meaning set forth in Section 2.2(e).

"P&A Budget" shall have the meaning set forth in Section 2.2(e).

"Permitted Transferee" shall mean any Person to whom a Stockholder Transfers Equity Interests in accordance with the terms of this Agreement.

"Person" shall mean any individual, corporation, partnership, limited liability company, trust, joint stock company, business trust, unincorporated association, joint venture, Governmental Authority or other entity of any nature whatsoever.

"Plan" shall mean the Joint Plan of Reorganization confirmed by order dated [●], 2010 of the United States Bankruptcy Court for the Southern District of New York in the chapter 11 case commenced by the Company and certain of its Affiliates.

"Pro Rata Share" shall have the meaning set forth in Section 4.5(a).

"Public Offering" shall mean an underwritten public offering and sale of Common Stock pursuant to an effective registration statement under the Securities Act.

"Purchasing Holder" shall have the meaning set forth in Section 4.7(d).

"Registration Rights Agreement" shall mean that certain Registration Rights Agreement dated as of the date hereof among the Company and the holders named therein.

"Right" shall have the meaning set forth in Section 4.7(a).

"SEC" shall mean the U.S. Securities and Exchange Commission.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

"Selling Stockholder(s)" shall have the meaning set forth in Section 4.6(a).

"Sharing Percentage" means, with respect to each holder of Common Stock (or group of holders of Common Stock), the fraction (expressed as a percentage), the numerator of which is the number of shares of Common Stock owned by such holder and the denominator of which is the sum of the total number of shares of Common Stock owned by all holders (or the relevant holders if the calculation is made with respect to a specified group of holders).

"Significant Stockholder" means each of (a) [HC] and (b) [AC], until such time after the Effective Date as such Person, together with its Affiliates, no longer beneficially owns at least ten percent (10%) of the issued and outstanding Common Stock of the Company.

"Significant Stockholder Director Designee" means each Non-Executive Director who is designated in writing to serve as a Non-Executive Director by a Significant Stockholder; provided, (x) that in the event any such Significant Stockholder, together with its Affiliates, ceases to beneficially own at least ten percent (10%) of the issued and outstanding Common Stock of the Company following the Effective Date and (y) whether or not clause (x) applies, following the Initial Term, the Significant Stockholder Director Designee of such Significant Stockholder shall cease to be a Significant Stockholder Director Designee for the purposes of this Agreement (and instead shall be treated herein as a Non-Executive Director).

"Spyglass Stockholders" shall have the meaning set forth in the preamble hereto.

"Stockholders" shall have the meaning set forth in the preamble hereto.

"Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which fifty percent (50%) or more of the total voting power of shares of capital stock entitled (without regard to the occurrence of any contingency) to vote generally in the election of directors, managers or trustees thereof, or fifty percent (50%) or more of the equity interest therein, is at the time owned or controlled, directly or indirectly, by any Person or one or more of the other Subsidiaries of such Person or a combination thereof. For purposes of this definition, United Artists Entertainment LLC shall be deemed to be a Subsidiary of the Company.

509265-1076-11218-Active.12121102.14

"Tagging Stockholder" shall have the meaning set forth in Section 4.5(a).

"Termination Date" shall mean, with respect to a Management Stockholder, the date upon which such Management Stockholder's employment with the Company or its Affiliates is terminated for Cause.

"Third Party" shall have the meaning set forth in Section 4.6(a).

"Transfer" shall mean any direct or indirect transfer, sale, offer, assignment, exchange, distribution, mortgage, pledge, hypothecation or other disposition. "Transferor" and "Transferee" have correlative meanings.

"Transferring Stockholder" shall have the meaning set forth in Section 4.5(a).

1.2     Other Definitional Provisions; Interpretation.

(a)     The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Subsection and Schedule references are to this Agreement unless otherwise specified.

(b)     The headings in this Agreement are included for convenience of reference only and shall not limit or otherwise affect the meaning or interpretation of this Agreement.

(c)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)     The words "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation".

(e)     References to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto.

(f)     References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(g)     Except as otherwise set forth herein, schedules to this Agreement are a material part hereof and shall be treated as if fully incorporated into the body of the Agreement and shall be included in the definition of "Agreement".

(h)     Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified and shall be counted from the day immediately following the date from which such number of days are to be counted.

(i)     In the event there is only one (1) CEO, the plural references to "CEOs" herein shall instead be interpreted to refer to a "CEO" in the singular.

7

SECTION 2.   CORPORATE GOVERNANCE

2.1   <u>Board of Directors</u>.

(a)   The Stockholders agree to cause the Board of Directors of the Company (the "<u>Board</u>") to consist of nine (9) authorized directors (individually, a "<u>Director</u>" and, collectively, the "<u>Directors</u>"), and it is hereby agreed that the initial Directors are Gary Barber, Roger Birnbaum, [●], [●], [●], [●],[●],[●] and[●].[1]  [●] has been designated as the initial Significant Stockholder Director Designee of [HC] and [●] has been designated as the initial Significant Stockholder Designee of [AC] and each Significant Stockholder shall have the right to designate, remove and replace its designated Significant Stockholder Director Designee during the Initial Term in accordance with the terms hereof.  Any vacancies as of the date hereof will be filled with Non-Executive Directors or Significant Stockholder Director Designees, specified by the Board and, if applicable, a Significant Stockholder in accordance with the provisions herein after full, timely and meaningful consultation with Gary Barber and Roger Birnbaum.

(b)   Each Stockholder agrees that such Stockholder will vote at each meeting of the stockholders of the Company, or in lieu of any such meeting shall give such Stockholder's written consent with respect to, as the case may be, all of the Equity Interests beneficially owned or held of record by such Stockholder that are entitled to vote thereon so as to elect and to continue in office as a Director:

(i)   Gary Barber (for so long as he is a CEO); and

(ii)   Roger Birnbaum (for so long as he is a CEO) (each of Gary Barber and Roger Birnbaum, an "<u>Executive Director</u>" and collectively, the "<u>Executive Directors</u>").

(c)   Each Stockholder further agrees that such Stockholder will (i) vote at each meeting of the Stockholders of the Company, or in lieu of any such meeting shall give such Stockholder's written consent with respect to, as the case may be, all of the Equity Interests beneficially owned or held of record by such Stockholder that are entitled to vote thereon so as to elect and continue in office the Non-Executive Directors recommended by a majority of the Board to the Stockholders, and (ii) not vote against or take any other action to remove any Non-Executive Directors other than for cause; <u>provided</u> that (x) to the extent that a Person is to be recommended to replace a Significant Stockholder Director Designee (or his successor) prior to the expiration of the Initial Term, such recommendation shall be made only in writing by the Significant Stockholder that designated such Significant Stockholder Director Designee if such Significant Stockholder, together with its Affiliates, beneficially owns not less than ten percent (10%) of the issued and outstanding Common Stock of the Company at the time of such designation, and (y) the Original Stockholders shall have no obligation to elect and continue in office the Non-Executive Directors under clause (i) or to refrain from removing any Non-

---

[1] The other directors (including the Significant Stockholder Director Designees) to be named herein will be identified at or following the Effective Date after full, timely, and meaningful consultation with Gary Barber and Roger Birnbaum.

Executive Director under clause (ii), in each case on or after the second anniversary of the date hereof. Non-Executive Directors (including Significant Stockholder Director Designees) shall be recommended by the Board only after full, timely and meaningful consultation with the Executive Directors, which one or more of whom shall be individual(s) with significant experience in the entertainment industry.

(d)     If any of the Non-Executive Directors ceases to serve as a member of the Board (whether by reason of death, resignation, removal or otherwise), a majority of the Non-Executive Directors shall be entitled to designate a successor Non-Executive Director to fill the vacancy created thereby; provided that (x) during the Initial Term, a Significant Stockholder Director Designee may be removed (other than for cause) only at the written direction of the Significant Stockholder that designated such Significant Stockholder Director Designee and (y) during the Initial Term, a successor to a Significant Stockholder Director Designee shall be designated in writing by the Significant Stockholder that designated such Significant Stockholder Director Designee, in each case if such Significant Stockholder, together with its Affiliates, beneficially owns not less than ten percent (10%) of the issued and outstanding Common Stock of the Company at the time of such designation. Each Stockholder agrees that such Stockholder will (i) vote all shares of the Common Stock beneficially owned or held of record by such Stockholder so as to elect any such successor Non-Executive Director and (ii) not vote or take any other action to remove such successor Non-Executive Director other than for cause; provided that the Original Stockholders shall have no obligation to elect and continue in office any successor Non-Executive Director under clause (i) or to refrain from removing any successor Non-Executive Director under clause (ii), in each case on or after the second anniversary of the date hereof. Regardless of the foregoing, in no event will a successor Non-Executive Director be designated (i) unless the Non-Executive Directors shall have first had full, timely and meaningful consultation with the Executive Directors with respect to such successor Non-Executive Director and (ii) if less than one (1) Non-Executive Director then on the Board has significant experience in the entertainment industry, unless such successor Non-Executive Director has significant experience in the entertainment industry.

(e)     Effective upon the Effective Date and for so long as Gary Barber is an Executive Director, he shall be a "Co-Chairman" or "Chairman" of the Board. Effective upon the Effective Date and for so long as Roger Birnbaum is an Executive Director, he shall be a "Co-Chairman" or "Chairman" of the Board. Without limiting the foregoing, the Company and the Stockholders agree to take such actions to ensure that Gary Barber and Roger Birnbaum are nominated and elected to the Board for so long as each of them is a CEO. Each Stockholder furthermore agrees that such Stockholder will not seek, vote for, consent to, or otherwise effect the removal of any Executive Director from the Board for so long as such individual is an Executive Director in accordance with Section 2.1(b)(i) and Section 2.1(b)(ii) (i.e., for so long as he is a CEO).

2.2     Board Committees; Lead Director.

(a)     The Board shall establish one or more committees, including the following: audit committee, compensation committee and greenlight committee. The Board may also establish an executive committee.

(b)     Both Executive Directors shall be appointed to serve on any executive committee and the Greenlight Committee, and one Executive Director (such individual to be determined by the Executive Directors) shall be appointed to serve on each other Board committee, with the exception of the audit committee (which shall, among other things, be required to recommend approval of the transactions referred to in Section 2.3(a)(8)) and the compensation committee (which shall, among other things, be required to recommend approval of the transactions referred to in Sections 2.3(a)(5) and 2.3(a)(7)), neither of which shall include the Executive Directors.  The foregoing right of the Executive Directors to serve on a committee of the Board of Directors shall terminate if both of the Executive Directors cease to serve as Directors.

(c)     The Company shall have a greenlight committee (the "Greenlight Committee") comprised of (i) the CEOs and (ii) the heads of each of the motion picture, television and digital media (which may include interactive gaming and digital entertainment) departments, if such department heads report directly to the CEOs and, in each case upon such department head's employment by the Company (each such department head being referred to herein as a "Department Head Committee Member").  The Department Head Committee Members and any additional members of senior management designated by the CEOs to attend meetings of the Greenlight Committee shall serve in an advisory capacity only, and such members shall not have the right to vote on any decisions of the Greenlight Committee.

(d)     The Greenlight Committee shall be the sole decision-making authority of the Company where any decision to (i) acquire a motion picture, television program or other audiovisual program of any kind or nature (which shall include interactive games, digital entertainment and all ancillary rights) or any rights thereto (and determine the acquisition cost therefor), (ii) proceed to production (or co-production) of a motion picture, television program or other audiovisual program (and determine the production budget therefor), or (iii) finance or co-finance any of the foregoing, is made (such decision, a "Greenlight"), in each case, subject only to Section 2.3(a)(1) with respect to motion pictures, the Annual Budget and the guidelines of the Greenlight Committee (as more fully described on Exhibit A hereto).

(e)     The Greenlight Committee shall also exclusively determine the amount of print and advertising costs and expenses ("P&A") to be spent on each motion picture and review all P&A budgets (each a "P&A Budget") for each motion picture, subject only to Section 2.3(a)(3) and the Annual Budget.  Similarly, initial marketing expenditures to be paid by the Company in connection with the launch of a television program or other audiovisual program shall be determined exclusively by the Greenlight Committee.

(f)     A low case performance model, medium case performance model and high case performance model shall be prepared for each motion picture, television program and other audiovisual program, as applicable, and a low case, medium case and high case P&A Budget (if applicable) and marketing and media plan tied to each performance model shall be prepared for each such motion picture or other program (collectively, the "Greenlight Models"). The applicable Greenlight Models shall be prepared in connection with each such program greenlit by the Greenlight Committee and presented to the Greenlight Committee.

10

(g)     Upon the Board's request, the Greenlight Committee will provide a Greenlight Package and the Greenlight Models to the Board for informational purposes (it being understood and agreed that a Greenlight Package shall not be a condition to any such Greenlight decision).  Minutes of each Greenlight Committee meeting shall be maintained by a designated member of the Greenlight Committee (or other individual designated by the CEOs).

(h)     Notwithstanding anything to the contrary contained herein, in the event that so-called "hot properties" projects owned or controlled by third parties should require Greenlight decisions to be made within an expedited timeframe, which the CEOs reasonably determine in good faith does not allow for customary Greenlight Committee procedures ("Exigent Circumstances"), the CEOs shall have the authority to make the Greenlight decision with respect thereto without a formal Greenlight Committee meeting and without preparing a Greenlight Package or Greenlight Models; provided, that (a) a Greenlight Package and Greenlight Models will be prepared following such Greenlight decision and presented to the Greenlight Committee at such time (and thereafter provided to the Board for informational purposes upon request) and (b) the authority of the CEOs to Greenlight under Exigent Circumstances is subject to any applicable provision in Section 2.3 and the approved Annual Budget (the "Exigent Circumstances Exception").

(i)     The Greenlight Committee and the provisions set forth in paragraphs (c) through (h) hereof may be terminated or amended if both of the CEOs cease to be employed by the Company in such capacity.

(j)     The Non-Executive Directors may appoint a "Lead Director" from among the Non-Executive Directors.  Such person shall have the authority and duties set forth in the Company's By-laws.

(k)     Each of the Company and the Stockholders agree to cause the Company to implement and make effective the provisions of this Section 2.2 as soon as practicable after the date hereof, except with respect to the Greenlight Committee, which will be established in accordance with this Section 2.2 as of the date hereof.

2.3     Protective Provisions.

(a)     Decisions Requiring Approval of a Majority of the Board.  Notwithstanding anything herein to the contrary, the following actions shall not be taken by the Company without first obtaining the approval of a majority of the Board at a duly called meeting of the Board at which a quorum is, subject to Section 2.3(c) below, present (or by unanimous written consent of the Board in lieu of a meeting):

(1)     Greenlight or produce a motion picture with a production budget in excess of $150 million, which was not included with reasonable specificity in the approved Annual Budget of the Company for such applicable fiscal year or, if approved in any such Annual Budget, to the extent such production budget is in excess of the amounts budgeted therefor;

(2)     enter into, in one or a series of transactions, (a) licensing agreements in any or all media (now known or hereafter developed) in the Domestic Territory or

any Major International Territory with respect to the Company's library of motion pictures, television programs and other intellectual property, in each case, with (i) so-called "base license fees", minimum guarantees, advances and other similar types of fixed consideration during the term thereof (collectively, "<u>Minimum Fees</u>") in excess of $75 million or (ii) a license term greater than fifteen (15) years, (b) output agreements in any or all media (now known or hereafter developed) in the Domestic Territory or any Major International Territory with respect to the Company's newly released motion pictures or television programs or other intellectual property, in each case, with (X) (i) an output term in excess of five (5) years or a license term in excess of fifteen (15) years and (ii) Minimum Fees in excess of $75 million or (Y) Minimum Fees in excess of $150 million or (c) sales of library assets or rights, individually or in the aggregate, in each case, with (i) a term greater than twenty-five (25) years or (ii) for consideration in excess of $75 million; <u>provided</u>, that whether or not such consent is required, the CEOs shall, to the extent practicable, provide to the Board advance notice and timely and meaningful information regarding all such output, licensing and sale transactions that are material to the Company;

(3)     (a) spend "going in" US P&A (i.e., for the period prior to and including opening weekend) on a motion picture in excess of $50 million, unless such US P&A Budget is otherwise set forth with reasonable specificity in the approved Annual Budget for such fiscal year or (b) adopt a P&A Budget if implementing such decision would require the affirmative waiver of any material term or condition in any credit facility of the Company;

(4)     commit to deficit finance a television production where the deficit reasonably projected to be assumed by the Company is greater than $200,000 per episode, unless such deficit obligation is set forth with reasonable specificity in the approved Annual Budget of the Company for such fiscal year or, if approved in any such Annual Budget, to the extent the proposed deficit is in excess of the amounts budgeted therefor;

(5)     cause the Company to (a) enter into or amend any employment agreement for an employee that is not included in the then-current Annual Budget and provides for annual compensation in excess of $400,000 per annum (it being understood and agreed that the CEOs shall have authority, without the approval of the Board, to enter into or change any employment agreement for an employee that is entitled to annual compensation at or below $400,000 (subject to the aforementioned restriction) and to terminate the employment of any such employee in their sole discretion); or (b) pay any discretionary bonus to any employee to the extent not included in the then-current Annual Budget; <u>provided</u>, that (i) other than as expressly set forth herein, the CEOs will have general hiring and firing authority over all employees of the Company without the need for Board approval and (ii) a majority of the Board will have the right to approve the hiring of the Co-President/President of the motion picture department, Co-President/Chief Operating Officer, Chief Financial Officer, head of the television department, head of the digital media department (which may include interactive

gaming and/or digital entertainment) (including any replacements thereof) but the CEOs shall have the right to fire any such executives (including any replacements thereof) in their discretion and without Board approval;

(6)     incur any indebtedness for borrowed money or assume, guarantee, endorse or assume other responsibility for the obligations of any other Person, in each case, except for the Company's obligations (a) pursuant to a new financing facility, (b) in connection with production/acquisition financing for motion pictures, television programs and other audiovisual programs greenlit by the Greenlight Committee and (c) otherwise in the ordinary course of business, provided that such ordinary-course indebtedness shall not exceed $100 million;

(7)     authorize, adopt or amend any profit sharing, stock-based or equity option plan, other than the Equity Incentive Plan;

(8)     enter into any affiliate or other "related-party" transactions (which shall require the consent of a majority of "disinterested" Directors with respect to such matter); and

(9)     enter into any transaction with respect to the Issuance of Equity Interests; provided, that any Issuance shall be limited to the amounts determined in good faith by the Board to be appropriate to satisfy the working capital needs and other corporate purposes of the Company (including future acquisitions and investments).

(b)     Decisions Requiring the Approval of a Supermajority of the Board. Notwithstanding anything herein to the contrary, the following acts shall not be taken by the Company without first obtaining the approval of at least two-thirds of the Board at a duly called meeting of the Board at which a quorum is, subject to Section 2.3(c) below, present (or by unanimous written consent of the Board in lieu of a meeting):

(1)     (a)  the adoption of an Annual Budget for a given fiscal year (which shall include (i) an overall operating budget; (ii) an overall development budget; (iii) an overall production/acquisition budget; (iv) an overall P&A/marketing budget; and (v) the target number of motion pictures, television programs and other audiovisual programs to be produced, acquired and/or released in such fiscal year and the target ranges of production budgets and P&A for each anticipated motion picture, television program or other audiovisual programs) (the "Annual Budget") and, until such approval is obtained for any fiscal year, no expenditures not previously approved shall be made for any new development or new production projects or (b) make any material changes to the then-current and approved Annual Budget and business plan of the Company and its Subsidiaries included in the Annual Budget;

(2)     the creation of or the Issuance of any new class of Equity Interests with rights, preferences or privileges senior to the Common Stock;

(3)     a material acquisition or disposition (other than (a) any acquisitions which are entered into pursuant to the Greenlight Committee's authority and (b) acquisitions or dispositions otherwise in the ordinary course of business, including, without limitation, the acquisition, disposition and exploitation of motion pictures, television programs and other audiovisual content (or any underlying intellectual property));

(4)     a merger or consolidation involving, or sale of all or substantially all of the assets of, the Company or its Subsidiaries (other than ordinary course development and production subsidiaries);

(5)     amendments to or a repeal of any provision of the Certificate of Incorporation or By-Laws;

(6)     conversion of the Company into another form of legal entity;

(7)     commencement of any bankruptcy, insolvency, liquidation, dissolution or any similar proceedings, or any corporate action in furtherance thereof, of the Company or its Subsidiaries; and

(8)     commencement of an initial Public Offering or filing of a shelf registration of the Company or any of its Subsidiaries, subject to the Registration Rights Agreement (it being understood that the Board, so long as at least two-thirds of the Board approve such action, shall have the right to cause the Company to commence an initial Public Offering or file a shelf registration of the Company or any of its Subsidiaries, subject to the Registration Rights Agreement).

(c)     A majority of the Directors in office that includes one (1) of the Executive Directors shall be necessary and sufficient to constitute a quorum of the Board; provided, that, if (i) notice of such meeting ("Board Notice") has been duly delivered to all Directors at least three (3) Business Days prior to the scheduled meeting in accordance with the notice procedures set forth in the By-Laws, and (ii) the quorum is not present within thirty minutes from the time appointed for the meeting solely because of the absence of an Executive Director, the meeting shall be adjourned and reconvened on the second (2nd) Business Day after such adjournment (the "Adjourned Meeting") at the same time and place (or to such other time or such other place as the Non-Executive Directors may determine with notice thereof delivered to the Executive Directors at least three (3) Business Days prior to the Adjourned Meeting) and if at the Adjourned Meeting the quorum is not present within thirty minutes from the time appointed for the meeting solely because of the absence of an Executive Director, then the separate requirement that the Executive Directors be present for a quorum of the Board of Directors to be established shall not apply to such Adjourned Meeting solely for purposes of establishing a quorum.  The foregoing quorum requirements and adjournment procedures shall not apply to any meeting of the Board for which, in the good faith opinion of the Non-Executive Directors, there is a willful or unreasonable failure on the part of both Executive Directors to attend a meeting of the Board for the purpose of preventing the transaction of business at such meeting, and in such event, the majority of the Directors in office shall constitute a quorum of the Board for such

meeting. At any meeting of the Board, no matter will be discussed if it is not set forth in the Board Notice.

(d)     The foregoing quorum requirements set forth in Section 2.3(c) shall terminate and no longer be valid if there are no Executive Directors on the Board, in which case, the majority of the Directors in office shall constitute a quorum of the Board.

2.4     Certificate of Incorporation and By-Laws. The Company and the Stockholders shall take or cause to be taken all lawful action necessary to ensure at all times that the certificates of incorporation and by-laws (or equivalent governing documents) of the Company and its Subsidiaries, as the same may be amended from time to time in accordance with the terms hereof and thereof, are not, at any time, inconsistent with the provisions of this Agreement.

SECTION 3.   INFORMATION REQUIREMENTS

3.1     Financial Reports. Until the Company becomes subject to the reporting requirements of the Exchange Act, the Company shall provide each of the Stockholders, other than any Management Stockholder or Director Stockholder who is not a Spyglass Stockholder (or Affiliate thereof), with:

(a)     as soon as available and in any event within ninety (90) days after the end of each fiscal year of the Company, a consolidated balance sheet of the Company and its Subsidiaries as of the end of such year, and consolidated statements of income and cash flows of the Company and its Subsidiaries for the year then ended, prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted therein, and setting forth in each case in comparative form the figures for the previous fiscal year, together with an auditor's report thereon of a firm of established national reputation and including a management discussion and analysis of financial condition and results of operations that would be required to be contained in a filing with the SEC on Form 10-K, or any successor or comparable form; and

(b)     as soon as available and in any event within forty-five (45) days after the end of each of the first three quarters of each fiscal year of the Company, consolidated balance sheets of the Company and its Subsidiaries as of the end of such period, and consolidated statements of income and cash flows of the Company and its Subsidiaries for the period then ended prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted therein, and subject to the absence of footnotes and to year-end adjustments, and setting forth in each case in comparative form the figures for the corresponding period of the previous fiscal year and including, for each such quarter, an abridged management discussion and analysis of financial condition and results of operations in reasonable detail, similar to the management discussion and analysis that would be contained in a filing with the SEC on Form 10-Q.

The annual and quarterly financial reports provided to the Stockholders under this Section 3.1 shall include (x) with the consolidated balance sheets and consolidated statements of income and cash flows for each period presented, a comparison of actual results to the

Company's budgeted results for such period and (y) in the analysis of the financial condition and results of operations for each period presented, discussion comparing actual results for such period to the Company's budgeted results for such period.

3.2     Quarterly Calls.  At least once per fiscal quarter, promptly following the Company's provision of financial reports required by Section 3.1, the Company shall host a conference call (with a question and answer period) with the Chief Financial Officer of the Company and such other members of senior management of the Company as the Company deems appropriate and the Stockholders to discuss the performance of the business, strategic alternatives and other issues as the Stockholders may reasonably request.  One or both of the CEOs may participate in such conference calls at their election.  No Stockholder who is a Company Competitor or an Affiliate of a Company Competitor shall be permitted to participate in such calls; provided, that in no event shall this Section 3.2 be deemed to prohibit such participation by any Spyglass Stockholder or an Affiliate of a Spyglass Stockholder solely by virtue of its direct or indirect ownership interest in Spyglass Entertainment Holdings, LLC.

3.3     Confidentiality.  Each Stockholder, in their capacity as a stockholder of the Company, agrees to maintain as confidential all Information (as defined below) provided to such Stockholder by the Company and its Affiliates for a period of the earlier of (i) five (5) years following receipt thereof and (ii) two (2) years following termination of this Agreement, except that such Stockholder may disclose such Information (a) to Persons employed or engaged by such Stockholder who need to know such Information that have agreed to comply with the covenant contained in this Section 3.3; (b) in connection with any Transfer or proposed Transfer of Equity Interests to any *bona fide* and permitted proposed Transferee that has agreed to comply with the covenant contained in this Section 3.3 (and any such *bona fide* proposed Transferee may disclose such Information to Persons employed or engaged by it as described in clause (a) of this Section 3.3); (c) as requested or required by any Governmental Authority or reasonably believed by such Stockholder to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of such Stockholder's counsel, is required by law; (e) in connection with the exercise of any right or remedy under this Agreement or in connection with any action, claim, lawsuit, demand, investigation or proceeding to which such Stockholder is a party before any Governmental Authority or before any arbitrator or panel of arbitrators; or (f) that becomes publicly available through no fault of such Stockholder or any other Person to whom such Stockholder provided such Information.  Each Stockholder shall be responsible and liable for any violation of this Section 3.3 by any Person described in clause (a) or (b) of this Section 3.3 to whom such Stockholder disclosed Information.  "Information" means all information received from or on behalf of the Company or any of its Subsidiaries relating to the Company or any of its Subsidiaries or any of their respective businesses, other than any such information that is publicly available, or was known to such Stockholder from a source other than the Company or its Subsidiaries, prior to disclosure by or on behalf of the Company or any of its Subsidiaries other than as a result of a breach of this Section 3.3.

16

SECTION 4.   TRANSFERS AND ISSUANCES

4.1   Limitations on Transfer.

(a)   Each Stockholder hereby agrees that such Stockholder shall not Transfer any Equity Interests in any manner that violates the provisions of this Agreement, the Registration Rights Agreement or any applicable federal or state securities laws.

(b)   Each Stockholder hereby agrees that, except for Transfers pursuant to Section 4.2 (for which the Stockholder has provided not less than 5 days' prior written notice, to the Company of such Transfer), 4.5 or 4.6 or Transfers effected pursuant to an effective registration statement filed under the Securities Act, no Transfer of Equity Interests by such Stockholder shall occur unless the Company has been furnished, after it has made a written request to that effect within five (5) days of its receipt of a notice of such Transfer, with an opinion in form and substance reasonably satisfactory to the Company from counsel reasonably satisfactory to the Company that such Transfer may be made without registration under Section 5 of the Securities Act and any applicable state securities laws; provided, however, that this Section 4.1(b) shall not apply to (x) Transfers of Equity Interests by a Stockholder (or Stockholders) who (i) beneficially owns less than ten percent (10%) of the shares of Common Stock then issued and outstanding; (ii) is not an "Affiliate" (as such term is defined in Rule 405 under the Securities Act) of the Company, and (iii) has furnished the Company with a certificate, in form and substance reasonably satisfactory to the Company, signed by an authorized officer of the Stockholder effecting such Transfer, to the effect that the requirements of clauses (i) and (ii) of this proviso are satisfied and that the Stockholder making such Transfer did not receive the securities proposed to be Transferred with a view to a subsequent distribution, (y) Transfers of Equity Interests by a Stockholder who has furnished the Company with a certificate, in form and substance reasonably satisfactory to the Company, signed by an authorized officer of the Stockholder effecting such Transfer, to the effect that the Transfer is being made in compliance with Rule 144 under the Securities Act or (z) Transfers of Equity Interests to the Company pursuant to the repurchase provisions of any management equity plan or agreement or independent director equity plan or agreement.

(c)   Each Stockholder hereby agrees that no Transfer (other than a mortgage, pledge or hypothecation or in connection with clause (z) of Section 4.1(b)) of Equity Interests by such Stockholder shall be permitted unless and until the proposed Transferee agrees in writing to become a party to, and be bound to the same extent as its Transferor by the terms of, this Agreement pursuant to the provisions of Section 7.6 hereof.

(d)   Notwithstanding any other provisions of this Agreement to the contrary, prior to a Public Offering, no Transfer of Equity Interests shall be permitted if, after giving effect to such Transfer, and after giving effect to the conversion, exercise or exchange of all Common Stock Equivalents, such Transfer would result in the Company becoming subject to the reporting requirements of the Exchange Act.

(e)   Each Stockholder hereby agrees that, except for Transfers pursuant to Section 4.6 hereof, no Transfer of Equity Interests to any Company Competitor or an Affiliate of any Company Competitor shall be permitted without the prior written consent of the Board;

509265-1076-11218-Active.12121102.14

provided, that for purposes of this Section 4.1(e), none of the Stockholders shall be deemed to be a Company Competitor or an Affiliate thereof solely by virtue of their direct or indirect ownership interest in Spyglass Entertainment Holdings, LLC.

4.2    Transfers to Affiliates; Third Party Transfer.

(a)    Notwithstanding any other provision of this Agreement to the contrary, but subject to Sections 4.1(a), (c), (d) and (e) hereof and the notice requirement in Section 4.1(b), each Stockholder and its Affiliates shall be permitted to Transfer from time to time any or all of the Equity Interests beneficially owned by it to any of its Affiliates.  Notwithstanding anything else in this Agreement to the contrary, if any Transfer of Equity Interests to Affiliates permitted hereunder is not permitted under any of the Other Agreements applicable to such Equity Interests, then such Transfer to Affiliates shall not be permitted hereunder.

(b)    Notwithstanding any other provision of this Agreement or any Other Agreement to the contrary, the Cypress/Garoge Stockholders (as defined in the Investment Agreement) may Transfer, to one or more Third Parties in a cash transaction, up to all of the Common Stock issued in the Mergers (as defined in the Investment Agreement) with respect to the Cypress/Garoge Common Stock (as defined in the Investment Agreement) that such Cypress/Garoge Stockholders were entitled to sell pursuant to Section 9.6(a) of the Investment Agreement and that remain unsold as of the Effective Date, provided, that any such Transfers made in respect of this Section 4.2(b) (i) shall be subject to the same requirements and restrictions set forth in Section 9.6(a) of the Investment Agreement and (ii) shall be completed on or prior to June 30, 2011.  Any such Transfers made in respect of this Section 4.2(b) shall be subject only to Section 4.1(a), (c) and (d) and no other provision of this Section 4.

4.3    Effect of Void Transfers.  In the event of any purported Transfer of Equity Interests in violation of the provisions of this Agreement, such purported Transfer shall be void and of no effect, and the Company shall not give effect to such Transfer nor shall it cause any third party transfer agent to effect such Transfer, to the extent it appoints one.

4.4    Legend on Securities.

(a)    Unless and until the Board shall determine otherwise, shares of Common Stock shall be uncertificated and recorded in the books and records of the Company.  If at any time the Board shall determine to certificate shares of Common Stock issued to any Stockholder or any additional Equity Interests that become subject to this Agreement pursuant to Section 7.1 (except for unexercised options issued pursuant to any management equity plan or agreement or independent director equity plan or agreement, which shall bear the legend set forth in Section 4.4(b) below), such certificates shall bear the following legend on the face thereof; provided, however, that certificates representing Equity Interests not subject to the Registration Rights Agreement, shall make no reference to the Registration Rights Agreement; provided, further, that the Company shall promptly remove such legend at the request of the holder thereof at such time that it no longer applies:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR

ANY STATE SECURITIES LAW AND ARE SUBJECT TO (A) A STOCKHOLDERS AGREEMENT AMONG MGM HOLDINGS INC. (THE "COMPANY") AND THE STOCKHOLDERS PARTIES THERETO, AND (B) A REGISTRATION RIGHTS AGREEMENT AMONG THE COMPANY AND CERTAIN HOLDERS OF REGISTRABLE COMMON STOCK (AS THAT TERM IS DEFINED IN THE REGISTRATION RIGHTS AGREEMENT), COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY. NO DIRECT OR INDIRECT TRANSFER, SALE, OFFER, ASSIGNMENT, EXCHANGE, DISTRIBUTION, MORTGAGE, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT AND REGISTRATION RIGHTS AGREEMENT. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT AND REGISTRATION RIGHTS AGREEMENT."

(b)     Each unexercised option that is certificated and issued pursuant to any management equity plan or agreement or independent director equity plan or agreement shall bear the following legend; provided, that the Company shall promptly remove such legend at the request of the holder thereof at such time that it no longer applies:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAW AND ARE SUBJECT TO A STOCKHOLDERS AGREEMENT AMONG MGM HOLDINGS INC. (THE "COMPANY") AND THE STOCKHOLDERS PARTIES THERETO AND A STOCK OPTION AGREEMENT, COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY. NO DIRECT OR INDIRECT TRANSFER, SALE, OFFER, ASSIGNMENT, EXCHANGE, DISTRIBUTION, MORTGAGE, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT AND STOCK OPTION AGREEMENT. THE HOLDER OF THIS OPTION, BY ACCEPTANCE HEREOF, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT AND STOCK OPTION AGREEMENT, INCLUDING RESTRICTIONS RELATING TO THE EXERCISE OF ANY VOTING RIGHTS GRANTED BY THE SECURITIES. "

4.5     Tag-Along Rights.

(a)     With respect to any proposed Transfer or Transfers (other than a mortgage, pledge or hypothecation or Transfer pursuant to Section 4.2) in one transaction or a series of related transactions, individually or in the aggregate, of thirty five percent (35%) or more of the then issued and outstanding shares of Common Stock by any Stockholder or two (2) or more Stockholders acting in concert with respect to such Transfer (in such capacity, a "Transferring Stockholder"), the Transferring Stockholder shall have the obligation, and each other Stockholder shall have the right but not the obligation, to request the proposed Transferee to purchase from each Stockholder exercising such right (each, a "Tagging Stockholder") that

19

number of shares of Common Stock requested to be included by such Tagging Stockholder; provided that if the proposed Transferee is unwilling to purchase all of the Common Stock that the Tagging Stockholders have requested to be acquired by the proposed Transferee, then each Tagging Stockholder shall have the right to sell or otherwise Transfer to the Transferee a number of such Tagging Stockholder's shares of Common Stock equal to the product of (x) the number of shares of Common Stock beneficially owned by such Tagging Stockholder (including all shares fully vested and held by such Tagging Stockholder, whether or not such shares are subject to any Transfer restriction referred to in the last sentence of this Section 4.5(a)) multiplied by (y) the percentage of the number of shares of Common Stock that the Transferring Stockholder is proposing to sell relative to the total number of shares of Common Stock held by such Transferring Stockholder (including all shares fully vested and held by such Transferring Stockholder, whether or not such shares are subject to any Transfer restriction referred to in the last sentence of this Section 4.5(a)) (the amounts in this clause (y), their "Pro Rata Share").  If the proposed Transferee is unwilling to purchase all of the shares of Common Stock proposed to be Transferred by all Tagging Stockholders (determined in accordance with the first sentence of this Section 4.5(a)), then the Transferring Stockholder and each Tagging Stockholder shall reduce, on a *pro rata* basis based on their respective Sharing Percentages of the shares of Common Stock held by the Transferring Stockholder and the Tagging Stockholders, the Pro Rata Share of the shares of Common Stock that each otherwise would have Transferred so as to permit the Transferring Stockholder and each Tagging Stockholder to sell the number of shares of Common Stock that the proposed Transferee is willing to purchase.  Each Tagging Stockholder shall Transfer its shares of Common Stock at the same price per share and upon the same terms and conditions (including time of payment, form of consideration or option to elect form of consideration) as to be paid and given to the Transferring Stockholder.  In order to be entitled to exercise its right to sell shares of Common Stock to the proposed Transferee pursuant to this Section 4.5, a Tagging Stockholder must agree to make to the proposed Transferee the same representations, warranties, covenants, indemnities and agreements as the Transferring Stockholder agrees to make in connection with the proposed Transfer of the shares of Common Stock of the Transferring Stockholder (except that, (A) in the case of representations and warranties pertaining specifically to the Transferring Stockholder, a Tagging Stockholder shall make the comparable representations and warranties pertaining specifically to itself, (B) no Tagging Stockholder shall have to make representations and warranties with respect to the Company and (C) no Tagging Stockholder shall be required to enter into a new non-competition, non-solicitation or other covenant restricting its ability to operate, engage in or conduct any business or activity).  All representations, warranties, covenants, agreements and indemnities made by the Transferring Stockholder and the Tagging Stockholders pertaining specifically to themselves shall be made by each of them severally and not jointly; provided that each of the Transferring Stockholder and each Tagging Stockholder shall be severally (but not jointly) liable for breaches of representations, warranties, covenants and agreements of or, in the case of representations and warranties pertaining to the Company and its Subsidiaries and for indemnification obligations arising out of or relating to any such breach or otherwise pertaining to the Company and its Subsidiaries, on a *pro rata* basis (based on the number of shares of Common Stock Transferred by each Transferring Stockholder and each Tagging Stockholder), such liability of each such Stockholder not to exceed the proceeds actually received by such Stockholder.  Subject to the next sentence, any Tagging Stockholder that is a holder of Common Stock Equivalents and wishes to participate in a sale of Common Stock pursuant to this Section

4.5(a) shall convert into or exercise or exchange such number of shares of Common Stock Equivalents for Common Stock as may be acquired therefor on or prior to the closing date of such Transfer, provided that any such conversion, exercise or exchange may be conditioned on the closing of such Transfer, in which case such conversion, exercise or exchange shall not be effective until such Transfer has been consummated. Notwithstanding anything in this Section 4.5 to the contrary, if any Transfer of Common Stock or Common Stock Equivalents pursuant to this Section 4.5 is not permitted under an Other Agreement, then such Transfer shall not be permitted hereunder.

(b)     The Transferring Stockholder shall give written notice to all other Stockholders of each proposed Transfer giving rise to the rights of the Tagging Stockholders set forth in the first sentence of Section 4.5(a) at least thirty (30) days prior to the consummation of such Transfer, setting forth the name of the Transferring Stockholder, the number of shares of Common Stock proposed to be so Transferred, the name and address of the proposed Transferee, the proposed amount and form of consideration and other terms and conditions offered by the proposed Transferee, and a representation that the proposed Transferee has been informed of the tag-along rights provided for in this Section 4.5 and has agreed to purchase shares of Common Stock from any Tagging Stockholder or Tagging Stockholders in accordance with the terms hereof. Any notice required by the Transferring Stockholder under this Section 4.5 to be given to the other Stockholders may, at the election of the Transferring Stockholder, be given to the Company which shall, on behalf of the Transferring Stockholder, give such notice to the other Stockholders. The tag-along rights provided by this Section 4.5 must be exercised by each Tagging Stockholder within twenty (20) days following receipt of the notice required by the preceding sentence, by delivery of a written notice to the Transferring Stockholder indicating such Tagging Stockholder's election to exercise its rights pursuant to Section 4.5 and specifying the number of shares of Common Stock it elects to sell. If the proposed Transferee fails to purchase shares of Common Stock from any Tagging Stockholder that has properly exercised its tag-along rights, then the Transferring Stockholder shall not be permitted to make the proposed Transfer, and any such attempted Transfer shall be void and of no effect, as provided in Section 4.3 hereof.

(c)     If any of the Tagging Stockholders exercise their rights under Section 4.5(a), the closing of the purchase of the Common Stock with respect to which such rights have been exercised shall take place concurrently with the closing of the sale of the Transferring Stockholder's Common Stock. No Transfer shall occur pursuant to this Section 4.5 unless the Transferee shall agree to become a party to, and be bound to the same extent as its Transferor by the terms of, this Agreement pursuant to the provisions of Section 7.6.

(d)     Any Transfer pursuant to this Section 4.5 shall occur within ninety (90) days of delivery of the notice from the Transferring Stockholder to the other Stockholders and at a price of not more than the maximum per share price set forth in the notice and otherwise on terms and conditions in the aggregate not more favorable to the Transferring Stockholder and the Tagging Stockholders than were set forth in the notice. If, at the end of such ninety (90) day period, the Transferring Stockholder and the Tagging Stockholders have not completed the sale or other disposition of the Common Stock of the Transferring Stockholder and the Tagging Stockholders in accordance with the terms and conditions of the proposed Transfer, all the

restrictions on Transfer contained in this Agreement with respect to Common Stock owned by the Transferring Stockholder and the Tagging Stockholders shall again be in effect.

4.6     Drag-Along Rights.

(a)     If any Stockholder, or two (2) or more Stockholders acting in concert with respect to the Transfer of their shares of Common Stock, and such Stockholder's or Stockholders' respective Affiliates  (the "Selling Stockholder(s)") that collectively own at least 66 2/3% of the then issued and outstanding shares of Common Stock (calculated on a fully diluted basis and including all issued and outstanding Common Stock Equivalents on an as-converted, as-exercised, and as-exchanged basis) receives an offer from a third party (excluding the Company and its Subsidiaries, the Stockholders, and the Affiliates of each of them) (a "Third Party") to purchase all or substantially all of the outstanding shares of Common Stock (whether pursuant to a sale of stock, a merger or otherwise) or all or substantially all of the assets of the Company, and such offer is accepted by the Selling Stockholder(s) (the "Drag-Along Transaction"), then each Stockholder hereby agrees that, if requested to do so by such Selling Stockholder(s) pursuant to a Drag-Along Notice, it will Transfer all of its shares of Common Stock (and any Common Stock Equivalents subject to the requirements described in Section 4.6(b) below) to such Third Party at the same price per share and upon the same terms and conditions (including time of payment, form of consideration or option to elect form of consideration) so accepted by the Selling Stockholder(s), except that no Stockholder shall be required to make any representations or warranties (except, in the definitive agreement with respect to the Drag-Along Transaction, as to ownership of its Common Stock and as to due authorization, enforceability and no conflicts with respect to such Stockholder), or bear any costs or expenses in connection with such Drag-Along Transaction (all of which shall be borne by the Selling Stockholders), or agree to any indemnity other than, in the definitive agreement with respect to the Drag-Along Transaction, solely with respect to breach of its own representations or warranties or, on a several, but not joint, *pro rata* basis with all other Stockholders (based on the proceeds received by each in the transaction), with respect to any breach of the representations and warranties with respect to the Company and in any event such liability of each such Stockholder not to exceed such Stockholder's *pro rata* portion of the proceeds of the sale actually paid to all Stockholders, and the sole source of recovery for such liability shall be from an escrow, holdback or similar arrangement and not directly from such Stockholders; provided, further that no such Stockholder shall be required to enter into a non-competition, non-solicitation or other covenant restricting its ability to operate, engage in or conduct any business or activity.  If the Selling Stockholder(s) accepts such Drag-Along Transaction and desires that the other Stockholders Transfer their shares of Common Stock in the Drag-Along Transaction, such Selling Stockholder(s) shall give written notice to all other Stockholders of the proposed Drag-Along Transaction ("Drag-Along Notice") at least thirty (30) days prior to the proposed consummation of such Drag-Along Transaction, which Drag-Along Notice shall specify the name and address of the Third Party, the form and amount of consideration to be paid to the Stockholders and any other material terms and conditions of the Drag-Along Transaction.  The Drag-Along Notice may, at the election of the Selling Stockholder(s), be given to the Company which shall, on behalf of the Selling Stockholder(s), give such notice to the other Stockholders.

(b)     Subject to the next sentence, if requested to do so by the Selling Stockholder(s), any Stockholder that is a holder of Common Stock Equivalents shall convert,

exercise or exchange such Common Stock Equivalents into or for Common Stock in accordance with their terms on or prior to the closing date of such Drag-Along Transaction, provided that any such conversion, exercise or exchange may be conditioned on the closing of such Drag-Along Transaction, in which case such conversion, exercise or exchange shall not be effective until such Drag-Along Transaction has been consummated.  Notwithstanding anything in this Section 4.6 to the contrary, (i) in the event a Stockholder that holds Common Stock Equivalents (other than options to acquire shares of Common Stock granted under any management equity plan or agreement or independent director equity plan or agreement, which are governed by clause (ii) below) is required to Transfer such Common Stock Equivalents in a Drag-Along Transaction, such Stockholder shall not be required to convert, exercise or exchange any such Common Stock Equivalent if and to the extent that the applicable conversion, exercise or exchange price of such Common Stock Equivalent is equal to or greater than the value of the consideration to be received by Stockholders in the Drag-Along Transaction giving rise to drag-along rights under this Section 4.6 and, in lieu of such conversion, exercise or exchange, at the election of such holder of Common Stock Equivalents, any such Common Stock Equivalents shall instead be cancelled and forfeited; (ii) in connection with any Drag-Along Transaction, the treatment of options to acquire shares of Common Stock granted under any management equity plan or agreement or independent director equity plan or agreement shall be governed by the terms of such plans or agreements and (iii) if any Transfer of Common Stock or Common Stock Equivalents of the Company pursuant to this Section 4.6 is not permitted under an Other Agreement, then such Transfer shall not be permitted or required hereunder.

(c)     Any Drag-Along Transaction pursuant to this Section 4.6 shall occur within one hundred twenty (120) days of delivery of the Drag-Along Notice to the other Stockholders.  If, at the end of such one hundred twenty (120) day period, the Selling Stockholder(s) and the other Stockholders have not completed the sale or other disposition of the Common Stock of the Selling Stockholder(s) and the other Stockholders in accordance with the terms and conditions of the proposed Drag-Along Transaction, all the restrictions on Transfer contained in this Agreement with respect to Common Stock owned by the Selling Stockholder(s) and the other Stockholders shall again be in effect.

(d)     The drag-along rights under this Section 4.6 shall terminate upon a Change of Control (including in connection with a Drag-Along Transaction).

4.7     Participation Rights.

(a)     The Company shall not issue additional Equity Interests (an "Issuance") to any Person unless, prior to such Issuance, the Company notifies each Eligible Stockholder in writing of the proposed Issuance and grants to each Eligible Stockholder (subject to compliance with Section 4.7(c) below), the right (the "Right") to subscribe for and purchase, in whole or in part, at the same price and upon the same terms and conditions (including, if such additional Equity Interests are issued as a unit together with other securities, the purchase of such unit, but the Right shall not apply separately to any component of such unit) as set forth in the notice of such Issuance, a portion of such additional Equity Interests proposed to be issued in the Issuance up to:

(i)     in the case of an Issuance in which shares of Common Stock or Common Stock Equivalents are to be issued, such that immediately after giving effect to the Issuance and exercise of the Right (including, for purposes of this calculation, the issuance of shares of Common Stock upon conversion, exchange or exercise of any Common Stock Equivalent issued in the Issuance or subject to the Right), the shares of Common Stock and Common Stock Equivalents beneficially owned by such Stockholder and its Affiliates (rounded to the nearest whole share) shall represent the same percentage of the aggregate number of shares of Common Stock and Common Stock Equivalents outstanding as was beneficially owned by such Stockholder and its Affiliates immediately prior to the Issuance; and

(ii)     in the case of an Issuance in which (A) equity securities of the Company other than Common Stock or Common Stock Equivalents ("Other Capital Stock") or (B) any securities exchangeable or exercisable for, or convertible into, such Other Capital Stock ("Other Capital Stock Equivalents") are to be issued, equal to the percentage of the shares of Common Stock and Common Stock Equivalents that was beneficially owned by such Stockholder and its Affiliates immediately prior to the Issuance.

(b)     If any Eligible Stockholder elects not to exercise its Right pursuant to Section 4.7 in full with respect to the Issuance of additional Equity Interests, then the other Eligible Stockholders may elect to subscribe for and purchase their *pro rata* share of such Equity Interests not subscribed for by such Eligible Stockholder.

(c)     The Right may be exercised by each Eligible Stockholder provided that the Eligible Stockholder exercising the Right must (i) be an Accredited Investor and (ii) deliver written notice to the Company of such exercise of the Right which is received by the Company within twenty (20) Business Days after the date on which the Eligible Stockholder receives notice from the Company of the proposed Issuance (which date shall be specified in the notice from the Company of the proposed Issuance).  The closing of the purchase and sale pursuant to the exercise of the Right shall occur on the date scheduled by the Company for the Issuance, which may not be earlier than ten (10) Business Days and no later than sixty (60) Business Days after the Company receives notice of the exercise of the Right.  Notwithstanding the foregoing, the Right shall not apply to any Issuance (i) made as consideration for the payment of the purchase price of assets acquired by the Company or any of its Subsidiaries, including any Issuance in connection with a merger, exchange offer, joint venture, license transaction or exchange of shares, or to any lender in connection with any loans made to the Company or any of its Subsidiaries, (ii) (A) of options granted to directors, officers or employees of the Company or its Subsidiaries, or Issuance of Common Stock upon exercise of such options or (B) otherwise in accordance with the terms of a stock option plan or other equity-based compensation plan of the Company or its Subsidiaries that has been approved by the Board and, in the case of each of the foregoing clauses (ii)(A) and (ii)(B), of the Equity Interests issued upon the exchange, exercise or conversion of such Equity Interests, (iii) of Equity Interests issued as dividends or distributions to holders of Common Stock, generally, on a *pro rata* basis, or in connection with a stock split, (iv) of Other Capital Stock or Other Capital Stock Equivalents issued as dividends or distributions to holders of Other Capital Stock or Other Capital Stock Equivalents, generally, on

24

a *pro rata* basis, or (v) pursuant to the exchange, exercise or conversion of any Equity Interest that is either (A) outstanding on the date hereof or (B) outstanding after the date hereof so long as the Eligible Stockholders have had an opportunity to exercise the Right granted to such Eligible Stockholders in this Section 4.7 with respect to the underlying Equity Interest, or such Equity Interest was issued pursuant to clause (i), (ii), (iii) or (iv) of this sentence.

(d)     Nothing in this Section 4.7 shall be deemed to prevent any Person from purchasing for cash or the Company from issuing any additional Equity Interests, to any such Person for cash without first complying with the provisions of this Section 4.7 if, in connection with such purchase, (i) the Board has determined in good faith that (A) the Company needs a prompt cash investment, (B) no alternative financing on terms as favorable to the Company in the aggregate than such purchase is available on an as timely basis, and (C) the delay caused by compliance with the provisions of this Section 4.7 in connection with such investment would be reasonably likely to materially and adversely affect the Company, (ii) the Person making such purchase (for purposes of this Section 4.7, the "Purchasing Holder") or the Company gives prompt notice to the Eligible Stockholders as of such date of the Purchasing Holder's investment, which notice shall describe in reasonable detail the additional Equity Interests being purchased by the Purchasing Holder and the purchase price thereof and the exigent circumstances, and (iii) the Purchasing Holder or the Company enables the Eligible Stockholders to effectively exercise their respective rights under this Section 4.7 with respect to their purchase of a *pro rata* share of the additional Equity Interests issued to the Purchasing Holder as promptly as practicable following the initial prompt cash investment after such purchase by the Purchasing Holder on the terms specified in Section 4.7(a).

(e)     Notwithstanding the foregoing, in connection with the Company's notification pursuant to Section 4.7(a) to Eligible Stockholders of a proposed Issuance as to which a Right applies, or a Purchasing Holder's or the Company's notification to Eligible Stockholders of the issuance of additional Equity Interests to a Purchasing Holder under Section 4.7(d), the Company (or such Purchasing Holder, as applicable) shall concurrently provide written notice to all other Stockholders of the proposed transaction.  If any such Stockholder notifies the Company or Purchasing Holder, as applicable, not less than five (5) Business Days prior to the date of the Issuance proposed by the Company pursuant to Section 4.7(c), or the deadline (if any) set by the Purchasing Holder or the Company to receive responses from Eligible Stockholders pursuant to Section 4.7(d), as the case may be, that such Stockholder is interested and capable of participating in such Issuance or transaction, then the Company or such Purchasing Holder, as the case may be, will discuss with each such interested Stockholder, whether such participation is possible (without obligation) and, if so, the terms upon which such Stockholder may participate in such Issuance or transaction.

SECTION 5.  CALL RIGHTS

5.1     Management Stockholders.

(a)     Except to the extent otherwise agreed in writing between the Company and a Management Stockholder, if the Company terminates a Management Stockholder's employment with the Company (or any of its Affiliates) for Cause, the Company shall have the right and option to purchase, and if such option is exercised by the Company, the Management

Stockholder and any of its Affiliates shall be required to sell to Parent, any or all of the Common Stock or Common Stock Equivalents then held by such Management Stockholder, at a purchase price per Common Stock or Common Stock Equivalent, as applicable, equal to the applicable purchase price determined as follows:

> (1)     All shares of Common Stock issued to such Management Stockholder in connection with the Mergers and the Contribution (as such terms are defined in the Investment Agreement) at the then current Fair Market Value;

> (2)     All shares of Common Stock issued to such Management Stockholder in connection with the Equity Incentive Plan at the lesser of (x) the then current Fair Market Value and (y) the applicable price paid for such shares of Common Stock issued to such Management Stockholder in connection with the Equity Incentive Plan; and

> (3)     All unexercised Common Stock Equivalents for no payment, and such unexercised Common Stock Equivalents shall automatically be terminated.

(b)     If the Company desires to exercise its right to purchase any or all of the Common Stock or Common Stock Equivalents pursuant to Section 5.1(a), the Company shall, at any time, within ninety (90) days after the Termination Date, send written notice to the applicable Management Stockholder (and its Affiliates) of its intention to purchase the Common Stock or Common Stock Equivalents then held by such Management Stockholder, specifying the number of shares of Common Stock or Common Stock Equivalents to be purchased (the "Call Notice").  The closing of the purchase shall take place at the principal office of the Company on a date specified by the Company no later than thirty (30) days after the giving of the Call Notice.

(c)     The right of the Company to repurchase the Common Stock and the Common Stock Equivalents in accordance with this Section 5.1 will terminate if, prior to the date on which the Company has delivered the Call Notice, the Company effectuates an initial Public Offering or a Change of Control occurs.

SECTION 6.   INDEMNIFICATION

6.1     Indemnification.  If a conversion of the Company into another form of legal entity (not classified as a corporation for United States federal income tax purposes) is undertaken on or prior to the date that is six (6) months after the Effective Date, the Company shall indemnify the Spyglass Stockholders, as applicable, for an amount equal to the United States federal, state and local income taxes payable by the Spyglass Stockholders that is attributable to the taxable gain recognized in connection with any such conversion (plus any such income taxes imposed on amounts paid pursuant to this Section 6.1); provided, however, that any indemnification arising under this Section 6.1 shall not exceed the amount of United States federal, state and local income taxes that would have been due and payable by the Spyglass Stockholders as of the Effective Date as a result of the Mergers (as defined in the Investment Agreement) and the Contribution (as defined in the Investment Agreement) not having been treated in the manner described in Sections 2.5 and 3.4, respectively, of the Investment

26

Agreement.  For purposes of this Section 6.1, the amount of United States federal, state and local income taxes payable shall be computed on a "with and without" basis.

SECTION 7.  MISCELLANEOUS

7.1     Additional Securities Subject to Agreement.  Each Stockholder agrees that any other Equity Interests which it shall hereafter acquire by means of a stock split, stock dividend, distribution, exercise, exchange or conversion of Common Stock Equivalents, purchase or otherwise shall be subject to the provisions of this Agreement to the same extent as if held on the date hereof.

7.2     Termination.  This Agreement shall terminate upon the first to occur of (a) the sale of all or substantially all of the assets of the Company (other than to a Subsidiary or an Affiliate of the Company), (b) any bankruptcy, insolvency, liquidation or dissolution of the Company or (c) an initial Public Offering.  No termination of this Agreement or any provision hereof will release any Stockholder from any obligation that arose on or prior to the effective date of such termination.

7.3     Injunctive Relief.  The Stockholders and the Company acknowledge and agree that a violation of any of the terms of this Agreement will cause the other parties irreparable injury for which adequate remedy at law is not available.  Accordingly, it is agreed that each of the Company and the Stockholders shall be entitled to seek an injunction, restraining order or other equitable relief to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof in any federal or state court of competent jurisdiction in the Southern District of New York, in addition to any other remedy to which it may be entitled at law or equity, without the posting of any bond.

7.4     Other Stockholders Agreements.  None of the Stockholders shall enter into any agreement or other arrangement of any kind with any Person with respect to Equity Interests which is inconsistent with the provisions of this Agreement or which would reasonably be considered to impair its ability to comply with this Agreement.

7.5     Amendments; Waiver.  This Agreement, the Certificate of Incorporation and the By-Laws may be amended only by a written instrument signed by (a) the Company and (b) Stockholders beneficially owning at least two-thirds of the then issued and outstanding shares of Common Stock; provided, that for so long as the Spyglass Stockholders and their Affiliates own at least 50% (in the aggregate) of the issued and outstanding Common Stock held by the Spyglass Stockholders on the Effective Date (as appropriately adjusted for share splits and similar events), the consent of the holders of a majority of the issued and outstanding Common Stock held by the Spyglass Stockholders shall be required for any amendment to this Agreement, the Certificate of Incorporation or the By-Laws that disproportionately adversely affects the rights or obligations of the Spyglass Stockholders relative to the Original Stockholders (determined solely with regards to rights under the agreement or document in question and without regard to personal circumstances); provided, further, that (x) any amendment to any of the following provisions of this Agreement adversely affecting the rights or obligations of any of the Spyglass Stockholders or any of their Affiliates will require the consent of the holders of a majority of the issued and outstanding Common Stock then held by the Spyglass Stockholders

509265-1076-11218-Active.12121102.14

and their Affiliates: Sections 2.1, 2.2, 2.3 and 2.4, Section 4, Section 5, Section 6, Section 7.2 and this Section 7.5 and (y) any amendment to Section 2.1 and this Section 7.5 adversely affecting the rights of any of the Significant Stockholders during the Initial Term will require the prior written consent of the Significant Stockholders.  Notwithstanding the foregoing, the Company may from time to time add additional holders of shares of Common Stock as parties to this Agreement.  In order to become a party to this Agreement, such Person must execute a joinder agreement, in form and substance satisfactory to the Company, evidencing such Person's agreement to become a party hereto and to be bound hereby as a Stockholder, and upon the Company's receipt of any such Person's executed joinder agreement, such Person shall be deemed to be a party hereto and bound hereby.

       7.6     <u>Successors, Assigns and Transferees</u>.  The provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their Permitted Transferees and their respective successors, each of which Permitted Transferees and successors must execute a joinder agreement, in form and substance reasonably satisfactory to the Company, evidencing such Person's agreement to become a party hereto and be bound hereby as a Stockholder to the same extent as its Transferor or predecessor, <u>provided</u>, that no Stockholder may assign to any Permitted Transferee any of its rights or obligations hereunder other than in connection with a Transfer to such Permitted Transferee of Equity Interests in accordance with the provisions of this Agreement.  Any purported assignment in violation of this provision shall be null and void *ab initio*.

       7.7     <u>Notices</u>.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or email), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or two (2) Business Days after being delivered to a recognized courier (whose stated terms of delivery are two (2) Business Days or less to the destination of such notice), or five calendar days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as set forth on <u>Schedule B</u> hereto to the parties hereto, or to such other address as may be hereafter notified by the respective parties hereto.

       7.8     <u>Integration</u>.  This Agreement, the Registration Rights Agreement, the By-Laws, Certificate of Incorporation and, in the case of a Management Stockholder or a Director Stockholder, all option, subscription, restricted stock, employment and other agreements entered into by such Management Stockholder or Director Stockholder and any of the Company and its Subsidiaries (the "<u>Other Agreements</u>") contain the entire understanding of the parties with respect to the subject matter hereof and thereof.  There are no agreements, representations, warranties, covenants or undertakings with respect to the subject matter hereof and thereof other than those expressly set forth herein and therein.  This Agreement and the Other Agreements supersede all prior agreements and understandings between the parties with respect to such subject matter hereof and thereof.

       7.9     <u>Severability</u>.  If one or more of the provisions, paragraphs, words, clauses, phrases or sentences contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision, paragraph, word, clause, phrase or sentence in every other respect and of the remaining provisions, paragraphs, words, clauses, phrases or sentences hereof

shall not be in any way impaired, it being intended that all rights, powers and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law.

7.10   Counterparts.  This Agreement may be executed in two or more counterparts, and by different parties on separate counterparts each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

7.11   Governing Law, Etc.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware applicable to contracts made and to be performed therein, without reference to its conflict of law rules.  The parties executing this Agreement hereby (i) agree to submit to the exclusive jurisdiction of the federal and state courts located in the Southern District of New York in any action or proceeding arising out of or relating to this Agreement, (ii) waive any objection to the laying of venue of any actions or proceedings brought in any such court and any claim that such actions or proceedings have been brought in an inconvenient forum, and (iii) agree that service of any process, summons, notice or document by United States registered mail to the address for such party specified in Section 7.7 shall be effective service of process for any action or proceeding in New York with respect to any matter specified above.

7.12   Management Stockholders.  Each Management Stockholder on the date hereof has executed this Agreement and is bound hereby.  After the date hereof, the Company shall not issue, and shall cause its Subsidiaries not to issue, any Equity Interests to an employee of the Company or any of its Subsidiaries, including any Affiliate of such employee, unless he or she first delivers to the Company a joinder agreement, in form and substance satisfactory to the Company, agreeing that he or she is bound by the terms hereof as a Management Stockholder.

7.13   Director Stockholders.  Each Director Stockholder on the date hereof has executed this Agreement and is bound hereby.  After the date hereof, the Company shall not issue, and shall cause its Subsidiaries not to issue, any Equity Interests to a Director until such Director first delivers to the Company a joinder agreement, in form and substance satisfactory to the Company, acknowledging that such Director is bound by the terms hereof as a Director Stockholder.

7.14   Lender Relationship.  Notwithstanding anything herein to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of any lender or any of its Affiliates in their capacity as lenders to the Company or any of its Affiliates pursuant to any agreement under which the Company or such Affiliate has borrowed money.  Without limiting the generality of the foregoing, no such Person, in exercising its rights as a lender, including making its decision on whether to foreclose on any collateral security, will have any duty to consider (a) its status as a direct or indirect stockholder of the Company and its Subsidiaries, (b) the interests of the Company or any of its Affiliates or (c) any duty it may have to any other direct or indirect stockholder of the Company and its Subsidiaries, except as may be required under the applicable loan documents.

7.15   Further Assurances.  Each of the parties agrees to take or cause to be taken all reasonable actions, to do or cause to be done, to execute such further instruments, and to assist and cooperate with the other parties hereto in doing, all things reasonably necessary,

509265-1076-11218-Active.12121102.14

proper or advisable under applicable laws or otherwise to consummate and make effective, in an expeditious manner, the agreements, terms and conditions contemplated by this Agreement.

[Remainder of this page intentionally left blank.]

509265-1076-11218-Active.12121102.14

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement or caused this Agreement to be executed on its behalf as of the date first written above.

MGM HOLDINGS INC.

By:_____

Name:

Title:

ORIGINAL STOCKHOLDERS WHO ARE
HOLDERS OF CLASS A CLAIMS UNDER THE
PLAN (AND THEIR SUCCESSORS AND
ASSIGNS) ARE DEEMED TO BE PARTIES TO
THIS AGREEMENT PURSUANT TO THE PLAN

SPYGLASS ENTERTAINMENT HOLDINGS, LLC


By:_____
    Name:
    Title:


THE GARY BARBER LIVING TRUST


By:_____
    Name:
    Title:


THE ROGER BIRNBAUM FAMILY TRUST


By:_____
    Name:
    Title:


BARBER TRUST PARTNERSHIP


By:_____
    Name:
    Title:


2000 BIRNBAUM IRREVOCABLE TRUST


By:_____
    Name:
    Title:


JONATHAN GLICKMAN


By:_____
    Name:
    Title:

MANAGEMENT STOCKHOLDERS
(Each of the undersigned signing individually, and
not on behalf of any other Management
Stockholder)

By: _____
    Name:  Gary Barber

By: _____
    Name:  Roger Birnbaum

DIRECTOR STOCKHOLDERS
(Each of the undersigned signing individually, and
not on behalf of any other Director Stockholder)


By: _____
    Name:

| **<u>Original Stockholders</u>** |
|---|
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |
|  |

| **Spyglass Stockholders** |
| --- |
| Spyglass Entertainment Holdings, LLC |
| The Gary Barber Living Trust |
| The Roger Birnbaum Family Trust |
| Barber Trust Partnership |
| 2000 Birnbaum Irrevocable Trust |
| Jonathan Glickman |

## NOTICES

If to the Company, to:

MGM Holdings Inc.
10250 Constellation Boulevard
Los Angeles, California 90067
Fax: (310) 449-3092
Attn: Scott Packman, Esq.

If to the Original Stockholders, to:

Such Original Stockholder, at such Original Stockholder's address or to such Original Stockholder's telecopy number reflected in the Company's books and records.

with a copy, which shall not constitute notice, to:

Simpson Thacher & Bartlett LLP
Attention:  Daniel Clivner
1999 Avenue of the Stars
Los Angeles, California  90067
Tel: (310) 407-7555
Fax: (310) 407-7502

If to the Spyglass Stockholders, to:

Spyglass Entertainment Holdings, LLC
Attention: Gary Barber
10900 Wilshire Boulevard, Floor 10
Los Angeles, California 90024
Tel: (310) 443-5858
Fax: 310-443-5912

and

SEH Investors, LLC
c/o Cerberus California, Inc.
Attention: Kurt Larsen
136 Heber Ave., Suite 206
P.O. Box 683130
Park City, UT 84068
Telephone: (435) 647-7794
Facsimile: (435) 615-1237

and

Brooknol Advisors, LLC
Attention: Brian Mulligan
4236 Commonwealth Ave.
La Canada, CA 91011
Telephone: (818) 952-9526
Facsimile: (310) 209-9125

and

Spyglass Entertainment Group, LLC
Attention: Gary Barber
10900 Wilshire Boulevard, 10th Floor
Los Angeles, CA 90021
Telephone: (310) 443-5858
Facsimile: (310) 443-5912

and

Cypress Entertainment Group, Inc.
Attention: Gary Barber
10900 Wilshire Boulevard, Floor 10
Los Angeles, California 90024
Tel: (310) 443-5858
Fax: 310-443-5912

and

Garoge, Inc.
Attention: Gary Barber
10900 Wilshire Boulevard, Floor 10
Los Angeles, California 90024
Tel: (310) 443-5858
Fax: 310-443-5912

with a copy, which shall not constitute notice, to:

O'Melveny & Myers LLP
Attention: Christopher Brearton, Esq.
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Tel: 310-246-8437
Fax: 310-246-6779

with a copy, which shall not constitute notice, to:

O'Melveny & Myers LLP
Attention: Sean Monroe, Esq.
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Tel: 310-246-8557
Fax: 310-246-6779

with a copy, which shall not constitute notice, to:

Allen Matkins Leck Gamble Mallory & Natsis LLP
Attention: Jeffrey N. Strug, Esq.
515 South Figueroa Street, 9th Floor
Los Angeles, California 90071
Tel: 213-622-5555
Fax: 213-620-8816

If to any other Stockholders, to:

Such Stockholder, at such Stockholder's address or to such Stockholder's telecopy number
reflected in the Company's books and records.

## GREENLIGHT COMMITTEE GUIDELINES

Requirements to Greenlight

1. Vote required to Greenlight will be the unanimous approval of the CEOs only.
2. The Department Head Committee Members may participate in decisions relating to the Greenlight of television, interactive and digital properties, but the only votes required to Greenlight any such properties shall be the vote of the CEOs.
3. Greenlight will not result in a breach under any credit agreement or similar agreement.
4. If Board approval is required (pursuant to Section 2.3(a)(1) or 2.3(a)(3)), then the Greenlight shall be conditioned on receiving such approval.

Greenlight Package

Subject to the Exigent Circumstances Exception, the Greenlight Committee will consider a range of factors when making a Greenlight decision, including, without limitation, the following (to the extent then available and applicable) (the "Greenlight Package"):

1. An estimated budget
2. A proposed director and potential replacements
3. Proposed key talent and potential replacements
4. The Greenlight Model
5. Total of all expected material third party participations and cut-in points
6. Domestic and international theatrical estimates
7. Domestic and international home video estimates
8. Domestic and international TV estimates
9. Summary of proposed co-financing and other soft money benefits
10. Low, medium and high estimates of projected net film ultimate for the motion picture based on elements of the applicable motion picture.

Meeting Procedure

Subject to the Exigent Circumstances Exception, each motion picture being considered for Greenlight for pre-production will have a Greenlight Package prepared and distributed to each member of the Greenlight Committee (voting and nonvoting) prior to or at the Greenlight Committee meeting. Members of the Greenlight Committee may attend meetings in person or by telephone. For the purposes of clarity, the Greenlight Committee process will also apply to acquisitions of motion pictures or television programs or rights thereto.

EXHIBIT F

EQUITY INCENTIVE PLAN

**2010 MGM HOLDINGS INC.**
**STOCK INCENTIVE PLAN**

**1.       Purpose of this Plan**

The purpose of this Plan is to aid the Company and its Affiliates in recruiting and retaining key employees, directors or other service providers and to motivate such employees, directors, or other service providers to exert their best efforts on behalf of the Company and its Affiliates by providing incentives through the granting of Awards.  The Company expects that it will benefit from the added interest which such key employees, directors or service providers will have in the welfare of the Company as a result of their proprietary interest in the Company's success.

**2.       Definitions**

The following capitalized terms used in the Plan have the respective meanings set forth in this Section:

(a)       <u>Act</u>:  The Securities Exchange Act of 1934, as amended, or any successor thereto.

(b)       <u>Affiliate</u>:  With respect to the Company, any entity directly or indirectly controlling, controlled by, or under common control with, the Company or any other entity designated by the Board in which the Company or an Affiliate has an interest.

(c)       <u>Award</u>:  An Option, Stock Appreciation Right or Other Stock-Based Award granted pursuant to the Plan.

(d)       <u>Beneficial Owner</u>:  A "beneficial owner", as such term is defined in Rule 13d-3 under the Act (or any successor rule thereto).

(e)       <u>Board</u>:  The board of directors of the Company.

(f)       <u>Change of Control</u>:  Change of Control occurs upon (i) the sale of all or substantially all of the assets of the Company to any Person (or Group of Persons acting in concert); or (ii) a merger, recapitalization, issuance of securities or other transaction by the Company or any of its Affiliates, involving a Person (or Group of Persons acting in concert) that results in more than 50% of the voting power of the Company (or any resulting company after a merger) being held by a Person (or Group of Persons acting in concert), other than to stockholders prior to the merger, recapitalization, issuance or other transaction by the Company or any of its Affiliates; or which results in the Lenders and their Affiliates ceasing to retain the ability to elect a majority of the members of the Board.

(g)       <u>Code</u>:  The Internal Revenue Code of 1986, as amended, or any successor thereto.

(h)       <u>Committee</u>:  The Compensation Committee of the Board (or a subcommittee thereof), or such other committee of the Board (including, without limitation, the full Board) to

which the Board has delegated power to act under or pursuant to the provisions of the Plan, and if no such Committee has been created, the Board.

(i)     Company:  MGM Holdings Inc., a Delaware corporation.[1]

(j)     Disability:  The term Disability of a Participant has the same meaning ascribed to such term in any employment or severance agreement then in effect between the Participant and the Company or one of its Affiliates or, if no such agreement containing a definition of "Disability" is then in effect, shall mean the inability of the Participant to perform the essential functions of the Participant's job, with or without reasonable accommodation, by reason of a physical or mental infirmity for a period of six (6) consecutive months or for an aggregate of nine (9) months in any twenty-four (24) consecutive month period.  The period of six (6) months shall be deemed continuous unless the Participant returns to work for at least 30 consecutive business days during such period and performs during such period at the level and competence that existed prior to the beginning of the six-month period.  The date of such Disability shall be on the first day of such six month or nine-month period, as applicable.

(k)     Dividend Equivalent Right.  The right to receive a payment in respect of one Share (whether or not subject to an Option) equal to the amount of any dividend paid in respect of one Share held by a shareholder in the Company.

(l)     Effective Date:  The date the Board approves the Plan, or such later date as is designated by the Board.

(m)     Employment:  The term "Employment" as used herein refers to (i) a Participant's employment if the Participant is an employee of any of the Company or any of its Affiliates or Subsidiaries, (ii) a Participant's services as a consultant, if the Participant is a consultant to the Company or its Affiliates and (iii) a Participant's services as a non-employee director, if the Participant is a non-employee member of the Board.

(n)     Fair Market Value:  Unless otherwise provided in the Award Agreement, on any given date, as determined reasonably and in good faith by the Committee, which shall not take into account any discount for minority interests or transfer restrictions imposed on the stock being valued.

(o)     Group:  A "group" as such term is used for purposes of Section 13(d) or 14(d) of the Act (or any successor section thereto).

(p)     Lenders:  The lenders to Metro-Goldwyn-Mayer Inc. pursuant to the Credit Agreement, dated as of April 8, 2005, as amended, as of the record date for distributions under the Company's Plan of Reorganization.

(q)     Minimum Hold Requirement: any minimum hold requirement established by the Board in good faith in a manner consistent with the recommendation of the Company's investment bankers or proxy solicitors, as consistent with good governance practices for public

---

[1] Under discussion whether MGM Holdings Inc. or MGM Holdings II Inc. will be the parent entity.

companies; <u>provided</u>, in no event will the minimum hold requirement require a Participant to hold Shares with a Fair Market Value at any given time in excess of four (4) times  the sum of such Participant's (x) annual base salary and (y) annual cash bonus, paid in respect of  the immediately preceding calendar year.

(r)     <u>Option</u>:  A stock option to purchase Shares granted pursuant to Section 6 of the Plan.

(s)     <u>Option Price</u>:  The purchase price per Share of an Option, as determined pursuant to Section 6(a) of the Plan.

(t)     <u>Other Stock-Based Awards</u>:  Awards described in and granted pursuant to Section 8 of the Plan.

(u)     <u>Participant</u>:  An employee, director or other service provider of any of the Company or its Affiliates who is selected by the Committee to participate in the Plan.

(v)     <u>Person</u>:  A "person", as such term is used for purposes of Section 13(d) or 14(d) of the Act (or any successor section thereto).

(w)     <u>Plan</u>:  The 2010 MGM Holdings Inc. Stock Incentive Plan.

(x)     <u>Public Offering</u>: An underwritten public offering and sale of Shares pursuant to an effective registration statement under the Securities Act.

(y)     <u>Shares</u>:  Shares of common stock of the Company.

(z)     <u>Stock Appreciation Right</u>:  A stock appreciation right granted pursuant to Section 7 of the Plan.

(aa)     <u>Subsidiary</u>:  A "subsidiary corporation", as defined in Section 424(f) of the Code (or any successor section thereto).

### 3. Shares Subject to the Plan

(a)     Subject to Section 9, the total number of Shares which may be issued under the Plan is [15% OF THE FULLY DILUTED SHARES OF THE COMPANY].   The Shares may consist, in whole or in part, of unissued Shares or treasury Shares.  The issuance of Shares or the payment of cash upon the exercise of an Award or in consideration of the settlement, cancellation or termination of an Award shall reduce the total number of Shares available under the Plan, as applicable (with any Awards settled in cash reducing the total number of Shares by the number of Shares determined by dividing the cash amount to be paid thereunder by the Fair Market Value of one Share on the date of payment).  Shares which are subject to Awards which are cancelled, forfeited, terminated or otherwise expired by their terms without the payment of consideration and Shares which are used to pay the exercise price of any Award, may be granted again subject to Awards under the Plan.

(b)     <u>Agreements Evidencing Awards</u>. Each Award granted under the Plan shall be evidenced by an Award agreement (the "<u>Award Agreement</u>") that shall contain such provisions and conditions as the Committee deems appropriate; provided that, except as otherwise expressly provided in an Award Agreement, if there is any conflict between any provision of the Plan and an Award Agreement, the provisions of the Plan shall govern.  Unless otherwise provided herein, the Committee may grant Awards in tandem with or in substitution for any other Award or Awards granted under the Plan.  By accepting an Award pursuant to the Plan, a Participant thereby agrees that the Award shall be subject to all of the terms and provisions of the Plan and the applicable Award Agreement.

### 4. Administration

The Plan shall be administered by the Committee, which may delegate its duties and powers in whole or in part to any subcommittee thereof.  Additionally, the Committee may delegate the authority to grant Awards under the Plan to any employee or group of employees of the Company or an Affiliate; <u>provided that</u> such delegation and grants are consistent with applicable law and guidelines established by the Board from time to time.  Awards may, in the discretion of the Committee, be made under the Plan in assumption of, or in substitution for, outstanding awards previously granted by the Company or its Affiliates or a company acquired by the Company or with which the Company combines.  The number of Shares underlying such substitute awards shall be counted against the aggregate number of Shares available for Awards under the Plan.  The Committee is authorized to interpret the Plan, to establish, amend and rescind any rules and regulations relating to the Plan, and to make any other determinations that it deems necessary or desirable for the administration of the Plan.  The Committee may correct any defect or supply any omission or reconcile any inconsistency in the Plan in the manner and to the extent the Committee deems necessary or desirable.  Any decision of the Committee in the interpretation and administration of the Plan, as described herein, shall lie within its sole and absolute discretion and shall be final, conclusive and binding on all parties concerned (including, but not limited to, Participants and their beneficiaries or successors).  The Committee shall have the full power and authority to establish the terms and conditions of any Award consistent with the provisions of the Plan and to waive any such terms and conditions at any time (including, without limitation, accelerating or waiving any vesting conditions).  The Committee shall require payment of any amount it may determine to be necessary to withhold for federal, state, local or

other taxes as a result of the exercise, grant or vesting of an Award and the Company or its Affiliates shall have the right and are authorized to withhold any applicable withholding taxes with respect to any Award, its exercise, or any payment or transfer under or with respect to the Award and to take such other action as may be necessary in the opinion of the Committee to satisfy all obligations for the payment of such withholding taxes.

## 5. Limitations

No Award may be granted under the Plan after the tenth anniversary of the Effective Date, but Awards theretofore granted may extend beyond that date.

## 6. Terms and Conditions of Options

Options granted under the Plan shall be non-qualified stock options for federal income tax purposes, as evidenced by the related Award Agreements, and shall be subject to the foregoing and the following terms and conditions and to such other terms and conditions, not inconsistent therewith, as the Committee shall determine:

(a)  Option Price.  The Option Price shall be determined by the Committee, provided that, for the purposes of an Option granted under the Plan to a Participant who is a U.S. taxpayer, in no event will (i) the Option Price be less than 100% of the Fair Market Value of a Share on the date an Option is granted (other than in the case of Options granted in substitution of previously granted awards, as described in Section 4) and (ii) any Option be granted unless the Share on which it is granted constitutes "service recipient stock" (within the meaning of Section 409A of the Code) with respect to the applicable Participant.

(b)  Exercisability.  Options granted under the Plan shall be exercisable at such time and upon such terms and conditions as may be determined by the Committee, but in no event shall an Option be exercisable more than ten years after the date it is granted.

(c)  Exercise of Options.  Except as otherwise provided in the Plan or in an Award Agreement, an Option may be exercised for all, or from time to time any part, of the Shares for which it is then exercisable.  For purposes of this Section 6 of the Plan, the exercise date of an Option shall be the later of the date a notice of exercise is received by the Company and, if applicable, the date payment is received by the Company pursuant to clauses (i), (ii), or (iii) in the following sentence.  The purchase price for the Shares as to which an Option is exercised shall be paid to the Company as designated by the Committee, pursuant to one or more of the following methods: (i) in cash or its equivalent (e.g., by personal check), including, with the consent of the Board, a full-recourse promissory note, (ii) in Shares having a Fair Market Value equal to the aggregate Option Price for the Shares being purchased and satisfying such other requirements as may be imposed by the Committee; provided that such Shares have been held by the Participant for no less than six months (or such other period as established from time to time by the Committee in order to avoid adverse accounting treatment applying generally accepted accounting principles), (iii) if there is a public market for the Shares at such time, to the extent permitted by the Committee and subject to such rules as may be established by the Committee, through the delivery of irrevocable instructions to a broker to sell Shares obtained upon the exercise of the Option and to deliver promptly to the Company an amount out of the proceeds of

such sale equal to the aggregate Option Price for the Shares being purchased, or (iv) with the consent of the Board or to the extent specified in an Award Agreement, using a net settlement mechanism whereby the number of shares delivered upon the exercise of the option will be reduced by a number of shares that has a Fair Market Value equal to the Option Price, provided that, in each case, the Participant tenders cash or its equivalent to pay any applicable withholding taxes.  No Participant shall have any rights to dividends or other rights of a stockholder with respect to Shares subject to an Option until the Participant has given written notice of exercise of the Option, paid in full for such Shares and, if applicable, has satisfied any other conditions imposed by the Committee pursuant to the Plan.

(d)      Attestation.  Wherever in this Plan or any agreement evidencing an Award a Participant is permitted to pay the exercise price of an Option or taxes relating to the exercise of an Option by delivering Shares, the Participant may, subject to procedures satisfactory to the Committee, satisfy such delivery requirement by presenting proof of beneficial ownership of such Shares, in which case the Company shall treat the Option as exercised without further payment and/or shall withhold such number of Shares from the Shares acquired by the exercise of the Option, as appropriate.

## 7.      Terms and Conditions of Stock Appreciation Rights

(a)      Grants.  The Committee may also grant a Stock Appreciation Right.

(b)      Terms.  The exercise price per Share of a Stock Appreciation Right shall be an amount determined by the Committee but in no event shall such amount be less than the Fair Market Value of a Share on the date the Stock Appreciation Right is granted (other than in the case of Stock Appreciation Rights granted in substitution of previously granted awards, as described in Section 4.  Each Stock Appreciation Right shall entitle a Participant upon exercise to an amount equal to (i) the excess of (A) the Fair Market Value on the exercise date of one Share over (B) the exercise price per Share, times (ii) the number of Shares covered by the Stock Appreciation Right.  The date a notice of exercise is received by the Company shall be the exercise date.  Payment to a Participant shall be made in Shares or in cash, or partly in Shares and partly in cash (any such Shares valued at such Fair Market Value), all as shall be determined by the Committee.  Stock Appreciation Rights may be exercised from time to time upon actual receipt by the Company of written notice of exercise stating the number of Shares with respect to which the Stock Appreciation Right is being exercised.  No fractional Shares will be issued in payment for Stock Appreciation Rights, but instead cash will be paid for a fraction or, if the Committee should so determine, the number of Shares will be rounded downward to the next whole Share.

(c)      Limitations.  The Committee may impose, in its discretion, such conditions upon the exercisability or transferability of Stock Appreciation Rights as it may deem appropriate, but in no event shall a Stock Appreciation Right be exercisable more than ten years after the date it is granted.  Unless otherwise expressly provided in the applicable Award Agreement, no Participant shall have any rights to dividends or other rights of a stockholder with respect to any Stock Appreciation Right.

## 8.      Other Stock-Based Awards

(a)     <u>Generally</u>.  The Committee, in its sole discretion, may grant or sell Awards of Shares, Awards of restricted Shares, purchased Shares and Awards that are valued in whole or in part by reference to, or are otherwise based on the Fair Market Value of, Shares ("<u>Other Stock-Based Awards</u>").  Such Other Stock-Based Awards shall be in such form, and dependent on such conditions, as the Committee shall determine, including, without limitation, the right to receive, or vest with respect to, one or more Shares (or the equivalent cash value of such Shares) upon the completion of a specified period of service, the occurrence of an event and/or the attainment of performance objectives.  Other Stock-Based Awards may be granted alone or in addition to any other Awards granted under the Plan.  Subject to the provisions of the Plan, the Committee shall determine to whom and when Other Stock-Based Awards will be made, the number of Shares to be awarded under (or otherwise related to) such Other Stock-Based Awards; whether such Other Stock-Based Awards shall be settled in cash, Shares or a combination of cash and Shares; and all other terms and conditions of such Awards (including, without limitation, the vesting provisions thereof and provisions ensuring that all Shares so awarded and issued shall be fully paid and non-assessable). The Committee may also grant Dividend Equivalent Rights in connection with Awards granted hereunder either alone or in connection with the grant of a Stock Option or Stock Appreciation Right.  Each Dividend Equivalent Right shall be subject to such terms as the Committee may determine.

## 9.     Adjustments Upon Certain Events

Notwithstanding any other provisions in the Plan to the contrary, the following provisions shall apply to all Awards granted under the Plan:

(a)     <u>Generally</u>.  In the event of any change in the outstanding Shares after the Effective Date by reason of any Share dividend or split, reorganization, recapitalization, merger, consolidation, spin-off, combination or transaction or exchange of Shares or other corporate exchange, or any distribution to shareholders of Shares other than regular cash dividends or any transaction similar to the foregoing, the Committee shall make such substitution or adjustment, if any, as it deems to be equitable in its sole discretion and without liability to any person (subject to Section 17), as to (i) the number or kind of Shares or other securities issued or reserved for issuance pursuant to the Plan or pursuant to outstanding Awards, (ii) the Option Price or exercise price of any Award and/or (iii) any other affected terms of such Awards.

(b)     <u>Change of Control</u>. In the event of a Change of Control after the Effective Date, (i) solely if and to the extent determined by the Committee in the applicable Award Agreement or otherwise, any outstanding Awards then held by Participants which are unexercisable or otherwise unvested or subject to lapse restrictions shall automatically be deemed exercisable or otherwise vested or no longer subject to lapse restrictions, as the case may be, as of immediately prior to such Change of Control and (ii) the Committee may (subject to Section 17), but shall not be obligated to, (A) accelerate, vest or cause the restrictions to lapse with respect to all or any portion of an Award, (B) cancel such Awards for fair value (as determined in the sole discretion of the Committee) which, in the case of Options and Stock Appreciation Rights, may equal the excess, if any, of value of the consideration to be paid in the Change of Control transaction to holders of the same number of Shares subject to such Options or Stock Appreciation Rights (or, if no consideration is paid in any such transaction, the Fair Market Value of the Shares subject to such Options or Stock Appreciation Rights) over the aggregate exercise price of such Options or

Stock Appreciation Rights, (C) provide for the issuance, assumption, or replacement of such substitute Awards that will substantially preserve the otherwise applicable terms of any affected Awards previously granted hereunder as determined by the Committee in its sole discretion whether by any successor or survivor Person, or parent or Affiliate thereof, or (D) provide that for a period of at least 15 days prior to the Change of Control, such Awards shall be exercisable, to the extent applicable, as to all Shares subject thereto and the Committee may further provide that upon the occurrence of the Change of Control, such Awards shall terminate and be of no further force and effect.

(c)     After any adjustment made pursuant to this Section 9, the number of Shares subject to each outstanding Award shall be rounded down to the nearest whole number.

## 10.     No Right to Employment or Awards

The granting of an Award under the Plan shall impose no obligation on the Company or any Affiliate to continue the Employment of a Participant and shall not lessen or affect the Company's or any Affiliate's right to terminate the Employment of such Participant.  No Participant or other Person shall have any claim to be granted any Award, and there is no obligation for uniformity of treatment of Participants, or holders or beneficiaries of Awards.  No Award (or payments or amounts received in respect thereof) shall constitute compensation for purposes of determining any benefits under any benefit plan.  The terms and conditions of Awards and the Committee's determinations and interpretations with respect thereto need not be the same with respect to each Participant (whether or not such Participants are similarly situated).

## 11.     Successors and Assigns

The Plan shall be binding on all successors and assigns of the Company and a Participant, including without limitation, the estate of such Participant and the executor, administrator or trustee of such estate, or any receiver or trustee in bankruptcy or representative of the Participant's creditors.

## 12.     Nontransferability of Awards

Unless otherwise (i) provided in an Award Agreement, (ii) determined by the Committee or (iii) after an initial Public Offering subject to the Minimum Hold Requirement, an Award shall not be transferable or assignable by the Participant otherwise than by will or by the laws of descent and distribution.  An Award exercisable after the death of a Participant may be exercised by the legatees, personal representatives or distributees of the Participant.

## 13.     Amendments or Termination

The Board may amend, alter or discontinue the Plan, but no amendment, alteration or discontinuation shall be made, (a) without the approval of a majority of the shareholders of the Company, if such action would (except as is provided in Section 9 of the Plan), increase the total number of Shares reserved for the purposes of the Plan or (b) without the consent of a Participant, if such action would materially adversely affect any of the rights of such Participant under any Award theretofore granted to such Participant under the Plan; provided, however, that

the Committee may amend the Plan in such manner as it deems necessary to permit the granting of Awards meeting the requirements of the Code or other applicable laws (including, without limitation, to avoid adverse tax consequences to the Company or to Participants).

## 14. International Participants

With respect to Participants who reside or work outside the United States of America, the Committee may, in its sole discretion, amend the terms of the Plan or Awards with respect to such Participants in order to conform such terms with the requirements of local law or to obtain more favorable tax or other treatment for a Participant, the Company or an Affiliate.

## 15. Choice of Law

The Plan shall be governed by and construed in accordance with the law of the State of New York without regard to conflicts of laws.

## 16. Effectiveness of the Plan

The Plan shall be effective as of the Effective Date.

## 17. Section 409A of the Code

To the extent applicable, this Plan and Awards issued hereunder shall be interpreted in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretative guidance issued thereunder, including without limitation any such regulations or other guidance that may be issued after the Effective Date. Notwithstanding other provisions of the Plan or any Award agreements issued thereunder, no Award shall be granted, deferred, accelerated, extended, paid out or modified under this Plan in a manner that would result in the imposition of an additional tax under Section 409A of the Code upon a Participant. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments in respect of any Award under the Plan may not be made at the time contemplated by the terms of the Plan or the relevant Award agreement, as the case may be, without causing the Participant holding such Award to be subject to taxation under Section 409A of the Code, consistent with the provisions of Section 4 above, the Company may take whatever actions the Committee determines necessary or appropriate to comply with, or exempt the Plan and Award agreement from the requirements of Section 409A of the Code and related Department of Treasury guidance and other interpretive materials as may be issued after the Effective Date including, without limitation, (a) adopting such amendments to the Plan and Awards and appropriate policies and procedures, including amendments and policies with retroactive effect, that the Committee determines necessary or appropriate to preserve the intended tax treatment of the benefits provided by the Plan and Awards hereunder and/or (b) taking such other actions as the Committee determines necessary or appropriate to avoid the imposition of an additional tax under Section 409A of the Code, which action may include, but is not limited to, delaying payment to a Participant who is a "specified employee" within the meaning of Section 409A of the Code until the first day following the six-month period beginning on the date of the Participant's termination of Employment. The Company shall use commercially reasonable efforts to implement the provisions of this Section 17 in good faith; provided that none of the

Company, the Committee, nor any employee, director or representative of the Company or of any of its Affiliates shall have any liability to Participants with respect to this Section 17.

18. **Miscellaneous**

(a) <u>Transfers and Leaves of Absence</u>. For purposes of the Plan, unless the Committee determines otherwise: (i) a transfer of a Participant's employment without an intervening period of separation among the Company and any Affiliate shall not be deemed a termination of employment, and (ii) a Participant who is granted in writing a leave of absence or who is entitled to a statutory leave of absence shall be deemed to have remained in the employ of the Company (and Affiliate) during such leave of absence.

(b) <u>Right of Offset</u>. The Company shall have the right to offset against its obligation to deliver Shares (or other property or cash) under the Plan or any Award Agreement any outstanding amounts (including, without limitation, travel and entertainment or advance account balances, loans, repayment obligations under any Awards or amounts repayable to the Company pursuant to tax equalization, housing, automobile or other employee programs) that the Participant then owes to the Company and any amounts the Committee otherwise deems appropriate pursuant to any tax equalization policy or agreement; provided, that the Participant is first offered the opportunity to pay cash for such outstanding amounts. Notwithstanding the foregoing, the Committee shall have no right to offset against its obligation to deliver Shares (or other property or cash) under the Plan, any Award Agreement or any non-qualified deferred compensation amounts if such offset would subject the Participant to the additional tax imposed under Section 409A in respect of an outstanding Award.

(c) <u>Waiver of Claims</u>. Each Participant who receives an Award recognizes and agrees that before being selected by the Committee to receive an Award he or she has no right to any benefits under such Award. Accordingly, in consideration of the Participant's receipt of any Award hereunder, he or she expressly waives any right to contest the amount of any Award, the terms of any Award Agreement, any determination, action or omission hereunder or under any Award Agreement by the Committee, the Company or the Board, or any amendment to the Plan or any Award Agreement (other than an amendment to the Plan or an Award Agreement to which his or her consent is expressly required by the express terms of an Award Agreement).

(d) <u>Nature of Payments</u>. Any and all grants of Awards and deliveries of cash, securities or other property under the Plan shall be in consideration of services performed or to be performed for the Company by the Participant. Awards under the Plan may, in the discretion of the Committee, be made in substitution in whole or in part for cash or other compensation otherwise payable to a Participant. Only whole Shares shall be delivered under the Plan. Awards shall, to the extent reasonably practicable, be aggregated in order to eliminate any fractional shares. Fractional shares may, in the discretion of the Committee, be forfeited or be settled in cash or otherwise as the Committee may determine. All grants and deliveries of Shares, cash, securities or other property under the Plan shall constitute a special discretionary incentive payment to the Participant and shall not be required to be taken into account in computing the amount of salary or compensation of the Participant for the purpose

of determining any contributions to or any benefits under any pension, retirement, profit-sharing, bonus, life insurance, severance or other benefit plan of the Company or under any agreement with the Participant, unless the Company specifically provides otherwise.

(e) <u>Shares Covered by Plan</u>. For purposes of Section 3, a Share will be considered to be "covered by" the Plan if (i) if it is available for issuance pursuant to the Plan but is not subject to an outstanding Award or (ii) it is subject to an outstanding Award. For purposes of Section 3, (A) an Option or Stock Appreciation Right that has been granted under the Plan will be considered to be an "outstanding" Award until it is exercised or otherwise terminates or expires by its terms, (B) a Share that has been granted as an Award under the Plan that is subject to vesting conditions will be considered an "outstanding" Award until the vesting conditions have been satisfied or the Award otherwise terminates or expires unvested by its terms and (C) any Award other than an Option, Stock Appreciation Right or Share that is subject to vesting conditions will be considered to be an "outstanding" award until it has been settled.

(f) <u>Non-Uniform Determinations</u>. The Committee's determinations under the Plan and Award Agreements need not be uniform and any such determinations may be made by it selectively among Persons who receive, or are eligible to receive, Awards under the Plan (whether or not such Persons are similarly situated). Without limiting the generality of the foregoing, the Committee shall be entitled, among other things, to make non-uniform and selective determinations under Award Agreements, and to enter into non-uniform and selective Award Agreements, as to (i) the Persons to receive Awards, (ii) the terms and provisions of Awards and (iii) whether a Participant's employment has been terminated for purposes of the Plan.

(g) <u>No Third Party Beneficiaries</u>. Except as expressly provided in the Plan or an Award Agreement, neither the Plan nor any Award Agreement shall confer on any Person other than the Company (or Affiliate) and the Participant receiving any Award any rights or remedies thereunder.

(h) <u>Other Payments or Awards</u>. Nothing contained in the Plan shall be deemed in any way to limit or restrict the Company from making any award or payment to any Person under any other plan, arrangement or understanding, whether now existing or hereafter in effect.

(i) <u>Plan Headings</u>. The headings in the Plan are for the purpose of convenience only and are not intended to define or limit the construction of the provisions hereof.

(j) <u>Severability</u>. Whenever possible, each provision of the Plan shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Plan is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but the Plan shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(k)  <u>Participant Representations</u>. The Company may require a Participant, as a condition to the grant or exercise of, or acquisition of stock under, any Option or Stock Appreciation Right, (A) to give written representations satisfactory to the Company as to such Participant's knowledge and experience in financial and business matters, and/or to employ a purchaser representative reasonably satisfactory to the Company who is knowledgeable and experienced in financial and business matters, and to give written representations satisfactory to the Company that he or she is capable of evaluating, alone or together with the purchaser representative, the merits and risks of exercising the Option or Stock Appreciation Right; (B) to give written representations satisfactory to the Company stating that such Participant is acquiring the stock subject to the Option or Stock Appreciation Right for such Participant's own account and not with any present intention of selling or otherwise distributing the stock; and (C) to give such other written representations as are deemed necessary or appropriate by the Company and its counsel. The foregoing requirements, and any representations given pursuant to such requirements, shall be inoperative if (1) the issuance of the shares upon the exercise or acquisition of stock under the applicable Option or Stock Appreciation Right has been registered under a then currently effective registration statement under the Securities Act or (2) as to any particular requirement, a determination is made by counsel for the Company that such requirement need not be met in the circumstances under the then applicable securities laws. The Company may, upon advice of counsel to the Company, place legends on stock certificates issued under the Plan as such counsel deems necessary or appropriate in order to comply with applicable securities laws, including, but not limited to, legends restricting the transfer of the stock.

EXHIBIT G

AMENDED BYLAWS OF REORGANIZED HOLDINGS

THIRD

AMENDED AND RESTATED

BY-LAWS

OF

MGM HOLDINGS INC.

A Delaware Corporation

Effective: [_], 2010

# TABLE OF CONTENTS

**Page**

## ARTICLE I
### OFFICES

Section 1.     Registered Office .......................................................................... 1
Section 2.     Other Offices .............................................................................. 1

## ARTICLE II
### MEETINGS OF STOCKHOLDERS

Section 1.     Place of Meetings ....................................................................... 1
Section 2.     Annual Meetings ......................................................................... 1
Section 3.     Special Meetings ........................................................................ 2
Section 4.     Notice ......................................................................................... 2
Section 5.     Adjournments ............................................................................. 2
Section 6.     Quorum ...................................................................................... 2
Section 7.     Voting ......................................................................................... 3
Section 8.     Proxies ....................................................................................... 3
Section 9.     Consent of Stockholders in Lieu of Meeting ............................... 4
Section 10.    Action by Telegram, Cablegram or Other Electronic
               Transmission .............................................................................. 5
Section 11.    List of Stockholders Entitled to Vote ........................................... 5
Section 12.    Record Date ............................................................................... 5
Section 13.    Stock Ledger .............................................................................. 6
Section 14.    Conduct of Meetings .................................................................. 6
Section 15.    Meeting by Remote Communication ........................................... 7

## ARTICLE III
### DIRECTORS

Section 1.     Number and Election of Directors ............................................... 7
Section 2.     Vacancies ................................................................................... 7
Section 3.     Duties and Powers ..................................................................... 8
Section 4.     Annual Meeting of the Board of Directors ................................... 8
Section 5.     Meetings and Notice .................................................................. 8
Section 6.     Quorum and Required Vote and Adjournment ............................ 8
Section 7.     Resignations and Removals of Directors .................................... 9
Section 8.     Actions of the Board by Written Consent .................................... 9
Section 9.     Meetings by Means of Conference Telephone ........................... 10
Section 10.    Lead Director ............................................................................ 10
Section 11.    Committees ............................................................................... 10

i

| Section 12. | Compensation | 13 |
| Section 13. | Interested Directors | 13 |

ARTICLE IV
OFFICERS

| Section 1. | General | 13 |
| Section 2. | Election, Removal, Resignation and Compensation | 14 |
| Section 3. | Voting Securities Owned by the Corporation | 14 |
| Section 4. | Chairman of the Board of Directors | 14 |
| Section 5. | Chief Executive Officer | 15 |
| Section 6. | Presidents | 15 |
| Section 7. | Chief Operating Officer | 15 |
| Section 8. | Chief Financial Officer | 15 |
| Section 9. | Vice Presidents | 15 |
| Section 10. | Secretary | 16 |
| Section 11. | Assistant Secretaries | 16 |
| Section 12. | Assistant Treasurers | 16 |
| Section 13. | Other Officers | 17 |

ARTICLE V
STOCK

| Section 1. | Form | 17 |
| Section 2. | Lost Certificates | 18 |
| Section 3. | Transfers | 18 |
| Section 4. | Dividend Record Date | 18 |
| Section 5. | Record Owners | 19 |
| Section 6. | Transfer and Registry Agents | 19 |
| Section 7. | Copies of Restrictions | 19 |

ARTICLE VI
NOTICES

| Section 1. | Notices | 19 |
| Section 2. | Waivers of Notice | 20 |

ARTICLE VII
GENERAL PROVISIONS

| Section 1. | Dividends | 20 |
| Section 2. | Disbursements | 21 |
| Section 3. | Fiscal Year | 21 |
| Section 4. | Corporate Seal | 21 |

404824.09-Los Angeles Server 2A - MSW
-Active.12130753.8

## ARTICLE VIII
## INDEMNIFICATION

Section 1.     Power to Indemnify in Actions, Suits or Proceedings other than Those by or in the Right of the Corporation .................................. 21

Section 2.     Power to Indemnify in Actions, Suits or Proceedings by or in the Right of the Corporation ....................................................... 22

Section 3.     Authorization of Indemnification ................................................. 23

Section 4.     Good Faith Defined........................................................................ 23

Section 5.     Indemnification Against Expenses of Successful Party............... 24

Section 6.     Indemnification by a Court ........................................................... 24

Section 7.     Nonexclusivity of Indemnification and Advancement of Expenses ...................................................................................... 25

Section 8.     Insurance ....................................................................................... 25

Section 9.     Certain Definitions........................................................................ 25

Section 10.    Continuing Obligation .................................................................. 26

## ARTICLE IX
## AMENDMENTS

Section 1.     Amendments .................................................................................. 26

## ARTICLE X
## MISCELLANEOUS

Section 1.     Inconsistent Provisions ................................................................. 27

Section 2.     Capitalized Terms ......................................................................... 27

404824.09-Los Angeles Server 2A - MSW
-Active.12130753.8

THIRD

AMENDED AND RESTATED

BY-LAWS

OF

MGM HOLDINGS INC.

(hereinafter called the "Corporation")


ARTICLE I

<u>OFFICES</u>

Section 1.　　<u>Registered Office</u>.  The registered office of the Corporation shall be in the City of Wilmington, County of Newcastle, State of Delaware.  The registered office of the Corporation may be changed from time to time by action of the board of directors of the Corporation (the "Board of Directors").


Section 2.　　<u>Other Offices</u>.  The Corporation may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may from time to time determine.


ARTICLE II

<u>MEETINGS OF STOCKHOLDERS</u>


Section 1.　　<u>Place of Meetings</u>.  The Board of Directors may designate any place, either within or without the State of Delaware, and/or by means of remote communication in the manner authorized by the General Corporation Law of the State of Delaware (the "DGCL"), as the place of meeting for any annual meeting or for any special meeting of the stockholders.


Section 2.　　<u>Annual Meetings</u>.  The annual meeting of stockholders (the "Annual Meeting") shall be held each year on such date and at such time as shall be designated from time to time by the Board of Directors for the purpose of electing directors and conducting such other proper business as may come before the meeting.  The date, time and place, if any, and/or the means of remote communication, of the Annual Meeting shall be determined by the

Board of Directors.

Section 3. Special Meetings. Unless otherwise required by law or by the certificate of incorporation of the Corporation, as amended and restated from time to time (the "Certificate of Incorporation"), a special meeting of the stockholders (a "Special Meeting") may be called at any time and for any purpose or purposes by either (i) the Board of Directors, (ii) the Lead Director (as defined below), (iii) the chairman of the Board of Directors (the "Chairman") (or, if there be more than one Chairman, any Co-Chairman), (iv) the chief executive officer (the "CEO") (or, if there be more than one CEO, any Co-CEO) or (v) by any officer of the Corporation at the request in writing of the stockholders holding not less than a majority of the Corporation's capital stock issued and outstanding and entitled to vote thereat, which written request shall state the purpose or purposes of the meeting and shall be delivered to the Chairman (or Co-Chairman) or the Lead Director and the secretary of the Corporation (the "Secretary"). At a Special Meeting, only such business shall be conducted as shall be specified in the notice of meeting (or any supplement thereto).

Section 4. Notice. Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, and, in the case of a Special Meeting, the purpose or purposes for which the meeting is called. Unless otherwise required by law, written notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to notice of and to vote at such meeting.

Section 5. Adjournments. Any meeting of the stockholders may be adjourned from time to time to reconvene at the same or some other place, and notice need not be given of any such adjourned meeting if the time and place, if any, thereof and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting in accordance with the requirements of Section 4 hereof shall be given to each stockholder of record entitled to notice of and to vote at the meeting.

Section 6. Quorum. Unless otherwise required by applicable law or the Certificate of Incorporation, the holders of a majority of the Corporation's capital stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business. A quorum, once established, shall not be broken by the withdrawal of enough votes to leave less than a quorum. If, however, such quorum shall not be present or represented at any meeting of

the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, in the manner provided in Section 5 hereof, until a quorum shall be present or represented.

Section 7. <u>Voting</u>. Unless otherwise required by law, the Certificate of Incorporation, these Third Amended and Restated By-Laws (the "By-Laws"), or the Stockholders' Agreement, dated as of [_], 2010, by and among the Corporation and the parties thereto (as may be amended or modified from time to time, the "Stockholders' Agreement") (but in the case of the Stockholders' Agreement, only until termination thereof in accordance with its terms), any question brought before any meeting of the stockholders, other than the election of directors (which shall be elected by a plurality of votes cast), shall be decided by the vote of the holders of a majority of the total number of votes of the Corporation's capital stock represented and entitled to vote thereat. Subject to Section 12(a) of this Article II and to the provisions of the Stockholders' Agreement until termination thereof in accordance with its terms, each stockholder represented at a meeting of the stockholders shall be entitled to cast the number of votes for each share of the capital stock entitled to vote thereat held by such stockholder as set forth in the Certificate of Incorporation. Such votes may be cast in person or by proxy as provided in Section 8 of this Article II. The Board of Directors, in its discretion, or the officer of the Corporation presiding at a meeting of the stockholders, in such officer's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

Section 8. <u>Proxies</u>. Each stockholder entitled to vote at a meeting of the stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder as proxy, but no such proxy shall be voted upon after three (3) years from its date, unless such proxy provides for a longer period. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, the following shall constitute a valid means by which a stockholder may grant such authority:

(a) A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy. Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means, including, but not limited to, by facsimile signature.

(b) A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of a telegram, cablegram or other means of electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such telegram, cablegram or other means of electronic transmission must either set forth or be submitted with information from which it can be determined that the telegram, cablegram or other electronic transmission was authorized by the stockholder. If it is determined that such telegrams, cablegrams or other electronic transmissions are valid, the inspectors or, if

there are no inspectors, such other persons making that determination shall specify the information on which they relied.

Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission authorizing another person or persons to act as proxy for a stockholder may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used; provided, however, that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 9.        Consent of Stockholders in Lieu of Meeting.  Unless otherwise provided in the Certificate of Incorporation, any action required or permitted to be taken at any Annual or Special Meeting of stockholders of the Corporation may be taken without a meeting and without a vote, if prior notice shall be provided as described in this Section 9, and a consent or consents in writing, setting forth the action so taken and bearing the dates of signature of the stockholders who signed the consent or consents, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of the stockholders are recorded. Whenever stockholders are required or permitted to take any action by written consent, a written notice shall be given which shall provide a summary of the proposed action or actions to be taken by such stockholder consent.  Unless otherwise required by law, written notice of any action by written consent shall be given not less than two (2) business days prior to such consent to each stockholder entitled to notice of and to participate in such consent.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  All consents properly delivered in accordance with this Section 9 shall be deemed to be recorded when so delivered.  No written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this Section 9 to the Corporation, written consents signed by a sufficient number of holders to take such corporate action are so recorded.

Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used; provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.  Any action taken pursuant to such written consent or consents of the stockholders shall have the same force and effect as if taken by the stockholders at a meeting thereof.

4

Section 10.    Action by Telegram, Cablegram or Other Electronic Transmission.  A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this Section 10; provided that any such telegram, cablegram or other electronic transmission sets forth  or is delivered with information from which the Corporation can determine (i) that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and (ii) the date on which such stockholder or proxyholder or authorized person or persons transmitted such telegram, cablegram or electronic transmission.   The date on which such telegram, cablegram or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed.  No consent given by telegram, cablegram or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of the stockholders are recorded.

Section 11.    List of Stockholders Entitled to Vote.  The officer of the Corporation who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of the stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

Section 12.    Record Date.

(a)    In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of the stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which

record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of the stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of the stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)     In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of the stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by applicable law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

Section 13.     Stock Ledger.  The stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list required by Section 11 of this Article II or the books of the Corporation or to vote in person or by proxy at any meeting of the stockholders.

Section 14.     Conduct of Meetings.  The Board of Directors of the Corporation may adopt by resolution such rules and regulations for the conduct of any meeting of the stockholders as it shall deem appropriate.  Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the Chairman (or, if applicable, the Co-Chairman) of any meeting of the stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such Chairman, are appropriate for the proper conduct of the meeting.  Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the Chairman (or, if applicable, the Co-Chairman) of the meeting, may include, without limitation, the following:  (i) the establishment of an agenda or order of business for the meeting; (ii) the determination of when

6

the polls shall open and close for any given matter to be voted on at the meeting; (iii) rules and procedures for maintaining order at the meeting and the safety of those present; (iv) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the Chairman (or, if applicable, the Co-Chairman of the meeting shall determine; (v) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (vi) limitations on the time allotted to questions or comments by participants.

Section 15. <u>Meeting by Remote Communication</u>. If authorized by the Board of Directors in its sole discretion, and subject to such guidelines and procedures as the Board of Directors may adopt, stockholders not physically present at a meeting of stockholders may, by means of remote communication, participate in a meeting of stockholders and be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication; provided that (i) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at such meeting by means of remote communication is a stockholder, (ii) the Corporation shall implement reasonable measures to provide such stockholders a reasonable opportunity to participate in such meeting and to vote on matters submitted to the stockholders, including, but not limited to, an opportunity to read or hear the proceedings of such meeting substantially concurrently with such proceedings and (iii) if any stockholder votes or takes other action at such meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

# ARTICLE III

## DIRECTORS

Section 1. <u>Number and Election of Directors</u>. The Board of Directors shall consist of nine (9) authorized directors; provided, that at any time after the Stockholders' Agreement has terminated in accordance with its terms, the number of directors shall be established from time to time by resolution of the Board of Directors. Subject to the Stockholders' Agreement, prior to its termination, directors shall be elected by a plurality of the votes cast at each Annual or Special Meeting of the stockholders. Each director so elected shall hold office until the next Annual Meeting of stockholders and until such director's successor is duly elected and qualified, or until such director's earlier death, resignation or removal. Directors need not be stockholders.

Section 2. <u>Vacancies</u>. Board vacancies arising through death, resignation, removal or otherwise shall be filled only as provided in the Stockholders' Agreement; provided, that at any time after the Stockholders' Agreement has terminated in accordance with its terms, such vacancies and newly created directorships may be filled by a majority of the shares then

entitled to vote at an election of directors, and the directors so chosen shall hold office until the next Annual Meeting or until their successors are duly elected and qualified, or until their earlier death, resignation or removal.

Section 3.          Duties and Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors which, subject to the provisions set forth in the Stockholders' Agreement until termination thereof in accordance with its terms, may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation, by the provisions of the Stockholders' Agreement until termination thereof in accordance with its terms or by these By-Laws required to be exercised or done by or with the consent of the stockholders.

Section 4.          Annual Meeting of the Board of Directors.  The annual meeting of each newly elected Board of Directors shall be held (with notice as provided under Article VI of these By-Laws) immediately after, and at the same place, if any, as the Annual Meeting.

Section 5.          Meetings and Notice.  The Board of Directors may hold meetings, both regular and special, either within or without the State of Delaware.  Regular meetings of the Board of Directors may be held at such time and at such place as may from time to time be determined by the Board of Directors.  Special meetings of the Board of Directors may be called by the Chairman (or, if there be more than one Chairman, any Co-Chairman), the CEO (or, if there be more than one CEO, any Co-CEO), the Lead Director or by any three (3) directors.  Notice of any regular meeting or special meeting ("Board Notice"), stating the place, if any, date and hour of the meeting, shall be given to each director as provided in Article VI not less than three (3) business days prior to the scheduled meeting, or on such shorter notice as the person or persons calling such meeting may deem necessary or appropriate in the circumstances, but subject in any event to Section 6 of this Article III.  Any meeting of the Board of Directors may be adjourned from time to time to reconvene at the same or some other place.  If a meeting is adjourned, notice of the adjourned meeting in accordance with the requirements stated for special meetings in this Section 5 shall be given to each director unless such meeting was adjourned due to a failure to meet the quorum requirement as set forth in Section 6 of this Article III.  At any meeting of the Board of Directors, no matter will be discussed if it is not set forth in the Board Notice.

Section 6.          Quorum and Required Vote and Adjournment.  A quorum of the Board of Directors shall consist of a majority of the directors then in office, such majority to include at least one (1) of the Executive Directors; provided, that, if (i) notice of such meeting has been duly delivered to all Directors at least three (3) business days prior to the scheduled meeting in accordance with the notice procedures set forth in Article VI of these By-Laws, and (ii) the quorum is not present within thirty minutes from the time appointed for the meeting solely because of the absence of an Executive Director, the meeting shall be adjourned and

8

reconvened on the second (2nd) business day after such adjournment at the same time and place (or to such other time or such other place as the other directors may determine with notice thereof delivered to the Co-CEOs or Co-Chairmen at least three (3) business days prior to such adjourned meeting), and, if at such adjourned meeting quorum is not present within thirty minutes from the time appointed for the meeting solely because of the absence of an Executive Director, then the separate requirement that an Executive Director be present for a quorum of the Board of Directors to be established shall not apply to such adjourned meeting solely for purposes of establishing a quorum. The foregoing quorum requirements and adjournment procedures shall not apply to any meeting of the Board of Directors for which, in the good faith opinion of the directors (other than the Executive Directors), there is a willful or unreasonable failure on the part of the Executive Directors to attend a meeting of the Board of Directors for the purpose of preventing the transaction of business at such meeting, and in such event, the majority of the directors in office shall constitute a quorum of the Board of Directors for such meeting. A quorum must be present at a meeting of the Board of Directors (whether in person or by telephone, videoconference or otherwise) to conduct business. A quorum must exist at all times during any meeting of the Board of Directors, including the reconvening of a meeting previously adjourned, in order for any action taken at such meeting to be valid. The foregoing quorum requirements set forth in this Section 6 of Article III shall terminate and no longer be valid if there are no Executive Directors on the Board of Directors, in which case, a majority of the directors in office shall constitute a quorum of the Board of Directors.

Other than with respect to decisions set forth in Section 2.3 of the Stockholders' Agreement prior to termination thereof in accordance with its terms, the vote of a majority of directors present at a meeting at which a quorum is present shall be the act of the Board of Directors. Each director shall be entitled to one (1) vote.

Section 7.        Resignations and Removals of Directors. Any director of the Corporation may resign at any time, by giving notice in writing or by electronic transmission to any Chairman, any CEO or the Secretary. Such resignation shall take effect at the time therein specified or, if no time is specified, immediately; and, unless otherwise specified in such notice, the acceptance of such resignation shall not be necessary to make it effective. Except as otherwise required by applicable law or provided in the Stockholders' Agreement until termination thereof in accordance with it terms, any or all of the directors (except for an Executive Director) may be removed from office at any time, with cause, and at any annual meeting, with or without cause, by the affirmative vote of the holders of a majority of the shares issued and outstanding then entitled to vote at an election of directors.

Section 8.        Actions of the Board by Written Consent. Unless otherwise provided in the Certificate of Incorporation or these By-Laws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all of the voting members of the Board of Directors or committee, as the case may be, unanimously consent to such action in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filed with the minutes of

9

proceedings of the Board of Directors or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 9. <u>Meetings by Means of Conference Telephone</u>. Unless otherwise provided in the Certificate of Incorporation or these By-Laws, members of the Board of Directors of the Corporation, or any committee thereof, may participate in a meeting of the Board of Directors or such committee by means of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 9 of Article III shall constitute presence in person at such meeting.

Section 10. <u>Lead Director</u>. The Board of Directors shall designate the Lead Director as provided in the Stockholders' Agreement until termination thereof in accordance with its terms and thereafter shall be an individual designated by a majority of the Board of Directors who is neither a Chairman nor CEO of the Corporation. The Lead Director shall (i) in the absence or disability of both the Chairman (or, if applicable, the Co-Chairmen) and the CEO (or, if applicable, the Co-CEOs), preside at all meetings of the stockholders and the Board of Directors, as the case may be; (ii) preside at all executive sessions, if any, of the non-management directors; (iii) determine the frequency and timing of executive sessions, if any, of the non-management directors and report to the Chairman (or, if applicable, the Co-Chairmen) and the CEO (or, if applicable, the Co-CEOs) on all relevant matters arising from those sessions, and shall invite the Chairman (or, if applicable, the Co-Chairmen) and the CEO (or, if applicable, the Co-CEOs) to join the executive session for further discussion as appropriate; (iv) consult with the Chairman (or, if applicable, the Co-Chairmen), the CEO (or, if applicable, the Co-CEOs) or committee chairs regarding the topics and schedules of the meetings of the Board of Directors and committees, as the case may be, and may supplement such topics and schedules, after prior consultation with, as applicable, the Chairman (or, if applicable, the Co-Chairmen), the CEO (or, if applicable, the Co-CEOs) or committee chairs; (v) review, comment on and, after prior consultation with, as applicable, the Chairman (or, if applicable, the Co-Chairmen), the CEO (or, if applicable, the Co-CEOs) or committee chairs, supplement all Board of Directors and committee meeting agendas and provide meaningful input to management on the agenda and scope and quality of information sent to the Board of Directors; (vi) act as liaison between the Chairman (or, if applicable, the Co-Chairmen) and the non-management directors; (vii) coordinate the Board of Director's (A) annual performance review of the CEO (or, if applicable, the Co-CEOs) and (B) annual self-assessment and evaluation process, if any; (viii) monitor information provided to the Board of Directors by the Corporation's senior management; and (ix) serve as the point of contact for stockholders to communicate with the Board of Directors and the Chairman (or, if applicable, the Co-Chairmen).

Section 11. <u>Committees</u>.

-Active.12130753.8

(a)     The Board of Directors shall designate one or more committees, including an audit committee, a compensation committee and a greenlight committee.  The Board may also establish an executive committee.  Each committee shall consist of one or more of the directors of the Corporation; provided, that both of the Executive Directors (and, if there be only one Executive Director, the Executive Director) shall be appointed to serve on any executive committee and the greenlight committee, and one (1) of the Executive Directors (such individual to be determined by the Executive Directors) shall be appointed to serve on each other committee, with the exception of the audit committee (which shall, among other things, be required to recommend approval of the transactions referred to in Section 2.3(a)(8) of the Stockholders' Agreement) and the compensation committee (which shall, among other things, be required to recommend approval of the transactions referred to in Sections 2.3(a)(5) and 2.3(a)(7) of the Stockholders' Agreement).  Neither the audit committee nor the compensation committee shall include the Executive Directors.  The foregoing right of the Executive Directors to serve on a committee of the Board of Directors shall terminate if both of the Executive Directors cease to serve as directors of the Corporation.

(b)     The Board of Directors shall establish a greenlight committee (the "Greenlight Committee"), which shall be comprised of (i) both of the Executive Directors (and, if there be only one Executive Director, the Executive Director) and (ii) the heads of each of the motion picture, television and digital media (which may include interactive gaming and digital entertainment) departments, if such department heads report directly to the Co-CEOs and, in each case, upon such department head's employment by the Corporation (each such department head being referred to herein as a "Department Head Committee Member").  The Department Head Committee Members and any additional members of senior management designated by the Co-CEOs to attend meetings of the Greenlight Committee shall serve in an advisory capacity only, and such members shall not have the right to vote on any decisions of the Greenlight Committee.

(c)     The Greenlight Committee shall be the sole decision-making authority of the Corporation where any decision to (i) acquire a motion picture, television program or other audiovisual program of any kind or nature (which shall include interactive games, digital entertainment and all ancillary rights) or any rights thereto (and determine the acquisition cost therefor), (ii) proceed to production (or co-production) of a motion picture, television program or other audiovisual program (and determine the production budget therefor), or (iii) finance or co-finance any of the foregoing, is made (such decision, a "Greenlight"), in each case, subject only to Section 2.3(a)(1) of the Stockholders' Agreement until termination thereof in accordance with its terms with respect to motion pictures, the Annual Budget and the guidelines of the Greenlight Committee (as more fully described in Exhibit A thereto).

(d)     The Greenlight Committee shall also exclusively determine the amount of print and advertising costs and expenses ("P&A") to be spent on each motion picture and review all P&A budgets (each a "P&A Budget") for each motion picture, subject only to Section 2.3(a)(3) of the Stockholders' Agreement until termination thereof in accordance with its terms and the Annual Budget.  Similarly, initial marketing expenditures to be paid by the Corporation

11

in connection with the launch of a television program or other audiovisual program shall be determined exclusively by the Greenlight Committee.

(e) A low case performance model, medium case performance model and high case performance model shall be prepared for each motion picture, television program and other audiovisual program, as applicable, and a low case, medium case and high case P&A Budget (if applicable) and marketing and media plan tied to each performance model shall be prepared for each such motion picture or other program (collectively, the "Greenlight Models"). The applicable Greenlight Models shall be prepared in connection with each such program greenlit by the Greenlight Committee and presented to the Greenlight Committee.

(f) Upon the Board of Directors' request, the Greenlight Committee will provide a Greenlight Package (as defined in Exhibit A to the Stockholders' Agreement) and the Greenlight Models to the Board of Directors for informational purposes (it being understood and agreed that a Greenlight Package shall not be a condition to any such Greenlight decision). Minutes of each Greenlight Committee meeting shall be maintained by a designated member of the Greenlight Committee (or other individual designated by the Co-CEOs (or, if there be one CEO, the CEO)).

(g) Notwithstanding anything to the contrary contained herein, in the event that so-called "hot properties" projects owned or controlled by third parties should require Greenlight decisions to be made within an expedited timeframe, which the Co-CEOs (or, if there be one CEO, the CEO) reasonably determine in good faith does not allow for customary Greenlight Committee procedures ("Exigent Circumstances"), the Co-CEOs shall have the authority to make the Greenlight decision with respect thereto without a formal Greenlight Committee meeting and without preparing a Greenlight Package or Greenlight Models; provided, that (a) a Greenlight Package and Greenlight Models will be prepared following such Greenlight decision and presented to the Greenlight Committee at such time (and thereafter provided to the Board of Directors for informational purposes upon request) and (b) the authority of the Co-CEOs to Greenlight under Exigent Circumstances is subject to any applicable provision in Section 2.3 of the Stockholders' Agreement until termination thereof in accordance with its terms and the approved Annual Budget.

(h) The Greenlight Committee and the provisions set forth in paragraphs (c) through (h) hereof may be terminated or amended by the Board of Directors if both of the Executive Directors cease to serve as directors of the Corporation.

(i) Except as otherwise required by the Stockholders' Agreement until termination thereof in accordance with its terms, the Board of Directors may designate one or more directors as alternate members of any committee (other than the Greenlight Committee), who may replace any absent or disqualified member at any meeting of any such committee. Each committee shall keep regular minutes and report to the Board of Directors when required.

Section 12.    Compensation.  The Board of Directors shall have the authority to fix the compensation of directors.  The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a reasonable fixed sum for attendance at each meeting of the Board of Directors or a reasonable stated salary for service as director, payable in cash or securities.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor; provided, that any employee of the Corporation who also serves as a director shall not be entitled to compensation for such services, but shall be entitled to reimbursement for reasonable out-of-pocket expenses incurred in connection with such service.  Members of special or standing committees may be allowed like compensation for service as committee members.

Section 13.    Interested Directors.  No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board of Directors or committee thereof which authorizes the contract or transaction, or solely because any such director's or officer's vote is counted for such purpose if: (i) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board of Directors or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or (ii) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board of Directors, a committee thereof or the stockholders.  Interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee which authorizes the contract or transaction.

ARTICLE IV

OFFICERS

Section 1.    General.  The officers of the Corporation shall be chosen by a majority of the Board of Directors and shall consist of the Co-CEOs (or, if there be one CEO, the CEO), president, chief operating officer, chief financial officer, vice presidents, secretary and such other officers and assistant officers as may be deemed necessary or desirable by the Board of Directors.  Any number of offices may be held by the same person, unless otherwise prohibited by law, the Certificate of Incorporation or these By-Laws.  The officers of the Corporation need not be stockholders of the Corporation or directors of the Corporation.  In its

13

discretion, the Board of Directors may choose not to fill any office for any period as it may deem advisable.

Section 2.    Election, Removal, Resignation and Compensation.  The Board of Directors, at its first meeting held after each Annual Meeting (or action by written consent of stockholders in lieu of the Annual Meeting), shall elect the officers of the Corporation who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors; and each officer of the Corporation shall hold office until such officer's successor is elected and qualified, or until such officer's earlier death, resignation or removal.  Any officer elected by the Board of Directors may be removed at any time by the Board of Directors or a Co-CEO (or, if there be one CEO, the CEO).  Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors.  The salaries of all officers of the Corporation shall be fixed by the Board of Directors.

Section 3.    Voting Securities Owned by the Corporation.  Powers of attorney, proxies, waivers of notice of meeting, consents and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by any of the Co-CEOs (or, if there be one CEO, the CEO) or any other officer authorized to do so by the Board of Directors and any such officer may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities and at any such meeting shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed if present.  The Board of Directors may, by resolution, from time to time confer like powers upon any other person or persons.

Section 4.    Chairman of the Board of Directors.  The Board of Directors shall designate the Chairman (or, if applicable, Co-Chairmen) as provided in the Stockholders' Agreement until termination thereof in accordance with its terms.  The Chairman (or, if applicable, the Co-Chairmen) of the Board of Directors shall preside at all meetings of the stockholders and of the Board of Directors.  In the absence or disability of the Chairman (or, if applicable, the Co-Chairmen), the CEO (or, if applicable, the Co-CEOs) and the Lead Director, an individual designated by a majority of the Board of Directors shall preside.  In the case of a Chairman (or, if applicable, the Co-Chairmen) of the Board, except where by law the signature of the CEO is required, the Chairman (or, if applicable, the Co-Chairmen) of the Board of Directors shall possess the same power as a CEO to sign all contracts, certificates and other instruments of the Corporation which may be authorized by the Board of Directors.  During the absence or disability of the CEO (or, if applicable, the Co-CEOs), the Chairman (or, if applicable, the Co-Chairmen) of the Board of Directors shall exercise all the powers and discharge all the duties of the CEO (or, if applicable, the Co-CEOs).  The Chairman (or, if applicable, the Co-Chairmen) of the Board of Directors shall also perform such other duties and may exercise such other powers as may from time to time be assigned by these By-Laws or by the Board of Directors.

-Active.12130753.8

Section 5.    Chief Executive Officer.  The Board of Directors may designate a Chief Executive Officer (or, if applicable, the Co-CEOs).  The CEO (or, if applicable, the Co-CEOs) shall have general responsibility for implementation of the policies of the Corporation, as determined by the Board of Directors, and for the management of the business and affairs of the Corporation.  The CEO (or, if applicable, the Co-CEOs) shall have the power to execute all bonds, mortgages, contracts and other instruments of the Corporation requiring a seal, under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except that the other officers of the Corporation may sign and execute documents when so authorized by these By-Laws, the Board of Directors or the CEO (or, if applicable, the Co-CEOs).  In the absence or disability of the Chairman (or, if applicable, the Co-Chairmen) of the Board of Directors, the CEO (or, if applicable, the Co-CEOs) shall preside at all meetings of the stockholders and, provided such CEO is also a director, the Board of Directors.  The CEO (or, if applicable, the Co-CEOs) shall also perform such other duties and may exercise such other powers as may from time to time be assigned to such officer by these By-Laws or by the Board of Directors.

Section 6.    Presidents.  The president (or, if there be more than one, the presidents) of the Corporation shall, under the direction of the CEO (or, if applicable, the Co-CEOs), be responsible for certain specified business, affairs and property of the Corporation as determined by the CEO (or, if applicable, the Co-CEOs), and control over the officers, agents and employees in their respective departments and shall see that all orders and resolutions of the Board of Directors are carried into effect.  The president (or, if applicable, the co-presidents) of the Corporation shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the CEO (or, if applicable, the Co-CEOs) or as may be provided in these By-Laws.

Section 7.    Chief Operating Officer.  The chief operating officer of the Corporation shall, under the direction of the CEO (or, if applicable, the Co-CEOs), be responsible for the general supervision of the management and control of the operations of the Corporation.  The chief operating officer of the Corporation shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the CEOs (or, if applicable, the Co-CEOs) or as may be provided in these By-Laws.

Section 8.    Chief Financial Officer.  The chief financial officer of the Corporation shall, under the direction of the CEO (or, if applicable, the Co-CEOs), be responsible for all financial and accounting matters and for the direction of the officers of treasurer and controller.  The chief financial officer of the Corporation shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the CEO (or, if applicable, the Co-CEOs) or as may be provided in these By-Laws.

Section 9.    Vice Presidents.  The vice-president (or if there is more than one, the co-vice presidents) of the Corporation in the order determined by the Board of Directors or by the CEO (or, if applicable, the Co-CEOs), shall, in the absence or disability of the president

-Active.12130753.8

(or, if applicable, the co-presidents), act with all of the powers and be subject to all the restrictions of the president. The vice-presidents (or, if applicable, the co-vice presidents) of the Corporation shall have such other powers and perform such other duties as the Board of Directors, the CEO (or, if applicable, the Co-CEOs), the president (or, if applicable, the co-presidents) or these By-Laws may, from time to time, prescribe.

Section 10. <u>Secretary</u>. The Secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings thereat in a book or books to be kept for that purpose; the Secretary shall also perform like duties for committees of the Board of Directors when required. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and regular and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors, the Chairman (or, if applicable, the Co-Chairmen) of the Board of Directors or the CEO (or, if applicable, the Co-CEOs), under whose supervision the Secretary shall be. If the Secretary shall be unable or shall refuse to cause to be given notice of all meetings of the stockholders and special meetings of the Board of Directors, and if there be no assistant secretary, then the Board of Directors or the CEO (or, if applicable, the Co-CEOs) may choose another officer to cause such notice to be given. The Secretary shall have custody of the seal of the Corporation and the Secretary or any assistant secretary, if there be one, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by the signature of the Secretary or by the signature of any such assistant secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest to the affixing by such officer's signature. The Secretary shall see that all books, reports, statements, certificates and other documents and records required by law to be kept or filed are properly kept or filed, as the case may be.

Section 11. <u>Assistant Secretaries</u>. Assistant secretaries, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the CEO (or, if applicable, the Co-CEOs), any vice president of the Corporation, if there be one, or the Secretary, and in the absence of the Secretary or in the event of the Secretary's inability or refusal to act, shall perform the duties of the Secretary, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Secretary.

Section 12. <u>Assistant Treasurers</u>. Assistant treasurers, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the CEO (or, if applicable, the Co-CEOs), any vice president, if there be one, or the chief financial officer, and in the absence of the chief financial officer or in the event of the chief financial officer's inability or refusal to act, shall perform the duties of the chief financial officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the chief financial officer. If required by the Board of Directors, an assistant treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of the office of assistant treasurer and for the restoration to the Corporation, in case of the assistant treasurer's

death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the assistant treasurer's possession or under the assistant treasurer's control belonging to the Corporation.

Section 13.    Other Officers.  Such other officers as the Board of Directors may choose shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors or the CEO (or, if applicable, the Co-CEOs), under whose supervision they shall be.  The Board of Directors may delegate to any other officer of the Corporation the power to choose such other officers and to prescribe their respective duties and powers.  Notwithstanding the foregoing, all officers of the Corporation shall be under the direct or indirect supervision of and report to the CEO (or, if applicable, the Co-CEOs).

ARTICLE V

STOCK

Section 1.    Form.  Except as otherwise provided in the resolution by the Board of Directors, all shares of capital stock of the Corporation shall be uncertificated.   In the event the Board of Directors elects to provide in a resolution that certificates shall be issued to represent any shares of capital stock of the Corporation, such certificates shall signed by, or in the name of the Corporation by (i) a Chairman of the Board of Directors or a president and (ii) by a treasurer or a secretary or an assistant treasurer or assistant secretary of the Corporation, certifying the number of shares of a specific class or series owned by such holder in the Corporation.  If such a certificate is countersigned (1) by a transfer agent or an assistant transfer agent other than the Corporation or its employee or (2) by a registrar, other than the Corporation or its employee, the signature of any such Chairman of the Board of Directors, president, treasurer, secretary, assistant treasurer or assistant secretary may be facsimiles.  In case any officer or officers who have signed, or whose facsimile signature or signatures have been used on, any such certificate or certificates shall cease to be such officer or officers of the corporation whether because of death, resignation or otherwise before such certificate or certificates have been delivered by the corporation, such certificate or certificates may nevertheless be issued and delivered as though the person or persons who signed such certificate or certificates or whose facsimile signature or signatures have been used thereon had not ceased to be such officer or officers of the corporation.  If the shares are certificated, all certificates shall be consecutively numbered or otherwise identified.  The name of the person to whom the shares represented thereby are issued, with the number of shares and date of issue, shall be entered on the books of the Corporation.  Any shares of certificated stock of the Corporation shall only be transferred on the books of the Corporation by the holder of record thereof or by such holder's attorney duly authorized in writing, upon surrender to the Corporation of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization, and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps.  In that event, it shall be the

17

duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate or certificates, and record the transaction on its books. Uncertificated shares of stock of the Corporation may be transferred on the books of the Corporation upon receipt of proper transfer instructions from the registered owner of the uncertificated shares, an instruction from a source duly authorized by such owner or from an attorney lawfully constituted by such owner. The Board of Directors may appoint a bank or trust company organized under the laws of the United States or any state thereof to act as its transfer agent or registrar, or both in connection with the transfer of any class or series of securities of the Corporation.

           Section 2.        <u>Lost Certificates</u>. The Board of Directors may direct a new certificate to be issued in place of any certificate theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new certificate, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate, or such owner's legal representative, to advertise the same in such manner as the Board of Directors shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate or the issuance of such new certificate.

           Section 3.        <u>Transfers</u>. Stock of the Corporation shall be transferable in the manner prescribed by applicable law and in the Certificate of Incorporation and these By-Laws and in accordance with the provisions set forth in the Stockholders' Agreement until termination thereof in accordance with its terms. Transfers of stock shall be made on the books of the Corporation only by the person named in the certificate or by such person's attorney lawfully constituted in writing and upon the surrender of the certificate therefor, properly endorsed for transfer and payment of all necessary transfer taxes; provided, however, that such surrender and endorsement or payment of taxes shall not be required in any case in which the officers of the Corporation shall determine to waive such requirement. Every certificate exchanged, returned or surrendered to the Corporation shall be marked "Cancelled," with the date of cancellation, by the Secretary or an assistant secretary of the Corporation or the transfer agent thereof. No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred.

           Section 4.        <u>Dividend Record Date</u>. In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or (subject to Section 12 of Article II hereof) for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, subject to Section 12 of Article II hereof, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

18

Section 5.    Record Owners.  The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise required by law.

Section 6.    Transfer and Registry Agents.  The Corporation may from time to time maintain one or more transfer offices or agencies and registry offices or agencies at such place or places as may be determined from time to time by the Board of Directors.

Section 7.    Copies of Restrictions.  Pursuant to Section 202 of the DGCL, there shall be conspicuously set forth on the face or back of the certificate that the Corporation shall issue to represent any shares of capital stock, a statement to the effect that the Corporation will furnish without charge to each stockholder who so requests a copy of the relevant restrictions on such shares.  Within a reasonable time after the issuance or transfer of shares of uncertificated stock, if any, the Corporation shall send to the registered owner thereof a written notice containing the information required to be set forth or stated on certificates pursuant to Sections 151, 156, 202(a) or 218(a) of the DGCL or a statement to the effect that the Corporation will furnish without charge to each stockholder who so requests a copy of the relevant restrictions on such shares.

ARTICLE VI

NOTICES

Section 1.    Notices.  Whenever written notice is required by law, the Certificate of Incorporation or these By-Laws, to be given to any director, member of a committee or stockholder, such notice may be given by mail, addressed to such director, member of a committee or stockholder, at such person's address as it appears on the records of the Corporation, with postage thereon prepaid, and such notice shall be deemed to be given when delivered to such person's address as it appears on the records of the Corporation.  Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under applicable law, the Certificate of Incorporation or these By-Laws shall be effective if given by a form of electronic transmission if consented to by the stockholder to whom the notice is given.  Any such consent shall be revocable by the stockholder by written notice to the Corporation.  Any such consent shall be deemed to be revoked if (i) the Corporation is unable to deliver by electronic transmission two (2) consecutive notices by the Corporation in accordance with such consent and (ii) such inability becomes known to the Secretary or assistant secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice; provided, however, that the

inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action. Notice given by electronic transmission, as described above, shall be deemed given: (i) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice; (ii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (iii) if by a posting on an electronic network, together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and (iv) if by any other form of electronic transmission, when directed to the stockholder. Notice to directors or committee members may be given personally or by telegram, telex, cable or by means of electronic transmission and in such cases shall be effective only upon receipt.

Section 2.        Waivers of Notice.  Whenever any notice is required by applicable law, the Certificate of Incorporation or these By-Laws, to be given to any director, member of a committee or stockholder, a waiver thereof in writing, signed by the person or persons entitled to notice, or a waiver by electronic transmission by the person or persons entitled to notice, whether before or after the time stated therein, shall be deemed equivalent thereto.  Attendance of a person at a meeting, present in person or represented by proxy, shall constitute a waiver of notice of such meeting, except where the person attends the meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any Annual or Special Meeting of stockholders or any regular or special meeting of the directors or members of a committee of directors need be specified in any written waiver of notice unless so required by law, the Certificate of Incorporation or these By-Laws.

ARTICLE VII

GENERAL PROVISIONS

Section 1.        Dividends.  Dividends upon the capital stock of the Corporation, subject to the requirements of the DGCL and the provisions of the Certificate of Incorporation, if any, may (where permitted by the Certificate of Incorporation) and shall (where required by the Certificate of Incorporation) be declared by the Board of Directors at any regular or special meeting of the Board of Directors (or any action by written consent in lieu thereof in accordance with Section 8 of Article III hereof), and may be paid in cash, in property or in shares of the Corporation's capital stock.  Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, deems proper as a reserve or reserves to meet contingencies, or for purchasing any of the shares of capital stock, warrants, rights, options, bonds, debentures, notes, scrip or other securities or evidences of indebtedness of the Corporation, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for any proper purpose, and the Board of Directors may modify or abolish any

20

such reserve.

Section 2.  <u>Disbursements</u>.  All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

Section 3.  <u>Fiscal Year</u>.  The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

Section 4.  <u>Corporate Seal</u>.  The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

# ARTICLE VIII

## INDEMNIFICATION

Section 1.  <u>Power to Indemnify in Actions, Suits or Proceedings other than Those by or in the Right of the Corporation</u>.  Subject to Section 3 of this Article VIII, the Corporation shall indemnify, in the manner and to the fullest extent permitted by the DGCL (but in the case of any amendment thereto, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior thereto) and, without limiting the foregoing, as required pursuant to any indemnity agreements of the Corporation or any of its Subsidiaries, any person (or the estate of any person) who is or was a party to, or is threatened to be made a party to, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative or otherwise (other than an action by or in the right of the Corporation), by reason of the fact that such person is or was a director or officer of the Corporation or any of its Subsidiaries (in and to the extent of their capacities as such, and not as stockholders and/or optionholders of the Corporation or its Subsidiaries), or is or was serving at the request of the Corporation or any of its Subsidiaries as a director or officer of another corporation, partnership, joint venture, trust or other enterprise against any costs or expenses (including attorneys' fees and expenses), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation and/or its Subsidiaries, as the case may be, and with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful.  The Corporation may indemnify, in the manner and to the fullest extent permitted by the DGCL (but in the case of any amendment thereto, only to the extent that such amendment permits the Corporation to provide

21

broader indemnification rights than permitted prior thereto), any person (or the estate of any person) who is or was a party to, or is threatened to be made a party to, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative or otherwise (other than by or in the right of the Corporation), by reason of the fact that such person is or was an employee or agent of the Corporation, or is or was serving at the request of the Corporation or any of its Subsidiaries as an employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any costs or expenses (including attorneys' fees and expenses), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, that such person had reasonable cause to believe that such person's conduct was unlawful.  To the fullest extent permitted by the DGCL, reasonable and documented costs and expenses (including attorneys' fees), judgments or fines incurred by and amounts paid in settlement by any such director, officer, employee or agent in defending any such action, suit or proceeding, shall (with respect to officers and directors) and may (with respect to other persons) be advanced by the Corporation as incurred prior to the final disposition of such action, suit or proceeding (with advances requested by any such director, officer, employee or agent to be made available by the Corporation promptly after receipt by the Corporation of a written request for such advance); provided, that such director, officer, employee or agent undertakes to repay such advances if it shall ultimately be determined that he or she is not entitled to be indemnified as authorized by the DGCL and this Article VIII.

Section 2. Power to Indemnify in Actions, Suits or Proceedings by or in the Right of the Corporation.  Subject to Section 3 of this Article VIII, the Corporation shall indemnify, in the manner and to the fullest extent permitted by the DGCL (but in the case of any amendment thereto, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior thereto) and, without limiting the foregoing, as requested pursuant to any indemnity agreements of the Corporation or any of its Subsidiaries, any person (or the estate of any person) who is or was a party to, or is threatened to be made a party to, any threatened, pending or completed action, suit or proceeding, by or in the right of the Corporation to procure a judgment in its favor, by reason of the fact that such person is or was a director or officer of the Corporation or of any of its Subsidiaries (in and to the extent of their capacities as such, and not as stockholders and/or option-holders of the Corporation or its Subsidiaries), or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise against any costs or expenses (including attorneys' fees and expenses) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best

interest of the Corporation and/or its Subsidiaries, as the case may be. The Corporation may indemnify, in the manner and to the fullest extent permitted by the DGCL (but in the case of any amendment thereto, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior thereto), any person (or the estate of any person) who is or was a party to, or is threatened to be made a party to, any threatened, pending or completed action, suit or proceeding, by or in the right of the Corporation to procure a judgment in its favor, by reason of the fact that such person is or was an employee or agent of the Corporation, or is or was serving at the request of the Corporation as an employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any costs or expenses (including attorneys' fees and expenses) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interest of the Corporation. Notwithstanding anything to the contrary in this Article VIII, Section 2, no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of such person's duty to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper. To the fullest extent permitted by the DGCL, reasonable and documented costs and expenses (including attorneys' fees), judgments or fines incurred by and amounts paid in settlement by any such director, officer, employee or agent in defending any such action, suit or proceeding shall (with respect to officers and directors) and may (with respect to other persons) be advanced by the Corporation as incurred prior to the final disposition of such action, suit or proceeding (with advances requested by any such director, officer, employee or agent to be made available by the Corporation promptly after receipt by the Corporation of a written request for such advance); provided, that such director, officer, employee or agent undertakes to repay such advances if it shall ultimately be determined that he or she is not entitled to be indemnified as authorized by the DGCL and this Article VIII.

Section 3. <u>Authorization of Indemnification</u>. Any indemnification under this Article VIII (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the present or former director or officer or the present or former employee or agent (if indemnification is authorized by the Board of Directors), is proper in the circumstances because such person has met the applicable standard of conduct set forth in Section 1 or Section 2 of this Article VIII, as the case may be. Such determination shall be made (i) by the Board of Directors by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (ii) by a committee of such directors designated by a majority vote of such directors, even though less than a quorum, or (iii) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (iv) by the stockholders.

Section 4. <u>Good Faith Defined</u>. For purposes of any determination under

23

Section 3 of this Article VIII, a person shall be deemed to have acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, or, with respect to any criminal action or proceeding, to have had no reasonable cause to believe such person's conduct was unlawful, if such person's action is based on the records or books of account of the Corporation or another enterprise, or on information supplied to such person by the officers of the Corporation or another enterprise in the course of their duties, or on the advice of legal counsel for the Corporation or another enterprise or on information or records given or reports made to the Corporation or another enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Corporation or another enterprise. The provisions of this Section 4 shall not be deemed to be exclusive or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct set forth in Section 1 or Section 2 of this Article VIII, as the case may be.

Section 5. _Indemnification Against Expenses of Successful Party_. Notwithstanding the other provisions of this Article VIII, to the extent that a director or officer, or an employee or agent (if indemnification is authorized by the Board of Directors) of the Corporation or any of its Subsidiaries, or any person that is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 1 or Section 2 of this Article VIII, as the case may be, or in defense of any claim, issue or matter therein, such person shall be indemnified against costs and expenses (including attorneys' fees and expenses) actually and reasonably incurred by such person in connection therewith.

Section 6. _Indemnification by a Court_. Notwithstanding any contrary determination in the specific case under Section 3 of this Article VIII, and notwithstanding the absence of any determination thereunder, any director, officer, employee or agent, or any person that is or was serving at the request of the Corporation or any of its Subsidiaries as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction in the State of Delaware for indemnification to the extent otherwise permissible under Section 1 or Section 2 of this Article VIII. The basis of such indemnification by a court shall be a determination by such court that indemnification of such director, officer, employee, agent or other person is proper in the circumstances because such person has met the applicable standard of conduct set forth in Section 1 or Section 2 of this Article VIII, as the case may be. Neither a contrary determination in the specific case under Section 3 of this Article VIII nor the absence of any determination thereunder shall be a defense to such application or create a presumption that the director, officer, employee, agent or such other person seeking indemnification has not met any applicable standard of conduct. Notice of any application for indemnification pursuant to this Section 6 shall be given to the Corporation promptly upon the filing of such application. If successful, in whole or in part, the director, officer, employee, agent or such other person seeking indemnification shall also be entitled to be paid the expense of prosecuting such application.

-Active.12130753.8

Section 7.        Nonexclusivity of Indemnification and Advancement of Expenses.  The indemnification and advancement of expenses provided by, or granted pursuant to, this Article VIII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the Certificate of Incorporation, these By-Laws, any agreement, any vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person, it being the policy of the Corporation that indemnification of the persons specified in Section 1 and Section 2 of this Article VIII shall be made to the fullest extent permitted by law.  The provisions of this Article VIII shall not be deemed to preclude the indemnification of any person who is not specified in Section 1 or Section 2 of this Article VIII but whom the Corporation has the power or obligation to indemnify under the provisions of the DGCL, or otherwise.

Section 8.        Insurance.  Upon resolution passed by the Board of Directors, the Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation or any of its Subsidiaries as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power or the obligation to indemnify such person against such liability under the provisions of this Article VIII.

Section 9.        Certain Definitions.  For purposes of this Article VIII, references to "the Corporation" shall include, in addition to the resulting or surviving corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors or officers, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article VIII with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.  The term "other enterprise" as used in this Article VIII shall mean any other corporation or any partnership, joint venture, trust, employee benefit plan or other enterprise of which such person is or was serving at the request of the Corporation as a director, officer, employee or agent.  For purposes of this Article VIII, references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the Corporation" shall include any service as a director or officer, or any employee or agent of the Corporation (if indemnification is authorized by the Board of Directors) which imposes duties on, or involves services by, such director or officer, or employee or agent (if indemnification is authorized by the Board of Directors) with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and

25

in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Article VIII.  For purposes of this Section 9 of Article VIII, the term "include" shall be deemed to be followed by "but shall not be limited to".

Section 10.        Continuing Obligation.  Any amendment, repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of a director, officer, employee or agent, or any person that is or was serving at the request of the Corporation or any of its Subsidiaries as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, existing at the time of, or increase the liability of any director, officer, employee or agent of the Corporation, or such other person, with respect to any acts or omissions of such director, officer, employee, agent or such other person occurring prior to, such amendment, repeal or modification.

## ARTICLE IX

## AMENDMENTS

Section 1.        Amendments.  These By-Laws may be altered, amended or repealed, in whole or in part, or new By-Laws may be adopted by the stockholders or by the Board of Directors; provided that amendments to or a repeal of any provision of these By-Laws shall not be taken by the Board of Directors without first obtaining the approval of at least 66 2/3% of the Board of Directors at a duly called meeting of the Board of Directors at which a quorum is, subject to Section 2.3(c) of Article III, present (or by unanimous written consent of the Board of Directors in lieu of a meeting); provided, further, that these By-Laws may be amended only by a written instrument signed by (a) the Corporation and (b) Stockholders beneficially owning at least 66 2/3% of the then issued and outstanding shares of capital stock; provided, however, that for so long as the Spyglass Stockholders and their Affiliates own at least fifty percent (50%) of the issued and outstanding capital stock held by the Spyglass Stockholders on the Effective Date (as appropriately adjusted for share splits and similar events), the consent of the holders of a majority of the issued and outstanding capital stock held by the Spyglass Stockholders shall be required for any amendment to these By-Laws that disproportionately adversely affects the rights or obligations of the Spyglass Stockholders relative to the Original Stockholders (determined solely with regards to rights under the Stockholders' Agreement until termination thereof in accordance with its terms or these By-Laws and without regard to personal circumstances).

## ARTICLE X

26

## MISCELLANEOUS

Section 1.  <u>Inconsistent Provisions</u>.  In the event that any provision of these By-Laws conflicts with a provision in the Stockholders' Agreement prior to termination thereof in accordance with its terms, the provision in the Stockholders' Agreement shall govern.

Section 2.  <u>Capitalized Terms</u>. Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the Stockholders' Agreement.

* * *

Adopted as of: [_____], 2010

-Active.12130753.8

EXHIBIT H

CERTIFICATE OF INCORPORATION OF REORGANIZED HOLDINGS

**RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF**

**MGM HOLDINGS INC.**

MGM Holdings Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

1.    That the name of the Corporation is MGM Holdings Inc.

2.    That the original Certificate of Incorporation of the Corporation was filed in the office of the Secretary of State of the State of Delaware on the 11th day of February, 2005, and amended on the 29th day of August, 2007 (as amended, the "Original Certificate").

3.    That this Restated Certificate of Incorporation (this "Restated Certificate") amends and restates the Original Certificate.

4.    On [_____], 2010, the Corporation and certain of its affiliates, including the Corporation, filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Case No. [_____]). This Restated Certificate has been duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware (the "DGCL"), pursuant to the authority granted to the Corporation under Section 303 of the DGCL to put into effect and carry out the Joint Prepackaged Plan of Reorganization (the "Plan") pursuant to Chapter 11 of the Bankruptcy Code of Metro-Goldwyn-Mayer Studios Inc., *et al.*, as confirmed on [_____], 20[  ] by order (the "Order") of the Bankruptcy Court. Provision for the filing of this Restated Certificate of the Corporation, for the reorganized debtors is contained in the Plan as confirmed by the Order.

5.    This Restated Certificate has been duly executed and acknowledged by an officer of the Corporation in accordance with the provisions of the Order, Section 1142 of the Bankruptcy Code and Sections 242, 245 and 303 of the DGCL.

6.    That the text of the Original Certificate is hereby restated and amended in its entirety to read in full as follows:

FIRST:  The name of the Corporation is MGM Holdings Inc.

SECOND:  The address of the registered office of the Corporation in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, County of New Castle.  The name of its registered agent at such address is The Corporation Trust Company.

THIRD:  The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the DGCL as set forth in Title 8 of the Delaware Code,

FOURTH:  The total number of shares of capital stock which the Corporation shall have authority to issue is [•] shares of common stock, par value $[•] per share.

FIFTH:  The Corporation shall not issue any class of non-voting equity securities unless and solely to the extent permitted by Section 1123(a)(6) of the United States Bankruptcy Code (the "Bankruptcy Code") as in effect on the date of filing this Restated Certificate with the Secretary of State of the State of Delaware; provided, however, that this Article FIFTH (i) will have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code; (ii) will have such force and effect, if any, only for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation; and (iii) in all events may be amended or eliminated in accordance with applicable law from time to time in effect.

SIXTH:  Any action required to be taken, or which may be taken, at any annual or special meeting of stockholders of the Corporation may be taken by written consent of the stockholders in lieu of such meeting in accordance with the DGCL.

SEVENTH:  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.  The total number of directors constituting the entire Board of Directors shall be fixed according to that certain Stockholders Agreement, dated as of [●], among the Corporation and the stockholders named therein or bound thereby (as it may be amended from time to time, the "Stockholders Agreement"); provided, that the number of directors initially shall be nine (9) and shall consist of the nine (9) individuals (such individuals comprising the "Initial Board") determined pursuant to the Stockholders Agreement.  Each director on the Initial Board (and any directors elected to fill vacancies or newly created directorships following the Effective Date and prior to the annual meeting of stockholders of the Corporation to be held in 2012) shall serve until the annual meeting of stockholders of the Corporation to be held in 2012, subject to such director's earlier death, resignation or removal. Prior to the annual meeting of stockholders of the Corporation to be held in 2012, the removal of a director for any reason other than for cause may not be brought before any annual meeting of the stockholders of the Corporation without, and special meetings of stockholders of the Corporation for the purpose of considering the removal of a director for any reason other than for cause may be called by the Board of Directors only upon, the affirmative vote of all of the directors (other than the director to be removed) then in office or the written direction of the applicable Significant Stockholder in the case of removal of a Significant Stockholder Director

509265-1076-13498-Active.12135821

Designee as set forth in the Stockholders Agreement.  The Board of Directors may exercise all such authority and powers of the Corporation and do all such lawful acts and things as are not by statute or this Restated Certificate directed or required to be exercised or done by the stockholders.  Unless and except to the extent that the by-laws of the Corporation shall so require, the election of directors need not be by written ballot.

EIGHTH:  The Board of Directors shall have the power to adopt, amend, alter or repeal the by-laws of the Corporation, provided, that the by-laws may not be amended, altered or repealed or new by-laws adopted to the extent inconsistent with the Stockholders Agreement.  The fact that the power to adopt, amend, alter or repeal the by-laws has been conferred upon the Board of Directors shall not divest the stockholders of the powers to make new by-laws or amend, alter or repeal any by-laws adopted by them or otherwise, subject to the proviso in the preceding sentence.

NINTH:  To the fullest extent permitted by the DGCL as the same exists or may hereafter be amended (provided that the effect of any such amendment shall be prospective only), a director of the Corporation shall not be liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director.  If the DGCL is amended after the date of the filing of this Restated Certificate to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended from time to time.  Any repeal or modification of this Article NINTH by the stockholders of the Corporation shall be prospective only, and shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

TENTH:  The Corporation shall provide indemnification as follows:

1.        <u>Power to Indemnify in Actions, Suits or Proceedings Other than Those by or in the Right of the Corporation</u>.  Subject to Section 3 of this Article TENTH, the Corporation shall indemnify, in the manner and to the fullest extent permitted by the DGCL (but in the case of any amendment thereto, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior thereto) and, without limiting the foregoing, as required pursuant to any indemnity agreements of the Corporation or any of its Subsidiaries, any person (or the estate of any person) who is or was a party to, or is threatened to be made a party to, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative or otherwise (other than an action by or in the right of the Corporation), by reason of the fact that such person is or was a director or officer of the Corporation or any of its Subsidiaries (in and to the extent of their capacities as such, and not as stockholders and/or optionholders of the Corporation or its Subsidiaries), or is or was serving at the request of the Corporation or any of its Subsidiaries as a director or officer of another corporation, partnership, joint venture, trust or other enterprise against any costs or expenses (including attorneys' fees and expenses), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation and/or its Subsidiaries, as the case may be, and with respect to any criminal action or proceeding, had no reasonable cause to believe such

person's conduct was unlawful. The Corporation may indemnify, in the manner and to the fullest extent permitted by the DGCL (but in the case of any amendment thereto, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior thereto), any person (or the estate of any person) who is or was a party to, or is threatened to be made a party to, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative or otherwise (other than by or in the right of the Corporation), by reason of the fact that such person is or was an employee or agent of the Corporation, or is or was serving at the request of the Corporation or any of its Subsidiaries as an employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any costs or expenses (including attorneys' fees and expenses), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, that such person had reasonable cause to believe that such person's conduct was unlawful. To the fullest extent permitted by the DGCL, reasonable and documented costs and expenses (including attorneys' fees), judgments or fines incurred by and amounts paid in settlement by any such director, officer, employee or agent in defending any such action, suit or proceeding, shall (with respect to officers and directors) and may (with respect to other persons) be advanced by the Corporation as incurred prior to the final disposition of such action, suit or proceeding (with advances requested by any such director, officer, employee or agent to be made available by the Corporation promptly after receipt by the Corporation of a written request for such advance); provided, that such director, officer, employee or agent undertakes to repay such advances if it shall ultimately be determined that he or she is not entitled to be indemnified as authorized by the DGCL and this Article TENTH.

2. <u>Power to Indemnify in Actions, Suits or Proceedings by or in the Right of the Corporation</u>. Subject to Section 3 of this Article TENTH, the Corporation shall indemnify, in the manner and to the fullest extent permitted by the DGCL (but in the case of any amendment thereto, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior thereto) and, without limiting the foregoing, as requested pursuant to any indemnity agreements of the Corporation or any of its Subsidiaries, any person (or the estate of any person) who is or was a party to, or is threatened to be made a party to, any threatened, pending or completed action, suit or proceeding, by or in the right of the Corporation to procure a judgment in its favor, by reason of the fact that such person is or was a director or officer of the Corporation or of any of its Subsidiaries (in and to the extent of their capacities as such, and not as stockholders and/or option-holders of the Corporation or its Subsidiaries), or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise against any costs or expenses (including attorneys' fees and expenses) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interest of the Corporation and/or its Subsidiaries, as the case may be. The Corporation may

indemnify, in the manner and to the fullest extent permitted by the DGCL (but in the case of any amendment thereto, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than permitted prior thereto), any person (or the estate of any person) who is or was a party to, or is threatened to be made a party to, any threatened, pending or completed action, suit or proceeding, by or in the right of the Corporation to procure a judgment in its favor, by reason of the fact that such person is or was an employee or agent of the Corporation, or is or was serving at the request of the Corporation as an employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any costs or expenses (including attorneys' fees and expenses) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interest of the Corporation.  Notwithstanding anything to the contrary in this Article TENTH, Section 2, no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of such person's duty to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.  To the fullest extent permitted by the DGCL, reasonable and documented costs and expenses (including attorneys' fees), judgments or fines incurred by and amounts paid in settlement by any such director, officer, employee or agent in defending any such action, suit or proceeding shall (with respect to officers and directors) and may (with respect to other persons) be advanced by the Corporation as incurred prior to the final disposition of such action, suit or proceeding (with advances requested by any such director, officer, employee or agent to be made available by the Corporation promptly after receipt by the Corporation of a written request for such advance); provided, that such director, officer, employee or agent undertakes to repay such advances if it shall ultimately be determined that he or she is not entitled to be indemnified as authorized by the DGCL and this Article TENTH.

> 3.     <u>Authorization of Indemnification</u>.  Any indemnification under this Article TENTH (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the present or former director or officer or the present or former employee or agent (if indemnification is authorized by the Board of Directors), is proper in the circumstances because such person has met the applicable standard of conduct set forth in Section 1 or Section 2 of this Article TENTH, as the case may be.  Such determination shall be made (i) by the Board of Directors by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (ii) by a committee of such directors designated by a majority vote of such directors, even though less than a quorum, or (iii) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (iv) by the stockholders.

> 4.     <u>Good Faith Defined</u>.  For purposes of any determination under Section 3 of this Article TENTH, a person shall be deemed to have acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, or, with respect to any criminal action or proceeding, to have had no reasonable cause to believe such person's conduct was unlawful, if such person's action is based on the records or books of

account of the Corporation or another enterprise, or on information supplied to such person by the officers of the Corporation or another enterprise in the course of their duties, or on the advice of legal counsel for the Corporation or another enterprise or on information or records given or reports made to the Corporation or another enterprise by an independent certified public accountant or by an appraiser or other expert selected with reasonable care by the Corporation or another enterprise. The provisions of this Section 4 shall not be deemed to be exclusive or to limit in any way the circumstances in which a person may be deemed to have met the applicable standard of conduct set forth in Section 1 or Section 2 of this Article TENTH, as the case may be.

5.    Indemnification Against Expenses of Successful Party.  Notwithstanding the other provisions of this Article TENTH, to the extent that a director or officer, or an employee or agent (if indemnification is authorized by the Board of Directors) of the Corporation or any of its Subsidiaries, or any person that is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 1 or Section 2 of this Article TENTH, as the case may be, or in defense of any claim, issue or matter therein, such person shall be indemnified against costs and expenses (including attorneys' fees and expenses) actually and reasonably incurred by such person in connection therewith.

6.    Indemnification by a Court.  Notwithstanding any contrary determination in the specific case under Section 3 of this Article TENTH, and notwithstanding the absence of any determination thereunder, any director, officer, employee or agent, or any person that is or was serving at the request of the Corporation or any of its Subsidiaries as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction in the State of Delaware for indemnification to the extent otherwise permissible under Section 1 or Section 2 of this Article TENTH.  The basis of such indemnification by a court shall be a determination by such court that indemnification of such director, officer, employee, agent or other person is proper in the circumstances because such person has met the applicable standard of conduct set forth in Section 1 or Section 2 of this Article TENTH, as the case may be.  Neither a contrary determination in the specific case under Section 3 of this Article TENTH nor the absence of any determination thereunder shall be a defense to such application or create a presumption that the director, officer, employee, agent or such other person seeking indemnification has not met any applicable standard of conduct.  Notice of any application for indemnification pursuant to this Section 6 shall be given to the Corporation promptly upon the filing of such application.  If successful, in whole or in part, the director, officer, employee, agent or such other person seeking indemnification shall also be entitled to be paid the expense of prosecuting such application.

7.    Nonexclusivity of Indemnification and Advancement of Expenses.  The indemnification and advancement of expenses provided by, or granted pursuant to, this Article TENTH shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under this Restated Certificate, the by-laws, any agreement, any vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person, it being the policy

of the Corporation that indemnification of the persons specified in Section 1 and Section 2 of this Article TENTH shall be made to the fullest extent permitted by law. The provisions of this Article TENTH shall not be deemed to preclude the indemnification of any person who is not specified in Section 1 or Section 2 of this Article TENTH but whom the Corporation has the power or obligation to indemnify under the provisions of the DGCL, or otherwise.

8. <u>Insurance</u>. Upon resolution passed by the Board of Directors, the Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation or any of its Subsidiaries as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power or the obligation to indemnify such person against such liability under the provisions of this Article TENTH.

9. <u>Certain Definitions</u>. For purposes of this Article TENTH, references to "the Corporation" shall include, in addition to the resulting or surviving corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors or officers, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article TENTH with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued. The term "other enterprise" as used in this Article TENTH shall mean any other corporation or any partnership, joint venture, trust, employee benefit plan or other enterprise of which such person is or was serving at the request of the Corporation as a director, officer, employee or agent. For purposes of this Article TENTH, references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the Corporation" shall include any service as a director or officer, or any employee or agent of the Corporation (if indemnification is authorized by the Board of Directors) which imposes duties on, or involves services by, such director or officer, or employee or agent (if indemnification is authorized by the Board of Directors) with respect to an employee benefit plan, its participants, or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Article TENTH. For the purposes of this Section 9 of this Article TENTH, the term "include" shall be deemed to be followed by "but shall not be limited to".

10. <u>Continuing Obligation</u>. Any amendment, repeal or modification of the foregoing provisions of this Article TENTH shall not adversely affect any right or protection of a director, officer, employee or agent, or any person that is or was serving at the request of the Corporation or any of its Subsidiaries as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, existing at the time of, or increase the liability of any director, officer, employee or agent of the Corporation, or such other person, with respect to any acts or omissions of such director, officer, employee, agent or such other person occurring prior

509265-1076-13498-Active.12135821

to, such amendment, repeal or modification.

ELEVENTH:  Notwithstanding anything contained in this Restated Certificate to the contrary, in addition to any other vote required by law, the affirmative vote of the beneficial holders of at least 66 2/3% of the then issued and outstanding shares of capital stock entitled to vote thereon, shall be required to alter, amend or repeal this Restated Certificate or to adopt any provision inconsistent therewith; provided, however, that for so long as the Spyglass Stockholders and their Affiliates own at least fifty percent (50%) of the issued and outstanding capital stock held by the Spyglass Stockholders on the Effective Date (as appropriately adjusted for share splits and similar events), the consent of the holders of a majority of the issued and outstanding shares of capital stock held by the Spyglass Stockholders shall be required for any amendment to this Restated Certificate that disproportionately adversely affects the rights or obligations of the Spyglass Stockholders relative to the Original Stockholders (determined solely with regards to rights under the Stockholders Agreement or this Restated Certificate and without regard to personal circumstances).

TWELFTH:  For the purposes of this Restated Certificate, the following terms shall have the meanings ascribed to them below:

"Affiliates" (a) shall mean, with respect to any person, any person that directly or indirectly controls, is controlled by or is under common control with, such person or any Immediate Family of such person; (b) shall also include, with respect to any person who is an individual, a trust, the beneficiaries of which, or a corporation or partnership, the stockholders or partners of which, include only such individual and/or such individual's Immediate Family; (c) shall also include, with respect to any person, an entity or trust established or utilized for purposes of estate planning for such person; and (d) in the case of a Spyglass Stockholder, without limitation to the foregoing in this definition of "Affiliate", any member, shareholder, or partner listed on Schedule B to the Stockholders Agreement.  For purposes of this definition, the term "control" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.

"Original Stockholders" shall have the meaning ascribed to such term in the Stockholders Agreement.

"Effective Date" shall mean the effective date of the Plan pursuant to the terms thereof.

"Immediate Family" shall have the meaning specified in Rule 16a-1 of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

"Significant Stockholder" shall have the meaning ascribed to such term in the Stockholders Agreement.

8

"Significant Stockholder Director Designee" shall have the meaning ascribed to such term in the Stockholders Agreement.

"Spyglass Stockholders" shall have the meaning ascribed to such term in the Stockholders Agreement.

"Subsidiary" shall mean, with respect to any person, any corporation, limited liability company, partnership, association or other business entity of which fifty percent (50%) or more of the total voting power of shares of capital stock entitled (without regard to the occurrence of any contingency) to vote generally in the election of directors, managers or trustees thereof, or fifty percent (50%) or more of the equity interest therein, is at the time owned or controlled, directly or indirectly, by any person or one or more of the other Subsidiaries of such person or a combination thereof.

[signature page follows]

509265-1076-13498-Active.12135821

IN WITNESS WHEREOF, this Restated Certificate of Incorporation has been executed on this [__] day of [_____], 2010.

**MGM HOLDINGS INC.**

By: _____
    Name:
    Title:

APPENDIX B


TO


DISCLOSURE STATEMENT
OF METRO-GOLDWYN-MAYER STUDIOS INC. AND CERTAIN OF ITS AFFILIATES


LIQUIDATION ANALYSIS

**Appendix B**

**Metro-Goldwyn-Mayer Studios Inc. et al.
Liquidation Analysis**

The Debtors[1] have prepared this Liquidation Analysis in connection with the *Disclosure Statement with respect to the Joint Prepackaged Plan of Reorganization of Metro-Goldwyn-Mayer Studios Inc. and Certain of its Affiliates* dated October 7, 2010. In connection therewith, the Debtors have had discussions with their financial advisors, Moelis & Company LLC ("Moelis") and the Debtors' other advisors regarding, among other things, the context of a liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that any liquidation analysis in these cases is highly speculative given the nature of the Debtors' assets.

In a chapter 7 case, one or more bankruptcy trustees would sell the Debtors' assets to generate cash. In general, the net proceeds of assets encumbered by valid and perfected security interests would be paid to the creditors holding those security interests. The remaining proceeds would be applied to the administrative expenses of the liquidation, including the trustees' fees, the fees of their professionals, and wind-down expenses. If funds were remaining, priority claims, including certain employee and tax claims, would be paid prior to any distributions to non-priority unsecured creditors.

The Liquidation Analysis assumes that, in chapter 7 cases, bankruptcy trustees would sell the Debtors' assets in an orderly but expedited basis. It is estimated that the liquidation would occur over a six-month period. It is assumed that the trustee could not sell the equity in an entity that was a guarantor or obligor under the Credit Agreement, so the transaction would need to be structured as a sale of the assets held by such entities. It is also assumed that the trustees would be able to maximize value by selling the assets to one or more strategic purchasers with the capability to perform substantially similar distribution functions as currently performed by the Debtors.

Additionally, for each category of assets there are a number of estimates and assumptions. These estimates and assumptions, described below, are subject to significant economic, competitive and operational uncertainties beyond the control of the Debtors or a chapter 7 trustee.

**Book Value**

The book values used in this Liquidation Analysis are the unaudited book values as of June 30, 2010.

---

[1] Capitalized terms used but not defined herein have the meaning set forth in the Plan.

1

### Cash and Cash Equivalents

The Liquidation Analysis assumes that during the liquidation period additional cash would not be generated or otherwise made available for distribution, except for the proceeds from the disposition of non-cash assets. It is assumed that cash and cash equivalents held would be 100% collectible.

### Restricted Cash

Restricted cash consists of cash and cash equivalents in segregated accounts that have been established in connection with certain production agreements and cash collection procedures that impose restrictions upon the use of such cash. Due to contractual obligations and the result of filing chapter 7 cases, an individual recovery analysis was performed on each reserve account resulting in a total projected recovery of between 51.2% to 55.5%.

### Accounts and Contracts Receivable, Net

The Liquidation Analysis assumes that accounts receivable, net of an allowance for uncollectible and doubtful accounts, will result in a recovery between 44.6% and 55.7% of book value. The discount to book value reflects (i) the inherent collection risks during a liquidation process, and (ii) that certain accounts receivable are under long-term contracts that likely would not be assumed and assigned in a chapter 7 liquidation and therefore would result in significant claims of setoff or recoupment upon rejection thereof.

### Film and Television Costs, Net

"Film and Television Costs, Net" include the costs of production, capitalized overhead and interest associated with the production of films and television programs. These costs, as well as participations and talent residuals, are charged against earnings on an individual film basis in the ratio that the current year's gross film revenues bear to management's estimate of total remaining ultimate gross film revenues. Capitalized film costs are stated at the lower of unamortized cost or estimated fair value on an individual basis. The Debtors also maintain home entertainment product in inventory, which primarily consists of digital video discs that are stated at the lower of cost or market. The Liquidation Analysis assumes that film and television costs will result in a recovery between 31.0% and 41.9% of book value. The discount to book value reflects (i) that the aggregate amount of "Film and Television Costs, Net" are projected to be recovered over a long period (on average between 10 and 20 years) and therefore must be discounted to the present value of projected cash flows, (ii) the erosion of the value of the Debtors' assets during the liquidation process, (iii) the incompatibility of the "forced sale" atmosphere of a chapter 7 liquidation with the extended and extensive due diligence that would be required by any bidder willing to pay fair market value for the assets, (iv) the inability of a trustee to fully and properly market and sell the assets, which are primarily intellectual property assets that often have complex chain of title and related issues that require institutional knowledge and expertise to understand and market, and (v) the likelihood of increased opportunistic litigation and claims by counterparties to the Debtors' various agreements.

**Investment in and Advances to Affiliates**

"Investments in and Advances to Affiliates" primarily relates to the Debtors' investments in domestic and international cable networks that have been structured as joint ventures. Given potential limitations on the transferability of joint venture interests in non-debtor entities, the Liquidation Analysis assumes a recovery of between 25.0% and 50.0%.

**Property and Equipment, Net**

Property and Equipment consists primarily of leasehold improvements, computer hardware and software and FF&E. As the majority of Property and Equipment consists of leasehold improvements on leases that are likely to be rejected in chapter 7 cases, it is estimated that between 10.0% and 15.0% would be recovered in the Liquidation Analysis.

**Goodwill and Other Intangible Assets, Net**

Goodwill and Other Intangible Assets consists primarily of trademarks and licensing or operating agreements with third parties. The Liquidation Analysis assumes that Goodwill and Other Intangible assets will result in a recovery between 17.0% and 37.6% of book value. The discount to book value reflects (i) the erosion of the value of the Debtors' assets during the liquidation process, (ii) the incompatibility of the "forced sale" atmosphere of a chapter 7 liquidation with the extended and extensive due diligence that would be required by any bidder willing to pay fair market value for the assets, (iii) the inability of a trustee to fully and properly market and sell the assets, which are primarily intellectual property assets that often have complex chain of title and related issues that require institutional knowledge and expertise to understand and market, and (iv) the likelihood of increased opportunistic litigation and claims by counterparties to the Debtors' various agreements.

**Other Assets**

Other Assets includes, among other items, travel deposits, prepaid taxes and other expenses, deposits with landlords, and rabbi trust assets. The Liquidation Analysis assumes that recoveries would come primarily from rabbi trusts, tax receipts and certain deposits, resulting in a recovery rate of between 5.0% and 10.0%.

**Wind-down Administrative Expenses and Fees**

In general, the net proceeds of assets encumbered by valid and perfected security interests would be paid to the creditors holding those security interests prior to the payment of administrative expenses of the liquidation, including the trustees' fees, the fees of their professionals and other wind-down costs. Section 506(c) of the Bankruptcy Code, however, provides that a trustee may recover the costs and expenses of preserving or disposing of collateral for the benefit of the secured party. The Liquidation Analysis assumes that funding for the liquidation would come from a negotiated carve-out of the Secured Lenders' collateral which

would recognize the benefit to the Secured Lenders of an orderly disposition of the Debtors' assets.

The Liquidation Analysis assumes three categories of cash usage during the liquidation period, which is estimated to take 6 months: (i) trustees' fees, (ii) professional fees, and (iii) employee and other wind-down costs.

Under section 326 of the Bankruptcy Code a chapter 7 trustee is entitled to reasonable fees and expenses not to exceed a specified formula. In simplified terms, the fee cap is 3% of all amounts disbursed by the trustee. (Technically, the trustee is entitled to a higher recovery for the first $1 million distributed). Here, application of the formula would result in maximum fees of up to approximately $37.4 million. The Liquidation Analysis assumes that the allowed fees of the chapter 7 trustees would be less than the capped amounts and would be between approximately $10 to $12.5 million.

Professional fees and expenses are estimated to average between $3 million and $5 million per month due to the complexity of the legal issues related to the liquidation of the Debtors' assets.

Employee Expenses / Wind-down costs are estimated to be $10 million per month for the first three months of the liquidation process and $5 million per month for the next three months. Given the complexity of the Debtors' assets, it is estimated that certain of the Debtors' employees would be asked to remain employed at the Company in order to maximize value for the assets.

**Secured Claims**

Secured Claims consist of the claims arising under the Credit Agreement and the P&A Facility.

The P&A Facility is secured by a first priority security interest in (i) an interest in a cash collateral account of up to $20,000,000 funded by MGM Studios from receipts generated from exploitation of certain television and home video rights with respect to qualifying pictures, (ii) certain domestic distribution agreements pursuant to which MGM Studios distributes qualifying pictures, (iii) any collateral granted to MGM Studios with respect to such qualifying pictures, and (iv) subject to certain limitations, any interest in the underlying copyright in, and physical materials relating to, such qualifying picture solely to the extent necessary to exercise certain distribution rights for such qualifying picture. The Liquidation Analysis projects that under a chapter 7 liquidation, the holder of claims under the P&A Facility would receive a recovery of between approximately 85.0% and 100.0%.

The Credit Agreement is secured by substantially all of the assets of Metro-Goldwyn-Mayer Inc. and the guarantors thereto, including perfected first-priority security interests in the capital stock and, subject to certain exceptions, substantially all other tangible and intangible assets of Metro-Goldwyn-Mayer Inc. and the guarantors (other than carve outs for permitted liens, including the liens securing the P&A Facility). Based on the estimated Total Distributable

Value, it is estimated that the Secured Claims would receive payment of between 16% and 22.8% of their claim.

**Unsecured Creditors**

Section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find that each entity that rejects (or is deemed to reject) the Plan will receive property with a value, as of the Effective Date, that is not less than the amount that it would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on that date. This requirement is known as the "best interests of creditors" test. The Liquidation Analysis was prepared to demonstrate that the Plan satisfies this test. Under the Plan, unsecured creditors will be paid in full. Because unsecured creditors would not be entitled to be paid more than in full under a chapter 7 liquidation, the Plan is clearly in the best interest of unsecured creditors who are deemed to accept the Plan. Accordingly, the Liquidation Analysis does not show an entity by entity chapter 7 liquidation analysis with respect to unsecured creditors, which would be an extremely complex analysis. In general, the liquidation analysis would show that unsecured creditors of any of the guarantors or obligors under the Credit Agreement would receive no recovery. At best, such unsecured creditors could potentially receive de minimus recoveries from the net proceeds of avoidance actions by the trustees. Creditors, if any, of the other entities would be entitled to receive recoveries based on the assets, if any, at such Debtor entities. Any distribution to unsecured creditors would reduce the recoveries to the Secured Lenders, but the Liquidation Analysis assumes that such diminution in recovery to the Secured Lenders would not be material.

**Metro-Goldwyn-Mayer Inc.**
**Preliminary Liquidation Analysis**
**June 30, 2010**
*($ in thousands)*

| | Book Value 6/30/2010 | Estimated Recovery Rate | | Est. Liquidation Proceeds | |
|---|---|---|---|---|---|
| | | Low | High | Low | High |
| Cash and Cash Equivalents [1] | $168,380 | 100.0% | 100.0% | $168,380 | $168,380 |
| Restricted Cash | 38,825 | 51.2% | 55.5% | 19,868 | 21,539 |
| Accounts and Contracts Receivable, net [2] | 267,930 | 44.6% | 55.7% | 119,468 | 149,298 |
| Film and Television Costs, net | 1,830,202 | 31.0% | 41.9% | 566,617 | 766,301 |
| Investments in and Advances to Affiliates | 28,649 | 25.0% | 50.0% | 7,162 | 14,325 |
| Property and Equipment, net | 16,483 | 10.0% | 15.0% | 1,648 | 2,472 |
| Goodwill & Other Intangible Assets, net | 314,559 | 17.0% | 37.6% | 53,446 | 118,238 |
| Other Assets | 44,534 | 5.0% | 10.0% | 2,227 | 4,453 |
| **Estimated Gross Liquidation Value** | **$2,709,562** | **34.6%** | **45.9%** | **$938,816** | **$1,245,006** |
| | | | | | |
| **Wind-down Administrative Expenses & Fees:** | | | | | |
| Chapter 7 Trustee Fees and Expenses | | | | $12,500 | $10,000 |
| Professional Fees and Expenses [3] | | | | 60,000 | 36,000 |
| Employee Expense / Wind-down Costs [4] | | | | 45,000 | 45,000 |
| **Total Distributable Value** | | | | **$821,316** | **$1,154,006** |
| | | | | | |
| **Secured Claims:** | | | | | |
| P&A Facility | $77,300 | 85.0% | 100.0% | $65,705 | $77,300 |
| Credit Agreement - Revolver | 249,358 | 16.0% | 22.8% | 39,981 | 56,971 |
| Credit Agreement - Term Loan | 3,668,500 | 16.0% | 22.8% | 588,196 | 838,149 |
| Interest Rate Swaps | 94,903 | 16.0% | 22.8% | 15,216 | 21,683 |
| Accrued Interest | 699,884 | 16.0% | 22.8% | 112,217 | 159,904 |
| Total Secured Claims | $4,789,945 | | | $821,316 | $1,154,006 |
| | | | | | |
| **Value Available to Other Claims** | | | | **$0** | **$0** |

1 Excludes $12.7 million of cash held at MGM Holdings Inc. (parent company)
2 Net of allowance for doubtful accounts of $16.7
3 Assumes $6 or $10mm per month through 6-month wind-down period
4 Assumes $10mm per month for the first three months and $5 million per month for the next three months

APPENDIX C


TO


DISCLOSURE STATEMENT
OF METRO-GOLDWYN-MAYER STUDIOS INC. AND CERTAIN OF ITS AFFILIATES


FINANCIAL PROJECTIONS

## MGM Free Cash Flow Summary

$ in millions

| | Fiscal Year Ended March 31, | | | Stub Period Est. * | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2008A | 2009A | 2010A | | CY11E | CY12E | CY13E | CY14E | CY15E |
| Library Cash Flow [1] | $557 | $517 | $228 | $145 | $277 | $355 | $405 | $443 | $455 |
| New Production Cash Flow [2] | (172) | (199) | (124) | (24) | (107) | (217) | (108) | (110) | 237 |
| Overhead, ex Incentive Plan | (134) | (123) | (113) | (96) | (92) | (93) | (94) | (96) | (99) |
| Incentive Plan | (13) | (15) | (16) | 0 | (16) | (17) | (18) | (18) | (19) |
| Restructuring & Severance | (5) | (7) | (17) | (120) | 2 | 0 | 0 | 0 | 0 |
| Other [3] | (27) | (8) | (31) | (10) | (55) | (16) | (16) | 2 | 7 |
| Epix / JV Distributions (Funding) | 1 | (12) | (21) | (14) | (4) | (9) | 5 | 7 | 20 |
| Net Film Financing | 57 | 126 | 42 | (79) | (27) | (2) | (1) | (1) | (1) |
| Interest | (308) | (272) | (83) | (2) | (4) | (8) | (4) | (3) | (3) |
| Principal Repayment | (38) | (38) | (29) | 0 | 0 | 0 | 0 | 0 | 0 |
| Free Cash Flow, Before Taxes | ($83) | ($30) | ($164) | ($201) | ($27) | ($8) | 169 | 225 | 597 |
| Taxes | (4) | (4) | (5) | (4) | (4) | (5) | (9) | (94) | (148) |
| Free Cash Flow, After Taxes | ($87) | ($34) | ($168) | ($205) | ($30) | ($12) | 160 | 131 | 449 |
| Ending Revolver Balance (4) | | | | | 106 | 118 | 0 | 0 | 0 |
| Max Revolver Drawn in Period (4) | | | | | 106 | 134 | 49 | 0 | 0 |

Notes:

1 FY2008 through FY2010 based on a rolling Library definition and CY2011 to CY2015 are presented on a static basis;
  MGM HD Channel cash flow in FY2008 through FY2010 has been reclassified to LCF to conform with Plan presentation

2 Includes cash flows related to new film and television production and distribution, including 3rd party distribution fees where applicable

3 Includes capital expenditures, various rights extensions/buyouts, contractual settlements, management fees and other

4 Assumes minimum cash balance of $50M in all periods

* Nine month period from April 1 to December 31, 2010

# MGM Library Cash Flow Summary

$ in millions

| | Fiscal Year Ended March 31, | | | | Fiscal Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2008A | 2009A | 2010A | Stub Period Est. * | CY11E | CY12E | CY13E | CY14E | CY15E |
| Theatrical / Non-Theatrical | $5 | $2 | $5 | $5 | $3 | $3 | $3 | $3 | $3 |
| Home Video | 305 | 233 | 52 | 57 | 61 | 60 | 54 | 51 | 49 |
| Fox One-Time Charges | 0 | 0 | (60) | 0 | 0 | 0 | 0 | 0 | 0 |
| Television Receipts | 535 | 596 | 510 | 285 | 415 | 458 | 512 | 525 | 533 |
| Digital Media | 0 | 3 | 6 | 5 | 25 | 33 | 48 | 66 | 84 |
| Ancillary [1] | 25 | 32 | 17 | 16 | 20 | 20 | 22 | 28 | 31 |
| MGM HD Channel [2, 3] | (1) | (1) | 5 | 2 | 13 | 16 | 22 | 28 | 31 |
| International Channels [3] | 11 | 9 | 12 | 9 | 14 | 15 | 16 | 17 | 17 |
| Spyglass Net Library | 0 | 0 | 0 | 0 | 10 | 10 | 10 | 10 | 10 |
| Participations & Residuals | (234) | (244) | (237) | (164) | (178) | (143) | (158) | (157) | (160) |
| Distribution Costs & Other [4] | (88) | (114) | (83) | (69) | (105) | (117) | (122) | (127) | (142) |
| Library Cash Flow | $557 | $517 | $228 | $145 | $277 | $355 | $405 | $443 | $455 |

Notes:

1 Includes licensing and merchandising, interactive, clips & stills, location based entertainment, music and MGM On-Stage

2 MGM HD Channel cash flow in FY2008 through FY2010 has been reclassified to LCF to conform with Plan presentation

3 Amounts are before intercompany programming costs (which are included in Distribution Costs & Other)

4 Includes Television distribution costs, Home Video sub-distribution fees, distribution legal fees, intercompany programming costs, partners' share and operating costs of This TV and similar channels and other misc receipts and distribution costs

* Nine month period from April 1 to December 31, 2010

## MGM P&L to Cash Reconciliation

*$ in millions*

| | CY 2011E | CY 2012E | CY 2013E | CY 2014E | CY 2015E |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| Library | $693 | $755 | $778 | $833 | $825 |
| New Production | 118 | 415 | 1,192 | 1,428 | 1,400 |
| **Total Revenues** | **811** | **1,169** | **1,970** | **2,261** | **2,224** |
| **Expenses:** | | | | | |
| Library | (573) | (582) | (582) | (607) | (613) |
| New Production | (113) | (519) | (1,168) | (1,391) | (1,213) |
| **Total Expenses** | **(686)** | **(1,101)** | **(1,750)** | **(1,998)** | **(1,826)** |
| **EBITDA:** | | | | | |
| Library | 119 | 173 | 196 | 227 | 212 |
| New Production | 5 | (104) | 24 | 36 | 187 |
| Overhead / Legal Fees | (113) | (110) | (112) | (114) | (119) |
| Bad Debt | (2) | (2) | (3) | (3) | (5) |
| **Total EBITDA** | **9** | **(44)** | **105** | **146** | **275** |
| Depreciation/Amortization | (17) | (17) | (17) | (17) | (17) |
| Equity in Earnings (Losses) | 2 | 3 | 6 | 9 | 20 |
| Interest Expense | (13) | (18) | (14) | (12) | (9) |
| **Pre-Tax income (loss)** | **(19)** | **(77)** | **81** | **125** | **270** |
| Taxes | (9) | (11) | (12) | (43) | (101) |
| **Net Income (Loss)** | **$(28)** | **$(88)** | **$69** | **$82** | **$169** |

| | | | | | |
|---|---|---|---|---|---|
| **Net Income to Free Cash Flow Reconciliation** | | | | | |
| **Net Income (Loss)** | **$(28)** | **$(88)** | **$69** | **$82** | **$169** |
| **Adjustments to Net Income (Loss):** | | | | | |
| **P&L Reconciling Items** | | | | | |
| Film Amortization | 259 | 353 | 447 | 521 | 676 |
| P&R Amortization | 175 | 214 | 231 | 264 | 312 |
| Development Writeoff | 12 | 8 | 9 | 10 | 10 |
| Bad Debt | 2 | 2 | 3 | 3 | 5 |
| Depreciation/Amortization | 17 | 17 | 17 | 17 | 17 |
| Equity in Earnings (Losses) | (2) | (3) | (6) | (9) | (20) |
| Interest Expense | 13 | 18 | 14 | 12 | 9 |
| Tax Provision | 9 | 11 | 12 | 43 | 101 |
| **Cash Reconciling Items** | | | | | |
| Production Spending | (191) | (245) | (344) | (481) | (333) |
| Participation Payments | (187) | (204) | (292) | (199) | (252) |
| Cash Flows (To)/From JV's | (4) | (9) | 5 | 7 | 20 |
| Capital Expenditures | (2) | (3) | (3) | (2) | (2) |
| Cash Taxes | (4) | (5) | (9) | (94) | (148) |
| Contractual Obligations | (22) | (14) | (4) | (2) | (0) |
| Withholding Taxes | (5) | (6) | (7) | (8) | (12) |
| Net Film Financing | (27) | (2) | (1) | (1) | (1) |
| Cash Interest | (4) | (8) | (4) | (3) | (3) |
| Other net changes in working capital | (42) | (51) | 24 | (32) | (97) |
| **Free Cash Flow, After Taxes** | **$(30)** | **$(12)** | **$160** | **$131** | **$449** |

**Summary of Significant Assumptions**

The Debtors, in consultation with prospective management and with the assistance of various professionals, prepared the financial projections for the calendar years 2011-2015 (the "Projections"). These Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtors and the film and television entertainment industries, general business and economic conditions and other matters, most of which are beyond the control of the Debtors or the Reorganized Debtors and their management. Therefore, although the Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will vary from the projected results. These variations may be material. Although the Debtors believe that the assumptions underlying the Projections, when considered on an overall basis, are reasonable in light of current circumstances, no representation can be or is being made with respect to the accuracy of the Projections or the ability of the Reorganized Debtors to achieve the projected results of operations. In deciding whether to vote to accept or reject the Plan, claimants must make their own determinations as to the reasonableness of such assumptions and the reliability of the Projections.

Additional information relating to the principal assumptions used in preparing the Projections is set forth below:

**General Market Conditions**

The Projections take into account the current market environment in which the Debtors compete, including many economic and financial forces that are beyond the control of the Debtors and management. The Debtors operate in the global entertainment production and distribution market. Economic growth or slowdowns on a global or regional basis may impact the Recognized Debtors' revenues, and changes in the entertainment industry may impact performance.

**Methodology**

The Projections were prepared based on several key assumptions, as discussed below.

***General***

- The Projections were prepared collaboratively by MGM's current and prospective management and their respective advisors
- The Projections do not include any material impact of inflation, deflation or fluctuations in foreign exchange rates
- The Projections assume that a restructuring takes place by the end of 2010
- Withholding taxes are provided for on all foreign receipts using a blended rate based on historical experience

- Library projections are based on a static library definition, which includes all titles released prior to April 1, 2009

- The Projections assume that at the Effective Date, the Debtor will change its fiscal year end from March 31 ("FY") to December 31 ("CY")

### *Films*

<u>Recently Released and Library Films</u>

- Projections for the FY2009 and FY2010 slates have been built up at the title/market/territory level using most recent 10-year accounting ultimates

- Selected Library titles have also been projected individually based on their most recent ultimates

- Remaining Library titles have been projected in the aggregate

<u>New Films</u>

- Consists of films projected to be released subsequent to March 31, 2010

- The Projections assume that MGM's annual release slate will include 5 to 6 MGM-produced films, supplemented by 2 domestic third-party pick-ups. The first slate is assumed to be released in CY2012

  - The Projections ramp up to an average of $300M production spend per year

  - The Projections ramp up to an average of $340M worldwide P&A spend per year

- The Projections assume that to mitigate risk and reduce capital requirements, MGM will co-finance non-Bond films with production budgets greater than $75M, while maintaining key worldwide television distribution rights

- New *Bond* films are assumed to be released every other year beginning in November 2012

  - The Projections assume that MGM will own 50% of *Bond 23* (target release date November 2012), with a partner funding 100% of production costs and P&A in exchange for 50% of the film's profits and certain distribution rights

  - For subsequent *Bond* films, MGM is assumed to own and fully fund 100% of production and distribution costs

- Two *Hobbit* films are projected to be produced back to back and released in Winter 2012 and 2013; these films are 50/50 co-productions with New Line; The Projections assume that MGM will retain a $40M investment in the films and a lender will fund 100% of MGM's remaining share of the production costs and P&A, in exchange for fees

- Performance of New Films has been measured using a receipts to cost ratio (computed by dividing 10-year ultimate receipts by ultimate costs of production and distribution, excluding any distribution fees, including participations and residuals); the Projections assume a blended 1.20x receipts to costs ratio over the accounting life of the films, including *Hobbit* and *Bond* films

  - This slate was developed in consultation with prospective management and reflects their input

■ The Projections assume a domestic theatrical distribution fee that is slightly favorable to the distribution fee for international releases charged by Fox under its existing agreement with MGM

Film Financing

■ Existing Financing

  ■ DDI – No borrowings are assumed and all remaining balances are projected to be repaid by the March 2012 facility maturity date

  ■ UAPF – Payments are assumed to be made over the term of the projections from the distribution proceeds of UA films, including two films which have yet to be released

    ■ No new UA films are assumed to be financed through the facility

■ The Projections do not assume any new external film financing vehicle/facility, other than the studio co-financing arrangements noted above

***TV Programs***

Recently Released and Library TV Programs

■ Projections for the FY2009 and FY2010 slates have been built up at the title/market/territory level using 10-year accounting ultimates

■ Remaining Library TV program titles have been projected in the aggregate

New TV Programs

■ The Projections include *Stargate Universe* through Season Two, which is currently airing on Syfy

■ TV is assumed to produce a number of low risk, project-driven series which would be partially financed through a combination of tax credits, co-production partners, and international pre-sales

  ■ The Projections assume that these new series, along with new films, will help drive Library Cash Flow

  ■ Along with successive seasons of prior new series, the Projections assume 1 to 2 new TV series are produced each year

■ The Projections also assume the television group will optimize existing Pay TV output deals by building upon its existing acquisitions business to acquire selected international television rights (New TV Acquisitions) to feature films in specific territories to fill unused slots

***Divisional Forecasts***

<u>Home Video</u>

■ Home Video library cash flow projections are based on assumed decay rates off Fox's projected P&L contribution from "catalog" product (Pre-2005 MGM product per the Fox agreement) for Contract Year 4 (September 2009 to August 2010). Fox has projected a Contract Year 4 worldwide net contribution margin of $100M, before fees and overhead

■ The Projections assume that Contract Year 5 contribution will be 26% less than Contract Year 4. The Projections assume this decay rate will then gradually decline to a 5% decay rate for Contract Years 8 through 13 (assuming a renewed or new agreement with similar Contract Years)

■ The Projections assume distribution services fees consistent with the current Fox arrangement, which MGM believes to be competitive

<u>Television: General Overview</u>

■ TV licensing projections are based on specific input from the domestic and international sales forces incorporating product availabilities in major territories

■ TV projects a near-term decline in Library Cash Flows related to lower recent sales velocity due to the recent global economic recession and the lack of new MGM content. Library TV licensing receipts are expected to begin to increase by CY2012 driven by the ramp up of feature film & TV program production and are projected to regain historical levels of $500M+ Library Cash Flow performance by CY2013. While the static library is expected to peak in CY2015, the addition of new product will continue to grow the library on a rolling basis

■ The TV licensing projections include intercompany license fees related to MGM HD, International Channels, This TV & similar channels; the offsetting intercompany programming charges are included in "Distribution & Other" in the Projections

<u>Domestic Pay/Free Television</u>

■ The Projections assume slight domestic Library growth in the early years due to the impact of the new feature film and TV program slates and an increase in MGM HD license fees due to the channel's subscriber growth

■ Barter Advertising Sales are based on projected ad inventory sales combined with ratings estimates

■ Projections include continued significant growth of This TV and the launch of two similar digital spectrum free TV channels

■ Traditional licensing to Domestic Pay TV networks (e.g., HBO, Showtime, Starz) is assumed to remain steady with limited subscriber erosion

<u>Foreign Pay/Free Television</u>

■ MGM TV expects cable, satellite and terrestrial TV platforms and on-demand services to continue to expand in territories worldwide

■ International Pay TV is assumed to remain strong and the return of more robust feature film slates is assumed to ensure long term renewals of output deals (e.g., deals whereby the client licenses most or all of MGM's new feature films, frequently including a commitment to library)

■ New feature film and TV Program slates are assumed to provide a Library sales uplift by increasing customer interest in MGM product

<u>TV Releasing and Distribution Costs</u>

■ Library servicing costs include storage, freight, dubbing, creation of TV masters, restoration and creation and delivery of tapes and digital files.  These costs represent over 50% of the TV Releasing and Distribution Costs budget and are expected to decline over time due to more internal oversight and efficiencies in digital distribution

■ The Projections also include costs related to ratings research (e.g., Nielsen), operating costs for This TV and similar channels, share payments to distribution partners in This TV and similar channels, domestic syndication marketing and distribution and costs to attend sales conventions

■ Expected growth in TV costs is driven primarily by partner share costs for This TV and similar channels, which are tied to increases in the related revenue projections

<u>MGM Worldwide Channels</u>

■ MGM International Channels

■ Subscription and advertising revenues are projected based on existing contractual terms for 100% owned channels and forecasted growth.  Subscription revenue collections are based on contractual minimum guarantees or flat fees, and comprise approximately 2/3's of anticipated cash receipts. Other collections are based on projected monthly subscriber counts

■ Joint venture projections are based on forecasts provided by the respective entities

■ MGM Domestic Channels

■ MGM HD - subscription and ad sale generated cash flows are projected based on existing contractual terms and assumed future carriage and subscriber growth; subscription fees currently account for almost all of the channel's revenue; however, the Projections forecast meaningful advertising revenue by year 5 due to growth in the subscriber base

■ EPIX - is currently projected to be self-sufficent for at least the next year. The Projections assume a $5M equity contribution in CY2011 and a $10M equity contribution in CY2012 as a contingency for additional original programming spending and/or fluctuations in subscriber fees. The Projections assume that MGM retains its 19% ownership position and that excess cash at the JV will be distributed back to MGM and other partners over time

<u>Digital Media</u>

- The Digital Media Projections are based upon several key assumptions including platform growth, new entrants' development, growth in user adaptation, and MGM historical activity (Digital Media gross receipts grew from $0.4M in FY2007 to $21.2M in FY2010). The Projections also assume increased MGM resources focused on Digital Media to further drive growth within this market

- Based on the above, the Projections assume substantial growth in digital markets such as Electronic Sell Through, Video On Demand, Free On Demand & Subscription Video On Demand

<u>Ancillary Markets</u>

- The Projections are based on existing multi-year licensing deals and forecasted advances and royalties

- The Projections include anticipated cash flows for Clips and Still, Consumer Products, Interactive, Downloadable Games/Applications, Location Based Entertainment, MGM On Stage and Music

- Projected disbursements include operating costs as well as third party share typically driven by receipts (e.g., quarterly payments to Danjaq related to *Bond* Interactive receipts)

<u>Participations and Residuals</u>

- Participations, residuals and third-party share payments (P&R) are modeled as a percentage of cash receipts. Titles are grouped into product categories that have similar P&R payment and timing requirements and assigned specific payout rate and lag assumptions based on blended averages of historical activity. These rate and lag assumptions are then applied to the projected cash receipts of each product category

- The Projections assume third-party related P&R payments will decline going forward as the majority of released third-party and co-financed titles have now run through the material portion of their cash flow life-cycles

<u>Overhead</u>

The Projections include the following costs: Payroll, Severance, Employee Benefits, Incentive Plan, and Non-Salary Overhead (for example: Occupancy, Accounting and Tax Preparation Fees, Software License Renewals, Insurance, Fox Overhead (through the end of Contract Year 5), Travel & Entertainment and Meetings & Conventions). It is assumed that in CY2011, the Domestic Theatrical Distribution and Marketing departments will contract to retain only small core groups as there will be no product for distribution in that period. For future years it is assumed that these core groups would be able to rebuild those departments if deemed strategically optimal for the operations of the business. Alternatively, in the future, management may decide it is preferable to outsource Domestic Theatrical Distribution and Marketing functions

- Salary/Headcount

  - With the contraction of the Domestic Theatrical Marketing and Distribution groups, the Projections imply an employee headcount of approximately 320 employees in CY2011 with strategic headcount growth thereafter

- Growth assumptions
  - Salary: 3% per year
  - Non-salary: 1% per year (unless specific assumptions were provided by divisions, i.e. Software License Renewal projections were provided by the Information Services division)
- Rent
  - It is assumed MGM will either renegotiate to reduce significantly the rent at the Los Angeles Headquarters (Century City Tower) or relocate to a new, lower cost building during 2011
  - In the event MGM elects to move, projected moving and tenant improvement costs are captured in "Restructuring Costs"
  - Costs to cure lease rejection damages are captured in "Restructuring Costs"

## Legal

- Corporate Legal projections were derived using historical benchmarks and incorporate the cost impact of new feature film and TV program production assumptions
- Corporate Legal projections include costs related to general corporate matters, litigation, IP (Trademark & Copyright), Human Resources, MGM Networks, Labor Relations and other miscellaneous categories
- Legal costs chargeable to product includes expenditures related to the distribution of Library titles and production of Current titles;  these costs are captured in Library and New Product net cash flows

## Income Taxes

- Projected taxes include state, local and foreign taxes based on historical expenditures.  Income taxes are based on the Company's projected financial performance
- MGM Inc. will realize cancellation of indebtedness ("COD") income when it restructures its bank debt. COD income triggered in bankruptcy is excluded from taxable income but the amount excluded must be applied to reduce the tax basis of certain tax attributes of the company and its subsidiaries, primarily NOL's.  The actual amount of COD income will depend on the FMV of the company and the total amount of debt outstanding.  The allocation of tax attribute reductions will depend on the amount and nature of each MGM group company's attributes
- The Projections assume that roughly 50% of MGM's NOL's will be preserved following the restructuring and will be subject to an annual limitation.  MGM is projected to become a regular Federal and State taxpayer beginning in CY2014.  The assumed combined federal/state tax rate is 38%

## Restructuring Costs

- The Projections include $85M of restructuring costs related to the recapitalization such as lease rejection damages, professional & advisor fees, bankruptcy related costs, employee retention/security plans, the costs of obtaining a new credit facility(ies), other transaction costs, etc.

Such costs are in addition to advisory fees and legal costs that have been paid regularly over the past year and will continue until MGM emerges from the restructuring

Interest

- The Projections contemplate access to a new credit facility(ies) totaling $500m at the Effective Date. The funding assumed in the Projections is based upon the requirements of the Projections, as well as an assumed minimum cash balance of $50M.  The Projections assume a 7.0% interest rate on drawn amounts, as well as a 0.25% commitment fee on undrawn amounts

Other

- The Projections include anticipated Capital Expenditures, primarily IT projects and leasehold improvements/equipment
- Contractual Settlements reflect estimates of the amounts and timing of projected settlement payments to third parties
- The Projections include spending for various rights extensions/buyouts

APPENDIX D

TO

DISCLOSURE STATEMENT
OF METRO-GOLDWYN-MAYER STUDIOS INC. AND CERTAIN OF ITS AFFILIATES

AUDITED FINANCIAL STATEMENT (MARCH, 2009)



CONSOLIDATED FINANCIAL STATEMENTS

MGM Holdings Inc.
Years Ended March 31, 2009 and 2008
With Report of Independent Auditors

Ernst & Young LLP



MGM Holdings Inc.

Consolidated Financial Statements

Years Ended March 31, 2009 and 2008

# Contents

Report of Independent Auditors ....................................................................................................1

Consolidated Financial Statements

Consolidated Balance Sheets ........................................................................................................2
Consolidated Statements of Operations .......................................................................................3
Consolidated Statements of Stockholders' Deficit ......................................................................4
Consolidated Statements of Cash Flows ......................................................................................5
Notes to Consolidated Financial Statements ...............................................................................6



**Ernst & Young LLP**
Suite 500
725 South Figueroa Street
Los Angeles, CA 90017-5418
Tel: +1 213 977 3200
Fax: +1 213 977 3729
www.ey.com

## Report of Independent Auditors

The Board of Directors of
MGM Holdings Inc.

We have audited the accompanying consolidated balance sheets of MGM Holdings Inc. (the "Company") as of March 31, 2009 and 2008, and the related consolidated statements of operations, stockholders' deficit, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of MGM Holdings Inc. at March 31, 2009 and 2008, and the consolidated results of its operations and its cash flows for the years then ended in conformity with U.S. generally accepted accounting principles.

*Ernst & Young LLP*

July 13, 2009

A member firm of Ernst & Young Global Limited

MGM Holdings Inc.

Consolidated Balance Sheets

(In thousands, except share data)

| | March 31, 2009 | | March 31, 2008 | |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ | **361,192** | $ | 176,101 |
| Restricted cash | | **2,412** | | 7,575 |
| Accounts and contracts receivable (net of allowance for doubtful accounts of $14,794 and $14,758, respectively) | | **344,402** | | 399,100 |
| Film and television costs, net | | **2,703,236** | | 2,929,699 |
| Investments in and advances to affiliates | | **31,184** | | 19,086 |
| Property and equipment, net | | **20,089** | | 21,712 |
| Goodwill and other intangible assets, net | | **1,739,124** | | 1,769,685 |
| Other assets | | **59,902** | | 98,384 |
| Total assets | $ | **5,261,541** | $ | 5,421,342 |
| | | | | |
| **Liabilities and stockholders' deficit** | | | | |
| Liabilities: | | | | |
| Bank and other debt | $ | **4,158,878** | $ | 3,828,865 |
| Accounts payable and accrued liabilities | | **326,192** | | 335,066 |
| Accrued participants' share | | **284,184** | | 287,863 |
| Current and deferred income taxes payable | | **131,061** | | 134,690 |
| Advances and deferred revenues | | **158,490** | | 225,987 |
| Other liabilities | | **179,163** | | 231,703 |
| Mandatorily redeemable preferred stock | | **1,302,717** | | 1,098,514 |
| Total liabilities | | **6,540,685** | | 6,142,688 |
| | | | | |
| Commitment and contingencies | | | | |
| | | | | |
| Stockholders' deficit: | | | | |
| Class A common stock, $.01 par value, 3,700,000,000 shares authorized, 531,045,266 and 530,885,927 issued and outstanding, respectively | | **5,310** | | 5,309 |
| Class B common stock, $.01 par value, 500 shares authorized, issued and outstanding | | **–** | | – |
| Additional paid-in capital | | **511,874** | | 505,247 |
| Warrants | | **208,085** | | 207,975 |
| Accumulated deficit | | **(1,986,916)** | | (1,339,254) |
| Accumulated other comprehensive loss | | **(17,497)** | | (100,623) |
| Total stockholders' deficit | | **(1,279,144)** | | (721,346) |
| Total liabilities and stockholders' deficit | $ | **5,261,541** | $ | 5,421,342 |

*The accompanying notes are an integral part of these consolidated financial statements.*

# MGM Holdings Inc.

## Consolidated Statements of Operations
### (In thousands)

| | Year Ended | | | |
| --- | --- | --- | --- | --- |
| | March 31, 2009 | | March 31, 2008 | |
| Revenues | $ | **1,223,951** | $ | 1,244,569 |
| | | | | |
| Expenses: | | | | |
| Operating | | **769,482** | | 811,499 |
| Selling, general and administrative | | **477,979** | | 454,585 |
| Depreciation and non-film amortization | | **18,814** | | 18,964 |
| Total expenses | | **1,266,275** | | 1,285,048 |
| | | | | |
| Operating loss | | **(42,324)** | | (40,479) |
| | | | | |
| Other income (expense): | | | | |
| Equity in net earnings of affiliates | | **1,530** | | 5,146 |
| Interest expense | | **(511,745)** | | (517,527) |
| Interest income | | **9,277** | | 16,895 |
| Other expense, net | | **(79,096)** | | (42,001) |
| Total other expenses | | **(580,034)** | | (537,487) |
| | | | | |
| Loss from operations before income taxes | | **(622,358)** | | (577,966) |
| Income tax (provision) benefit | | **(25,304)** | | 1,863 |
| Net loss | $ | **(647,662)** | $ | (576,103) |

*The accompanying notes are an integral part of these consolidated financial statements.*

# MGM Holdings Inc.

## Consolidated Statements of Stockholders' Deficit
(In thousands, except share data)

| | Common Stock Class A Number of Shares | Par Value | Common Stock Class B Number of Shares | Par Value | Additional Paid-in Capital | Warrants | Accumulated Deficit | Comprehensive Income (Loss) | Accumulated Other Comprehensive Income (Loss) | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|---|
| Balance, March 31, 2007 | 530,404,178 | $ 5,304 | 500 | $ – | $ 496,717 | $ 207,643 | $ (763,151) | $ – | $ 10,168 | $ (43,319) |
| Issuance of shares | 129,249 | 1 | – | – | 128 | – | – | – | – | 129 |
| Issuance of warrants | – | – | – | – | – | 89 | – | – | – | 89 |
| Stock-based employee compensation and option vesting charge | 352,500 | 4 | – | – | 8,402 | 243 | – | – | – | 8,649 |
| Comprehensive income (loss): | | | | | | | | | | |
| Net loss | – | – | – | – | – | – | (576,103) | (576,103) | – | (576,103) |
| Unrealized loss on derivative instruments | – | – | – | – | – | – | – | (109,315) | (109,315) | (109,315) |
| Unrealized loss on securities | – | – | – | – | – | – | – | (610) | (610) | (610) |
| Change in unfunded benefit obligation upon adoption of FAS 158 | – | – | – | – | – | – | – | (4,441) | (4,441) | (4,441) |
| Foreign currency translation adjustments | – | – | – | – | – | – | – | 3,575 | 3,575 | 3,575 |
| Comprehensive loss | | | | | | | | (686,894) | | |
| Balance, March 31, 2008 | 530,885,927 | 5,309 | 500 | – | 505,247 | 207,975 | (1,339,254) | – | (100,623) | (721,346) |
| Issuance of shares | 71,214 | 1 | – | – | 70 | – | – | – | – | 71 |
| Issuance of warrants | – | – | – | – | – | 49 | – | – | – | 49 |
| Stock-based employee compensation and option vesting charge | 88,125 | – | – | – | 6,557 | 61 | – | – | – | 6,618 |
| Comprehensive income (loss): | | | | | | | | | | |
| Net loss | – | – | – | – | – | – | (647,662) | (647,662) | – | (647,662) |
| Unrealized gain on derivative instruments | – | – | – | – | – | – | – | 94,259 | 94,259 | 94,259 |
| Unrealized loss on securities | – | – | – | – | – | – | – | (1,800) | (1,800) | (1,800) |
| Retirement plan adjustments | – | – | – | – | – | – | – | (4,628) | (4,628) | (4,628) |
| Foreign currency translation adjustments | – | – | – | – | – | – | – | (4,705) | (4,705) | (4,705) |
| Comprehensive loss | | | | | | | | (564,536) | | |
| Balance, March 31, 2009 | 531,045,266 | $ 5,310 | 500 | $ – | $ 511,874 | $ 208,085 | $ (1,986,916) | $ – | $ (17,497) | $ (1,279,144) |

*The accompanying notes are an integral part of these consolidated financial statements.*

# MGM Holdings Inc.

## Consolidated Statements of Cash Flows
### (In thousands)

| | Year Ended | |
| --- | --- | --- |
| | March 31, 2009 | March 31, 2008 |
| **Operating activities** | | |
| Net loss | $ (647,662) | $ (576,103) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Additions to film costs, net | (197,160) | (271,288) |
| Amortization of film and television costs and participants' share | 557,781 | 596,727 |
| Accretion of senior and junior preferred stock dividends | 178,614 | 155,852 |
| Decrease in distribution fees paid in junior preferred stock | (114) | – |
| Amortization of senior preferred stock discount | 25,407 | 24,372 |
| Depreciation and non-film amortization | 18,814 | 18,964 |
| Amortization of deferred financing costs | 19,120 | 19,772 |
| Stock-based employee compensation and option vesting charge | 6,782 | 9,303 |
| Paid-in-kind interest | 4,055 | – |
| Provision for bad debt and other reserves | 11,266 | 11,304 |
| Change in fair value of financial instruments | 78,059 | 42,845 |
| Change in fair value of Rabbi Trust | (2,181) | 139 |
| Equity in net earnings of affiliates | (1,530) | (5,146) |
| Decrease (increase) in restricted cash, accounts and contracts receivable, and other assets | 42,591 | (14,329) |
| Decrease in accounts payable, accrued and other liabilities, accrued participants' share and taxes | (169,979) | (130,311) |
| (Decrease) increase in advances and deferred revenues | (67,497) | 46,398 |
| Foreign currency exchange loss (gain) | 14,745 | (4,886) |
| Net cash used in operating activities | (128,889) | (76,387) |
| | | |
| **Investing activities** | | |
| Dividends received from investees | 1,860 | 4,230 |
| Sale of equity interests in joint venture | – | 1,090 |
| Investments in and advances to affiliates | (12,428) | (680) |
| Additions to property and equipment | (2,638) | (3,267) |
| Sales of property and equipment | – | 18 |
| Net cash (used in) provided by investing activities | (13,206) | 1,391 |
| | | |
| **Financing activities** | | |
| Additions to borrowed funds | 394,688 | 135,376 |
| Repayments of borrowed funds | (68,730) | (135,786) |
| Net proceeds from issuance of common stock | 71 | 129 |
| Net proceeds from issuance of preferred stock | 132 | 238 |
| Net proceeds from issuance of warrants | 49 | 89 |
| Decrease (increase) in restricted cash | 193 | (2,605) |
| Financing costs and other | – | (13,969) |
| Net cash provided by (used in) financing activities | 326,403 | (16,528) |
| | | |
| Net change in cash and cash equivalents from operating, investing and financing activities | 184,308 | (91,524) |
| Net increase in cash due to foreign currency fluctuations | 783 | 842 |
| | | |
| Net change in cash and cash equivalents | 185,091 | (90,682) |
| Cash and cash equivalents at beginning of year | 176,101 | 266,783 |
| Cash and cash equivalents at end of year | $ 361,192 | $ 176,101 |

*The accompanying notes are an integral part of these consolidated financial statements.*

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies**

*Basis of Presentation.* The accompanying consolidated financial statements include the accounts of MGM Holdings Inc. ("MGM Holdings"), MGM Holdings II, Inc., Metro-Goldwyn-Mayer Inc. ("MGM"), Metro-Goldwyn-Mayer Studios Inc. and its majority owned subsidiaries (collectively, "MGM Studios"), and Orion Pictures Corporation and its majority owned subsidiaries (collectively, "Orion;" all collectively, the "Company"). MGM Holdings is a Delaware corporation formed on February 11, 2005, specifically in connection with the acquisition of MGM and owned by an investor group comprised of Providence Equity Partners, Texas Pacific Group, Sony Corporation of America ("Sony"), Comcast Corporation, and DLJ Merchant Banking Partners (collectively, the "Consortium"). The acquisition of MGM by the Consortium (the "Acquisition") was completed on April 8, 2005. The accompanying consolidated financial statements include the push down of the purchase price allocation.

*Business.* The Company is a filmed entertainment company, with one of the world's largest film and television libraries and a group of important content franchises. The Company is engaged primarily in the development, production and worldwide distribution of feature films, television programming, interactive media, music and licensed merchandise. The Company also distributes films produced or financed, in whole or in part, by third parties. Additionally, the Company holds equity interests in various domestic and international television channels, reaching more than 130 countries. The Company has an exclusive home entertainment distribution services agreement with Twentieth Century Fox Film Corporation (hereinafter, "Fox" and the "Fox Agreement"). The Fox Agreement extends through August 31, 2011, subject to certain termination provisions, and grants Fox worldwide DVD distribution rights for all MGM products.

The accompanying consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States. As permitted by American Institute of Certified Public Accountants Statement of Position ("SOP") 00-2, "Accounting by Producers or Distributors of Films," the Company has presented unclassified consolidated balance sheets. Certain reclassifications have been made to amounts reported in prior periods to conform with the current presentation.

*Principles of Consolidation.* The consolidated financial statements include the accounts of MGM Holdings, MGM, MGM Studios, Orion and all of their majority owned and controlled subsidiaries. The Company's investments in related companies, which represent a 20% to 50% ownership interest, over which the Company has significant influence but not control are accounted for using the equity method (see Note 4). All significant intercompany balances and transactions have been eliminated.

Notes to Consolidated Financial Statements
(continued)

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

*Liquidity.* The Company's primary sources of liquidity are cash and cash equivalents, cash flows generated from operations, and amounts, if any, available under certain credit facilities. At March 31, 2009, the Company had $361.2 million in cash and cash equivalents. In addition, the Company had $3.7 billion in outstanding borrowings under its senior secured term loans, with no unused borrowing capacity available, as well as $229.0 million in outstanding borrowings under its revolving credit facility, with $0.6 million in available borrowing capacity (see Note 6). The senior secured term loans mature on April 8, 2012 and the revolving credit facility matures on April 8, 2010, at which time the Company will be required to pay all amounts then outstanding under the revolving credit facility. At March 31, 2009, the Company also had $136.6 million in outstanding borrowings under an additional credit facility used to finance domestic theatrical print and advertising costs, with $38.4 million in available borrowing capacity, as well as $20.0 million in outstanding borrowings under its production financing facility, with $230.0 million in available borrowing capacity (see Note 6).

Based on the Company's cash flow projections for the year ended March 31, 2010, the Company estimates that cash and cash equivalents, together with cash flows from operations and borrowings available under certain credit facilities, will be sufficient to satisfy cash requirements over the next 12 months, including scheduled interest and required principal payments on the outstanding borrowings and projected working capital needs. Management believes that the Company will continue to remain in compliance with all bank covenants as of June 30, 2009, September 30, 2009, and December 31, 2009. However, the Company's revolving credit facility matures on April 8, 2010, and current cash flow projections indicate that cash and cash equivalents will be insufficient to pay all amounts then outstanding under the revolving credit facility. As a result, the Company's ability to satisfy debt repayment obligations occurring after March 31, 2010, will depend in large part on its ability to (i) refinance certain of these obligations; (ii) amend or restructure some of the terms, maturities and principal amounts of these obligations; or (iii) effect other transactions or agreements to satisfy such obligations.

*Cash and Cash Equivalents.* The Company considers all high quality money market investments and highly liquid debt instruments, purchased with an initial maturity of three months or less, to be cash equivalents. The Company has reclassified $0.8 million and $10.2 million of bank overdrafts to accounts payable at March 31, 2009 and 2008, respectively. The carrying value of the Company's cash equivalents approximated fair value at the balance sheet dates.

Notes to Consolidated Financial Statements
(continued)

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

*Restricted Cash.* At March 31, 2009 and 2008, the Company had $2.4 million and $7.6 million in restricted cash, respectively, of which $2.4 million and $2.6 million, respectively, was held as collateral in accordance with the terms and conditions of certain of the Company's debt arrangements (see Note 6). At March 31, 2008, $5.0 million of restricted cash was held as collateral for foreign tax subsidies to be received in relation to certain of the Company's production activities.

*Accounts and Contracts Receivable.* At March 31, 2009 and 2008, accounts and contracts receivable aggregated $359.2 million and $413.9 million (before allowance for doubtful accounts), respectively. Concentration of credit and geographic risk with respect to accounts receivable is limited due to the large number and general dispersion of accounts which constitute the Company's customer base. The Company performs credit evaluations of its customers and in some instances requires collateral. At March 31, 2009, there was one customer individually accounting for 12% of the Company's accounts and contracts receivable. At March 31, 2008, there were two customers individually accounting for 12% and 11% of the Company's accounts and contracts receivable.

*Allowance for Doubtful Accounts.* At both March 31, 2009 and 2008, the allowance for doubtful accounts receivable aggregated $14.8 million. The Company determines its allowance by monitoring its delinquent accounts and estimating a reserve based on contractual terms and other customer specific issues. Additionally, the Company records a general reserve against all customers not reviewed on a specific basis. The Company charges off trade and contracts receivable against the allowance when the receivable is deemed uncollectible.

*Accounts Payable and Accrued Liabilities.* The Company accounts for certain borrowings pursuant to revenue participation agreements with Domestic Distribution Inc. ("DDI") in accordance with FASB Interpretation 46(R), "Consolidation of Variable Interest Entities (revised December 2003)." These borrowings are for theatrical print and advertising costs paid on behalf of third parties in relation to certain distribution arrangements under which MGM earns a fee. DDI is a variable interest entity for which MGM is not the primary beneficiary under these third-party distribution arrangements, and as such the Company does not consolidate DDI. The Company has included all unspent borrowings from DDI for such distribution arrangements in accounts payable and accrued liabilities in the consolidated balance sheets, totaling $0.2 million and $0.7 million at March 31, 2009 and 2008, respectively.

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

*Sales Returns*. In the home entertainment market, the Company calculates an estimate of future returns of product. In determining the estimate of product sales that will be returned, the Company performs an analysis that considers historical returns, changes in customer demand and current economic trends. Based on this information, a percentage of each sale is reserved provided that the customer has the right of return.

*Revenue Recognition*. Revenue is recognized upon meeting all recognition requirements of SOP 00-2. Revenues from theatrical distribution of feature films are recognized on the dates of exhibition. Revenues from direct home entertainment distribution are recognized, net of an allowance for estimated returns, together with related costs, in the period in which the product is available for sale by the Company's customers. Under revenue sharing arrangements, the Company also participates in consumer rental revenues generated in the home entertainment market by rental establishments and records revenues as earned. Revenues on films financed under a co-financing arrangement, or distributed under a third-party distribution arrangement through which MGM earns a fee, are recorded on a net basis in accordance with Emerging Issues Task Force 99-19, "Recording Revenue Gross as a Principal versus Net as an Agent." Revenues recorded on a net basis represent gross revenues less distribution fees earned and expenses paid in accordance with the distribution arrangement. Revenues from television licensing, together with related costs, are recognized when the feature film or television program is initially available to the licensee for telecast. Payments received in advance of initial availability are classified as deferred revenue until all SOP 00-2 revenue recognition requirements have been met. At March 31, 2009, deferred revenue primarily consists of advances related to the Company's television licensing contracts under which the related product will become available in future periods. Long-term, non-interest-bearing receivables arising from licensing agreements are discounted to present value in accordance with Accounting Principles Board ("APB") Opinion No. 21, "Interest on Receivables and Payables."

*Barter Transactions.* The Company accounts for advertising time spots received as full or partial consideration from the sale of feature film and television programming product in the domestic syndication market at the estimated fair value of the advertising received in accordance with the provisions of APB Opinion No. 29, "Accounting for Nonmonetary Transactions." The Company recognized barter revenues of $10.5 million and $11.3 million in the years ended March 31, 2009 and 2008, respectively.

## Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)

*Film and Television Costs.* Except for purchase accounting adjustments arising from the Acquisition, film costs include the costs of production, capitalized overhead and interest. These costs, as well as participations and talent residuals, are charged against earnings on an individual film basis in the ratio that the current year's gross film revenues bear to management's estimate of total remaining ultimate gross film revenues as of the beginning of the current year from all sources (the "individual film forecast method"). The cost allocated to films revalued in purchase accounting is being amortized over their estimated economic lives not to exceed 20 years.

Under SOP 00-2, exploitation costs, including advertising and marketing costs, are expensed as incurred. The Company incurred advertising and marketing costs of approximately $183.4 million and $157.1 million for the years ended March 31, 2009 and 2008, respectively. Theatrical print costs are amortized over the periods of theatrical release of the respective territories and are included in operating expenses.

Capitalized film costs are stated at the lower of unamortized cost or estimated fair value on an individual film basis. Revenue and cost forecasts are periodically reviewed by management and revised when warranted by changing conditions. When estimates of total revenues and costs indicate that a feature film or television program will result in an ultimate loss, additional amortization is recognized to the extent that capitalized film costs exceed estimated fair value. During the years ended March 31, 2009 and 2008, the Company recorded film cost write-downs of $44.0 million and $7.8 million, respectively.

The Company also maintains home entertainment product in inventory, which primarily consists of digital video discs that are stated at the lower of cost or market. The Company accounts for its home entertainment inventory using the first-in-first-out method.

Shipping and handling costs are included in selling, general and administrative expenses in the consolidated statements of operations.

*Property and Equipment.* Except for purchase accounting adjustments from the Acquisition, property and equipment are stated at cost. Depreciation of property and equipment is computed using the straight-line method over the expected useful lives of applicable assets, ranging from three to five years.

MGM Holdings Inc.

Notes to Consolidated Financial Statements
(continued)

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

Leasehold improvements are amortized using the straight-line method over the shorter of the estimated useful lives of the assets or the terms of the related leases. When property is sold or otherwise disposed of, the cost and related accumulated depreciation and amortization is removed from the accounts, and any resulting gain or loss is included in income. The costs of normal maintenance, repairs and minor replacements are charged to expense when incurred.

*Goodwill and Other Intangible Assets.* Goodwill represents the excess cost of acquisition over the fair market value of identifiable net assets of the Company. In accordance with Statement of Financial Accounting Standards ("SFAS") No. 142, "Goodwill and Other Intangible Assets," goodwill and intangible assets with indefinite lives are not subject to amortization, but an annual assessment of impairment by applying a fair-value based test is performed. Fair value of goodwill is based on discounted cash flows, market multiples and/or appraised values as appropriate. Under SFAS No. 142, the carrying values of assets are calculated at the lowest levels for which there are identifiable cash flows, which include filmed entertainment, cable channels and other businesses (consumer products, music and interactive operations). SFAS No. 142 requires the Company to compare the fair value of the reporting unit to its carrying amount on an annual basis to determine if there is potential impairment. If the fair value of the reporting unit is less than its carrying value, an impairment loss is recorded to the extent that the fair value of the goodwill within the reporting unit is less than its carrying value.

The Acquisition resulted in goodwill and other identifiable intangible assets totaling approximately $1.8 billion, of which none are expected to be deductible for tax purposes. The allocation of the excess purchase price included identifiable intangible assets totaling $518.0 million. This includes $424.9 million of identifiable intangible assets subject to amortization, consisting of certain operating agreements with lives ranging from 14 to 40 years. Additionally, trademarks valued at $93.1 million were identified and determined to have indefinite lives. In accordance with SFAS No. 142, goodwill and intangible assets with indefinite lives are not amortized but instead are measured for impairment annually, or when events indicate that impairment exists. Intangible assets that are determined to have definite lives are amortized on a straight-line basis over their estimated useful lives. At March 31, 2009, the Company completed an impairment review and did not recognize any impairment of goodwill and other intangible assets included in the consolidated financial statements.

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

Amortization of identifiable intangible assets was $15.3 million for the years ended March 31, 2009 and 2008, and is expected to be $15.3 million in each of the next five fiscal years. Identifiable intangible assets and the related accumulated amortization and weighted-average amortization period as of March 31, 2009, are summarized as follows (amounts in thousands):

| Identifiable Intangible Assets | Gross Fair Value | | Accumulated Amortization | | Weighted-Average Amortization Period |
|---|---|---|---|---|---|
| Danjaq agreements | $ | 243,500 | $ | (24,197) | 40 years |
| MSO agreements | | 7,000 | | (1,926) | 14.5 years |
| Consumer products licensing rights | | 113,000 | | (22,462) | 20 years |
| Music publishing/licensing rights | | 61,400 | | (12,206) | 20 years |
| Intangible assets subject to amortization | | 424,900 | | (60,791) | 31.4 years |
| Trademarks | | 93,100 | | – | Indefinite |
| Total identifiable intangible assets | $ | 518,000 | $ | (60,791) | N/A |

*Income Taxes*. In accordance with SFAS No. 109, "Accounting for Income Taxes," deferred tax assets and liabilities are recognized with respect to the tax consequences attributable to differences between the financial statement carrying values and tax basis of existing assets and liabilities. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which these temporary differences are expected to be recovered or settled. Further, the effect on deferred tax assets and liabilities of changes in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established, when necessary, to reduce deferred tax assets if it is more likely than not that some portion or all of the deferred tax assets will not be realized.

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes – an interpretation of FASB Statement No. 109, '*Accounting for Income Taxes*'" ("FIN 48"). FIN 48 sets out the use of a single comprehensive model to address uncertainty in tax positions and clarifies the accounting for income taxes by establishing the minimum recognition threshold that a tax position is required to meet before being recognized in the financial statements. FIN 48 also provides guidance on derecognition of tax positions, measurement, classification, interest and penalties, accounting in interim periods, disclosure and transition. The Company adopted FIN 48 on April 1, 2007, and upon adoption the Company

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

recognized approximately $1.9 million in additional tax reserves for positions that were previously unrecognized. All such positions predated the Acquisition, and as such, the adjustment was accounted for as an increase in goodwill. The Company continues to include interest and penalties related to income tax matters as part of the income tax provision.

*Foreign Currency Translation*. Foreign subsidiary assets and liabilities are translated into United States dollars at the exchange rates in effect at the balance sheet date. Revenues and expenses of foreign subsidiaries are translated into United States dollars at the average exchange rates that prevailed during the period. The gains or losses that result from this process are included as a component of the accumulated other comprehensive income (loss) in stockholders' deficit. Foreign currency denominated transactions are recorded at the exchange rate in effect at the time of occurrence, and the gains or losses resulting from subsequent translation at current exchange rates are included in the accompanying consolidated statements of operations.

*Comprehensive Income (Loss)*. The Company computes comprehensive income (loss) pursuant to SFAS No. 130, "Reporting Comprehensive Income." This statement establishes standards for the reporting and display of comprehensive income (loss) and its components in financial statements and thereby reports a measure of all changes in equity of an enterprise that result from transactions and other economic events other than transactions with owners. Total comprehensive income (loss) for the Company includes net income (loss) and other comprehensive income (loss) items, including unrealized gain (loss) on derivative instruments, unrealized gain (loss) on securities and cumulative foreign currency translation adjustments. Components of other comprehensive income (loss), net of related income tax effect, and components of accumulated other comprehensive income (loss) are shown in the consolidated statements of stockholders' deficit.

*Derivative Financial Instruments*. The Company has only limited involvement with derivative financial instruments and does not use them for trading purposes. In certain instances, the Company enters into foreign currency exchange forward contracts in order to reduce exposure to changes in foreign currency exchange rates that affect the value of the Company's firm commitments and certain anticipated foreign currency cash flows. Additionally, historically the Company has used derivative financial instruments to manage well-defined interest rate risks. The Company entered into interest rate swap arrangements, under which the Company agrees with other parties to exchange, at specified intervals, the difference between fixed-rate and floating-rate interest amounts calculated by reference to an agreed notional principal amount.

## Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)

The Company uses mark-to-market accounting to determine the fair value of its derivative financial instruments in accordance with SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," and SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities." The Company measures interest rate swap contracts and foreign currency forward contracts for effectiveness on a quarterly basis. Changes in the fair value of effective hedges are reflected in accumulated other comprehensive income (loss) within the consolidated statements of stockholders' deficit, while changes in ineffective hedges are reflected in other expense on the consolidated statements of operations.

*Stock-Based Compensation*. The Company uses the fair value recognition provisions of SFAS No. 123R, "Share-Based Payment." The Company recognizes compensation expense related to the grant of restricted stock and options on a straight-line basis over the requisite service period of the award, taking into consideration the applicable estimated forfeiture rates. The Company measures liability awards at their intrinsic value through the date of settlement. The Company recorded compensation expense of $6.8 million and $9.3 million for the years ended March 31, 2009 and 2008, respectively, which has been included in selling, general and administrative expenses in the consolidated statements of operations.

*Use of Estimates in the Preparation of Financial Statements*. The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities. Management estimates ultimate revenues and costs for feature films and television programs for each market based on anticipated release patterns, public acceptance and historical results for similar products. Actual results could differ materially from those estimates.

*New Accounting Pronouncements*. In September 2006, SFAS No. 157, "Fair Value Measurements," was released. SFAS No. 157 establishes a common definition of fair value to be used when the Company is required to use a fair value measure for recognition or disclosure purposes. The SFAS No. 157 provisions adopted by the Company on April 1, 2008, relate to financial assets and liabilities as well as other assets and liabilities carried at fair value on a recurring basis. The adoption of SFAS No. 157 did not have a material impact on the consolidated financial statements.

In February 2008, SFAS No. 157-2, "Effective Date of FASB Statement No. 157," was released. SFAS No. 157-2 delays the effective date for all nonrecurring fair value measurements of nonfinancial assets and liabilities until fiscal years beginning after November 15, 2008. SFAS No. 157-2 will be effective for the year ending March 31, 2010. The Company does not expect the adoption of SFAS No. 157-2 to have a material impact on the consolidated financial statements.

## Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)

In February 2007, SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities – Including an amendment of FASB Statement No. 115," was released. SFAS No. 159 provides companies with an option to report selected financial assets and liabilities at fair value and establishes presentation and disclosure requirements designed to facilitate comparisons between companies that choose different measurement attributes for similar types of assets and liabilities. The fair value election is irrevocable and generally made on an instrument-by-instrument basis, even if a company has similar instruments that it elects not to measure based on fair value. SFAS No. 159 expands the use of fair value accounting but does not affect existing standards that require assets or liabilities to be carried at fair value. The Company adopted SFAS No. 159 on April 1, 2008, for its financial assets and liabilities. The adoption did not have a material impact on the consolidated financial statements and the Company did not elect the fair value option for any items.

In December 2007, SFAS No. 141(R), "Business Combinations," was released. SFAS No. 141(R) establishes principles and requirements for determining how a company recognizes and measures the fair value of certain assets and liabilities acquired in a business combination, including noncontrolling interests, contingent consideration, and certain acquired contingencies. SFAS No. 141(R) also requires acquisition-related transaction expenses and certain restructuring costs to be expensed as incurred rather than capitalized as a component of the business combination. SFAS No. 141(R) will be effective prospectively for business combinations beginning during the year ending March 31, 2010. The Company does not expect the adoption of SFAS No. 141(R) to have a material impact on the consolidated financial statements.

In December 2007, SFAS No. 160, "Noncontrolling Interests in Consolidated Financial Statements – an amendment of ARB No. 51," was released. SFAS No. 160 establishes accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. SFAS No. 160 requires the noncontrolling interest in a consolidated subsidiary to be reported as a separate component of equity in the consolidated balance sheets and any earnings and losses attributable to noncontrolling interests to be separately stated on the consolidated statements of operations. SFAS No. 160 requires the retroactive adoption of the presentation and disclosure requirements for existing noncontrolling interests while all other requirements shall be applied prospectively. SFAS No. 160 will be effective for the year ending March 31, 2010. The Company does not expect the adoption of SFAS No. 160 to have a material impact on the consolidated financial statements.

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

In March 2008, SFAS No. 161, "Disclosures about Derivative Instruments and Hedging Activities – an amendment of FASB Statement No. 133," was released. SFAS No. 161 requires entities to provide enhanced disclosures related to how an entity uses derivative instruments, how derivative instruments are accounted for under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," and how derivative instruments and the related hedged items impact an entity's financial statements. SFAS No. 161 will be effective for the year ending March 31, 2010. The Company does not expect the adoption of SFAS No. 161 to have a material impact on the consolidated financial statements.

**Note 2—Film and Television Costs**

Film and television costs, net of amortization, are summarized as follows (in thousands):

|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Theatrical productions: |  |  |
| Released | $ 3,702,841 | $ 3,404,216 |
| Less accumulated amortization | (1,321,158) | (974,717) |
|  | 2,381,683 | 2,429,499 |
| Completed not released | 17,462 | 22,987 |
| In production | 60,467 | 221,262 |
| In development | 25,210 | 10,448 |
| Total theatrical productions | 2,484,822 | 2,684,196 |
| Television programs: |  |  |
| Released | 567,076 | 517,958 |
| Less accumulated amortization | (366,789) | (289,631) |
|  | 200,287 | 228,327 |
| In production | 18,127 | 16,480 |
| In development | – | 696 |
| Total television programs | 218,414 | 245,503 |
|  | $ 2,703,236 | $ 2,929,699 |

## Note 2—Film and Television Costs (continued)

Based on the Company's estimates of projected gross revenues as of March 31, 2009, approximately 18% of completed film and television costs are expected to be amortized over the next 12 months, and approximately $158.9 million of accrued participants' share as of March 31, 2009, will be paid in the next 12 months. The acquired film and television library is being amortized under the individual film forecast method in order to properly match the expected future revenue streams. The average remaining life of the library is approximately 15 years.

Interest costs capitalized to theatrical productions were $0.4 million and $6.1 million during the years ended March 31, 2009 and 2008, respectively. Overhead costs capitalized to theatrical productions were $6.3 million and $7.1 million during the years ended March 31, 2009 and 2008, respectively.

## Note 3—Fair Value Measurements

In accordance with SFAS No. 157, a fair value measurement is determined based on the assumptions that a market participant would use in pricing an asset or liability. SFAS No. 157 also established a three-tiered hierarchy that draws a distinction between market participant assumptions based on (i) observable inputs such as quoted prices in active markets for identical assets or liabilities (Level 1), (ii) inputs other than quoted prices for similar assets or liabilities in active markets that are observable either directly or indirectly (Level 2), and (iii) unobservable inputs that require the company to use present value and other valuation techniques in the determination of fair value (Level 3). The following table presents information about financial assets and liabilities required to be carried at fair value on a recurring basis at March 31, 2009 (in thousands):

| | | Fair Value Measurements at March 31, 2009, using | | |
| Description | Balance at March 31, 2009 | Quoted Market Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| Assets: | | | | |
| Cash equivalents | $ 309,940 | $ 309,940 | $ – | $ – |
| Non-current investments | 5,229 | 5,229 | – | – |
| Liabilities: | | | | |
| Deferred compensation plan | (5,229) | (5,229) | – | – |
| Derivatives | (127,615) | – | (127,615) | – |
| Total | $ 182,325 | $ 309,940 | $ (127,615) | $ – |

MGM Holdings Inc.

Notes to Consolidated Financial Statements
(continued)

Note 3—Fair Value Measurements (continued)

Cash equivalents consist primarily of money market funds with original maturity dates of three months or less, for which fair value was determined based on quoted prices of identical assets that are trading in active markets.

Non-current investments are comprised of the money market funds, mutual funds and other marketable securities that are held in the Company's deferred compensation plan. The fair value of these assets and the deferred compensation plan liability were determined based on quoted prices of identical assets that are trading in active markets.

Derivative liabilities include interest rate swap agreements and foreign currency forward contracts. The fair values of these derivatives were determined using models based on market observable inputs, including interest rate curves and both forward and spot prices for foreign currencies.

Estimating the fair value of the Company's bank and other debt is not practicable since only an insignificant portion is actively traded on a market.

Note 4—Investments in and Advances to Affiliates

Investments in and advances to affiliates are summarized as follows (in thousands):

|  | March 31, 2009 | | March 31, 2008 | |
|---|---|---|---|---|
| Foreign cable channels | $ | 20,978 | $ | 18,936 |
| Joint ventures |  | 10,056 |  | – |
| Others |  | 150 |  | 150 |
|  | $ | 31,184 | $ | 19,086 |

In April 2008, the Company formed a joint venture with Viacom Inc., Paramount Pictures Corporation and Lions Gate Entertainment Corp. to create a premium television channel and subscription video on demand service named "Epix." The new venture will have access to the Company's titles released theatrically on or after January 1, 2009. Viacom Inc. will provide operational support to the venture, including marketing and affiliate services through its MTV Networks division. Upon its expected launch in the fall of 2009, the joint venture will provide

**Note 4—Investments in and Advances to Affiliates (continued)**

the Company with an additional platform to distribute its library of feature films and television programming. The Company has invested $12.4 million as of March 31, 2009, which represents 28.57% or its proportionate share of investment in the joint venture. The Company has a mandatory funding commitment of $31.4 million increasing to $42.9 million if certain performance targets are achieved.

**Note 5—Property and Equipment**

Property and equipment are summarized as follows (in thousands):

|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Leasehold improvements | $ 25,187 | $ 24,821 |
| Furniture, fixtures and equipment | 20,604 | 19,512 |
|  | 45,791 | 44,333 |
| Less accumulated depreciation and amortization | (25,702) | (22,621) |
|  | $ 20,089 | $ 21,712 |

**Note 6—Bank and Other Debt**

Bank and other debt are summarized as follows (in thousands):

|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Term loans | $ 3,697,000 | $ 3,735,000 |
| Revolving facility | 229,000 | – |
| Mezzanine promissory notes | 79,055 | 75,000 |
| Production loans | 20,036 | – |
| Other borrowings | 133,787 | 18,865 |
|  | $ 4,158,878 | $ 3,828,865 |

## Note 6—Bank and Other Debt (continued)

*Credit Facilities*. On April 8, 2005, the Company entered into a credit facility with a syndicate of banks (the "2005 Credit Facility") aggregating $4.0 billion, consisting of a five-year $250 million revolving credit facility (the "Revolving Facility"), a six-year $1.05 billion term loan ("Term A Facility") and a seven-year $2.7 billion term loan ("Term B Facility") (collectively, the "Term Loans"). On August 15, 2006 and March 9, 2007, the Company entered into the First and Second amended and restated credit facilities, respectively (incorporating these amendments, the "Amended Credit Facility"). The Amended Credit Facility replaced the Term A Facility with a five-year $1.1 billion term loan ("Term B-1 Facility") that incorporates the same loan amortization payment requirements as the Term B Facility. Among other things, the Amended Credit Facility also eliminated certain financial covenant requirements, increased the credit spreads on the Revolving Facility and the Term Loans, and established additional mandatory prepayment requirements.

Under the Amended Credit Facility, the Revolving Facility bears interest at 2.25% over the Prime Rate, as defined (5.50% at March 31, 2009), and the Term Loans bear interest at 3.25% over the Adjusted LIBOR rate, as defined (3.77% at March 31, 2009). Credit spreads on the Revolving Facility are subject to adjustment based on certain leverage tests, and can range from 2.00% to 3.25% for Eurodollar Loans, as defined, and 1.00% to 2.25% for ABR Loans, as defined. Amounts available under the Revolving Facility are limited by outstanding letters of credit which amounted to $20.4 million and $20.1 million at March 31, 2009 and 2008, respectively. At March 31, 2009 and 2008, there was $0.6 million and $229.9 million available under the Revolving Facility, respectively. The Revolving Facility matures on April 8, 2010, and the Term B Facility and the Term B-1 Facility mature on April 8, 2012.

The Company incurred approximately $72.2 million and $27.6 million in fees and other costs associated with the 2005 Credit Facility and the Amended Credit Facility, respectively, which are included in other assets and are being amortized under the effective interest method.

Borrowings under the Amended Credit Facility are secured by substantially all the assets of MGM, with the exception of the Company's subsidiary United Artists Entertainment ("UAE"), and any of its subsidiaries, as well as the copyrights in the James Bond series of motion pictures. The Amended Credit Facility contains various covenants, including limitations on indebtedness, production spending and capital expenditures, and maintenance of certain financial ratios. As of March 31, 2009, MGM was in compliance with all applicable covenants.

### Note 6—Bank and Other Debt (continued)

In August 2007, UAE, through its wholly owned subsidiary United Artists Production Finance LLC ("UAPF"), a Delaware Limited Liability Company, entered into a $250.0 million senior credit facility (the "Senior Facility") with a syndicate of banks and sold mezzanine promissory notes (the "Mezzanine Notes") totaling $75.0 million (collectively, the "UAPF Financing"). In the case of LIBO Rate Loans, as defined, the Senior Facility bears interest at 1.50% and 2.25% over the LIBO Rate, as defined (2.00% and 2.75% at March 31, 2009, respectively), for Ultimates Borrowing Base Loans (as defined) and all other LIBO Rate Loans, respectively, and matures on August 15, 2014. At March 31, 2009 and 2008, there was $230.0 million and $250.0 million, respectively, available under the Senior Facility.

The Mezzanine Notes bear interest at 14%. At any time that funds are insufficient to pay interest on the Mezzanine Notes or such interest cannot be paid due to restrictions set forth in the Senior Facility, all unpaid interest shall be paid-in-kind ("PIK") and added to the aggregate outstanding principal. During the year ended March 31, 2009, $4.1 million of PIK interest was added to the aggregate outstanding principal of the Mezzanine Notes. The Mezzanine Notes mature and are mandatorily redeemable on August 15, 2014, in cash, including PIK interest. UAPF may, at its option, redeem the Mezzanine Notes in whole, and in cash, at the optional prepayment price of 103%, 102%, 101% and 100% of the aggregate outstanding principal, including PIK interest, during the period ended August 16, 2008, 2009, 2010 or thereafter, respectively.

The Company incurred approximately $14.0 million in fees and other costs associated with the UAPF Financing, which are included in other assets and are being amortized under the effective interest method. In addition, the Company is required to retain certain funds on deposit as collateral for the payment of borrowings, interest and commitment fees until the maturity date of the UAPF Financing. At March 31, 2009 and 2008, the Company had $2.4 million and $2.6 million, respectively, of such funds on deposit, which have been classified as restricted cash within the consolidated balance sheets.

Borrowings under the Senior Facility are secured by substantially all the assets of UAPF. The UAPF Financing contains various covenants, including limitations on indebtedness, certain financial ratio tests, exposure limitations on cash availability and feature film costs, and specific conditions for Stop Funding Events (as defined). As of March 31, 2009, the Company was in compliance with all applicable covenants.

Other borrowings include certain amounts received from DDI for theatrical print and advertising costs for MGM productions. As MGM is solely responsible for these borrowings, the amounts are classified as other debt within the consolidated balance sheets.

**Note 7—Mandatorily Redeemable Preferred Stock**

Mandatorily redeemable preferred stock is summarized as follows (in thousands):

|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| 14% Senior Preferred Stock | $ **1,213,251** | $ 1,017,044 |
| 10% Junior Preferred Stock | **89,466** | 81,470 |
|  | $ **1,302,717** | $ 1,098,514 |

*Mandatorily Redeemable Senior Preferred Stock.* The Company is authorized to issue 1,000,000 shares of 14% Senior Preferred Stock ("Senior Preferred Stock") with a par value of $.01 per share. During the year ended March 31, 2009, the Company issued 405 shares of Senior Preferred Stock, and retired no shares. During the year ended March 31, 2008, the Company issued 1,226 shares of Senior Preferred Stock, and retired no shares. The Company had 767,843 and 767,438 shares outstanding at March 31, 2009 and 2008, respectively. The Senior Preferred Stock has a $1,000 per share liquidation preference (plus accrued and unpaid dividends) and has limited voting rights. In the event of liquidation or dissolution of MGM Holdings, all shares of Senior Preferred Stock, including accrued and unpaid dividends thereon, will rank senior to all other classes of stock of MGM Holdings.

Holders of the Senior Preferred Stock are entitled to receive, when and if declared, dividends at a rate equal to 14% per annum, which are cumulative and accrue from date of issuance and are compounded quarterly. All accrued dividends on the Senior Preferred Stock must be paid in cash prior to the payment of any cash dividends on any other series or class of capital stock.

The Senior Preferred Stock is mandatorily redeemable on April 8, 2013, in cash, at a price equal to the mandatory redemption price. The Senior Preferred Stock may not be redeemed prior to April 8, 2010. After April 8, 2010, MGM Holdings may, at its option, redeem the outstanding shares of the Senior Preferred Stock, in whole or in part, in cash, at a price equal to the optional redemption price of 101% of the liquidation preference, plus any accrued but unpaid dividends.

The Senior Preferred Stock was issued at a $208.1 million discount to the par value. The discount is being amortized over the life of the Senior Preferred Stock using the effective interest method. For the years ended March 31, 2009 and 2008, $25.4 million and $24.4 million of the discount, respectively, has been amortized and included in interest expense in the consolidated statements of operations.

**Note 7—Mandatorily Redeemable Preferred Stock (continued)**

*Mandatorily Redeemable Junior Preferred Stock.* The Company is authorized to issue 550,000 shares of 10% Junior Preferred Stock ("Junior Preferred Stock") with a par value of $.01 per share. During the year ended March 31, 2009, the Company issued no shares of Junior Preferred Stock, and retired 114 shares. During the year ended March 31, 2008, no shares of Junior Preferred Stock were issued or retired. At March 31, 2009 and 2008, the Company had 64,706 and 64,820 shares of Junior Preferred Stock outstanding. The Junior Preferred Stock has a $1,000 per share liquidation preference (plus accrued and unpaid dividends) and has limited voting rights. In the event of liquidation or dissolution of MGM Holdings, all shares of Junior Preferred Stock, including accrued and unpaid dividends thereon, will rank junior to all senior classes of securities of MGM Holdings (including the Senior Preferred Stock) and will rank senior to all junior classes of securities of MGM Holdings (including the common stock of MGM Holdings).

Holders of the Junior Preferred Stock are entitled to receive, when and if declared, dividends at a rate equal to 10% per annum, which are cumulative and accrue from date of issuance and are compounded annually. All accrued dividends on the Junior Preferred Stock must be paid in cash prior to the payment of any cash dividends on any other series or class of capital stock that rank junior to, or on parity with, the Junior Preferred Stock.

The Junior Preferred Stock is mandatorily redeemable on October 8, 2013, in cash, at a price equal to the mandatory redemption price. After, or contemporaneously with, the redemption of all outstanding Senior Preferred Stock, MGM Holdings may, at its option, redeem the outstanding shares of the Junior Preferred Stock, in whole or in part, in cash, at a price equal to the optional redemption price of 101% of the liquidation preference, plus any accrued but unpaid dividends.

**Note 8—Financial Instruments**

The Company is exposed to the impact of interest rate changes as a result of its variable rate Revolving Facility and Term Loans. In certain instances, the Company enters into interest rate swap agreements to lower funding costs, diversify sources of funding, or to alter interest rate exposures. Accordingly, MGM has entered into various interest rate swap agreements (the "Swap Agreements") whereby MGM agrees with other parties to exchange, at specified intervals, the difference between fixed-rate and floating-rate interest amounts calculated by reference to an agreed notional principal amount.

### Note 8—Financial Instruments (continued)

At March 31, 2009, the Swap Agreements aggregated a notional value of $3.9 billion, at an average pay rate of approximately 4.81%, with commencement dates ranging from June 30, 2005 to June 30, 2009, and expiration dates ranging from June 30, 2009 to June 30, 2010. As of March 31, 2009, the Company would have to pay approximately $124.2 million, if all such Swap Agreements were terminated, and these amounts have been included in other liabilities within the consolidated balance sheets. At March 31, 2008, the Swap Agreements aggregated a notional value of $5.5 billion, at an average pay rate of approximately 4.68%, with commencement dates ranging from June 30, 2005 to June 30, 2009, and expiration dates ranging from June 30, 2008 to June 30, 2010. As of March 31, 2008, the Company would have to pay approximately $132.5 million, if all such Swap Agreements were terminated, and these amounts have been included in other liabilities within the consolidated balance sheets.

At March 31, 2009, the Company's Swap Agreements did not qualify for hedge accounting and, as such, changes in the fair value of these hedges were reflected in other expense on the consolidated statement of operations for the year ended March 31, 2009. At March 31, 2008, certain of the Company's Swap Agreements qualified for hedge accounting and, as such, changes in the fair value of effective hedges were reflected in accumulated other comprehensive income (loss) within the consolidated statements of stockholders' deficit, while changes in the fair value of ineffective hedges were reflected in other expense on the consolidated statement of operations for the year ended March 31, 2008.

The Company transacts business globally and is subject to market risks resulting from fluctuations in foreign currency exchange rates. In certain instances, the Company enters into foreign currency exchange forward contracts or similar instruments in order to reduce exposure to changes in foreign currency exchange rates that affect the value of the Company's firm commitments and certain anticipated foreign currency cash flows. The Company intends to continue to enter into such contracts to modify its exposure to future material foreign currency exchange rate risks. As of March 31, 2009 and 2008, the Company had outstanding foreign currency forward contracts aggregating $25.1 million CAD and $22.1 million CAD, respectively. As of March 31, 2009 and 2008, the Company would have to pay approximately $3.4 million and $1.2 million, respectively, if all such foreign currency forward contracts were terminated. The Company's foreign currency forward contracts qualify for hedge accounting, and as such, the market value of all such contracts as of March 31, 2009 and 2008, has been included in other liabilities, and changes in the market value have been included in accumulated other comprehensive loss.

**Note 8—Financial Instruments (continued)**

During the year ended March 31, 2009, the Company recorded aggregate unrealized gains of $94.3 million, net of tax, in accumulated other comprehensive income. Of this amount, $96.4 million related to derivative contracts that settled during the year or no longer qualified for hedge accounting, due to a change in the underlying interest rate of the hedged cash flows and as such, were reclassed to earnings from accumulated other comprehensive income. In addition, during the year ended March 31, 2009, the Company recorded aggregated unrealized losses of $78.1 million in other expense. During the year ended March 31, 2008, the Company recorded aggregate unrealized losses of $116.8 million, net of tax, and $42.9 million in accumulated other comprehensive loss and other expense, respectively.

**Note 9—Stockholders' Deficit**

*Common Stock.* The Company is authorized to issue 3,700,000,000 shares of Class A Common Stock, $0.01 par value, and 500 shares of Class B Common Stock, $0.01 par value. As of March 31, 2009, 531,045,266 shares of Class A Common Stock and 500 shares of Class B Common Stock were issued and outstanding. As of March 31, 2008, 530,885,927 shares of Class A Common Stock and 500 shares of Class B Common Stock were issued and outstanding.

*2005 Incentive Plan.* The 2005 Stock Incentive Plan (the "2005 Incentive Plan") allows for the granting of stock awards aggregating not more than 116,431,619 and 101,431,619 shares outstanding at any time as of March 31, 2009 and 2008, respectively. Awards under the 2005 Incentive Plan are generally not restricted to any specific form or structure and may include, without limitation, qualified or non-qualified stock options, incentive stock options, restricted stock awards and stock appreciation rights (collectively, "Awards"). Awards may be conditioned on continued employment, have various vesting schedules and accelerated vesting and exercisability provisions in the event of, among other things, a change in control of the Company. All outstanding stock options under the 2005 Incentive Plan have been issued at or above market value with an exercise price of $1.00 and generally vest over a period of three to four years.

## Note 9—Stockholders' Deficit (continued)

Stock option transactions under the 2005 Incentive Plan were as follows:

| | March 31, 2009 | | March 31, 2008 | |
| | Shares | Weighted-Average Exercise Price | Shares | Weighted-Average Exercise Price |
|---|---|---|---|---|
| Options outstanding at beginning of year | 95,736,255 | $ 1.00 | 77,799,069 | $ 1.00 |
| Granted | 7,275,000 | 1.00 | 24,265,567 | 1.00 |
| Exercised | – | – | – | – |
| Canceled or expired | (8,218,691) | 1.00 | (6,328,381) | 1.00 |
| Options outstanding at end of year | 94,792,564 | $ 1.00 | 95,736,255 | $ 1.00 |
| Options exercisable at end of year | 69,820,577 | $ 1.00 | 49,875,177 | $ 1.00 |

The weighted-average remaining contractual life of all outstanding options as of March 31, 2009 and 2008, is 7.0 years and 7.9 years, respectively. As of March 31, 2009, total compensation cost related to non-vested awards not yet recognized under the 2005 Incentive Plan was $1.4 million, which is expected to be recognized over a weighted-average period of 0.7 years. The fair value of option grants was estimated using the Black-Scholes option pricing model. The weighted-average fair value of stock options granted during the years ended March 31, 2009 and 2008, was $0.01 and $0.08, respectively. The fair values were determined using the following assumptions: a dividend yield of 0% in all periods and an expected volatility of 33.9% and 34.2% for the years ended March 31, 2009 and 2008, respectively. The expected life was 5.0 years in all periods, and the weighted-average assumed risk-free interest rate was 3.0% and 3.9% for the years ended March 31, 2009 and 2008, respectively.

*Warrants.* Warrants to purchase Class A Common Stock of MGM Holdings were issued in conjunction with the issuance of shares of Senior Preferred Stock. Each share of Senior Preferred Stock was issued together with warrants to purchase 1,000 shares of Class A Common Stock. The warrants are immediately exercisable, in whole or in part, with an exercise price per share of $1.00, and will expire on the earlier of (i) April 8, 2015 and (ii) ten business days after the date on which all of the outstanding shares of Senior Preferred Stock are redeemed by MGM Holdings pursuant to the exercise of its optional redemption right. As of March 31, 2009 and 2008, there were outstanding warrants to purchase 767,843,000 and 767,438,000 shares of Class A Common Stock, respectively, all of which were currently exercisable as of such date. The fair value of these warrants is recorded in stockholders' deficit.

## Note 10—Income Taxes

The Company's domestic and foreign tax liability balances consist of the following (in thousands):

|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Current | $ 18,552 | $ 19,105 |
| Deferred | 112,509 | 115,585 |
|  | $ 131,061 | $ 134,690 |

The income tax effects of temporary differences between the book value and tax basis of assets and liabilities are as follows (in thousands):

|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Deferred tax assets: |  |  |
| Contract termination | $ 11,168 | $ 10,690 |
| Fixed assets | 4,171 | 5,420 |
| Participations and residuals payable | 50,450 | 23,899 |
| Investments | 14,967 | 18,085 |
| Reserves | 31,646 | 40,544 |
| Real estate leases | 21,440 | 22,346 |
| Other tax assets | 47,251 | 11,417 |
| Operating loss carryforwards | 754,841 | 663,783 |
| Stock options | 13,860 | 11,600 |
| Unrealized losses on derivative instruments and investments | 5,399 | 39,795 |
| Film revenue | 3,386 | 12,229 |
|  | 958,579 | 859,808 |
| Valuation allowance | (439,910) | (271,137) |
| Total deferred tax assets | 518,669 | 588,671 |
|  |  |  |
| Deferred tax liabilities: |  |  |
| Film and television costs | (421,792) | (487,056) |
| Goodwill and other intangibles | (209,386) | (217,200) |
| Total deferred tax liabilities | (631,178) | (704,256) |
| Net deferred tax liability | $ (112,509) | $ (115,585) |

## Notes to Consolidated Financial Statements
### (continued)

**Note 10—Income Taxes (continued)**

At March 31, 2009, the Company and its subsidiaries had net operating loss carryforwards for U.S. federal tax purposes of $2.0 billion, which will be available to reduce future taxable income. The net operating loss carryforwards expire between the years ending March 31, 2010 and 2029. Net operating loss carryforwards in the amount of $590.0 and $639.8 million as of March 31, 2009 and 2008, respectively, are subject to limitation on use under Section 382 of the Internal Revenue Code. In addition, the Company has net operating loss carryforwards for California state tax purposes of $584.1 million, which will expire between the years ending March 31, 2012 and 2029.

As of March 31, 2009 and 2008, the Company has determined that deferred tax assets in the amount of $439.9 million and $271.1 million, respectively, do not satisfy the recognition criteria set forth in SFAS No. 109. Accordingly, the Company has recorded valuation allowances for these amounts.

Details of the income tax expense (benefit) are as follows (in thousands):

| | March 31, 2009 | | March 31, 2008 |
|---|---|---|---|
| Current taxes: | | | |
| Federal and state taxes | **$ 1,110** | $ | 403 |
| Foreign taxes | **19,841** | | 3,839 |
| | | | |
| Deferred taxes: | | | |
| Federal taxes | **(147,321)** | | (106,051) |
| State taxes | **(34,011)** | | (5,765) |
| Change in valuation allowance | **185,685** | | 105,711 |
| Total tax expense (benefit) | **$ 25,304** | $ | (1,863) |

The following is a summary reconciliation of the federal tax rate to the effective tax rate:

| | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Federal tax rate on pre-tax book loss | **(35)%** | (35)% |
| State taxes, net of federal income tax benefit | **1** | – |
| Foreign taxes, net of federal income tax benefit | **(1)** | – |
| Non-deductible interest | **12** | 11 |
| Loss carryforwards and other tax attributes not benefited | **28** | 23 |
| Effective tax rate | **5%** | (1)% |

## Note 10—Income Taxes (continued)

As of March 31, 2009, the Company had $7.4 million of unrecognized tax benefits, of which $1.2 million, if recognized, would impact the effective tax. Subsequent to the adoption of SFAS No. 141(R), $7.4 million of the unrecognized tax benefits at March 31, 2009 would impact the effective tax rate. The Company has accrued interest and penalties associated with these unrecognized tax benefits of $2.6 million as of March 31, 2009, of which $0.3 million was recognized as a component of the income tax expense during the year ended March 31, 2009. The Company believes that there are no material unrecognized tax benefits which are reasonably possible to reverse within the following year. The following is a summary reconciliation of the beginning and ending amount of unrecognized tax benefits (in thousands):

|  | March 31, 2009 | | March 31, 2008 |
|---|---|---|---|
| Unrecognized tax benefits at April 1 | $ | **9,139** | $ 12,530 |
| Increases based on tax positions taken during a prior period | | **1,272** | 1,893 |
| Decreases based on tax positions taken during a prior period | | **(2,784)** | (783) |
| Increase based on tax positions taken during the current period | | **97** | – |
| Settlement with tax authorities | | **(293)** | – |
| Lapse of applicable statute of limitations | | **–** | (4,501) |
| Unrecognized tax benefits at March 31 | $ | **7,431** | $ 9,139 |

The Company or one of its subsidiaries files income tax returns with federal, state, local and foreign jurisdictions. As of March 31, 2009, the tax years that remain subject to examination by significant jurisdiction are as follows:

| | |
|---|---|
| U.S. federal | April 8, 2005 through the current period |
| California | December 31, 2004 through the current period |
| New York State | December 31, 1999 through the current period |
| New York City | December 31, 2000 through the current period |

## Note 11—Retirement Plans

The Company has a noncontributory retirement plan (the "Plan") covering substantially all regular full-time, non-union employees. Benefits are based on years of service and compensation, as defined. Effective December 31, 2000, MGM's predecessor amended the Plan to cease benefit accruals.

### Note 11—Retirement Plans (continued)

On April 1, 2007, the Company adopted the recognition and disclosure provisions of SFAS No. 158. SFAS No. 158 requires the recognition of the overfunded or underfunded status of defined benefit pension and other postretirement plans as an asset or liability in the consolidated balance sheet, and changes in that funded status to be recognized in comprehensive income in the year in which the changes occur.

The incremental effect of applying SFAS No. 158 on individual line items within the consolidated balance sheet as of March 31, 2008, including tax effects, is as follows (in thousands):

|  | Prior to adopting SFAS No. 158 | Effect of adopting SFAS No. 158 | As reported under SFAS No. 158 |
|---|---|---|---|
| Other assets | $ 102,825 | $ (4,441) | $ 98,384 |
| Accumulated other comprehensive loss | $ 96,182 | $ 4,441 | $ 100,623 |

Reconciliation of the funded status of the Plan and the amounts included in the Company's consolidated balance sheets are as follows (in thousands):

|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Projected benefit obligations: |  |  |
| Beginning obligations | $ 18,786 | $ 19,447 |
| Service cost | – | – |
| Interest cost | 1,200 | 1,174 |
| Actuarial gain | (2,587) | (875) |
| Net benefits paid | (807) | (960) |
| Ending obligations | $ 16,592 | $ 18,786 |
|  |  |  |
| Fair value of plan assets: |  |  |
| Beginning fair value | $ 22,753 | $ 24,059 |
| Actual return on plan assets | (6,072) | (346) |
| Employer contributions | – | – |
| Net benefits paid | (807) | (960) |
| Ending fair value | $ 15,874 | $ 22,753 |
| Funded status and net balance sheet (liability) asset | $ (718) | $ 3,967 |

MGM Holdings Inc.

Notes to Consolidated Financial Statements
(continued)

**Note 11—Retirement Plans (continued)**

The Company's net balance sheet assets and liabilities recognized at March 31, 2009 and 2008, under SFAS No. 158 are entirely comprised of non-current liabilities and non-current assets, respectively.

Amounts recognized in accumulated other comprehensive income (loss), before tax, under SFAS No. 158 were as follows (in thousands):

|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Net loss | $ 9,070 | $ 4,446 |
| Prior service credit | (1) | (5) |
| Total | $ 9,069 | $ 4,441 |

Key assumptions used in actuarial computations were as follows:

|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Assumptions – benefit obligations |  |  |
| Discount rate | 7.50% | 6.50% |
| Rate of increase in future compensation levels | N/A | N/A |
| | | |
| Assumptions – net periodic pension cost |  |  |
| Discount rate | 6.50% | 6.00% |
| Long-term rate of return on assets | 6.00% | 6.00% |
| Rate of increase in future compensation levels | N/A | N/A |

The overall expected long-term rate of return on Plan assets was based on the performance of the Plan assets in the past three years and on the expected performance of the Plan assets over the next five years pursuant to the investment policies and strategies stated within this pension footnote. The overall expected long-term rate of return on Plan assets for pension footnote purposes was selected in coordination with the actuarial valuation interest rate for minimum funding purposes.

Notes to Consolidated Financial Statements
(continued)

**Note 11—Retirement Plans (continued)**

Periodic pension cost includes the following components (in thousands):

| | March 31, 2009 | | March 31, 2008 |
|---|---|---|---|
| Service cost | $ – | $ | – |
| Interest cost on projected benefit obligation | **1,200** | | 1,174 |
| Expected return on plan assets | **(1,336)** | | (1,404) |
| Net amortization and deferral | **192** | | 136 |
| Net periodic pension expense (benefit) | $ **56** | $ | (94) |

The unrecognized net asset is being amortized over the estimated remaining service life of 12.0 years and 14.8 years for the years ended March 31, 2009 and 2008, respectively. Domestic pension benefits and expense were determined under the entry age actuarial cost method.

Additional supplemental information for the Plan is as follows (in thousands):

| | March 31, 2009 | | March 31, 2008 |
|---|---|---|---|
| Projected benefit obligation | $ **16,592** | $ | 18,786 |
| Accumulated benefit obligation | $ **16,592** | $ | 18,786 |
| Fair value of plan assets | $ **15,874** | $ | 22,753 |

As of March 31, 2009, benefits expected to be paid under the Plan are as follows (in thousands):

| Fiscal Year | | Amount |
|---|---|---|
| 2010 | $ | 666 |
| 2011 | | 638 |
| 2012 | | 540 |
| 2013 | | 1,373 |
| 2014 | | 1,153 |
| 2015-2019 | | 7,053 |
| | $ | 11,423 |

**Note 11—Retirement Plans (continued)**

Plan assets by category were as follows:

|  | March 31, 2009 | March 31, 2008 |
|---|---|---|
| Equity securities | **52%** | 54% |
| Debt securities and other | **48%** | 46% |
|  | **100%** | 100% |

The Plan's pension investments are allocated in a manner designed to provide a long-term investment return greater than the actuarial assumption, maximize investment return commensurate with appropriate levels of risk, and comply with the Employee Retirement Income Security Act of 1974 ("ERISA") by investing the funds in a manner consistent with ERISA fiduciary standards. Assets are allocated to provide adequate liquidity for the Plan's disbursements, such as benefit payments and ongoing expenses. The Plan's assets are managed such that all retirement benefit payments are met as they become due. The Plan's investment strategy focuses on the long term to take into account the long-term nature of the Plan's liabilities. The asset allocation strategy is implemented with due regard for the Plan's long-term needs and in a manner designed to control volatility and with regard for the Company's risk tolerance. The risk tolerance is comprised of financial and other relevant characteristics of the Company, as well as the Company's risk philosophy for pension assets. Certain business characteristics may reduce the Company's tolerance for volatility of investment returns and potential swings in contribution levels.

The Company's portfolio manager's asset/liability analyses indicate that approximately 30% of projected Plan assets are needed for upcoming disbursements and reserves. Accordingly, approximately 70% of the Plan's assets are available to invest in long-term securities, such as equities. However, the Plan is concerned about the level of volatility implicit in an asset mix of approximately 70% equity and 30% fixed income, and the attendant concern that the Company continues to be able to meet contributions during years when the investment markets are down and/or its business environment is depressed. In summary, the quantitative analyses of the Plan's assets and liabilities show approximately 55% is available to invest in equities (approximately 70% is available to invest in equities less 15% for risk tolerance and philosophy).

**Note 11—Retirement Plans (continued)**

The Plan currently targets the following as part of its long-term asset allocation strategy: approximately 45% in fixed income securities (20% for general account, 20% for fixed income (intermediate maturities), and 5% for high yield bonds) and approximately 55% in equity securities (27% for large capitalization United States equity securities, 4% for mid-capitalization equity securities, 10% for small capitalization United States equity securities, and 14% for international equity securities). Equity securities do not include any of the Company's common stock.

The Company did not contribute to the Plan during the years ended March 31, 2009 or 2008. The Company does not expect to be required to contribute to the Plan in the year ended March 31, 2010.

A significant number of the Company's production employees were covered by various union sponsored, collectively bargained multi-employer pension plans. The Company contributed approximately $13.5 million and $15.1 million for such plans during the years ended March 31, 2009 and 2008, respectively. Information from the plans' administrators is not sufficient to permit the Company to determine its share of unfunded vested benefits, if any.

The Company also provides each of its employees, including its officers, who have completed one year of service with the Company the opportunity to participate in the MGM Savings Plan (the "Savings Plan"). The Company makes matching contributions, on a monthly basis, up to 100% of the first 4% of the participant's basic earnings on a pre- and after-tax basis. The Company contributed approximately $1.7 million and $2.1 million to the Savings Plan during the years ended March 31, 2009 and 2008, respectively.

**Note 12—Related-Party Transactions**

The Company has equity interests ranging from 5% to 50% in certain television ventures located in various international territories, to which the Company licenses feature films and television programming produced or distributed by the Company. The Company recognized aggregate license fees under these agreements of $37.3 million and $48.0 million during the years ended March 31, 2009 and 2008, respectively.

The Company has production and distribution operating agreements with Sony Pictures Entertainment, Inc. ("SPE"). As a result of these agreements, SPE is entitled to a distribution service fee of 7.5% of gross receipts, as defined. During the years ended March 31, 2009 and 2008, the Company incurred SPE distribution service fees totaling $2.2 million and $1.4 million,

## Note 12—Related-Party Transactions (continued)

respectively. Until certain conditions are met, the distribution service fee is payable in cash up to $35.0 million annually, with the balance payable in 10% Junior Preferred stock. During the years ended March 31, 2009 and 2008, the Company has included $8.1 million and $7.4 million, respectively, of interest expense in the consolidated statements of operations relating to the outstanding Junior Preferred stock. At March 31, 2009 and 2008, the Company had a net payable due to SPE totaling $66.0 million and $148.1 million, respectively.

The Company has certain television licensing arrangements with Comcast Corporation. During the years ended March 31, 2009 and 2008, the Company recorded $3.3 million and $11.6 million in revenue, respectively, under these arrangements.

The Company has an agreement with the Consortium to pay a management fee of $5.0 million annually. Management fees for the years ended March 31, 2009 and 2008, were paid subsequent to the respective year ends. Additionally, the Company reimbursed Providence Equity Partners and Texas Pacific Group $289,000 and $7,000, respectively, during the year ended March 31, 2009, and $185,000 and $73,000, respectively, during the year ended March 31, 2008, relating primarily to travel and other out-of-pocket charges.

## Note 13—Commitments and Contingencies

*Litigation*. The Company, together with other major companies in the filmed entertainment industry, has been subject to numerous antitrust suits brought by various motion picture exhibitors, producers and others. In addition, various legal proceedings involving alleged breaches of contract, antitrust violations, copyright infringement and other claims are now pending, which the Company considers routine to its business activities.

The Company has provided an accrual for pending litigation as of March 31, 2009 and 2008, in accordance with SFAS No. 5, "Accounting for Contingencies." In the opinion of the Company's management, any liability under pending litigation is not expected to be material in relation to the Company's financial condition or results of operations.

*Leases*. The Company has operating leases for offices and equipment. Certain property leases include provisions for increases over base year rents as well as for escalation clauses for maintenance and other building operations. Rent expense was approximately $19.9 million and $14.7 million during the years ended March 31, 2009 and 2008, respectively.

## Note 13—Commitments and Contingencies (continued)

*Employment Agreements*. The Company has employment agreements with various principal officers and employees. The agreements provide for minimum salary levels as well as, in some cases, bonuses.

*Creative Talent Agreements*. The Company has entered into contractual agreements for creative talent related to future film production. Such amounts are scheduled to be paid through the year ended March 31, 2012.

*Other Commitments*.   The Company has various other commitments entered into in the ordinary course of business relating to operating leases for offices and equipment, contractual agreements for creative talent, employment agreements and letters of credit.

Future minimum annual commitments under bank and other debt agreements, noncancelable operating leases net of subleasing income, employment agreements, creative talent agreements, letters of credit and preferred stock as of March 31, 2009, are as follows (in thousands):

| | Year Ended March 31 | | | | | | |
| | 2010 | 2011 | 2012 | 2013 | 2014 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Bank and other debt | $ 171,787 | $ 267,000 | $ 2,715,750 | $ 905,250 | $ – | $ 99,091 | $ 4,158,878 |
| Operating leases | 16,447 | 16,956 | 17,596 | 18,280 | 18,405 | 82,521 | 170,205 |
| Employment agreements | 28,445 | 17,469 | 8,384 | 95 | – | – | 54,393 |
| Creative talent agreements | 12,663 | 1,785 | 1,000 | – | – | – | 15,448 |
| Letters of credit | 20,353 | – | – | – | – | – | 20,353 |
| Preferred stock and dividends | – | – | – | – | 2,438,086 | – | 2,438,086 |
| | $ 249,695 | $ 303,210 | $ 2,742,730 | $ 923,625 | $ 2,456,491 | $ 181,612 | $ 6,857,363 |

## Note 14—Supplementary Cash Flow Information

The Company paid interest, net of amounts capitalized, of $281.3 million and $304.5 million during the years ended March 31, 2009 and 2008, respectively. The Company paid income taxes of $14.4 million and $8.9 million during the years ended March 31, 2009 and 2008, respectively.

Ernst & Young LLP

Assurance | Tax | Transactions | Advisory

**About Ernst & Young**
Ernst & Young is a global leader in assurance,
tax, transaction and advisory services.
Worldwide, our 135,000 people are united
by our shared values and an unwavering
commitment to quality. We make a difference
by helping our people, our clients and our wider
communities achieve their potential.

www.ey.com

0907-1072933



APPENDIX E

TO

DISCLOSURE STATEMENT
OF METRO-GOLDWYN-MAYER STUDIOS INC. AND CERTAIN OF ITS AFFILIATES

UNAUDITED FINANCIAL STATEMENT (MARCH, 2010)

# MGM Holdings Inc.

## Condensed Consolidated Balance Sheets

(Unaudited, in thousands, except share data)

| | March 31, 2010 | March 31, 2009 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 191,601 | $ 361,192 |
| Restricted cash | 48,442 | 2,412 |
| Accounts and contracts receivable (net of allowance for doubtful accounts of $13,863 and $14,794, respectively) | 288,251 | 344,597 |
| Film and television costs, net | 1,867,686 | 2,703,236 |
| Investments in and advances to affiliates | 30,775 | 31,184 |
| Property and equipment, net | 17,386 | 20,089 |
| Goodwill and other intangible assets, net | 318,614 | 1,739,124 |
| Other assets | 44,261 | 59,902 |
| Total assets | $ 2,807,016 | $ 5,261,736 |
| | | |
| **Liabilities and deficit** | | |
| Liabilities: | | |
| Bank and other debt | $ 2,245,884 | $ 4,158,878 |
| Accounts payable and accrued liabilities | 404,247 | 326,192 |
| Accrued participants' share | 200,598 | 284,184 |
| Current and deferred income taxes payable | 111,816 | 131,061 |
| Advances and deferred revenues | 156,008 | 158,490 |
| Other liabilities | 86,187 | 179,163 |
| Mandatorily redeemable preferred stock | 1,534,017 | 1,302,717 |
| Total liabilities | 4,738,757 | 6,540,685 |
| | | |
| Commitment and contingencies | | |
| | | |
| Deficit: | | |
| Class A common stock, $.01 par value, 3,700,000,000 shares authorized, 531,133,391 and 531,045,266 issued and outstanding, respectively | 5,311 | 5,310 |
| Class B common stock, $.01 par value, 500 shares authorized, issued and outstanding | – | – |
| Additional paid-in capital | 512,948 | 511,874 |
| Warrants | 208,146 | 208,085 |
| Accumulated deficit | (2,626,627) | (1,986,916) |
| Accumulated other comprehensive loss | (7,489) | (17,497) |
| Total stockholders' deficit | (1,907,711) | (1,279,144) |
| Noncontrolling interests | (24,030) | 195 |
| Total deficit | (1,931,741) | (1,278,949) |
| Total liabilities and deficit | $ 2,807,016 | $ 5,261,736 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.*

# MGM Holdings Inc.

## Condensed Consolidated Statements of Operations

(Unaudited, in thousands)

| | Year Ended | |
| --- | --- | --- |
| | March 31, 2010 | March 31, 2009 |
| Revenues | $ 1,119,187 | $ 1,223,951 |
| | | |
| Expenses: | | |
| Operating | 1,351,961 | 769,482 |
| Selling, general and administrative | 417,177 | 477,878 |
| Depreciation and non-film amortization | 19,173 | 18,814 |
| Impairment of goodwill and other intangible assets | 1,405,217 | - |
| Total expenses | 3,193,528 | 1,266,174 |
| | | |
| Operating loss | (2,074,341) | (42,223) |
| | | |
| Other income (expense): | | |
| Equity in net (losses) earnings of affiliates | (19,723) | 1,530 |
| Interest expense | (823,201) | (511,745) |
| Interest income | 6,754 | 9,277 |
| Gain on extinguishment of debt | 2,216,155 | – |
| Other income (expense), net | 28,664 | (79,096) |
| Total other expenses | 1,408,649 | (580,034) |
| | | |
| Loss from operations before income taxes | (665,692) | (622,257) |
| Income tax benefit (provision) | 1,756 | (25,304) |
| Net loss | $ (663,936) | $ (647,561) |
| Less: Net (loss) income attributable to noncontrolling interests | (24,225) | 101 |
| Net loss attributable to MGM Holdings Inc. | $ (639,711) | $ (647,662) |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.*

# MGM Holdings Inc.

## Condensed Consolidated Statements of Stockholders' Deficit
### (Unaudited, in thousands, except share data)

| | Common Stock Class A | | Common Stock Class B | | Additional Paid-in Capital | Warrants | Accumulated Deficit | Comprehensive Income (Loss) | Accumulated Other Comprehensive Income (Loss) | MGM Holdings Inc. Stockholders' Deficit | Non-controlling Interests | Total Deficit |
| | Number of Shares | Par Value | Number of Shares | Par Value | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance, April 1, 2008 | 530,885,927 | $ 5,309 | 500 | $ – | $ 505,247 | $ 207,975 | $ (1,339,254) | $ – | $ (100,623) | $ (721,346) | $ 94 | $ (721,252) |
| Issuance of shares | 71,214 | 1 | – | – | 70 | – | – | – | – | 71 | – | 71 |
| Issuance of warrants | – | – | – | – | – | 49 | – | – | – | 49 | – | 49 |
| Stock-based employee compensation and option vesting charge | 88,125 | – | – | – | 6,557 | 61 | – | – | – | 6,618 | – | 6,618 |
| Comprehensive income (loss): | | | | | | | | | | | | |
| Net loss | – | – | – | – | – | – | (647,662) | (647,662) | – | (647,662) | 101 | (647,561) |
| Unrealized gain on derivative instruments | – | – | – | – | – | – | – | 94,259 | 94,259 | 94,259 | – | 94,259 |
| Unrealized loss on securities | – | – | – | – | – | – | – | (1,800) | (1,800) | (1,800) | – | (1,800) |
| Retirement plan adjustments | – | – | – | – | – | – | – | (4,628) | (4,628) | (4,628) | – | (4,628) |
| Foreign currency translation adjustments | – | – | – | – | – | – | – | (4,705) | (4,705) | (4,705) | – | (4,705) |
| Comprehensive loss | | | | | | | | (564,536) | | | | |
| Balance, March 31, 2009 | 531,045,266 | 5,310 | 500 | – | 511,874 | 208,085 | (1,986,916) | – | (17,497) | (1,279,144) | 195 | (1,278,949) |
| Issuance of shares | – | – | – | – | – | – | – | – | – | – | – | – |
| Issuance of warrants | – | – | – | – | – | – | – | – | – | – | – | – |
| Stock-based employee compensation and option vesting charge | 88,125 | 1 | – | – | 1,074 | 61 | – | – | – | 1,136 | – | 1,136 |
| Comprehensive income (loss): | | | | | | | | | | | | |
| Net loss | – | – | – | – | – | – | (639,711) | (639,711) | – | (639,711) | (24,225) | (663,936) |
| Unrealized gain on derivative instruments | – | – | – | – | – | – | – | 3,377 | 3,377 | 3,377 | – | 3,377 |
| Unrealized gain on securities | – | – | – | – | – | – | – | 1,315 | 1,315 | 1,315 | – | 1,315 |
| Retirement plan adjustments | – | – | – | – | – | – | – | 1,353 | 1,353 | 1,353 | – | 1,353 |
| Foreign currency translation adjustments | – | – | – | – | – | – | – | 3,963 | 3,963 | 3,963 | – | 3,963 |
| Comprehensive loss | | | | | | | | (629,703) | | | | |
| Balance, March 31, 2010 | 531,133,391 | $ 5,311 | 500 | $ – | $ 512,948 | $ 208,146 | $ (2,626,627) | $ – | $ (7,489) | $ (1,907,711) | $ (24,030) | $ (1,931,741) |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.*

# MGM Holdings Inc.

## Condensed Consolidated Statements of Cash Flows
### (Unaudited, in thousands)

| | Year Ended | |
| --- | --- | --- |
| | March 31, 2010 | March 31, 2009 |
| **Operating activities** | | |
| Net loss | $ (639,711) | $ (647,662) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Additions to film costs, net | (163,612) | (197,160) |
| Amortization of film and television costs and participants' share | 1,158,099 | 557,781 |
| Accretion of senior and junior preferred stock dividends | 204,681 | 178,614 |
| Decrease in distribution fees paid in junior preferred stock | – | (114) |
| Amortization of senior preferred stock discount | 26,456 | 25,407 |
| Depreciation and non-film amortization | 19,173 | 18,814 |
| Impairment of goodwill and other intangible assets | 1,405,217 | – |
| Amortization of deferred financing costs | 18,451 | 19,120 |
| Stock-based employee compensation and option vesting charge | 1,299 | 6,782 |
| Paid-in-kind interest | 11,713 | 4,055 |
| Provision for bad debt and other reserves | 2,735 | 11,266 |
| Change in fair value of financial instruments | (29,335) | 78,059 |
| Change in fair value of Rabbi Trust | 792 | (2,181) |
| Equity in net losses (earnings) of affiliates | 21,335 | (1,530) |
| Other non-cash expenses | 910 | 57 |
| Gain on extinguishment of debt | (2,216,155) | – |
| Net (loss) income attributable to noncontrolling interests | (24,225) | 101 |
| (Increase) decrease in restricted cash, accounts and contracts receivable, and other assets | (1,920) | 42,490 |
| Increase (decrease) in accounts payable, accrued and other liabilities, accrued participants' share and taxes | 42,479 | (170,036) |
| Decrease in advances and deferred revenues | (2,482) | (67,497) |
| Foreign currency exchange (gain) loss | (1,059) | 14,745 |
| Net cash used in operating activities | (165,159) | (128,889) |
| | | |
| **Investing activities** | | |
| Dividends received from investees | 3,494 | 1,860 |
| Investments in and advances to affiliates | (24,420) | (12,428) |
| Additions to property and equipment | (1,190) | (2,638) |
| Net cash used in investing activities | (22,116) | (13,206) |
| | | |
| **Financing activities** | | |
| Additions to borrowed funds | 215,082 | 394,688 |
| Repayments of borrowed funds | (189,382) | (68,730) |
| Net proceeds from issuance of common stock | – | 71 |
| Net proceeds from issuance of preferred stock | – | 132 |
| Net proceeds from issuance of warrants | – | 49 |
| (Increase) decrease in restricted cash | (7,453) | 193 |
| Net cash provided by financing activities | 18,247 | 326,403 |
| | | |
| Net change in cash and cash equivalents from operating, investing and financing activities | (169,028) | 184,308 |
| Net (decrease) increase in cash due to foreign currency fluctuations | (563) | 783 |
| | | |
| Net change in cash and cash equivalents | (169,591) | 185,091 |
| Cash and cash equivalents at beginning of year | 361,192 | 176,101 |
| Cash and cash equivalents at end of year | $ 191,601 | $ 361,192 |

*The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.*

## Note 1—Basis of Presentation and Summary of Significant Accounting Policies

*Basis of Presentation.* The accompanying unaudited condensed consolidated financial statements include the accounts of MGM Holdings Inc. ("MGM Holdings"), MGM Holdings II Inc., Metro-Goldwyn-Mayer Inc. ("MGM"), Metro-Goldwyn-Mayer Studios Inc. and its majority owned subsidiaries (collectively, "MGM Studios"), and Orion Pictures Corporation and its majority owned subsidiaries (collectively, "Orion"; all collectively, the "Company"). MGM Holdings is a Delaware corporation formed on February 11, 2005, specifically in connection with the acquisition of MGM and owned by an investor group comprised of Providence Equity Partners, Texas Pacific Group, Sony Corporation of America, Comcast Corporation, and DLJ Merchant Banking Partners (collectively, the "Consortium"). The acquisition of MGM by the Consortium (the "Acquisition") was completed on April 8, 2005. The accompanying unaudited condensed consolidated financial statements include the push down of the purchase price allocation.

The accompanying unaudited condensed consolidated financial statements have been prepared based on the assumptions more fully described herein, and do not represent complete financial statements. Accordingly, these financial statements do not include certain adjustments, information and footnotes required by accounting principles generally accepted in the United States for complete financial statements. In addition, the footnotes do not include all the disclosures required of publicly reporting entities. The Company's auditors have not completed their audit of the accompanying unaudited condensed consolidated financial statements, and as such, several adjustments, information and footnotes included herein are based on business judgments and management's best estimates, which could be subject to material change following completion of the financial statement audit. However, these financial statements contain adjustments consisting only of normal recurring accruals which, in the opinion of management, are necessary in order to make the financial statements not misleading. The balance sheet at March 31, 2009 has been derived from the audited financial statements at that date but does not include all of the information and footnotes required by accounting principles generally accepted in the United States for complete financial statements. These financial statements should be read in conjunction with the Company's audited financial statements and notes thereto for the year ended March 31, 2009. The Company has presented unclassified balance sheets. Certain reclassifications have been made to amounts reported in prior periods to conform with the current presentation.

*Business.* The Company is a filmed entertainment company, with one of the world's largest film and television libraries and a group of important content franchises. The Company is engaged primarily in the development, production and worldwide distribution of feature films, television programming, interactive media, digital media, music and licensed merchandise. The Company also distributes films produced or financed, in whole or in part, by third parties. Additionally, the

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

Company holds equity interests in various domestic and international television channels, reaching more than 130 countries. The Company has an exclusive home entertainment distribution services agreement with Twentieth Century Fox Film Corporation (hereinafter, "Fox" and the "Fox Agreement"). The Fox Agreement extends through August 31, 2011, subject to certain termination provisions, and grants Fox worldwide DVD and international theatrical distribution rights.

The Company has been subject to a number of competitive pressures, including a significant reduction in home video revenue caused by, among other things, the reduction in consumer discretionary spending. In response to these competitive pressures, the Company obtained forbearance agreements with sufficient lenders under its senior secured corporate credit facility and interest rate swap counterparties that enabled it to suspend payment of amounts due thereunder without the threat of exercise of default remedies by those lenders and swap counterparties (see Note 7) while the Company considered certain financial and strategic options. Under the terms of the forbearance agreements the Company was not in default under its senior secured corporate credit facility due to its failure to pay interest and certain principal payments due during the period from September 30, 2009 through October 29, 2010, the expiration date of the forbearance agreements.

*Liquidity.* The Company's primary sources of liquidity are cash and cash equivalents, cash flows generated from operations, and amounts, if any, available under certain credit facilities. At March 31, 2010, the Company had $191.6 million in cash and cash equivalents. In addition, the Company had $3.67 billion and $248.9 million in outstanding borrowings under its senior secured term loans and revolving credit facility, respectively, with no unused borrowing capacity available (see Note 7). The senior secured term loans mature on April 8, 2012, and the revolving credit facility matures on April 8, 2010, at which time the Company would be required to pay all amounts then outstanding if it were not for the existence of the aforementioned forbearance agreements. At March 31, 2010, there were $97.1 million in outstanding borrowings under a production financing facility, with $152.9 million in available borrowing capacity, subject to certain limitations (see Note 7); subsequent to March 31, 2010, the use of available borrowing capacity in this facility was further restricted (see Note 16). In addition, at March 31, 2010, there were $92.6 million in outstanding amounts received under the revenue participation agreement with Domestic Distribution Inc. ("DDI") and used to pay certain domestic theatrical print and advertising costs, with $82.4 million in additional availability; however, subsequent to March 31, 2010, the additional availability was reduced to zero (see Note 16).

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

The Company's cash flow projections indicate that cash and cash equivalents, together with cash flows from operations, will be insufficient to pay all amounts due upon expiration of the forbearance agreements, including principal and accrued but unpaid interest then due under the senior secured term loans, revolving credit facility and terminated interest rate swap agreements.

*Going Concern.* The accompanying unaudited condensed consolidated financial statements have been prepared assuming that the Company will continue as a going concern, which contemplates continuity of operations, realization of assets, and satisfaction of liabilities in the normal course of business.

Upon expiration of the forbearance agreements, the Company anticipates that it will be unable to pay principal and accrued but unpaid interest due under its senior secured term loans, revolving credit facility and terminated interest rate swap agreements. As such, the Company has been evaluating certain financial and strategic alternatives, which may include a recapitalization, refinancing, restructuring or reorganization of the Company's obligations, or a sale of some or all of its assets. As part of this process, MGM may reorganize under chapter 11 of the Bankruptcy Code. As a result of the uncertainties inherent in the bankruptcy process, there is substantial doubt about the Company's ability to continue as a going concern. The accompanying unaudited condensed consolidated financial statements of the Company do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the outcome of these uncertainties.

*Principles of Consolidation.* The unaudited condensed consolidated financial statements include the accounts of MGM Holdings, MGM, MGM Studios, Orion and all of their majority owned and controlled subsidiaries. The Company's investments in related companies, over which the Company has significant influence but not control, are accounted for using the equity method (see Note 5). All significant intercompany balances and transactions have been eliminated.

*Cash and Cash Equivalents.* The Company considers all high quality money market investments and highly liquid debt instruments, purchased with an initial maturity of three months or less, to be cash equivalents. At March 31, 2009, the Company reclassified $0.8 million of bank overdrafts to accounts payable; no such reclassification was recorded at March 31, 2010. The carrying value of the Company's cash equivalents approximated fair value at the balance sheet dates.

*Restricted Cash.* At March 31, 2010 and 2009, the Company had $48.4 million and $2.4 million in restricted cash, respectively, of which $9.9 million and $2.4 million, respectively, was held as collateral in accordance with the terms and conditions of the Company's production financing

Notes to Unaudited Condensed Consolidated Financial Statements
(continued)

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

facility (see Note 7). In addition, at March 31, 2010, restricted cash included $19.1 million held in a segregated account and earmarked for pre-production and production costs related to a particular film project as required under the terms of the Company's senior secured corporate credit facility, as amended (see Note 7).

*Accounts and Contracts Receivable.* At March 31, 2010 and 2009, accounts and contracts receivable aggregated $302.1 million and $359.4 million (before allowance for doubtful accounts), respectively. Concentration of credit and geographic risk with respect to accounts receivable is limited due to the large number and general dispersion of accounts which constitute the Company's customer base. The Company performs credit evaluations of its customers and in some instances requires collateral. At March 31, 2010, there was one customer individually accounting for 13% of the Company's accounts and contracts receivable. At March 31, 2009, there was one customer individually accounting for 12% of the Company's accounts and contracts receivable.

*Allowance for Doubtful Accounts.* At March 31, 2010 and 2009, the allowance for doubtful accounts receivable aggregated $13.9 million and $14.8 million, respectively. The Company determines its allowance by monitoring its delinquent accounts and estimating a reserve based on contractual terms and other customer specific issues. Additionally, the Company records a general reserve against all customers not reviewed on a specific basis. The Company charges off trade and contracts receivable against the allowance when the receivable is deemed uncollectible.

*Accounts Payable and Accrued Liabilities.* The Company receives certain amounts pursuant to the revenue participation agreement with DDI. These amounts are for theatrical print and advertising costs paid on behalf of third parties in relation to certain distribution arrangements under which MGM earns a fee. DDI is a variable interest entity for which MGM is not the primary beneficiary under these third-party distribution arrangements, and as such the Company does not consolidate DDI. The Company has included all unspent amounts received from DDI for such distribution arrangements in accounts payable and accrued liabilities in the condensed consolidated balance sheets, totaling $0.2 million at March 31 2009; there were no such unspent borrowings at March 31, 2010.

*Sales Returns.* In the home entertainment market, the Company calculates an estimate of future returns of DVD and Blu-ray product. In determining the estimate of product sales that will be returned, the Company performs an analysis that considers historical returns, changes in customer demand and current economic trends. Based on this information, a percentage of each sale is reserved provided that the customer has the right of return.

# MGM Holdings Inc.

## Notes to Unaudited Condensed Consolidated Financial Statements
## (continued)

### Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)

*Revenue Recognition.* Revenue is recognized upon meeting all applicable recognition requirements. Revenues from theatrical distribution of feature films are recognized on the dates of exhibition. Revenues from direct home entertainment distribution are recognized, net of an allowance for estimated returns, together with related costs, in the period in which the product is available for sale by the Company's customers. Under revenue sharing arrangements, the Company also participates in consumer rental revenues generated in the home entertainment market by rental establishments and records revenues as earned.

Revenues on films financed under a specific co-financing arrangement, or distributed under a third-party distribution arrangement through which MGM earns a fee, are recorded on a net basis. Revenues recorded on a net basis represent gross revenues less distribution fees earned and expenses paid in accordance with the distribution arrangement.

Revenues from television licensing, together with related costs, are recognized when the feature film or television program is initially available to the licensee for telecast. Payments received in advance of initial availability are classified as deferred revenue until all revenue recognition requirements have been met. At March 31, 2010, deferred revenue primarily consisted of advances related to the Company's television licensing contracts under which the related product will become available in future periods. Long-term, non-interest-bearing receivables arising from licensing agreements are discounted to present value.

Advertising revenues are recognized when the advertising spot is broadcast, and are recorded net of agency fees and commissions.

*Barter Transactions.* The Company accounts for advertising time spots received as full or partial consideration from the licensing of feature film and television programming product in the domestic syndication market at the estimated fair value of the advertising received. The Company recognized barter revenues of $9.7 million and $10.5 million during the years ended March 31, 2010 and 2009, respectively.

*Film and Television Costs.* Except for purchase accounting adjustments arising from the Acquisition, film and television costs include development, production and acquisition costs, as well as capitalized production overhead and financing costs. These costs, as well as participations and talent residuals, are charged against earnings, and included in operating expenses, on an individual film or television program basis in the ratio that the current year's gross revenues bear to management's estimate of total remaining ultimate gross revenues as of the beginning of the current year, for all revenues expected to be recognized from such film or television program over a period not to exceed ten years from the date of initial release (the

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

"individual film forecast method"). For previously released films and television programs acquired as part of a library, ultimate revenue includes estimates over a period not to exceed 20 years from the date of the Acquisition.

Capitalized film and television costs are stated at the lower of unamortized cost or estimated fair value on an individual film or television program basis. Revenue and cost forecasts are periodically reviewed by management and revised when warranted by changing conditions. When estimates of total revenues and costs indicate that a film or television program will result in an ultimate loss, additional amortization is recognized to the extent that capitalized costs exceed estimated fair value. During the years ended March 31, 2010 and 2009, the Company recorded aggregate film and television program cost write-downs of $558.4 million and $44.0 million, respectively.

Exploitation costs, including advertising and marketing costs, are expensed as incurred. The Company incurred advertising and marketing costs of approximately $158.9 million and $183.4 million for the years ended March 31, 2010 and 2009, respectively. Theatrical print costs are amortized over the periods of theatrical release in the respective territories and are included in operating expenses.

The Company also maintains home entertainment product in inventory, which primarily consists of digital video discs that are stated at the lower of cost or market. The Company accounts for its home entertainment inventory using the first-in-first-out method, and the total value of home entertainment inventory, net of reserves, is included in film and television costs in the condensed consolidated balance sheets.

Shipping and handling costs are included in selling, general and administrative expenses in the condensed consolidated statements of operations.

*Property and Equipment*. Except for purchase accounting adjustments arising from the Acquisition, property and equipment are stated at cost. Depreciation of property and equipment is computed using the straight-line method over the expected useful lives of applicable assets, ranging from three to five years.

Leasehold improvements are amortized using the straight-line method over the shorter of the estimated useful lives of the assets or the terms of the related leases. When property is sold or otherwise disposed of, the cost and related accumulated depreciation and amortization is removed from the accounts, and any resulting gain or loss is included in income. The costs of normal maintenance, repairs and minor replacements are charged to expense when incurred.

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

*Goodwill and Other Intangible Assets.* The Acquisition resulted in goodwill and other identifiable intangible assets totaling approximately $1.8 billion, of which none are expected to be deductible for tax purposes. The allocation of the excess purchase price included identifiable intangible assets totaling $518.0 million. This includes $424.9 million of identifiable intangible assets subject to amortization, consisting of certain operating agreements with lives ranging from 14 to 40 years. Additionally, trademarks valued at $93.1 million were identified and determined to have indefinite lives. Intangible assets with definite lives are amortized on a straight-line basis over their estimated useful lives, while goodwill and intangible assets with indefinite lives are not subject to amortization, but instead are tested annually for impairment, or earlier upon the occurrence of certain events or substantive changes in circumstances.

Goodwill impairment is determined using a two-step process. The first step ("Step 1") involves a comparison of the estimated fair value of a reporting unit to its carrying amount, including goodwill. If the estimated fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is not impaired and the second step of the impairment test is not necessary. If the carrying amount of a reporting unit exceeds its estimated fair value, then the second step of the goodwill impairment test must be performed. The second step ("Step 2") compares the implied fair value of the reporting unit's goodwill with its goodwill carrying amount to measure the amount of impairment loss, if any. Fair value of goodwill is based on discounted cash flows, market multiples and/or appraised values as appropriate. The carrying values of assets are calculated at the lowest levels for which there are identifiable cash flows, which include filmed entertainment, cable channels and other businesses (consumer products, music and interactive operations). For purposes of the Company's annual goodwill impairment assessment, the Company has determined that its operations and the aggregate net cash flows from all sources represent a single reporting unit that supports the overall goodwill balance.

Based on the Company's analyses, during the year ended March 31, 2010, the Company recorded a $1.28 billion non-cash goodwill impairment charge and $123.3 million of aggregate non-cash impairment charges for other intangible assets (see Note 2), both of which were included in impairment of goodwill and other intangible assets in the unaudited condensed consolidated statement of operations. During the year ended March 31, 2009, the Company did not recognize any impairment of goodwill and other intangible assets.

*Gain on Extinguishment of Debt.* During the year ended March 31, 2010, the Company entered into four amendments to its senior secured corporate credit facility (see Note 7). The Company determined that the terms of these amendments related to the senior secured term loans and interest rate swap agreements were substantially different from the terms prior to these amendments, and as such, qualified for extinguishment accounting. Under extinguishment

## Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)

accounting, the outstanding principal under the senior secured term loans and the aggregate termination value of the terminated interest rate swap agreements, as well as the respective accrued but unpaid interest thereon, were written down to their respective estimated fair values. The estimated fair value was determined based on a discounted cash flow methodology, using the projected cash flows of the Company. Since no obligation of, or other claim against, the Company has priority over the senior secured debt, the Company determined the fair value of its senior secured debt by allocating the total estimated enterprise fair value to the senior secured term loans, revolving credit facility and terminated interest rate swap agreements, including the respective accrued but unpaid interest thereon, based on the pro rata share of each to the total outstanding senior secured debt and total accrued but unpaid interest at March 31, 2010.

Based on the allocation of the estimated enterprise fair value and accounting guidance governing extinguishment accounting, at March 31, 2010, the Company reduced the aggregate outstanding principal related to its senior secured term loans, and the aggregate termination value of its terminated interest rate swap agreements, to their estimated fair values of $1.72 billion and $44.4 million, respectively, representing discounts of $1.95 billion and $50.5 million, respectively. As a result, the Company recognized a net gain on extinguishment of debt of $2.22 billion, reflecting these discounts, plus an aggregate discount of $236.3 million to the related accrued but unpaid interest, net of a $21.0 million write-off of deferred financing fees.

*Income Taxes.* Deferred tax assets and liabilities are recognized with respect to the tax consequences attributable to differences between the financial statement carrying values and tax basis of existing assets and liabilities. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which these temporary differences are expected to be recovered or settled. Further, the effect on deferred tax assets and liabilities of changes in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established, when necessary, to reduce deferred tax assets if it is more likely than not that some portion or all of the deferred tax assets will not be realized. The Company includes interest and penalties related to income tax matters as part of the income tax provision.

*Foreign Currency Translation.* Foreign subsidiary assets and liabilities are translated into United States dollars at the exchange rates in effect at the balance sheet date. Revenues and expenses of foreign subsidiaries are translated into United States dollars at the average exchange rates that prevailed during the period. The gains or losses that result from this process are included as a component of the accumulated other comprehensive (loss) income in stockholders' deficit. Foreign currency denominated transactions are recorded at the exchange rate in effect at the time of occurrence, and the gains or losses resulting from subsequent translation at current exchange rates are included in the accompanying condensed consolidated statements of operations.

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

*Comprehensive Income (Loss)*. Comprehensive income (loss) for the Company includes net income (loss) and other comprehensive income (loss) items, including unrealized gain (loss) on derivative instruments, unrealized gain (loss) on securities, cumulative foreign currency translation adjustments, and changes in the funded status of benefit plan obligations. Components of other comprehensive income (loss), net of related income tax effect, and components of accumulated other comprehensive income (loss) are shown in the condensed consolidated statements of stockholders' deficit.

*Noncontrolling Interests*. Net loss attributable to noncontrolling interests included $24.4 million representing the noncontrolling interests' 37.5% share of the net loss of United Artists Entertainment LLC ("UAE") for the year ended March 31, 2010. In addition, during the years ended March 31, 2010 and 2009, net income attributable to noncontrolling interests included $0.1 million representing the noncontrolling interests' 45% share of the net income of MGM Channel Poland Limited.

*Derivative Financial Instruments*. The Company has only limited involvement with derivative financial instruments and does not use them for trading purposes. In certain instances, the Company enters into foreign currency exchange forward contracts in order to reduce exposure to changes in foreign currency exchange rates that affect the value of the Company's firm commitments and certain anticipated foreign currency cash flows. Additionally, historically the Company had used derivative financial instruments to manage well-defined interest rate risks. The Company entered into interest rate swap arrangements, under which the Company agreed with other parties to exchange, at specified intervals, the difference between fixed-rate and floating-rate interest amounts calculated by reference to an agreed notional principal amount.

The Company uses mark-to-market accounting to determine the fair value of its derivative financial instruments. The Company measures interest rate swap contracts and foreign currency forward contracts for effectiveness on a quarterly basis. Changes in the fair value of effective hedges are reflected in accumulated other comprehensive income (loss) within the condensed consolidated statements of stockholders' deficit, while changes in ineffective hedges are reflected in other expense in the condensed consolidated statements of operations.

*Stock-Based Compensation*. The Company recognizes compensation expense related to the grant of restricted stock and options on a straight-line basis over the requisite service period of the award, taking into consideration the applicable estimated forfeiture rates. The Company measures liability awards at their intrinsic value through the date of settlement. The Company recorded compensation expense of $1.3 million and $6.8 million for the years ended March 31, 2010 and 2009, respectively, which has been included in selling, general and administrative expenses in the condensed consolidated statements of operations.

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

*Use of Estimates in the Preparation of Financial Statements*. The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities. Management estimates ultimate revenues and costs for feature films and television programs for each market based on anticipated release patterns, public acceptance and historical results for similar products. Management also estimates sales returns and other reserves, including an allowance for doubtful accounts, accruals for contingent liabilities, and impairment assessments for films and television programs, equity investments, goodwill and other intangible assets. Actual results could differ materially from those estimates.

*New Accounting Pronouncements.*

Subsequent Events. On April 1, 2009, the Company adopted, on a prospective basis, guidance related to the accounting for and disclosure of events that occur subsequent to the balance sheet date but before the financial statements are issued or are available to be issued. This guidance requires the Company to disclose the date through which subsequent events have been evaluated, as well as whether that date is the date the financial statements were issued or the date the financial statements were available to be issued. For the year ended March 31, 2010, the Company evaluated, for potential recognition and disclosure, events that occurred through the date of preliminary issuance of these unaudited condensed consolidated financial statements, October 1, 2010 (see Note 16).

Fair Value Measurements. On April 1, 2009, the Company adopted, on a prospective basis, guidance related to fair value measurements pertaining to nonfinancial assets and liabilities. This guidance establishes the authoritative definition of fair value, sets out a framework for measuring fair value and expands the required disclosures about fair value measurement. On April 1, 2008, the Company adopted this guidance as it pertains to the accounting for financial assets and liabilities as well as other assets and liabilities carried at fair value on a recurring basis.

Business Combinations. On April 1, 2009, the Company adopted guidance related to accounting for business combinations and is applying such guidance prospectively to business combinations that occur on or after April 1, 2009. This guidance establishes principles and requirements for how an acquirer in a business combination (i) recognizes and measures in its financial statements the identifiable assets acquired and the liabilities assumed, including any noncontrolling interests, contingent consideration and pre-acquisition contingencies, (ii) recognizes and measures goodwill, and (iii) determines what information to disclose to enable users of financial statements to evaluate the nature and financial effects of the business combination. In addition,

Notes to Unaudited Condensed Consolidated Financial Statements
(continued)

**Note 1—Basis of Presentation and Summary of Significant Accounting Policies (continued)**

under the adopted guidance, changes in an acquired entity's deferred tax assets and income tax uncertainties after the measurement period are recognized in earnings rather than as an adjustment to the cost of the acquisition.

Noncontrolling Interests. On April 1, 2009, the Company adopted accounting guidance for noncontrolling interests in a consolidated subsidiary, including the accounting treatment applicable upon deconsolidation of a subsidiary. This guidance is being applied prospectively, except for the provisions related to the presentation of noncontrolling interests, which are being applied retrospectively. Under this guidance, noncontrolling interests in a consolidated subsidiary are reported as a separate component of equity in the condensed consolidated balance sheets and any earnings and losses attributable to noncontrolling interests is separately stated on the condensed consolidated statements of operations.

Disclosures about Derivative Instruments and Hedging Activities. On April 1, 2009, the Company adopted, on a prospective basis, guidance that expands the disclosure requirements for derivative instruments and hedging activities by requiring enhanced disclosures about (i) how and why an entity uses derivative instruments, (ii) how derivative instruments and related hedged items are accounted for and (iii) how derivative instruments and related hedged items affect an entity's financial position, financial performance, and cash flows.

Variable Interest Entities. In June 2009, guidance was issued that (i) modifies the previous guidance related to the identification of controlling financial interests in a variable interest entity ("VIE"), (ii) changes the approach for determining the primary beneficiary of a VIE from a quantitative risk and reward model to a qualitative model based on control, and (iii) requires the Company to reassess each reporting period whether any of the Company's variable interests give it a controlling financial interest in a VIE. This guidance will be effective for the Company for the year ending March 31, 2011, and will be applied on a retrospective basis. The Company does not expect the adoption of this guidance to have a material impact on the condensed consolidated financial statements.

**Note 2—Goodwill and Other Intangible Assets**

At March 31, 2009, the Company completed an annual Step 1 impairment review using a discounted cash flow methodology and discount rates based on a weighted average cost of equity and cost of debt that were adjusted with various risk premiums. Based on this analysis the Company did not recognize any impairment of goodwill and other intangible assets in the consolidated financial statements at March 31, 2009.

# MGM Holdings Inc.

## Notes to Unaudited Condensed Consolidated Financial Statements
## (continued)

**Note 2—Goodwill and Other Intangible Assets (continued)**

At September 30, 2009, certain triggering events indicated that goodwill impairment may exist. In particular, subsequent to March 31, 2009, the Company experienced a reduction in the contribution realized from its DVD products that resulted in lower cash flow from operations. In addition, based on industry projections and revised guidance from the Company's home video distribution services provider, the Company reduced its cash flow forecasts from DVD distribution, leading to a significant overall reduction in estimated Library Cash Flow, as defined, for the year ended March 31, 2010. These revised forecasts also had a negative impact on the Company's long-term cash flow projections. As such, the Company performed an interim Step 1 impairment analysis at September 30, 2009 utilizing a discounted cash flow methodology and the revised cash flow projections from DVD distribution, and the results indicated that a potential impairment of goodwill existed.

Based on these results, the Company concluded that a Step 2 analysis was necessary. In the Step 2 analysis, the estimated enterprise fair value of the Company was determined based on a discounted cash flow methodology, using the projected cash flows of the Company. The estimated enterprise fair value was then allocated to the Company's net assets, including existing identified intangible assets, based on their estimated fair values, in a manner similar to a purchase price allocation in a business combination. As a result of this analysis, the Company determined that the estimated fair value of the Company's net assets exceeded the estimated enterprise fair value of the Company, and thus, the implied fair value of goodwill was zero. Accordingly, the Company recorded a $1.28 billion non-cash goodwill impairment charge, which was included in the line item entitled impairment of goodwill and other intangible assets in the unaudited condensed consolidated statement of operations for the year ended March 31, 2010, and no remaining goodwill was reflected in the unaudited condensed consolidated balance sheet at March 31, 2010.

The Company also reviewed its other identifiable intangible assets for impairment based on the underlying estimated future cash flows. Based on these analyses, the Company recorded an aggregate non-cash impairment charge of $123.3 million, which was included in impairment of goodwill and other intangible assets in the unaudited condensed consolidated statement of operations for the year ended March 31, 2010. In addition, the Company recorded amortization of identifiable intangible assets of $15.3 million for the years ended March 31, 2010 and 2009, and expects to record amortization of $14.1 million in each of the next five fiscal years. Identifiable intangible assets and the related impairment charges, accumulated amortization and weighted-average remaining amortization period as of March 31, 2010, are summarized as follows (in thousands):

**Note 2—Goodwill and Other Intangible Assets (continued)**

| Identifiable Intangible Assets | Gross Fair Value | Impairment | Accumulated Amortization | Weighted-Average Remaining Amortization Period |
|---|---|---|---|---|
| Danjaq agreements | $ 243,500 | $ (8,328) | $ (30,284) | 33.6 years |
| MSO agreements | 7,000 | – | (2,412) | 9.5 years |
| Consumer products licensing rights | 113,000 | (47,624) | (28,112) | 12 years |
| Music publishing/licensing rights | 61,400 | (21,398) | (15,276) | 7 years |
| Intangible assets subject to amortization | 424,900 | (77,350) | (76,084) | 23.7 years |
| Trademarks | 93,100 | (45,951) | – | Indefinite |
| Total identifiable intangible assets | $ 518,000 | $ (123,301) | $ (76,084) | N/A |

*Danjaq agreements.* The Company revised its estimates of forecasted cash flows projected to be received following the future expiration of a long term license agreement related to certain of the Company's rights under the Danjaq agreements. This revision was based on the conclusion that the Company would not be able to extend or replace the existing agreement with an agreement containing equal license fees. As a result, the Company recorded an $8.3 million non-cash impairment charge. In addition, the weighted average remaining useful life of the Danjaq agreements was reduced from 35 years to 33.6 years.

*Consumer products licensing rights.* The Company revised its long term cash flow estimates from consumer products licensing to account for a significant recent decline in new licensing activity. The Company's cash flow forecasts incorporate estimated decay rates based on the assumption that licensing activity will continue to decline as the intellectual property and related films and television programs continue to age. The revised cash flow projections resulted in a non-cash impairment charge of $47.6 million. In addition, the remaining useful life was reduced from 15 years to 12 years.

*Music publishing/licensing rights.* The Company revised its long term cash flow estimates from music publishing and licensing to account for a significant recent decline in new sales activity. The Company's cash flow forecasts incorporate estimated decay rates based on the assumption that sales activity will continue to decline as the music and related films and television programs continue to age. The revised cash flow projections resulted in a non-cash impairment charge of $21.4 million. In addition, the remaining useful life was reduced from 15 years to 7 years.

**Note 2—Goodwill and Other Intangible Assets (continued)**

*Trademarks*. The Company revised its long term cash flow estimates from trademark licensing to account for its revised outlook for future licensing activity. Specifically, the Company applied lower growth rate assumptions to future cash flow projections and excluded cash flows from contracts that recently terminated. The revised cash flow projections resulted in a non-cash impairment charge of $46.0 million. The Company also determined that the continued use of an indefinite useful life for the Trademarks intangible asset appears to be appropriate.

**Note 3—Film and Television Costs**

Film and television costs, net of amortization, are summarized as follows (in thousands):

|  | March 31, 2010 | | March 31, 2009 |
|---|---|---|---|
| Theatrical productions: |  |  |  |
| Released | $ | 3,783,475 | $ 3,702,841 |
| Less accumulated amortization |  | (2,206,520) | (1,321,158) |
|  |  | 1,576,955 | 2,381,683 |
| Completed not released |  | 1,771 | 17,462 |
| In production |  | 135,776 | 60,467 |
| In development |  | 14,319 | 25,210 |
| Total theatrical productions |  | 1,728,821 | 2,484,822 |
| Television programs: |  |  |  |
| Released | $ | 612,282 | $ 567,076 |
| Less accumulated amortization |  | (480,606) | (366,789) |
|  |  | 131,676 | 200,287 |
| In production |  | 7,189 | 18,127 |
| In development |  | – | – |
| Total television programs |  | 138,865 | 218,414 |
|  | $ | 1,867,686 | $ 2,703,236 |

Based on the Company's estimates of projected gross revenues as of March 31, 2010 approximately 21% of completed film and television costs are expected to be amortized over the next 12 months, and approximately $112.3 million of accrued participants' share as of March 31,

**Note 3—Film and Television Costs (continued)**

2010, will be paid in the next 12 months. The acquired film and television library is being amortized under the individual film forecast method in order to properly match the expected future revenue streams. The average remaining life of the library is approximately 15 years.

Interest costs capitalized to theatrical productions totaled $1.6 million and $0.4 million during the years ended March 31, 2010 and 2009, respectively. Overhead costs capitalized to theatrical productions totaled $2.4 million and $6.3 million during the years ended March 31, 2010 and 2009, respectively.

**Note 4—Fair Value Measurements**

A fair value measurement is determined based on the assumptions that a market participant would use in pricing an asset or liability. A three-tiered hierarchy draws distinctions between market participant assumptions based on (i) observable inputs such as quoted prices in active markets for identical assets or liabilities (Level 1), (ii) inputs other than quoted prices for similar assets or liabilities in active markets that are observable either directly or indirectly (Level 2) and (iii) unobservable inputs that require the company to use present value and other valuation techniques in the determination of fair value (Level 3). The following table presents information about financial assets and liabilities required to be carried at fair value on a recurring basis at March 31, 2010 (in thousands):

| Description | Balance at March 31, 2010 | Fair Value Measurements at March 31, 2010 using | | |
| --- | --- | --- | --- | --- |
| | | Quoted Market Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Assets | | | | |
| Cash equivalents | $ 156,041 | $ 156,041 | $ – | $ – |
| Restricted cash | 19,086 | 19,086 | – | – |
| Non-current investments | 3,362 | 3,362 | – | – |
| Liabilities | | | | |
| Deferred compensation plan | (3,362) | (3,362) | – | – |
| Total | $ 175,127 | $ 175,127 | $ – | $ – |

Cash equivalents and certain components of restricted cash consist primarily of money market funds with original maturity dates of three months or less, for which fair value was determined based on quoted prices of identical assets that are trading in active markets.

**Note 4—Fair Value Measurements (continued)**

Non-current investments are comprised of the money market funds, mutual funds and other marketable securities that are held in the Company's deferred compensation plan. The fair value of these assets and the deferred compensation plan liability were determined based on quoted prices of identical assets that are trading in active markets.

**Note 5—Investments in and Advances to Affiliates**

Investments in and advances to affiliates are summarized as follows (in thousands):

|  | March 31, 2010 | | March 31, 2009 | |
| --- | ---: | --- | ---: | --- |
| Foreign cable channels | $ | **21,818** | $ | 20,978 |
| Joint venture | | **8,932** | | 10,056 |
| Others | | **25** | | 150 |
| | $ | **30,775** | $ | 31,184 |

In April 2008, the Company formed a joint venture with Viacom Inc., Paramount Pictures Corporation and Lions Gate Entertainment Corp. to create a premium television channel and subscription video on demand service named "Epix." The new venture has access to the Company's titles released theatrically on or after January 1, 2009. Viacom Inc. provides operational support to the venture, including marketing and affiliate services through its MTV Networks division. The joint venture provides the Company with an additional platform to distribute its library of feature films and television programming. In December 2009, MGM's initial 28.57% interest in Epix was reduced to 19.09%, however, MGM retained its one-third voting rights and as such, continued to record its investment using the equity method of accounting. For the years ended March 31, 2010 and 2009, the Company invested $24.1 million and $12.4 million, respectively.

Certain of the Company's feature films were made available to Epix for exhibition in the domestic pay television window, for which $19.8 million of revenue and $8.3 million of gross profit was recognized by the Company during the year ended March 31, 2010. Intercompany profits based on MGM's pro rata share of the venture and totaling $1.6 million for the year ended March 31, 2010, were eliminated in the unaudited condensed consolidated statement of operations. For the years ended March 31, 2010 and 2009, equity in net losses of affiliates in the

**Note 5—Investments in and Advances to Affiliates (continued)**

condensed consolidated statements of operations also included $23.7 million and $2.4 million, respectively, representing the Company's share of net losses incurred by Epix, as well as $3.5 million and $1.9 million, respectively, of dividend income received from minority interests in certain other joint ventures accounted for under the cost method of accounting.

**Note 6—Property and Equipment**

Property and equipment are summarized as follows (in thousands):

|  | March 31, 2010 | March 31, 2009 |
|---|---|---|
| Leasehold improvements | $ 22,742 | $ 25,187 |
| Furniture, fixtures and equipment | 7,656 | 20,604 |
|  | 30,398 | 45,791 |
| Less accumulated depreciation and amortization | (13,012) | (25,702) |
|  | $ 17,386 | $ 20,089 |

**Note 7—Bank and Other Debt**

Bank and other debt are summarized as follows (in thousands):

|  | March 31, 2010 | March 31, 2009 |
|---|---|---|
| Term loans (net of discount of $1,950,407 at March 31, 2010) | $ 1,718,093 | $ 3,697,000 |
| Revolving facility | 248,875 | 229,000 |
| Production loans | 97,144 | 20,036 |
| Mezzanine promissory notes | 90,768 | 79,055 |
| Other borrowings | 91,004 | 133,787 |
|  | $ 2,245,884 | $ 4,158,878 |

*Term Loans and Revolving Facility*. On April 8, 2005, the Company entered into a credit facility with a syndicate of banks (the "2005 Credit Facility") aggregating $4.0 billion, consisting of a five-year $250 million revolving credit facility (the "Revolving Facility"), a six-year $1.05 billion term loan ("Term A Facility") and a seven-year $2.7 billion term loan ("Term B Facility") (collectively, the "Term Loans"). On August 15, 2006 and March 9, 2007, the Company entered

**Note 7—Bank and Other Debt (continued)**

into the First and Second amendments to the 2005 Credit Facility, respectively (incorporating these amendments, the "Amended Credit Facility"). The Amended Credit Facility replaced the Term A Facility with a five-year $1.1 billion term loan ("Term B-1 Facility") that incorporates the same loan amortization payment requirements as the Term B Facility. Among other things, the Amended Credit Facility also eliminated certain financial covenant requirements, increased the credit spreads on the Revolving Facility and the Term Loans, and established additional mandatory prepayment requirements.

On September 30, 2009, November 13, 2009, January 31, 2010, March 31, 2010, May 14, 2010, July 14, 2010 and September 15, 2010, the Company entered into the Third, Fourth, Fifth, Sixth, Seventh, Eighth and Ninth amendments to the 2005 Credit Facility, respectively, including an amendment to each existing interest rate swap agreement (the "Swap Agreements"), and a forbearance agreement (collectively, the "Forbearance"). The Forbearance extended the date on which interest payments and certain principal payments due under the Amended Credit Facility and all payments due under the Swap Agreements were required to be paid until October 29, 2010. Among other things, the Forbearance also (a) initiated a process to evaluate the Company's strategic alternatives, including contacting potential buyers, (b) required the creation of a segregated account into which the Company must deposit the shortfall, if any, between forecasted and actual pre-production costs for a particular film project, (c) implemented covenants limiting the amount of certain expenditures, and (d) established minimum aggregate cash balance requirements.

The Company determined that the terms of the Forbearance were substantially different from the terms of the Amended Credit Facility, and as such, qualified for extinguishment accounting. In accordance therewith, at March 31, 2010, the Company reduced the aggregate outstanding principal related to the Term B Facility and Term B-1 Facility, and the aggregate termination value of the Swap Agreements, to their estimated fair values of $1.72 billion and $44.4 million, respectively, representing discounts of $1.95 billion and $50.5 million, respectively. As a result, the Company recognized a net gain on extinguishment of debt of $2.22 billion, reflecting these discounts, plus an aggregate discount of $236.3 million to the related accrued but unpaid interest, net of a $21.0 million write-off of deferred financing fees.

Under the Forbearance, the Revolving Facility and Term Loans bear interest at 17.25% over the Prime Rate, as defined (20.50% at March 31, 2010), which increased by 14.00% over the applicable margin under the Amended Credit Facility. During the term of the Forbearance, credit spreads are not subject to adjustment and no additional amounts are available under the

**Note 7—Bank and Other Debt (continued)**

Revolving Facility. Prior to the Forbearance, amounts available under the Revolving Facility were limited by outstanding letters of credit, which amounted to $0.5 million and $20.4 million at March 31, 2010 and 2009, respectively. At March 31, 2009, there was $0.6 million available under the Revolving Facility. The Revolving Facility matures on April 8, 2010, and the Term Loans mature on April 8, 2012.

During the term of the Forbearance, the Company, along with a committee of holders of the Company's Revolving Facility and Term Loans, and their respective advisors, have been evaluating certain financial and strategic alternatives, which may include a recapitalization, refinancing, restructuring or reorganization of the Company's obligations or a sale of some or all of its assets. At the consummation of such a transaction, the carrying value of certain financial assets and liabilities of the Company may be restated based on the terms and conditions of the transaction and the estimated fair value of such assets and liabilities following the transaction.

The Company incurred approximately $72.2 million, $27.6 million and $1.0 million in fees and other costs associated with the 2005 Credit Facility, the Amended Credit Facility and the Forbearance, respectively (collectively, the "Financing Fees"). During the year ended March 31, 2010, the Company wrote-off $21.0 million of deferred Financing Fees related to the Term B Facility and Term B-1 Facility. Prior to this write-off, deferred Financing Fees were included in other assets in the condensed consolidated balance sheets and were amortized using the effective interest method. There were no deferred Financing Fees remaining in the unaudited condensed consolidated balance sheet at March 31, 2010.

Borrowings under the 2005 Credit Facility, as amended and restated, are secured by substantially all the assets of MGM, with the exception of the Company's majority-owned subsidiary UAE, and any of UAE's subsidiaries, as well as the copyrights in the James Bond series of motion pictures. The 2005 Credit Facility, as amended and restated, contains various covenants, including limitations on indebtedness, asset sales, and overhead and production expenditures. At March 31, 2010, MGM was in compliance with all applicable covenants, after giving effect to all waivers, amendments and modifications to the 2005 Credit Facility.

*Production Loans and Mezzanine Promissory Notes.* In August 2007, UAE, through its wholly-owned subsidiary United Artists Production Finance LLC ("UAPF"), a Delaware Limited Liability Company, entered into a $250.0 million senior credit facility (the "Senior Facility") with a syndicate of banks and sold mezzanine promissory notes (the "Mezzanine Notes") totaling $75.0 million (collectively, the "UAPF Financing"). In the case of LIBO Rate Loans, as defined, the Senior Facility bears interest at 1.50% and 2.25% over the LIBO Rate, as defined (1.73% and 2.48% at March 31, 2010, respectively), for Ultimates Borrowing Base Loans (as defined) and

Notes to Unaudited Condensed Consolidated Financial Statements
(continued)

**Note 7—Bank and Other Debt (continued)**

Production Borrowing Base (as defined), respectively, and matures on August 15, 2014. At March 31, 2010, there was $152.9 million available under the Senior Facility; however, subsequent to March 31, 2010, the use of available borrowing capacity in this facility was restricted (see Note 16).

The Mezzanine Notes bear interest at 14%. At any time that funds are insufficient to pay interest on the Mezzanine Notes or such interest cannot be paid due to restrictions set forth in the Senior Facility, all unpaid interest shall be paid-in-kind ("PIK") and added to the aggregate outstanding principal. During the years ended March 31, 2010 and 2009, $11.7 million and $4.1 million, respectively, of PIK interest were added to the aggregate outstanding principal of the Mezzanine Notes. The Mezzanine Notes mature and are mandatorily redeemable on August 15, 2014, in cash, including PIK interest. UAPF may, at its option, redeem the Mezzanine Notes in whole, and in cash, at the optional prepayment price of 101% of the aggregate outstanding principal, including PIK interest, during the period from April 1, 2010 through August 16, 2010, or at 100% of the aggregate outstanding principal, including PIK interest, for any optional redemption occurring thereafter.

The Company incurred approximately $14.0 million in fees and other costs associated with the UAPF Financing, which are included in other assets and are being amortized under the effective interest method. In addition, the Company is required to retain certain funds on deposit as collateral for the payment of borrowings, interest and commitment fees until the maturity date of the UAPF Financing. At March 31, 2010 and 2009, the Company had $9.9 million and $2.4 million, respectively, of such funds on deposit, which have been classified as restricted cash within the condensed consolidated balance sheets.

Borrowings under the Senior Facility are secured by substantially all the assets of UAPF. The UAPF Financing contains various covenants, including limitations on indebtedness, certain financial tests, exposure limitations on cash availability and feature film costs, and specific conditions for Stop Funding Events (as defined). As of March 31, 2010, UAPF was in compliance with all applicable covenants; however, subsequent to March 31, 2010, UAPF failed to satisfy a specific liquidity test, which resulted in a Stop Funding Event (see Note 16).

*Other Borrowings*. Other borrowings include certain amounts received from DDI for theatrical print and advertising costs for MGM productions. As MGM is solely responsible for these amounts they are classified as other debt within the condensed consolidated balance sheets.

**Note 8—Mandatorily Redeemable Preferred Stock**

Mandatorily redeemable preferred stock is summarized as follows (in thousands):

|  | March 31, 2010 | March 31, 2009 |
|---|---|---|
| 14% Senior Preferred Stock | $ 1,435,605 | $ 1,213,251 |
| 10% Junior Preferred Stock | 98,412 | 89,466 |
|  | $ 1,534,017 | $ 1,302,717 |

*Mandatorily Redeemable Senior Preferred Stock.* The Company is authorized to issue 1,000,000 shares of 14% Senior Preferred Stock ("Senior Preferred Stock") with a par value of $.01 per share. During the year ended March 31, 2010, the Company issued 224 shares of Senior Preferred Stock, and retired no shares. During the year ended March 31, 2009, the Company issued 405 shares of Senior Preferred Stock, and retired no shares. The Company had 768,067 and 767,843 shares outstanding at March 31, 2010 and 2009, respectively. The Senior Preferred Stock has a $1,000 per share liquidation preference (plus accrued and unpaid dividends) and has limited voting rights. In the event of liquidation or dissolution of MGM Holdings, all shares of Senior Preferred Stock, including accrued and unpaid dividends thereon, will rank senior to all other classes of stock of MGM Holdings.

Holders of the Senior Preferred Stock are entitled to receive, when and if declared, dividends at a rate equal to 14% per annum, which are cumulative and accrue from date of issuance and are compounded quarterly. All accrued dividends on the Senior Preferred Stock must be paid in cash prior to the payment of any cash dividends on any other series or class of capital stock.

The Senior Preferred Stock is mandatorily redeemable on April 8, 2013, in cash, at a price equal to the mandatory redemption price. The Senior Preferred Stock may not be redeemed prior to April 8, 2010. After April 8, 2010, MGM Holdings may, at its option, redeem the outstanding shares of the Senior Preferred Stock, in whole or in part, in cash, at a price equal to the optional redemption price of 101% of the liquidation preference, plus any accrued but unpaid dividends.

The Senior Preferred Stock was issued at a $208.1 million discount to the par value. The discount is being amortized over the life of the Senior Preferred Stock using the effective interest method. For the years ended March 31, 2010 and 2009, $26.5 million and $25.4 million of the discount, respectively, has been amortized and included in interest expense in the condensed consolidated statements of operations.

## Note 8—Mandatorily Redeemable Preferred Stock (continued)

*Mandatorily Redeemable Junior Preferred Stock.* The Company is authorized to issue 550,000 shares of 10% Junior Preferred Stock ("Junior Preferred Stock") with a par value of $.01 per share. During the year ended March 31, 2010, no shares of Junior Preferred Stock were issued or retired. During the year ended March 31, 2009, the Company issued no shares of Junior Preferred Stock, and retired 114 shares. At both March 31, 2010 and 2009, the Company had 64,706 shares of Junior Preferred Stock outstanding. The Junior Preferred Stock has a $1,000 per share liquidation preference (plus accrued and unpaid dividends) and has limited voting rights. In the event of liquidation or dissolution of MGM Holdings, all shares of Junior Preferred Stock, including accrued and unpaid dividends thereon, will rank junior to all senior classes of securities of MGM Holdings (including the Senior Preferred Stock) and will rank senior to all junior classes of securities of MGM Holdings (including the common stock of MGM Holdings).

Holders of the Junior Preferred Stock are entitled to receive, when and if declared, dividends at a rate equal to 10% per annum, which are cumulative and accrue from date of issuance and are compounded annually. All accrued dividends on the Junior Preferred Stock must be paid in cash prior to the payment of any cash dividends on any other series or class of capital stock that rank junior to, or on parity with, the Junior Preferred Stock.

The Junior Preferred Stock is mandatorily redeemable on October 8, 2013, in cash, at a price equal to the mandatory redemption price. After, or contemporaneously with, the redemption of all outstanding Senior Preferred Stock, MGM Holdings may, at its option, redeem the outstanding shares of the Junior Preferred Stock, in whole or in part, in cash, at a price equal to the optional redemption price of 101% of the liquidation preference, plus any accrued but unpaid dividends.

## Note 9—Financial Instruments

The Company is exposed to the impact of interest rate changes as a result of its variable rate Revolving Facility and Term Loans. In certain instances, the Company enters into interest rate swap agreements to lower funding costs, diversify sources of funding, or to alter interest rate exposures. Accordingly, MGM has entered into various Swap Agreements whereby MGM agrees with other parties to exchange, at specified intervals, the difference between fixed-rate and floating-rate interest amounts calculated by reference to an agreed notional principal amount.

At the beginning of October 2009, all Swap Agreements were mutually terminated resulting in an aggregate termination value of $94.9 million. This amount, net of a discount of $50.5 million (see Note 7), has been included in other liabilities within the unaudited condensed consolidated balance sheets at March 31, 2010 and, under the terms of the Forbearance, is required to be paid

Notes to Unaudited Condensed Consolidated Financial Statements
(continued)

**Note 9—Financial Instruments (continued)**

to the respective counterparties, including interest thereon, on October 29, 2010. At March 31, 2009, the Swap Agreements aggregated a notional value of $3.9 billion, at an average pay rate of approximately 4.81%, with commencement dates ranging from June 30, 2005 to June 30, 2009, and expiration dates ranging from June 30, 2009 to June 30, 2010. As of March 31, 2009, the Company would have had to pay approximately $124.2 million, if all such Swap Agreements were terminated, and this amount has been included in other liabilities within the condensed consolidated balance sheets.

The Company's Swap Agreements did not qualify for hedge accounting and, as such, changes in the fair value of these hedges were included in other expense within the condensed consolidated statement of operations.

The Company transacts business globally and is subject to market risks resulting from fluctuations in foreign currency exchange rates. In certain instances, the Company enters into foreign currency exchange forward contracts or similar instruments in order to reduce exposure to changes in foreign currency exchange rates that affect the value of the Company's firm commitments and certain anticipated foreign currency cash flows. The Company intends to continue to enter into such contracts to modify its exposure to future material foreign currency exchange rate risks. As of March 31, 2010, the Company had no outstanding foreign currency forward contracts.  As of March 31, 2009, the Company had outstanding foreign currency forward contracts aggregating $25.1 million CAD, and would have had to pay approximately $3.4 million if all such foreign currency forward contracts were terminated. The Company's foreign currency forward contracts qualify for hedge accounting, and as such, the market value of all such contracts as of March 31, 2009, has been included in other liabilities, and changes in the market value have been included in accumulated other comprehensive loss.

During the year ended March 31, 2010, the Company recorded aggregate unrealized gains of $3.4 million, net of tax, and $29.3 million in accumulated other comprehensive income and other income, respectively. During the year ended March 31, 2009, the Company recorded aggregate unrealized gains of $94.3 million, net of tax, in accumulated other comprehensive income. Of this amount, $96.4 million related to derivative contracts that settled during the year or no longer qualified for hedge accounting due to a change in the underlying interest rate of the hedged cash flows and as such, were reclassed to earnings from accumulated other comprehensive income. In addition, during the year ended March 31, 2009, the Company recorded aggregated unrealized losses of $78.1 million in other expense.

## Note 10—Stockholders' Deficit

*Common Stock*. The Company is authorized to issue 3,700,000,000 shares of Class A Common Stock, $0.01 par value, and 500 shares of Class B Common Stock, $0.01 par value. As of March 31, 2010, 531,133,391 shares of Class A Common Stock and 500 shares of Class B Common Stock were issued and outstanding. As of March 31, 2009, 531,045,266 shares of Class A Common Stock and 500 shares of Class B Common Stock were issued and outstanding.

*2005 Incentive Plan*. The 2005 Stock Incentive Plan (the "2005 Incentive Plan") allows for the granting of stock awards aggregating not more than 116,431,619 shares outstanding at any time as of March 31, 2010 and 2009. Awards under the 2005 Incentive Plan are generally not restricted to any specific form or structure and may include, without limitation, qualified or non-qualified stock options, incentive stock options, restricted stock awards and stock appreciation rights (collectively, "Awards"). Awards may be conditioned on continued employment, have various vesting schedules and accelerated vesting and exercisability provisions in the event of, among other things, a change in control of the Company. All outstanding stock options under the 2005 Incentive Plan have been issued at or above market value with an exercise price of $1.00 and generally vest over a period of three to four years.

Stock option transactions under the 2005 Incentive Plan were as follows:

| | March 31, 2010 | | March 31, 2009 | |
| --- | --- | --- | --- | --- |
| | Shares | Weighted-Average Exercise Price | Shares | Weighted-Average Exercise Price |
| Options outstanding at beginning of year | 94,792,564 | $ 1.00 | 95,736,255 | $ 1.00 |
| Granted | 5,350,000 | 1.00 | 7,275,000 | 1.00 |
| Exercised | – | – | – | – |
| Canceled or expired | (18,832,784) | 1.00 | (8,218,691) | 1.00 |
| Options outstanding at end of year | 81,309,780 | $ 1.00 | 94,792,564 | $ 1.00 |
| Options exercisable at end of year | 74,676,791 | $ 1.00 | 69,820,577 | $ 1.00 |

The weighted-average remaining contractual life of all outstanding options as of March 31, 2010 and 2009, was 5.9 years and 7.0 years, respectively. As of March 31, 2010, total compensation cost related to non-vested awards not yet recognized under the 2005 Incentive Plan was $0.3 million, which is expected to be recognized over a weighted-average period of 0.7 years. The fair

**Note 10—Stockholders' Deficit (continued)**

value of option grants were estimated using the Black-Scholes option pricing model. The weighted-average fair value of stock options granted during the years ended March 31, 2010 and 2009 was $0.01. The fair values were determined using the following assumptions: a dividend yield of 0% in all periods and an expected volatility of 33.9% for the years ended March 31, 2010 and 2009. The expected life was 5.0 years in all periods, and the weighted-average assumed risk-free interest rate was 3.0% for the years ended March 31, 2010 and 2009.

*Warrants*. Warrants to purchase Class A Common Stock of MGM Holdings were issued in conjunction with the issuance of shares of Senior Preferred Stock. Each share of Senior Preferred Stock was issued together with warrants to purchase 1,000 shares of Class A Common Stock. The warrants are immediately exercisable, in whole or in part, with an exercise price per share of $1.00, and will expire on the earlier of (i) April 8, 2015 and (ii) ten business days after the date on which all of the outstanding shares of Senior Preferred Stock are redeemed by MGM Holdings pursuant to the exercise of its optional redemption right. As of March 31, 2010 and 2009, there were outstanding warrants to purchase 768,067,000 and 767,843,000 shares of Class A Common Stock, respectively, all of which were currently exercisable as of such date. The fair value of these warrants is recorded in stockholders' deficit.

**Note 11—Income Taxes**

The Company's domestic and foreign tax liability balances consisted of the following (in thousands):

|  | March 31, 2010 | March 31, 2009 |
|---|---|---|
| Current | $ 19,653 | $ 18,552 |
| Deferred | 92,163 | 112,509 |
|  | $ 111,816 | $ 131,061 |

Notes to Unaudited Condensed Consolidated Financial Statements
(continued)

**Note 11—Income Taxes (continued)**

The income tax effects of temporary differences between the book value and tax basis of assets and liabilities were as follows (in thousands):

| | March 31, 2010 | March 31, 2009 |
|---|---|---|
| Deferred tax assets: | | |
| Contract termination | $ 8,969 | $ 11,168 |
| Fixed assets | 3,765 | 4,171 |
| Participations and residuals payable | 50,350 | 50,450 |
| Investments | 14,523 | 14,967 |
| Reserves | 26,196 | 31,646 |
| Real estate leases | 20,965 | 21,440 |
| Other tax assets | 18,197 | 47,251 |
| Operating loss carryforwards | 576,733 | 754,841 |
| Stock options | 14,260 | 13,860 |
| Unrealized losses on derivative instruments and investments | 3,101 | 5,399 |
| Film revenue | – | 3,386 |
| | 737,059 | 958,579 |
| Valuation allowance | (164,580) | (439,910) |
| Total deferred tax assets | 572,479 | 518,669 |
| | | |
| Deferred tax liabilities: | | |
| Film and television costs | (179,460) | (421,792) |
| Goodwill and other intangible assets | (120,063) | (209,386) |
| Film revenue | (12,082) | – |
| Loans | (353,037) | – |
| Total deferred tax liabilities | (664,642) | (631,178) |
| Net deferred tax liability | $ (92,163) | $ (112,509) |

At March 31, 2010, the Company and its subsidiaries had net operating loss carryforwards for U.S. federal tax purposes of $1.5 billion, which will be available to reduce future taxable income. The net operating loss carryforwards expire between the years ending March 31, 2011 and 2030. Net operating loss carryforwards in the amount of $146.7 and $329.3 million as of March 31, 2010 and 2009, respectively, are subject to limitation on use under Section 382 of the Internal Revenue Code. In addition, the Company has net operating loss carryforwards for California state tax purposes of $797.7 million, which will expire between the years ending March 31, 2011 and 2030.

## Note 11—Income Taxes (continued)

As of March 31, 2010 and 2009, the Company has determined that deferred tax assets in the amount of $164.6 million and $439.9 million, respectively, do not satisfy the criteria for recognition. Accordingly, the Company has recorded valuation allowances for these amounts.

Details of the income tax (benefit) provision were as follows (in thousands):

|  | March 31, 2010 | March 31, 2009 |
|---|---|---|
| Current taxes: | | |
| Federal and state taxes | $ (3,648) | $ 1,110 |
| Foreign taxes | 22,237 | 19,841 |
| Deferred taxes: | | |
| Federal taxes | 262,782 | (147,321) |
| State taxes | (10,013) | (34,011) |
| Change in valuation allowance | (273,114) | 185,685 |
| Total income tax (benefit) provision | $ (1,756) | $ 25,304 |

The following is a summary reconciliation of the federal tax rate to the effective tax rate:

|  | March 31, 2010 | March 31, 2009 |
|---|---|---|
| Federal tax rate on pre-tax book loss | (35)% | (35)% |
| State taxes, net of federal income tax benefit | 1 | 1 |
| Foreign taxes, net of federal income tax benefit | (1) | (1) |
| Non-deductible interest | 13 | 12 |
| Goodwill | 63 | – |
| Loss carryforwards and other tax attributes (benefited) not benefited | (41) | 28 |
| Effective tax rate | 0% | 5% |

As of March 31, 2010, the Company had $9.9 million of unrecognized tax benefits, of which $9.9 million, if recognized, would impact the effective tax. The Company has accrued interest and penalties associated with these unrecognized tax benefits of $3.0 million as of March 31, 2010, of which $0.4 million was recognized as a component of the income tax provision during the year ended March 31, 2010. The Company believes that approximately $6.9 million of additional unrecognized tax benefits are reasonably possible to reverse within the following year.

**Note 11—Income Taxes (continued)**

The following is a summary reconciliation of the beginning and ending amount of unrecognized tax benefits (in thousands):

|  | March 31, 2010 | March 31, 2009 |
|---|---|---|
| Unrecognized tax benefits at April 1 | $ 7,431 | $ 9,139 |
| Increases based on tax positions taken during a prior period | 6,867 | 1,272 |
| Decreases based on tax positions taken during a prior period | (4,253) | (2,784) |
| Increase based on tax positions taken during the current period | – | 97 |
| Settlement with tax authorities | (117) | (293) |
| Lapse of applicable statute of limitations | – | – |
| Unrecognized tax benefits at March 31 | $ 9,928 | $ 7,431 |

The Company or one of its subsidiaries files income tax returns with federal, state, local and foreign jurisdictions. As of March 31, 2010, the tax years that remain subject to examination by significant jurisdiction are as follows:

| | |
|---|---|
| U.S. federal | March 31, 2007 through the current period |
| California | April 8, 2005 through the current period |
| New York State | March 31, 2006 through the current period |
| New York City | December 31, 2000 through December 31, 2004 and March 31, 2006 through the current period |

**Note 12—Retirement Plans**

The Company has a noncontributory retirement plan (the "Plan") covering substantially all regular full-time, non-union employees. Benefits are based on years of service and compensation, as defined. Effective December 31, 2000, MGM's predecessor amended the Plan to cease benefit accruals. A summary of the activity of the Plan and the amounts included in the Company's condensed consolidated balance sheets is as follows (in thousands):

**Note 12—Retirement Plans (continued)**

|  | March 31, 2010 | | March 31, 2009 | |
|---|---|---|---|---|
| **Change in benefit obligation:** | | | | |
| Projected benefit obligation, beginning of year | $ | **16,592** | $ | 18,786 |
| Service cost | | **–** | | – |
| Interest cost | | **1,198** | | 1,200 |
| Actuarial loss (gain) | | **4,674** | | (2,587) |
| Net benefits paid | | **(1,201)** | | (807) |
| Projected benefit obligation, end of year | $ | **21,263** | $ | 16,592 |
| Accumulated benefit obligation, end of year | $ | **21,263** | $ | 16,592 |
| **Change in fair value of plan assets:** | | | | |
| Fair value of plan assets, beginning of year | $ | **15,874** | $ | 22,753 |
| Actual return on plan assets | | **6,315** | | (6,072) |
| Employer contributions | | **–** | | – |
| Net benefits paid | | **(1,201)** | | (807) |
| Fair value of plan assets, end of year | $ | **20,988** | $ | 15,874 |
| **Funded status:** | | | | |
| Fair value of plan assets | $ | **20,988** | $ | 15,874 |
| Projected benefit obligation | | **21,263** | | 16,592 |
| Funded status, and net balance sheet liability | $ | **(275)** | $ | (718) |

The Company's net balance sheet liability recognized at March 31, 2010 and 2009 is a non-current liability.

Amounts recognized in accumulated other comprehensive income (loss), before tax, were as follows (in thousands):

|  | March 31, 2010 | | March 31, 2009 | |
|---|---|---|---|---|
| Net actuarial loss | $ | **7,716** | $ | 9,070 |
| Prior service credit | | **–** | | (1) |
| Total | $ | **7,716** | $ | 9,069 |

## Note 12—Retirement Plans (continued)

Components of net periodic pension cost were as follows (in thousands):

|  | March 31, 2010 | | March 31, 2009 |
|---|---|---|---|
| Service cost | $ – | $ | – |
| Interest cost on projected benefit obligation | 1,198 | | 1,200 |
| Expected return on plan assets | (925) | | (1,336) |
| Net amortization and deferral | 637 | | 193 |
| Net periodic pension expense | $ 910 | $ | 57 |

The unrecognized net asset is being amortized over the estimated remaining service life of 11.4 years and 12.0 years for the years ended March 31, 2010 and 2009, respectively. Domestic pension benefits and expense were determined under the entry age actuarial cost method.

The estimated amounts that will be amortized from accumulated other comprehensive income (loss) into net periodic pension cost during the year ending March 31, 2011 are as follows (in thousands):

| Actuarial loss | $ | 535 |
|---|---|---|
| Prior service credit | | – |
| Total | $ | 535 |

Weighted-average assumptions used in actuarial computations were as follows:

|  | March 31, 2010 | March 31, 2009 |
|---|---|---|
| Assumptions – benefit obligations | | |
| Discount rate | 6.00% | 7.50% |
| Rate of increase in future compensation levels | N/A | N/A |
| | | |
| Assumptions – net periodic pension cost | | |
| Discount rate | 7.50% | 6.50% |
| Long-term rate of return on assets | 6.00% | 6.00% |
| Rate of increase in future compensation levels | N/A | N/A |

# MGM Holdings Inc.

## Notes to Unaudited Condensed Consolidated Financial Statements
## (continued)

### Note 12—Retirement Plans (continued)

The overall expected long-term rate of return on Plan assets was based on the performance of the Plan assets in the past three years and on the expected performance of the Plan assets over the next five years pursuant to the investment policies and strategies stated within this pension footnote. The overall expected long-term rate of return on Plan assets for pension footnote purposes was selected in coordination with the actuarial valuation interest rate for minimum funding purposes.

As of March 31, 2010, benefits expected to be paid under the Plan are as follows (in thousands):

| Fiscal Year | Amount |
|---|---|
| 2011 | $ 539 |
| 2012 | 644 |
| 2013 | 684 |
| 2014 | 823 |
| 2015 | 769 |
| 2016-2020 | 5,594 |
| | $ 9,053 |

The following table sets forth by level, within the fair value hierarchy described in Note 4, the Plan's assets required to be carried at fair value on a recurring basis as of March 31, 2010 (in thousands):

| | | Fair Value Measurements at March 31, 2010 using | | |
|---|---|---|---|---|
| Description | Balance at March 31, 2010 | Quoted Market Prices in Active Markets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Pooled separate accounts | $ 17,386 | $ – | $ 17,386 | $ – |
| Guaranteed deposit account | 3,602 | | 3,602 | – |
| Total | $ 20,988 | $ – | $ 20,988 | $ – |

Pooled separate accounts primarily consist of investments in mutual funds that include both equity and fixed income securities and are designed to provide a diversified portfolio. Investments in pooled separate accounts are valued by Prudential, the trustee of the Plan's assets, based on the Plan's share of the fair value of the assets held in the pooled separate accounts.

**Note 12—Retirement Plans (continued)**

Investments in the guaranteed deposit account are stated at approximately fair value as reported by Prudential.

Plan assets by category were as follows:

|  | March 31, 2010 | March 31, 2009 |
|---|---|---|
| Equity securities | **58%** | 52% |
| Debt securities and other | **42%** | 48% |
|  | **100%** | 100% |

The Plan's pension investments are allocated in a manner designed to provide a long-term investment return greater than the actuarial assumption, maximize investment return commensurate with appropriate levels of risk, and comply with the Employee Retirement Income Security Act of 1974 ("ERISA") by investing the funds in a manner consistent with ERISA fiduciary standards. Assets are allocated to provide adequate liquidity for the Plan's disbursements, such as benefit payments and ongoing expenses. The Plan's assets are managed such that all retirement benefit payments are met as they become due. The Plan's investment strategy focuses on the long term to take into account the long-term nature of the Plan's liabilities. The asset allocation strategy is implemented with due regard for the Plan's long-term needs and in a manner designed to control volatility and with regard for the Company's risk tolerance. The risk tolerance is comprised of financial and other relevant characteristics of the Company, as well as the Company's risk philosophy for pension assets. Certain business characteristics may reduce the Company's tolerance for volatility of investment returns and potential swings in contribution levels.

The Company's portfolio manager's asset/liability analyses indicate that approximately 30% of projected Plan assets are needed for upcoming disbursements and reserves. Accordingly, approximately 70% of the Plan's assets are available to invest in long-term securities, such as equities. However, the Plan is concerned about the level of volatility implicit in an asset mix of approximately 70% equity and 30% fixed income, and the attendant concern that the Company continues to be able to meet contributions during years when the investment markets are down and/or its business environment is depressed. In summary, the quantitative analyses of the Plan's assets and liabilities show approximately 55% is available to invest in equities (approximately 70% is available to invest in equities less 15% for risk tolerance and philosophy).

MGM Holdings Inc.

Notes to Unaudited Condensed Consolidated Financial Statements
(continued)

**Note 12—Retirement Plans (continued)**

The Plan currently targets the following as part of its long-term asset allocation strategy: approximately 45% in fixed income securities (20% for general account, 20% for fixed income (intermediate maturities), and 5% for high yield bonds) and approximately 55% in equity securities (27% for large capitalization United States equity securities, 4% for mid-capitalization equity securities, 10% for small capitalization United States equity securities, and 14% for international equity securities). Equity securities do not include any of the Company's common stock.

The Company did not contribute to the Plan during the years ended March 31, 2010 or 2009. The Company does not expect to make any required or discretionary contributions to the Plan during the year ending March 31, 2011.

A significant number of the Company's production employees were covered by various union sponsored, collectively bargained multi-employer pension plans. The Company contributed approximately $10.9 million and $13.5 million for such plans during the years ended March 31, 2010 and 2009, respectively. Information from the plans' administrators is not sufficient to permit the Company to determine its share of unfunded vested benefits, if any.

The Company also provides each of its employees, including its officers, who have completed one year of service with the Company the opportunity to participate in the MGM Savings Plan (the "Savings Plan"), a defined contribution plan. The Company makes matching contributions, on a monthly basis, up to 100% of the first 4% of the participant's basic earnings on a pre- and after-tax basis. The Company contributed approximately $1.4 million and $1.7 million to the Savings Plan during the years ended March 31, 2010 and 2009, respectively.

**Note 13—Related-Party Transactions**

The Company has equity interests ranging from 5% to 50% in certain television ventures located in the United States and various international territories, to which the Company licenses feature films and television programming produced or distributed by the Company. The Company recognized aggregate license fees under these agreements of $64.6 million and $37.3 million during the years ended March 31, 2010 and 2009, respectively.

The Company has production and distribution operating agreements with Sony Pictures Entertainment, Inc. ("SPE"). Under these agreements, SPE is entitled to a distribution service fee of 7.5% of certain gross receipts, as defined. During the years ended March 31, 2010 and 2009, the Company incurred SPE distribution service fees totaling $2.6 million and $2.2 million, respectively. In prior years, the distribution service fee was payable in cash up to $35.0 million

## Note 13—Related-Party Transactions (continued)

annually, with any excess balance payable in 10% Junior Preferred stock of MGM Holdings. During the years ended March 31, 2010 and 2009, the Company has included $8.9 million and $8.1 million, respectively, of interest expense in the condensed consolidated statements of operations relating to the outstanding Junior Preferred stock. At March 31, 2010 and 2009, the Company had a net payable due to SPE totaling $45.7 million and $66.0 million, respectively.

The Company has certain television licensing and channel carriage arrangements with Comcast Corporation. During the years ended March 31, 2010 and 2009, the Company recorded $4.1 million and $3.4 million in aggregate revenue, respectively, under these arrangements.

The Company has an agreement with the Consortium to pay management fees totaling $5.0 million annually, which are paid in arrears following completion of the Company's fiscal year end, March 31. Pursuant to the terms of the Forbearance, the Company is not permitted to pay any management fees during the term of the Forbearance, and thus, management fees for the year ended March 31, 2010 have not been paid as of the date of these financial statements and a related provision has been included in accounts payable and accrued liabilities in the unaudited condensed consolidated balance sheet at March 31, 2010. Management fees for the year ended March 31, 2009 were paid in April 2009. Additionally, the Company reimbursed Comcast Corporation, Texas Pacific Group and Providence Equity Partners a total of $41,000, $22,000 and $0, respectively, during the year ended March 31, 2010, and $0, $7,000 and $289,000, respectively, during the year ended March 31, 2009, relating primarily to travel and other out-of-pocket charges.

## Note 14—Commitments and Contingencies

*Litigation.* The Company, together with other major companies in the filmed entertainment industry, has been subject to numerous antitrust suits brought by various motion picture exhibitors, producers and others. In addition, various legal proceedings involving alleged breaches of contract, antitrust violations, copyright infringement and other claims are now pending, which the Company considers routine to its business activities.

The Company has provided an accrual for pending litigation as of March 31, 2010 and 2009. In the opinion of the Company's management, any liability under pending litigation is not expected to be material in relation to the Company's financial condition or results of operations.

*Leases.* The Company has operating leases for offices and equipment. Certain property leases include provisions for increases over base year rents as well as for escalation clauses for maintenance and other building operations. Rent expense was approximately $17.4 million and $19.9 million during the years ended March 31, 2010 and 2009, respectively.

## Note 14—Commitments and Contingencies (continued)

*Employment Agreements*. The Company has employment agreements with various principal officers and employees. The agreements provide for minimum salary levels as well as, in some cases, bonuses.

*Creative Talent Agreements*. The Company has entered into contractual agreements for creative talent related to future film production. Such amounts are scheduled to be paid through the year ended March 31, 2012.

*Other Commitments*. The Company has various other commitments entered into in the ordinary course of business relating to operating leases for offices and equipment, contractual agreements for creative talent, employment agreements and letters of credit.

Future minimum annual commitments under bank and other debt agreements, noncancelable operating leases net of subleasing income, employment agreements, creative talent agreements, letters of credit and preferred stock as of March 31, 2010, are as follows (in thousands):

| | Year Ended March 31 | | | | | | |
| | 2011 | 2012 | 2013 | 2014 | 2015 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Bank and other debt | $ 387,379 | $ 2,715,750 | $ 905,250 | $ – | $ 187,912 | $ – | $ 4,196,291 |
| Operating leases | 19,635 | 20,477 | 21,394 | 21,706 | 22,679 | 74,875 | 180,766 |
| Employment agreements | 20,475 | 9,075 | 95 | – | – | – | 29,645 |
| Creative talent agreements | 24,362 | 1,000 | – | – | – | – | 25,362 |
| Letters of credit | 500 | – | – | – | – | – | 500 |
| Preferred stock and dividends | – | – | – | 2,445,034 | – | – | 2,445,034 |
| | $ 452,351 | $ 2,746,302 | $ 926,739 | $ 2,466,740 | $ 210,591 | $ 74,875 | $ 6,877,598 |

## Note 15—Supplementary Cash Flow Information

The Company paid interest, net of amounts capitalized, of $82.6 million and $281.3 million during the years ended March 31, 2010 and 2009, respectively. The Company paid income taxes of $17.4 million and $14.4 million during the years ended March 31, 2010 and 2009, respectively.

## Note 16—Subsequent Events (unaudited)

In April 2010, an MGM Event of Default, as defined, under the revenue participation agreement with Domestic Distribution Inc. ("DDI"), occurred due to the non-payment of a principal amortization payment in respect of the term loans outstanding under the Company's senior secured corporate credit facility. As a result, the Company is not entitled to any additional funds

Notes to Unaudited Condensed Consolidated Financial Statements
(continued)

**Note 16—Subsequent Events (unaudited) (continued)**

pursuant to the revenue participation agreement with DDI. In addition, certain Accountable Receipts, as defined, collected from the exploitation of DDI films, which were previously retained by the Company, must now be paid to DDI. The conditions resulting from the MGM Event of Default may remain in effect until all amounts owed to DDI under the revenue participation agreement, and the related interest charges thereon, are paid in full.

In May 2010, the Company failed to satisfy a specific film performance test, the Cash Deficiency Test (as defined), under the UAPF Senior Facility, which resulted in a Stop Funding Event. A Stop Funding Event that is not cured within 18 months of its initial occurrence will constitute an Event of Default (as defined), during which the lenders under the UAPF Senior Facility may, under certain circumstances, have the right to exercise certain remedies, including termination of certain commitments, causing all amounts outstanding under the UAPF Senior Facility to become immediately due and payable, and, in certain additional circumstances, placing claim on UAPF's assets as collateral. A Stop Funding Event does not impede the Company's ability to complete the two films currently in production, but does preclude the Company from funding the production of any film not already in production.