SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP
Jay M. Goffman
Four Times Square
New York, New York 10036
(212) 735-3000

Nick P. Saggese
Rick C. Madden
Glenn S. Walter
300 South Grand Avenue
Suite 3400
Los Angeles, California 90071
(213) 687-5000

and

KLEE, TUCHIN, BOGDANOFF & STERN LLP
Kenneth N. Klee
Michael L. Tuchin
1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, California 90067
(310) 407-4000

Proposed Counsel for Debtors and
 Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| METRO-GOLDWYN-MAYER STUDIOS INC., <u>et al.</u>, | : | Case No. 10-15774 (SMB) |
| | : | |
| | : | |
| Debtors. | : | (Motion for Joint Administration |
| | : | Pending) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. §§ 105 AND 1127 AND FED. R. BANKR. P. 3019(a) (I) FINDING THAT PLAN MODIFICATIONS ARE NON-MATERIAL AND (II) DEEMING THE PLAN, AS MODIFIED, ACCEPTED BY CLASS 3 CREDITORS WHO PREVIOUSLY ACCEPTED THE PLAN**

Metro-Goldwyn-Mayer Studios Inc. and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"),[1] hereby move (the "Motion") the Court for entry of an order under sections 105 and 1127 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) finding that the proposed modifications to the Joint Prepackaged Plan of Reorganization of Metro-Goldwyn-Mayer Studios Inc. and Certain of its Affiliates dated October 7, 2010 (the "Plan") set forth in the memorandum (the "Plan Modifications"),[2] attached hereto as Exhibit B, are non-material, and (b) deeming the Plan, as may be modified by the Plan Modifications, accepted by holders of Class 3 claims who have previously accepted the Plan. In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Stephen F. Cooper, a member of the Office of the Chief Executive Officer of MGM Holdings Inc. (the "First-Day Declaration"), filed with the Court concurrently herewith. In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are sections 105 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019(a).

---

[1] The names of the Debtors in these cases, which the Debtors are separately seeking to have jointly administered, are identified on Exhibit A hereto.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan Modifications.

**BACKGROUND**

**A.    General Background**

3.     The Debtors are engaged primarily in the development, production, and worldwide distribution of feature films, television programming, interactive media, music, and licensed merchandise. The Debtors' film and television library (the "MGM Library") contains approximately 4,100 theatrically released feature film titles and approximately 10,800 television episodes, and is one of the largest collections of post-1948 feature films in the world. Films in the MGM Library have won over 200 Academy Awards, including fifteen Best Picture Awards. The MGM Library also contains rights to many iconic film and television franchises, including twenty-four titles in the *James Bond* film franchise, six titles in the *Rocky* film franchise, and with respect to the *Stargate* franchise, one film, two direct-to-video titles and several television series, including *Stargate SG-1*, the longest running science fiction series in U.S. television history.

4.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code. The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First-Day Declaration.

5.     The Debtors continue to operate their businesses and manage their properties as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases. As of the date hereof, no creditors' committee has been appointed.

6. On the Petition Date, the Debtors filed with the Court, among other things, (a) the Plan and (b) a disclosure statement related thereto ("Disclosure Statement"). The Plan provides for the payment in full of all allowed general unsecured claims against the Debtors.

**B.  Development of Plan of Reorganization**

7. Starting in September 2009, the Debtors, by and through a Capital Structure Committee of Holdings' Board of Directors ("CSC"), worked with the Debtors' financial advisor, Moelis & Company ("Moelis") to draft a confidential information memorandum ("CIM") regarding a potential sale of the Debtors and their non-Debtor affiliates (together, the "Company"). In this regard, the Debtors, along with Moelis, prepared a potential buyers list and Moelis reached out to numerous potential parties to gauge interest. In preparing this potential buyers list, Moelis consulted with the advisors to the steering committee (the "Steering Committee") of certain lenders under that certain Credit Agreement, dated as of August 8, 2005, by and among MGM Holdings II, Inc., Metro-Goldwyn-Mayer Inc., as Borrower, the lenders party thereto (the "Lenders"), Bank of America, N.A., Citicorp USA, Inc. and the Royal Bank of Scotland, PLC, as Documentation Agents, Credit Suisse, as Syndication Agent, and JPMorgan Chase Bank, N.A., as Administrative Agent (the "Administrative Agent"), as amended, modified, or supplemented from time to time (the "Credit Agreement") that was formed in connection with a potential restructuring of the Debtors' obligations under the Credit Agreement. Beginning in December 2009, Moelis began delivering CIMs to 18 potential buyers and their respective advisors following execution of confidentiality agreements. These potential buyers and their advisors were also granted access to a virtual data room.

8. In January 2010, the Debtors received non-binding indications of interest from eight parties. Following receipt of such indications of interest, the Debtors, working with Moelis and the Steering Committee's advisors, invited six of these parties to participate in a

second round of bidding.  The parties' indications of interest were evaluated primarily on long term value to the Company's stakeholders, proposed structure, the perceived ability of each party to consummate a transaction on a timely basis, and the ability to obtain the requisite support from the Lenders to the Credit Agreement for the transaction.

9. During the second round, bidders were granted access to both physical and virtual data rooms.  The Debtors also invited the bidders to management presentations to discuss the Company's business.  Bidders were later invited to follow-up diligence sessions with the Company's management to discuss questions following the management presentation as well as questions resulting from the review of documents in the data rooms.

10. Following the second round, three parties submitted non-binding bid letters by the end of March 2010, subject to, among other things, continued due diligence and the negotiation of definitive documents.  The Steering Committee determined that such bids were inadequate, and informed the Debtors that its members would not support a plan of reorganization embodying a transaction based upon these bids, and as a result, the Debtors did not accept any of the bids.

11. At the request of the Steering Committee, the Debtors then presented their business plan that assumed a stand-alone plan of reorganization.  In April 2010, the Steering Committee, with the Company's consent, elected to meet with certain industry experts to inform their perspectives of such standalone plan and formed an informal committee of certain members of the Steering Committee (the "<u>Subcommittee</u>") to do so and to consider additional alternatives. During April and May 2010, the Subcommittee met with numerous industry experts and potential partners to discuss their perspectives on the Company and potential alternatives for a reorganization of the Company.  During the months of June and July 2010, the discussions

narrowed to Spyglass Entertainment Holdings, LLC ("Spyglass"), Lions Gate Entertainment Corporation ("Lions Gate") (one of whose largest shareholders was and is Carl Icahn), and a handful of other parties.

12. Ultimately, the Subcommittee advised the Debtors that it supported moving forward with a standalone plan, under which Gary Barber and Roger Birnbaum, the current co-CEOs of Spyglass, would become co-CEOs of reorganized MGM.

13. Thereafter, the Subcommittee, in consultation with the Steering Committee, negotiated a preliminary non-binding letter of intent with Spyglass, Cypress Entertainment Group, Inc. ("Cypress") and Garoge, Inc. ("Garoge" and, together with Cypress, "C/G"), which was presented to the Debtors for their consideration. C/G are entities affiliated with Messrs. Barber and Birnbaum.

14. The Debtors further negotiated the non-binding letter of intent (the "Letter of Intent") with Spyglass and the stockholders of C/G (the "C/G Stockholders"), and the Letter of Intent was signed on September 3, 2010.

15. Following execution of the Letter of Intent, the parties worked diligently to negotiate the Debtors' Plan, including the transaction documents that are exhibits to the Plan (the "Transaction Documents"). The overall purpose of the Plan is to provide for a restructuring of the Debtors' liabilities in a manner designed to maximize value to all stakeholders and to enhance the financial viability of the reorganized Debtors. Generally, the Plan provides for a balance sheet restructuring whereby existing equity in MGM Holdings Inc. ("Holdings") will be cancelled and approximately $5 billion of claims under the Credit Agreement will be converted into 100% of the equity in Reorganized Holdings, less any equity issued to Spyglass and the C/G

Stockholders in exchange for the contribution of assets (directly or by way of merger) by Spyglass and C/G.[3]

16. On October 7, 2010, the Plan and the Disclosure Statement describing the Plan were disseminated to holders of Credit Agreement claims in Class 3, along with voting ballots (collectively, the "Solicitation Packages"). Creditors eligible to vote were required to vote their claims by October 22, 2010, at 5:00 p.m. Eastern time. Following the distribution of the Solicitation Packages, the Debtors disseminated a supplemental package containing additional information. To provide the Lenders with sufficient time to review the supplemental materials, the Debtors extended the voting deadline to October 29, 2010, at 5:00 p.m. Eastern time.

17. As set forth in the Declaration of Jung Song of Donlin, Recano & Company, Inc. filed contemporaneously herewith, the Plan was overwhelmingly accepted as required under section 1126(c) of the Bankruptcy Code – by approximately 80% in numerosity and amount – with the vast majority of claimholders eligible to vote casting ballots. Despite having sufficient votes to confirm the Plan, the Subcommittee and the Debtors continued to solicit feedback from, and try to find common ground with, certain Lenders and significant holders of Class 3 claims, including affiliates of Mr. Carl Icahn which would own a significant amount of stock of the reorganized Debtors under the Plan. Ultimately, the Subcommittee, the Debtors, Spyglass and the C/G Stockholders agreed to certain proposed amendments to the Transaction Documents on the terms described below. The Debtors believe that the proposed amendments are non-material. Based on the Plan Modifications, Mr. Icahn will support the Plan

---

[3] As set forth, certain holders of Class 3 claims and the Debtors agreed to the Plan Modifications. If the Plan Modifications are implemented, C/G's assets will not be acquired (by way of merger or otherwise) by the reorganized Debtors and no New Common Stock (as defined in the Plan) will be issued to Cypress or Garoge.

(including the conversion of the Lenders' debt to equity in reorganized Holdings and the appointment of Messrs. Barber and Birnbaum as co-Chief Executive Officers of reorganized Holdings).

## RELIEF REQUESTED

18. By this Motion, the Debtors seek entry of an order (a) finding that the proposed Plan Modifications are non-material and do not adversely change the treatment of the claim of any creditor or interest of any equity security holder, and therefore (b) deeming that the Plan, as modified by the Plan Modifications, has been accepted by holders of Class 3 claims who previously accepted the Plan. The Debtors wish to assure all parties in interest far in advance of a hearing on confirmation of the Plan that there is indeed a consensual plan of reorganization. Accordingly, contemporaneously herewith, the Debtors have filed a motion to shorten time for notice of a hearing to consider this Motion.

19. If the Motion is granted, and the Debtors are able to timely negotiate definitive documents incorporating such changes, the Debtors will seek confirmation of the Plan as modified by the Plan Modifications. Alternatively, if the Motion is denied, the Debtors will have the option to either: (a) solicit votes solely on the Plan Modifications, subject to the approval of this Court or (b) seek confirmation of the Plan without the Plan Modifications.

## PROPOSED PLAN MODIFICATIONS

20. The Plan Modifications generally fall within two categories, which Plan Modifications are attached hereto as Exhibit B. First, the Plan Modifications relate to C/G and Messrs. Barber and Birnbaum. The modified transaction will no longer include an acquisition of C/G's assets (the "C/G Library Assets"). Further, Messrs. Barber and Birnbaum will join the reorganized Debtors as co-CEOs and will both have seats on the board of directors of

reorganized Holdings (the "Board"), but neither will be appointed as chairman of the Board, which will not have a designated chairman as of the Effective Date.

21. Second, the Plan Modifications modify certain corporate governance provisions in the Plan to, among other things, provide Mr. Icahn with parity to the other significant shareholders, including granting Mr. Icahn a seat on the Board, and to address other corporate governance issues raised by Mr. Icahn as set forth in detail on Exhibit B hereto.

22. The Debtors believe that the Plan Modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder. Furthermore, the Debtors believe that the exclusion of the C/G Library Assets is non-material to the reorganized Debtors' long-term business plan, and is in the nature of a modification of the terms by which Messrs. Barber and Birnbaum will join the reorganized Debtors as co-CEOs. By way of example, the Business Plan attached to the Disclosure Statement as Exhibit C shows cash flow from the C/G Library Assets (identified therein as the Spyglass Net Library) of only $10 million per year during each of the five years set forth in the Business Plan. These cash flows are projected to only contribute $0.05 billion out of the Reorganized MGM's projected $1.94 billion in Library Cash Flow over the five year period as set forth in the Business Plan. Accordingly, the Debtors believe the Plan Modifications are non-material, and request that the Court deem the Plan, as modified by the Plan Modifications, accepted by the holders of Class 3 claims who previously accepted the Plan.

**APPLICABLE AUTHORITY**

**A. The Plan Modifications are Non-Material Modifications to the Plan**

23. Section 1127(a) provides that "[t]he proponent of a plan may modify such plan at any time before confirmation. . . . After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan." 11 U.S.C. § 1127(a). In fact,

9

"[a]ny holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection." Id. at 1127(d). Likewise, Bankruptcy Rule 3019(a) provides that a plan proponent may modify the plan even after the plan has been accepted, but before its confirmation. Fed. R. Bankr. P. 3019(a). Further,

> [i]f the court finds after hearing on notice to the trustee, any committee appointed under the [Bankruptcy] Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modifications, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Id.

24. The proposed Plan Modifications do not "adversely change the treatment of any creditor or the interest of any equity security holder." Id. The Plan Modifications merely provide for certain corporate governance provisions to be modified and the elimination of the contribution of assets by C/G, and therefore should be considered technical, non-material, and non-adverse changes. See In re Gulf Coast Holdings, Inc., 2007 WL 1340802, at *7 (Bankr. N.D. Tex. Apr. 30, 2007) (confirming plan containing "technical and immaterial" modifications that did not adversely change treatment of any claims or interests, were disclosed and discussed with unsecured creditors' committee before filing, and complied with provisions of Bankruptcy Code). Similar to those modifications in Gulf Coast Holdings, the Plan Modifications here are the product of extensive negotiations involving the Subcommittee. Moreover, by this Motion, the Debtors are providing even more protections than required by the Bankruptcy Code or the Bankruptcy Rules by providing notice of the proposed Plan Modifications and an opportunity to object to their designation as non-material. See In re Simplot, 2007 WL 2479664, at *14 n.55

(Bankr. D. Idaho Aug. 28, 2007) (noting in order confirming plan containing modifications that were documented in stipulations on the record that notice and opportunity to object were given).

25. Because the Plan Modifications do not adversely affect the treatment of any claim holder or equity holder, the Court should deem the Plan, as modified, accepted by those impaired holders of Class 3 claims who previously voted to accept the Plan.

## REQUEST FOR WAIVER OF ANY APPLICABLE STAY

26. As discussed above, the relief sought by this Motion is extremely time sensitive and is in the best interests of the estates. In order to avoid potential delays associated with achieving a successful restructuring of the Debtors and the resulting potential harm to the Debtors' business operations resulting from any such delays, the Debtors request that the Court waive any stay that might apply to an order on this Motion under Bankruptcy Rule 6004(h) or otherwise, such that any order on this Motion will be effective immediately upon entry.

## NOTICE

27. Notice of this Motion has been given to (a) the United States Trustee for the Southern District of New York; (b) counsel to the Administrative Agent; (c) the parties listed in the consolidated list of fifty (50) largest unsecured creditors filed by the Debtors in these bankruptcy cases; (d) C/G; (e) Spyglass; and (f) counsel to Icahn Partners L.P. The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

28. No prior request for the relief requested herein has been made to this or any other Court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order (a) granting the relief sought herein, substantially in the form attached hereto as <u>Exhibit C</u>, and (b) granting such other and further relief as may be just and proper.

Dated: New York, New York
       November 3, 2010

    SKADDEN, ARPS, SLATE, MEAGHER
     & FLOM LLP

By:   */s/ Jay M. Goffman*
     Jay M. Goffman
     Four Times Square
     New York, New York 10036
     (212) 735-3000

     -and-

     Nick P. Saggese
     Rick C. Madden
     Glenn S. Walter
     300 South Grand Avenue
     Suite 3400
     Los Angeles, California 90071
     (213) 687-5000

     -and-

     KLEE, TUCHIN, BOGDANOFF & STERN LLP
     Kenneth N. Klee
     Michael L. Tuchin
     1999 Avenue of the Stars
     Thirty-Ninth Floor
     Los Angeles, California 90067
     (310) 407-4000