Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 10-15774(SMB)

5    - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    METRO-GOLDWYN-MAYER STUDIOS INC., et al.

9

10                 Debtors.

11

12    - - - - - - - - - - - - - - - - - - - - -x

13

14                 United States Bankruptcy Court

15                 One Bowling Green

16                 New York, New York

17

18                 November 4, 2010

19                 11:03 AM

20

21    B E F O R E:

22    HON. STUART M. BERNSTEIN

23    U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    HEARING re Debtors' Motion for Order (i)Directing Joint

3    Administration of the Chapter 11 Cases Under Fed. R. Bankr. P.

4    1015(b); and (ii)Waiving Requirements of 11 U.S.C. §342(c)(1)

5    and Fed. R. Bankr. P. 1005 and 2002(n)

6

7    HEARING re Debtors' Motion for Order (i)Waiving Certain

8    Creditor List Filing Requirements; and (ii)Authorizing the

9    Filing of a Consolidated List of Top 50 Unsecured Creditors

10

11   HEARING re Debtors' Motion for Order (i)Dispensing with the

12   Requirement of Filing Schedules and Statements of Financial

13   Affairs; (ii)Pending the Waiver of Such Requirement, Granting

14   Additional Time to File Schedules and Statements of Financial

15   Affairs; (iii)Authorizing Debtors to File Required Monthly

16   Operating Reports on a Consolidated Basis; and (iv)Establishing

17   Certain Notice Procedures

18

19   HEARING re Debtors' Application for Order Under 28 U.S.C.

20   §56(c), Fed. R. Bankr. P. 2002, S.D.N.Y. LBR 5075-1, and

21   General Order M-409 Authorizing Retention and Appointment of

22   Donlin, Recano & Company, Inc. as Claims and Noticing Agent

23

24   HEARING re Debtors' Motion for Order Authorizing Retention of

25   Professionals Utilized in Ordinary Course of Business

Page 3

1

2   HEARING re Debtors' Motion for Order Under 11 U.S.C. §§105,

3   345, 363, 364, 503, 1107, and 1108 (i)Authorizing Continued Use

4   of Existing Cash Management System, Bank Accounts, and Business

5   Forms, and Payment of Related Pre-petition Obligations;

6   (ii)Waiving Investment and Deposit Requirements;

7   (iii)Authorizing Continued Engagement in Intercompany

8   Transactions; and (iv)According Administrative Expense Priority

9   Status to All Post-Petition Intercompany Claims

10

11   HEARING re Debtors' Motion for Order Under 11 U.S.C. §§105,

12   363(b), 507(a), 541(b)(7), 1107(a), and 1108 for Order

13   (i)Authorizing, but Not Directing, Debtors to (a) Pay Certain

14   Pre-Petition Compensation; (b)Continue Employee Benefit

15   Programs; and (c)Pay Related Costs; (ii)Directing Financial

16   Institutions to Honor All Related Checks and Electronic Payment

17   Requests

18

19   HEARING re Debtors' Motion for Entry of Interim and Final

20   Stipulated Orders Under 11 U.S.C. §§361, 363, and 507(b), and

21   Fed. R. Bankr. P. 4001(b) (i)Authorizing the Use of Cash

22   Collateral and Related Relief Respecting the MGM Credit

23   Facility; (ii)Granting Adequate Protection; and (iii)Scheduling

24   a Final Hearing

25

Page 4

1

2    HEARING re Debtors' Motion for Order (i)Authorizing Limited Use

3    of Pre-Petition Collateral (of Domestic Distribution Inc. and

4    United Artists Production Finance LLC); (ii)Granting Adequate

5    Protection; and (iii)Granting Related Relief

6

7    HEARING re Debtors' Motion for Interim and Final Orders

8    Authorizing the Debtors to Pay Pre-Petition Claims in Ordinary

9    Course of Business

10

11   HEARING re Debtors' Motion for Order Under 11 U.S.C. §§105(a),

12   506(a), 507(a)(8), 541, 1107, 1108, and 1129 (i)Authorizing,

13   but Not Directing, the Debtors to Pay Sales, Use, and Foreign

14   Taxes; and (ii)Directing Banks to Honor Payments Relating to

15   Such Taxes

16

17   HEARING re Debtors' Motion for Interim and Final Orders Under

18   11 U.S.C. §§ 105(a), 363(b), 1107, and 1108 (i)Authorizing, but

19   Not Directing, the Debtors to Pay Certain Pre-Petition

20   Shipping, Storage Facility and Laboratory Charges; and

21   (ii)Directing Banks to Honor Payments Relating to Such Charges

22

23

24

25

Page 5

1

2    HEARING re Debtors' Motion for Interim and Final Orders Under

3    11 U.S.C. §§105, 363, 1107 and 1108, and Fed. R. Bankr. P. 6003

4    Authorizing Payment of Pre-petition Residuals and

5    Participations in the Ordinary Course of Business

6

7    HEARING re Debtors' Motion for Order Authorizing Payment of

8    Production and Marketing Costs in the Ordinary Course of

9    Business

10

11   HEARING re Debtors' Motion for Order Determining Adequate

12   Assurance of Payment for Future Utility Services and Granting

13   Related Relief

14

15   HEARING re Debtors' Motion for Order Shortening Time for Notice

16   of Hearing to Consider the Debtors' Motion for Order Under 11

17   U.S.C. §§105, 363(b), 364(c)(1), and 503(b) Granting (i)Breakup

18   Fee and Expense Reimbursement Pursuant to Investment Agreement

19   Superpriority Administrative Expense Status; and (ii)Unpaid

20   Fees and Expenses Pursuant to Letter of Intent Administrative

21   Expense Status

22

23

24

25

Page 6

1

2    HEARING re Debtors' Motion for Order Shortening Time for Notice

3    of Hearing to Consider the Debtors' Motion for Order Under 11

4    U.S.C. §§105 and 1127 and Fed. R. Bankr. P. 3019(a) (i)Finding

5    that Plan Modifications are Non-Material; and (ii)Deeming the

6    Plan, as Modified, Accepted by Class 3 Creditors Who Previously

7    Accepted the Plan

8

9    HEARING re Debtors' Motion for Order (i)Scheduling Combined

10   Hearing on Adequacy of Disclosure Statement and Pre-petition

11   Solicitation Procedures and Confirmation of Plan;

12   (ii)Establishing Procedures for Objecting to Disclosure

13   Statement, Solicitation Procedures, and Plan; (iii)Approving

14   Form, Manner, and Sufficiency of Notice of Combined Hearing;

15   and (iv)Granting Related Relief

16

17   HEARING re Motion of Metro-Goldwyn-Mayer Studios Inc. for Order

18   Shortening Time for Notice of Hearing to Consider Motion of

19   Metro-Goldwyn-Mayer Studios, Inc. for Order Approving Space

20   Reduction Agreement and Transactions Thereunder, and Granting

21   Related Relief

22

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 7

1

2    A P P E A R A N C E S :

3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4         Attorneys for Debtors and Debtors-in-Possession

5         Four Times Square

6         New York, NY 10036

7

8    BY:  JAY M. GOFFMAN, ESQ.

9

10   KLEE, TUCHIN, BOGDANOFF & STERN LLP

11        Attorneys for Debtors and Debtors-in-Possession

12        1999 Avenue of the Stars

13        Thirty-Ninth Floor

14        Los Angeles, CA 90067

15

16   BY:  MICHAEL L. TUCHIN, ESQ.

17

18   UNITED STATES DEPARTMENT OF JUSTICE

19        Office of the United States Trustee

20        33 Whitehall Street

21        21st Floor

22        New York, NY 10004

23

24   BY:  PAUL K. SCHWARTZBERG, ESQ.

25

1

2    BUSH GOTTLIEB SINGER LOPEZ KOHANSKI ADELSTEIN & DICKINSON

3         500 North Central Avenue

4         Suite 800

5         Glendale, CA 91203

6

7    BY:   JOSEPH A. KOHANSKI, ESQ.

8

9    COHEN, WEISS AND SIMON LLP

10        Attorneys for The Producer Guild Benefit Funds AFTRA

11        330 West 42nd Street

12        New York, NY 10036

13

14   BY:   BABETTE CECCOTTI, ESQ.

15

16   JONES DAY

17        Attorneys for 20th Century Fox

18        222 East 41st Street

19        New York, NY 10017

20

21   BY:   LANCE E. MILLER, ESQ.

22

23

24

25

Page 9

```
 1

 2    LATHAM & WATKINS LLP

 3         Attorneys for United Artist

 4         53rd at Third

 5         885 Third Avenue

 6         New York, NY 10022

 7

 8    BY:   KELLI GREER SUSSMAN, ESQ.

 9

10    MORGAN, LEWIS & BOCKIUS LLP

11         Attorneys for JPMorgan Chase Bank, N.A., as P&A Agent and

12          UAPF Agent

13         101 Park Avenue

14         New York, NY 10178

15

16    BY:   WENDY S. WALKER, ESQ.

17

18    PEITZMAN WEG & KEMPINSKI LLP

19         Attorneys for Danjaq LLC

20         10100 Santa Monica Boulevard

21         Suite 1450

22         Los Angeles, CA 90067

23

24    BY:   LAWRENCE PEITZMAN, ESQ.

25
```

Page 10

```
 1

 2    SIMPSON THACHER & BARTLETT LLP

 3         Attorneys for JPMorgan Chase Bank, N.A., as P&A Agent and

 4          UAPF Agent

 5         425 Lexington Avenue

 6         New York, NY 10017

 7

 8    BY:   PETER V. PANTALEO, ESQ.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Please be seated.  MGM.

 3            MR. GOFFMAN:  Thank you, Your Honor.  Good morning.

 4    Jay Goffman, Skadden Arps, on behalf of MGM and its affiliated

 5    debtors.  Your Honor, it's my privilege to be able to stand

 6    here today to present to this Court the pre-packaged and

 7    consensual plan of reorganization for MGM Studios, the iconic

 8    film studio.

 9            As the newspapers have reported over the last several

10    weeks, there's been quite a drama going on here as we've tried

11    to get to our restructuring.  I'm happy to report that, as we

12    stand here today, we not only have the necessary vote in favor

13    of the plan but it is now based upon an agreement reached with

14    Mr. Icahn yesterday and almost unanimously approved pre-

15    packaged plan.  So, again, what we're bringing here today is a

16    fully negotiated pre-packaged consensual plan of

17    reorganization.

18            Before I go into the substance of today's hearing, I'd

19    like to make some introductions first and then tell the Court

20    how we got to where we are today.  First, I'd like to introduce

21    Mr. Stephen Cooper.  Mr. Cooper is the person in charge at MGM.

22    He was brought in about fifteen months ago as vice chairman and

23    as a member of the office of the CEO to lead this

24    restructuring.  His history is well known to the Court.  He's

25    run Enron, LyondellBasell, Krispy Kreme and many others and
```

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 12 of 65

Page 12

```
 1    pre-pack --

 2              THE COURT:  Before or after they went into bankruptcy?

 3              MR. GOFFMAN:  After they went into bankruptcy, Your

 4    Honor.

 5              THE COURT:  'Cause I would say, that's a very good

 6    track record if --

 7              MR. GOFFMAN:  He's led the -- he's led those

 8    restructurings and he's done a wonderful job.  He's also, in

 9    terms of pre-packs, he did the legendary Blue Bird's thirty-two

10    hour pre-pack, still the quickest one ever.

11              Mr. Cooper brought with him to MGM when he came on

12    board two of his colleagues, Mr. Brent Fernandez and Mr. Adam

13    Murphy.  They've also played an integral role in this

14    restructuring and they're here today also.

15              THE COURT:  Welcome.

16              MR. GOFFMAN:  Also on the MGM side, I'd like to talk

17    about management.  I have here today Mr. Steve Hendry, MGM's

18    senior executive vice president of finance.  Mr. Hendry and Mr.

19    Cooper have both put in affidavits for today's hearing.  We

20    have Mr. Charlie Cohen, an executive vice president of the

21    holding company and the CEO of the motion picture group.  Mr.

22    Scott Packman, general counsel to MGM, Ms. Barbara Van Sickle,

23    deputy general counsel, and also Matt Davidson, controller.

24              There are other players on the MGM side.  We have the

25    financial advisor, Moelis & Company.  Key players there were
```

1    Mr. Navid Mahmoodzadegan -- I always have a problem with that

2    one.  He could not be here today but here today are also Mr.

3    Carlos Jimenez and Rob Flachs.

4              On the legal side, outside general counsel.  My

5    partners could not be here today but I feel I need to introduce

6    them since they've worked tirelessly, Your Honor.  My partner

7    Nick Saggese, he leads a private equity practice and he's been

8    doing restructurings and leverage finance transactions for over

9    thirty years.  My partner, Rick Madden, who is one of our

10   corporate M&A restructuring partners who has worked tirelessly

11   on it, and Glenn Walter also from or L.A. office who's worked

12   day to day on this for the last two years.

13             Now, we've also had co-counsel on this from the start.

14   We've had Ken Klee and Michael Tuchin from the firm of Klee

15   Tuchin.  Klee Tuchin has been longtime outside counsel on

16   restructuring matters to MGM.  Mr. Klee is well known to

17   everyone.  He is one of the deans of the bankruptcy bar.  We've

18   been lucky to have him aboard.  And Mr. Tuchin who's here with

19   me today has been a tireless and a terrific lawyer to work with

20   on a day to day basis.  By the way, I would move his motion for

21   pro hac today.

22             THE COURT:  Did he pay his twenty-five bucks?

23             MR. GOFFMAN:  Did you pay --

24             MR. TUCHIN:  I believe that was submitted this

25   morning, Your Honor.

Page 14

```
 1              THE COURT:  I'll review the application but you're

 2    certainly admitted for today's purposes.

 3              MR. TUCHIN:  Thank you, Your Honor.

 4              MR. GOFFMAN:  These people and a whole slew of other

 5    people who could not be here today represent the MG --

 6              THE COURT:  I should say, I assume you're a member of

 7    the bar.

 8              MR. TUCHIN:  Yes.

 9              THE COURT:  Okay.

10              MR. GOFFMAN:  -- represent the MGM side of the table.

11              But like any great drama, there were many other

12    players here.  So let me introduce some of those.  On the bank

13    side, Mrs. Mary Ellen Egbert.  She couldn't be here today but

14    she was our managing -- she's a managing director at JPMorgan

15    Chase, the agent bank for our credit facility.  We have Mr.

16    Pantaleo from Simpson Thacher and his partner, Nick Baker.  Mr.

17    Pantaleo's done a wonderful job representing the bank to

18    working consensually with us.  And then there were the

19    financial advisors also for the banks.  Houlihan Lokey -- you

20    have Mr. Irwin Gold, Chris Wilson and Andrew Walter.  They

21    couldn't be here today but they played an important role in

22    this process.

23              Your Honor, I have to say that in all the years I've

24    been restructuring, I've never had a restructuring where the

25    parties work better together, more cohesively.  The amount of
```

10-15774-smb   Doc 95   Filed 11/05/10   Entered 11/10/10 08:21:14   Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 15 of 65

Page 15

1   trust -- the amount of team play that's gone into this

2   restructuring is what's brought this here today as a fully

3   consensual pre-packaged plan.  Now there have been many other

4   players who have worked long and hard over the last eighteen

5   months to bring this restructuring to where we are today.  And

6   I don't want to leave them out.  So on behalf of the company, I

7   want to thank everyone for their efforts.

8            Now, before I actually address the motions, I'd like

9   to spend a few minutes telling you about MGM and how we got

10  here.  MGM Studios is an iconic film studio company, maybe the

11  most famous in history.  We have one of the world's largest

12  film libraries and film and television libraries.  It includes

13  4100 theatrically released films, 10,800 television episodes.

14  We own one of the largest post-modern collection of feature

15  films in the world.  It includes the post-1985 MGM library, the

16  historic United Artist library, the Orion Pictures library and

17  the PolyGram libraries.  We've won over 200 academy awards

18  including fifteen best picture awards.  The MGM library today

19  includes twenty-four titles in the James Bond film franchise,

20  six titles in the Rocky film franchise and several Stargate

21  television series including Stargate SG-1, the longest running

22  science fiction series in U.S. history.  We also co-owned the

23  rights to produce a film based on The Hobbit, a book which has

24  sold more than a hundred million copies.

25           When one mentions the name MGM, you instantly know

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 16 of 65

Page 16

1   you're talking about one of the hallowed names in entertainment

2   history.  And that's why we're also pleased to be able to come

3   here today with a fully pre-packaged case that we hope will

4   allow us to emerge thirty days from now minus five billion

5   dollars of debt with a new 500 million dollar credit facility

6   and poised to move forward to great success again.

7        Let me now briefly address the corporate and the

8   capital structure.  As Your Honor is aware, this filing

9   included 160 companies, the parent company and 159 subs or

10  affiliates.  We did not file petitions for any foreign

11  subsidiaries, joint ventures or any bankruptcy remote entities.

12  And even though we have a storied history and a complicated

13  corporate structure, our capital structure is really very

14  simple.  We basically have three debt facilities only one of

15  which is being impacted by this plan, the JPMorgan credit

16  facility, which today is about five billion dollars including

17  accrued interest.  The other two are not --

18        THE COURT:  Five million or five billion?

19        MR. GOFFMAN:  Five billion.  So let me talk briefly

20  about these three facilities.  The debtors' primary credit

21  facility, again, the only one being impacted by this pre-pack

22  is the one with JPMorgan.  There's about four billion dollars

23  in principal amount plus about another billion dollars in

24  accrued interest.  It's secured by substantially all the assets

25  of the debtors and it's the only impaired class under the

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 17 of 65

Page 17

 1    claims.  Under the plan, we're going to convert this into a

 2    hundred percent of the equity and then the banks are going to

 3    give some small amount, very tiny amount, to our new --

 4    effectively, to our new CEOs in satisfaction for some assets

 5    that are being distributed.  And I'll go through that in a

 6    little more detail.

 7            Under the original plan that was sent out,

 8    approximately 4.7 percent of the equity is being given by the

 9    banks to our new two CEOs in satisfaction of certain interest

10    they were going to contribute.  We spent the last few days

11    trying to negotiate an agreement with Mr. Icahn.  And under

12    that proposed agreement, we've modified that so that most of

13    those assets are not being contributed and the equity

14    distribution going is much smaller.  It's now down to one-half

15    of one percent being given.  I'll go through that in more

16    detail.

17            The other two facilities.  First, we have a P&A

18    facility.  The P&A facility is used to fund print and

19    advertising.  That's why it's called P&A costs when a film is

20    released with the actual distribution.  This facility will be

21    reinstated under the plan.

22            The next one is the United Artist facility or what we

23    sometimes call the UAPF facility.  The United Artist

24    entertainment is not debtor here.  It's a nondebtor affiliate

25    of MGM.  MGM owns sixty-two and a half percent of the equity in

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 18 of 65

Page 18

1    United Artist Entertainment which was formed to develop and

2    create new theatrically released films under the United Artist

3    banner.  Films released include "Fame", "Hot Tub Time Machine",

4    "Lions for Lambs" and "Valkyrie".  We currently have two films

5    in post-production, "Cabin in the Woods" and "Red Dawn", both

6    of which are contemplated to be released in 2011.

7            MR. GOFFMAN:  Historically, United Artist funded its

8    file production under a separate credit facility which we refer

9    to as the UAPF facility.  This, currently, has stopped funding

10   event there, so we're not borrowing under that.  Nevertheless,

11   for purposes of the record, I'll go through all more details.

12           The UAPF facility is a facility between two nondebtor

13   entities.  However, MGM has an exclusive right to distribute

14   the films produced by United Artists pursuant to the master

15   distribution agreement.  We don't -- the debtors don't have any

16   direct obligations under the UAPF facility but the proceeds

17   from the master distribution agreement are used to satisfy the

18   UAPF obligation's under the UAPF's facility, by contract.  The

19   master distribution is going to be assumed under the plan.  And

20   that's basically the entire cap -- long term debt structure of

21   MGM.

22           Now let's talk about what brought us here, Judge.  To

23   understand why we're here today you have to go back in history

24   a little bit.  So let's go back about five years ago when Mr.

25   Kirk Kerkorian still owned MGM and he put it up for sale.

METRO-GOLDWYN-MAYER STUDIOS INC., et al.

Page 19

1    There was a bidding process and in the end, a group of private

2    equity funds won the bid.  They paid about five billion dollars

3    for it.  About four billion dollars was debt finance, about a

4    billion dollars was equity.

5            Everyone had -- everyone had high hopes for the future

6    at that point.  But the last few years have been difficult at

7    MGM.  First, there was a massive change in the whole DVD

8    process and how DVDs are used worldwide.  We didn't have great

9    luck with what certain major motion picture releases.  And then

10   you had the greatest recession in the last eighty years.  All

11   that combined to place MGM in a difficult position in

12   satisfying its four billion dollars of debt.

13           SO MGM brought in advisors.  They brought in Skadden,

14   they brought in Klee, Tuchin, they brought in Moelis, and then

15   in the summer they brought in Mr. Cooper and his team to help

16   run this restructuring and lead us through it.  One of the

17   first things that Mr. Cooper did was we had a conference call.

18   And he got on the phone with all the lenders, and there were

19   hundred of them, and he said we're going to change things.

20   We're going to fix this.  We recognize the equity's out of the

21   money, we're prepared to turn over the equity to you pursuant

22   to a pre-pack, but we're also going to stop paying interest and

23   we'd like you to work with us on that.

24           And we've been operating pursuant to a forbearance

25   agreement or extensions of that forbearance agreement ever

Page 20

1    since.  And this is in the fall of 2009.  The lenders came back

2    to us and said we're happy to work with you through the

3    forbearance -- on a forbearance agreement and we're happy to

4    have you -- we're not happy that you're not paying interest but

5    we're willing to work with you on that basis.  But they said

6    don't turn over the equity to us right now.  Do something

7    different.

8           They formed their own steering committee, they got

9    their biggest -- the agent bank got the biggest lenders

10   together, their hard counsel and finance advisors, and they

11   came back in and they said rather than giving us ownership

12   today, please run an M&A process.  We'd like to see what the

13   bids would be.  So we did that.  We ran a full M&A process.

14   Went out to all the likely bidders, there were two rounds of

15   bidding, there were data rooms, there were management

16   presentations, there was diligence.  And we kept working

17   through the process and then finally by the spring of 2010 it

18   became clear to us and to the steering committee that the bids

19   weren't coming in at a high enough number to satisfy people.

20          So the steering committee said let's put a stop to

21   this. We really don't like these bids; we'll do a stand-alone

22   plan.  So they came to us and said that.  The company then went

23   ahead and put together its stand alone plan and we made a

24   presentation to the steering committee at MGM's headquarters in

25   LA in April 2010.

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 21 of 65

Page 21

1          Once we finished that, the steering committee came

2     back to us and said look, we understand your presentation.  We

3     would like now to do our own diligence.  We'd like to talk to

4     other experts in the field, we'd like to understand your plan

5     better, we'd like to understand if there are ways to cut more

6     costs and we'd like to figure out who's going to run this

7     company after we emerge.  Because Mr. Cooper had made it clear

8     to the bank from the beginning, while he was willing to see

9     this through the restructuring process and get to the right

10    conclusion, he really wasn't interested in running MGM on a

11    going forward basis after the restructuring.

12          So during the months of June and Ju -- during the

13    months of April and May, this -- the steering committee created

14    a subcommittee.  And they went out and they met with a bunch of

15    industry experts out in LA.  And they narrowed the group of

16    people that we were talking to, to a handful, three or four

17    groups.  One of which included the people who had founded

18    Spyglass Entertainment, Gary Birnbaum and -- I'm sorry, Gary

19    Barber and Roger Birnbaum.  And they talked to them about

20    potentially coming in and being the new C -- co-CEOs.  They

21    talked to a bunch of other people including Lionsgate and I

22    mention Lionsgate because that'll come back to us later.

23    Lionsgate is one of the competitors that's principally owned by

24    Carl Icahn.  He's their largest share holder.

25          Ultimately, after going through all this, the

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 22 of 65

Page 22

1    subcommittee came back to us and said that they'd like to do

2    the stand-alone plan with Mr. Birnbaum and Mr. Barber being our

3    new co-CEOs of the reorganized company.  And we met with them

4    and we went over -- and we tried to determine whether that --

5    we thought that was the best thing for the company.  We spent

6    time working through the business plan with them to make sure

7    we were all on the same page.  And ultimately, after

8    considering all that and considering the interests of the

9    banks, who basically owned the company, we decided that that

10   was the best way to proceed.

11           With that, we then began to negotiate all the relevant

12   documents and ended up with a plan of reorganization.  What's

13   important to note, Judge, is that one of the agreements that we

14   negotiated, an investment agreement in which certain assets

15   would be contributed, had a fiduciary out.  It allowed us to

16   consider any superior proposal that came in because, again, the

17   ultimate goal was to maximize the value for the lenders here.

18   We had a plan that was going to pay everybody else in full and

19   we wanted to maximize the value.  And that's why you're going

20   to see later we have a motion to set a hearing for a bre -- to

21   approve a breakup fee.  That breakup fee is part of that

22   investment agreement.  It's been very good for the company.

23           Okay.  Now as part of -- one of the things that was

24   interesting in that is that the banks went to Mr. Birnbaum and

25   Mr. Barber and they say, look, we want you to be our new co-

10-15774-smb   Doc 95   Filed 11/05/10   Entered 11/10/10 08:21:14   Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 23 of 65

Page 23

1    CEOs, we want to make sure you have some skin in the game so

2    we'd like you to contribute some of your own personal assets,

3    what's called the CGS.  That's what referred to two companies

4    that they own that have some film library rights.

5         So they were going to contribute those in exchange for

6    about four percent of the equity and then Spyglass, the company

7    that they founded, was going to contribute at a very small

8    percent -- number of rights in exchange for one half of one

9    percent of the equity.  And that was the whole deal.  it was a

10   hundred percent for the banks, a little bit of that being given

11   to the -- to Mr. Birnbaum and Mr. Barber to "let them have some

12   skin in the game" which is what the steering committee wanted

13   and to align their interests.

14        Now let's talk about what the pre-pack that we have

15   here today is.  It's a very straight forward debt for equity

16   exchange.  We're converting all the secured debt, approximately

17   five billion dollars, into a hundred percent of the equity of

18   the reorganized company.  Again, originally, we were going to

19   give 4.7 percent of that equity in each -- to what we call the

20   CG stock holders, Mr. Birnbaum and Mr. Barber and to Spyglass,

21   in exchange for their contribution of certain assets.  It was

22   split up 4.17 percent to CG, Mr. Birnbaum and Mr. Barber for

23   those assets and then one half of one percent to Spyglass.

24        Now you're read in the paper probably all about this

25   being a Spyglass transaction.  That's a misnomer.  It's not a

Page 24

1    Spyglass transaction.  This is stand-alone reorganization.

2    Spyglass is remaining a separate company; it's just that the

3    two people that founded Spyglass are now going to be our

4    current CEOs.

5          Again, that's the only impaired class of -- the only

6    impaired class of claims under our plan is the secured lenders

7    who have voted almost unanimously in favor of it.  We also have

8    the equity which is getting nothing in exchange for their ole

9    equity.  But they've agreed to support this plan and for that,

10   we're eternally grateful.  They've made this easy, they don't

11   want to stand in the way of MGM's reorganization.  They're not

12   seeking anything; they're not getting anything in exchange for

13   their old equity.

14         Having documented the plan on October 27th, on October

15   7th we commenced our solicitation.  First we had a conference

16   call with all the lenders, hundreds of them on it.  We went

17   over the plan and, again, we've been keeping the lenders up to

18   speed throughout this process.  Pursuant to the forbearance

19   agreements, we've been having conference calls with all the

20   lenders every single month.  In addition, we've been working

21   with the steering committee which compromises almost half of

22   the bank debt on almost a daily basis.

23         So we started with this conference call, we explained

24   everything about the plan and we answered all their questions.

25   And then, at -- in consultation with the agent bank and the

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 25 of 65

Page 25

1    steering committee, we sent out the plan, the disclosure

2    statement and the ballots.  We all originally thought two weeks

3    was sufficient because everybody had been up to date on the

4    entire transaction and we moved forward.  Now, about a week

5    into the process, the agent bank said some of the lenders had

6    requested some more information and some of the lenders had

7    requested another week to consider it.  So we gave them the

8    information and we extended the voting deadline by another

9    week.

10           Again, I'm happy to report that the voting declaration

11    filed by Donlin, Recano, our voting agent, showed that at the

12    voting deadline we had more than satisfied the requisite voting

13    condition.  We had about eighty percent of the amount and about

14    eighty percent of the number.  most of the other -- most of the

15    no vote-- and we'll talk about this in a minute, belong to

16    either Mr. icon or people working with Mr. icon.  Pursuant to

17    an agreement we now have with him, those votes have now been

18    changed to yes votes and therefore we believe that our plan is

19    almost unanimously in favor of approval.

20           Now there's been a lot of intrigue and drama over the

21    last few weeks and I need to explain what's happened so you

22    know where -- how we got to the settlement.  As has been widely

23    reported in the press, right after we started the solicitation

24    in our plan, Lionsgate approached us again about doing a

25    transaction with them.  They had been part of the auction

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 26 of 65

Page 26
1    process that didn't lead anywhere.  And then they've had some

2    discussions with the steering committee.

3          One of the main reasons it hadn't led anywhere prior

4    to that is that Mr. Icahn had publicly stated that he didn't

5    want to see a merger of the two studios and that he would sue

6    anybody that tried to create that.  So we stayed away from

7    them.  They came back to us now and said, no, no, no, we have a

8    proposal and we believe it's supported by Mr. Icahn and Mr.

9    Rachesky, the other large owner.  Between Mr. Icahn and Mr.

10   Rachesky, they own about half of Lionsgate.

11         So we looked at it and the steering committee came

12   back and said, you know, we don't really like the economics and

13   we certainly don't like the corporate governance that they're

14   suggesting which including giving Mr. Icahn two board seats.

15   But first and foremost, we all agree that we needed to know if

16   this was a real proposal.  Was it really a proposal that was

17   supported by Mr. Icahn and Mr. Rachesky or not?  Because we

18   knew there was a litigation going on already in Canada, started

19   by Mr. Icahn with respect to his tender offer.  And we told

20   them, we don't want to get in the middle of your litigation.

21   We're not looking for that.  So if you want to do a trans -- if

22   you want to talk to us about a transaction, you have to come

23   back in writing to us and say here's a proposal.  And in

24   writing tell us Mr. Icahn and Mr. Rachesky support it.  They

25   weren't able to do that and so those discussions did not

10-15774-smb   Doc 95   Filed 11/05/10   Entered 11/10/10 08:21:14   Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 27 of 65

Page 27

1    proceed.

2         We continued on with our solicitation.  But Mr. Icahn

3    had concluded that he wanted to merge these two studios and

4    he's not a man easily deterred.  So we started on a process.

5    First he told us that he'd bought 4- to 500 million dollars of

6    our bank debt.  And he was going to do everything he could to

7    block our plan.  Then he put out an interesting transaction;

8    there was a put tender offer.  He -- on October 21st, he

9    publicly offered to all MGM bank lenders the right to sell him

10   their loans, a put, for forty-five cents on the dollar in

11   exchange for two things; one, they're committing to vote

12   against our plan, and two, granting him a proxy to excise

13   voting rights associated with the plan.

14        The offer was conditioned on him getting at least 963

15   million dollars in principal amount of the bank debt,

16   approximately twenty-four percent, which when you add it to the

17   debt he already owned, would have given him exactly a blocking

18   position.  Fortunately for all of us, Mr. Icahn wasn't

19   successful in trying to buy those votes.

20        When that didn't work, he came up with a new idea.  So

21   on October 26th, he put out a new tender offer.  This time, he

22   was willing to buy MGM bank debt at fifty-three cents on the

23   dollar, conditioned on getting at least fifty percent or

24   control of the bank debt and again, conditioned on those

25   parties voting against the plan.  Again, the banks didn't jump

Page 28

1    at that offer.  We don't think he got any traction.

2         So the next day, he cam out with another offer and

3    said he'll buy any debt at fifty cents on the dollar, not

4    conditioned on fifty-one percent approving it, but they still

5    had to vote against the plan.  I'm very happy to tell you, Your

6    Honor, that all of those failed and as a result, at the voting

7    deadline, even including the no votes of Mr. Icahn and his

8    colleagues had tendered, we had eighty per -- about eighty

9    percent of the amount and number voting in favor of the plan.

10        So, we had the votes Friday evening.  We got the tally

11   on Saturday and normally, we would have with -- we would have

12   filed on Sunday and asked for first day hearings on Monday.

13   But we got together and -- with the steering committee and we

14   said look, the best thing that we can do is try to bring a

15   fully consensual plan here.  So let's put off the filing for a

16   few days, until Wednesday and see if we can negotiate an

17   agreement with Mr. Icahn.  He wants some corporate governance;

18   let's see if we can satisfy him.  Let's see what his issues

19   really are.

20        And over the next -- from Sunday through yesterday,

21   there were round the clock negotiations with Mr. Icahn and his

22   representatives.  And I'm happy to report that we did reach an

23   agreement.  it requires some minor modifications to the plan

24   that was originally sent out and I'll talk about those, but we

25   think these are all nonmaterial and don't require any -- really

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 29 of 65

Page 29

1    resolicitation.

2           Let me go over what those changes are.  Mr. Icahn had

3    objected to the MGM's purchase of the so-called CG library

4    assets for 4.1 percent of the new equity.  That -- again, that

5    wasn't material to our plan.  It was there just to make sure

6    that Mr. Barber and Mr. Birnbaum had skin in the game.  It's

7    not central to the plan, it's not important to our business

8    philosophy.  These aren't key assets.  So as part of a

9    settlement with Mr. Icahn, we said, okay, we'll delete that.

10   They don't make that investment in us of those assets, they

11   don't get that 4.1 percent equity.  Instead, the debtors will

12   either manage those assets for them at a fee, at a market fee,

13   or they'll find someone else to manage them for them.

14          Mr. Icahn raised some corporate governance issues.  So

15   the amended plan will make clear a few things that we thought

16   were -- some of the things were in there already, but we'll

17   make clear; that Mr. Birnbaum and Mr. Barber are subject to the

18   control and supervision of the board; a consultant to the board

19   who will be independent of the affiliates of Lionsgate, Mr.

20   Birnbaum, Mr. Barber and Mr. Icahn, will be retained by the

21   board to work with Mr. Barber and Birnbaum on the initial

22   overhead cuts and who they will report their findings to the

23   whole board.

24          The settlement also addresses the initial appointment

25   rights of the board which was important to Mr. Icahn.  So under

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 30 of 65

Page 30

```
 1    the settlement, there'll be nine directors.  Two will be the
 2    senior executives, Mr. Birnbaum and Mr. Barber, there will be
 3    three what we call significant stockholder director designees
 4    and four independent directors.  The three initial nonexecutive
 5    significant stockholders will be appointed in the following
 6    manner.  One by Mr. Icahn, one by Anchorage Capital and one by
 7    Highland Capital.  Those are our largest lenders here.  So it's
 8    consistent with people's voting rights.  The four remaining
 9    nonexecutive directors will be approved by the subcommittee
10    following consultation with Spencer Stuart, an executive search
11    firm, and the executive directors.
12         The amended plan will also clearly separate the roles
13    of chairman and CEO.  Mr. Birnbaum and Mr. Barber will assume
14    the role of co-CEOs and will be executive directors, but they
15    won't be appointed as chairmen of the board.  The
16    administrative duties of the chairman of the board will be
17    executed by the lead director who will be selected by the new
18    nonexecutive directors from among the independent directors.
19         That's basically it.  I believe it's clear these minor
20    changes, and in some cases just clarifications, are not
21    material and we don't believe require any resolicitation.
22    They're supported by the company, the agent bank, the steering
23    committee, Mr. Birnbaum, Mr. Barber and Mr. Icahn.  Between Mr.
24    Icahn and the steering committee alone they culled almost two-
25    thirds of the of the bank debt.
```

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:31:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 31 of 65

Page 31

1    We've asked for a return date on that motion and I'll

2    get to that at the end of this for som -- towards the end of

3    next week.  We've agreed with Mr. Icahn that well try to get a

4    determination early on to make sure that we don't require any

5    resolicitation to get these approved.  So when I get to it at

6    the end, Your Honor, we're going to be asking for a hearing

7    towards the end of next week, if it fits Your Honor's

8    calendars.  Just for a determination that no resolicitation is

9    required.

10    Your Honor, the stakes have been very high, the storm

11    was more fitting for an Academy Award motion picture than it is

12    for a restructuring.  But, again, we are very pleased to be

13    able to present this fully consensually pre-pack.

14    Now, unless Your Honor has any questions, I'll go

15    directly into the first day motions.

16    THE COURT:  Thank you.  Why don't you go ahead with

17    the motions?

18    MR. GOFFMAN:  Thank you.  These are all what I would

19    call standard first day pre-pack motions.  We've worked with

20    the U.S. Trustee, we believe, to resolve all of his concerns.

21    So, I believe there'll be no objections from anyone.  If the

22    U.S. Trustee has any concerns whatsoever, we're happy to

23    address them.

24    And, again, I can provide as much detail as Your Honor

25    would like.   I'll try not to repeat what's in the motion.

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 32 of 65

Page 32

1    Again, these are pretty standard motions.

2            First joint administration.  We're requesting that the

3    160 Chapter 11 cases be jointly administered for procedural

4    purposes only.  The caption will be under Metro-Goldwyn-Mayer

5    Studios, Inc., the primary operating company, so everybody will

6    know what this case is about.  We ask for a waiver of the

7    requirements that we would otherwise include the tax ID and

8    other identifying information.  In lieu, we propose that each

9    part plead and file in the case include an exhibit listing the

10   names of the debtors and the last four digits of each debt --

11   respective debtor's tax ID numbers.

12           If there are no questions, Your Honor --

13           THE COURT:  Is there anyone who wants to be heard in

14   connection with that motion?

15      (No response)

16           THE COURT:  There's no response.  The motion -- are

17   you standing up, Mr. Pantaleo?

18           MR. PANTALEO:  Just to say, Your Honor, I don't want

19   to be heard.  Thank you.

20           THE COURT:  It would be unnecessary to say that.  Now

21   I've heard you.  That motion is granted.

22           MR. GOFFMAN:  Thank you, Your Honor.  Procedural --

23   would you like me to hand up the orders now or at the end?

24           THE COURT:  At the end you can drop it off in

25   chambers.

Page 33

1          MR. GOFFMAN:  Very good.  Then we have a second, we

2     have a motion to waive certain procedural requirements.  We

3     filed the motion requesting that the Court waive the

4     requirement applicable to creditor list filings pursuant to

5     local Bankruptcy Rule 1007 and authorize the debtors to file a

6     consolidated list of their fifty largest unsecured creditors.

7          We've separately filed an application to retain

8     Donlin, Recano as Noticing and Claims Agent.  Donlin, Recano is

9     prepared a list of creditors and potential parties and

10    interests.  The list has been provided to the clerk of the

11    Court.  Converting the debtors' computerized information into a

12    format compatible with the matrix requirements would be

13    burdensome and would create a risk of -- an unnecessary risk of

14    error in the process.  So we ask that we be allowed to file a

15    single consolidated list of our fifty largest creditors.

16    Our -- it would be a very difficult process to actually go back

17    through and figure out, of these creditors, which one apply to

18    which companies.  This gives a better picture of everything and

19    provides all the necessary information.

20          THE COURT:  Well, in the end, they're all going to be

21    paid in full anyway, correct?

22          MR. GOFFMAN:  They're all going to be paid in full,

23    Your Honor.

24          THE COURT:  Is there anyone who wants to be heard in

25    connection with that application?

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 34 of 65

Page 34

```
 1        (No response)

 2             THE COURT:  The record should reflect there's no

 3    response.  The application is granted.

 4             MR. GOFFMAN:  On schedules and statement, Your Honor,

 5    we're just simply asking to extend the deadline to file

 6    schedules, statements of financial affairs and reports of

 7    financial information for sixty days.  We believe this case

 8    will be confirmed before that deadline and therefore, at that

 9    time, we -- at confirmation we would ask for a full waiver of

10    that requirement.  This is consistent with -- to what's one in

11    all -- most pre-packs, Judge.  As a --

12             THE COURT:  Is there any --

13             MR. GOFFMAN:  -- concession to the U.S. Trustee, the

14    debtors have agreed not to seek the Court's authorization to

15    waive the requirements of the 341 meeting.  And I believe with

16    that, we have an agreement.

17             THE COURT:  Is there anyone who wants to be heard in

18    connection with that motion?

19        (No response)

20             THE COURT:  Hearing no response, the motion is

21    granted.

22             MR. GOFFMAN:  Let me talk about applications to retain

23    professionals.  First, the notice agent.  As I mentioned, we

24    filed an application to retain Donlin, Recano as our Claims and

25    Noticing Agent.  General order M409 which was adopted on
```

Page 35

1    September 22, 2010 requires the retention of an approved claims

2    and noticing agent in a case having more than 1,000 creditors.

3              We have that and therefore Donlin, Recano is an

4    approved claims and noticing agent and we'd ask that their

5    motion be approved.

6              THE COURT:  Does anyone want to be heard in connection

7    with that motion?  I'll refer that motion to the clerk since

8    the agent does the clerk's duties.

9              MR. GOFFMAN:  Very good, Your Honor.

10             Ordinary course professionals.  We filed the usual

11   ordinary course motion.  In the ordinary course of business not

12   related to this restructuring, the debtors retain many

13   professionals.  We ask that we be allowed to retain them

14   without them having to file 327, 328 type applications.  And we

15   seek to be able to compensate these professionals in the

16   ordinary course of business.  Again, very standard pre-pack

17   motion.  We've included some limitations in here.

18             We've -- the debtors propose that 106 firms will be

19   subject to a monthly cap of 50,000 dollars and 7 firms will be

20   subject to a monthly fee cap of 100,000 dollars.  Each of the

21   ordinary course professionals is subject to a cap of 500,000

22   dollars for the duration of these cases and after negotiations

23   with the U.S. Trustee we've agreed that no fees in excess of

24   the monthly fee caps will be paid either without the U.S.

25   Trustee's approval or without coming back to this Court.

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 09:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 36 of 65

Page 36

1          To the extent that any ordinary course professional

2     s fees exceed 500,000 dollars during that time period, they'll

3     be required to seek a separate retention under 327 and 328.

4     And each ordinary course professional is required to file and

5     serve a verified statement briefly describing the

6     professional -- who they are, the services to be rendered and

7     their customary rates.

8          THE COURT:  Is there anyone who wants to be heard in

9     connection with that motion?

10        (No response)

11         THE COURT:  All right, I have one change to the order.

12    In paragraph 10 it provides that the debtors are authorized

13    without further hearing or order of the Court to employ or

14    retain additional ordinary course professionals.  And you

15    should change that to say that you're authorized with further

16    order of the Court --

17         MR. GOFFMAN:  Yes, Your Honor.

18         THE COURT:  -- to retain additional professionals.

19         MR. GOFFMAN:  Yes, Your Honor.

20         THE COURT:  Otherwise, the application is granted.

21         MR. GOFFMAN:  Very good.  As far as the other

22    professionals, what we're going to do is right after today's

23    hearing, either this afternoon or tomorrow, we're going to file

24    retention applications for my firm, Skadden, Arps, for Klee,

25    Tuchin, for Moelis, for Cooper and for Ernst & Young.

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 09:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 37 of 65

Page 37

1          All these, we think, can be heard in the ordinary

2     course at confirmation, thirty days or so from now if it fits

3     Your Honor's schedule.  The only one that needs to get heard

4     earlier, Your Honor, is the E&Y retention.  E&Y is our auditor.

5     At the end -- on confir -- on the effective date, MGM's going

6     to get a new credit facility for another 500 million dollars to

7     have liquidity going forward.

8          In order to have that credit facility in place, the

9     bank needs the audit.  In order for the -- for E&Y to finish

10    and turn over the audit, they need to be retained.  So, we're

11    going to be asking for a hearing date towards the end of next

12    week to cover a bunch of things.  We would hope that we could

13    have E&Y heard on that date.

14          THE COURT:  All right.

15          MR. GOFFMAN:  Next I have the motion to continue

16    certain banking and business practices.  By the -- again,

17    standard pre-pack motion.  We -- by this, we seek authority to

18    continue to use our existing cash management system, bank

19    accounts and business forms and to pay related pre-petition

20    obligations, waiver of any applicable investment and deposit

21    requirements and authority to continue engaging in

22    intercompany transactions in the ordinary course.

23          I can go into detail on each of these, but these are

24    very standard and are laid in our motion.

25          THE COURT:  Does the -- do the debtors have bank

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 38 of 65

Page 38

 1    accounts outside of the United States?

 2             MR. GOFFMAN:  We d -- one moment.  I believe we do,

 3    Your Honor, and som -- all our deposits -- what's -- all our

 4    deposits in the United States all comply with the appropriate

 5    guidelines that there are in the approp -- FDIC insured or

 6    otherwise.  I think it's the nondebtor affiliates, actually --

 7             THE COURT:  Oh.

 8             MR. GOFFMAN:  -- that have bank accounts outside the

 9    US.  But it all gets funneled into the cash concentration

10    account.

11             I'm told that we do have certain accounts outside the

12    United States, but they're immaterial to our business.

13             THE COURT:  We're going to do this.  I'll grant this

14    on an interim basis.  What are you looking for next Thursday

15    for those other motions?

16             MR. GOFFMAN:  Yes, Your Honor.  Thursday afternoon or

17    Friday would work.

18             THE COURT:  We're closed -- I'm advised we're closed

19    next Thursday.

20             MR. GOFFMAN:  Okay, Friday?

21             THE COURT:  We can do it Friday.

22             MR. GOFFMAN:  Okay, is there more detail that you'd

23    like for that hearing?

24             THE COURT:  Well, ordinarily, I get a statement from

25    the U.S. Trustee that they're working with you.  I realize that

10-15774-smb   Doc 95   Filed 11/05/10   Entered 11/10/10 09:21:14   Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 39 of 65

Page 39

1    this is a small -- quick case, not small case.  But I would

2    like to know which -- how much money is in these accounts that

3    don't comply with the statutory requirements.

4         MR. GOFFMAN:  We will get --

5         THE COURT:  And how do you intend to work through it.

6         MR. GOFFMAN:  We will get you that amount and we have

7    been working with the U.S. Trustee.  We actually think we have

8    agreement with them.  We will certainly get you the number of

9    accounts and the amounts for next Friday.

10        THE COURT:  Okay.

11        MR. TUCHIN:  Your Honor, we did supply the U.S.

12   Trustee with copies of the pleadings last week and have them --

13        THE COURT:  Let me ask the Unites States Trustee

14   whether you've reviewed this.

15        MR. SCHWARTZBERG:  Yes, Your Honor, we have and we

16   have no objection to it.

17        THE COURT:  All right.  Then, I'll --

18        MR. SCHWARTZBERG:  I just -- I'm sorry.  I just wanted

19   to note that this is just an interim order.  There is a final

20   order and our right to specifically preserve them in the

21   interim order --

22        MR. GOFFMAN:  And that's fine.  And we'd be happy to

23   have this just as an interim and deal with this actually at the

24   confirmation hearing.  And we'll let it all happen at that

25   point, if that works, Your Honor.

10-15774-smb   Doc 95   Filed 11/05/10   Entered 11/10/10 08:21:14   Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 40 of 65

Page 40

1           THE COURT:  Well, if there's a concern about the

2      security of the money, it should be dealt with before then.

3           MR. GOFFMAN:  Okay, we're happy to do that next

4      Friday.

5           THE COURT:  We'll do it on next Friday.  Okay.

6           MR. GOFFMAN:  Very good.  Next, Your Honor, the next

7      item on the agenda is the debtors' motion seeking authority to

8      continue paying or performing various pre-petition employee --

9      various employee obligations.  Obviously, this is a very

10     important motion to us.  The loyal employees of MGM have been

11     working hard for the last eighteen months in a period of great

12     uncertainty.  It's critically important that they not be

13     impacted by this plan and both the company and the secured

14     lenders recognize that.

15          So we're asking essentially for a standard pre-peti --

16     employees-type motion.  It -- that would allow us to pay pre-

17     petition obligations to current employees including pre-

18     petition wages, salaries and commissions, to pay any

19     outstanding pre-petition obligations to independent contractors

20     and consultants and temporary workers, to continue the debtors'

21     vacation and leave policies and other bonus programs, and

22     employee benefit plans and programs and to pay all fees and

23     costs in connection therewith, to reimburse employees for pre-

24     petition expenses consistent with the debtors' reimbursement

25     practices, to pay any obligations related to pre-petition

Page 41

1    worker's comp claims and to withhold and to pay to the

2    appropriate authorities or agencies all related amounts that

3    are applicable or requires to be withheld from employee payroll

4    checks in respect of federal, state and local income taxes,

5    garnishments, contributions, Social Security and Medicaid taxes

6    and any other required holdings.

7            We have about 350 full time employees, Judge.  That's,

8    frankly, down significantly over the last eighteen months.

9    That's in the United States and we employ approximately twenty-

10   five people in the United Kingdom and in other foreign offices.

11   We currently have arrangements with about eighty-five

12   independent contractors who support a number of different

13   departments and projects for the debtor.  And we also employ

14   temporary workers on an as-needed basis.

15           Our monthly payroll expenditures for the US and Canada

16   is approximately 3.167 million dollars and the monthly foreign

17   payroll, other than Canada, is approximately 180,000 dollars.

18   The debtors made their last company-wide payroll to employees

19   on October 22nd and we made a certain supplemental payroll to

20   certain employees on October 29th.  We have verified that no

21   employee has a claim against the debtors of an excess of 11,725

22   dollars on account of their employee obligations, excluding any

23   claim for accrued vacation, which is the statutory priority.

24           As of the petition date, we estimate that

25   approximately --

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 09:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 42 of 65

Page 42

 1              THE COURT:  But you're seeking to pay unsecured claims

 2      anyway, today, so what --

 3              MR. GOFFMAN:  That's correct.

 4              THE COURT:  -- difference is it if it's limited to

 5      priority claims?

 6              MR. GOFFMAN:  You're right, Your Honor.

 7              So with that, we'd ask for approval of this motion.

 8              THE COURT:  Is there anyone who wants to be heard in

 9      connection with this motion?

10          (No response)

11              THE COURT:  Hearing no response, the motion is

12      granted.

13              MR. GOFFMAN:  Next, I'll turn to our motions to

14      utilize cash collateral.  Obviously, we need to be able to use

15      cash collateral to run our businesses.  Virtually all of our

16      cash is cash collateral of our lenders in one form or another.

17      So we've negotiated two cash collateral agreements.  The first

18      is with JPMorgan under the big credit agreement.  Essentially,

19      what we're providing to them is adequate protection for the use

20      of cash collateral is a pre-placement lien on existing first

21      priority collateral -- first priority lien on the unencumbered

22      property and junior liens on previously encumbered property.

23              To the extent any of those -- some of those liens, as

24      you'll see in the papers, are actually shared with the other

25      lenders of the other credit facility and I'll go through that.

10-15774-smb   Doc 95   Filed 11/05/10   Entered 11/10/10 08:21:14   Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 43 of 65

Page 43

1          In addition, we're providing superpriority

2     administrative claims in the event that eh liens were

3     prevented, providing -- don't provide adequate protection and

4     is subject to the normal carve-out to cover all costs and fees

5     of the estate or costs and fees of the U.S. Trustee and

6     appropriate expenses for all professionals in the case.

7          THE COURT:  Are you going to pay the banks'

8     administrative claims on confirmation or are they going to be

9     rolled in as part of the equity?

10         MR. GOFFMAN:  Everything's being rolled in, Your

11    Honor, making it very easy.

12         Again, the secured parties have consented to the use

13    of cash collateral in these terms.  these are very simple and

14    ordinary types of cash collateral provisions and is absolutely

15    necessary to continue in the business.

16         The second cash collateral stipulation goes back to

17    what I described earlier, the UAPF facility and DDI.  And

18    again, that's the other facility that's essentially used to

19    fund the making of new motion pictures under a separate

20    facility.  And all we've basically done there is agreed, Your

21    Honor, to continue to honor our contractual obligations,

22    whether we owe monies on a pre-petition or post-petition basis.

23    And as Your Honor's pointed out, since we're seeking to pay all

24    obligations today, having that be our primary adequate

25    protection isn't really asking for very much.

Page 44

```
 1        We also ha -- there is a lien on certain bank accounts

 2   that we've provided to them and we've agreed to keep at least

 3   500,000 dollars in one of the accounts and we've also agreed to

 4   limit how we use the money going forward.  But again, very

 5   simple, very basic adequate protection provisions, agreed to by

 6   the lenders and necessary for us to continue to run our

 7   business for the next thirty days while we hopefully get the

 8   confirmation.

 9        THE COURT:  Is there anyone who wants to be heard in

10   connection with the cash collateral order?

11        MR. PEITZMAN:  Your Honor, on the telephone, this is

12   Lawrence Peitzman of Peitzman, Weg and Kempinksi for Danjaq LLC

13   which is the other owner of the bond franchise.  And I had a

14   discussion with the debtors' --

15        THE COURT:  Yes.

16        MR. PEITZMAN:  -- counsel yesterday regarding a

17   modification to the order.  I want to make sure --

18        MR. GOFFMAN:  Yes.

19        MR. PEITZMAN:  -- that it gets made.

20        THE COURT:  He's nodding his head yes.  What are those

21   modifications?

22        MR. GOFFMAN:  Yes, I apologize.  We --

23        THE COURT:  Let's hear what he has to say then you can

24   disagree with him.

25        MR. GOFFMAN:  We had spoken to counsel.
```

10-15774-smb   Doc 95   Filed 11/05/10   Entered 11/10/10 08:21:14   Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 45 of 65

Page 45

1          MR. PEITZMAN:  Thank you, Your Honor.

2          MR. GOFFMAN:  We had spoken to counsel to Danjaq, they

3      asked for some clarifying language in the order that's -- it's

4      just clarifying.  It's perfectly fine with us.  It's fine with

5      the agent and we have a blackline copy to hand up to Your

6      Honor.

7          THE COURT:  All right.  I have some other questions

8      about the order before you hand up the blackline copy.  is

9      there anyone else who wants to be heard in connection with the

10     cash collateral order?

11         MR. PEITZMAN:  Your Honor, this is Lawrence Peitzman

12     again.  I'm sorry to --

13         THE COURT:  Quite all right.

14         MR. PEITZMAN:  -- but a minor thing that I just

15     noticed actually this morning as I was looking again --

16         THE COURT:  Which order are you talking about?

17         MR. PEITZMAN:  This is the JPMorgan --

18         THE COURT:  Okay.

19         MR. PEITZMAN:  -- order and I just believe that

20     when -- there was a clause that was added, Clause E after a

21     Clause D which should appear in the redline.  But the

22     defined -- I believe that the defined terms post-petition

23     collateral was not moved from Clause D to Clause E and it

24     should probably, I think, unless somebody tells me I'm wrong,

25     appear at the end of Clause E and not remain in Clause D.  But

10-15774-smb   Doc 95   Filed 11/05/10   Entered 11/10/10 08:21:14   Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 46 of 65

Page 46

 1    somebody there could take a look at that, if they would.

 2              MR. TUCHIN:  We're taking a look at it right now, Your

 3    Honor.

 4              Okay, so I'm looking at page 9 of the blackline, Your

 5    Honor.  When we did add a Clause E that explicitly excludes any

 6    real or personal property under the terms of restrictive

 7    agreement --

 8              THE COURT:  Let me make a suggestion.  Let me go

 9    through my comments.  You may have to change it a little more

10    and then you can send an e-mail to Mr. Peitzman so we don't

11    have to spend time --

12              MR. TUCHIN:  Sorry about --

13              THE COURT:  -- on this now.

14              MR. TUCHIN:  -- this, Your Honor.  And we're prepared

15    to accommodate his requested change.

16              MR. GOFFMAN:  Absolutely, won't be any issue, Mr.

17    Peitzman.

18              MR. PEITZMAN:  Great.  Thank you.

19              THE COURT:  All right.  I'd like to comment first

20    about the findings.  You have a finding, looking on page -- the

21    order that was delivered to me, page 6, paragraph H.  And you

22    have a finding regarding the adequacy of notice.  And one of

23    the things I'm finding or you're asking me to find is that US

24    mail sent yesterday is sufficient for a hearing at 11 o'clock

25    today.  How can that be?

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 09:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 47 of 65

Page 47

1          MR. GOFFMAN:  No, Your Honor, that's clearly not

2    right.  We will --

3          THE COURT:  All right.  So how did you -- who did you

4    give notice to and how did you do it?

5          MR. GOFFMAN:  We've -- well, let's start with -- the

6    only parties that had an interest in this collateral,

7    obviously, we had the company, the steering committee, the

8    agent banks.  We provided notice -- we posted all this on --

9    there's a website and it's all posted for anyone to get -- let

10   me find out exactly --

11         THE COURT:  But, for example, with the secured

12   creditors or the steering committee or whatever, how did you

13   provide them with notice of this hearing?

14         MR. GOFFMAN:  Well, we've been working with the

15   secured creditors and the steering committee.

16         THE COURT:  So did you give them telephonic notice?

17         MR. GOFFMAN:  We've -- they've had these documents for

18   a week and we've told them --

19         THE COURT:  But he didn't know until yesterday morning

20   that the hearing was 11:00 today.

21         MR. GOFFMAN:  Mr. Pantaleo is here representing the

22   steering committee and the lenders.

23         THE COURT:  All right.

24         MR. PANTALEO:  Your Honor, Peter Pantaleo.  For the

25   record, Peter Pantaleo, Simpson Thacher, for JPMorgan as agent

Page 48

```
 1    with the syndicate.  This was negotiated with us -- with our
 2    client's consent.  It was consented to by the agent who's the
 3    collateral agent.
 4              THE COURT:  That's in there but how did you know to be
 5    here today at 11:00?
 6              MR. GOFFMAN:  I called him.
 7              THE COURT:  All right.  Well -- so you gave telephonic
 8    notice.
 9              MR. GOFFMAN:  Yes.  We gave telephonic and e-mail
10    notice.
11              THE COURT:  All right.  So you should modify that
12    provision to state how you gave notice.
13              MR. GOFFMAN:  We will, Your Honor.
14              THE COURT:  All right.  Similarly, overnight courier
15    isn't going to be sufficient notice but it's here and that's in
16    the finding.
17              MR. GOFFMAN:  Yes, Your Honor.
18              THE COURT:  Let me see if there's anything else.
19         (Pause)
20              THE COURT:  All of the debtors are giving liens on
21    their assets?
22              MR. GOFFMAN:  Yes, Your Honor.
23              THE COURT:  Are all the debtors liable for the debts
24    that are being compromised?
25              MR. GOFFMAN:  I believe so, Your Honor, yes.
```

10-15774-smb   Doc 95   Filed 11/05/10   Entered 11/10/10 08:21:14   Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 49 of 65

Page 49

1           THE COURT:  Behind all 160 debtors?

2           MR. GOFFMAN:  Every one that filed, I believe is --

3           THE COURT:  Okay.  On page 10, I'm sure you can

4     explain it to me --

5           MR. GOFFMAN:  Your Honor, I stand corrected.  Not

6     every one of them is a guarantor but they all --

7           THE COURT:  Are they getting any of the proceeds?

8           MR. GOFFMAN:  They all benefit.  It all goes into a

9     cash concentration account and to the extent necessary, they

10    get the proceeds.  So they all benefit from providing -- from

11    participating in this.

12          THE COURT:  On page 10, I think you were talking about

13    the replacement liens and in the body of page 10, as I read it,

14    it seems to say that all of the replacement liens under this

15    and the other cash collateral order are equal rank.  And then I

16    looked at the footnote and there's a reference to junior rank.

17          MR. GOFFMAN:  Yeah.  To the extent that they're -- the

18    replacement liens are on different types of -- different

19    assets.  They -- you know, JPMorgan has certain assets that it

20    has its lien on through the IEPF; UAPF has other assets.  To

21    the extent that they're -- we're giving new liens on

22    unencumbered collateral or whatnot I believe that those are all

23    pari passu.

24          THE COURT:  So these are the liens you're giving to

25    JPMorgan on assets that are collateral for the other lenders?

METRO-GOLDWYN-MAYER STUDIOS INC., et al.

```
 1    And is that what you mean by junior rank?

 2            MR. GOFFMAN:  Junior -- well, there's junior interest

 3    on other collateral or unencumbered collateral.  And both of

 4    the agents have agreed to these provisions.

 5            THE COURT:  Paragraph 11 on page 19, you say that "if

 6    an order dismissing these cases is entered, the order shall

 7    provide" and then it has certain things that it should provide.

 8    If a dismissal order is entered and it doesn't provide those

 9    things, what's the result?  It doesn't count?

10            MR. TUCHIN:  The debtor is in default

11            THE COURT:  I think the way you want to deal with it,

12    is to say that "no dismissal order shall effect these rights",

13    which you probably had in there at some point.

14            MR. TUCHIN:  That's fine.

15            MR. GOFFMAN:  Well will amend that, Judge.

16            THE COURT:  All right.  Paragraph 13, you're invoking

17    the protections of 363(m).  I'm not sure if this is a sale or

18    lease of properties but if you're going to do that, don't you

19    need a good faith finding in your findings?

20            MR. GOFFMAN:  Yes we do, Your Honor.

21            THE COURT:  So what's the offer of proof on good

22    faith?

23            MR. GOFFMAN:  Well, I think the proof is in the

24    declarations that have been filed by both Mr. Cooper and Mr.

25    Hendry as to the entire process we're going through to get to
```

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 08:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 51 of 65

Page 51

1    this point.  But we're happy to add finding on good faith.

2              THE COURT:  All right.  Subject to those changes, do

3    you have a specific finding of good faith in your --

4              MR. GOFFMAN:  We will add that --

5              THE COURT:  -- findings?

6              MR. GOFFMAN:  -- to the findings, Your Honor.

7              THE COURT:  With those changes, I'll approve the

8    cash -- the interim cash collateral order but what I want you

9    to do is when you send me a blackline copy --

10             MR. GOFFMAN:  Yes, Your Honor.

11             THE COURT:  -- and a clean copy, just to represent

12   that Mr. Peitzman consents to the changes or we'll have to have

13   another hearing, telephonic or in person.

14             MR. GOFFMAN:  We will make certain Mr. Peitzman --

15             THE COURT:  All right.

16             MR. GOFFMAN:  -- we've satisfied Mr. Peitzman's

17   concerns.

18             THE COURT:  And when do you want to have the final

19   hearing?

20             MR. GOFFMAN:  The final --

21             THE COURT:  No reason to come back in another week to

22   have another preliminary hearing.

23             MR. GOFFMAN:  No.  I mean, ideally, we're looking at

24   two hearings.  One next Friday to cover things that have to get

25   done quickly and then a final hearing for confirmation and

Page 52

1    anything else that needs to get wrapped up at that point.

2         THE COURT:  Do you want to the final hearing on the

3    financing at the time of confirmation?

4         MR. GOFFMAN:  I'm happy to do that.  Peter?

5         MR. PANTALEO:  That's fine, Your Honor.  Since it's

6    not a new money deal, that's fine.

7         THE COURT:  All right.  So let's just hold off on

8    setting a date for the final hearing for the time being.  Now,

9    the next cash collateral order.

10        (Pause)

11        MR. GOFFMAN:  Oh, I'm sorry, Your Honor.  Okay.  Let's

12   talk about the DDI.  Again, for DDI, we filed a motion to seek

13   to use their -- the DDI and UAPF cash collateral, subject to

14   limitations.  In substance, what we're providing to them is an

15   agreement to continue to pay in the ordinary course whatever

16   obligations there are under those agreements, whether they're

17   pre or post-petition.  As adequate protection for any

18   diminution of the value of their interest in the collateral,

19   again, we're proposing to honor our obligations under the

20   agreement.  And there's a bank account that's been set up at

21   JPMorgan Chase that will hold at least a half million dollars

22   as additional protection.  They're going to maintain their

23   liens in certain accounts they also have with JPMorgan.

24   Minimal amount of protection, Your Honor, we think -- and of

25   course, Your Honor, they're going to give the same

10-15774-smb   Doc 95   Filed 11/05/10   Entered 11/10/10 09:21:14   Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 53 of 65

Page 53

1   superpriority administrative expense to the extent that the

2   existing -- that the liens that are granted aren't sufficient.

3              Questions, Your Honor?

4              THE COURT:  Does anyone want to be heard in connection

5   with this application?  All right, just a couple of things.  On

6   page 2, in addition to the parties to disagreement stipulating

7   and agreeing to these things, I'm finding them.  And I can't

8   make these findings on the first day of the case.

9              MR. GOFFMAN:  We'll correct that, Your Honor.

10             THE COURT:  All right.  On the other hand, you have no

11  findings, that I saw in here, regarding immediate and

12  irreparable harm, the adequacy of notice or the good faith of

13  the cash collateral lenders.

14             MR. GOFFMAN:  We'll make sure that that gets added to

15  the finals.

16             THE COURT:  Okay and the notice provisions so the

17  evidence in support of this should be set forth.

18             MR. GOFFMAN:  The same issues, yes.

19             THE COURT:  Those are the only comments.

20             MR. GOFFMAN:  Very good.

21             THE COURT:  With those changes, again, send me a

22  blackline and a clean copy.  I don't know if Mr. Peitzman has

23  the same issue with these --

24             MR. GOFFMAN:  No.  I don't believe so, Your Honor.

25             THE COURT:  -- as the other ones.  All right.  Send it

10-15774-smb    Doc 95    Filed 11/05/10    Entered 11/10/10 09:21:14    Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 54 of 65

Page 54

1    to me with those changes and otherwise I'll approve it.  And

2    I'll schedule the final hearing for the confirmation hearing --

3    same day as the confirmation hearing.

4        MR. GOFFMAN:  Thank you.  Next, Your Honor, we move to

5    the motion to pay all pre-petition unsecured claims.  Again,

6    this is a pre-pack, fully consensual pre-pack where we've got

7    all the requisite votes.  Consistent with the Court's pre-pack

8    guidelines and consistent with the process adopted in almost

9    every pre-pack I know of, we intend to -- we would like

10   authority to pay or trade in -- and other ordinary general

11   unsecured claims info in the ordinary course.

12       THE COURT:  Now you have to show irreparable harm.

13   Those are the rules.

14       MR. GOFFMAN:  Well I believe that it -- let me try,

15   Your Honor.

16       THE COURT:  Okay.

17       MR. GOFFMAN:  I believe that --

18       THE COURT:  It is your burden of proof.

19       MR. GOFFMAN:  It is our burden.  I believe that if you

20   take a look at the affidavits of Mr. Cooper and Mr. Hendry,

21   both provide that if we're not able to pay our independent

22   contractors or employees or vendors and all of our other

23   licensors and others, we create a real difficulty for MGM.  All

24   we're seeking to hope to pay is 125 million dollars.

25       THE COURT:  Is that all?  Pretty soon you'll be

Page 55

1    talking about real money.

2            MR. GOFFMAN:  Pretty soon --

3            THE COURT:  I thought it was 145 million.

4            MR. GOFFMAN:  I thought it was 125 million.  According

5    to my notes, Your Honor, we're seeking authorization to pay the

6    aggregate amount of up to 125 million, subject to our right to

7    come back and seek additional authority.  If we don't pay these

8    in the ordinary course, we are concerned that many of these

9    parties will stop doing business with us.  We've already heard

10   from the guilds and the licensors and from other parties and

11   people want to know what's going to happen here today.  They

12   want to know that they're going to be paid in the ordinary

13   course.  They want to know that MGM's going to live up to its

14   obligations.  One of the things that happens on the pre-packs,

15   Judge -- the reason pre-packs have worked over the last twenty

16   years is there's a bond that's been developed between companies

17   that go through these restructurings and the unsecured creditor

18   community.

19           At the beginning it was very difficult to convince

20   those creditors that yes, you'll get paid in the ordinary

21   course, pursuant to a first day order.  But the process has

22   developed and the secured lenders who have voted in favor of

23   this plan, knowing and that they were dissenting to these

24   payments, recognize that absent making these payments in the

25   ordinary course, we're going to immediately have difficulty

METRO-GOLDWYN-MAYER STUDIOS INC., et al.

1    with vendors, with our licensors, with our employees, with all

2    of our trade, with the people that take care of our motion

3    picture materials, with the guilds, with the stars that we need

4    with motion pictures.  These are payments that need to be made.

5    Otherwise Your Honor, what you're going to find is that we're

6    going to take a fully consensual pre-packaged plan of

7    reorganization that's been fully voted on and consent -- and

8    the payments again here.  The payments were all identified.

9    This was identified in the plan of disclosure statement so when

10   the lenders almost unanimously voted in favor of this, they

11   demonstrated that they understood that absent making these

12   payments, we could have a real meltdown at MGM.  And I believe

13   that the affidavits of Mr. Cooper and Mr. Hendry support that

14   in terms of making a finding.

15             THE COURT:  I'll approve the application.  The Rule

16   6003 does require irreparable -- immediate and irreparable harm

17   and I think that would incur to the process -- the whole pre-

18   pack process, particularly in a case like this where it's

19   evident that these matters have been worked out and this a true

20   pre-pack as opposed to cases that came in -- tell me they're

21   going to be out in thirty days and three years later, they're

22   still here.  I'm confident that all the secured creditors will

23   be paid anyway in this case.  Indeed, all the creditors will be

24   paid except for the banks who are involved in the exchange.  So

25   I'll approve that application.

1            MR. GOFFMAN:  Thank you, Your Honor.  And with that

2      approval, we can then skip the next four motions.

3            THE COURT:  But next time, you better be ready to

4      answer that question.

5            MR. GOFFMAN:  Yes, Your Honor, absolutely.  With that,

6      we will skip the next four motions which were going to take the

7      various types --

8            THE COURT:  Okay.

9            MR. GOFFMAN:  -- of pre-petition claims by categories.

10     We're going to move on to the motion to determine adequate

11     assurance of future payment for the utilities.  Again, standard

12     utilities motion for a pre-pack.  It -- in the ordinary course

13     of our business --

14           THE COURT:  Why is this a first day motion?  Is this

15     the utilities motion?

16           MR. GOFFMAN:  Yes.

17           THE COURT:  You get a thirty-day stay.

18           MR. GOFFMAN:  Yes, Your Honor but we always -- in pre-

19     packs, we always do this on the first day because one of the

20     things you want to do, Judge, is set up a procedure.  So we

21     don't want to wake up on the thirtieth day, hoping -- when

22     we're hopefully confirming it and finding that utilities are --

23           THE COURT:  So why don't you just make a motion on

24     notice -- on ten days' notice or fourteen days' notice,

25     whatever the time is now.  Why is this a first -- in other

10-15774-smb   Doc 95   Filed 11/05/10   Entered 11/10/10 08:21:14   Main Document
METRO-GOLDWYN-MAYER STUDIOS INC., et al.
Pg 58 of 65

Page 58

1    words, this is like the monthly fee order.  This is not

2    something that has to be decided on the first day of the case.

3    You have seventeen other motions here that you're making.

4    There's no emergency.  You've got a thirty-day statutory stay.

5            MR. GOFFMAN:  Well, yes, Your Honor.  We have -- what

6    we didn't want to do, Your Honor was not -- if we don't have

7    this procedure in place -- because what it does is it puts a

8    procedure in place that says to the utilities here, we're

9    setting up this escrow.  We're going to put a month's worth of

10   all utility costs into escrow and that's your adequate

11   assurance.  But if you disagree, you have to come to us and you

12   have to identify --

13           THE COURT:  You can put the same procedure in place.

14   To the extent you can put in place on the first day, you can

15   put in place on the fourteenth day.  That's my only point.

16           MR. GOFFMAN:  If Your Honor would prefer that we do it

17   in that fashion, we're happy to do it that way.

18           THE COURT:  Do it on notice.

19           MR. GOFFMAN:  Absolutely, Your Honor.  And that just

20   brings us, Your Honor, to essentially, setting up hearings.  We

21   have a motion for an order shortening time to grant breakup

22   fees and expenses.  That's the investment agreement I referred

23   to earlier.  Your Honor, if we could, we'd like to do that --

24   we'd like to do all -- as many of these as we can next Friday

25   when we come back to court.

Page 59

```
 1          THE COURT:  Which was the one you said, for the plan
 2     modification motion, had to be decided sooner rather than
 3     later?
 4          MR. GOFFMAN:  We had a plan modification motion, the
 5     motion to pay the breakup fees and the lease and E&Y are the
 6     four motions we'd like to have heard next Friday.
 7          THE COURT:  When do you propose to have a confirmation
 8     hearing in the case and the hearing to approve the disclosure
 9     statement?
10          MR. GOFFMAN:  In about thirty days, Your Honor.
11          THE COURT:  Why don't we work backwards from here?
12        (Pause)
13          MR. GOFFMAN:  We follow -- today's the 4th so I
14     believe any --
15          THE COURT:  How about December 7th?
16          MR. GOFFMAN:  Is there -- for confirmation, is there
17     any way we can do the week before, Your Honor?
18          THE COURT:  We can do it the week before if you can
19     get notice out.  Do you want to do it the 2nd?
20          MR. GOFFMAN:  Well I'll be -- sure, Your Honor.  I'll
21     be here for another status conference with you, I think, that
22     afternoon on our other matter.
23          THE COURT:  Well then you don't even have to go back
24     to your office.
25          MR. GOFFMAN:  That will be perfect, Your Honor.  So if
```

Page 60

```
 1   we can get notice out very quickly, would you like to do

 2   Thursday the 2nd?

 3            THE COURT:  You don't have to get it out that quickly.

 4   If you want to do it on the 2nd, get the notice out.  That's

 5   fine.

 6            MR. GOFFMAN:  We will.

 7            THE COURT:  All right.

 8            MR. GOFFMAN:  In the morning, Your Honor or the

 9   afternoon?

10            THE COURT:  Let's do it at 11 -- no, you have that

11   other matter on in the afternoon.

12            MR. GOFFMAN:  Yeah.  I think we have it in the

13   afternoon.

14            THE COURT:  That should take a good -- you know, that

15   could take a lot of time.  So let's do it at 11:00, okay?

16            MR. GOFFMAN:  Very good, Your Honor.

17            THE COURT:  Let me just find that.

18       (Pause)

19            MR. GOFFMAN:  So if we can do this the 2nd at 11 for

20   confirmation, disclosure statement, adequacy and other

21   procedures?

22            THE COURT:  Right.  Are there any other motions aside

23   from the final hearings on cash collateral that can be done on

24   that day?

25            MR. GOFFMAN:  Retention.
```

Page 61

```
 1              THE COURT:  Okay.  You can just make those motions
 2     returnable on that day.
 3              MR. GOFFMAN:  That's fine, Your Honor.
 4              THE COURT:  Except for the E&Y retention.
 5              MR. GOFFMAN:  Except for the E&Y which we'd like to do
 6     next Friday with the others.
 7              THE COURT:  All right.  Why don't you submit an order
 8     scheduling that next Friday and get it down to me as soon as
 9     possible?
10              MR. GOFFMAN:  Very good.  And we can do all four of
11     those next Friday, Judge?
12              THE COURT:  Let me see, what else do we have?  Plan
13     modifications --
14              MR. GOFFMAN:  Plan modifications, breakup fees, E&Y
15     retention and the lease amendment.
16              THE COURT:  That's the space reduction motion?
17              MR. GOFFMAN:  That's correct, Your Honor.
18              THE COURT:  All right.  I'll put those on at 10:00
19     because I don't have anything else on those days.
20              MR. GOFFMAN:  Very good.
21              THE COURT:  All right.  Is there anything else?
22              MR. GOFFMAN:  No, Your Honor.  We appreciate your
23     time --
24              THE COURT:  Okay.
25              MR. GOFFMAN:  -- and courtesy and we look forward to a
```

Page 62

1    quick and successful pre-pack.

2              THE COURT:  Okay.  Thank you very much.

3              MR. GOFFMAN:  Thank you, Judge.

4         (Whereupon these proceedings were concluded at 12:10 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 63

1

2                          I N D E X

3

4                        R U L I N G S

5    DESCRIPTION                                PAGE    LINE

6    Debtors' motion for joint administration     32     20

7    granted

8    Motion granted for waiver of certain creditor  34     2

9    list filing requirements and consolidated

10   list authorized

11   Motion granted for additional time to file    34     20

12   schedules and statements of financial affairs

13   Motion to retain Donlin, Recano referred      35     7

14   to clerk

15   Motion to retain ordinary course professionals  36   20

16   approved with the Court's addition that future

17   retention of professional is by order of Court

18   Motion to continue certain banking and         38     13

19   business practices granted on interim basis

20   Debtors' motion seeking authority to continue  42     12

21   paying or performing various pre-petition

22   employee obligations granted

23   Debtors' motion authorizing use of cash        51     7

24   collateral granted on an interim basis

25

1

2                       I N D E X, cont'd

3

4                       R U L I N G S

5    DESCRIPTION                              PAGE     LINE

6    Debtors' motion for order authorizing      54       1

7    limited use of pre-petition collateral

8    for the DDI and UAPF cash collateral

9    approved pending modification

10   Debtors' motion to pay all pre-petition    56      15

11   unsecured claims granted

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 65

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  November 5, 2010

17

18

19

20

21

22

23

24

25