UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                             :

In re:                                               :        Chapter 11
                                                            :
METRO-GOLDWYN-MAYER STUDIOS INC.,   :        Case No. 10-15774 (SMB)
                                                            :
                   Reorganized Debtor.            :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM DECISION AND ORDER DENYING
REORGANIZED DEBTOR'S MOTION FOR AUTHORIZATION
TO ENTER INTO CERTAIN TRANSACTIONS**

**A P P E A R A N C E S:**

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036

        Glenn S. Walter, Esq.
        Jay M. Goffman, Esq.
        Rick C. Madden, Esq.
                Of Counsel

        --and--

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars
Thirty-Ninth Floor
Los Angeles, California 90067

        Kenneth N. Klee, Esq.
        Michael L. Tuchin, Esq.
        David A. Fidler, Esq.
                Of Counsel

*Counsel for the Reorganized Debtor*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Metro-Goldwyn-Mayer Studios Inc. ("MGM") has moved in this confirmed chapter 11 case for authority to enter into transactions by which it will purchase the debts of a wholly-owned subsidiary and secure the authority to release the debts owed by another subsidiary (the "Motion"). (*See Motion of Metro-Goldwyn-Mayer Studios Inc. for Order Approving Intercompany Transactions, Entry Into Purchase Agreements, and Related Release and Discharge Provisions in Further Implementation of the Plan*, dated September 1, 2011 ("*Motion*") (ECF Doc. # 260).) On the return date, the Court *sua sponte* questioned its post-confirmation subject matter jurisdiction, and gave MGM the opportunity to submit supplemental briefing on the issue. MGM filed its supplemental brief (the "Brief") on September 29, 2011. (*See Supplemental Brief in Support of Motion of Metro-Goldwyn-Mayer Studios Inc. for Order Approving Intercompany Transactions, Entry Into Purchase Agreements, and Related Release and Discharge Provisions in Further Implementation of the Plan*, dated September 29, 2011 ("*Brief*") (ECF Doc. # 269).) The Court now concludes that it lacks subject matter jurisdiction to grant the Motion.

## BACKGROUND

**A.    The New United Artists Venture**

Prior to the petition date, MGM owned a 62.5% stake in United Artists Entertainment, LLC ("United Artists Entertainment" and, together with its subsidiaries, "New United Artists"), non-debtors in the eventual chapter 11 cases. (*Motion* at ¶ 7.) New United Artists was formed "to develop and produce new theatrically released films under the New United Artists banner." (*Id.*) On or about August 16, 2007, several agreements were entered into to facilitate the venture. These agreements are lengthy and somewhat complex, and the description that now follows summarizes those provisions needed to explain this decision.

2

1.      **The Financing Agreements**

To provide financing for the venture, United Artists Entertainment's wholly-owned subsidiary, United Artists Production Finance, LLC ("United Artists Finance"), executed two independent financing agreements.  First, it entered into a senior credit facility in the amount of $250 million with certain lenders and JP Morgan Chase, N.A. Bank, as administrative agent.  (*Id.* at ¶ 8.)  The senior credit facility is referred to as the "Senior Debt," and the lenders are referred to as the "Senior Lenders."  Second, United Artists Finance entered into a note purchase and security agreement with the noteholder parties and Merrill Lynch Mortgage Capital Inc., as administrative agent, and sold promissory notes totaling $75 million. (*Id.* at ¶ 9.)  These are referred to as the "Mezzanine Notes," and the holders of those notes are referred to as the "Mezzanine Noteholders."  As of August 20, 2011, United Artists Finance owed approximately $57 million to the Senior Lenders and $112,000,000 to the Mezzanine Noteholders.  (*Id.* at ¶ 10.)

2.      **The Distribution Agreement**

United Artists Finance and MGM entered into a Master Distribution Agreement (the "Master Distribution Agreement") pursuant to which MGM agreed to serve as the exclusive distributor of pictures owned by New United Artists or that it otherwise had the right to distribute, market, and promote (the "Licensed Rights").  (*Id.* at ¶ 7.)  To secure MGM's performance of certain obligations under the Master Distribution Agreement, MGM granted United Artists Finance a security interest in all of MGM's right, title, and interest in and to certain collateral ("MGM Collateral"), including, but not limited to, the Licensed Rights and "any amounts receivable [by MGM] in connection with the distribution and exploitation of such Licensed Rights."  (*Brief* at ¶ 16 (internal quotations omitted).)  Additionally, MGM agreed "to

3

deposit a portion of the gross receipts received by [MGM] in connection with the exploitation of [the Licensed Rights] . . . into a reserve account (the 'Distributor Reserve Account')." (*Id.*) The funds in the Distributor Reserve Account were to be used to satisfy the Senior Debt, and after repayment of the Senior Debt in full, to satisfy the Mezzanine Notes. (*Id.*)

### 3. The Pledge Agreement

To secure United Artists Finance's obligations to the Senior Lenders, MGM entered into a Pledge Agreement (the "Pledge Agreement") that granted the Senior Lenders a perfected, first priority security interest in all MGM's interest in the Distributor Reserve Account and all proceeds that may arise therefrom. (*Id.* at ¶ 17.)

### 4. The Interparty Agreement

The agents for the Senior Lenders and the Mezzanine Noteholders, MGM and United Artists Finance entered into a Master Interparty Agreement (the "Interparty Agreement"). MGM acknowledged and consented to the grant by United Artists Finance to the agents for the Senior Lenders and the Mezzanine Noteholders of a security interest in all of United Artists Finance's rights under the Master Distribution Agreement. (*Id.* at ¶ 18.) In addition, MGM agreed to remit directly to the agents, as appropriate, its payment obligations to United Artists Finance under the Master Distribution Agreement. (*Id.*)

Read together, these various agreements granted the Senior Lenders and Mezzanine Noteholders security interests in the MGM Collateral. Accordingly, they held non-recourse secured claims against MGM as of the petition date. (*Id.* at ¶ 19.)

**B.    The Intercompany Claim**

Separate from the above, and as of August 20, 2011, United Artists Entertainment owed MGM approximately $122 million relating to advances under United Artists Entertainment's operating agreement. This obligation is referred to in the Motion as the "UA Intercompany Claim." (*Motion* at ¶ 11.)

**C.    The Bankruptcy Cases**

MGM and certain of its affiliates (collectively, the "Debtors") filed pre-packaged chapter 11 cases on November 3, 2010, and confirmed their Amended Joint Prepackaged Plan of Reorganization (the "Plan") on December 6, 2010. The Senior Debt and Mezzanine Noteholders were placed in Class 2 (Other Secured Claims). By virtue of the operation of Article 3.3 under the Plan, their claims were reinstated without prejudice to MGM's right to contest their validity. (*Brief* at ¶ 20 & n. 5; *see Plan*, Art. 3.3.)

The Plan went effective on December 20, 2010 (the "Effective Date"), and the property of the several estates vested in the respective reorganized Debtors at that time. (*Plan* at Art. 9.2 ("[O]n the Effective Date, all property comprising the Estates . . . shall revest in the Reorganized Debtors."); *see* 11 U.S.C. § 1141(b) ("Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.").) The Court entered a Final Decree closing the cases of MGM's affiliated debtors, but MGM's case remains open.

The Plan included two provisions that addressed the treatment of certain intercompany claims. First, the definition of "Intercompany Claims" was limited to claims between a debtor

and any other debtor or a non-debtor affiliate that was a wholly-owned subsidiary of a debtor.

Under the Plan, an "Intercompany Claims" referred to:

> (a) any account reflecting intercompany book entries by one Debtor with respect to any other Debtor or any non-Debtor affiliate that is a direct or indirect wholly owned subsidiary of a Debtor or (b) any Claim that is not reflected in such book entries and is held by a Debtor against any other Debtor or any non-Debtor affiliate that is a direct or indirect wholly owned subsidiary of a Debtor.

(*Plan* at Art. 1.44.)

Second, the Plan gave MGM the option, *inter alia*, to release net Intercompany Claims held as of the Effective Date. Specifically, the Plan provided:

> On the Effective Date, all net Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors or between one or more Debtors and any affiliate of one of the Debtors that is not itself a Debtor shall, at the election of Reorganized Holdings, be either (a) Reinstated, (b) released, waived, and discharged, or (c) contributed to, or dividended to, the capital of the obligor.

(*Plan* at Art. 3.4.)

As noted below, the New United Artists entities did not become direct or indirect wholly-owned subsidiaries of MGM until after the Effective Date. Consequently, the claims *inter se* were not Intercompany Claims under the Plan as of the Effective Date.

D. **The Post-Effective Date Transactions**

After the Effective Date, MGM purchased the remaining membership interests in United Artists Entertainment, (*Motion* at ¶ 12), and agreed to the proposed transactions that are the subject of the Motion. MGM will purchase the Senior Debt from the Senior Lenders (the "Senior Debt Assignment Agreement") for a purchase price of (i) $11 million less certain payments already made by United Artists Finance to the Senior Lenders, plus (ii) the balances of

certain accounts, including the Distributor Reserve Account, on the date of the Senior Debt Assignment Agreement, and (iii) United Artists Finance's share of the exploitation proceeds from the motion picture "Red Dawn." In addition, MGM will purchase the Mezzanine Notes from the Mezzanine Noteholders (the "Mezzanine Assignment Agreement," and together with the Senior Debt Assignment Agreement, the "Purchase Agreements")[1] for $15,000. (*See Motion* at ¶ 13.) The Purchase Agreements include mutual releases between MGM and United Artists Finance (and their respective guarantors) on the one hand, and the Senior Lenders and the Mezzanine Noteholders on the other (the "Purchase Agreements Releases"). (*See id.* at ¶¶ 16-17.)

**E.     The Motion**

By the Motion, MGM seeks the Court's authorization to enter into the Purchase Agreements. In addition, the Motion seeks authorization for MGM to enter into an agreement with United Artists Entertainment to release and discharge United Artists Entertainment from the UA Intercompany Claim (the "Studios Release"). (*See id.* at ¶ 18.) According to MGM, the consummation of the Purchase Agreements will provide operational and accounting benefits. First, the acquisition of the Senior Debt and Mezzanine Notes will allow MGM to enhance its rights under the Master Distribution Agreement by eliminating the rights of the Senior Lenders and the Mezzanine Noteholders to exercise remedies and foreclose on the underlying collateral. Foreclosure would render MGM's distribution rights worthless, and hence, acquisition of those debts will enable MGM to maximize value by continuing to exploit the films. Second, consummation of the Purchase Agreements will strengthen MGM's balance sheet because the

---

[1]   The Purchase Agreements are annexed as Exhibits D and E to the *Declaration of Scott Packman in Support of the [Motion]*, dated Sept. 1, 2011 (ECF Doc. # 261).

non-recourse obligations to the lenders are reflected on MGM's consolidated balance sheet, and the transaction will eliminate those obligations from the consolidated balance sheet.  Finally, consummation of the transactions will provide administrative convenience because MGM will no longer have to meet certain reporting requirements.  (*Id.* at ¶ 14.)

The Motion is driven purely by the perceived tax advantages of a Court order authorizing some or all or the proposed transactions.  (*See Motion* at ¶ 25.)  The transactions include several releases.  According to MGM, the cancellation of a debt may result in income ("COD Income") under the Internal Revenue Code, 26 U.S.C. § 61, unless the discharge occurs in a chapter 11 case, and the discharge of indebtedness is granted by the court or pursuant to a plan approved by the court.  (*Motion* at ¶ 24; *see* 26 U.S.C. § 108(d)(2).)  If the Court grants the Motion, MGM may be able to exclude the COD Income from its gross income under 26 U.S.C. § 108.  (*Id.* at ¶ 24.)  Without Court approval, MGM maintains that the tax consequences of entering into the Purchase Agreements and delivering the Studios Release "are likely too onerous to justify consummation of the [t]ransactions."  (*Motion* at ¶ 15.)

## DISCUSSION

As noted, the Court expressed its concern with the reach of its post-confirmation subject matter jurisdiction.  Under  28 U.S.C. § 1334(b), the district court has "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  The district court may refer its bankruptcy jurisdiction to the bankruptcy court, 28 U.S.C. § 157(a), and the United States District Court for the Southern District of New York referred its bankruptcy jurisdiction pursuant to General Order of Reference, signed July 10, 1984.  Proceedings that arise under title 11, or arise in a case under

title 11 correspond to the Court's "core" jurisdiction. *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987). Generally, a core proceeding is one that invokes a substantive right under title 11, or could only arise in the context of a bankruptcy case. *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 162-63 (3rd Cir. 2004); *Wood*, 825 F.2d at 97; *Liberty Mut. Ins. Co. v. Lone Star Indus., Inc.*, 313 B.R. 9, 16 (D. Conn. 2004). On the other hand, a proceeding is "related to" a case under title 11 if the outcome might have a "conceivable effect" on the estate. *Publicker Indus., Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992); *see Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995); *U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 304 (5th Cir. 2002); *Pacor, Inc. v. Higgins (In re Pacor, Inc.)*, 743 F.2d 984, 994 (3d Cir. 1984). "Related to" proceedings correspond to the Court's non-core jurisdiction. *Resorts Int'l*, 372 F.3d at 162; *see Wood*, 825 F.2d at 97.

Section 1334 does not expressly limit bankruptcy jurisdiction following plan confirmation. *U.S. Brass Corp.*, 301 F.3d at 304. Nevertheless, bankruptcy case law has long recognized that once confirmation occurs, the bankruptcy court's jurisdiction shrinks. *In re Kassover*, 448 B.R. 625, 632 (S.D.N.Y. 2011); *Ace Am. Ins. Co. v. DPH Holdings Corp. (In re DPH Holdings Corp.)*, 437 B.R. 88, 97 (S.D.N.Y. 2010); *Penthouse Media Group v. Guccione (In re General Media)*, 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005). Over sixty years ago, Second Circuit Judge Clark wrote:

> We have had occasion before to deplore the tendency of District Courts to keep reorganized concerns in tutelage indefinitely by orders purporting to retain jurisdiction for a variety of purposes, extending from complete supervision of the new business to modifications of detail in the reorganization. Since the purpose of reorganization clearly is to rehabilitate the business and start it off on a new and to-be-hoped-for more successful career, it should be the objective of courts to cast off as quickly as possible all leading strings which may limit and hamper its

>activities and throw doubt upon its responsibility. *It is not consonant with the purposes of the Act, or feasible as a judicial function, for the courts to assume to supervise a business somewhat indefinitely.*

*North Am. Car Corp. v. Peerless Weighing & Vending Mach. Corp.*, 143 F.2d 938, 940 (2d Cir. 1944) (emphasis added) (citations omitted). Judge Easterbrook has echoed the limits on post-bankruptcy jurisdiction under the current jurisdictional scheme: "[o]nce the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the protection of the bankruptcy court. Formerly a ward of the court, the debtor is emancipated by the plan of reorganization." *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991) (citations omitted).

Consequently, to invoke the bankruptcy court's post-confirmation jurisdiction a party must show that the plan provides for the retention of jurisdiction over the dispute, and the matter has a "close nexus to the bankruptcy plan or proceeding." *Allstate Ins. Co. v. Ace Secs. Corp.*, No. 11 Civ. 1914 (LBS), 2011 WL 3628852, at *4 (S.D.N.Y. Aug. 17, 2011); *Kassover*, 448 B.R. at 632-33; *DPH Holdings Corp.*, 437 B.R. at 97; *General Media*, 335 B.R. at 73-74. The "close nexus" inquiry insures that at that the post-confirmation stage, the matter before the court "affect[s] an integral aspect of the bankruptcy process." *Resort Intl.*, 372 F.3d at 167; *accord Valley Historic Limited Partnership v. Bank of New York*, 486 F.3d 831, 837 (4th Cir. 2007) (holding that the "close nexus" requirement "insures that the proceeding serves a bankruptcy administration purpose on the date that bankruptcy court exercises that jurisdiction"). The "close nexus" test is met "when a matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan or incorporated litigation trust agreement." *General Media*, 335 B.R. at 73 (quoting *Resorts Int'l*, 372 F.3d at 168-69). Where, however, the case has been fully administered and the resolution of the dispute will not affect the interests of

creditors, a bankruptcy court may decline to exercise post-confirmation jurisdiction. *Kassover*, 448 B.R. at 632-33; *General Media*, 335 B.R. at 75.[2]

The Motion does not refer to section 1334, and states only that the Court has jurisdiction under Article 10.1(c) and (o) of the Plan and the Confirmation Order. (*Motion* at ¶ 1.) Article 10.1(c) retained jurisdiction to "enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan," and Article 10.1(o) retained jurisdiction to "hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code . . . ." (*Plan* at Art. 10.1(c) & (o).) The MGM Brief also invokes Article 10(h), (*Brief* at ¶ 23), which retains jurisdiction to "adjudicate controversies arising out of the administration of the Estates or the implementation of [the] Plan." (*Plan* at Art. 3.3(h).)

These provisions parrot the general parameters of the "close nexus" test, which MGM attempted to address for the first time in its Brief. According to MGM, the Motion presses two forms of relief that have separate jurisdictional bases. First, MGM seeks to resolve a disputed claim, to wit, the extent and validity of the liens securing the Senior Debt and Mezzanine Notes,

---

[2]     MGM cites *Baker v. Simpson*, 613 F.3d 346 (2d Cir. 2010), *cert. denied*, 131 U.S. 928 (2011), for the proposition that the bankruptcy court retains post-confirmation jurisdiction over core matters. (*Brief* at ¶ 3.) In *Baker*, the Second Circuit ruled that the debtor's malpractice claims against his chapter 11 counsel arose in the bankruptcy case, were therefore core, and were not subject to mandatory abstention. *Id.* at 351. Furthermore, the "disposal" of the debtor's estate did not preclude the bankruptcy court from exercising core jurisdiction over the malpractice claim because "a bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders." *Id.* at 352 (internal quotation marks and citations omitted). In *Baker*, the bankruptcy court had approved the retention of the debtor's counsel, and "it is clear to us that the bankruptcy court has the ability to review the conduct of attorneys, such as appellee Simpson, who are appointed by the court to aid a person in need of counsel in a proceeding pursuant to Title 11." *Id.* at 351.

The transactions involved in the Motion did not arise in MGM's chapter 11 case; they were entered into after the Effective Date. Furthermore, they do not require the Court to interpret the Confirmation Order or any other order entered in the case. Accordingly, *Baker* is not apposite.

and to settle the disputed value of the collateral through the execution of the Purchase Agreements. (*See Brief* at ¶¶ 7, 13, 20, 21.) Second, MGM contends that the definition of Intercompany Claim under the Plan is ambiguous, and must be interpreted by the Court. In particular, the definition does not reference a specific date, and MGM argues that the claims being released under the Purchase Agreements and the Studios Release are covered by the definition. (*See id.*at ¶¶ 6, 24.)

While the satisfaction of a disputed secured claim may qualify as a settlement, the Motion did not make this argument, and in fact, the Purchase Agreements do not reflect the settlement of a disputed claim.[3] Rather, MGM is taking an assignment of the debts that its affiliate, United Artists Finance, owes to two groups of lenders. Each Purchase Agreement provides, *inter alia*, that MGM will purchase and assume all of Assignors' rights and obligations under relevant financing documents, (¶ 1), perform the lenders' obligations under their respective lending agreements, (¶ 3), become a party to and be bound by the those documents (¶ 5) and have the right to receive all payments in respect of the assigned interests including payments of principal, interest fees and other amounts. (¶ 6.) Buying the debts may make good business

---

[3] In any event, MGM has not explained why the Court has post-confirmation jurisdiction to approve the settlement of this disputed claim. The Plan does not expressly retain jurisdiction to approve settlements. While the provisions cited by MGM are broad enough to encompass a settlement application, the Plan states that after the Effective Date, the Reorganized Debtors may "settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order." (*Plan* at ¶ 9.2.) Hence, MGM plainly contemplated that it could and would settle disputes without this Court's approval, and this undoubtedly explains the Plan's silence concerning the retention of jurisdiction.

In addition to the jurisdictional obstacle, MGM failed to sustain its burden of showing that the settlement was reasonable. *See Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (holding that the bankruptcy court has a duty to make an independent, informed judgment as to whether a proposed compromise is fair and equitable); *accord* In re Iridium Operating LLC, 478 F.3d 452, 462 (2d Cir. 2007). MGM did not identify the nature or extent of the dispute regarding the value of the MGM Collateral, what part of the consideration to be paid by MGM under the Purchase Agreements related to the resolution of the dispute as opposed to the acquisition of the assignors' rights, or discuss any of the other factors that a court must consider when asked to approve a settlement.

sense for the reasons MGM stated, but the "close nexus" test demands more, and the proposed transactions have nothing to do with the Plan, its interpretation or its implementation. They are post-Effective Date business transactions, like the decision to buy up the rest of the equity in United Artists Entertainment, a decision that MGM did not ask the Court to authorize.

The contemplated Studios Release suffers from an additional problem. The Brief argues that the definition of Intercompany Claim under the Plan is ambiguous, and the Studios Release will resolve the ambiguity by effectuating the discharge of Intercompany Claims under the Plan.[4] This branch of the Motion implicitly seeks an advisory opinion that Intercompany Claims include claims between MGM and entities that became wholly-owned subsidiaries after the Effective Date. Initially, MGM does not need Court authorization to release its claims against United Artists Entertainment any more than it needed Court authorization to buy the remaining equity in United Artists Entertainment after the Effective Date. Furthermore, no one is arguing that MGM needs this Court's approval to avoid the tax consequences it fears. If the taxing authorities agree with MGM's interpretation that the UA Intercompany Claim has been released under the terms of the Plan, there will never be a case or controversy. On the other hand, if the taxing authorities dispute this interpretation and charge MGM with COD Income, an actual dispute will exist regarding the interpretation of Intercompany Claims under the Plan, and can be

---

[4] The Motion seems to make the same argument with respect to the Purchase Agreements Releases. (*See Motion* at ¶¶ 21-22.) The Purchase Agreements Releases do not, however, implicate the Plan's definition of Intercompany Claims because MGM and United Artists Finance are exchanging mutual releases with non-affiliated lenders; they are not releasing each other.

resolved by the appropriate court after hearing from both sides to that dispute.

    Accordingly, the Motion is denied.

    So ordered.

Dated: New York, New York
       November 7, 2011

                                      /s/ *Stuart M. Bernstein*
                                      STUART M. BERNSTEIN
                                      United States Bankruptcy Judge